RON BENDER (SBN 143364)
PHILIP A. GASTEIER (SBN 130043)
MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbyb.com; pag@lnbyb.com;
myk@lnbyb.com; kjm@lnbyb.com

Proposed Attorneys for Chapter 11 Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>RDIO, INC.,<br><br>                    Debtor. | Case No. 15-31430<br><br>Chapter 11<br><br>**DEBTOR'S EMERGENCY MOTION FOR, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF, ENTRY OF INTERIM AND FINAL ORDERS:**<br><br>**(I)   AUTHORIZING DEBTOR TO (A) OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c), 364(d)(1) AND 364(e), AND (B) UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363;**<br>**(II)  GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED LENDERS PURSUANT TO 11 U.S.C. §§ 361, 362, 363, 364, and 507;**<br>**(III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND 4001(c); AND**<br>**(IV) GRANTING RELATED RELIEF**<br><br>DATE:     November 18, 2015<br>TIME:     10:00 a.m.<br>PLACE:  U.S. Bankruptcy Court<br>              235 Pine Street, 19th Floor, Courtroom 22<br>              San Francisco, CA 94104<br>JUDGE:  The Hon. Dennis Montali |

Rdio, Inc., a Delaware corporation, debtor and debtor in possession in the above-captioned chapter 11 bankruptcy case ("Debtor"), hereby files its emergency motion ("Motion"), and Memorandum of Points and Authorities in support of its Motion, pursuant to Sections 105(a), 361, 362, 363, 364, and 507 of chapter 11 of title 11 of the United States Code §§ 101, et seq. ("Bankruptcy Code"),[1] for the entry of interim and final orders (respectively, "Interim Order" and "Final Order," and, collectively, "Financing Orders") authorizing the Debtor to use Cash Collateral and obtain Post-Petition Financing. The Motion, which is uncontested, is brought pursuant to B.L.R. 9029-1, and Federal Rules of Bankruptcy Procedure ("FRBP") 4001(b) and 4001(c). In support of its Motion, the Debtor respectfully represents as follows.

## CASH COLLATERAL AND POST-PETITION FINANCING

## INTRODUCTORY STATEMENT

The Debtor seeks immediate Court authority to use Cash Collateral and obtain Post-Petition Financing in order to avoid a shutdown of its business and remain operational until it can consummate a sale and liquidation ("Sale") of certain of its assets to its stalking horse buyer or a successful overbidder. The Sale is targeted to close by December 31, 2015.

By way of summary, the Debtor has two secured creditors, Pulser Media, Inc. ("Pulser Media") and Iconical Investments II LP ("Iconical II" and with Pulser Media, collectively "Prepetition Secured Parties"), with blanket security interests and liens upon all of its property and assets. These Prepetition Secured Parties have consented to the Debtor's use of Cash Collateral during through and including June 30, 2016 (a period sufficient to complete the Sale process and then confirm a chapter 11 plan), on the terms set forth in this Motion and the DIP Documents (including the Budget) (each as defined and described below). These Prepetition Secured Parties shall be granted adequate protection for, and in equal amount to, the diminution in value of their valid, perfected, enforceable, continuing and non-avoidable prepetition security interests in the form of super-priority claims and replacement liens on all property and assets of the Debtor ("Adequate Protection Liens"). The priority of the Adequate Protection Liens vis a

---

[1] Unless otherwise stated, all Section references herein are to the Bankruptcy Code.

vis other liens, including, without limitation, liens granted in connection with the Post-Petition Financing is detailed in the DIP Term Sheet (as defined and described below). In addition, these Prepetition Secured Parties shall be entitled to the payment of post-petition interest, and reasonable and documented fees and expenses incurred in connection with the Debtor's Chapter 11 case, which fees and expenses shall be paid on the closing date of the Sale.

As demonstrated by the Budget, the Cash Collateral of the Prepetition Secured Parties is not sufficient for the Debtor to meet all of its operating expenses through the close of a Sale. Fortunately for the Debtor, Iconical II, one of the Prepetition Secured Parties, has agreed to provide Post-Petition Financing pursuant to the terms of the "***Term Sheet for Debtor-in-Possession Credit Facility***" ("DIP Term Sheet"), a true and correct copy of which is attached as **Exhibit "A"** to the Declaration of Elliott Peters ("Peters Declaration") filed herewith.

Pursuant to the DIP Term Sheet, the Debtor is required to obtain the Interim Order by not later than November 20, 2015, and to obtain the Final Order by not later than December 16, 2015, which authorize the Debtor to obtain a post-petition, super-priority debtor-in-possession term loan in the aggregate principal amount not to exceed $3,000,000, plus all capitalized interest thereon at the non-default Base Rate[2] of 8% per annum (or default rate of 10% per annum), plus all capitalized fees and expenses, on a senior secured, super-priority basis ("DIP Facility"), pursuant to Sections 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1), and on the terms and conditions of the DIP Term Sheet, secured automatically by all property and assets of the Debtor.

Under the terms of the DIP Term Sheet, $1.8 million of the DIP Facility will be advanced to the Debtor upon satisfaction of certain conditions precedent to the initial funding, including, but not limited to, the Court's entry of the Interim Order that is acceptable to Iconical II and the Prepetition Secured Parties and each of their counsel in each of their sole discretion, and so long as the Interim Order is in full force and effect and shall not have been reversed, stayed, modified, or amended without the express written consent of Iconical II and the Prepetition Secured

---

[2] All capitalized terms used herein which are not otherwise defined shall have the meanings given in the DIP Term Sheet.

Parties, and no application or motion shall have been made for any stay, modification or amendment of the Interim Order and no stay, appeal or leave to appeal shall be pending. The remaining $1.2 million of the DIP Facility shall be advanced to the Debtor upon satisfaction of certain conditions precedent to the final funding, including, but not limited to, the Court's entry of the Final Order that is acceptable to Iconical II and the Prepetition Secured Parties and each of their counsel in each of their sole discretion, and so long as the Final Order is in full force and effect and shall not have been reversed, stayed, modified, or amended without the express written consent of Iconical II and the Prepetition Secured Parties, and no application or motion shall have been made for any stay, modification or amendment to the Final Order, and no stay, appeal or leave to appeal shall be pending.

By the Motion, the Debtor seeks immediate Court authority to enter into and deliver the DIP Term Sheet and all other related documents and agreements, including security agreements, deposit account control agreements, pledge agreements, guaranties and promissory notes (collectively, "DIP Documents"), and Court approval of all of the terms and conditions of the DIP Term Sheet, including, without limitation, the following salient provisions relating to security, priority and liens, budget, carve-out, adequate protection, maturity, repayment of the DIP Facility, releases, stipulations and admissions, "surcharges" against collateral, and relief from the automatic stay. The form of the proposed Interim Order approved by Iconical II is attached as **Exhibit "2"** to the Peters Declaration. As reflected in the form of the Interim Order submitted to the Court, Iconical II requires that all of the provisions contained in the DIP Term Sheet be approved on an interim basis, except as expressly excluded below or in the DIP Term Sheet as a term which is effective only upon the entry of the Final Order:

*(a)* ***Security; Priority and Liens***. The DIP Facility shall be **(i)** pursuant to Section 364(c)(1), entitled to super-priority administrative expense priority status; **(ii)** pursuant to Section 364(c)(2), secured by a perfected first-priority lien on all unencumbered "DIP Collateral" (which definition includes all assets and property of the Debtor and its estate, including Avoidance Actions, provided, however, that Iconical II's receipt of a perfected security interest in and lien on Avoidance Actions shall be effective only upon the entry of a Final Order; please refer to the

definition in the DIP Term Sheet for the full terms of such definition); **(iii)** pursuant to Section 364(c)(3), secured by a perfected junior lien on all property and assets of the Debtor that are subject to valid, enforceable, and non-avoidable liens in existence on the Petition Date, which liens are permitted under the Prepetition Financing Documents (as defined below, in Section I.D.), senior to the liens securing the Prepetition Financing Documents, and either perfected as of the Petition Date or subsequently perfected pursuant to Section 546(b) (collectively, "Permitted Senior Liens"); **(iv)** pursuant to Section 364(d)(1), secured by a first-priority senior priming lien on the DIP Collateral ("Priming Lien") that is senior to and primes the liens securing the Prepetition Financing Documents and all liens junior thereto, and any adequate protection liens granted (y) to the Prepetition Secured Parties post-petition in respect of the obligations under any Prepetition Financing Documents, and (z) in respect of any liens junior to the liens securing the obligations under any Prepetition Financing Documents, and **(v)** subordinate only to Permitted Senior Liens (and adequate protection liens granted to the holders thereof on the collateral securing the same, if any) and the Carve-Out. The grant of the valid, enforceable, non-avoidable and fully perfected security interests and liens upon all of the DIP Collateral pursuant to Sections 364(c)(2), 364(c)(3) and 364(d)(1) as set forth in the DIP Term Sheet shall be referred to herein as the "DIP Liens." By execution of the DIP Term Sheet, Pulser Media, which is the only other creditor which asserts liens upon the DIP Collateral, has acknowledged and agreed to the priming of its pre-petition liens and the use of cash collateral.

(b) *Budget*. The proceeds of the DIP Facility shall be used by the Debtor solely to (i) fund the Debtor's operations, (ii) to conduct and pursue the Sale as set forth in the order approving the proposed bidding procedures[3], (iii) pay all fees owing to the Court and the United States Trustee, and (iv) pay all expenses to third party vendors for photocopying, postage and mailings, in the case of clauses (i) through (iv), as set forth in and in accordance with the budget approved by the DIP Lender and the Prepetition Secured Parties in each of their sole discretion (the "Budget") attached as **Exhibit "3"** to the Peters Declaration, subject to the Permitted

---

[3] Concurrently herewith, the Debtor has filed its emergency motion seeking the entry of an order approving bidding procedures relating to the sale of its assets to Pandora Media, Inc. or to a successful overbidder.

Variance (as defined below). The Budget may be modified only with the written consent of Iconical II and the Prepetition Secured Parties in each of their sole discretion and without further order of the Court. At any given time, the Debtor's actual cash disbursements may deviate from the Budget by 15% on a line item basis without any further approval of Iconical II or the Prepetition Secured Parties; provided that there shall be no deviation from the Budget on a cumulative basis (the "Permitted Variance"). After the first month of the case, the Debtor is required to provide weekly and cumulative variance reporting on a line by line basis as more fully set forth in the DIP Term Sheet.

(c) **_Budgeted Professional Fees_**. The professional fees included in the Budget relate to the fees and expenses expected to be incurred by Moelis & Company (as the Debtor's investment banker) and Levene, Neale, Bender, Yoo & Brill L.L.P. ("LNBYB") (as the Debtor's bankruptcy counsel), during the affected period. The Debtor has agreed to make, on a weekly basis, payments which have been allocated in the Budget for professional fees expenses. These weekly professional fee payments will be held by LNBYB in a segregated trust account, with no funds to be released to any professional absent a further Court order. Iconical II and the Prepetition Secured Parties have consented to this arrangement.

(d) **_Carve-Out_**. The DIP Liens on the DIP Collateral, as well as the super-priority claim status granted to Iconical II pursuant to Section 364(c)(1), shall be subordinate to the "Carve-Out" which means:

(i) with respect to the period prior to the closing of the Sale: (a) all unpaid fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code, (b) all reasonable fees and expenses incurred by a trustee under Section 726(b) of the Bankruptcy Code not to exceed $25,000, (c) after the occurrence and during the continuance of a Carve-Out Event, unpaid professional fees and disbursements incurred by the Debtor and any statutory committee appointed in the Chapter 11 case (the "Committee"), that are in compliance with the Budget, in an aggregate amount not to exceed $500,000 less fees paid to professionals during the pendency of the Chapter 11 Case until the closing of the Sale (which amount may be used subject to the terms of the DIP Term

Sheet, the Interim Order and the Budget and shall be supported by back-up documentation in respect of the amounts and dates of incurrence of such fees and disbursements), in each of the foregoing clauses (a), (b) and (c), to the extent allowed by the Court at any time; *provided, however,* that nothing herein shall be construed to impair the ability of any party-in-interest in the Chapter 11 Case to object to any of the fees, expenses, reimbursement or compensation described in clause (c) above.

          ***(ii)***    with respect to the period <u>after</u> the closing of the Sale and payment in full in cash of the DIP Obligations: (a) amounts due to employees of the Debtor pursuant to the Bonus Agreements (as such term is defined and described in the Debtor's Emergency Motion for Authority to Honor Pre-Petition Cash Bonus Incentive Agreements filed concurrently with the Motion), *provided* that the Prepetition First Lien Secured Parties have countersigned such Bonus Agreement to indicate the Prepetition First Lien Secured Parties' consent to such carve-out, (b) all unpaid fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code, (c) all reasonable fees and expenses incurred by a trustee under Section 726(b) of the Bankruptcy Code not to exceed $25,000, (d) after the occurrence and during the continuance of Carve-Out Event, all allowed and unpaid professional fees and disbursements incurred by the Debtor and the Committee, that are in compliance with the Budget, in an aggregate amount not to exceed $200,000 in the aggregate for the Debtor and $100,000 in the aggregate for the Committee, which amounts may be used subject to the terms of this Term Sheet, the Interim DIP Order, and the Budget, and (e) all allowed and unpaid professional fees and disbursements (regardless of when such fees and disbursements become allowed by order of the Court) incurred or accrued by the Debtor and the Committee at any time when no Carve-Out Event is continuing, that remain unpaid subsequent to a Carve-Out Event, in an aggregate amount not exceeding such unpaid professional fees and disbursements reflected on the most recent Budget delivered to and approved by the Prepetition Secured Parties prior to any Carve-Out Event that is then continuing, to be supported by back-up documentation in respect of the amounts and dates of incurrence of such fees and disbursements), in each of the foregoing clauses (a), (b), (c), (d), and (e), to the extent allowed by

the Court at any time; *provided*, *however,* that nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement or compensation described in clauses (c), (d) and (e) above.

*(e)* ***Maturity***.  Unless accelerated by an Event of Default, the DIP Facility shall be paid in full in cash on the date (the "Maturity Date") which is the earliest of (a) January 15, 2016; (b) the effective date of a plan of reorganization or liquidation for the Debtor; (c) the consummation of the Sale or sale(s) of all or substantially all of the assets of the Debtor; (d) the occurrence of an Event of Default; (e) the entry of an order by the Court approving an alternative debtor-in-possession facility; and (f) such later date as Iconical II in its sole discretion may agree to in writing with the Debtor.  The Maturity Date shall be accelerated upon the occurrence of an Event of Default, subject to the Default Notice Period.

*(f)* ***Mandatory Payments***.  The proceeds from any asset sales (other than sales in the ordinary course of business) shall be applied in the following order: (i) to pay or fund a restricted account maintained by counsel for the Debtor in the amount of (x) all allowed and unpaid professional fees and disbursements (regardless of when such fees and disbursements become allowed by order of the Court, with an estimate to be agreed upon by the parties or as ordered by the Court if such fees and disbursements have not yet been allowed by the Court) incurred or accrued by the Debtor and the Committee at any time on or prior to the date of the closing of the sale in an aggregate amount not exceeding such unpaid professional fees and disbursements reflected on the Budget plus (y) allowed and accrued administrative expenses of the types included in the Carve Out; (ii) to pay the fees and expenses of Iconical II and the Prepetition Secured Parties; (iii) to pay any interest with respect to the principal amount of the DIP Loans being repaid which has accrued but is not yet due and payable; and (iv) to pay the principal amount of DIP Loans.

*(g)* ***Releases***.  Upon the entry of the Final Order, the Debtor provides a general release of all claims, known or unknown, in favor of Iconical II and the Prepetition Secured Parties, which release shall be binding on any committee and other parties-in-interest following the expiration of the Challenge period.

**(h)** **_Debtor's Stipulations._** Pursuant to the Financing Orders, the Debtor stipulates to the validity and enforceability of the claims and liens of the Prepetition Secured Parties. In particular, the Debtor admits, stipulates and agrees that the Rdio Note and the Pulser Note (each as defined below) represent legal, valid, and binding obligations of the Debtor, enforceable in accordance with their terms and that the obligations thereunder are secured by valid, binding, enforceable and perfected security interests and liens on substantially all assets of the Debtor, which liens are not subject to avoidance, recharacterization, recovery, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law. The Interim Order and the Final Order provide that these admissions, stipulations and agreements will be binding on the Debtor's estate and all parties in interest, including, without limitation, any Committee, unless any Committee or another party in interest (other than any of the Debtor), in each case with standing and requisite authority, has timely commenced a "challenge" relating to such liens and claims, or otherwise asserting any objections, claims, or causes of action on behalf of the Debtor's estate, on or before the thirtieth (30th) calendar day after the date of entry of the Interim Order.

**(i)** **_Section 506(c) Waiver_**. Subject to entry of the Final Order, the Debtor waives its right to "surcharge" the collateral of the Prepetition Secured Parties under section 506(c) of the Bankruptcy Code.

**(j)** **_Provisions Regarding Automatic Stay_**. The proposed Interim Order and Final Order grants the DIP Lender and the Prepetition Secured Parties prospective relief from the automatic stay under section 362 of the Bankruptcy to the extent necessary to exercise remedies against the Collateral following a DIP Termination Event or Cash Collateral Termination Event, as applicable. The Prepetition Secured Parties must provide five business days' notice to the Debtors, any Committee, and the U.S. Trustee before exercising such remedies. During this "Default Notice Period", the Debtor or other parties in interest may seek a determination from the Court on an emergency basis that no DIP Termination Event or Cash Collateral Termination Event has occurred.

     **(k)**     ***Expenses and Indemnification***.     Iconical II (and its present and former predecessors, successors, assigns, affiliates, members, partners, managers, current and former equity holders, officers, agents, employees, attorneys and affiliates) will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities, or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court to arise from the gross negligence or willful misconduct of the relevant indemnified person.

     In addition to the foregoing, the Debtor requests that the Financing Orders include provisions instructing and enjoining any banking or other financial institution at which the Debtor maintained any accounts not to freeze or close such accounts in order to allow for the Debtor to access its Cash Collateral or proceeds of the DIP Facility to stay in business until the Debtor has had a reasonable opportunity to establish in a timely manner debtor-in-possession accounts.

## CERTIFICATION

     The undersigned Certifying Professional has read the accompanying motion and the Cash Collateral – Post Petition Financing Introductory Statement; to the best of my knowledge, information and belief, formed after reasonable inquiry, the terms of the relief sought in the motion are in conformity with the Court's Guidelines For Cash Collateral And Financing Motions and Stipulations except as set forth above.  I understand and have advised the debtor in possession that the court may grant appropriate relief under [14] if the court determines that a material element of the motion was not adequately disclosed in the Introductory Statement.

     WHEREFORE, the Debtor respectfully requests that the Court:

     (1)     Grant the Motion as requested herein, and enter the Financing Orders.

     (2)     Find that adequate notice of the Motion has been provided.

     (3)     Find that Iconical II and the Prepetition Secured Parties have acted in good faith in connection with the DIP Term Sheet.

     (4)     Schedule a final hearing (the "Final Hearing") to consider the relief requested in the Motion.

1         (5)    Waive any applicable stay, including under Federal Rules of Bankruptcy

2    Procedure 4001(b) and (c) and providing for the immediate effectiveness of the Interim Order.

3         (6)    Granting related relief.

4

5    Dated:  November 16, 2015          RDIO, INC.,

6                              By:    */s/ Ron Bender*

7                                 RON BENDER
                                  PHILIP A. GASTEIER

8                                 MONICA Y. KIM

9                                 KRIKOR J. MESHEFEJIAN
                                  LEVENE, NEALE, BENDER, YOO

10                                & BRILL L.L.P.
                                  Proposed Attorneys for Debtor and

11                                Debtor in Possession

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# MEMORANDUM OF POINTS AND AUTHORITIES

In support of its Motion, the Debtor respectfully represents as follows.[4]

## I.

## STATEMENT OF FACTS

**A.    Background**

1.    The Debtor filed a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on November 16, 2015 (the "Petition Date").   The Debtor continues to operate its business, manage its financial affairs and administer its bankruptcy estate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

**B.    The Debtor's Business, Assets and Liabilities**

2.    The Debtor was founded in 2008 as a digital music service.   The Debtor's business operations were launched in 2010 after the Debtor secured requisite licenses from the applicable holders of music rights.   Since that time, the Debtor has strived to grow into a world-wide music service and today is in 86 countries.

3.    One of the primary services provided by the Debtor is an unlimited, on demand music streaming service where for $9.99 per month, the user has access to an entire library of songs with access to them through a computer, mobile device, etc.   In other words, the Debtor's business model is based upon a monthly recurring subscription for full access to content rather than on an owned a la carte download model.   The Debtor also makes available other subscription tiers at lower costs per month with varying service offerings or functionality (e.g., a family tier, a student tier, and a select tier with alternative functionality).   The Debtor generates approximately $1.5 million of U.S. monthly revenue from its monthly subscription service.

4.    While the Debtor's monthly subscription service provides the Debtor with its primary revenue source, the Debtor also generates approximately $100,000-$150,000 of monthly revenue from advertisers who advertise in the Debtor's advertising based service offerings.   The Debtor therefore currently generates approximately $1.6-$1.65 million of total monthly revenue.

---

[4] All capitalized terms herein have the same meanings as stated in the Motion unless otherwise stated.

5. The Debtor's primary assets consist of the Debtor's (i) owned technology (e.g., website-mobile apps, content ingestion technology, reporting technology, software, data bases, etc.), (ii) content license agreements, (iii) subscribers, (iv) employee talent pool, and (v) good will.

6. Under its current operating business model, the Debtor has monthly operating expenses of approximately $3.5-$4.0 million, comprising primarily payroll for the Debtor's approximately U.S. 140 employees (much of which represents costs of retaining high caliber Silicon Valley engineering talent), payment to the owners of music rights, costs of maintaining the service, rent, marketing costs, business development costs, technology maintenance costs, and foreign administrative expenses). With average monthly total revenue of approximately $1.6-$1.65 million and average monthly operating expenses of $3.5-$4.0 million, the Debtor's business operations under its current operating business model result in operating losses of approximately $1.85-$2.4 million per month, and the Debtor no longer has the economic means of funding such significant operating cash flow shortfall.

7. The Debtor has approximately $190,237,000 of secured debt and approximately $30,000,000 of unsecured debt. A material portion of the secured debt, in the estimated amount of $186,024,000, is owed to Pulser Media, which is the majority owner of the Debtor (owning approximately 79% of the Debtor's equity interests). The remaining portion of the secured debt, in the estimated amount of $4,213,467 concerning the Debtor's prepetition secured debt is set forth in the Debtor's emergency motion for use of cash collateral and approval of debtor-in-possession financing.

**C.      The Proposed Asset Sale**

8. Pulser Media employed a highly qualified investment bank in Moelis & Company ("Moelis") in the fall of 2014, initially with the goal of attempting to raise new equity capital. Despite extensive efforts by Moelis, it ultimately became clear that raising new equity capital was not going to be possible. At that point, Pulser Media charged Moelis with finding either substantial outside investment or a buyer or merger partner because the Debtor was not going to be able to continue to fund its significant operating losses indefinitely.

9.      After conducting an extremely broad marketing process, the highest and best offer received by the Debtor was an all cash asset purchase offer from Pandora Media, Inc. ("Pandora") in the amount of $75 million, plus certain other consideration, to acquire the Debtor's technological assets.    Based on its due diligence, by the time of the execution of the LOI, Pandora had decided that it would only proceed with a transaction if that transaction were conducted as part of a Chapter 11 filing and a purchase pursuant to a sale under the Bankruptcy Code.   Pandora has agreed that the Debtor can and should market Pandora's offer for overbid to insure that the highest and best price is paid for the Debtor's assets/business.   The Debtor retained Moelis for the purpose of marketing the Debtor's assets/business for overbid and to assist the Debtor to conduct an auction process in the event of any successful overbids – recognizing that the Debtor has only a limited amount of time available to it to consummate a sale (both because the Debtor does not have the financial means with which to continue to fund its operating losses on any long-term basis and because of the vulnerability to the Debtor's business, particularly with regard to its employee talent, from the business uncertainty created by the Debtor's bankruptcy filing).

10.      Pandora has conditioned its offer on the Debtor obtaining an entered order of the Court by December 1, 2015 approving bid procedures for any overbid, and the Debtor obtaining an entered order of the Court by December 31, 2015 approving of the Debtor's proposed asset sale to Pandora.  The Debtor has been assured by Moelis that this is a reasonable amount of time for Moelis to conduct an overbid process, particularly given the breadth of Moelis' pre-bankruptcy marketing process and Moelis' in-depth knowledge of this industry and marketplace and prospective overbidders, to insure that the highest and best price is obtained from the sale of the Debtor's assets/business.

**D.      The Debtor's Secured Debts to Pulser Media and Iconical II**

11.      Pursuant to that certain Third Amended and Restated Secured Promissory Note, dated as of July 10, 2015 (as amended, restated, supplemented or otherwise modified, the "Pulser Note"), Pulser Media, as lender, agreed to advance up to the maximum aggregate principal amount of $208,000,000 to the Debtor, as borrower.  A true and correct copy of the Pulser Note

is attached as **Exhibit "4"** to the Peters Declaration filed concurrently herewith. As of the Petition Date, the Debtor was indebted to Pulser Media under the Pulser Note in the amount of approximately $186,024,000 ("Pulser Secured Debt").

12. The Debtor's obligations to Pulser Media under the Pulser Note are secured by all of the Debtor's assets. On December 27, 2013, Pulser Media recorded a UCC-1 financing statement against the Debtor in the State of Delaware (the Debtor's state of incorporation) asserting a lien against all of the Debtor's assets. A true and correct copy of the financing statement recorded by Pulser Media, as provided and certified by the Delaware Secretary of State, is attached as **Exhibit "5"** to the Peters Declaration.[5]

13. In addition, as of October 19, 2015, the Debtor, Iconical II, as the collateral agent, and Iconical II, as purchaser, entered into that certain Note Purchase Agreement (the "Rdio NPA"), pursuant to which the purchasers thereunder agreed to advance up to a maximum aggregate principal amount of $5,000,000 to the Debtor. The only purchaser under the Rdio NPA is Iconical II. In connection with the Rdio NPA, the Debtor executed that certain Note, dated as of October 19, 2015 (the "Rdio Note"), by the Debtor in favor of Iconical II, as purchaser. True and correct copies of the Rdio NPA and the Rdio Note are attached as **Exhibit "6"** to the Peters Declaration. As of the Petition Date, the Debtor was indebted to Iconical II under the Rdio Note in the amount of approximately $4,213,467 ("Iconical II Secured Debt").

14. The repayment of the Debtor's obligations to Iconical II under the Rdio Note and the Rdio NPA is also guaranteed by Pulser Media. A true and correct copy of the guaranty is attached as **Exhibit "7"** to the Peters Declaration. The obligations under the Rdio NPA, the Rdio Note and such guaranty are secured by all of the Debtor's and Pulser Media's assets (including the Pulser note and a related Allonge), and contemporaneously with the execution of the Rdio Note, Iconical II recorded a UCC-1 financing statement against the Debtor in the State of Delaware (the Debtor's state of incorporation) asserting a lien against all of the Debtor's

---

[5] Pulser Media is indebted to Iconical II pursuant to the terms of various secured promissory notes and related agreements. The obligations of Pulser Media to Iconical II are secured by all assets of Pulser Media, including, without limitation, a pledge by Pulser Media to Iconical II of all of its stock (and voting powers thereon) in the Debtor, and Pulser Media's rights and interests in and to the Pulser Note.

assets. A true and correct copy of the financing statement recorded by Iconical II, as provided and certified by the Delaware Secretary of State, is attached as **Exhibit "8"** to the Peters Declaration.

15.     With respect to the Pulser Note, the Rdio NPA, the Rdio Note and the related security documents, Pulser Media and Iconical II are parties to an Intercreditor Agreement, dated as of October 19, 2015, that governs the lien priorities and rights as between Iconical II and Pulser Media in respect of the security interests in the Debtor's assets, with Iconical II's liens being deemed senior to the liens in favor of Pulser Media. A true and correct copy of the Intercreditor Agreement is attached as **Exhibit "9"** to the Peters Declaration.

16.     A Notice of Events of Default and Reservation of Rights letter ("Default Notice") was also delivered by Iconical II to both the Debtor and Pulser Media on October 15, 2015 in connection with the Rdio NPA, the Rdio Note and the Pulser Note. A true and correct copy of this Default Notice is attached as **Exhibit "10"** to the Peters Declaration.

17.     The Pulser Note, the Rdio NPA, Rdio Note, the Intercreditor Agreement, and all agreements and documents pertaining thereto, including, without limitation, all notes, security agreements, and guaranties are defined and included as "Prepetition Financing Documents" under the DIP Term Sheet, as reflected therein.

18.     Other than the Pulser Secured Debt and the Iconical II Secured Debt, there are no creditors asserting claims against the Debtor secured by a blanket lien on the Debtor's assets. Attached as **Exhibit "A"** to the Declaration of Monica Y. Kim ("Kim Declaration") is a true and correct copy of the certified search from the Delaware Secretary of State which reflects all financing statements recorded against the Debtor. As set forth in the Kim Declaration, other than the financing statements recorded by Pulser Media and Iconical II as to all assets, the only other creditor to have active financing statements against the Debtor is Dell Financial Services which pertain to leases of equipment.

**E.    Relationships Between Debtor, Pulser Media, Iconical II And Related Entities and Parties**

19.    Pulser Media is the majority equity holder of the Debtor.  In turn, the majority stockholder of Pulser Media is Iconical Investments LP ("Iconical  LP"), a limited partnership that is associated with Janus Friis Degnbol ("Janus Friis").  Pulser Media and the Debtor have been primarily funded by companies associated with Janus Friis.  Iconical II, which has made substantial loans to the Debtor and Pulser Media, is also a limited partnership that is associated with Janus Friis.

20.    Iconical II and Iconical LP and their respective affiliated entities (collectively, the "Iconical Entities") are funds engaged in making investments in innovative businesses and are primarily managed by the following directors:  Mark Dyne, Janus Friis, and Murray Markiles. Prior to the Petition Date, the Debtor had four members on its Board of Directors - Mark Dyne, Janus Friis, Anthony Bay and Andrew Larner - however, on October 30, 2015, Mark Dyne and Janus Friis resigned from the Debtor's Board of Directors (and from the Board of Directors of Pulser Media).

21.    Because of the state of financial affairs of the Debtors and the sale path likely to ensue, the Board of Directors sought to add and appoint an independent member to the Board. Accordingly, on or about November 2, 2015, Peter Kravitz was appointed to the Debtor's Board of Directors, joining the other two remaining members of the Board of Directors (Anthony Bay and Andrew Larner) to manage the Debtor's affairs.  Prior to joining the Debtor's Board of Directors, Peter Kravitz has had no prior affiliation, relationship, connection, or business dealings with the Debtor, Pulser Media, or any of the Iconical Entities.

22.    From approximately late 2009 until November 2013, Andrew Larner served as the Chief Executive Officer of the Debtor. From the middle of 2014 until early 2015, Andrew Larner was a partner and operating employee of an investment and incubation company, The Factory LP, which was financed by Iconical II.  Europlay Capital Advisors, LLC ("ECA") provides advisory services and back-office services to Iconical LP and Iconical II.   ECA, directly and acting on behalf of Iconical LP and Iconical II, has provided various support and business advisory services

to the Debtor and Pulser Media. Joseph Miller, a member of ECA and an authorized bank signatory for Iconical LP and Iconical II, acting on behalf of Iconical LP and Iconical II and their respective interests, has been directly involved in all of the financing and strategic discussions involving Pulser Media and the Debtor, the Debtor's bankruptcy case and the proposed asset sale to Pandora.

**F.**    **The Need For Use Of Cash Collateral And Post-Petition Financing**

23.    As demonstrated by the $75 million offer from Pandora which resulted following an extensive marketing process undertaken by Moelis, the totality of the Pulser Secured Debt and Iconical Secured Debt substantially exceeds the value of the Debtor's business and related assets. Furthermore, under its current operating business model, the Debtor is suffering from operating losses of approximately $1.85-$2.4 million per month. Given this ongoing and significant operating shortfall, the Debtor's current cash flow, which constitutes the "Cash Collateral" of Pulser Media and Iconical II, is insufficient to meet the Debtor's immediate and ongoing expenses to keep the business operating. Therefore, in addition to use of Cash Collateral, the Debtor requires immediate funding to maintain its business. However, given the Debtor's current financial condition, the Debtor is not a viable candidate to obtain financing from traditional sources of funding.

24.    Pre-petition, the Debtor took every step possible to streamline and eliminate its operating expenses without causing a complete shutdown of its business and without jeopardizing any possible sale transaction where such preservation of the business and/or its related assets would be an important value driver to a would-be buyer. Pursuant to the asset purchase agreement with Pandora ("APA"), Pandora has expressly required maintenance of certain operating assets and designated employees as a condition to its willingness to close. In that regard, the Debtor has prepared an 8-week operating budget ("Budget"), covering the period from November 16, 2015 through and including December 31, 2015, at which time the Debtor anticipates that it will have consummated a sale transaction with Pandora or a successful higher bidder. A true and correct copy of the Budget is attached as **Exhibit "3"** to the Peters Declaration. The Budget, which has been prepared on a weekly basis, reflects only those basic

and minimal operating expenses of the Debtor's business which the Debtor believes must be paid to avoid irreparable harm to the business, maintain compliance with the terms of the APA, and attract overbids.

25. As shown on the Budget, the Debtor anticipates that it will incur total operating expenses of approximately $5,278,960 for the period from November 16, 2015 through and including December 31, 2015. These expenses can be broken down essentially into three (3) categories: (i) operational costs associated with providing music streaming services to its customers (estimated at $353,000 for the period); (ii) salaries and related expenses to its employees, including, without limitation, the payment of "paid time off" benefits to employees at the time of termination which will not exceed the Section 507(a)(4) priority amount of $12,475 for each employee and the payment of which has been approved by the Debtors' existing secured creditors and the proposed post-petition financing lender (estimated at $3,588,660 for the period); and (iii) other operational expenses, such as professional fees, insurance costs, office and other rents, utilities, parking and office supplies (estimated at $1,337,300).

26. The professional fees included in the Budget relate to the fees and expenses expected to be incurred by Moelis (as the Debtor's investment banker) and Levene, Neale, Bender, Yoo & Brill L.L.P. ("LNBYB") (as the Debtor's bankruptcy counsel), during the affected period. The Debtor has agreed to make, on a weekly basis, payments which have been allocated in the Budget for professional fees expenses. The weekly professional fee payments will be held by LNBYB in a segregated trust account, with no funds to be released to any professional absent a further Court order. Pulser Media and Iconical II, in their capacities as Prepetition Secured Parties, have consented to this arrangement, and, thus, the Debtor requests that the Court approve this arrangement as part of its Financing Orders.

27. On the revenue side, the Debtor's Budget shows that, during the next 8 weeks, the Debtor will have two (2) sources of revenue: (i) loans under the $3,000,000 DIP Facility as discussed below, and (ii) payment(s) from Pandora pursuant to a "Master Services Agreement" ("MSA") entered into by the parties totaling $2,500,000, which is anticipated to be paid to the Debtor in three installments: $1,250,000 during week starting November 23, 2015, $625,000

during the week starting December 7, 2015 and $625,000 during the week starting December 14, 2015. Contemporaneously herewith, the Debtor has filed its emergency motion for authority to enter into the MSA with Pandora, which, as the Budget shows, is essential to the Debtor's continued survival over the next 8 weeks. As discussed more fully in the MSA and the Debtor's emergency motion for authority to enter into the MSA with Pandora, the Debtor has agreed to provide certain designated services to Pandora prior to a sale relating to the development of music streaming products and services for Pandora and its subscribers. However, as shown on the Budget, the anticipated payment(s) under the MSA for the Budget period will not be sufficient for the Debtor to pay for all of its expenses during the Budget period. To bridge the gap between the MSA revenue and the expenses that the Debtor must pay, Iconical II has agreed to provide the Debtor with post-petition financing to cover the shortfalls through the DIP Facility, subject to the entry of and the terms of the Financing Orders and the terms set forth in the DIP Term Sheet.

28. As mentioned above, subject to the terms of the Financing Orders and the DIP Term Sheet, Iconical II has also agreed to provide the Debtor with a post-petition, super-priority debtor-in-possession term loan in the aggregate principal amount not to exceed $3,000,000, plus all capitalized interest thereon at the non-default Base Rate[6] of 8% per annum (or default rate of 10% per annum), plus all capitalized fees and expenses, on a senior secured, super-priority basis ("DIP Facility"), pursuant to Sections 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1) and on the terms and conditions of the "*Rdio, Inc. - Term Sheet for Debtor-in-Possession Credit Facility*" (as amended, supplemented, restated, or otherwise modified from time to time, the "DIP Term Sheet")[7] by and among the Debtor, Iconical II and Pulser Media, substantially in the form of **Exhibit "1"** attached to the Peters Declaration, secured automatically by all property and assets of the Debtor. By execution of the DIP Term Sheet, Pulser Media, which is the only other creditor which asserts liens upon the DIP Collateral, has acknowledged and agreed to the priming of its pre-petition liens and the use of cash collateral.

---

[6] All capitalized terms used herein which are not otherwise defined shall have the meanings given in the DIP Term Sheet.

[7] To the extent there are any inconsistencies between the summary contained herein and the DIP Term Sheet, such inconsistencies shall be resolved in favor of the DIP Term Sheet which shall control.

29.     The Debtor and its investment banker had explored financing options as part of its solicitation of a sale and other strategic transaction; however, given the Debtor's persistent operating losses and other financial circumstances, the Debtor was unable to obtain sufficient interim and long-term financing from sources other than Iconical II on terms and subject to conditions more favorable than under the DIP Term Sheet because all of the Debtor's property and assets are encumbered by liens securing claims which substantially exceeded and still exceed the value of the Debtor's assets. Therefore, no lender would lend to the Debtor in a junior position, or extend unsecured credit allowable only as an administrative expense under Section 503(b)(1). The Debtor was also unable to obtain credit from Iconical II without providing Iconical II with (1) a "super-priority" administrative expense claim pursuant to Section 364(c)(1) for the obligations arising under the DIP Term Sheet, (2) a perfected first-priority lien on all unencumbered DIP Collateral pursuant to Section 364(c)(3), (3) a perfected junior lien on all property and assets of the Debtor that are subject to valid, enforceable, and non-avoidable liens in existence on the Petition Date, which liens are Permitted Senior Liens (as defined below) pursuant to Section 364(c)(3), (4) perfected first-priority Priming Liens upon all of the Debtor's property and assets to secure the obligations arising under the DIP Term Sheet pursuant to Section 364(d)(1), and (5) the other protections for the DIP Lender in the DIP Term Sheet and in the Financing Orders as set forth therein.

30.     The Debtor therefore concluded, in an exercise of its sound business judgment, that the DIP Facility proposed to be provided by Iconical II, when coupled with the MSA and the consent to use Cash Collateral to be provided by Iconical II and Pulser Media, represents the best financing presently available to the Debtor. The terms of the DIP Term Sheet are the result of good faith, arms-length negotiations between the Debtor and Iconical II. Thus, any credit to be extended, loans to be made, and other financial accommodations to be extended to the Debtor by Iconical II will be extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code.

**G.      Salient Terms of the DIP Facility**

31.      Pursuant to the DIP Term Sheet, the Debtor is required to obtain the Interim Order by not later than November 20, 2015, and to obtain the Final Order by not later than December 16, 2015, which authorize the DIP Facility.  Under the terms of the DIP Term Sheet, $1.8 million of the DIP Facility will be advanced to the Debtor upon satisfaction of certain conditions precedent to the initial funding, including, but not limited to, the Court's entry of the Interim Order that is acceptable to Iconical II and the Prepetition Secured Parties and each of their counsel in each of their sole discretion, and so long as the Interim Order is in full force and effect and shall not have been reversed, stayed, modified, or amended without the express written consent of Iconical II and the Prepetition Secured Parties, and no application or motion shall have been made for any stay, modification or amendment of the Interim Order and no stay, appeal or leave to appeal shall be pending.  The remaining $1.2 million of the DIP Facility shall be advanced to the Debtor upon satisfaction of certain conditions precedent to the final funding, including, but not limited to, the Court's entry of the Final Order that is acceptable to Iconical II and the Prepetition Secured Parties and each of their counsel in each of their sole discretion, and so long as the Final Order is in full force and effect and shall not have been reversed, stayed, modified, or amended without the express written consent of Iconical II and the Prepetition Secured Parties, and no application or motion shall have been made for any stay, modification or amendment to the Final Order, and no stay, appeal or leave to appeal shall be pending.

32.      By the Motion, the Debtor seeks immediate Court authority to enter into and deliver the DIP Term Sheet and all other related documents and agreements, including security agreements, deposit account control agreements, pledge agreements, guaranties and promissory notes (collectively, "DIP Documents"), and Court approval of all of the terms and conditions of the DIP Term Sheet, including, without limitation, the salient provisions relating to security, priority and liens, budget, carve-out, adequate protection, maturity, repayment of the DIP Facility and releases, the Debtor's stipulations, waivers, and automatic stay provisions as described above.  The form of the proposed Interim Order approved by Iconical II is attached as **Exhibit "2"** to the Peters Declaration.  As reflected in the form of the Interim Order submitted to

the Court, Iconical II requires that all of the provisions contained in the DIP Term Sheet be approved on an interim basis, except as expressly excluded below or in the DIP Term Sheet as a term which is effective only upon the entry of the Final Order.

33.     In addition to the foregoing, the Debtor requests that the Financing Orders include provisions instructing and enjoining any banking or other financial institution at which the Debtor maintained any accounts not to freeze or close such accounts in order to allow for the Debtor to access its Cash Collateral or proceeds of the DIP Facility to stay in business until the Debtor has had a reasonable opportunity to establish in a timely manner debtor-in-possession accounts.

**II.**

**THE DEBTOR SHOULD BE AUTHORIZED TO USE CASH COLLATERAL**

**A.     The Debtor Must Be Authorized To Use Cash Collateral To Operate, Maintain And Preserve Its Assets In Accordance With The Budget.**

The Debtor's use of property of the estate is governed by Bankruptcy Code section 363. 11 U.S.C. § 363(c).  Section 363(c)(1) provides in pertinent part:

> If the business of the debtor is authorized to be operated under section. . .1108. . . of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

11 U.S.C. § 363(c)(1).  A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Section 363.  11 U.S.C. § 1107(a).

"Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity other than the estate have an interest [.]"  11 U.S.C. § 363(a).  Section 363(c)(2) establishes a special requirement with respect to "cash collateral," providing that the trustee or debtor in possession may use "cash collateral" under subsection (c)(1) if:

> (A)      each entity that has an interest in such cash collateral consents; or
>
> (B)      the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

11 U.S.C. §363(c)(2)(A) and (B).

It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for the purpose of maintaining and operating its property. 11 U.S.C. § 363(c)(2)(B); *In re Oak Glen R-Vee*, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); *In re Tucson Industrial Partners*, 129 B.R. 614 (B.A.P. 9th Cir. 1991). In addition, where the debtor is operating a business, it is extremely important that the access to cash collateral be allowed in order to facilitate the goal of reorganization: "the purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary to operate a business." *In re Dynaco Corporation*, 162 B.R. 389 (Bankr. D.N.H. 1993), *quoting In re Stein*, 19 B.R. 458, 459. (Bankr. E.D. Pa. 1982).

For all of the reasons discussed herein, the Debtor has no ability to continue to maintain its business operations or preserve the value of its assets unless the Debtor can use its Cash Collateral to pay its projected expenses in accordance with the Budget. The Debtor's inability to pay those expenses would cause immediate and irreparable harm to the Debtor's bankruptcy estate. Indeed, the Debtor's inability to pay its expenses, including payroll, utilities, and other "bare bones" operating expenses would result in the immediate shutdown of the Debtor's business and the decimation of the value (going-concern or otherwise) of the Debtor's business and assets, and jeopardize its ability to consummate a sale to Pandora or to a successful overbidder. The maintenance of the Debtor's business and preservation of the Debtor's assets are critical to maximizing value and potentially providing for recoveries to creditors in this case.

**B.    Pulser Media and Iconical II Have Consented to the Debtor's Use of Cash Collateral.**

Pursuant to Section 363(c)(2), the Court may authorize a debtor in possession to use a secured creditor's cash collateral if the secured creditor consents to the use of cash collateral or is adequately protected. *In re Mellor*, 734 F.2d 1396, 1400 (9th Cir. 1984). *See also In re*

*O'Connor*, 808 F.2d 1393, 1398 (10th Cir. 1987); *In re McCombs Properties VI, Ltd.*, 88 B.R. 261, 265 (Bankr. C.D. Cal. l988) ("McCombs").

As noted above, Pulser Media and Iconical II are the only parties with valid security interests in the Debtor's Cash Collateral. Here, both Pulser Media and Iconical II have consented to the Debtor's use of Cash Collateral on the terms set forth in this Motion to pay the expenses set forth in the Budget. Accordingly, the Debtor should be authorized to use its Cash Collateral pursuant to Section 363(c)(2).

Furthermore, the Debtor submits that, to the extent there is any other creditor with an interest in the Debtor's Collateral, such interest in will be adequately protected by, among other things, the maintenance and continued operation of the Debtor's business. Pursuant to the Supreme Court case of *United Savings Association v. Timbers of Inwood Forest Associates*, 108 S.Ct. 626, 629 (1988) and subsequent case law, the property interest that a debtor must adequately protect pursuant to Sections 361(1) and (2) is only the value of the lien that secures the creditor's claim. 108 S.Ct. at 630; *see also, McCombs,* 88 B.R. at 266. Section 506(a) "limit[s] the secured status of a creditor (i.e., the secured creditor's claim) to the lesser of the [allowed amount of the] claim or the value of the collateral." *McCombs*, 88 B.R. at 266. The law is clear that the preservation of the value of a secured creditor's lien is sufficient to provide adequate protection to a secured creditor when a debtor seeks to use cash collateral. *In re Triplett*, 87 B.R. 25 (Bankr. W.D.Tex. 1988). *See also In re Stein*, 19 B.R. 458 (Bankr. E.D.Pa. 1982). The *Stein* Court determined that the use of cash collateral was necessary to the continued operations of the debtor, and that the creditor's secured position could only be enhanced by the continued operation of the debtor's business. *See also, In re McCombs*, *supra*, where the court determined that the debtor's use of cash collateral for needed repairs, renovations and operating expenses eliminated the risk of diminution in the creditor's interest in the cash collateral and such use would more likely increase cash collateral.

As reflected in the Budget, the payment of the expenses necessary for the Debtor to maintain and continue operating its business will adequately protect any other parties with purported interests in the Debtor's Cash Collateral, because, by doing so, the Debtor will be able

to preserve the going-concern value of the Debtor's business pending the close of the proposed sale to Pandora or to a successful overbidder, which will benefit all creditors. Other courts have determined that a debtor's continued business operations can constitute the adequate protection of a secured creditor. *See Matter of Pursuit Athletic Footwear, Inc.,* 193 B.R. 713, 716-18 (Bankr. D. Del. 1996); *In re Newark Airport/Hotel Ltd. Partnership*, 156 B.R. 444, 450 (Bankr. D.N.J. 1993); *In re Dynaco*, 162 B.R. 389, 394-5 (Bankr. D.N.H. 1993); *In re Immenhausen Corp.*, 164 B.R. 347, 352 (Bankr. M.D. Fla. 1994).

Additionally, in determining adequate protection, courts have stressed the importance of promoting a debtor's reorganization. In *In re O'Connor*, *supra*, the Tenth Circuit stated:

> "In this case, Debtors, in the midst of a Chapter 11 proceeding, have proposed to deal with cash collateral for the purpose of enhancing the prospects of reorganization. This quest is the ultimate goal of Chapter 11. Hence, the Debtor's efforts are not only to be encouraged, but also their efforts during the administration of the proceeding are to be measured in light of that quest. Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estate, a fair opportunity must be given to the Debtors to achieve that end. Thus, while interests of the secured creditor whose property rights are of concern to the court, the interests of all other creditors also have bearing upon the question of whether use of cash collateral shall be permitted during the early stages of administration."

808 F.2d at 1937.

The use of Cash Collateral is critical to the Debtor's ability to implement an effective reorganization strategy for the benefit of all creditors. As discussed above, the Debtor already engaged in an extensive marketing process with Moelis, a highly qualified investment bank, and will be proceeding expeditiously to implement a bidding procedure process, hold an auction (if needed) and to consummate a sale transaction. If the Debtor is not permitted to use Cash Collateral to maintain the Debtor's business operations and to preserve the value of the Debtor's assets, the chances of successfully consummating a sale for the highest and best price possible will evaporate, and the value of the Debtor's assets will be dramatically and negatively impacted. On the other hand, if the Debtor is authorized to use its Cash Collateral, the Debtor will be able to maintain the Debtor's business operations and preserve the value of the Debtor's assets while

the Debtor pursues the successful consummation of a transaction or transactions benefiting all creditors. The use of Cash Collateral will therefore only enhance the prospect of the Debtor's reorganization.

Since Pulser Media and Iconical II are the only parties with an interest in the Debtor's Cash Collateral and both have consented to the use thereof in accordance with the terms of the DIP Documents, including the Budget, the Debtor submits that the requirements of Section 363(c)(2) have been satisfied and that the Debtor should be authorized to use its Cash Collateral in accordance with the terms thereof.

## III.

## THE DEBTOR SHOULD BE AUTHORIZED TO OBTAIN THE PROPOSED POST-PETITION DIP FACILITY

**A.     The Debtor Should Be Authorized To Obtain The Proposed Post-Petition Secured DIP Facility From Iconical II To Maintain The Debtor's Business And To Maintain And Preserve The Value Of The Debtor's Assets.**

Pursuant to Section 364(c), a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interest of the estate. *See, e.g., In re Simasko Production Co.*, 47 B.R. 444, 448-9 (D. Colo.1985) (authorizing interim financing agreement where debtor's business judgment indicated financing was necessary and reasonable for benefit of estate); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to post-petition credit, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties"). Section 364(c) provides, in pertinent part, that:

> (c)  If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable-under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –
> (1)  with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of this title:
> (2)  secured by a lien on property of the estate that is not otherwise subject to a lien; or
> (3)  secured by a junior lien on property of the estate that is

subject to a lien.

11 U.S.C. § 364(c).

Section 364(d)(1) governs the incurrence of senior secured debt or "priming" loans. Pursuant to Section 364(d)(1), the Court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien only if –

> (1)    the trustee is unable to obtain such credit otherwise; and
> (2)    there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364 (d)(1).

Section 364 is structured with an escalating series of inducements which a debtor in possession may offer to attract credit during the post-petition period. *In re Photo Promotion Associates, Inc.*, 87 B.R. 835, 839 (Bankr. S.D.N.Y. 1988), *aff'd*, 881 F.2d 6 (2d. Cir. 1989). Where a trustee or debtor in possession cannot otherwise obtain unsecured post-petition credit, such credit may be obtained under certain conditions. *In re T.M. Sweeney & Sons LTL Services, Inc.*, 131 B.R. 984, 989 (Bankr.N.D.Ill.1991). For example, if creditors are unwilling to extend unsecured credit to a debtor in possession, further inducements are offered, with court approval after notice and a hearing, including, without limitation, liens equal to or senior to existing liens on encumbered property in accordance with 11 U.S.C. § 364(d). *In re Photo Promotion Associates, Inc.*, 87 B.R. at 839.

Section 364(c) also enumerates certain incentives that a court may grant to post-petition lenders. However, the list set forth in Section 364(c) is not exhaustive. Courts have frequently authorized the use of inducements not specified in the statute. *See, e.g., In re Ellingsen MacLean Oil Co.*, 834 F.2d 599 (6th Cir. 1987) (affirming financing order which prohibited any challenges to the validity of already existing liens); *In re Defender Drug Stores*, 126 B.R. 76 (Bankr. D. Ariz. 1991) (authorizing enhancement fee to post-petition lender), *aff'd* 145 B.R. 312, 316 (Bankr. 9th Cir. 1992) ("[b]ankruptcy courts . . . have regularly authorized postpetition financial

arrangements containing lender incentives beyond the explicit priorities and liens specified in section 364").

As discussed above, the Budget reflect the expenses that must be paid in order for the Debtor to stay in business and avoid irreparable harm to its business and preserve the value of its assets until a sale to Pandora or successful overbidder can be consummated. Pulser Media and Iconical II have approved the Budget. As the Budget reflects, the Debtor's use of Cash Collateral will not be sufficient to fund the expenses of the Debtor's post-petition operations as shown on the Budget. Additional financing is critically needed to allow for the Debtor to proceed with operations pending the sale to Pandora or to a successful overbidder, which will benefit all creditors of the estate.

Subject to the approval of the Court, and in order to obtain the necessary DIP Facility, the Debtor has agreed to provide Iconical II with (1) a super-priority claim pursuant to Section 364(c)(1) for all amounts owed by the Debtor under the DIP Term Sheet, (2) a perfected first-priority lien on all unencumbered property and assets of the Debtor pursuant to Section 364(c)(2), (3) a perfected junior lien on all property and assets of the Debtor that are subject to valid, enforceable, and non-avoidable liens in existence on the Petition Date, which liens are Permitted Senior Liens, (4) perfected first-priority Priming Liens upon all of the Debtor's property and assets to secure the obligations arising under the DIP Term Sheet pursuant to Section 364(d)(1), and (5) the other protections and inclusions in the DIP Term Sheet and in the Financing Orders as set forth therein. The Debtor negotiated the terms of the DIP Facility with Iconical II at arm's length and in good faith and obtained several favorable concessions relative to Iconical II's initial proposal, including a significant reduction in the interest rate and an longer maturity. The terms the Debtor and Iconical II ultimately agreed upon represent the most favorable terms on which Iconical II—or, indeed, any lender—would provide postpetition financing to the debtor.

For all of the reasons explained herein, the Debtor believes that granting the DIP Liens (as well as the other protections being provided under the DIP Term Sheet) is warranted, appropriate and necessary given the circumstances of this case where Iconical II has agreed to provide the Debtor with critically necessary emergency DIP Facility and to consensual Cash

Collateral use, without which the Debtor would be forced to shut down and immediately liquidate.

Two factors courts consider in determining whether to authorize post-petition financing which contemplates the granting of a security interest in favor of the lender are (1) whether the debtor is unable to obtain unsecured credit per Section 364(b), *i.e.*, by allowing a lender only an administrative claim per Section 364(b)(1)(A); and (2) whether the terms of the transaction are fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender. *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D.Pa. 1987); *see also In re Aqua Assoc.*, 123 B.R. 192, 195 (Bankr. E.D.Pa. 1991).

In addition to the foregoing, a debtor in possession seeking subordination of liens to new financing must establish adequate protection of the liens to be subordinated to the new financing. *In re C.B.G. Ltd.*, 150 B.R. 570, 571 (Bankr. M.D.Pa. 1992).

The Debtor submits that all of these standards have been satisfied in this case.

**1.      *The Debtor Is Unable To Obtain Unsecured Credit Or Secured Credit On A Junior Lien Basis.***

In satisfying the standards of Section 364, a debtor need not seek credit from every available source, but should make a reasonable effort to seek other sources of credit available under § 364(a) and (b).  *See, e.g., In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (trustee had demonstrated by good faith effort that credit was not available without senior lien by unsuccessfully contacting other financial institutions in immediate geographic area; "the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); *Ames, supra*, 115 B.R. at 40 (finding that debtors demonstrated the unavailability of unsecured financing where debtors approached four lending institutions).

As previously noted, under its current operating business model, the Debtor has operating losses of approximately $1.95-$2.4 million per month, and given the results of the extensive marketing process performed by Moelis pre-petition, it is without dispute that the fair market value of the Debtor's business and related assets are substantially less than the total secured debt owed to Pulser Media and Iconical II.  Given the Debtor's bleak financial condition, obtaining

financing from traditional sources proved impossible, and the only post-petition financing commitment that the Debtor can viably obtain is the one offered by Iconical II. There are no lenders willing to provide financing junior to Pulser Media and Iconical II or unsecured financing. Moreover, priming Pulser Media and Iconical II would not be realistic since the Debtor would have to show that these secured creditors are adequately protected which it cannot. And, even if a third-party lender were willing to provide the necessary financing on a priming basis, such lender would likely impose terms and conditions substantially more onerous than those on which Iconical II is willing to lend.

Fortunately, Iconical II is offering to provide the Debtor with post-petition secured financing but solely on the terms and conditions set forth in the DIP Term Sheet. The Debtor has little doubt that, even if there was another lender who was willing to provide the Debtor with the necessary post-petition financing (recognizing that the Debtor is not aware of any such lender at this time), such lender would require that its financing be secured by a senior priming lien against the Debtor's assets, which the Debtor does not believe is even possible. The terms and conditions set forth in the DIP Term Sheet have been negotiated extensively, in good faith and at arms' length, by the parties.

After considering all of their alternatives, the Debtor has concluded, in an exercise of its sound business judgment, that the DIP Facility to be provided by Iconical II (particularly, in conjunction with the consent to use Cash Collateral by Iconical II) represents the best financing presently available to the Debtor.

2. **The Terms Of The Proposed Post-Petition DIP Facility From Iconical II Are Fair, Reasonable, and Adequate.**

The Debtors submit that terms of the proposed DIP Facility from Iconical II are fair, reasonable, and adequate. As noted above, the terms and conditions set forth in the DIP Term Sheet were negotiated extensively, in good faith and at arms' length, by the parties. Indeed, the Debtor obtained several significant concessions from Iconical during the course of those negotiations. The amount of financing being offered to the Debtor is certainly not insignificant. The Debtor submits that the benefits afforded to the Debtor by the DIP Facility justify the

protections being afforded under the terms of the DIP Term Sheet. The DIP Facility offers the Debtor its best and, likely, only opportunity to maintain and preserve the value of its assets while pursuing to close a sale to Pandora or to a successful overbidder, which will benefit of all creditors and parties in interest in this case.

Based on the foregoing, the Debtor believes that (1) the terms and conditions of the proposed DIP Facility under the DIP Term Sheet are fair and reasonable, reflect the Debtor's exercise of prudent business judgment in light of the current circumstances and are supported by reasonably equivalent value and fair consideration, (2) the DIP Facility has been negotiated in good faith and at arm's length by the Debtor and Iconical II, and (3) the DIP Facility extended to the Debtor by Iconical II will have been extended, issued or made, as the case may be, in "good faith" within the meaning of Section 364(e).

### 3. *Pulser Media Has Consented To The Priming of Its Liens Securing the Prepetition Obligations And Pulser Media's Liens And Any Other Liens Being "Primed" Are Adequately Protected.*

Pulser Media has consented to the Priming Lien being granted to Iconical II under the DIP Term Sheet. However, the proposed Priming Lien is authorized by the Bankruptcy Code, even absent consent of other existing lien holders. Section 364(d)(1)(B) of the Bankruptcy Code requires the furnishing of adequate protection in favor of lien holders which assert an interest in collateral. 11 U.S.C. §§ 364(d)(1)(B). Although section 364 does not specifically define the term "adequate protection," Bankruptcy Code section 361 requires that adequate protection be furnished to the extent Debtor's "use, sale, lease or grant results in a decrease in the value of such entity's interest in such property." 11 U.S.C. §§ 361(1), (2), (3). Stated succinctly, adequate protection protects a secured creditor against a decrease in the value of its collateral. *See e.g., In re Planned System, Inc.*, 78 B.R. 852, 861-62 (Bankr. S.D. Ohio 1987). This standard applies equally with respect to "priming" financing under section 364(d)(1)(B). *See, e.g., In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996) ("The goal of adequate protection for purposes of the provision entitling a debtor to obtain financing secured by liens senior to all other interests is to safeguard the secured creditor from diminution in the

value of its interests."); *In re Aqua Assoc.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991); *In re Beker Ind. Corp.*, 58 B.R. 725, 741-42 (Bankr. S.D.N.Y. 1986).

The Court has broad discretion to determine whether adequate protection is furnished. *See e.g., In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992). Whether the party entitled to such protection is over or undersecured is not dispositive of whether adequate protection is furnished. As the court in *Aqua Assoc.*, 123 B.R. 192, noted:

> Therefore, we believe that, while the presence of an equity cushion should be a relevant factor, it should not be a determinative factor in any 'adequate protection' analysis, and particularly one relating to § 364(d)(1)(B). The important question, in determination of whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized.

*Id.* at 196 (emphasis added; approving priming financing where interest rate was 5% over prime and loan likely would enhance value of estate).

Pursuant to the DIP Term Sheet, Pulser Media is consenting to the "priming" of the liens securing the Debtor's pre-petition obligations (i.e., the Pulser Secured Debt). The Debtor is not aware of any secured creditor whose lien will effectively be "primed" by the Priming Lien granted to Iconical II to secure the DIP Facility (other than Pulser Media which is consenting).

It is by virtue of the DIP Facility that the Debtor will have the ability to maintain its business operations and preserve the value of its assets while the Debtor pursues its sale with Pandora or a successful overbidder in order to maximize value for all creditors. The Debtor therefore submits that, to the extent any creditor holds a lien against the Debtor's assets which is being primed (which the Debtor is not aware of), such secured creditor is adequately protected as a result of, and indeed will substantially benefit from, the DIP Facility.

**4.     *The Proposed DIP Facility From Iconical II Is Necessary And Proper*.**

While in determining whether to approve such a transaction, a Court is authorized to act in its informed discretion, *In re Ames Department Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990), the Court should give broad deference to the business decision of a Chapter 11 debtor, particularly with respect to a debtor's business judgment regarding the need for and proposed use

of funds. *Richmond Leasing Co. v. Capital Bank N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985). As the Court noted in *In re Ames Dept. Stores Inc., supra*, "the court's discretion under section 364 is to be utilized on the grounds that permit the reasonable business judgment [of the Debtor] to be exercised . . ." *In re Ames Department Stores, Inc.*, 115 B.R. at 40.

There is little dispute that, without substantial post-petition financing, the Debtor will be forced to immediately cease business operations and engage in a disorderly fire-sale liquidation of its assets without the ability to maximize value through the proposed sale to Pandora or to a successful overbidder pursuant to an auction process. There can also be no question that such a result would cause the Debtor, its estate and its creditors immediate and irreparable harm. In contrast, the proposed DIP Facility affords the Debtor the ability to maintain the going-concern value of its business and provides the Debtor with the time necessary to consummate the sale to Pandora or to a successful overbidder. The Debtor has therefore concluded that obtaining the proposed DIP Facility from Iconical II is critically important to maximizing the recovery for creditors, and is therefore in the best interests of the Debtor's estate.

**IV.**

**THE WAIVER OF ANY APPLICABLE STAY IS APPROPRIATE**

For the reasons noted herein, the Debtor will suffer immediate and irreparable harm if the Debtor is not able to pay the expenses set forth in the Budget, pending a final hearing on the Motion. The Debtor requires the terms of the Interim Order to become immediately effective to ensure that the Debtor will be able to use their Cash Collateral and obtain the proposed DIP Facility from Iconical II to pay such critical expenses. Based on the foregoing, the Debtor requests that any applicable stay, including the stay provided under FRBP 6004, be waived to allow the Interim Order to become immediately effective.

/ / /

/ / /

/ / /

/ / /

/ / /

## CONCLUSION

Based upon all of the foregoing, the Debtor respectfully requests that the Court:

(1)     grant the relief requested in the Motion on an interim basis;

(2)     enter the proposed form of the Interim Order attached as **Exhibit "2"** to the Peters Declaration;

(3)     schedule a Final Hearing on the Motion to consider entry of a Final Order granting the relief requested in the Motion on a final basis; and

(4)     grant such further relief as the Court deems just and proper.


Dated:  November 16, 2015                    RDIO, INC.,

                                             By:     /s/ Ron Bender
                                                     RON BENDER
                                                     PHILIP A. GASTEIER
                                                     MONICA Y. KIM
                                                     KRIKOR J. MESHEFEJIAN
                                                     LEVENE, NEALE, BENDER, YOO
                                                         & BRILL L.L.P.
                                                     Proposed Attorneys for Debtor and
                                                     Debtor in Possession