RON BENDER (SBN 143364)
PHILIP A. GASTEIER (SBN 130043)
MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbyb.com; pag@lnbyb.com;
myk@lnbyb.com; kjm@lnbyb.com

Proposed Attorneys for Chapter 11 Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>RDIO, INC.,<br><br>                 Debtor. | Case No. 15-31430<br><br>Chapter 11<br><br>**DECLARATION OF ELLIOTT PETERS IN SUPPORT OF DEBTOR'S EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS:**<br><br>(I)   **AUTHORIZING DEBTOR TO (A) OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c), 364(d)(1) AND 364(e), AND (B) UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363;**<br>(II)  **GRANTING ADEQUATE PROTECTION TO PRE-PETITION SECURED LENDERS PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364;**<br>(III) **SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND 4001(c); AND**<br>(IV) **GRANTING RELATED RELIEF**<br><br>DATE:     November 18, 2015<br>TIME:     10:00 a.m.<br>PLACE:  U.S. Bankruptcy Court<br>              235 Pine Street, 19th Floor, Courtroom 22<br>              San Francisco, CA 94104<br>JUDGE:  The Hon. Dennis Montali |

I, Elliott Peters, hereby declare as follows:

1.     I am over the age of eighteen (18).  I have personal knowledge of the facts set forth herein, and, if called to testify, would and could testify competently with respect thereto.

2.     I am the General Counsel Rdio, Inc., the debtor and debtor in possession in the above-captioned Chapter 11 bankruptcy case (the "Debtor").  In my capacity as the General Counsel of the Debtor, I am very familiar with the business operations and financial books and records of the Debtor.

3.     I have access to the Debtor's books and records.  I am familiar with the history, organization, operations and financial condition of the Debtor.  The records and documents referred to in this declaration constitute writings taken, made, or maintained in the regular or ordinary course of the Debtor's business at or near the time of act, condition or event to which they relate by persons employed by the Debtor who had a business duty to the Debtor to accurately and completely take, make, and maintain such records and documents.  The statements set forth in this declaration are based upon my own personal knowledge and my knowledge of the Debtor's books and records.

4.     I made this Declaration in support of the Debtor's emergency motion ("Motion") pursuant to Sections 105(a), 361, 362, 363, and 364 of chapter 11 of title 11 of the United States Code §§ 101, et seq. ("Bankruptcy Code"),[1] for the entry of interim and final orders (respectively, "Interim Order" and "Final Order," and, collectively, "Financing Orders") authorizing the Debtor to use Cash Collateral and obtain Post-Petition Financing.

5.     The Debtor is a corporation incorporated in the State of Delaware.

6.     The Debtor filed a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") on November 16, 2015 (the "Petition Date").  The Debtor continues to operate its business, manage its financial affairs and administer its bankruptcy estate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

---

[1] Unless otherwise stated, all Section references herein are to the Bankruptcy Code.

7.      The Debtor was founded in 2008 as a digital music service. The Debtor's business operations were launched in 2010 after the Debtor secured requisite licenses from the applicable holders of music rights. Since that time, the Debtor has strived to grow into a world-wide music service and today is in 86 countries.

8.      One of the primary services provided by the Debtor is an unlimited, on demand music streaming service where for $9.99 per month, the user has access to an entire library of songs with access to them through a computer, mobile device, etc. In other words, the Debtor's business model is based upon a monthly recurring subscription for full access to content rather than on an owned a la carte download model. The Debtor also makes available other subscription tiers at lower costs per month with varying service offerings or functionality (e.g., a family tier, a student tier, and a select tier with alternative functionality). The Debtor generates approximately $1.5 million of U.S. monthly revenue from its monthly subscription service.

9.      While the Debtor's monthly subscription service provides the Debtor with its primary revenue source, the Debtor also generates approximately $100,000-$150,000 of monthly revenue from advertisers who advertise in the Debtor's advertising based service offerings. The Debtor therefore currently generates approximately $1.6-$1.65 million of total monthly revenue.

10.     The Debtor's primary assets consist of the Debtor's (i) owned technology (e.g., website-mobile apps, content ingestion technology, reporting technology, software, data bases, etc.), (ii) content license agreements, (iii) subscribers, (iv) employee talent pool, and (v) good will.

11.     Under its current operating business model, the Debtor has monthly operating expenses of approximately $3.5-$4.0 million, comprising primarily payroll for the Debtor's approximately U.S. 140 employees (much of which represents costs of retaining high caliber Silicon Valley engineering talent), payment to the owners of music rights, costs of maintaining the service, rent, marketing costs, business development costs, technology maintenance costs, and foreign administrative expenses). With average monthly total revenue of approximately $1.6-$1.65 million and average monthly operating expenses of $3.5-$4.0 million, the Debtor's business operations under its current operating business model result in operating losses of approximately

$1.85-$2.4 million per month, and the Debtor no longer has the economic means of funding such significant operating cash flow shortfall.

12. The Debtor has approximately $190,237,000 of secured debt and approximately $30,000,000 of unsecured debt. A material portion of the secured debt, in the estimated amount of $186,024,000, is owed to Pulser Media, which is the majority owner of the Debtor (owning approximately 79% of the Debtor's equity interests). The remaining portion of the secured debt, in the estimated amount of $4,213,467, is owed to Iconical II, which is also the secured creditor of Pulser Media. Further information concerning the Debtor's prepetition secured debt is set forth in the Motion.

13. Pulser Media employed a highly qualified investment bank in Moelis & Company ("Moelis") in the fall of 2014, initially with the goal of attempting to raise new equity capital. Despite extensive efforts by Moelis, it ultimately became clear that raising new equity capital was not going to be possible. At that point, Pulser Media charged Moelis with finding either substantial outside investment or a buyer or merger partner because the Debtor was not going to be able to continue to fund its significant operating losses indefinitely.

14. After conducting an extremely broad marketing process, the highest and best offer received by the Debtor was an all cash asset purchase offer from Pandora Media, Inc. ("Pandora") in the amount of $75 million, plus certain other consideration, to acquire the Debtor's technological assets. Based on its due diligence, by the time of the execution of the LOI, Pandora had decided that it would only proceed with a transaction if that transaction were conducted as part of a Chapter 11 filing and a purchase pursuant to a sale under the Bankruptcy Code. Pandora has agreed that the Debtor can and should market Pandora's offer for overbid to insure that the highest and best price is paid for the Debtor's assets/business. The Debtor retained Moelis for the purpose of marketing the Debtor's assets/business for overbid and to assist the Debtor to conduct an auction process in the event of any successful overbids – recognizing that the Debtor has only a limited amount of time available to it to consummate a sale (both because the Debtor does not have the financial means with which to continue to fund its operating losses on any long-term basis and

because of the vulnerability to the Debtor's business, particularly with regard to its employee talent, from the business uncertainty created by the Debtor's bankruptcy filing).

15.     Pandora has conditioned its offer on the Debtor obtaining an entered order of the Court by December 1, 2015 approving bid procedures for any overbid, and the Debtor obtaining an entered order of the Court by December 31, 2015 approving of the Debtor's proposed asset sale to Pandora.  The Debtor has been assured by Moelis that this is a reasonable amount of time for Moelis to conduct an overbid process, particularly given the breadth of Moelis' pre-bankruptcy marketing process and Moelis' in-depth knowledge of this industry and marketplace and prospective overbidders, to insure that the highest and best price is obtained from the sale of the Debtor's assets/business.

16.     Pursuant to that certain Third Amended and Restated Secured Promissory Note, dated as of July 10, 2015 (as amended, restated, supplemented or otherwise modified, the "Pulser Note"), Pulser Media, as lender, agreed to advance up to the maximum aggregate principal amount of $208,000,000 to the Debtor, as borrower.  A true and correct copy of the Pulser Note is attached hereto as **Exhibit "4"**.  As of the Petition Date, the Debtor was indebted to Pulser Media under the Pulser Note in the amount of approximately $186,024,000 ("Pulser Secured Debt").

17.     The Debtor's obligations to Pulser Media under the Pulser Note are secured by all of the Debtor's assets.  On December 27, 2013, Pulser Media recorded a UCC-1 financing statement against the Debtor in the State of Delaware (the Debtor's state of incorporation) asserting a lien against all of the Debtor's assets.  A true and correct copy of the financing statement recorded by Pulser Media, as provided and certified by the Delaware Secretary of State, is attached hereto as **Exhibit "5"**.[2]

18.     In addition, as of October 19, 2015, the Debtor, Iconical II, as the collateral agent, and Iconical II, as purchaser, entered into that certain Note Purchase Agreement (the "Rdio

---

[2] Pulser Media is indebted to Iconical II pursuant to the terms of various secured promissory notes and related agreements. The obligations of Pulser Media to Iconical II are secured by all assets of Pulser Media, including, without limitation, a pledge by Pulser Media to Iconical II of all of its stock (and voting powers thereon) in the Debtor, and Pulser Media's rights and interests in and to the Pulser Note.

NPA"), pursuant to which the purchasers thereunder agreed to advance up to a maximum aggregate principal amount of $5,000,000 to the Debtor. The only purchaser under the Rdio NPA is Iconical II. In connection with the Rdio NPA, the Debtor executed that certain Note, dated as of October 19, 2015 (the "Rdio Note"), by the Debtor in favor of Iconical II, as purchaser. True and correct copies of the Rdio NPA and the Rdio Note are attached hereto as **Exhibit "6"**. As of the Petition Date, the Debtor was indebted to Iconical under the Rdio Note in the amount of approximately $4,200,000 ("Iconical II Secured Debt").

19. The repayment of the Debtor's obligations to Iconical II under the Rdio Note and the Rdio NPA is also guaranteed by Pulser Media. A true and correct copy of the guaranty is attached hereto as **Exhibit "7"**. The obligations under the Rdio NPA, the Rdio Note and such guaranty are secured by all of the Debtor's and Pulser Media's assets (including the Pulser note and a related Allonge), and contemporaneously with the execution of the Rdio Note, Iconical II recorded a UCC-1 financing statement against the Debtor in the State of Delaware (the Debtor's state of incorporation) asserting a lien against all of the Debtor's assets. A true and correct copy of the financing statement recorded by Iconical II, as provided and certified by the Delaware Secretary of State, is attached hereto as **Exhibit "8"**.

20. With respect to the Pulser Note, the Rdio NPA, the Rdio Note and the related security documents, Pulser Media and Iconical II are parties to an Intercreditor Agreement, dated as of October 19, 2015, that governs the lien priorities and rights as between Iconical II and Pulser Media in respect of the security interests in the Debtor's assets, with Iconical II's liens being deemed senior to the liens in favor of Pulser Media. A true and correct copy of the Intercreditor Agreement is attached hereto as **Exhibit "9"**.

21. A Notice of Events of Default and Reservation of Rights letter ("Default Notice") was also delivered by Iconical II to both the Debtor and Pulser Media on October 15, 2015 in connection with the Rdio NPA, the Rdio Note and the Pulser Note. A true and correct copy of this Default Notice is attached hereto as **Exhibit "10"**.

22. The Pulser Note, the Rdio NPA, Rdio Note, the Intercreditor Agreement, and all agreements and documents pertaining thereto, including, without limitation, all notes, security

agreements, and guaranties are defined and included as "<u>Prepetition Financing Documents</u>" under the DIP Term Sheet, as reflected therein and described below.

23.     Other than the Pulser Secured Debt and the Iconical II Secured Debt, there are no creditors asserting claims against the Debtor secured by a blanket lien on the Debtor's assets.

24.     Pulser Media is the majority equity holder of the Debtor.  In turn, the majority stockholder of Pulser Media is Iconical Investments LP ("<u>Iconical LP</u>"), a limited partnership that is associated with Janus Friis Degnbol ("<u>Janus Friis</u>").  Pulser Media and the Debtor have been primarily funded by companies associated with Janus Friis.  Iconical II, which has made substantial loans to the Debtor and Pulser Media, is also a limited partnership that is associated with Janus Friis.

25.     Iconical II and Iconical LP and their respective affiliated entities (collectively, the "<u>Iconical Entities</u>") are funds engaged in making investments in innovative businesses and are primarily managed by the following directors:  Mark Dyne, Janus Friis, and Murray Markiles. Prior to the Petition Date, the Debtor had four members on its Board of Directors - Mark Dyne, Janus Friis, Anthony Bay and Andrew Larner - however, on October 30, 2015, Mark Dyne and Janus Friis resigned from the Debtor's Board of Directors (and from the Board of Directors of Pulser Media).

26.     Because of the state of financial affairs of the Debtors and the sale path likely to ensue, the Board of Directors sought to add and appoint an independent member of the Board. Accordingly, on or about November 2, 2015, Peter Kravitz was appointed to the Debtor's Board of Directors, joining the other two remaining members of the Board of Directors (Anthony Bay and Andrew Larner) to manage the Debtor's affairs.  Prior to joining the Debtor's Board of Directors, Peter Kravitz has had no prior affiliation, relationship, connection, or business dealings with the Debtor, Pulser Media, or any of the Iconical Entities.

27.     From approximately late 2009 until November 2013, Andrew Larner served as the Chief Executive Officer of the Debtor. From the middle of 2014 until early 2015, Andrew Larner was a partner and operating employee of an investment and incubation company, The Factory LP, which was financed by Iconical II.  Europlay Capital Advisors, LLC ("<u>ECA</u>") provides advisory

services and back-office services to Iconical LP and Iconical II. ECA, directly and acting on behalf of Iconical LP and Iconical II, has provided various support and business advisory services to the Debtor and Pulser Media. Joseph Miller, a member of ECA and an authorized bank signatory for Iconical LP and Iconical II, acting on behalf of Iconical LP and Iconical II and their respective interests, has been directly involved in all of the financing and strategic discussions involving Pulser Media and the Debtor, the Debtor's bankruptcy case and the proposed asset sale to Pandora.

28.     As demonstrated by the $75 million offer from Pandora which resulted following an extensive marketing process undertaken by Moelis, the totality of the Pulser Secured Debt and Iconical Secured Debt substantially exceeds the value of the Debtor's business and related assets. Furthermore, under its current operating business model, the Debtor is suffering from operating losses of approximately $1.85-$2.4 million per month. Given this ongoing and significant operating shortfall, the Debtor's current cash flow, which constitutes the "Cash Collateral" of Pulser Media and Iconical II, is insufficient to meet the Debtor's immediate and ongoing expenses to keep the business operating. Therefore, in addition to use of Cash Collateral, the Debtor requires immediate funding to maintain its business. However, given the Debtor's current financial condition, the Debtor is not a viable candidate to obtain financing from traditional sources of funding.

29.     Pre-petition, the Debtor took every step possible to streamline and eliminate its operating expenses without causing a complete shutdown of its business and without jeopardizing any possible sale transaction where such preservation of the business and/or its related assets would be an important value driver to a would-be buyer. Pursuant to the asset purchase agreement with Pandora ("APA"), Pandora has expressly required maintenance of certain operating assets and designated employees as a condition to its willingness to close. In that regard, the Debtor has prepared an 8-week operating budget ("Budget"), covering the period from November 16, 2015 through and including December 31, 2015, at which time the Debtor anticipates that it will have consummated a sale transaction with Pandora or a successful higher bidder. A true and correct copy of the Budget is attached hereto as **Exhibit "3"**. The Budget,

which has been prepared on a weekly basis, reflects only those basic and minimal operating expenses of the Debtor's business which the Debtor believes must be paid to avoid irreparable harm to the business, maintain compliance with the terms of the APA, and attract overbids.

30.     As shown on the Budget, the Debtor anticipates that it will incur total operating expenses of approximately $5,278,960 for the period from November 16, 2015 through and including December 31, 2015.  These expenses can be broken down essentially into three (3) categories:   (i) operational costs associated with providing music streaming services to its customers (estimated at $353,000 for the period); (ii) salaries and related expenses to its employees, including, without limitation, the payment of "paid time off" benefits to employees at the time of termination which will not exceed the Section 507(a)(4) priority amount of $12,475 for each employee and the payment of which has been approved by the Debtors' existing secured creditors and the proposed post-petition financing lender (estimated at $3,588,660 for the period); and (iii) other operational expenses, such as professional fees, insurance costs, office and other rents, utilities, parking and office supplies (estimated at $1,337,300).

31.     The professional fees included in the Budget relate to the fees and expenses expected to be incurred by Moelis (as the Debtor's investment banker) and Levene, Neale, Bender, Yoo & Brill L.L.P. ("LNBYB") (as the Debtor's bankruptcy counsel), during the affected period. The Debtor has agreed to make, on a weekly basis, payments which have been allocated in the Budget for professional fees expenses.  The weekly professional fee payments will be held by LNBYB in a segregated trust account, with no funds to be released to any professional absent a further Court order.  Pulser Media and Iconical II, in their capacities as Prepetition Secured Parties, have consented to this arrangement, and, thus, the Debtor requests that the Court approve this arrangement as part of its Financing Orders.

32.     On the revenue side, the Debtor's Budget shows that, during the next 8 weeks, the Debtor will have two (2) sources of revenue: (i) loans under the $3,000,000 DIP Facility as discussed below, and (ii) payment(s) from Pandora pursuant to a "Master Services Agreement" ("MSA") entered into by the parties totaling $2,500,000, which is anticipated to be paid to the Debtor in three installments:  $1,250,000 during week starting November 23, 2015, $625,000

during the week starting December 7, 2015 and $625,000 during the week starting December 14, 2015. Contemporaneously herewith, the Debtor has filed its emergency motion for authority to enter into the MSA with Pandora, which, as the Budget shows, is essential to the Debtor's continued survival over the next 8 weeks. As discussed more fully in the MSA and the Debtor's emergency motion for authority to enter into the MSA with Pandora, the Debtor has agreed to provide certain designated services to Pandora prior to a sale relating to the development of music streaming products and services for Pandora and its subscribers. However, as shown on the Budget, the anticipated payment(s) under the MSA for the Budget period will not be sufficient for the Debtor to pay for all of its expenses during the Budget period. To bridge the gap between the MSA revenue and the expenses that the Debtor must pay, Iconical II has agreed to provide the Debtor with post-petition financing to cover the shortfalls through the DIP Facility, subject to the entry of and the terms of the Financing Orders and the terms set forth in the DIP Term Sheet.

33. As mentioned above, subject to the terms of the Financing Orders and the DIP Term Sheet, Iconical II has also agreed to provide the Debtor with a post-petition, super-priority debtor-in-possession term loan in the aggregate principal amount not to exceed $3,000,000, plus all capitalized interest thereon at the non-default Base Rate[3] of 8% per annum (or default rate of 10% per annum), plus all capitalized fees and expenses, on a senior secured, super-priority basis ("DIP Facility"), pursuant to Sections 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1) and on the terms and conditions of the "*Rdio, Inc. - Term Sheet for Debtor-in-Possession Credit Facility*" (as amended, supplemented, restated, or otherwise modified from time to time, the "DIP Term Sheet")[4] by and among the Debtor, Iconical II and Pulser Media, substantially in the form of **Exhibit "1"** attached hereto, secured automatically by all property and assets of the Debtor. By execution of the DIP Term Sheet, Pulser Media, which is the only other creditor which asserts liens upon the DIP Collateral, has acknowledged and agreed to the priming of its pre-petition

---

[3] All capitalized terms used herein which are not otherwise defined shall have the meanings given in the DIP Term Sheet.

[4] To the extent there are any inconsistencies between the summary contained herein and the DIP Term Sheet, such inconsistencies shall be resolved in favor of the DIP Term Sheet which shall control.

liens and the use of cash collateral.

34.      The Debtor and its investment banker had explored financing options as part of its solicitation of a sale and other strategic transaction; however, given the Debtor's persistent operating losses and other financial circumstances, the Debtor was unable to obtain sufficient interim and long-term financing from sources other than Iconical II on terms and subject to conditions more favorable than under the DIP Term Sheet because all of the Debtor's property and assets are encumbered by liens securing claims which substantially exceeded and still exceed the value of the Debtor's assets.  Therefore, no lender would lend to the Debtor in a junior position, or extend unsecured credit allowable only as an administrative expense under Section 503(b)(1).  The Debtor was also unable to obtain credit from Iconical II without providing Iconical II with (1) a "super-priority" administrative expense claim pursuant to Section 364(c)(1) for the obligations arising under the DIP Term Sheet, (2) a perfected first-priority lien on all unencumbered DIP Collateral pursuant to Section 364(c)(3), (3) a perfected junior lien on all property and assets of the Debtor that are subject to valid, enforceable, and non-avoidable liens in existence on the Petition Date, which liens are Permitted Senior Liens (as defined below) pursuant to Section 364(c)(3), (4) perfected first-priority Priming Liens upon all of the Debtor's property and assets to secure the obligations arising under the DIP Term Sheet pursuant to Section 364(d)(1), and (5) the other protections for the DIP Lender in the DIP Term Sheet and in the Financing Orders as set forth therein.

35.      The Debtor therefore concluded, in an exercise of its sound business judgment, that the DIP Facility proposed to be provided by Iconical II, when coupled with the MSA and the consent to use Cash Collateral to be provided by Iconical II and Pulser Media, represents the best financing presently available to the Debtor.  The terms of the DIP Term Sheet are the result of good faith, arms-length negotiations between the Debtor and Iconical II.  Thus, any credit to be extended, loans to be made, and other financial accommodations to be extended to the Debtor by Iconical II will be extended, issued or made, as the case may be, in "good faith".

36.      Pursuant to the DIP Term Sheet, the Debtor is required to obtain the Interim Order by not later than November 20, 2015, and to obtain the Final Order by not later than

December 16, 2015, which authorize the DIP Facility.  Under the terms of the DIP Term Sheet, $1.8 million of the DIP Facility will be advanced to the Debtor upon satisfaction of certain conditions precedent to the initial funding, including, but not limited to, the Court's entry of the Interim Order that is acceptable to Iconical II and the Prepetition Secured Parties and each of their counsel in each of their sole discretion, and so long as the Interim Order is in full force and effect and shall not have been reversed, stayed, modified, or amended without the express written consent of Iconical II and the Prepetition Secured Parties, and no application or motion shall have been made for any stay, modification or amendment of the Interim Order and no stay, appeal or leave to appeal shall be pending.  The remaining $1.2 million of the DIP Facility shall be advanced to the Debtor upon satisfaction of certain conditions precedent to the final funding, including, but not limited to, the Court's entry of the Final Order that is acceptable to Iconical II and the Prepetition Secured Parties and each of their counsel in each of their sole discretion, and so long as the Final Order is in full force and effect and shall not have been reversed, stayed, modified, or amended without the express written consent of Iconical II and the Prepetition Secured Parties, and no application or motion shall have been made for any stay, modification or amendment to the Final Order, and no stay, appeal or leave to appeal shall be pending.

37.     By the Motion, the Debtor seeks immediate Court authority to enter into and deliver the DIP Term Sheet and all other related documents and agreements, including security agreements, deposit account control agreements, pledge agreements, guaranties and promissory notes (collectively, "DIP Documents"), and Court approval of all of the terms and conditions of the DIP Term Sheet, including, without limitation, the salient provisions relating to security, priority and liens, budget, carve-out, adequate protection, maturity, repayment of the DIP Facility and releases, the Debtor's stipulations, waivers, and automatic stay provisions as described in the Motion.  The form of the proposed Interim Order approved by Iconical II is attached hereto as **Exhibit "2"**.  As reflected in the form of the Interim Order submitted to the Court, Iconical II requires that all of the provisions contained in the DIP Term Sheet be approved on an interim basis, except as expressly excluded below or in the DIP Term Sheet as a term which is effective only upon the entry of the Final Order.

38.     In addition to the foregoing, the Debtor requests that the Financing Orders include provisions instructing and enjoining any banking or other financial institution at which the Debtor maintained any accounts not to freeze or close such accounts in order to allow for the Debtor to access its Cash Collateral or proceeds of the DIP Facility to stay in business until the Debtor has had a reasonable opportunity to establish in a timely manner debtor-in-possession accounts.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this 16th day of November 2015, at San Francisco, California.

ELLIOTT PETERS

# EXHIBIT "1"

**Rdio, Inc.**
**Term Sheet for Debtor-in-Possession Credit Facility**

| | |
|---|---|
| ***Borrower*** | Rdio Inc. a Delaware corporation (the "**Borrower**" or the "**Debtor**"), as a debtor-in-possession in a case (the "**Chapter 11 Case**") to be filed under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Northern District of California (the "**Court**"). |
| ***Lender*** | Iconical Investments II LP, a Cayman limited partnership (the "**DIP Lender**"). |
| ***DIP Loans and Commitment*** | The DIP Lender will make loans (the "**DIP Loans**") to the Borrower under a superpriority debtor in possession term loan credit facility (the "**DIP Facility**") in an aggregate principal amount not to exceed in the aggregate $3,000,000 plus all capitalized interest thereon and all capitalized fees and expenses, in each case pursuant to the terms herein (such amount, the "**Principal Amount**") to be made available to the Borrower in accordance with the Budget (as defined below) until the Maturity Date (as defined below). Upon the entry of the Interim DIP Order (as defined below), the Borrower shall be permitted to borrow in a single drawing an amount not to exceed $1,800,000, subject to the terms and conditions set forth in this term sheet (this "**Term Sheet**") and the Interim DIP Order in accordance with the Budget (the "**Initial DIP Loan**"). Upon the entry of the Final DIP Order (as defined below), the Borrower shall be permitted to borrow in a single drawing an amount not to exceed $1,200,000, subject to the terms and conditions set forth in this Term Sheet and the Final DIP Order in accordance with the Budget (the "**Final DIP Loan**"). The DIP Lender's agreement to make (i) the Initial DIP Loan shall terminate automatically on the Closing Date after giving effect to the borrowing of the Initial DIP Loan on such date and (ii) the Final DIP Loan shall terminate automatically on the Final Funding Date (as defined below). |
| ***DIP Obligations*** | As used in this Term Sheet, (any collateral documents, guaranties, the Budget and all such instruments and documents as may be executed and delivered in connection with or relating to the DIP Facility, the Interim DIP Order and the Final DIP Order (as defined below) and any certificate or other document made or delivered pursuant hereto or thereto (collectively, the "**DIP Documents**")), the term "**DIP Obligations**" means (a) the due and punctual payment by the Borrower of (i) the unpaid principal amount of and interest on (including interest accruing after the maturity of the DIP Loans and interest accruing after (or that would have accrued but |

1

for) the commencement of the Chapter 11 Case or any case or proceeding by or against the Borrower under any federal or state bankruptcy, insolvency, receivership, or similar law, whether or not allowed in such case or proceeding) on the DIP Loans, as and when due, whether at maturity, by acceleration or otherwise, and (ii) all other monetary obligations, including advances, debts, liabilities, obligations, fees, costs, expenses, and indemnities, whether primary, secondary, direct, indirect, absolute or contingent, due or to become due, now existing or hereafter arising, fixed or otherwise, of the Debtor to the DIP Lender under this Term Sheet, the other DIP Documents, the Interim DIP Order, and the Final DIP Order, and (b) the due and punctual payment and performance of all covenants, duties, agreements, obligations and liabilities of the Debtor to the DIP Lender under or pursuant to this Term Sheet, the other DIP Documents, the Interim DIP Order, and the Final DIP Order.

***Use of Proceeds***

The proceeds of the DIP Facility shall be used by the Debtor solely to (i) fund the Debtor's operations, (ii) to conduct and pursue a sale and liquidation process (the "**Sale**") as set forth herein, as described in the Bidding Procedures Order (as defined in the Stalking Horse APA), (iii) pay all other expenses owing, (iv) pay all fees owing to the Court and the United States Trustee, and (v) pay all expenses to third party vendors for photocopying, postage and mailings, in the case of clauses (i) through (v), as set forth in and in accordance with the budget approved by the DIP Lender in its sole discretion (the "**Budget**"), subject to the Permitted Variance (as defined below), as such Budget may be modified with the written consent of each of (a) the DIP Lender and (b) the Prepetition Secured Parties (as defined below), in each of their sole discretion, and without further order of the Court. Compliance with the Budget will be measured every month (after the first month of the Chapter 11 Case) on a trailing four week basis.

The Borrower may amend the Budget solely with the written consent of each of (a) the DIP Lender and (b) the Prepetition Secured Parties, in each of their sole discretion. At any given time, the Debtor's actual cash disbursements may deviate from the Budget by 15% on a line item basis without any further approval of the DIP Lender; provided that there shall be no deviation from the Budget on a cumulative basis (the "**Permitted Variance**"). As further set forth below, after the first month of the Chapter 11 Case, on each Reporting Date (as defined below), the Debtor shall provide the DIP Lender with weekly and cumulative variance reporting on a line item basis, which reporting shall (i) detail the variance, if any, of actual cash disbursements and actual cash

|   |   |
|---|---|
| | receipts from the Budget and (ii) provide an explanation of any per line item variance greater than 5% (the "**Variance Report**"). |
| ***Interest Rate*** | Interest on the DIP Loans made under the DIP Facility shall be equal to the Base Rate. On November 30, 2015, December 31, 2015 and the Maturity Date (any such day being hereinafter referred to as an "**Interest Calculation Date**"), the amount of all interest accrued through such date and not previously capitalized shall be capitalized and added to the Principal Amount. Any such amount so capitalized will thereafter accrue interest at the Base Rate. Prior to the Maturity Date, Borrower may pay, but the DIP Lender shall have no right to demand, on any Interest Calculation Date other than the Maturity Date, all or any portion of the accrued and unpaid interest under the DIP Facility in cash. |
| ***Base Rate*** | 8.0% per annum (the "**Base Rate**"). |
| ***Default Interest*** | Upon the occurrence and during the continuation of any Event of Default (as defined below) (including without limitation any default in payment of any obligations under the DIP Facility when such obligations are due), interest on the DIP Loans shall be payable at the Base Rate, *plus* 2.0% per annum, payable on demand. |
| ***Maturity*** | Unless accelerated by an Event of Default, the DIP Facility shall be paid in full in cash on the date (the "**Maturity Date**") which is the earliest of (a) January 15, 2015; (b) the effective date of a plan of reorganization or liquidation for the Debtor; (c) the consummation of the Sale or a sale(s) of all or substantially all of the assets of the Debtor; (d) the occurrence of an Event of Default; (e) the entry of an order by the Court approving an alternative DIP facility; and (f) such later date as the DIP Lender in its sole discretion may agree to in writing with the Debtor. The Maturity Date shall be accelerated upon the occurrence of an Event of Default, subject to the Default Notice Period. |
| ***Voluntary Prepayments*** | The Borrower may prepay the DIP Facility in whole or in part at any time without premium or penalty. |
| ***Mandatory Prepayments*** | The proceeds from any asset sales (other than sales in the ordinary course of business) shall be applied in the following order: (i) to pay or fund a restricted account maintained by counsel for the Debtor in the amount of (x) all allowed and unpaid professional fees and disbursements (regardless of when such fees and disbursements become allowed by order of the Court, with an estimate to be agreed upon by the parties or as ordered by the Court |

3

if such fees and disbursements have not yet been allowed by the Court) incurred or accrued by the Debtor and the Committee at any time on or prior to the date of the closing of the sale in an aggregate amount not exceeding such unpaid professional fees and disbursements reflected on the Budget plus (y) allowed and accrued administrative expenses of the types included in the Carve Out (as defined below); (ii) to pay the fees and expenses of the DIP Lender and the Prepetition Secured Parties; (iii) to pay any interest with respect to the principal amount of the DIP Loans being repaid which has accrued but is not yet due and payable; and (iv) to pay the principal amount of DIP Loans.

| | |
|---|---|
| ***Conditions Precedent to Funding of Initial DIP Loan*** | Availability of the Initial DIP Loan under the DIP Facility shall be subject to the following conditions precedent, all of which shall be for the benefit of the DIP Lender and must be satisfied on occasion of the borrowing of the Initial DIP Loan under the DIP Facility, unless waived in writing in advance by the DIP Lender: |

1.  The Court shall have issued an interim order, in form and substance acceptable to the DIP Lender, the Prepetition Secured Parties and each of their counsel in each of their sole discretion, on or before November 20, 2015, in substantially the form annexed hereto as **Exhibit A** or such other form as may be agreed to by the DIP Lender, the Prepetition Secured Parties and each of their counsel, in each of their sole discretion (the "**Interim DIP Order**") which order shall, among other things, approve the DIP Facility on an interim basis, including, without limitation, the grant of, pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, valid, enforceable, non-avoidable, and fully perfected security interests in and liens and mortgages (collectively, the "**DIP Liens**") upon all DIP Collateral (as defined below), with the priority as set forth in the section entitled "**Priority and Liens**" below, to secure the DIP Obligations in accordance with the terms hereof, effective immediately upon the granting of the Interim DIP Order, without the need for any further action on the part of the DIP Lender, the Debtor or any other person (including, without limitation, the execution or delivery of any further documents or agreements or the recording, filing, indexing, entering, or registering of any financing statements or other similar instruments or documents), and the Interim DIP Order shall provide for adequate protection in favor of the Prepetition Secured Parties as and to the extent provided herein.

2.  The Interim DIP Order shall be in full force and effect and

4

shall not have been reversed, stayed, modified, or amended without the express written consent of the DIP Lender and the Prepetition Secured Parties, and no application or motion shall have been made to the Court for any stay, modification or amendment of the Interim DIP Order and no stay, appeal or leave to appeal with respect to same shall be pending.

3.    The DIP Lender shall be satisfied that it has been granted and holds a perfected first-priority lien on, and security interest in, all of the DIP Collateral and proceeds thereof, whether then owned or thereafter acquired, including, without limitation, the Services Agreement Collateral (as defined below), subject only to the Carve Out, the Permitted Senior Liens, and adequate protection liens granted to the holders of the Permitted Senior Liens on the collateral securing the same, if any. "**Services Agreement Collateral**" means that certain Master Services Agreement, dated as of November 16, 2015 (as amended, restated, supplemented or otherwise modified from time to time with the prior written consent of the DIP Lender and the Prepetition Secured Parties and each of their counsel in each of their sole discretion, the "**Services Agreement**"), by and between Rdio, Inc., a Delaware corporation, and Pandora Media, Inc., a Delaware corporation, all of the Debtor's rights to payment thereunder, all accounts in connection therewith, all cash received by the Debtor in connection therewith, all deposit accounts into which such cash is deposited, and all proceeds of the foregoing.

4.    All fees and expenses payable by the Debtor on or prior to the closing date of the DIP Facility (the "**Closing Date**") (including but not limited to the fees and expenses of legal counsel and financial advisors), to the DIP Lender shall have been paid, with such fees and expenses being capitalized on the Closing Date and added to the Principal Amount.

5.    All "first-day orders" entered by the Court at the time of the commencement of the Chapter 11 Case shall be reasonably satisfactory in form and substance to the DIP Lender.

6.    The DIP Lender and the Prepetition Secured Parties shall have received and approved the Budget.

7.    All representations and warranties of the Debtor set forth in this Term Sheet shall be accurate in all material respects

5

(except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of such date as if made on and as of such date, and after giving effect to the Initial DIP Loan to be made on such date (except to the extent that such representations and warranties specifically relate solely to an earlier date thereto, in which case such representation and warranty shall be true and correct as of such earlier date).

8. No event has occurred and is continuing that constitutes an Event of Default or would constitute an Event of Default, but for the requirement that notice be given or time elapse or both.

***Conditions Precedent to Funding of Final DIP Loan***

Availability of the Final DIP Loan under the DIP Facility shall be subject to the following conditions precedent (the date that such conditions precedent are satisfied, the "**Final Funding Date**"), all of which shall be for the benefit of the DIP Lender and must be satisfied on occasion of the borrowing of the Final DIP Loan under the DIP Facility, unless waived in writing in advance by the DIP Lender:

1. The Court shall have entered a final and nonappealable order, in form and substance acceptable to the DIP Lender, the Prepetition Secured Parties and each of their counsel in each of their sole discretion, on or before December 16, 2015, in a form substantially similar in all material respects to the Interim DIP Order or such other form as may be agreed to by the DIP Lender, in relation to the Debtor (the "**Final DIP Order**") which order shall, among other things, (i) contain and approve the admissions, stipulations, and agreements of the Debtor, on behalf of and for itself, with regard to the Prepetition Indebtedness, the Prepetition Agreements, and the Prepetition Liens, in each case on a final basis, (ii) provide that such admissions, stipulations, and agreements shall be binding on all parties-in-interest, including the Committee if no "Challenge" (as defined in the Interim DIP Order and the Final DIP Order) is commenced within thirty days of entry of the Interim DIP Order, (iii) approve the DIP Facility on a final basis, including, without limitation, the grant of, pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, valid, enforceable, non-avoidable, and fully perfected DIP Liens upon all DIP Collateral, with the priority as set forth in the section entitled "**Priority and**

6

**Liens**", to secure the DIP Obligations in accordance with the terms hereof, effective as of the granting of the Interim DIP Order, without the need for any further action on the part of the DIP Lender, the Debtor or any other person (including, without limitation, the execution or delivery of any further documents or agreements or the recording, filing, indexing, entering, or registering of any financing statements or other similar instruments or documents).

2.      The Final DIP Order shall be in full force and effect and shall not have been reversed, stayed, modified, or amended without the express written consent of the DIP Lender and the Prepetition Secured Parties, and no application or motion shall have been made to the Court for any stay, modification or amendment of the Final DIP Order and no stay, appeal or leave to appeal with respect to same shall be pending.

3.      All of the funds available under the Interim DIP Order shall have been borrowed and used in accordance with the Budget, subject to the Permitted Variance.

4.      The DIP Lender shall be satisfied that it has been granted and holds a perfected first-priority lien on, and security interest in, all of the DIP Collateral and proceeds thereof, whether then owned or thereafter acquired, including, without limitation, the Services Agreement Collateral, subject only to the Carve Out, the Permitted Senior Liens, and adequate protection liens granted to the holders of the Permitted Senior Liens on the collateral securing the same, if any.

5.      All fees payable by the Debtor on or prior to the Final Funding Date (including but not limited to the fees and expenses of legal counsel and financial advisors), to the DIP Lender shall have been paid, with such fees and expenses being capitalized on the Final Funding Date and added to the Principal Amount.

6.      All "first-day orders" entered by the Court at the time of the commencement of the Chapter 11 Case and any related "final orders" subsequently entered by the Court shall be reasonably satisfactory in form and substance to the DIP Lender.

7.      The DIP Lender and the Prepetition Secured Parties shall have received and approved the Budget and the Debtor shall

7

Case: 15-31430    Doc# 3    Filed: 11/16/15    Entered: 11/16/15 16:34:05    Page 21 of 201

be in compliance with the Budget, subject to the Permitted Variance.

8.  All representations and warranties of the Debtor set forth in this Term Sheet shall be accurate in all material respects (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of such date as if made on and as of such date, and after giving effect to the Final DIP Loan to be made on such date (except to the extent that such representations and warranties specifically relate solely to an earlier date thereto, in which case such representation and warranty shall be true and correct as of such earlier date).

9.  No event has occurred and is continuing that constitutes an Event of Default or would constitute an Event of Default, but for the requirement that notice be given or time elapse or both.

10. The Court shall have entered a final and nonappealable order, in form and substance acceptable to the DIP Lender, the Prepetition Secured Parties and each of their counsel in each of their sole discretion, by not later than November 30, 2015, which order shall, among other things, approve the Services Agreement, which agreement shall be in form and substance acceptable to the DIP Lender, the Prepetition Secured Parties and each of their counsel in each of their sole discretion.

11. The Debtor shall have received the full amount of funds payable to the Debtor under the Services Agreement.

*Security*                As security for the payment and performance in full of the DIP Obligations, the Debtor hereby grants to the DIP Lender a security interest in and continuing lien on all of the Debtor's right, title, and interest in, to, and under all assets of the Debtor, including, but not limited to the following, in each case, whether now owned or existing or hereafter acquired, created or arising and wherever located (all of which being hereafter collectively referred to as the "**DIP Collateral**"): all assets and property of the Debtor and its estate, real or personal, tangible or intangible, now owned or hereafter acquired, whether arising before or after the Petition Date, including, without limitation, all contracts, general intangibles, instruments, equipment, accounts, and documents, all goods, inventory and fixtures, all documents, cash, cash equivalents,

8

Case: 15-31430   Doc# 3   Filed: 11/16/15   Entered: 11/16/15 16:34:05   Page 22 of 201

chattel paper, letters of credit and letter of credit rights, investment property, commercial tort claims, money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations, all interests in leaseholds and real properties, all patents, copyrights, trademarks, tradenames, domain names, source code and other intellectual property, all equity interests in all subsidiaries of the Borrower, all Services Agreement Collateral, all books and records relating to the foregoing, all other personal and real property of the Debtor, and all other collateral pledged under the DIP Documents, any actions under sections 544, 545, 547, 548 and 550 of the Bankruptcy Code (the "**Avoidance Actions**") (*provided* that the DIP Lender shall receive perfected security interests in and a lien on Avoidance Actions only upon entry of the Final DIP Order), and all proceeds, products, accessions, rents, and profits of or in respect of any of the foregoing (in each case as the foregoing are defined in the Uniform Commercial Code as in effect from time to time in the State of California (and, if defined in more than one Article of such Uniform Commercial Code, shall have the meaning given in Article 9 thereof)); *provided* that DIP Collateral shall not include, and the DIP Liens and Adequate Protection Liens shall not attach to, any of the outstanding equity interest in any foreign subsidiary of the Borrower in excess of 65% of the voting power of the equity interests in such foreign subsidiary of the Borrower.

| | |
|---|---|
| ***Priority and Liens*** | The DIP Obligations shall: |

      (a) pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to super-priority administrative expense status in the Chapter 11 Case (the "**DIP Superpriority Claims**");

      (b) pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first-priority lien on all unencumbered DIP Collateral;

      (c) pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all property and assets of the Debtor that are subject to valid, enforceable, and non-avoidable liens in existence on the Petition Date, which liens are (i) permitted under the Prepetition Financing Documents, (ii) senior to the liens securing the Prepetition Financing Documents, and (iii) either perfected as of the Petition Date or subsequently perfected pursuant to section 546(b) of the Bankruptcy Code (collectively, the "**Permitted Senior Liens**");

(d) pursuant to section 364(d)(1) of the Bankruptcy Code, be secured by a first-priority senior priming lien on the DIP Collateral (the "**Priming Lien**") that is senior to and primes (the "**Primed Liens**") (i) the liens securing the Prepetition Financing Documents and all liens junior thereto, and (ii) any adequate protection liens granted (x) to the Prepetition Secured Parties after the commencement of the Chapter 11 Case in respect of the obligations under any Prepetition Financing Documents (as defined below), and (y) in respect of any liens junior to the liens securing the obligations under any Prepetition Financing Documents; and

(e) be subordinate only to (i) Permitted Senior Liens (and adequate protection liens granted to the holders thereof on the collateral securing the same, if any), and (ii) the Carve-Out.

"**Prepetition Financing Documents**" means:

(i) that certain Third Amended and Restated Secured Promissory Note, dated July 10, 2015 (as heretofore amended, restated, amended and restated, supplemented or otherwise modified, the "**Prepetition Second Lien Note**"), by and between Debtor and Pulser Media, Inc., a Delaware corporation, as lender (in such capacity, the "**Prepetition Second Lien Noteholder**");

(ii) that certain Note Purchase Agreement, dated as of October 19, 2015 (as heretofore amended, restated, amended and restated, supplemented or otherwise modified, the "**Prepetition First Lien Note Purchase Agreement**"), by and among the Debtor, Iconical Investments II LP, as purchaser (the "**Prepetition First Lien Noteholder**"),[1] and Iconical Investments II LP, as collateral agent (in such capacity, the "**Prepetition First Lien Collateral Agent**", and together with the Prepetition First Lien Noteholder, the "**Prepetition First Lien Secured Parties**", and collectively with the Prepetition Second Lien Noteholder, the "**Prepetition Secured Parties**");

(iii) that certain Security Agreement, dated as of October 19, 2015 (as heretofore amended, restated, amended and restated,

---

[1] Loans are made by purchasing notes from the company, with the purchaser under a note purchase agreement and the corresponding note being the equivalent of a lender under a credit agreement.

Case: 15-31430    Doc# 3    Filed: 11/16/15    Entered: 11/16/15 16:34:05    Page 24 of 201

supplemented or otherwise modified, the "**Prepetition First Lien Security Agreement**") by the Debtor and Pulser Media, Inc. ("**Pulser**"), as grantors, in favor of Collateral Agent;

(iv) that certain Guaranty Agreement, dated as of October 19, 2015 (as heretofore amended, restated, amended and restated, supplemented or otherwise modified, the "**Guaranty**"), by and between Pulser, as guarantor, in favor of the holders of notes issued pursuant to the Prepetition First Lien Note Purchase Agreement;

(v) that certain Note, dated as of October 19, 2015 (as heretofore amended, restated, amended and restated, supplemented or otherwise modified, the "**Prepetition First Lien Note**"), by the Debtor in favor of Iconical Investments II LP, as purchaser;

(vi) that certain Patent Security Agreement, dated as of October 19, 2015 (as heretofore amended, restated, amended and restated, supplemented or otherwise modified, the "**Patent Security Agreement**"), by the Debtor in favor of Collateral Agent;

(vii) that certain Trademark Security Agreement, dated as of October 19, 2015 (as heretofore amended, restated, amended and restated, supplemented or otherwise modified, the "**Trademark Security Agreement**"), by the Debtor in favor of Collateral Agent; and

(viii) that certain Intercreditor Agreement, dated as of October 19, 2015 (as heretofore amended, restated, amended and restated, supplemented or otherwise modified, the "**Intercreditor Agreement**"), by and between the Prepetition First Lien Collateral Agent and the Prepetition Second Lien Noteholder.

*Carve Out*                    As more fully set forth in the Interim DIP Order and Final DIP Order, the DIP Liens on the DIP Collateral and the DIP Superpriority Claims shall be subordinate to the Carve Out.

For purposes hereof, the "**Carve Out**" means, with respect to the period prior to the closing of the Sale: (a) all unpaid fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code, (b) all reasonable fees and expenses incurred by a trustee under Section 726(b) of the Bankruptcy Code not to exceed

936167.02B-CHISR01A - MSW

$25,000, (c) after the occurrence and during the continuance of a Carve-Out Event (as defined below), unpaid professional fees and disbursements incurred by the Debtor and any statutory committee appointed in the Chapter 11 Case (the "**Committee**"), that are in compliance with the Budget, in an aggregate amount not to exceed $500,000 less fees paid to professionals during the pendency of the Chapter 11 Case until the closing of the Sale (which amount may be used subject to the terms of this Term Sheet, the Interim DIP Order and the Budget and shall be supported by back-up documentation in respect of the amounts and dates of incurrence of such fees and disbursements), in each of the foregoing clauses (a), (b) and (c), to the extent allowed by the Court at any time; *provided*, *however,* that nothing herein shall be construed to impair the ability of any party-in-interest in the Chapter 11 Case to object to any of the fees, expenses, reimbursement or compensation described in clause (c) above.

For purposes hereof, the "**Carve Out**" means, with respect to the period after the closing of the Sale and payment in full in cash of the DIP Obligations:[2] (a) amounts due to employees of the Debtor pursuant to (x) the Bonus Agreements (as such term is defined and described in the Debtors' Emergency Motion for Authority to Honor Pre-Petition Cash Bonus Incentive Agreements) and (y) employee severance agreements, *provided* that, in each case, the Prepetition First Lien Secured Parties have countersigned such Bonus Agreement or severance agreement, as applicable, to indicate the Prepetition First Lien Secured Parties' consent to such carve-out, (b) all unpaid fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code, (c) all reasonable fees and expenses incurred by a trustee under Section 726(b) of the Bankruptcy Code not to exceed $25,000, (d) after the occurrence and during the continuance of Carve-Out Event, all allowed and unpaid professional fees and disbursements incurred by the Debtor and the Committee, that are in compliance with the Budget, in an aggregate amount not to exceed $200,000 in the aggregate for the Debtor and $100,000 in the aggregate for the Committee, which amounts may be used subject to the terms of this Term Sheet, the Interim DIP Order, and the Budget, and (e) all allowed and unpaid professional fees and disbursements (regardless of when such fees and disbursements become allowed by order of the Court) incurred or accrued by the Debtor and the Committee at any time when no

---

[2] For the avoidance of doubt, the Carve-Out set forth in this paragraph is granted by the Prepetition Secured Parties with respect to their Cash Collateral.

Case: 15-31430   Doc# 3   Filed: 11/16/15   Entered: 11/16/15 16:34:05   Page 26 of 201

Carve-Out Event is continuing, that remain unpaid subsequent to a Carve-Out Event, in an aggregate amount not exceeding such unpaid professional fees and disbursements reflected on the most recent Budget delivered to and approved by the Prepetition Secured Parties prior to any Carve-Out Event that is then continuing, to be supported by back-up documentation in respect of the amounts and dates of incurrence of such fees and disbursements), in each of the foregoing clauses (a), (b), (c), (d), and (e), to the extent allowed by the Court at any time; *provided*, *however,* that nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement or compensation described in clauses (c), (d) and (e) above.

For purposes hereof, a "**Carve-Out Event**" shall occur, (i) with respect to the period prior to the closing of the Sale, upon the occurrence and during the continuation of an Event of Default and upon the delivery of written notice thereof by the DIP Lender to bankruptcy counsel to the Debtor and bankruptcy counsel to the Committee and (ii), with respect to the period after the closing of the Sale, upon the occurrence and during the continuation of a Cash Collateral Termination Event (as defined in the Interim DIP Order) and upon the delivery of written notice thereof by the Prepetition Credit Parties to bankruptcy counsel to the Debtor and bankruptcy counsel to the Committee (a notice delivered pursuant to clause (i) or clause (ii) hereof, a "**Carve-Out Notice**"). Upon receipt of such notice, the Debtor shall provide immediate notice by email to all retained professionals informing them that a Carve-Out Event has occurred and that the Debtor's ability to pay professionals is subject to the Carve Out.

|                        |                                                                 |
| ---------------------- | --------------------------------------------------------------- |
| *Adequate Protection*  | As adequate protection for the use of the Prepetition Collateral, including Cash Collateral (as defined in the Interim DIP Order), the Prepetition Secured Parties with a valid, perfected, enforceable, continuing and non-avoidable prepetition lien on or security interest in property of the Debtor shall be granted adequate protection for, and in equal amount to, the diminution in value of its valid, perfected, enforceable, continuing and non-avoidable prepetition security interests in the form of superpriority claims and replacement liens on all assets securing the DIP Facility (the "**Adequate Protection Liens**"), which claims and Adequate Protection Liens shall be junior in priority and subject in all respects to the DIP Liens, the Carve Out and the Permitted Senior Liens (and adequate protection liens granted to the holders thereof on the collateral securing the same, if any), but shall be senior to the Prepetition Liens. In addition, the Prepetition First Lien Secured Parties shall be entitled to the payment of postpetition |

13

interest, as provided for in the applicable Prepetition Agreements. The Prepetition Secured Parties shall also be entitled to payment of the reasonable and documented fees and expenses incurred in connection with the Chapter 11 Case, which fees and expenses shall be paid on the closing date of the Sale.

| | |
|---|---|
| ***Commitment and Other Fees*** | None. |
| ***Expenses*** | On the Sale closing date, the Borrower shall reimburse the DIP Lender for the fees and expenses incurred by the DIP Lender, with such fees and expenses being capitalized on the Sale closing date and added to the Principal Amount. |
| ***Representations and Warranties*** | The Debtor hereby represents and warrants that: |

1.      The Debtor is duly organized, validly exists, in good standing and qualified to do business in its state of organization.

2.      The Debtor has full power and authority to operate its business, conduct its business and to execute, deliver and perform its obligations under this Term Sheet, the associated documents, and its obligations under the Interim DIP Order and the Final DIP Order.

***Affirmative Covenants***

1.      The Debtor covenants and agrees with the DIP Lender that, unless the DIP Lender otherwise consents in writing, so long as any amount payable hereunder is outstanding or the DIP Facility shall remain in place, it shall only use the proceeds of the DIP Loans for the purposes set out herein and identified in and consistent with the Budget and subject to the challenge rights set forth in the section entitled "**Release**" below, shall not use such funds to commence any action against the DIP Lender or any of its present or former predecessors, successors, assigns, affiliates, members, partners, managers, current or former equity holders, officers, agents, employees, attorneys or affiliates, including, without limitation, the Prepetition Secured Parties.

2.      As more fully set forth in the Interim DIP Order and Final DIP Order, the Debtor further covenants and agrees that no Obligation under the DIP Facility shall be subject to setoff or recoupment or any such rights under Bankruptcy Code section 553 or otherwise with respect to any claim the

14

936167.02B-CHISR01A - MSW

Debtor may have against the DIP Lender arising on or before the Petition Date.

3. The Debtor further covenants and agrees that it shall:

(a) deliver to the DIP Lender (i) certifications upon submission of the borrowing request for the DIP Loans with respect to compliance with the Budget and any other information reasonably requested by the DIP Lender, (ii) every month (after the first month of the Chapter 11 Case) and no later than the 17th day of each month (the "**Reporting Date**"), the Variance Report, (iii) every month a revised rolling-6 week cash flow projection no later than the 17th day of each month, (iv) as soon as possible and in any event within three (3) business days after an officer or director of the Debtor obtains actual knowledge, or after due inquiry, would have obtained such knowledge by acting in good faith and in a prudent manner in the performance of his or her duties, of the occurrence of any condition, occurrence or event which, after notice or lapse of time or both, would constitute an Event of Default (a "**Default**"), a statement of an officer or director of the Debtor setting forth details of such Default and the action which the Debtor has taken and proposes to take with respect thereto, and (v) as soon as possible and in any event within three (3) business days after an officer or director of the Debtor obtains actual knowledge, or after due inquiry, would have obtained such knowledge by acting in good faith and in a prudent manner in the performance of his or her duties, of the occurrence of any material adverse development with respect to any loss, damage, investigation, claim, litigation, action, proceeding, or controversy involving the Debtor, notice thereof and as soon as practicable thereafter, to the extent the DIP Lender requests, copies of all documentation relating thereto;

(b) permit the DIP Lender and its representatives and designees to visit and inspect the properties, books, and records of the Debtor upon reasonable notice at the Debtor's expense;

(c) subject to the Budget, pay all taxes, assessments, contributions and other governmental charges

imposed upon the Debtor or any of its properties or assets as they become due and payable, to the extent payment and/or enforcement thereof is not stayed as a result of the Chapter 11 Case;

(d)   maintain in good working order all material properties used in the business of the Debtor, as and to the extent in good working order as of the Petition Date;

(e)   maintain insurance with respect to the business and properties of the Debtor against loss of the kind and in the amounts maintained by the Debtor as of the Petition Date;

(f)   comply in all material respects with the requirements of all applicable laws;

(g)   promptly upon request execute and deliver such documents and do such other acts as the DIP Lender may reasonably request in connection with the DIP Facility, and in accordance with the DIP Documents (including but not limited to execution of any additional security documents that may be required by the DIP Lender to secure or perfect the DIP Liens), in each case at the Debtor's expense;

(h)   maintain compliance with the Budget (subject to any Permitted Variance) and all other provisions of this Term Sheet;

(i)   include the DIP Lender and the Prepetition Secured Parties (and any of their respective present and former predecessors, successors, assigns, affiliates, members, partners, managers, current and former equity holders, officers, agents, employees, attorneys and affiliates) as released and exculpated parties in the release and exculpation provisions of any plan pursued in the Chapter 11 Case; and

(j)   perform all obligations of the Debtor under the DIP Facility, the DIP Documents, and the Interim DIP Order and the Final DIP Order, as applicable.

***Negative Covenants***   The Debtor covenants and agrees that it shall not:

1.   except to the extent existing as of the Closing Date, incur any indebtedness (other than the DIP Loans and obligations

16

permitted to be incurred under the Budget, any other indebtedness permitted in writing to be incurred by the DIP Lender and the Court, and any unsecured obligations incurred in the ordinary course of business by the Debtor and permitted to be incurred by the DIP Budget);

2.  except to the extent existing as of the Closing Date and other than the Carve Out expenses as permitted by this Term Sheet and the Adequate Protection Liens as set forth in the proposed form of Interim Order attached as **Exhibit A** hereto, consent to the granting of adequate protection payments or liens, superpriority administrative expense claims or liens having priority senior or *pari passu* with the liens granted to the DIP Lender or the Adequate Protection Liens granted to the Prepetition Secured Parties or otherwise incur, create or suffer to exist any liens other than liens permitted in writing by the DIP Lender and the Prepetition Secured Parties and lien on escrow accounts and proceeds deposited therein, in each case arising in connection with the Sale; provided that the escrow agreements in connection therewith shall be in form and substance satisfactory to the DIP Lender;

3.  except to the extent existing as of the Closing Date, make any investments in any person or make any loan to any person (other than as permitted in writing by the DIP Lender);

4.  engage in any business other than the businesses engaged in by the Debtor on the Closing Date except with the written consent of the DIP Lender;

5.  terminate or agree to any modification to any organizational documents of the Debtor except with the written consent of the DIP Lender; or

6.  make any payment of prepetition claims or payment of postpetition items except in accordance with the Budget.

*Events of Default*    The occurrence of any one or more of the following events (each such event and the expiry of the cure period, if any, provided in connection therewith, being herein referred to as an "**Event of Default**") shall constitute a default under this Term Sheet:

1.  The failure by the Debtor to perform or comply with any term, condition, covenant, or obligation (including a payment obligation) contained in this Term Sheet, the

17

Interim DIP Order or Final DIP Order, on its part to be performed or complied with where any such failure to perform or comply shall not be remedied within three (3) business days following receipt by the Debtor and bankruptcy counsel to the Debtor and bankruptcy counsel to the Committee of notice of default from the DIP Lender.

2.      The cessation of the DIP Facility to be in full force and effect or the DIP Facility being declared by the Court to be null and void or the validity or enforceability the DIP Facility being contested by the Debtor or the Debtor denying that it has any further liability or obligation under the DIP Facility or the DIP Lender ceasing to have the benefit of the liens granted by the Interim DIP Order or Final DIP Order.

3.      Except as permitted in the Interim DIP Order or Final DIP Order, the entry of any order of the Court granting to any third party a superiority claim or lien *pari passu* with or senior to that granted to the DIP Lender hereunder.

4.      The Debtor shall make any payment of principal or interest or otherwise on account of any indebtedness or payables other than the DIP Obligations or other than in accordance with the Budget approved by the DIP Lender or as otherwise authorized by this Term Sheet.

5.      If, as of any Reporting Date, the Debtor's cumulative cash disbursements from the period from the Petition Date through the end of any calendar month exceeds 15% from the amount included in the Budget (i.e., exceeds scheduled disbursements by more than 15%) or as otherwise authorized by this Term Sheet.

6.      The entry of an order converting the Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or the Debtor filing a motion or not opposing a motion seeking such relief.

7.      The entry of an order dismissing the Debtor's Chapter 11 Case, or the Debtor filing a motion or not opposing a motion seeking such relief, unless consented to in writing by the DIP Lender.

8.      The entry of any order in the Debtor's Chapter 11 Case or any successor case, which order constitutes the stay, modification, appeal, or reversal of the Interim DIP Order

18

or Final DIP Order or which otherwise affects the effectiveness of the Interim DIP Order or Final DIP Order.

9.    The entry of an order in the Debtor's Chapter 11 Case appointing any examiner having expanded powers or a trustee to operate all or any part of the Debtor's business.

10.    The entry of an order in the Debtor's Chapter 11 Case granting relief from the automatic stay so as to allow a third party or third parties to proceed against any property, including the collateral pledged pursuant to the DIP Facility and the prepetition liens, of the Debtor or to commence or continue any prepetition litigation against the Debtor involving potential liability not covered by insurance, in excess of $500,000 in the aggregate.

11.    Any judgment or order as to postpetition liability or debt for the payment of money in excess of $500,000 shall be rendered against the Debtor individually or in the aggregate, and the enforcement thereof shall not have been stayed.

12.    Any non-monetary, judgment or order with respect to a postpetition event shall be rendered against the Debtor which does or would reasonably be expected to (a) cause a material adverse change in the financial condition, business, prospects, operations, or assets of the Debtor or (b) have a material adverse effect on the rights and remedies of the DIP Lender hereunder, and there shall be a period of ten (10) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect.

13.    The Interim DIP Order or Final DIP Order being amended or modified without the prior written consent of the DIP Lender.

14.    That certain Asset Purchase Agreement, dated as of November 16, 2015 (the "**Stalking Horse APA**"), by and among Pandora Media, Inc., a Delaware corporation (the "**Purchaser**"), and Debtor, being amended, terminated or otherwise modified without the prior written consent of the DIP Lender.

***Remedies***    If any Event of Default occurs and is continuing, the DIP Lender may take any or all of the following actions:

1.    declare the unpaid principal amount of the DIP Loans, all interest accrued and unpaid thereon, and all other amounts

19

owing or payable under the DIP Documents, this Term Sheet, Interim DIP Order, or the Final DIP Order to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower;

2.  declare interest on the DIP Obligations to accrue at the default rate set forth in this Term Sheet, whereupon the interest on the DIP Obligations shall automatically accrue at the default rate;

3.  subject to the Default Notice Period (as defined below), (a) enter upon any premises on or in which any of the DIP Collateral may be located and take possession of the DIP Collateral or complete processing, manufacturing, and repair of all or any portion of the DIP Collateral, (b) collect, foreclose, receive, appropriate, setoff, and realize upon any and all DIP Collateral, (c) remove any DIP Collateral from any premises on or in which the same may be located for the purpose of effecting the sale, foreclosure, or other disposition thereof or for any other purpose, (d) subject to the limitations set forth in that certain Written Consent of Prepetition Secured Lenders, dated as of November 16, 2015, by and among Iconical Investments II LP, Pulser Media, Inc. and Pandora Media, Inc., exercise its unqualified right to credit bid up to the full amount of the outstanding DIP Obligations in any sale of the DIP Collateral (or any part thereof), which credit bid may incorporate a credit bid of the Prepetition Indebtedness and the Adequate Protection Obligations (each as defined in the Interim DIP Order), without the need for further Court order authorizing the same, and whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under Section 726 of the Bankruptcy Code, or otherwise, and (d) take whatever other action the DIP Lender may deem necessary or desirable for the protection of its interests; and/or

4.  exercise all rights and remedies available to it (whether as a secured creditor or otherwise) under the DIP Facility, this Term Sheet, the Interim DIP Order, the Final DIP Order, or applicable law (including in respect of the DIP Collateral).

All rights, remedies and powers granted to the DIP Lender under the DIP Documents or the Interim DIP Order or Final DIP Order, as applicable, are cumulative, not exclusive, and enforceable, in the DIP Lender's discretion, alternatively, successively, or

20

concurrently.

**_Default Notice Period_**    The Interim DIP Order shall include, without limitation, provisions that upon the occurrence of a Termination Event,[3] the automatic stay provisions of section 362 of the Bankruptcy Code shall be automatically vacated and modified to the extent necessary to permit the DIP Lender to exercise all rights and remedies provided in the Interim DIP Order and the other DIP Documents, as applicable, and to take any or all of the following actions without further order of or application to this Court, including without limitation: (a) immediately terminate the Debtor's use of Cash Collateral and cease making the DIP Loans available to the Borrower; (b) immediately declare all DIP Obligations to be immediately due and payable; (c) immediately terminate the DIP Facility and the availability of the DIP Loans; (d) immediately set off any and all amounts held on account of or owed to the Debtor against the DIP Obligations, or otherwise enforce rights against the DIP Collateral in the possession of, or subject to a lien in favor of the DIP Lender for application towards the DIP Obligations; and (e) take any other actions or exercise any other rights or remedies permitted under the Interim DIP Order and the other DIP Documents or applicable law to effect the repayment of the DIP Financing; _provided_ that, notwithstanding anything herein to the contrary, no DIP Lender or Prepetition Secured Party shall enforce any DIP Liens against any DIP Collateral or exercise any other remedies prior to the expiration of the Default Notice Period. The Interim DIP Order shall further provide that (i) the automatic stay under section 362(a) of the Bankruptcy Code shall be automatically vacated and modified, effective following the expiration of the Default Notice Period, unless the Court has determined that an Event of Default has not occurred and/or is not continuing, (ii) any party-in-interest's sole recourse with respect to opposing such modification of the automatic stay under section 362(a) of the Bankruptcy Code shall be to contest the occurrence and/or continuance of an Event of Default, (iii) during the Default Notice Period, the Debtor shall (x) have no right to request extensions of credit under the DIP Facility, other than with the consent of the DIP Lender, and (y) be entitled to an emergency hearing before the Court, with proper notice to the DIP Lender, solely for the purpose of contesting whether an Event of Default has occurred and/or is continuing, (iv) the rights and remedies of the DIP Lender specified

---

[3]    "Termination Event" shall mean the earliest to occur of (a) 30 days after the entry of the Interim DIP Order (unless a Final Order approved by the DIP Lender in its sole discretion has been entered as of such date), (b) the occurrence of an Event of Default, (c) the occurrence of the Maturity Date, and (d) the date on which neither the Interim DIP Order nor the Final DIP Order is in full force and effect.

936167.02B-CHISR01A - MSW

Case: 15-31430   Doc# 3   Filed: 11/16/15   Entered: 11/16/15 16:34:05   Page 35 of 201

in the Interim DIP Order are cumulative and not exclusive of any rights or remedies that the DIP Lender may have under hereunder or otherwise, (v) the Debtor shall cooperate fully with the DIP Lender in any permitted exercise of rights and remedies, whether against the DIP Collateral or otherwise.

*Release*

The Interim DIP Order shall (i) contain and approve the admissions, stipulations, and agreements of the Debtor, on behalf of and for itself, with regard to the Prepetition Indebtedness, Prepetition Agreements, and Prepetition Liens (each as defined in the Interim DIP Order in substantially the form annexed hereto as **Exhibit A**) and (ii) provide that such admissions, stipulations, and agreements shall be binding on all parties-in-interest, including the Committee, if no "Challenge" (as defined and provided for in the Interim DIP Order) is brought within 30 days of entry of the Interim DIP Order.

Upon the entry of the Final DIP Order and subject to the closing of the DIP Facility, in consideration of (a) the DIP Lender's agreement to the making of postpetition loans, advances, and providing other credit and financial accommodations to the Debtor pursuant to the provisions of this Term Sheet, the DIP Documents, the Interim DIP Order and the Final DIP Order, and (b) the Prepetition Secured Parties' agreement to permit the Debtor to use the Cash Collateral and for the Prepetition Liens to be primed by the DIP Liens, the Debtor, on behalf of and for itself (collectively, the "**Releasors**"), shall forever release, discharge and acquit the DIP Lender and the Prepetition Secured Parties and any of their respective present and former predecessors, successors, assigns, affiliates, members, partners, managers, current and former equity holders, officers, agents, employees, attorneys and affiliates (collectively, the "**Releasees**") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every kind, nature and description, including, without limitation, any so-called "lender liability" claims or defenses, that Releasors had, have, or hereafter can or may have against Releasees as of the date hereof, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, in respect of events that occurred on or prior to the date hereof. In addition, upon the repayment of all DIP Obligations and termination of the rights and obligations arising under the DIP Documents (which payment and termination shall be on terms and conditions acceptable to the DIP Lender), the DIP Lender in such capacity shall be released from any and all obligations, liabilities, actions, duties, responsibilities, and causes of action arising or occurring in connection with or

22

Case: 15-31430   Doc# 3   Filed: 11/16/15   Entered: 11/16/15 16:34:05   Page 36 of 201

related to this Term Sheet, the DIP Documents or the Interim DIP Order or Final DIP Order (including without limitation any obligation or responsibility (whether direct or indirect, absolute or contingent, due or not due, primary or secondary, liquidated or unliquidated) to pay or otherwise fund the Carve Out expenses), on terms and conditions acceptable to the DIP Lender. Notwithstanding anything to the contrary herein, the Debtor's releases do not extend to the DIP Lender's obligations to make the advances and otherwise comply with the terms of this Term Sheet and the Interim DIP Order and Final DIP Order (but subject to the terms and conditions thereof).

| | |
|---|---|
| ***Expenses and Indemnification*** | The DIP Lender (and its present and former predecessors, successors, assigns, affiliates, members, partners, managers, current and former equity holders, officers, agents, employees, attorneys and affiliates) will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities, or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court to arise from the gross negligence or willful misconduct of the relevant indemnified person. |
| ***Governing Law*** | California. |

936167.02B-CHISR01A - MSW

IN WITNESS WHEREOF, the parties hereto have caused this Term Sheet to be executed by their respective officers thereunto duly authorized, as of this 16th day of November, 2015.

Borrower:

**RDIO, INC.**

By: _____

Name: Elliott Peters

Title: Sr Vice President/General Counsel

*[Term Sheet for DIP Credit Facility – Signature Page]*

Lender:

**ICONICAL INVESTMENTS II LP**
By:    Iconical Fund Partners II Ltd., its
        General Partner

By: _____
Name: Murray Markiles
Title:   Director

Acknowledged and agreed, solely for the purpose of the priming of its Prepetition Liens and the use of Cash Collateral:

**PULSER MEDIA, INC.,**
as a Prepetition Secured Party

By: _____

Name: GILKUEN

Title:

**FORM OF INTERIM ORDER**

(To be attached.)

936167.02B-CHISR01A - MSW

**EXHIBIT "2"**

RON BENDER (SBN 143364)
PHILIP A. GASTEIER (SBN 130043)
MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbyb.com; pag@lnbyb.com;
myk@lnbyb.com; kjm@lnbyb.com

Proposed Attorneys for Chapter 11 Debtor
and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>RDIO, INC.,<br><br>             Debtor. | Case No. 15-31430<br><br>Chapter 11<br><br>**INTERIM ORDER:**<br><br>**(I)  AUTHORIZING DEBTOR TO OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 362, 363, AND 364;**<br>**(II)  GRANTING LIENS AND SUPERPRIORITY CLAIMS TO POSTPETITION LENDER PURSUANT TO 11 U.S.C. §§ 364 AND 507;**<br>**(III) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363;**<br>**(IV) PROVIDING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363, 364, AND 507, AND**<br>**(V)  SCHEDULING FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B)**<br><br>DATE:     [To Be Set]<br>TIME:     [To Be Set]<br>PLACE:   [To Be Set] |

Upon the motion (the "**Motion**"), dated November 16, 2015, of Rdio, Inc. (the "**Borrower**" or the "**Debtor**") in the above-captioned chapter 11 case (the "**Chapter 11 Case**"), pursuant to sections 105(a), 361, 362, 363, 364, and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 9029-1 of the Bankruptcy Local Rules of the Bankruptcy Court (the "**Local Rules**") seeking, among other things, entry of an interim order (this "**Interim DIP Order**") and a final order (the "**Final DIP Order**"):

(a) authorizing the Borrower to obtain postpetition financing (the "**DIP Financing**"), consisting of a first-lien, superpriority term loan credit facility in an aggregate principal amount of up to $3,000,000, plus all capitalized interest thereon and all capitalized fees and expenses (the "**DIP Facility**"), with Iconical Investments II, LP, a Cayman limited partnership (the "**DIP Lender**").

(b) authorizing the Debtor to execute and deliver, and incur all liabilities and obligations under

    (i) that certain Term Sheet for Debtor-in-Possession Credit Facility, dated as of November 16, 2015, as amended, modified, restated, or supplemented in accordance with the terms thereof or hereof (the "**DIP Term Sheet**"), and the collateral documents (including but not limited to one or more control agreements, pledge agreements and security agreements to the extent applicable), the Budget (as defined below), all such instruments, financing statements, and documents as may be executed and delivered in connection with or relating to the DIP Facility, together with this Interim DIP Order and the Final DIP Order (subject to entry by the Court thereof) and any certificate or other document made or delivered pursuant hereto or thereto (collectively, the "**DIP Documents**"), and perform all such other and further acts as may be required in connection with the respective DIP Documents; and

    (ii) all other agreements, documents, notes, or instruments as may be required, necessary, or desirable (including all collateral documents) and which are executed or delivered in connection with the DIP Term Sheet, including the budget attached hereto as **Exhibit B** (the "**Budget**");

(c) authorizing the Borrower to use proceeds of the DIP Facility solely as expressly permitted in the DIP Documents, including the Budget, including the use solely to fund the Debtor's operations and conduct and pursue a sale and liquidation process (the "**Sale**") as

described in the Bidding Procedures Order (as defined in the Stalking Horse APA);

(d)     granting automatically perfected security interests in and liens on all of the DIP Collateral (as defined below) to the DIP Lender, and granting superpriority administrative expense status to the DIP Obligations (as defined below), in each case on the terms and subject to the relative priorities set forth in the DIP Documents;

(e)     granting adequate protection to the Prepetition Secured Parties (as defined below), whose existing liens on or security interests in the DIP Collateral (as defined below) are being primed by the DIP Liens (as defined below) and whose collateral is being used (including Cash Collateral (as defined below)) by the Debtor pursuant to the DIP Term Sheet and this Interim DIP Order, to the extent of any diminution in value of their interests in the DIP Collateral (as defined below) and subject in all respects to the Carve Out (as defined below);

(f)     authorizing the Borrower under the DIP Documents to use, subject to the DIP Documents, any Cash Collateral in which the secured parties under the Prepetition Financing Documents (as defined below) have an interest, and granting adequate protection to the Prepetition Secured Parties with respect to, inter alia, such use of their Cash Collateral to the extent of any diminution in value of their interests in such Cash Collateral;

(g)     authorizing the Borrower to pay the principal, interest, fees, expenses, disbursements, and other amounts payable under the DIP Documents as such amounts become due and payable;

(h)     vacating and modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of this Interim DIP Order and the other DIP Documents;

(i)     scheduling a final hearing (the "**Final Hearing**") to consider entry of the Final DIP Order and, in connection therewith, approving the form and manner of notice of the Final Hearing; and

(j)     granting the Debtor such other and further relief as is just and proper;

and the Court having considered the Motion, the exhibits attached thereto, the Declaration of Maikao Grare in Support of Certain First-Day Motions, dated as of November 16, 2015 (the

"**First Day Declaration**"), and the Declaration of Elliot Peters in Support of the Motion, sworn to as of November 16, 2015 (the "**Peters Declaration**"); and a hearing to consider entry of this Interim DIP Order having been held before the Court on November **[•]**, 2015 (the "**Interim Hearing**"); and upon all of the pleadings filed with the Court, all evidence presented in support of this Interim DIP Order, the arguments of counsel stated on the record of the Interim Hearing, and all of the proceedings held before the Court; and after due deliberation and consideration, and good and sufficient cause appearing therefor,

**IT IS HEREBY FOUND, DETERMINED, ORDERED, AND ADJUDGED, that**:[1]

1.      **Motion Granted.**   The Motion is GRANTED on the terms and conditions set forth herein.

2.      **Commencement of the Chapter 11 Case.**   On November 16, 2015 (the "**Petition Date**"), the Debtor commenced the Chapter 11 Case by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtor continues to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in the Chapter 11 Case.

3.      **Jurisdiction and Venue.**   This Court has jurisdiction over the Chapter 11, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of the Chapter 11 Case and the Motion in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      **Committee Formation**.   As of the date hereof, the Office of the United States Trustee (the "**U.S. Trustee**") has not appointed an official committee of unsecured creditors in the Chapter 11 Case.

5.      **Notice.**   Notice of the relief sought by the Motion and the Interim Hearing was served via facsimile, email, and/or overnight delivery on the following parties: (a) the U.S.

---

[1]    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

Trustee; (b) counsel to Iconical Investments II, LP; (c) counsel to Pulser Media, Inc.; (d) counsel to Pandora Media, Inc.; (e) the United States Attorney for the Northern District of California; and (f) the parties included on the Debtor's list of its twenty (20) largest creditors. Given the nature of the relief requested in the Motion, the Court concludes that the foregoing notice was sufficient and adequate under the circumstances and complies with Bankruptcy Rules 2002 and 4001 and all applicable Local Bankruptcy Rules in all respects, and no other or further notice is necessary.

6. **Debtor's Stipulations.** Subject to paragraph 23 of this Interim DIP Order, the Debtor admits, stipulates, and agrees that:

(a) Prior to the Petition Date, the Debtor entered into that the following debt facilities:

(i) That certain Note Purchase Agreement (the "**First Lien Note Purchase Agreement**") dated as of October 19, 2015 by and among Rdio, Inc., Inconical Investments II, LP, as purchaser (the "**Prepetition First Lien Noteholder**"), and Iconical Investments II, LP, as collateral agent (the "**Prepetition First Lien Collateral Agent**" and, together with the Prepetition First Lien Noteholder, the "**Prepetition First Lien Secured Parties**"). Pursuant to the First Lien Note Purchase Agreement, the Debtor made and issued to the Prepetition First Lien Noteholder that certain Secured Promissory Note in the maximum aggregate amount of $5,000,000 (the "**Prepetition First Lien Note**"); and

(ii) That certain Third Amended and Restated Secured Promissory Note (the "**Prepetition Second Lien Note**" and, together with the Prepetition First Lien Note, the "**Prepetition Notes**") effective as of September 21, 2012 and amended and restated as of July 10, 2015 among Rdio, Inc., as borrower, and Pulser Media, Inc., as lender (the "**Prepetition Second Lien Noteholder**"), in the maximum aggregate amount of $208,000,000.

The Prepetition Notes are valid and binding agreements and obligations of the Debtor. The Debtor's indebtedness under the Prepetition Notes as of the Petition Date (the "**Prepetition Indebtedness**") includes any and all principal amounts owing or outstanding under the Prepetition Notes, interest on, fees and other costs, expenses and charges owing in respect of, such amounts (including, without limitation, any reasonable fees and expenses of attorneys,

accountants, and financial advisors to the extent chargeable or reimbursable pursuant to the Prepetition Notes or related agreements).

(b) Pursuant to the Prepetition Notes, the Debtor was, as of the Petition Date, indebted to the Prepetition First Lien Noteholder under the Prepetition First Lien Note in the aggregate principal amount of approximately $4,213,467 plus all accrued interest, fees, and other amounts due and payable thereunder, and was indebted to the Prepetition Second Lien Noteholder under the Prepetition Second Lien Note in the aggregate principal amount of approximately $186,024,000, plus all accrued interest, fees, and other amounts due and payable thereunder. The Prepetition Indebtedness, including the amounts specified in this subparagraph 6(b), constitutes the legal, valid, and binding obligations of the Debtor, enforceable in accordance with its terms (other than in respect of the stay of enforcement arising under section 362 of the Bankruptcy Code), without objection, offset, defense, or counterclaim of any kind or nature to the Prepetition Indebtedness. The Debtor has nor shall assert any claim, counterclaim, setoff, or defense of any kind, nature, or description that would in any way affect the validity, enforceability, and non-avoidability of any of the Prepetition Indebtedness. The Prepetition Indebtedness and any amounts previously paid to any Prepetition Secured Party (as defined below) pursuant to the terms of the Prepetition Notes on account thereof or with respect thereto are not subject to avoidance, reduction, disallowance, impairment, recharacterization, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, except as provided in this Interim DIP Order or the other DIP Documents.

(c) The relative priorities of the Prepetition Indebtedness under each of the Prepetition Notes, and the relative rights of the Prepetition Secured Parties (as defined below), is governed by that certain Intercreditor Agreement dated as of October 19, 2015 between the Prepetition First Lien Collateral Agent and the Prepetition Second Lien Noteholder (the "**Prepetition Intercreditor Agreement**").

(d) To secure the Prepetition Indebtedness under the Prepetition First Lien Note, the Debtor entered into that certain Security Agreement, dated as of October 19, 2015 (the "**Prepetition First Lien Security Agreement**") by the Debtor and Pulser Media, Inc., as

grantors, in favor of Prepetition First Lien Collateral Agent. Pursuant to the Prepetition First Lien Security Agreement, the Debtor granted security interests in, and continuing liens on (collectively, the "**Prepetition First Liens**"), substantially all property and assets of the Debtor (the "**Prepetition Collateral**") to and/or for the Prepetition First Lien Secured Parties. Pursuant to the Prepetition Second Lien Note (together with the Prepetition First Lien Security Agreement, as it relates to the granting of security interests and liens and related matters, the "**Prepetition Collateral Documents**"), the Debtor granted security interests in, and continuing liens on (collectively, the "**Prepetition Second Liens**" and, together with the Prepetition First Liens, the "**Prepetition Second Liens**"), the Prepetition Collateral to and/or for the Prepetition Second Lien Noteholder. The Prepetition Collateral Documents, together with the Prepetition Notes and the Prepetition First Lien Note Purchase Agreement, are collectively referred to herein as the "**Prepetition Financing Documents**".

(e)     Pursuant to the Prepetition Intercreditor Agreement, the Prepetition First Liens rank senior in lien priority to the Prepetition Second Liens. The Prepetition Collateral includes any Cash Collateral (as defined below) and collateral in or upon which a lien or other security interest has been granted in favor or for the benefit of the Prepetition Secured Parties in connection with, pursuant to, or under the Prepetition Agreement that existed as of the Petition Date and, subject to section 552 of the Bankruptcy Code, postpetition proceeds, products, offspring, rents, and profits.

(f)     The Prepetition Collateral Documents are valid and binding agreements and obligations of the Debtor, and the Prepetition Liens constitute valid, binding, enforceable, and perfected security interests and "liens", as that term is defined Bankruptcy Code Section 101(37) ("**Liens**"), which are not subject to avoidance, recharacterization, recovery, reduction, disallowance, impairment, or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, except as provided in this Interim DIP Order or the other DIP Documents.

(g)     To the extent provided in the Prepetition Collateral Documents or related agreements, the Prepetition Secured Parties have taken all reasonable steps to properly perfect their security interests and Liens in and on the Prepetition Collateral by taking possession of, or

obtaining control over, certain assets and by the filing of UCC-1 financing statements, mortgages, and other required documents against the Debtor and such Prepetition Collateral with the proper state and county offices for the perfection of such security interests and Liens.

(h)     Without the requirement or need to file any proof of claim with respect thereto, (i) the Prepetition Indebtedness under the Prepetition Financing Documents shall constitute allowed, secured prepetition claims for all purposes in the Chapter 11 Case and any subsequent proceedings under the Bankruptcy Code, including, without limitation, any chapter 7 proceeding if a the Chapter 11 Case is converted to a case under chapter 7 of the Bankruptcy Code or in any proceedings related to any of the foregoing (a "**Successor Case**"), (ii) the Prepetition Liens shall be deemed legal, valid, binding, enforceable, perfected, not subject to subordination (except as provided in this Interim DIP Order or the other DIP Documents) or avoidance for all purposes in the Chapter 11 Case and any Successor Case, and (iii) the Prepetition Indebtedness, the Prepetition Liens, and any prior payments on account of or with respect to the Prepetition Indebtedness shall not be subject to any other or further claim, cause of action, objection, contest, setoff, defense, or challenge by any party in interest for any reason, including, without limitation, by any successor to or estate representative of the Debtor, except as provided in this Interim DIP Order or the other DIP Documents.

7.     **Findings Regarding the DIP Financing.**

(a)     An immediate and critical need exists for the Borrower to obtain postpetition financing and use Cash Collateral (as defined below) to continue the operation of its business.  However, the use of cash, that is property of the Debtor and that constitutes "cash collateral" as defined by section 363(a) of the Bankruptcy Code, including any and all prepetition and, subject to section 552 of the Bankruptcy Code, postpetition proceeds of any collateral pledged pursuant the Liens and security interests granted to the Prepetition Secured Parties that is property of the Debtor ("**Cash Collateral**") alone would be insufficient to meet the Borrower's immediate postpetition liquidity needs.

(b)     As discussed in the First Day Declaration and the Peters Declaration, the Borrower is unable to obtain the required funds (i) in the forms of (A) unsecured credit or debt

allowable under section 503(b)(1) of the Bankruptcy Code, (B) an administrative expense pursuant to section 364(a) or (b) of the Bankruptcy Code, (C) unsecured debt having the priority afforded by section 364(c)(l) of the Bankruptcy Code, or (D) debt secured only as described in section 364(c)(2) or (3) of the Bankruptcy Code, or (ii) on terms more favorable than those embodied in the DIP Term Sheet and the other DIP Documents.  The DIP Lender is prepared to enter into the DIP Financing solely on the terms set forth in the DIP Term Sheet, the proposed form of Interim DIP Order submitted with the Motion, and the other DIP Documents.

(c)     The terms of the DIP Financing are fair, just, and reasonable under the circumstances, reflect the Debtor's exercise of its reasonable business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.  The terms of the DIP Financing have been negotiated in good faith and at arm's length by and among the Borrower and the DIP Lender.  Any credit extended or other indebtedness or liabilities arising under, in respect of, or in connection with the DIP Financing, the DIP Term Sheet, this Interim DIP Order, or any other DIP Financing Document, shall be deemed to have been extended in "good faith" by the DIP Lender as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections afforded by section 364(e) of the Bankruptcy Code, and the DIP Lender's claims, the DIP Superpriority Claims (as defined below), the DIP Liens (as defined below), and other protections granted pursuant to this Interim DIP Order (and, subject to entry by the Court, the Final DIP Order), and the other DIP Documents, shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim DIP Order or any portion hereof is vacated, reversed, amended, or modified, on appeal or otherwise.

(d)     The relief requested in the Motion is necessary, essential, and appropriate for the management and preservation of the Debtor's assets and properties and is in the best interests of the Debtor, its estate, and its creditors.  Absent the relief granted herein, the Debtor's estate will be immediately and irreparably harmed.  Accordingly, good, adequate, and sufficient cause has been shown to justify the relief granted herein and the immediate entry and effectiveness of this Interim DIP Order pursuant to Bankruptcy Rules 4001(b) and (c).

**8.** **Authorization of the DIP Financing.**

        (a)     The DIP Documents, including the DIP Term Sheet attached hereto as **Exhibit A** and the Budget, are approved, and the Borrower and is hereby authorized to execute and enter into, deliver, and perform all obligations under, the DIP Documents. This Interim DIP Order and the other DIP Documents shall govern the financial and credit accommodations to be provided to the Borrower by the DIP Lender in connection with the DIP Financing.

        (b)     The Borrower is hereby immediately authorized to borrow money pursuant to the DIP Documents up to $1,800,000 under the DIP Facility, which shall be used solely as expressly provided in this Interim DIP Order and the other applicable DIP Documents, including the Budget. The Debtor is authorized to pay and perform all "DIP Obligations" as that term is defined below.

        (c)     Notwithstanding the Budget, so long as no DIP Termination Event (as defined below) has occurred, the Debtor shall be authorized to use the proceeds of the DIP Loans in accordance with the Budget and the other applicable DIP Documents in an amount that would not cause the Debtor to use Cash Collateral or proceeds of the DIP Loans in an amount greater than, at any given time, 115% of the amount set forth on each line of the Budget (a "**Permitted Variance**"); *provided*, *however*, that there shall be no deviation from the Budget on a cumulative basis unless and until the DIP Obligations have been paid in full in cash. If the aggregate amount of any proceeds of the DIP Loans or any Cash Collateral actually used by the Debtor, measured once every month, is less than the aggregate amount of proceeds of the DIP Facility and Cash Collateral available for use by the Debtor in the Budget during such period, then the Debtor may carry over any such unused amount to the future periods in the Budget.

        (d)     In furtherance of the foregoing and without further approval of this Court, the Borrower is hereby authorized to perform all acts; to make, execute and deliver all instruments and documents; and to pay all related fees, that may be required or necessary for the Debtor's performance of its obligations under the DIP Financing, including, without limitation:

        (i)     the execution, delivery, and performance of the respective DIP Documents, and any security and pledge agreements, financing statements, and mortgages contemplated by the DIP Documents;

        (ii)    the execution, delivery and performance of one or more amendments, waivers, consents, or other modifications to and under the respective DIP Documents, in each case in such form as the Debtor and the DIP Lender may agree;

        (iii)   the non-refundable payment of principal and interest under, and any fees referred to in, the respective DIP Documents, and such costs and expenses as may be due in accordance with the respective DIP Documents; and

        (iv)   the performance of all other acts required under, or in connection with, the DIP Documents.

        (e)     All of the DIP Liens and the Adequate Protection Liens (each as defined below) shall be effective and perfected as of the date of entry of this Interim DIP Order without the necessity of the execution, recording, or filing of mortgages, security agreements, pledge agreements, financing statements, or other agreements or instruments.

        (f)     The DIP Term Sheet and the DIP Obligations (as defined below) constitute valid, binding, and non-avoidable obligations of the Debtor enforceable against it, and its successors and assigns, and each person or entity party to the DIP Documents in accordance with the respective terms of this Interim DIP Order, the Final DIP Order (subject to entry by the Court thereof), and the other DIP Documents, and shall survive the dismissal of any of the Chapter 11 Case or the conversion of any of the Chapter 11 Case to a Successor Case.

        (g)     No obligation, payment, transfer, or grant of security under this Interim DIP Order, the Final DIP Order (subject to entry by the Court thereof), or the other DIP Documents shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law, or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaims, cross-claims, defenses, disallowance, impairment, or any other challenges under the Bankruptcy Code or any other applicable foreign or domestic law or regulation by any person or entity, except as provided in this Interim DIP Order or the other DIP Documents.

(h)     For purposes of this Interim DIP Order, the term "**DIP Obligations**" shall mean all loans made to the Debtor pursuant to the DIP Term Sheet (the "**DIP Loans**"), all other "DIP Obligations" (as defined in the DIP Term Sheet), all interest thereon and all fees, costs, expenses, indemnification obligations, and other liabilities, owing by the Debtor to the DIP Lender in accordance with and relating to this Interim DIP Order, the Final DIP Order (subject to entry thereof by the Court), or the other DIP Documents relating to the DIP Facility.

(i)     The DIP Loan shall (i) be evidenced by the books and records of the DIP Lender and, upon the request of the DIP Lender, a note executed and delivered to the DIP Lender by the Borrower in accordance with the terms of the DIP Documents, which note shall evidence the DIP Lender's DIP Loan in addition to such accounts and records, (ii) bear interest and incur fees at the rates set forth in the DIP Term Sheet, (iii) be secured in the manner specified below and under the applicable DIP Documents, (iv) be payable in accordance with the applicable DIP Documents, and (v) otherwise be governed by the terms set forth in this Interim DIP Order and the other DIP Documents.

(j)     The automatic stay provisions of section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified and vacated without further notice, application, or order of the Court to the extent necessary to permit the DIP Lender, subject in all respects to the DIP Documents, to perform any act authorized or permitted under or by virtue of this Interim DIP Order or any of the other DIP Documents, including, without limitation, (i) to implement the DIP Financing authorized by this Interim DIP Order and pursuant to the terms of the DIP Documents, (ii) to take any act to create, validate, evidence, attach, or perfect any Lien, security interest, right, or claim in the DIP Collateral, and (iii) to assess, charge, collect, advance, deduct, and receive payments with respect to the respective DIP Obligations, including, without limitation, all principal, interest, fees, costs, and expenses permitted under the DIP Documents, and apply such payments to the respective DIP Obligations pursuant to this Interim DIP Order and the other DIP Documents.

**9.     Conditions Precedent.**  The DIP Lender shall have no obligation to make any DIP Loan or any other financial accommodation under the respective DIP Documents unless the

conditions precedent to make such extensions of credit under the respective DIP Documents have been satisfied in full or waived in accordance with such DIP Documents.

10. **Use of DIP Facility Proceeds.** The Debtor shall use the proceeds of the DIP Facility solely to (a) fund the Debtor's operations, (b) conduct and pursue a Sale and liquidation process (as defined in the DIP Term Sheet), as described in the Bidding Procedures Order, (c) pay all other expenses owing, (d) pay all fees owing to the Court and the U.S. Trustee, and (e) pay all expenses to third party vendors for photocopying, postage and mailings, in each case solely as set forth in and in accordance with the Budget (subject to Permitted Variance) and the other DIP Documents.

11. **DIP Superpriority Claims.** Subject in all respects to paragraph 12 below, pursuant to section 364(c)(1) of the Bankruptcy Code, the DIP Obligations constitute (without the need to file a proof of claim) superpriority claims (the "**DIP Superpriority Claims**") against the Debtor, with priority over any and all administrative expenses of the Debtor, whether now existing or hereafter arising or incurred, of any kind whatsoever, including any and all administrative expenses or other claims of the kind specified in or arising under sections 105, 326, 328, 330, 331, 364, 365, 503(b), 506(c) (following entry of the Final DIP Order), 507, 546(c), 552(b), 726, 1113, 1114, or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy or attachment, whether now in existence or hereafter incurred by the Debtor, and shall at all times be senior to the rights of the Debtor, the Debtor's estate, and any successor trustee, estate representative, or any creditor, in the Chapter 11 Case or any Successor Case. The DIP Superpriority Claims shall have recourse to and be payable from all prepetition and postpetition assets of the Debtor, including, but not limited to, the DIP Collateral and the Prepetition Collateral.

12. **DIP Liens.**

(a) As security for the full and timely payment of the DIP Obligations, the DIP Lender is hereby granted, pursuant to sections 364(c)(2), 364(c)(3), and 364(d)(1) of the Bankruptcy Code, valid, enforceable, non-avoidable, and fully perfected security interests in and

liens and mortgages (collectively, the "**DIP Liens**") upon all DIP Collateral (as defined below), which shall (i) constitute first-priority security interests in and Liens upon all DIP Collateral (as defined below) that, subject to (ii) below, is not otherwise subject to any valid, enforceable, and non-avoidable Liens, which Liens are not subject to subordination, in existence on the Petition Date and were either properly perfected as of the Petition Date or subsequently perfected pursuant to section 546(b) of the Bankruptcy Code (collectively, the "**Permitted Senior Liens**"), (ii) be senior to and prime the Prepetition Liens on Prepetition Collateral, (iii) be senior to and prime all Adequate Protection Liens (as defined below), and (iv) be subordinate only to the Carve Out (as defined below) and the Permitted Senior Liens. Notwithstanding the foregoing, the DIP Lender shall receive perfected security interests in and a Lien on Avoidance Actions (as defined below) and the proceeds thereof only upon entry of the Final DIP Order.

(b)     As used herein, "**DIP Collateral**" shall mean all assets and property of the Debtor and its estate, real or personal, tangible or intangible, now owned or hereafter acquired, whether arising before or after the Petition Date, including, without limitation, all contracts, general intangibles, instruments, equipment, accounts, and documents, all goods, inventory, and fixtures, all documents, cash, cash equivalents, chattel paper, letters of credit, and letter of credit rights, investment property, commercial tort claims, money, insurance, receivables, receivables records, deposit accounts, collateral support, supporting obligations, all interests in leaseholds and real properties, all patents, copyrights, trademarks, tradenames, domain names, source code, and other intellectual property, all equity interests in any subsidiaries of the Borrower, all books and records relating to the foregoing, all other personal and real property of the Debtor, and all other collateral pledged under the DIP Financing Documents, the Services Agreement Collateral (as defined in the DIP Term Sheet), upon entry of the Final DIP Order, any actions under sections 544, 545, 547, 548 and 550 of the Bankruptcy Code (the "**Avoidance Actions**"), and all proceeds, products, accessions, rents, and profits of or in respect of any of the foregoing, including, without limitation, proceeds of the Sale (in each case as the foregoing are defined in the Uniform Commercial Code as in effect from time to time in the State of California (and, if defined in more than one Article of such Uniform Commercial Code, shall have the meaning

given in Article 9 thereof)); *provided* that DIP Collateral shall not include, and the DIP Liens and Adequate Protection Liens shall not attach to, any outstanding equity interest in any foreign subsidiary of the Borrower in excess of 65% of the voting power of the equity interests in such foreign subsidiary of the Borrower.

(c)     The DIP Liens shall be effective immediately upon entry of this Interim DIP Order; *provided*, *however*, that with respect to Avoidance Actions, the DIP Liens shall not be effective until immediately upon entry of the Final DIP Order.

**13.     Priority of Liens.**

(a)     The DIP Liens and the DIP Superpriority Claims are and shall be at all times senior and prior in all respects to the Adequate Protection Liens (as defined below) and the Prepetition Liens on the DIP Collateral.

(b)     The DIP Liens shall constitute valid, enforceable, non-avoidable, and duly perfected first-priority security interests in and Liens upon the DIP Collateral, junior and subject only to any Permitted Senior Liens (but only with respect to property that was encumbered by Permitted Senior Liens on the Petition Date); any adequate protection liens granted to the holders of Permitted Senior Liens on the collateral securing such Permitted Senior Liens; and the Carve Out.

(c)     The DIP Liens shall not be (i) subject to any Lien that is avoided and preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy Code or (ii) except as to the Permitted Senior Liens (but only with respect to property that was encumbered by Permitted Senior Liens on the Petition Date), subordinated to or made *pari passu* with any other Lien under section 364(d) of the Bankruptcy Code or otherwise, including by any order heretofore or hereafter entered in the Chapter 11 Case or any Successor Case.  Except as expressly permitted in the respective DIP Documents and absent full payment and satisfaction of all obligations of the Debtor under the DIP Facility, the Borrower shall not (x) grant or impose any Liens on the DIP Collateral or (y) except as permitted in the respective DIP Documents, prime or seek to prime the DIP Liens and shall not offer any other parties any Lien on the DIP Collateral.  In addition, the Borrower shall not incur, create, assume, become, or be liable in any

manner with respect to, or permit to exist, any secured indebtedness, except as expressly permitted under the DIP Documents and the Budget.

**14.** **Validity of Liens.**

(a)     In no event shall (i) any Lien or security interest that is avoided and preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy Code, or (ii) any person or entity who pays (or through the extension of credit to the Debtor, causes to be paid) any of the respective DIP Obligations, be subrogated, in whole or in part, to any rights, remedies, claims, privileges, Liens, or security interests granted in favor of, or conferred upon the DIP Lender by the terms of this Interim DIP Order, the Final DIP Order (subject to entry by the Court thereof), or any of the respective DIP Documents, until all of the DIP Obligations are paid in full in cash in accordance with this Interim DIP Order, the Final DIP Order (subject to entry by the Court thereof), or any of the respective DIP Documents.

(b)     The DIP Liens and the DIP Superpriority Claims shall continue in any Successor Case for the Debtor under any chapter of the Bankruptcy Code, and all Liens, security interests, and claims shall maintain their priority as provided in this Interim DIP Order.  If an order dismissing the Chapter 11 Case, pursuant to section 1112 of the Bankruptcy Code or otherwise, is at any time entered, such order shall provide that the DIP Liens and the DIP Superpriority Claims shall continue in full force and effect, shall remain binding on all parties in interest in the Chapter 11 Case, and shall maintain their priorities as provided in this Interim DIP Order, until all DIP Obligations under the DIP Documents have been paid and satisfied in full and in cash.  Notwithstanding the dismissal of the Chapter 11 Case, this Court shall retain jurisdiction with respect to enforcing the DIP Liens and the DIP Superpriority Claims.

**15.** **Carve Out.**

(a)     Notwithstanding anything in this Interim DIP Order, any other DIP Documents, or any other order of this Court to the contrary (but subject to paragraph 17 hereof), the Prepetition Liens and all claims and Liens granted hereunder to or for the benefit of the DIP Lender, including the DIP Superpriority Claims and the DIP Liens, and to the Prepetition Secured Parties, including the Adequate Protection Liens and any Adequate Protection

Superpriority Claims (as defined below), shall be subject to payment of the Carve Out.  As used in this Interim DIP Order, the "**Carve Out**" means, with respect to the period prior to the closing of the Sale and the payment in full in cash of the DIP Obligations: (a) all unpaid fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code, (b) all reasonable fees and expenses incurred by a trustee under Section 726(b) of the Bankruptcy Code not to exceed $25,000, (c) after the occurrence and during the continuance of a Carve-Out Event (as defined below), professional fees and disbursements incurred by the Debtor and any statutory committees appointed in the Chapter 11 Case (each, a "**Committee**") that are in compliance with the Budget, in an aggregate amount not to exceed $500,000 less fees paid to professionals during the pendency of the Chapter 11 Case until the closing of the Sale (which amount may be used subject to the terms of the DIP Term Sheet, this Interim DIP Order, and the Budget and shall be supported by back-up documentation in respect of the amounts and dates of incurrence of such fees and disbursements), in each of the foregoing clauses (a), (b), and (c), to the extent allowed by the Court at any time; *provided*, *however,* that nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement or compensation described in clause (c) above.

(b)     As used in this Interim DIP Order, the "**Carve Out**" means, with respect to the period after the closing of the Sale and payment in full in cash of the DIP Obligations:[2] (a) amounts due to employees of the Debtor pursuant to the Bonus Agreements (as such term is defined and described in the Debtors' Emergency Motion for Authority to Honor Pre-Petition Cash Bonus Incentive Agreements, *provided* that the Prepetition First Lien Secured Parties have countersigned such Bonus Agreement to indicate the Prepetition First Lien Secured Parties' consent to such carve-out and the applicable employee has provided a release of the DIP Lender and the Prepetition Secured Parties in form and substances acceptable to the DIP Lender and Prepetition Secured Parties, (b) all unpaid fees required to be paid to the Clerk of the Bankruptcy

---

[2]     For the avoidance of doubt, the Carve-Out set forth in this paragraph 15(b) is granted by the Prepetition Secured Parties with respect to their Cash Collateral.

Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code, (c) all reasonable fees and expenses incurred by a trustee under Section 726(b) of the Bankruptcy Code not to exceed $25,000, (d) after the occurrence and during the continuance of a Carve-Out Event (as defined below), all allowed and unpaid professional fees and disbursements incurred by the Debtor and any Committee, that are in compliance with the Budget, in an aggregate amount not to exceed $200,000 in the aggregate for the Debtor and $100,000 in the aggregate for the Committee or Committees, which amounts may be used subject to the terms of the DIP Term Sheet, this Interim DIP Order, and the Budget, and (e) all allowed and unpaid professional fees and disbursements (regardless of when such fees and disbursements become allowed by order of the Court) incurred or accrued by the Debtor and any Committees at any time when no Carve-Out Event is continuing, that remain unpaid subsequent to a Carve-Out Event, in an aggregate amount not exceeding such unpaid professional fees and disbursements reflected on the most recent Budget delivered to and approved by the Prepetition Secured Parties prior to any Carve-Out Event that is then continuing, to be supported by back-up documentation in respect of the amounts and dates of incurrence of such fees and disbursements), in each of the foregoing clauses (a), (b), (c), (d), and (e), to the extent allowed by the Court at any time; *provided*, *however,* that nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement or compensation described in clauses (d) and (e) above.

(c)     As used in this Interim DIP Order, a "**Carve-Out Event**" shall occur, (i) with respect to the period prior to the closing of the Sale and the payment in full in cash of the DIP Obligations, upon the occurrence and during the continuation of an Event of Default and upon the delivery of written notice thereof by the DIP Lender to bankruptcy counsel to the Debtor and bankruptcy counsel to any Committee and (ii), with respect to the period after the closing of the Sale and payment in full in cash of the DIP Obligations, upon the occurrence and during the continuation of a Cash Collateral Termination Event (as defined below) and upon the delivery of written notice thereof by the Prepetition Secured Parties to bankruptcy counsel to the Debtor and bankruptcy counsel to any Committee (a notice delivered pursuant to clause (i) or

clause (ii) hereof, a "**Carve-Out Notice**"). Upon receipt of a Carve-Out Notice, the Debtor shall provide immediate notice by email to all retained professionals informing them that a Carve-Out Event has occurred and that the Debtor's ability to pay professionals is subject to the Carve Out.

16. <u>**Use of Cash Collateral.**</u>

(a)    Subject to the terms and conditions set forth in this Interim DIP Order, including paragraph 17 hereof, and the Budget, and effective immediately upon entry of the Interim DIP Order, the Debtor is authorized, pursuant to section 363(c)(2)(B) of the Bankruptcy Code, to use Cash Collateral (i) in the ordinary course of the Debtor's businesses, (ii) to pay reasonable professional fees, expenses, and disbursements related to services provided in connection with the Chapter 11 Case, including, without limitation, to the retained professionals under Bankruptcy Code sections 327, 328, and 330 and pursuant to paragraph 22 below, and (iii) to pay all fees required to be paid to the Clerk of this Court and to the U.S. Trustee under 28 U.S.C. § 1930(a), *provided*, *however*, that the Debtor's authorization to use Cash Collateral shall immediately terminate upon the occurrence of a Termination Event (as defined below).

17. <u>**Restriction on Use of Funds.**</u>  Notwithstanding anything in this Interim DIP Order, any other DIP Documents, or any other order by this Court to the contrary, no proceeds of the DIP Financing, Cash Collateral, Prepetition Collateral, or DIP Collateral, and no portion of the Carve Out, may be used in the Chapter 11 Case or any other proceeding of any kind, or in any jurisdiction, directly or indirectly by any Debtor, or any other person or entity, to (a) object to, contest, or raise any defense to, or assert any Challenge (as defined below) to, the validity, perfection, priority, extent, or enforceability of any amounts due under, the DIP Financing, the DIP Documents, the DIP Collateral, the Prepetition Indebtedness, the Prepetition Financing Documents, or the Prepetition Collateral, or the liens or claims granted under the Prepetition Financing Documents, this Interim DIP Order, or any other DIP Documents, including the DIP Liens and the DIP Superpriority Claims, (b) investigate, assert, or prosecute any claims, defenses, or causes of action (including, without limitation, any claims or causes of action under chapter 5 of the Bankruptcy Code) or any Challenge against the DIP Lender, the Prepetition Secured Parties, or any of their respective present and former predecessors, successors, assigns,

affiliates, members, partners, managers, current and former equity holders, officers, agents, employees, attorneys and affiliates, except as set forth in paragraphs 23, 27 and 30(b), (c) prevent, hinder, or otherwise delay the DIP Lender, or the Prepetition Secured Parties' assertion, enforcement, or realization against or upon Cash Collateral or the DIP Collateral, in accordance with this Interim DIP Order, the other DIP Documents, and the Prepetition Financing Documents, except as set forth in paragraphs 23, 27 and 30(b), (d) seek to modify any of the rights granted to the DIP Lender or the Prepetition Secured Parties hereunder or under the DIP Documents or the Prepetition Financing Documents, or (e) take any other action prohibited by the DIP Term Sheet; *provided, however*, that not more than $25,000 in the aggregate may be used to pay any allowed fees of a Committee and professionals retained by such Committee incurred in connection with pursuing a Challenge (as defined in paragraph 23 below) (the "**Investigation Budget**").

   18.   **Termination of DIP Financing and Cash Collateral.**

   (a)   Subject to paragraphs 15 and 30 hereof, the Debtor's authorization to use the DIP Financing shall automatically and immediately terminate upon the occurrence of a "**DIP Termination Event**", which shall mean the earliest to occur of (i) 30 days after the entry of this Interim DIP Order (unless a Final DIP Order approved by the DIP Lender has been entered as of such date); (ii) the occurrence of an Event of Default; (iii) the occurrence of a Maturity Date as that term is defined in the DIP Term Sheet; and (d) the date on which neither this Interim DIP Order nor the Final DIP Order is in full force and effect.

   (b)   Subject to paragraphs 15 and 30 hereof, the Debtor's authorization to use Cash Collateral shall automatically and immediately terminate upon the earliest to occur of the following (each, a "**Cash Collateral Termination Event**"):

   (i)   The occurrence of an Event of Default with respect to the DIP Facility;

   (ii)   Thirty (30) days after the entry of this Interim DIP Order (unless a Final DIP Order approved by the each Prepetition Secured Party has been entered as of such date);

   (iii)   June 30, 2016 (unless extended with the written consent of each Prepetition Secured Party, which extension thereof shall be effective without further application or approval by the Court);

(iv)    The failure by the Debtor to perform or comply with any term, condition, covenant, or obligation (including a payment obligation) contained in the Interim DIP Order or Final DIP Order, on its part to be performed or complied with where any such failure to perform or comply shall not be remedied within three (3) business days from notice of default;

(v)    Except as permitted in the Interim DIP Order or Final DIP Order, the entry of any order of the Court granting to any third party a superpriority claim or lien *pari passu* with or senior to that granted to the Prepetition Secured Parties on account of the Adequate Protection Obligations;

(vi)    The Debtor shall make any payment of principal or interest or otherwise on account of any indebtedness or payables other than the DIP Obligations under the DIP Facility, the Prepetition Indebtedness, or as otherwise permitted by the Budget approved by the DIP Lender (until the DIP Obligations are indefeasibly paid in full in cash) and each Prepetition Secured Party;

(vii)    As of any Reporting Date, the Debtor's cumulative cash disbursements from the period from the Petition Date through the end of any calendar month exceed 115% of the amount included in the Budget (i.e., exceed scheduled disbursements by more than 15%);

(viii)    The entry of an order converting the Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or the Debtor filing a motion or not opposing a motion seeking such relief;

(ix)    The entry of any order in the Debtor's Chapter 11 Case or any Successor Case, which order constitutes the stay, modification, appeal, or reversal of the Interim DIP Order or Final DIP Order or which otherwise affects the effectiveness of the Interim DIP Order or Final DIP Order;

(x)    The entry of an order in the Debtor's Chapter 11 Case appointing any examiner having expanded powers or a trustee to operate all or any part of the Debtor's business;

(xi)    The entry of an order in the Debtor's Chapter 11 Case granting relief from the automatic stay so as to allow a third party or third parties to proceed against any property, including the collateral pledged pursuant to the DIP Facility and the Prepetition Liens, of the Debtor or to commence or continue any prepetition litigation against the Debtor involving potential liability not covered by insurance, in excess of $500,000 in the aggregate;

(xii)    Any judgment or order as to postpetition liability or debt for the payment of money in excess of $500,000 shall be rendered against the

Debtor individually or in the aggregate, and the enforcement thereof shall not have been stayed; and

(xiii) Any non-monetary, judgment or order with respect to a postpetition event shall be rendered against the Debtor which does or would reasonably be expected to have a material adverse effect on the rights and remedies of the Prepetition Secured Parties hereunder, and there shall be a period of ten (10) consecutive days during which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect.

19. **Adequate Protection.**

(a)     As adequate protection for the interests of the Prepetition Secured Parties in the DIP Collateral (including Cash Collateral), in an aggregate amount equal to any diminution in fair market value (the "**Diminution of Value**") of such interests from and after the Petition Date, whether or not resulting from the depreciation, physical deterioration, loss, or decline in market value, use, sale or lease by the Debtor of the DIP Collateral (including Cash Collateral), the granting of the DIP Liens, the subordination of their Prepetition Liens thereto and to the Carve Out, the imposition or enforcement of the automatic stay of section 362(a), the payment of professional fees and expenses, or otherwise, the Prepetition Secured Parties shall receive adequate protection as follows (collectively, the "**Adequate Protection Obligations**"):

(i)     Adequate Protection Liens**.**  Solely to the extent of any such Diminution of Value, the Prepetition Secured Parties shall have pursuant to sections 361, 362(d), 363(c), 363(e), and 364(d) of the Bankruptcy Code, replacement security interests in and Liens upon all of the DIP Collateral (the "**Adequate Protection Liens**"), which Adequate Protection Liens shall be junior and subject in all respects to the DIP Liens, the Carve Out, and the Permitted Senior Liens (and adequate protection liens granted to the holders thereof on the collateral securing the same, if any), but shall be senior to a the Prepetition Liens.

(ii)    Adequate Protection Superpriority Claims.  Solely to the extent of any such Diminution of Value, the Prepetition Secured Parties shall have, an allowed superpriority administrative expense claim (the "**Adequate Protection Superpriority Claim**"), as provided for in section 507(b) of the Bankruptcy Code, in the Case and any Successor Case of the Debtor, which shall be junior and subject in all respects to the DIP Superpriority Claims and the Carve Out.  The Adequate Protection Superpriority Claims have priority in the applicable Case or Successor Case of the Debtor over all administrative expenses of the kind

specified in, or ordered pursuant to, any provision of the Bankruptcy Code, including, without limitation, those specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(b), 506(c) (following entry of the Final DIP Order), 507, 546(c), 552(b), 726, 1113, or 1114 of the Bankruptcy Code, but are subordinate and junior in all respects to the DIP Superpriority Claims and the Carve Out, it being understood that the Prepetition Secured Parties shall not receive or retain any payments, property, or other amounts in respect of their Adequate Protection Superpriority Claims, or granted hereunder or under the Prepetition Financing Documents, unless and until all DIP Obligations and Carve Out related expenses are indefeasibly paid in full and in cash in accordance with the terms of the respective DIP Documents.

     (iii)  <u>Postpetition Interest</u>.  The Prepetition First Lien Secured Parties shall be entitled to the payment of postpetition interest, as provided for in the applicable  Prepetition Agreements.

     (iv)  <u>Payment of Fees and Expenses</u>.  Upon the Sale closing date, the Debtors shall immediately pay in cash to the applicable Prepetition Secured Parties all accrued and unpaid fees and disbursements owing under the Prepetition Agreements and shall further pay the reasonable and documented fees and expenses incurred in connection with the Chapter 11 Case by the Prepetition Secured Parties.  Payment of any such fees and expenses shall not be conditioned on the provision of time records and invoices compliant with U.S. Trustee guidelines or in any particular format; *provided*, *however*, that the Court shall resolve any disputes as to the reasonableness of any payment request.

     (b)     Notwithstanding anything to the contrary in this Interim DIP Order or in any other order of the Court, in determining the relative priorities and rights of the Prepetition Secured Parties (including, without limitation, the relative priorities and rights of the Prepetition Secured Parties with respect to the adequate protection granted hereunder), such relative priorities and rights shall be governed by this Interim DIP Order, the Prepetition Financing Documents, and any other valid agreements by and among the Prepetition Secured Parties, and the adequate protection rights granted hereunder to each Prepetition Secured Party shall have the same relative seniority vis-à-vis the adequate protection rights granted to each other Prepetition Secured Party as the prepetition claims of such Prepetition Secured Party have relative to the prepetition claims of such other Prepetition Secured Party.

     **20.**    **<u>Perfection of Liens</u>.**  This Interim DIP Order shall be sufficient and conclusive

evidence of the validity, perfection, and priority of the DIP Liens and the Adequate Protection Liens without the necessity of executing, filing, or recording any mortgage, security agreement, pledge agreement, financing statement, or other instrument or document, or the taking of any other act that otherwise may be required under state or federal law, rule, or regulation of any jurisdiction to validate or perfect the DIP Liens and the Adequate Protection Liens or to entitle the DIP Lender or the Prepetition Secured Parties to the priorities granted herein. The Borrower may execute, and the DIP Lender and the Prepetition Secured Parties are hereby authorized to execute, file, and/or record mortgages, security agreements, pledge agreements, financing statements, and/or other instruments or documents to evidence the DIP Liens, and the Adequate Protection Liens, respectively, and the Debtor is hereby authorized, promptly upon a demand by a DIP Lender or a Prepetition Secured Party made in accordance with the terms of the DIP Documents or Prepetition Financing Documents, as applicable, to execute, file, and/or record any such mortgages, security agreements, pledge agreements, financing statements, or other instruments or documents as the respective DIP Lender or Prepetition Secured Party may request; provided, however, that no such execution, filing, or recordation shall be necessary or required in order to create or perfect the DIP Liens or Adequate Protection Liens, and further, if a DIP Lender or a Prepetition Secured Party, in its sole discretion, shall choose to execute, file, and/or record such mortgages, security agreements, pledge agreements, financing statements, or other instruments or documents, or otherwise confirm perfection of such Liens, all such instruments and documents shall be deemed to have been filed or recorded as of the Petition Date. A copy of this Interim DIP Order may, in the discretion of any DIP Lender or Prepetition Secured Party, be filed with or recorded in any filing or recording office in addition to or in lieu of such mortgages, security agreements, pledge agreements, financing statements, or other instruments or documents, and each and every federal, state, and local governmental agency, department, or office is hereby directed to accept a copy of this Interim DIP Order and any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by this Interim DIP Order and the other DIP Documents, for filing and recording, and to deem this Interim DIP Order to be in proper form for filing and recording.

Notwithstanding the foregoing, pursuant to any applicable law, the DIP Lender and the Prepetition Secured Parties are hereby authorized (but not required) to file or record financing statements and other filing or recording documents or instruments with respect to the DIP Collateral and DIP Liens and the Adequate Protection Liens, as applicable, without the signature of the Debtor in such form and in such offices as the DIP Lender and the Prepetition Secured Parties, as applicable, determine appropriate to perfect the security interests of the DIP Lender and the Prepetition Secured Parties, as applicable, under the DIP Documents and this Interim DIP Order; and the DIP Lender and the Prepetition Secured Parties are authorized to use collateral descriptions such as "all personal property" or "all assets", in each case "whether now owned or hereafter acquired", words of similar import or any other description DIP Lender and/or the Prepetition Secured Parties, each in their sole discretion, so chooses in any such financing statements.

21.     **Section 506(c).**  Subject only to and effective upon entry of the Final DIP Order, except to the extent of the Carve Out, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Case or any Successor Case at any time shall be charged against or recovered from the DIP Collateral, the Prepetition Collateral, any DIP Lender or Prepetition Secured Party, or any of their respective claims, pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise.

22.     **Fees.**     All fees paid and payable, and costs and expenses reimbursed or reimbursable by the Borrower to the DIP Lender under the DIP Documents are hereby approved. On the Sale closing date, all such fees, costs, and expenses payable under the DIP Documents in accordance with the DIP Documents, shall be capitalized and added to the Principal Amount (as defined in the DIP Term Sheet), without the necessity of any further application with the Court for approval or payment of such fees, costs, or expenses.  Professionals for the DIP Lender shall not be required to file fee applications or comply with the U.S. Trustee's fee guidelines. Notwithstanding anything to the contrary herein, the fees, costs, and expenses of the DIP Lender whether incurred prior to or after the Petition Date, shall be deemed fully earned, indefeasibly paid, non-refundable, irrevocable, and non-avoidable as of the entry of this Interim DIP Order

and, irrespective of any subsequent order approving or denying the DIP Financing or any other financing pursuant to section 364 of the Bankruptcy Code, fully entitled to all protections of section 364(e) of the Bankruptcy Code.

23.     **Effect of Stipulations on Third Parties.**   The stipulations and admissions contained in this Interim DIP Order, including, without limitation, in paragraph 6 of this Interim DIP Order, shall be binding on the Debtor's estate and all parties in interest, including, without limitation, any Committee, unless any Committee or another party in interest (other than any of the Debtor or other Debtors), in each case with standing and requisite authority, has timely commenced a contested matter or adversary proceeding (subject to the limitations set forth in paragraph 17 hereof, including, for the avoidance of doubt, the Investigation Budget), challenging the amount, validity, or enforceability of the Prepetition Indebtedness or the perfection or priority of the Prepetition Liens, or otherwise asserting any objections, claims, or causes of action on behalf of the Debtor's estate against the Prepetition Secured Parties relating to the Prepetition Indebtedness or the Prepetition Liens (such adversary proceeding or contested matter, a "**Challenge**"), on or before the thirtieth (30th) calendar day after the date of entry of this Interim DIP Order.  If no such Challenge is timely commenced as of such date then, without further order of the Court, (x) the claims, Liens, and security interests of the Prepetition Secured Parties shall, without further order of the Court, be deemed to be finally allowed for all purposes in the Chapter 11 Case and any Successor Case and shall not be subject to challenge or objection by any party in interest as to validity, priority, amount, or otherwise, and (y) without further order of the Court, the Debtor and its estate shall be deemed to have relinquished, released, and waived any and all claims or causes of action against the Prepetition Secured Parties with respect to the Prepetition Financing Documents or any related transactions.  Notwithstanding anything to the contrary herein, if no Challenge is timely commenced, the stipulations contained in paragraph 6 of this Interim DIP Order shall be binding on the Debtor's estate, any Committee, and all parties in interest. If a Challenge is timely commenced, the stipulations contained in paragraph 6 of this Interim DIP Order shall be binding on the Debtor's estate and all parties in interest except to the extent such stipulations are specifically challenged in such Challenge, as

and when originally filed (ignoring any relation back principles); *provided*, *that* if and to the extent a Challenge is withdrawn, denied, or overruled, the stipulations specifically challenged in such Challenge also shall be binding on the Debtor's estate and all parties in interest.

24. **Indemnity.** The DIP Lender (any of its present and former predecessors, successors, assigns, affiliates, members, partners, managers, current and former equity holders, officers, agents, employees, attorneys and affiliates) shall be and hereby are indemnified and held harmless by the Debtor in respect of any losses, claims, damages, liabilities, or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court to arise from the gross negligence or willful misconduct of the relevant indemnified person. No exception or defense in contract, law, or equity exists as to any obligation set forth in this paragraph 24 or in the DIP Documents to indemnify and/or hold harmless the DIP Lender.

25. **Release.** Subject to entry of the Final DIP Order, and subject further to the rights of any Committee or other party in interest provided in paragraph 23 of this Interim DIP Order and to the closing of the DIP Facility, in consideration of (i) the DIP Lender's agreement to make postpetition loans, advances and other credit and financial accommodations to the Debtor pursuant to the provisions of the DIP Term Sheet, the other DIP Documents, and this Interim DIP Order, and (ii) the Prepetition Secured Parties' agreements to make loans, advances, and credit and other financial accommodations to the Debtor pursuant to the provisions of the Prepetition Financing Documents, permit the use of Cash Collateral, and permit the Prepetition Liens to be primed by the DIP Liens, the Debtor (the "**Releasor**"), shall forever release, discharge and acquit the DIP Lender and the Prepetition Secured Parties and any of their respective present and former predecessors, successors, assigns, affiliates, members, partners, managers, current and former equity holders, officers, agents, employees, attorneys and affiliates (collectively, the "**Releasees**") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness, and obligations, of every kind, nature and description, including, without limitation, any so-called "lender liability" claims or defenses, that Releasors had, have or hereafter can or may have against Releasees as of the

date hereof, whether known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity or otherwise, in respect of events that occurred on or prior to the date hereof. In addition, upon the repayment of all DIP Obligations owed to the DIP Lender by the Debtor and termination of the rights and obligations arising under the DIP Term Sheet, the DIP Documents, the Interim DIP Order, or the Final DIP Order (which payment and termination shall be on terms and conditions acceptable to the DIP Lender), the DIP Lender in such capacity shall be released from any and all obligations, liabilities, actions, duties, responsibilities, and causes of action arising or occurring in connection with or related to the Term Sheet, the DIP Documents, the Interim DIP Order, or Final DIP Order (including, without limitation, any obligation or responsibility (whether direct or indirect, absolute or contingent, due or not due, primary or secondary, liquidated or unliquidated) to pay or otherwise fund the Carve Out expenses), on terms and conditions acceptable to the DIP Lender. Notwithstanding anything to the contrary herein, the Debtor's releases do not extend to the DIP Lender's obligations to make the advances and otherwise comply with the terms of the DIP Term Sheet and the Interim DIP Order and Final DIP Order.

26. **Limitation of Liability.** In determining to extend credit under the DIP Documents, or in exercising any rights or remedies pursuant to this Interim DIP Order and the other DIP Documents, the DIP Lender shall not be deemed to be in control of the operations of any Debtor or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of any Debtor (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601, *et seq*., as amended, or any similar federal or state statute).

27. **Debtor's Waivers.** At all times during the Chapter 11 Case, and whether or not an Event of Default has occurred, the Debtor irrevocably waives any right that it may have (a) to challenge the application of any payments authorized by this Interim DIP Order pursuant to section 506(b) of the Bankruptcy Code, (b) to seek authority to grant Liens on the DIP Collateral or any portion thereof to any other entities, pursuant to section 364(d) of the Bankruptcy Code or otherwise, which Liens are senior to, or *pari passu* with, the DIP Liens, the DIP Superiority

Claims, or any other liens or claims granted to the DIP Lender, unless the DIP Obligations are first repaid in full in cash and the DIP Facility is terminated, or (c) to seek authority to obtain postpetition loans or other financial accommodations pursuant to section 364(c) or 364(d) of the Bankruptcy Code, other than from the DIP Lender, or as may be otherwise expressly permitted under the DIP Documents, unless the Debtor uses the proceeds of such postpetition loans or other financial accommodations to pay in full in cash all DIP Obligations. In addition, in any hearing regarding any exercise of rights or remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Debtor hereby waive their right to seek relief, including without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the DIP Lender, as set forth in this Interim DIP Order or the other DIP Documents, other than to contest whether an Event of Default has occurred or is continuing.

**28. _Disposition of Collateral._** The Debtor shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral in any way inconsistent with the terms and conditions of the DIP Documents without the prior written consent of the DIP Lender and an order of this Court, except for (a) sales in the ordinary course of the Debtor's businesses and (b) sales to the DIP Lender. In the absence of express prior written consent, no consent to a sale, transfer, lease, encumbrance, or other disposition of any portion of the DIP Collateral shall be implied from any action, inaction, or acquiescence by the DIP Lender. Until all DIP Obligations are paid and satisfied in full and in cash in accordance with the terms of the DIP Documents on terms and conditions acceptable to the DIP Lender, the proceeds of any sale of the DIP Collateral (other than sales in the ordinary course of business) shall be applied in the following order: (i) to pay or fund an escrow account or a restricted account maintained by counsel for the Debtor in the amount of (x) all allowed and unpaid professional fees and disbursements (regardless of when such fees and disbursements become allowed by order of the Court) incurred or accrued by the Debtor and any Committee at any time on or prior to the date of the closing of the Sale in an aggregate amount not exceeding such unpaid professional fees and disbursements reflected on

the Budget plus (y) accrued administrative expenses of the types included in the Carve Out, not to exceed the Carve Out amount, (ii) to pay the fees and expenses of the DIP Lender and the Prepetition Secured Parties, (iii) to pay any interest which is then due and payable, (iv) to pay any interest with respect to the principal amount being repaid which has accrued but is not yet due and payable, and (v) to pay the principal amount of DIP Loans.

29. **Collateral Rights**. Except as expressly permitted in this Interim DIP Order and the other DIP Documents, in the event that any person or entity that holds a Lien or security interest in DIP Collateral that is junior or subordinate to the DIP Liens in such DIP Collateral receives or is paid the proceeds of such DIP Collateral, or receives any other payment with respect thereto from any other source, prior to payment in full and in cash and the complete satisfaction of all DIP Obligations, such junior or subordinate lienholder shall be deemed to have received, and shall hold, the proceeds of any such DIP Collateral in trust for the applicable DIP Lender, and shall immediately turnover such proceeds to the DIP Lender for application in accordance with this Interim DIP Order and the other DIP Documents.

30. **Modification of Stay; Rights and Remedies Upon Termination.**

(a) Subject to paragraph 18 of this Interim DIP Order, upon the occurrence of a DIP Termination Event or Cash Collateral Termination Event, as applicable, the automatic stay provisions of section 362 of the Bankruptcy Code shall be automatically vacated and modified to the extent necessary to permit the respective DIP Lender or Prepetition Secured Parties, as applicable, to exercise all rights and remedies provided in this Interim DIP Order and the other DIP Documents, as applicable, and to take any or all of the following actions, as applicable, without further order of or application to this Court: (i) immediately terminate the Debtor's use of Cash Collateral and cease making any DIP Loans to the Borrower; (ii) immediately declare all DIP Obligations to be immediately due and payable; (iii) immediately terminate the DIP Facilities and the availability of any DIP Loans thereunder; (iv) immediately set off any and all amounts held on account of or owed to the Debtor against the DIP Obligations, or otherwise enforce rights against the DIP Collateral in the possession of, or subject to a lien in favor of the DIP Lender for application towards the DIP Obligations; and (v) take any other actions or

exercise any other rights or remedies permitted under this Interim DIP Order and the other DIP Documents or applicable law to effect the repayment of the DIP Financing; *provided* that notwithstanding anything herein to the contrary, no DIP Lender or Prepetition Secured Party shall enforce any DIP Liens against the DIP Collateral or exercise any other remedies prior to the expiration of the expiration of five (5) business days following the provision of written notice to the Debtor (with a copy of such notice provided to counsel for the Debtor, counsel for any Committee, and the U.S. Trustee) (the "**Default Notice Period**").

(b) The automatic stay under section 362(a) of the Bankruptcy Code shall be automatically vacated and modified as provided in paragraph 30(a) above, effective following the expiration of the Default Notice Period, unless the Court has determined that an Event of Default or Cash Collateral Termination Event, as applicable, has not occurred and/or is not continuing. Unless otherwise ordered by the Court, any party in interest's sole recourse with respect to opposing such modification of the automatic stay under section 362(a) of the Bankruptcy Code shall be to contest the occurrence and/or continuance of an Event of Default or Cash Collateral Termination Event, as applicable. During the Default Notice Period, the Debtor shall (x) have no right to request extensions of credit under the DIP Facility, other than with the consent of the DIP Lender, (y) no right to use Cash Collateral other than with the consent of the DIP Lender and Prepetition Secured Parties or to consent in Good Faith whether an Event of Default or Cash Collateral Termination Event, as applicable, has occurred, and (z) be entitled to an emergency hearing before the Court, with proper notice to the DIP Lender, solely for the purpose of contesting whether an Event of Default or Cash Collateral Termination Event, as applicable, has occurred and/or is continuing. The rights and remedies of the DIP Lender and the Prepetition Secured Parties specified herein are cumulative and not exclusive of any rights or remedies that the DIP Lender or Prepetition Secured Parties may respectively have under the DIP Documents or Prepetition Financing Documents, as applicable, or otherwise. The Debtor shall cooperate fully with the DIP Lender in any permitted exercise of rights and remedies, whether against the DIP Collateral or otherwise.

31. **Survival of Order.** The provisions of this Interim DIP Order and any actions

taken pursuant thereto (a) shall survive the entry of any order: (i) confirming any chapter 11 plan in the Chapter 11 Case, (ii) converting the Chapter 11 Case to a Successor Case, or (iii) dismissing the Chapter 11 Case, and (b) shall continue in full force and effect notwithstanding the entry of any such order, and the claims, Liens, and security interests granted pursuant to this Interim DIP Order shall maintain their priority as provided by this Interim DIP Order until all of the DIP Obligations are indefeasibly paid in full and discharged in accordance with the DIP Documents. The applicable DIP Obligations shall not be discharged by the entry of any order confirming any chapter 11 plan in any of the Chapter 11 Case that does not provide for payment in full of the DIP Obligations, and, only upon the entry of any such order, the Debtor shall, and shall be deemed to, waive any such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code.

32. **No Waiver.** This Interim DIP Order shall not be construed in any way as a waiver or relinquishment of any rights that the DIP Lender or Prepetition Secured Parties may have to bring or be heard on any matter brought before this Court.

33. **Reservation of Rights.** The terms, conditions, and provisions of this Interim DIP Order are in addition to and without prejudice to the rights of the DIP Lender or the Prepetition Secured Parties to pursue any and all rights and remedies under the Bankruptcy Code, the DIP Documents or Prepetition Financing Documents, as applicable, or any other applicable agreement or law, including, without limitation, rights (a) to seek relief from the automatic stay, (b) to seek an injunction, (c) to oppose any future request for use of Cash Collateral or the granting of any interest in the DIP Collateral or priority in favor of any other party, (d) to object to any sale of assets, or (e) to object to applications for allowance or payment of compensation of professionals or other parties seeking compensation or reimbursement from the Debtor's estate.

34. **No Consent.** No action, inaction, or acquiescence by the DIP Lender or Prepetition Secured Parties, including funding the Debtor's operations and the conduct and pursuit of a sale and liquidation process under this Interim DIP Order, shall be deemed to be or shall be considered as evidence of any alleged consent by the DIP Lender to a charge against the DIP Collateral pursuant to sections 506(c), 552(b), or 105(a) of the Bankruptcy Code. The DIP

Lender and the Prepetition Secured Parties shall not be subject in any way whatsoever to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the Prepetition Collateral. The DIP Liens and the Prepetition Liens shall not be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code and, subject to entry of the Final DIP Order, the "equities of the case" exception of section 552(b) of the Bankruptcy Code shall not apply to the Prepetition Secured Parties with respect to the Prepetition Financing Documents or the Prepetition Collateral.

35. **Binding Effect; Successors and Assigns**. Except as otherwise provided in the DIP Documents, the provisions of this Interim DIP Order shall be binding upon and inure to the benefit of the DIP Lender, the Prepetition Secured Parties, the Debtor, and their respective successors and assigns (including any trustee or fiduciary hereafter appointed or elected as a legal representative of the Debtor, its estate, or with respect to the property of any of its estate) whether in this Chapter 11 Case, in any Successor Case, or upon dismissal of the Chapter 11 Case or any Successor Case; *provided*, *however*, that the DIP Lender and the Prepetition Secured Parties shall have no obligation to extend any financing to, or permit the use of Cash Collateral or DIP Collateral or Prepetition Collateral by, any chapter 7 or chapter 11 trustee or similar representative person appointed for the Debtor's estate.

36. **Proofs of Claim.** Notwithstanding anything to the contrary contained in any prior or subsequent order of this Court:

(a) The DIP Lender shall not be required to file proofs of claim in the Chapter 11 Case or any Successor Case in order to maintain its claims with respect to the DIP Obligations, all of which shall be due and payable in accordance with this Interim DIP Order, the Final DIP Order (subject to entry by the Court thereof), and the other DIP Documents, without the necessity of filing any such proof of claim; the statements of claim in respect of the respective DIP Obligations set forth in this Interim DIP Order, together with the evidence accompanying the Motion, and presented at the Interim Hearing, are deemed sufficient to and do constitute proofs of claim in respect of such obligations and such secured status.

(b) The Prepetition Secured Parties shall not be required to file any proof of

claim with respect to any of the Prepetition Indebtedness, all of which shall be due and payable in accordance with the Prepetition Financing Documents and this Interim DIP Order, as applicable, without the necessity of filing any such proof of claim, and the failure to file any such proof of claim shall not affect the validity or enforceability of any of the Prepetition Financing Documents, this Interim DIP Order, the Prepetition Indebtedness, or any other obligations hereunder or thereunder, or prejudice or otherwise adversely affect the rights, remedies, powers, or privileges of the Prepetition Secured Parties under the Prepetition Financing Documents; *provided*, *further*, that, for the avoidance of doubt, the filing of any proof of claim by the Prepetition Secured Parties shall not in any way prejudice or otherwise adversely affect such parties' rights, remedies, powers, or privileges under the Prepetition Financing Documents and this Interim DIP Order.

37. **Order Effective Immediately.** Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, 9024, or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim DIP Order shall be immediately effective and enforceable *nunc pro tunc* to the Petition Date upon its entry, and there shall be no stay of execution or effectiveness of this Interim DIP Order.

38. **Interim DIP Order Governs**. In the event of any inconsistency or conflict between any of the terms and provisions of this Interim DIP Order and the DIP Documents or the Prepetition Financing Documents, the terms and provisions of this Interim DIP Order shall govern.

39. **Monitoring of Collateral.** The DIP Lender, the Prepetition Secured Parties, and their consultants, advisors, and counsel shall be given reasonable access to the Debtor's books, records, assets, and properties.

40. **Financial Reporting.** The Debtor shall provide the DIP Lender and the Prepetition Secured Parties with the monthly financial reporting given to the U.S. Trustee and all of the financial reporting as required under and in all instances consistent with the DIP Documents and the Prepetition Financing Documents.

41. **Cash Management.** The Debtor's cash management system shall at all times be

maintained (a) in accordance with any order of this Court approving the maintenance of the Debtor's cash management system and (b) in a manner which is otherwise reasonably satisfactory to the DIP Lender and the Prepetition Secured Parties. The DIP Lender shall be deemed to have "control" over all such accounts for all purposes of perfection under the Uniform Commercial Code. Any and all banking or financial institutions at which the Debtor maintained any account as of the Petition Date are hereby prohibited and enjoined from placing any freeze or hold on such account or otherwise restricting or limiting in any manner the Debtor's access to the funds in such account absent written instruction from the Debtor that it intends to close such account. Notwithstanding the foregoing, (i) the DIP Lender shall have DIP Liens with the priority set forth in the DIP Term Sheet and deemed control over such accounts and all cash and financial assets credited thereto, and such assets shall constitute DIP Collateral, and (ii) the Prepetition Secured Parties shall have Adequate Protection Liens over such assets, in the case of clauses (i) and (ii), subordinate only to (x) Permitted Senior Liens (and adequate protection liens granted to the holders thereof on the collateral securing the same, if any), (y) the Carve- Out and (z) solely in the case of clause (ii), the DIP Liens.

42. **Credit Bidding.** Subject to that certain Written Consent of Prepetition Secured Lenders dated as of November 16, 2015, the DIP Lender and the Prepetition Secured Parties shall each have the unqualified right to credit bid up to the full amount of the applicable outstanding DIP Obligations, the Adequate Protection Obligations, and the Prepetition Indebtedness (as applicable), in each case including any accrued interest, in any sale of the DIP Collateral (or any part thereof) or the Prepetition Collateral (or any part thereof), as applicable, without the need for further Court order authorizing the same, and whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

43. **No Third Party Rights.** Except as explicitly provided for herein, this Interim DIP Order does not create any rights for the benefit of any party, creditor, equity holder, or other entity other than the DIP Lender, the Prepetition Secured Parties, and the Debtor, and each of their respective successors and assigns.

**44.    Payment of Budgeted Professional Fees**. The Debtor shall make, on a weekly basis, payments which have been allocated in the Budget for professional fees expenses. These weekly professional fee payments will be held by counsel to the Debtor, Levene, Neale, Bender, Yoo & Brill L.L.P., in a segregated trust account, with no funds to be released to any professional absent a further Court order.

**45.    Headings.** Section headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim DIP Order.

**46.    Retention of Jurisdiction.** This Court retains exclusive jurisdiction to interpret, implement, and enforce the provisions of this Interim DIP Order and the other DIP Documents.

**47.    Subsequent Reversal or Modification.** This Interim DIP Order is entered pursuant to, *inter alia*, section 364 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), granting the DIP Lender and the Prepetition Secured Parties all protections afforded by section 364(e) of the Bankruptcy Code. If any or all of the provisions of this Interim DIP Order are hereafter reversed, modified, vacated, or stayed, that action will not affect (a) the validity of any obligation, indebtedness, or liability incurred hereunder by the Borrower to the DIP Lender or the Prepetition Secured Parties prior to the date of receipt by the DIP Lender or Petition Secured Parties, as applicable, of written notice of the effective date of such action, (b) the payment of any fees required under this Interim DIP Order or the other DIP Documents, or (c) the validity and enforceability of any lien, claim, obligation, or priority authorized or created under this Interim DIP Order or pursuant to the other DIP Documents or the Prepetition Financing Documents as of such date. Notwithstanding any such reversal, stay, modification, or vacatur, any postpetition indebtedness, obligation, or liability incurred by the Borrower or any of the other Debtors to any DIP Lender or the Prepetition Secured Parties, prior to written notice being delivered to DIP Lender or the Prepetition Secured Parties of the effective date of such action, shall be governed in all respects by the original provisions of this Interim DIP Order, and the DIP Lender or Prepetition Secured Parties, as applicable shall be entitled to all the rights, remedies, privileges, and benefits granted herein and in the DIP Documents with respect to all such indebtedness, obligations, or liability.

48.     **Notice of Final Hearing.**  The Debtor shall promptly serve by United States mail, first class postage prepaid, copies of this Interim DIP Order and a notice of the Final Hearing to be held on December ___, 2015 at ___:___ __.m. to consider entry of the Final DIP Order on the parties having been given notice of the Motion and the Interim Hearing, to any other party that has filed a request for notices in this Chapter 11 Case, and any Committee that has been appointed.

**\*End of Order\***

**EXHIBIT "3"**

# Budget for Rdio Inc.
## Assumes Service runs-off

Budget excludes costs for subs and foreign entities
Free shutdown as of 11/16

|  | Week starting | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
|  | 11/16/15 | 11/23/15 | 11/30/15 | 12/7/15 | 12/14/15 | 12/21/15 | 12/28/15 | 12/31/15 | Total |
| **Payment under transition service agreement** |  | $ 1,250,000 |  | $ 625,000 | $ 625,000 |  |  |  | $ 2,500,000 |
|  |  |  |  |  |  |  |  |  |  |
| Streaming/Bandwidth (Mosaic / Akamai / Edgecast) | 70,000 |  |  |  |  |  |  |  | 70,000 |
| Datacenter | 100,000 |  |  |  |  |  |  |  | 100,000 |
| Dell equipment Leases | 160,000 |  |  |  |  |  |  |  | 160,000 |
| Rovi (software licensing / artist bio) | 23,000 |  |  |  |  |  |  |  | 23,000 |
| **Total Cost of Service** | $ 353,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 353,000 |
|  |  |  |  |  |  |  |  |  |  |
| **People Cost** |  |  |  |  |  |  |  |  |  |
| Salaries & wages (inc. Employer's taxes) - transferred employees |  | $ 650,380 |  | $ 650,380 |  |  | $ 650,380 |  | $ 1,951,139 |
| Salaries & wages (inc. Employer's taxes) - Unknown status |  | $ 275,066 |  | $ 275,066 |  |  | $ 275,066 |  | $ 825,199 |
| PTO (<$12K threshold & <180days accrual period) |  |  |  |  |  |  | $ 640,822 |  | $ 640,822 |
| Benefits |  | $ 130,500 |  |  |  |  |  |  | $ 130,500 |
| **Total Payroll** | $ - | $ 1,055,946 | $ - | $ 925,446 | $ - | $ - | $ 1,566,268 | $ - | $ 3,547,660 |
| Contractors/Consultants |  |  | 41,000 |  |  |  |  |  | $ 41,000 |
| **Total People Cost** | $ - | $ 1,055,946 | $ 41,000 | $ 925,446 | $ - | $ - | $ 1,566,268 | $ - | $ 3,588,660 |
|  |  |  |  |  |  |  |  |  |  |
| **Other Expenses** |  |  |  |  |  |  |  |  |  |
| Other Employee Expenses (Meals/refreshment) | $ 8,500 | $ 8,500 | $ 8,500 | $ 8,500 | $ 8,500 | $ 8,500 | $ 8,500 | $ 8,500 | $ 68,000 |
| Legal fees | $ 85,000 | $ 85,000 | $ 85,000 | $ 85,000 | $ 80,000 | $ 80,000 |  |  | $ 500,000 |
| Moelis |  |  |  | $ 100,000 |  |  |  |  | $ 100,000 |
| Bankruptcy service costs | $ 25,000 | $ 25,000 | $ 25,000 |  |  |  |  |  | $ 75,000 |
| Insurance Policies |  |  | $ 22,000 |  |  |  | $ 22,000 |  | $ 44,000 |
| Office Rent / Other rentals |  |  | $ 125,000 |  |  |  | $ 125,000 |  | $ 250,000 |
| Telephone/Internet |  |  | $ 8,000 |  |  |  | $ 8,000 |  | $ 16,000 |
| Parking |  |  | $ 1,650 |  |  |  | $ 1,650 |  | $ 3,300 |
| Utilities |  |  | $ 5,500 |  |  |  | $ 5,500 |  | $ 11,000 |
| Office Supplies | $ 1,250 | $ 1,250 | $ 1,250 | $ 1,250 | $ 1,250 | $ 1,250 | $ 1,250 | $ 1,250 | $ 10,000 |
| Software |  |  | $ 10,000 |  |  |  |  |  | $ 10,000 |
| Miscellaneous | $ 50,000 | $ 50,000 | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 | $ 25,000 | $ 250,000 |
| **Total Other Expenses** | $ 119,750 | $ 169,750 | $ 316,900 | $ 219,750 | $ 114,750 | $ 114,750 | $ 196,900 | $ 34,750 | $ 1,337,300 |
|  |  |  |  |  |  |  |  |  |  |
| **TOTAL** | $ (472,750) | $ 24,304 | $ (357,900) | $ (520,196) | $ 510,250 | $ (114,750) | $ (1,763,168) | $ (34,750) | $ (2,778,960) |
|  |  |  |  |  |  |  |  |  |  |
| **Opening Cash Balance** | $ - | $ (472,750) | $ (448,446) | $ (806,346) | $ (1,326,542) | $ (816,292) | $ (931,042) | $ (2,694,210) | $ (2,728,960) |
| **DIP** |  |  |  |  |  |  |  |  |  |
| **Closing Cash Balance** | $ (472,750) | $ (448,446) | $ (806,346) | $ (1,326,542) | $ (816,292) | $ (931,042) | $ (2,694,210) | $ (2,728,960) |  |

NB: Excludes portion of PTO subject to statutory cap of $12,475 per person and 180-day look-back. Balance not included = unsecured claim amount of $262,156

Case: 15-31430   Doc# 3   Filed: 11/16/15   Entered: 11/16/15 16:34:05   Page 81 of 201

Proprietary and Confidential

Budget 13 weeks 3 scenarios v15c - Values Only.xlsx / Budget
11/16/2015, 1:53 PM

# EXHIBIT "4"

Case: 15-31430    Doc# 3    Filed: 11/16/15    Entered: 11/16/15 16:34:05    Page 82 of 201

$208,000,000.00

Effective as of September 21, 2012
Amended and Restated as of July 10, 2015
San Francisco, California

## RDIO, INC.

## THIRD AMENDED AND RESTATED
## SECURED PROMISSORY NOTE

FOR VALUE RECEIVED, the undersigned, RDIO, INC., a Delaware corporation (the "*Borrower*"), promises to pay to the order of PULSER MEDIA, INC., a Delaware corporation (hereafter, together with any holder hereof, called "*Lender*"), at such place as Lender may designate in writing to Borrower, in lawful money of the United States of America, and in immediately available funds, such amount as may from time to time be advanced by Lender to Borrower pursuant to an Advance (as defined below) hereunder, up to the maximum aggregate principal amount of Two Hundred Eight Million U.S. Dollars ($208,000,000.00) (the "*Maximum Aggregate Amount*"), plus interest as hereinafter provided. Such Advances may be endorsed from time to time on the Schedule of Advances attached hereto (the "*Schedule of Advances*") by the initials of Lender, but the failure to make such notations shall not affect the validity of Borrower's obligation to repay unpaid principal and interest hereunder. For the avoidance of doubt, Lender is hereby authorized to record in its books and records, the date and amount of all Advances of borrowings under this note (this "*Note*"), and those books and records, along with copies of the request(s) for Advance(s), shall be conclusive and binding absent manifest error. The aggregate principal under this Note, and all accrued and unpaid interest thereon, shall be due and payable to Lender on December 31, 2018 (the "*Maturity Date*"). This Note expressly amends and restates in its entirety that certain Second Amended and Restated Secured Promissory Note, amended and restated as of December 17, 2014, but effective as of September 21, 2012, by and between Lender and the Borrower, having a Maximum Aggregate Amount of One Hundred Seventy-Eight Million U.S. Dollars ($178,000,000.00), which expressly amended and restated that certain Amended and Restated Secured Promissory Note, amended and restated as of January 8, 2013, but effective as of September 21, 2012, by and between Lender and the Borrower, having a Maximum Aggregate Amount of Forty-Eight Million Seven Hundred Fifty Thousand Ten U.S. Dollars ($48,750,010.00), which expressly amended and restated that certain Secured Promissory Note, dated as of September 21, 2012, by and between Lender and the Borrower, having a Maximum Aggregate Amount of Twenty-Six Million Two Hundred Thousand U.S. Dollars ($26,200,000.00).

1. Subject to the terms hereof, Lender may, in its absolute discretion, but shall not be required to, make advances of funds available hereunder ("*Advances*") to Borrower. Borrower shall give Lender irrevocable written notice requesting an Advance at least five (5) business days before the date on which Borrower wishes to receive the Advance (unless a shorter period is consented to by Lender). Notwithstanding any term or provision of this Note that may be construed to the contrary, at no time shall Lender be required to make an Advance hereunder if (a) an Event of Default (as defined below) shall have occurred; or (b) the Lender determines, in its absolute discretion, not to make such Advance.

2. From and after the date of any individual Advance (until maturity or default as hereinafter provided), interest shall accrue on the principal amount of this Note that is outstanding from time to time at a rate per annum equal to 0.95%. If, however, an interest rate of 0.95% exceeds the allowable rate of interest under California law, then interest shall accrue on the principal amount of this Note from time to time at a rate per annum equal to the highest maximum allowable percentage rate under California law. Interest shall be computed on the daily outstanding principal balance hereunder on the basis of a three hundred sixty (360) day year, as the case may, counting the number of actual days elapsed. The principal balance of all Advances then outstanding, together with all accrued but unpaid interest thereon shall be due and payable on the Maturity Date or on such earlier date on which the maturity hereof is accelerated pursuant to the provisions hereof.

3. From and after the occurrence of an Event of Default, interest shall accrue on any amounts past due hereunder (whether by acceleration, maturity or otherwise) at a rate of five percent (5%) per annum in excess of the interest rate otherwise payable hereunder. All such interest accruing on amounts past due hereunder shall be due and payable on demand.

4. The loan represented by this Note is not a revolving credit line, and accordingly, at such time that any Advances are provided hereunder, the Maximum Aggregate Amount shall be reduced until such time that the total Maximum Aggregate Amount is advanced hereunder, irrespective of any payment or prepayment hereunder. Borrower, at its option, may repay or prepay all or any portion of the outstanding principal amount on the Advances, together with all accrued and unpaid interest, at any time without penalty by giving Lender at least one (1) business day's prior written notice of any such prepayment. All payments received by Lender shall be applied <u>first</u>, to fees, costs and expenses that may be due to Lender, <u>second</u>, to accrued and unpaid interest under the Advances and <u>third</u>, to the outstanding principal balance of the Advances.

5. Notwithstanding any provision to the contrary contained in this Note, Borrower shall not be required to pay, and Lender shall not be permitted to collect any amount of interest in excess of the maximum amount of interest permitted by law ("*Excess Interest*"). If any Excess Interest is provided for or determined by a court of competent jurisdiction to have been provided for in this Note, then in such event: (a) the provisions of this paragraph shall govern and control; (b) Borrower shall not be obligated to pay any Excess Interest; (c) any Excess Interest that Lender may have received hereunder shall be, at Lender's option, applied as a credit against the outstanding principal balance of this Note or the accrued and unpaid interest (not to exceed the maximum amount permitted by law), or refunded to the payor thereof, or any combination of the foregoing; (d) the interest rate provided for herein shall be automatically reduced to the maximum lawful rate allowed from time to time under applicable law (the "*Maximum Rate*"), and this Note shall be deemed to have been and shall be, reformed and modified to reflect such reduction; and (e) Borrower shall not have any action against Lender for any damages arising out of the payment or collection of any Excess Interest. Notwithstanding the foregoing, if, for any period of time, interest on this Note is calculated at the Maximum Rate rather than the applicable rate under this Note, and thereafter the Maximum Rate exceeds the applicable rate, the rate of interest payable on this Note shall become the Maximum Rate until Lender shall have received the amount of interest

2

which Lender would have received during such period on this Note had the rate of interest not been limited to the Maximum Rate during such period.

6. Each of the following events shall constitute an *"Event of Default"* under this Note: (a) failure of Borrower to pay any principal, interest or other amount due hereunder within five (5) business days of the date due, or Borrower shall in any way fail to comply with the other terms, covenants or conditions contained in this Note, when such failure continues for a period of five (5) days following notice thereof from Lender; (b) Borrower shall (i) commence a voluntary case under the Bankruptcy Code of 1978, as amended or other federal bankruptcy law (as now or hereafter in effect); (ii) file a petition seeking to take advantage of any other laws, domestic or foreign, relating to bankruptcy, insolvency, reorganization, winding up or composition for adjustment of debts; (iii) consent to or fail to contest in a timely and appropriate manner any petition filed against it in an involuntary case under such bankruptcy laws or other laws; (iv) apply for or consent to, or fail to contest in a timely and appropriate manner, the appointment of, or the taking of possession by, a receiver, custodian, trustee, or liquidator of Borrower or of a substantial part of Borrower's property, domestic or foreign; (v) admit in writing its inability to pay its debts as they become due; (vi) make a general assignment for the benefit of creditors; or (vii) make a conveyance fraudulent as to creditors under any state or federal law; or (c) a case or other proceeding shall be commenced against Borrower in any court of competent jurisdiction seeking (i) relief under the Bankruptcy Code of 1978, as amended or other federal bankruptcy law (as now or hereafter in effect) or under any other laws, domestic or foreign, relating to bankruptcy, insolvency, reorganization, winding up or adjustment of debts or (ii) the appointment of a trustee, receiver, custodian, liquidator or the like for Borrower of all or any substantial part of its assets, domestic or foreign, and such proceeding shall not have been stayed or dismissed within sixty (60) days.

7. Upon the occurrence of an Event of Default described in clause (a) of the definition thereof, any and all of the obligations hereunder, at the option of Lender, exercisable in its sole discretion, and without demand or notice of any kind, may be immediately declared, and thereupon shall immediately be in default and due and payable and Lender may exercise any and all rights and remedies available to it at law, in equity or otherwise. Upon the occurrence of an Event of Default described in clause (b) or (c) of the definition thereof, any and all of the obligations hereunder, without demand or notice of any kind, shall immediately be in default and due and payable and Lender may exercise any and all rights and remedies available to it at law, in equity or otherwise. Nothing in this paragraph shall limit the right of Lender to make demand, at any time, with or without the occurrence of an Event of Default, for payment in full of all amounts due hereunder.

8. Borrower agrees to pay all costs and expenses (including, without limitation, attorneys' fees) incurred by Lender in connection with or related to this Note, or its enforcement, whether or not suit be brought.

9. All payments of principal, interest and other amounts to be made by Borrower under this Note shall be made without any deduction, set-off or counterclaim whatsoever. The receipt of any check or other item of payment by Lender shall not be considered a payment on this Note until such check or other item of payment is honored at the drawee bank. Lender may

3

delay the credit of such payment until the funds become available and interest under this Note shall accrue until the funds are in fact collected.

10. As security for the full and final payment of all obligations of the Borrower pursuant to this Note, Borrower hereby grants to Lender a continuing first priority security interest and general lien in and to any and all, right, title and interest of Borrower in and to the Collateral, whether now owned or hereafter acquired. For purposes of this Note, "*Collateral*" means all property and other assets of Borrower, wherever located and whether now owned or hereafter acquired, including, but not limited to, all Inventory, General Intangibles (including but not limited to copyrights), Accounts, Accounts Receivable, Chattel Paper, Contracts, Equipment, Investment Property, Commercial Tort Claims, Letter-of-Credit Rights, Accounts and Deposits in banks and other financial institutions, Fixtures, and Profits (in each case as the same may be defined from time to time in the Uniform Commercial Code of California). Upon the failure of the Borrower to pay any amounts hereunder when due, Lender shall, in addition to any other rights and remedies available at law or equity and subject to the last sentence of this Section 10, be entitled to exercise all rights and remedies of a secured party under the Uniform Commercial Code. Lender is hereby authorized to file any and all financing statements in appropriate jurisdictions to reflect the security interest granted herein. Nothing herein shall be deemed to limit any of the terms or provisions of this Note or any other present or future document, instrument or agreement, between Borrower and Lender, and all of Lender's rights and remedies hereunder and thereunder are cumulative.

11. Time is of the essence of this Note.

12. No delay or failure on the part of Lender in the exercise of any right or remedy shall operate as a waiver thereof, and no single or partial exercise by Lender of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy.

13. All amendments to this Note, and any waiver or consent of Lender, must be in writing and signed by Lender and Borrower.

14. Borrower hereby waives notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor, and all other notices or demands of any kind or character, and to the fullest extent permitted by law, the right to invoke any statute of limitations as a defense to any demand hereunder. No delay or failure on the part of Lender in the exercise of any right or remedy shall operate as a waiver thereof and no single or partial exercise of any right or remedy shall preclude other or further exercise thereof or the exercise of any other right or remedy. Borrower acknowledges that this Note is executed as part of a commercial transaction and that the proceeds of this Note will not be used for any personal or consumer purpose.

15. THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS (AS OPPOSED TO THE CONFLICTS OF LAW PROVISIONS) OF THE STATE OF CALIFORNIA, AS THE SAME MAY FROM TIME TO TIME BE IN EFFECT. BORROWER HEREBY (a) IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY FEDERAL COURT, OR AT THE OPTION OF LENDER, ANY STATE COURT, LOCATED IN LOS ANGELES, CALIFORNIA OVER ANY CLAIMS

4

OR DISPUTES BETWEEN BORROWER AND LENDER, PERTAINING DIRECTLY OR INDIRECTLY TO THIS NOTE OR TO ANY MATTER ARISING THEREFROM OR RELATING THERETO; (b) WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON BORROWER, AND CONSENTS SO THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY MESSENGER, CERTIFIED MAIL OR REGISTERED MAIL AND SERVICE SO MADE SHALL BE DEEMED TO BE COMPLETED UPON THE EARLIER OF ACTUAL RECEIPT OR THREE (3) DAYS AFTER THE SAME SHALL HAVE BEEN POSTED TO BORROWER'S ADDRESS; (c) IRREVOCABLY WAIVES, TO THE FULLEST EXTENT BORROWER MAY EFFECTIVELY DO SO, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF ANY SUCH ACTION OR PROCEEDING; (d) AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN ANY OTHER JURISDICTION BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW; AND (e) AGREES NOT TO INSTITUTE ANY LEGAL ACTION OR PROCEEDING AGAINST LENDER OR ANY OF LENDER'S EMPLOYEES, AGENTS OR PROPERTY, CONCERNING ANY MATTER ARISING OUT OF OR RELATING TO THIS NOTE IN ANY COURT OTHER THAN ONE LOCATED IN LOS ANGELES, CALIFORNIA. NOTHING IN THIS PARAGRAPH SHALL AFFECT OR IMPAIR LENDER'S RIGHT TO SERVE LEGAL PROCESS IN ANY MANNER PERMITTED BY LAW OR LENDER'S RIGHT TO BRING ANY ACTION OR PROCEEDING AGAINST BORROWER OR BORROWER'S PROPERTY IN THE COURTS OF ANY OTHER JURISDICTION.

16. LENDER AND BORROWER EACH HEREBY WAIVE THE RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING BASED UPON, ARISING OUT OF, OR IN ANY WAY RELATING TO: (a) THIS NOTE; OR (b) ANY OTHER PRESENT OR FUTURE INSTRUMENT OR AGREEMENT BETWEEN LENDER AND BORROWER PERTAINING TO BORROWED MONEY; OR (c) ANY CONDUCT, ACTS OR OMISSIONS OF LENDER OR BORROWER OR ANY OF THEIR EMPLOYEES, AGENTS, ATTORNEYS OR ANY OTHER PERSONS AFFILIATED WITH LENDER OR BORROWER ARISING OUT OF THE TRANSACTIONS CONTEMPLATED HEREBY; IN EACH OF THE FOREGOING CASES, WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE.

17. THE FOREGOING WAIVERS HAVE BEEN MADE WITH THE ADVICE OF COUNSEL AND WITH A FULL UNDERSTANDING OF THE LEGAL CONSEQUENCES THEREOF.

18. In the event any one or more of the provisions of this Note shall for any reason be held to be invalid, illegal or unenforceable, the same shall not affect any other provision of this Note and the remaining provisions of this Note shall remain in full force and effect.

19. This Note inures to and binds the heirs, successors and assigns of Borrower and Lender. Lender may assign its rights under this Note. However, Borrower may not assign any rights or obligations under this Note without Lender's prior written consent.

5

20. All notices and other communications provided for hereunder shall be in writing and shall be sent to Lender's principal place of business or Borrower's address set forth below its signature hereto, as the case may be. All such notices and other communications shall be effective when received.

*[Signature Page Follows]*

6

IN WITNESS WHEREOF, Borrower has executed and delivered this Third Amended and Restated Secured Promissory Note as of the date amended and restated as written above, to be effective as of the effective date first written above.

BORROWER:

RDIO, INC.

By: _____
Name: _____
Title: _____

Address for notices:

1550 Bryant Street, Ste. 200
San Francisco, California 94103
Attn:    Board of Directors
Fax:     (415) 626-6837

Acknowledged and Agreed as
of the date first written above:

LENDER:

PULSER MEDIA, INC.

By: _____
Name: _____
Title: _____

Address for notices:

1550 Bryant Street, Ste. 200
San Francisco, California 94103
Attn:   Elliott Peters
Fax:    (415) 626-6837

# SCHEDULE OF ADVANCES

| Date | Amount of Advance | Unpaid Principal Balance | Notes: |
|---|---|---|---|
| September 21, 2012 | $5,325,000.00 | $5,325,000.00 | Made by Lender |
| October 17, 2012 | $4,600,000.00 | $9,925,000.00 | Made by Lender |
| November 23, 2012 | $4,817,157.00 | $14,742,157.00 | Made by Lender |
| December 9, 2012 | $6,000,000.00 | $20,742,157.00 | Made by Lender |
| January 8, 2013 | $5,457,853.00 | $26,200,010.00 | Made by Lender |
| February 5, 2013 | $10,650,000.00 | $36,850,010.00 | Made by Lender |
| March 25, 2013 | $1,750,000.00 | $38,600,010.00 | Made by Lender |
| April 11, 2013 | $9,154,295.07 | $47,754,305.007 | Made by Lender |
| April 29, 2013 | $7,000,000.00 | $54,754,305.07 | Made by Lender |
| June 18, 2013 | $2,100,00.00 | $56,854,305.07 | Made by Lender |
| July 2, 2013 | $3,065,006.14 | $59,919,311.21 | Made by Lender |
| July 22, 2013 | $8,500,000.00 | $68,419,311.21 | Made by Lender |
| August 31, 2013 | $5,000,000.00 | $73,419,311.21 | Made by Lender |
| September 30, 2013 | $5,450,000.00 | $78,869,311.21 | Made by Lender |
| October 30, 2013 | $4,400,000.00 | $83,269,311.21 | Made by Lender |
| November 12, 2013 | $9,400,000.00 | $92,669,311.21 | Made by Lender |
| December 16, 2013 | $7,090,121.00 | $99,759,432.21 | Made by Lender |
| January 22, 2014 | $12,436,988.07 | $112,196,420.28 | Made by Lender |
| April 17, 2014 | $23,999,990.00 | $136,196,410.28 | Made by Lender |
| December 19, 2014 | $2,500,000.00 | $138,696,410.28 | Made by Lender |
| December 29, 2014 | $5,000,000.00 | $143,696,410.28 | Made by Lender |
| January 27, 2015 | $7,500,000.00 | $151,196,410.28 | Made by Lender |
| March 23, 2015 | $5,000,000.00 | $156,196,410.28 | Made by Lender |
| April 8, 2015 | $5,000,000.00 | $161,196,410.28 | Made by Lender |
| May 12, 2015 | $8,000,000.00 | $169,196,410.28 | Made by Lender |
| July 10, 2015 | $7,000,000.00 | $176,196,410.28 | Made by Lender |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

# EXHIBIT "5"

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]

Kirstin Choi                                    8184444523

B. SEND ACKNOWLEDGMENT TO:  (Name and Address)

STUBBS ALDERTON & MARKILES

15260 VENTURA BLVD., 20TH FLOOR

SHERMAN OAKS CA 91403

DELAWARE DEPARTMENT OF STATE
U.C.C. FILING SECTION
FILED 11:48 AM 12/27/2013
INITIAL FILING # 2013 5130191
SRV: 131480808

---

**1. DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| RDIO, INC. | | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1550 BRYANT STREET, SUITE 200 | SAN FRANCISCO | CA | 94103 | US |

| | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|
| | CORPORATION | DE | |

**2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME** - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

| | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | |
|---|---|---|---|

**3. SECURED PARTY'S NAME** (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| PULSER MEDIA, INC. | | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
|---|---|---|---|---|

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1550 BRYANT STREET, SUITE 200 | SAN FRANCISCO | CA | 94103 | US |

**4.  This FINANCING STATEMENT covers the following collateral:**

All property and other assets of Borrower, wherever located and whether now owned or hereafter acquired, including, but not limited to, all Inventory, General Intangibles (including but not limited to copyrights), Accounts, Accounts Receivable, Chattel Paper, Contracts, Equipment, Investment Property, Commercial Tort Claims, Letter-of-Credit Rights, Accounts and Deposits in banks and other financial institutions, Fixtures, and Profits (in each case as the same may be defined from time to time in the Uniform Commercial Code of California).

---

| 6. | This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.     Attach Addendum        [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE]        [optional] | All Debtors | Debtor 1 | Debtor 2 |
|---|---|---|---|---|---|

8. OPTIONAL FILER REFERENCE DATA

# EXHIBIT "6"

Case: 15-31430   Doc# 3   Filed: 11/16/15   Entered: 11/16/15 16:34:05   Page 93 of 201

**RDIO, INC.**

———————————————————

**NOTE PURCHASE AGREEMENT**

———————————————————

# RDIO, INC.

# NOTE PURCHASE AGREEMENT

This NOTE PURCHASE AGREEMENT (the "*Agreement*") is made as of the 19th day of October, 2015 (the "*Effective Date*") by and among RDIO, INC., a Delaware corporation (the "*Company*"), and the persons and entities named on the Schedule of Purchasers attached hereto (individually, a "*Purchaser*" and collectively, the "*Purchasers*"), and Iconical Investments II LP, as the collateral agent (the "*Collateral Agent*").

## RECITALS

To provide the Company with additional resources solely to fund payroll obligations and general operating expenses of the Company, the Purchasers may, in their sole discretion, loan to the Company up to an aggregate amount of Five Million Dollars ($5,000,000) subject to the terms and conditions specified herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, and the representations, warranties, covenants and conditions set forth below, the Company, the Collateral Agent and the Purchasers, intending to be legally bound, hereby agree as follows:

1. **AMOUNT AND TERMS OF THE LOANS**

Subject to the terms and conditions of this Agreement and the Notes (as defined below), each Purchaser may, in its sole discretion, lend to the Company from and after the Closing (as hereinafter defined) in one or more advances, as requested in writing by the Company, up to the amount set forth opposite each such Purchaser's name on the Schedule of Purchasers attached hereto (each, a "*Maximum Loan Amount*" and collectively the "*Total Loan Amount*" or "*Loan*"), against the issuance and delivery by the Company of a Promissory Note or Notes for such amount(s), in the form attached hereto as <u>Exhibit A</u> (or such other form as the Purchasers may agree in writing) (each, a "*Note*" and collectively, the "*Notes*"). "*Maximum Available Amount*" means, at any time, an amount equal to the Maximum Loan Amount *minus* the aggregate amount of all Advances made under all Notes from the Effective Date through and including such time.

2. **THE CLOSING**

2.1 **Closing.** Subject to the terms and conditions of this Agreement, the initial closing (the "*Initial Closing*") of the sale and purchase of Notes under this Agreement shall take place on the Effective Date, remotely via the exchange of documents and signatures, or at such other time and place as the Company and the Purchasers participating at the Initial Closing shall agree in writing.

Case: 15-31430    Doc# 3    Filed: 11/16/15    Entered: 11/16/15 16:34:05    Page 95 of 201

**2.2   Additional Closings.**   Through and including November 15, 2015 (the "*Availability Termination Date*"), additional sales and issuances of Notes of up to, in the aggregate with all sales and issuances of Notes at the Initial Closing and at all Additional Closings, the Total Loan Amount of $5,000,000, may, in the sole discretion of the Purchasers, be made by the Company, at one or more additional closings (each, an "*Additional Closing*"), to any or all of the Purchasers, and additional Purchasers approved by the Company and who are reasonably acceptable to Iconical Investments II LP.   Each Additional Closing and the Initial Closing are collectively referred to as the "*Closings.*"   Each Additional Closing shall take place remotely via the exchange of documents and signatures.   All Loans made at any Additional Closings shall be made on the terms and conditions set forth in this Agreement.

**2.3**   At each Closing, each Purchaser may, in its sole discretion, fund to the Company a portion of the Maximum Loan Amount not to exceed the Maximum Available Amount at such time. During the period commencing with the date after the date of the Initial Closing and ending on (and including) the Availability Termination Date:

(a)   each Purchaser may, in its sole discretion, fund up to the Maximum Available Amount at such time after giving effect to all Advances (as such term is defined in such Purchaser's Note) made under all Notes prior to such Closing, in one or more Advances in accordance with and subject to the terms and conditions hereof and of such Purchaser's Note; and

(b)   in the event there is more than one Note outstanding at the time the Company requests an Advance, then the Company shall request Advances under such Notes, and the Purchasers may, in their sole discretion, fund such Advances (subject to the terms and conditions hereof and of the Notes), on a pro rata basis, up to the Maximum Available Amount at such time after giving effect to all Advances (as such term is defined in such Purchaser's Notes) made under all Notes prior to such Closing.

**2.4   Conditions Precedent to each Closing.**   In the event that the Purchasers elect, in their sole discretion, to fund an Advance, the making of such Advance at the applicable Closing, unless specifically limited below solely to the Initial Closing or to each Additional Closing, as applicable, is subject to the satisfaction (or waiver by such Purchaser) of the following conditions precedent:

(a)   all representations and warranties made by the Company and Pulser Media, Inc., a Delaware corporation ("*Pulser*") in this Agreement and in each other Loan Document shall be true and correct in all material respects on the date of such Closing (it being understood that the making of any Advance on the date of the Initial Closing shall not be conditioned upon the accuracy or correctness of any representation or warranty in respect of the Identified Defaults); "*Identified Defaults*" mean (i) an Event of Default under Section 4(e) of the Notes as a result of an Event of Default under and as defined in the Existing Notes arising from Pulser's failure to be in good standing in the State of Delaware at the time funds were advanced thereunder on September 3, 2015, and (ii) an Event of Default under Section 4(c) of the Notes as a result of each the Company's and Pulser's admission in writing of its inability to pay its debts when such debts become due;

2.

(b) each of the Company and Pulser shall have complied with all covenants and agreements set forth in this Agreement and the other Loan Documents that are to be performed at or prior to the date of such Closing (it being understood that the making of any Advance on the date of the Initial Closing shall not be conditioned upon such compliance in respect of the Identified Defaults);

(c) on or prior to the date of the Initial Closing, the Company shall have duly authorized, executed and delivered to the Purchasers (i) this Agreement, (ii) the Security Agreement dated as of the date hereof and in the form as attached hereto as Exhibit B (as amended, restated, supplemented or otherwise modified from time to time, the "*Security Agreement*"), by Pulser and the Company, as grantors, in favor of the Collateral Agent, (iii) the Guaranty dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the "*Guaranty*"), by Pulser in favor of the Purchasers and the Collateral Agent, (iv) a Note for each Purchaser, (v) the Patent Security Agreement, dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the "*Patent Security Agreement*") by the Company in favor of the Purchasers, (vi) the Trademark Security Agreement, dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the "*Trademark Security Agreement*") by the Company in favor of the Purchasers, (vii) the Intercreditor Agreement, dated as of the date hereof (as amended, restated, supplemented or otherwise modified from time to time, the "*Intercreditor Agreement*" and collectively with this Agreement, the Security Agreement, the Guaranty, the Patent Security Agreement and the Trademark Security Agreement, the "*Loan Documents*"), between the Collateral Agent and Pulser;

(d) the Purchasers shall have received a certificate from the Company, dated as of the date of each Closing, signed by an authorized officer of the Company, certifying as to the conditions in Sections 2.4(a), (b) and (h) hereof;

(e) the Purchasers shall have received certificates from each of the Company and Pulser, dated the Effective Date, signed by the Secretary or any Assistant Secretary of such person, and cross-certified by an officer of such person, in customary form, together with copies of the certificate of incorporation and by-laws of such person, resolutions of the board of directors and the independent members of such person's board of directors authorizing the Loan Documents and, if available, good standing certificates dated as of a recent date and, if available, customary good standing bringdowns for such person certified by the Secretary of State of the State of Delaware, and each of the foregoing shall be in form and substance reasonably satisfactory to the Collateral Agent;

(f) on the date of the Initial Closing, the Purchasers shall have received from Stubbs, Alderton & Markiles, LLP, counsel to the Company, an opinion addressed to the Purchasers and dated as of the date of the Initial Closing, in form and substance reasonably satisfactory to the Purchasers;

(g) on the date of each Additional Closing, the Purchasers shall have received a reaffirmation and grant of security interests from the Company and Pulser to the Collateral Agent for the benefit of the Purchasers, in form and substance reasonably satisfactory to the Purchasers;

Case: 15-31430    Doc# 3    Filed: 11/16/15    Entered: 11/16/15 16:34:05    Page 97 of
201

(h) on the date of such Closing, the aggregate amount of all Advances made or to be made on such date shall not exceed the Maximum Loan Amount; and

(i) on the date of each Additional Closing, the Purchasers shall have received such other items as the Purchaser or the Collateral Agent may request in their sole discretion.

## 3. REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE COMPANY

The Company hereby represents and warrants to the Purchasers as follows:

**3.1  Organization, Good Standing and Qualification**. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Pulser and each Company Subsidiary is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. The Company, Pulser and each Company Subsidiary (collectively, the "*Company Entities*") has the requisite power to own and operate its properties and assets and to carry on its business as now conducted and as proposed to be conducted. Each Company Entity is duly qualified and is authorized to do business and is in good standing as a foreign corporation in all jurisdictions in which the nature of its activities and of its properties (both owned and leased) makes such qualification necessary, except for those jurisdictions in which failure to do so would not have a material adverse effect on the Company Entities or their business. For purposes hereof "*Company Subsidiary*" means any corporation, partnership, association or other business entity of which (i) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by the Company or one or more of the other subsidiaries of the Company or a combination thereof, or (ii) if a partnership, limited liability company or other business entity, a majority of the partnership, limited liability company or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by the Company or one or more of the other Subsidiaries of the Company or a combination thereof. For purposes hereof, the Company shall be deemed to have a majority ownership interest in a partnership, limited liability company or other business entity if the Company shall be allocated a majority of partnership, limited liability company or other business entity gains or losses or shall be or control the managing director or general partner of such partnership, limited liability company or other business entity.

**3.2  Authority**. Each Company Entity has, and will have as of each Closing, all requisite corporate power to execute and deliver the Loan Documents, to issue the Notes (in the case of the Company), and to carry out and perform its obligations under the terms of this Agreement and each of the other Loan Documents to which it is a party. The Company's Board of Directors and the independent members of the Board of Directors have approved the Loan Documents based upon a reasonable belief that the Loan and each Note and Advance is appropriate for the Company after reasonable inquiry concerning the Company's financing objectives and financial situation.

**3.3  Authorization.** All corporate action on the part of each Company Entity, its directors and its stockholders necessary for the authorization, execution, delivery and performance of the Loan Documents to which such Company Entity is party and the transactions

4.

contemplated hereby and thereby and the performance of such person's obligations thereunder, including the issuance and delivery of the Notes by the Company, has been taken or will be taken prior to the issuance of such Notes. This Agreement, the Notes and the other Loan Documents, when executed and delivered by the Company and the Company Subsidiaries party thereto, shall constitute valid and binding obligations of such person, enforceable in accordance with their terms, subject to laws of general application relating to bankruptcy, insolvency, the relief of debtors and, with respect to rights to indemnity, subject to federal and state securities laws and general principles of equity that restrict the availability of equitable remedies.

**3.4**    **Governmental Consents**. All consents, approvals, orders, or authorizations of, or registrations, qualifications, designations, declarations, or filings with, any governmental authority, required on the part of the Company Entities in connection with the valid execution and delivery of this Agreement and the other Loan Documents and the offer, sale or issuance of the Notes or the consummation of any other transaction contemplated hereby or thereby shall have been obtained and will be effective at each Closing.

**3.5**    **Compliance with Laws**. No Company Entity is in violation of any applicable statute, rule, regulation, order or restriction of any domestic or foreign government or any instrumentality or agency thereof in respect of the conduct of such Company Entity's business or the ownership of its properties, which violation of which could reasonably be expected to materially and adversely affect the business, assets, liabilities, financial condition, operations or prospects of any Company Entity.

**3.6**    **Compliance with Other Instruments**. No Company Entity is in violation or default of any term of its articles of incorporation, bylaws or other governing document, or of any judgment, decree, order or writ applicable to such Company Entity, in each case, the violation or default of which would be material to such Company Entity. The execution, delivery and performance of this Agreement, the Note and the other Loan Documents, and the consummation of the transactions contemplated hereby or thereby will not result in any material violation or be in conflict with, or constitute, with or without the passage of time and giving of notice, either a default under any such provision, instrument, judgment, decree, order or writ or an event that results in the creation of any lien, charge or encumbrance upon any assets of any Company Entity or the suspension, revocation, impairment, forfeiture, or nonrenewal of any material permit, license, authorization or approval applicable to such Company Entity, its business or operations or any of its assets or properties. Without limiting the foregoing, the Company Entities have obtained all waivers reasonably necessary with respect to any preemptive rights, rights of first refusal or similar rights, including any notice or offering periods provided for as part of any such rights, in order for the Company Entities to consummate the transactions contemplated hereunder and under the other Loan Documents without any third party obtaining any rights to cause any Company Entity to offer or issue any securities of such Company Entity or any other Company Entity as a result of the consummation of the transactions contemplated hereunder or thereunder.

**3.7**    **Capitalization**. Immediately prior to the Initial Closing, the authorized, issued and outstanding capital stock of the Company is as set forth on Schedule 3.7. Except as set forth on Schedule 3.7, at the Closing there are no outstanding options, warrants, rights (including conversion or preemptive rights) or agreements for the purchase or acquisition from any

5.

Company Entity of any shares of capital stock or ownership interests of such Company Entity or any other Company Entity. The outstanding ownership interests of each Company Entity have been duly authorized and validly issued in compliance with applicable laws, and are fully paid and nonassessable.

**3.8  Material Contracts.**  Each agreement or contract of the Company Entities in effect as of the date of each Closing with a value in excess of $1,000,000 and all other contracts deemed material by any Company Entity (each a "*Material Contract*") is a valid and binding agreement of the applicable Company Entity party thereto and is in full force and effect, and, except as set forth on Schedule 3.8, neither such Company Entity nor, to the knowledge of the Company Entities, any other party thereto, is in default under the terms of any such Material Contract, nor has any event or circumstance occurred that, with notice or lapse of time or both, would constitute any event of default thereunder with respect to such Company Entity or, to the knowledge of the Company Entities, any other party thereto.

**3.9  Intellectual Property.**  The Company Entities own or possess sufficient legal rights to all patents, trademarks, service marks, trade names, copyrights, trade secrets, licenses (software or otherwise), information, processes and similar proprietary rights ("*Intellectual Property*") necessary to the business of the Company Entities as presently conducted or proposed to be conducted. Except as set forth on Schedule 3.9, the operation of the Company Entities' business as currently conducted and as proposed to be conducted does not, and will not, violate or infringe any of the Intellectual Property of any other person or entity. For purposes of this definition, with respect to sound recordings and music publishing and similar copyrights, copyrights should be deemed to mean the number and mix of copyrights the removal of which from the Company Entities' music services would cause a material degradation of such services.

**3.10  Title to Properties and Assets; Liens.**  Each Company Entity has good and marketable title to its properties and assets, and has good title to all its leasehold interests, in each case subject to no mortgage, pledge, lien, lease, encumbrance or charge of any kind other than such liens granted by the Company to Pulser pursuant to that certain Third Amended and Restated Secured Promissory Note, dated July 10, 2015 (as amended, restated, supplemented or otherwise modified from time to time to the extent permitted hereunder, the "*Intercompany Note*"), and such liens granted by Pulser to Iconical Investments II LP pursuant to that certain Security Agreement dated December 19, 2014 (as amended, restated or otherwise modified from time to time, the "*Pulser Security Agreement*").

**3.11  No Liabilities.**  Except with respect to the Intercompany Note, and except as set forth on Schedule 3.11 and pursuant the Loan Documents, as of each Closing, no Company Entity has any liabilities (whether accrued, absolute, contingent, unliquidated or otherwise, whether or not known to the Company Entities, whether due or to become due) having, in the aggregate, a value equal to or in excess of $1,000,000, except for performance obligations under agreements, contracts and instruments that have been entered into in the ordinary course of business consistent with past practice.

**3.12  Litigation.**  Except as set forth on Schedule 3.12, there is no material action, suit, proceeding or investigation pending or currently threatened against any Company Entity. No Company Entity is a party or subject to the provisions of any order, writ, injunction, judgment or

6.

decree of any court or government agency or instrumentality. There is no material action, suit, proceeding or investigation by the Company Entities currently pending or that the Company Entities intend to initiate.

**3.13    Permits and Franchises.**  Each Company Entity has all franchises, permits, licenses and any similar authority necessary for the conduct of its business as now being conducted by it, the lack of which could reasonably be expected to materially and adversely affect the business, properties, prospects or financial condition of any Company Entity.  No Company Entity is in default in any material respect under any of such franchises, permits, licenses or other similar authority.

**3.14    Tax Returns and Payments.** The Company Entities have filed all tax returns and reports as required by law. These returns and reports are true and correct in all material respects. The Company Entities have paid all taxes and assessments due.

**3.15    Offering.**  Assuming the accuracy of the representations and warranties of the Purchasers contained in <u>Section 4</u> hereof, the offer, issue, and sale of the Notes are and will be exempt from the registration and prospectus delivery requirements of the Securities Act of 1933, as amended (the "*Act*"), and have been registered or qualified (or are exempt from registration and qualification) under the registration, permit, or qualification requirements of all applicable state securities laws.

**3.16    Use of Proceeds.**   The proceeds of the Loan shall be used by the Company Entities solely to fund payroll obligations and general operating expenses of the Company, and not for any personal, family or household purpose.

**3.17    Operating Company; Use of Proceeds.**   The Company is an "operating company" within the meaning of Section 22062(b)(2) of the California Financial Code.  The Company (i) primarily engages, wholly or substantially, directly or indirectly through a majority owned subsidiary or subsidiaries, in the production or sale, or the research or development, of a product or service other than the investment of capital, (ii) is not an individual or sole proprietorship, and (iii) is not an entity with no specific business plan or purpose and its business plan is not to engage in a merger or acquisition with an unidentified company or companies or other entity or person.  The Company intends to use the proceeds from the sale of the Notes extended to it solely to fund payroll obligations and general operating expenses of the Company and not for any personal, family, or household purposes. The Company's Board of Directors, in the exercise of its fiduciary duties, has approved the sale of the Notes based upon a reasonable belief that the Loan represented by the Notes is appropriate for the Company Entities after reasonable inquiry concerning the Company Entities' financing objectives and financial situation. The Company Entities, together with their advisers, have the capacity to protect their own interests in connection the transactions contemplated hereby.

**3.18    Usury Exemption.** The lending transactions contemplated by this Agreement are exempt from the constitutional usury provisions of the California Constitution by operation of Section 25118 of the California Corporations Code, it being expressly acknowledged by the Company that it has a preexisting personal or business relationship with the Purchasers as such terms are used in Section 25118(f)(1) of such corporations code.

7.

**3.19    Post-Closing Deliverables.**  Within five (5) business days after the Initial Closing Date (or such longer time as may be agreed to by the Collateral Agent in its sole discretion), or within such other time period as specifically described below, if applicable, the Company shall deliver, or shall cause to be delivered, to the Collateral Agent:

(a)    all Pledged Equity (as defined in the Security Agreement) of the Company or Pulser including a valid stock power endorsed in blank for each such certificate, in each case, in form and substance satisfactory to the Collateral Agent;

(b)    a stock certificate issued by the Company to Pulser replacing that certain stock certificate numbered CS-063 evidencing 2,985,966 shares of the Company held by Pulser, in form and substance reasonably satisfactory to the Collateral Agent and such stock certificate shall not contain any legend restricting transfer thereof;

(c)    any Promissory Notes (as defined in the Security Agreement) held by the Company or Pulser including an allonge or other transfer instrument in form and substance satisfactory to the Collateral Agent;

(d)    certificates of insurance evidencing any insurance held by the Company and endorsements to the Collateral Agent's reasonable satisfaction for the benefit of the Collateral Agent (including, without limitation, containing a loss payable clause or endorsement that names the Collateral Agent, on behalf of the Purchasers, as lender loss payee);  and

(e)    within ten (10) business days after the Initial Closing, Company and Pulser shall, and shall use commercially reasonable efforts to cause each depository or intermediary holding any of their respective deposit accounts, securities accounts, or other deposit, brokerage, securities or other similar accounts to, enter into control agreements in favor of Collateral Agent, in form and substance satisfactory to Collateral Agent in its sole and absolute discretion, over such accounts.

**4.    REPRESENTATIONS AND WARRANTIES OF THE PURCHASERS**

**4.1    Purchase for Own Account.**  Each Purchaser represents that it is acquiring the Notes made to such Purchaser solely for its own account and beneficial interest for investment and not for sale or with a view to distribution of the Notes or any part thereof, has no intention of selling (in connection with a distribution or otherwise), granting any participation in, or otherwise distributing the same.

**4.2    Information and Sophistication.**  Each Purchaser represents that it has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risk of this investment.

**4.3    Ability to Bear Economic Risk.**  Each Purchaser acknowledges that investment in the Notes involves a high degree of risk, and represents that it is able, without materially impairing its financial condition, to hold such Notes for an indefinite period of time and to suffer a complete loss of its investment.

8.

**4.4    Accredited Investor Status.**  Each Purchaser is an "accredited investor" as such term is defined in Rule 501 under the Act.

**5.    FURTHER AGREEMENTS**

**5.1    Use of Proceeds.**  The proceeds from the sale of the Notes hereunder shall be used solely to fund payroll obligations and general operating expenses of the Company.

**5.2    Negative Covenants Requiring Purchaser Approval.**  So long as any Notes remain outstanding, the Company shall not, and shall cause the other Company Entities not to, take any of the following actions without the prior written consent of the Purchasers holding Notes representing a majority of the Total Loan Amount (the "***Requisite Holders***"):

(a)    grant or permit to exist any liens, security interests or other encumbrances on the assets of the Company or any other Company Entities other than Permitted Liens (as such term is defined in the Security Agreement), the liens, security interests and other encumbrances on the assets of (x) the Company granted by the Company to Pulser pursuant to the Intercompany Note and (y) Pulser granted by Pulser to Iconical Investments II LP pursuant to the Pulser Security Agreement;

(b)    incur any indebtedness or issue any bonds, notes or other obligations in amount in excess of $500,000 in the aggregate in any fiscal year, other than (i) trade payable incurred in the ordinary course of business, (ii) indebtedness incurred by the Company hereunder and under the Notes, (iii) indebtedness incurred pursuant to the Intercompany Note, (iv) indebtedness incurred by Pulser pursuant to the Note Purchase Agreement, dated as of December 19, 2014 (as amended, restated or otherwise modified from time to time, the "***Pulser Note Purchase Agreement***") among Pulser, as borrower, and Iconical Investments II LP, as purchaser, the notes issued pursuant thereto, and (v) indebtedness incurred pursuant to the Guaranty;

(c)    assume, guarantee, or otherwise become directly or contingently liable for any indebtedness of any other person other than the Guaranty;

(d)    agree to or consummate a merger, consolidation, recapitalization, reorganization, sale of substantially all of the assets of any Company Entity or similar transaction;

(e)    materially alter or change the business of any Company Entity;

(f)    sell, license or otherwise transfer to any person or legal entity any of its Intellectual Property or other material assets out of the ordinary course of business;

(g)    approve any operating or capital budget or make any capital expenditure not in the capital budget in excess of $100,000 in the aggregate in any fiscal year;

(h)    directly or indirectly pay or declare any dividend or make any distribution upon the ownership interests of any Company Entity;

9.

(i)        purchase any capital stock or other interest in, or any material portion of the assets of, any other entity;

(j)        enter into any transaction with any director, manager, officer or affiliate of any Company Entity, other than transactions that are in the ordinary course of business and approved by the Company's Board of Directors (including a majority of the disinterested directors); or

(k)        directly or indirectly redeem or repurchase any ownership interests of any Company Entity, other than stock repurchased from former employees or consultants at the lower of cost or fair market value in connection with the termination of their employment or other services to the Company or any Company Entity; or

(e)        amend, restate, supplement or otherwise modify the Intercompany Note.

5.3        **Operation of Business.**  So long as any Notes remains outstanding, the Company shall, and shall cause each other Company Entity to, operate its business in the ordinary course, including by:

(a)        maintaining, with financially sound and reputable independent insurers, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by persons engaged in the same or similar business, of such types and in such amounts as are customarily carried under similar circumstances by such other persons, and in any event including workers' compensation insurance, public liability, errors and omissions and property and casualty insurance;

(b)        maintaining in full force and effect its organizational existence and good standing under the laws of its state or jurisdiction of incorporation and all jurisdictions in which such Company Entity is qualified to do business as a foreign corporation as of the date hereof;

(c)        preserving and maintaining in full force and effect all Material Contracts and all qualifications, permits, licenses and franchises necessary in the normal conduct of its business; and

(d)        preserving and maintaining all Intellectual Property necessary to the business of the Company Entities as presently conducted or proposed to be conducted.

6.        **COLLATERAL AGENT.**

6.1        **Appointment and Authority**.  Each Purchaser appoints and designates Iconical Investments II LP as Collateral Agent hereunder.  Collateral Agent may, and each Purchaser authorizes Collateral Agent to, enter into all Loan Documents to which Collateral Agent is intended to be a party for Collateral Agent's benefit and the pro rata benefit of the Purchasers. Each Purchaser agrees that any action taken by Collateral Agent in accordance with the provisions of the Loan Documents, and the exercise by Collateral Agent of any rights or remedies set forth therein, together with all other powers reasonably incidental thereto, shall be authorized by and binding upon the Purchasers.  Without limiting the generality of the foregoing,

10.

Collateral Agent shall have the sole and exclusive authority to (i) act as the disbursing and collecting agent for the Purchasers with respect to all payments and collections arising in connection with the Loan Documents (other than payments under the Notes before an Event of Default (as such term is defined in the Notes)), though it is under no duty to act as such a disbursing or collateral agent; (ii) execute and deliver as Collateral Agent each Loan Document, and accept delivery of each Loan Document from the Company or any other person or entity; (iii) act as collateral agent for the Purchasers for purposes of perfecting and administering Liens (as such term is defined in the Security Agreement) under the Loan Documents, and for all other purposes stated therein; (iv) manage, supervise or otherwise deal with Collateral (as such term is defined in the Security Agreement); and (v) take any enforcement action or otherwise exercise any rights or remedies with respect to any Collateral under the Loan Documents, applicable law or otherwise. The duties of Collateral Agent shall be ministerial and administrative in nature, and Collateral Agent shall not have a fiduciary relationship with any Purchaser, any Company Entity, or any other person or entity, by reason of any Loan Document or any transaction relating thereto.

**6.2    Duties.**  Collateral Agent shall not have any duties except those expressly set forth in the Loan Documents. The conferral upon Collateral Agent of any right shall not imply a duty on Collateral Agent's part to exercise such right, unless instructed to do so by Required Holders in accordance with this Agreement.

**6.3    Instructions of Required Holders**.  The rights and remedies conferred upon Collateral Agent under the Loan Documents may be exercised without the necessity of joinder of any other party, unless required by applicable law. Collateral Agent may request instructions from Required Holders with respect to any act (including the failure to act) in connection with any Loan Document, and may seek assurances to its satisfaction from Purchasers of their indemnification obligations under Section 6.5 against all Damages that could be incurred by Collateral Agent in connection with any act. Collateral Agent shall be entitled to refrain from any act until it has received such instructions or assurances, and Collateral Agent shall not incur liability to any person by reason of so refraining. In no event shall Collateral Agent be required to take any action that, in its opinion, is contrary to applicable law or any Loan Documents or could subject any Collateral Agent Indemnitee to liability.

**6.4    Action Upon Default**.  Collateral Agent shall not be deemed to have knowledge of any Event of Default unless it has received written notice from a Purchaser or the Company specifying the occurrence and nature thereof. If any Purchaser acquires knowledge of an Event of Default, then it shall promptly notify Collateral Agent and the other Purchasers thereof in writing. Each Purchaser agrees that, except as otherwise provided in any Loan Document or with the written consent of Collateral Agent and Required Holders, it will not take any enforcement action, accelerate Obligations (as such term is defined in the Security Agreement) under any Loan Documents, or exercise any right that it might otherwise have under applicable law to credit bid at foreclosure sales, UCC sales or other similar dispositions of Collateral. Notwithstanding the foregoing, however, a Purchaser may take action to preserve or enforce its rights against the Company where a deadline or limitation period is applicable that would, absent such action, bar enforcement of Obligations held by such Purchaser, including the filing of proofs of claim in an insolvency proceeding.

11.

**6.5    Indemnification of Collateral Agent Indemnitees**.  Each Purchaser shall indemnify and hold harmless Collateral Agent and its officers, directors, managers, employees, affiliates, agents and attorneys (collectively, the *"Collateral Agent Indemnitees"* to the extent not reimbursed by the Company (but without limiting the indemnification obligations of the Company under any Loan Document), on a pro rata basis, against all claims, expenses and/or liabilities (*"Damages"*) that may be incurred by or asserted against any Collateral Agent Indemnitee; provided, that the Damages relates to or arises from a Collateral Agent Indemnitee acting as or for Collateral Agent (in its capacity as Collateral Agent hereunder).  In Collateral Agent's discretion, it may reserve for any such Damages incurred by a Collateral Agent Indemnitee, and may satisfy any judgment, order or settlement relating thereto, from proceeds of Collateral prior to making any distribution of Collateral proceeds to the Purchasers.  If Collateral Agent is sued by any receiver, bankruptcy trustee, debtor-in-possession or other person for any alleged preference or fraudulent transfer, then any monies paid by Collateral Agent in settlement or satisfaction of such proceeding, together with all interest, costs and expenses (including attorneys' fees) incurred in the defense of same, shall be promptly reimbursed to Collateral Agent by each Purchaser to the extent of its pro rata share.

**6.6    Limitation on Responsibilities of Collateral Agent**.  Collateral Agent shall not be liable to Purchasers for any action taken or omitted to be taken under the Loan Documents, except for losses directly and solely caused by Collateral Agent's gross negligence or willful misconduct.  Collateral Agent does not assume any responsibility for any failure or delay in performance or any breach by any Company Entity or any Purchaser of any obligations under the Loan Documents.  Collateral Agent does not make to Purchasers any express or implied warranty, representation or guarantee with respect to any Obligations, Collateral, Loan Documents, or any Company Entity.  No Collateral Agent Indemnitee shall be responsible to Purchasers for: (a) any recitals, statements, information, representations or warranties contained in any Loan Documents; (b) the execution, validity, genuineness, effectiveness or enforceability of any Loan Document; (c) the genuineness, enforceability, collectability, value, sufficiency, location or existence of any Collateral, or the validity, extent, perfection or priority of any Lien therein; (d) the validity, enforceability or collectability of any Obligations; or (e) the assets, liabilities, financial condition, results of operations, business, creditworthiness or legal status of the Company Entities.  No Collateral Agent Indemnitee shall have any obligation to any Purchaser to ascertain or inquire into the existence of any Event of Default, the observance or performance by the Company Entities of any terms of the Loan Documents, or the satisfaction of any conditions precedent contained in any Loan Document.

**6.7    Resignation; Successor Collateral Agent**.  Subject to the appointment and acceptance of a successor Collateral Agent as provided below, Collateral Agent may resign at any time by giving at least 30 days written notice thereof to the Purchasers and the Company.  Upon receipt of such notice, Required Holders shall have the right to appoint a successor Collateral Agent, which shall be (i) a Purchaser or an affiliate of a Purchaser or (ii) a commercial bank that is organized under the laws of the United States or any state or district thereof and has a combined capital surplus of at least $200,000,000.  If no successor agent is appointed prior to the effective date of the resignation of Collateral Agent, then Collateral Agent may appoint a successor agent from among Purchasers (and Purchasers hereby agree to such appointment).  Upon acceptance by a successor Collateral Agent of an appointment to serve as Collateral Agent hereunder, such successor Collateral Agent shall thereupon succeed to and become vested with

Case: 15-31430    Doc# 3    Filed: 11/16/15    Entered: 11/16/15 16:34:05    Page 106 of
201

all the powers and duties of the retiring Collateral Agent without further act, except for its execution and delivery of a joinder to the Intercreditor Agreement, and the retiring Collateral Agent shall be discharged from its duties and obligations hereunder but shall continue to have the benefits of the indemnification set forth in Section 6.5. Notwithstanding any Collateral Agent's resignation, the provisions of this Section 6 shall continue in effect for its benefit with respect to any actions taken or omitted to be taken by it while Collateral Agent.

**6.8    Due Diligence and Non-Reliance.** Each Purchaser acknowledges and agrees that it has, independently and without reliance upon Collateral Agent or any other Purchaser, and based upon such documents, information and analyses as it has deemed appropriate, made its own credit analysis of the Company Entities and its own decision to enter into this Agreement and to purchase the applicable Notes. Each Purchaser has made such inquiries concerning the Loan Documents, the Collateral, and the Company Entities as such Purchaser feels necessary. Each Purchaser will, independently and without reliance upon any other Purchaser or Collateral Agent, and based upon such financial statements, documents and information as it deems appropriate at the time, continue to make and rely upon its own credit decisions in purchasing the applicable Notes, and in taking or refraining from taking any action under any Loan Document. Collateral Agent shall furnish to each Purchaser any notices, reports or certificates furnished to Collateral Agent by the Company insofar as such notices, reports or certificates relate to this Agreement, the Loan Documents or the transactions contemplated hereby or thereby.

**6.9    Recovery of Payments.** If Collateral Agent pays any amount to a Purchaser in the expectation that a related payment will be received by Collateral Agent from the Company and such related payment is not received, then Collateral Agent may recover such amount from each Purchaser that received it. If Collateral Agent determines at any time that an amount received under any Loan Document must be returned to the Company or paid to any other person or entity pursuant to applicable law or otherwise, then, notwithstanding any other term of any Loan Document, Collateral Agent shall not be required to distribute such amount to any Purchaser. If any amounts received and applied by Collateral Agent to any Obligations are later required to be returned by Collateral Agent pursuant to applicable law, each Purchaser shall pay to Collateral Agent, on demand, such Purchaser's pro rata share of the amounts required to be returned.

**6.10    Acknowledgements.** Each Purchaser hereby acknowledges that the Collateral Agent and/or its affiliates (the "*Collateral Agent Parties*") currently own directly or indirectly a substantial portion of the capital stock of the Company Entities, and in the future, may have direct and/or indirect interests in or relationships with the Company Entities and/or any of their respective subsidiaries, whether as equity holders, officers, directors, advisors, contracting parties or otherwise ("*Company Affiliations*"). Each Purchaser hereby agrees that (i) nothing herein shall prevent, restrict or otherwise prohibit, in any manner, any Collateral Agent Party from entering into any Company Affiliation now or in the future, and (ii) it shall have no claim or cause or action against any Collateral Agent Party as a result of, or arising from, any Company Affiliation, including, without limitation, in connection with any act or omission by any Collateral Agent Party to enforce, exercise or obtain any rights or benefits related to, or arising from, any Company Affiliation, even if such act or omission would materially and adversely affect the Collateral and/or any of the other rights or benefits of the Purchasers under the Loan Documents. For and in consideration of the agreements contained in the Loan

13.

Documents and other good and valuable consideration, each Purchaser hereby unconditionally and irrevocably releases, acquits, waives and forever discharges the Collateral Agent Parties of and from all claims, offsets, deductions, causes of action, suits or defenses of any type or nature whatsoever, which such Purchaser may now or hereafter have against the Collateral Agent Parties or any of them on account of, resulting from or with respect to any Company Affiliation, whether known or unknown. Each Purchaser hereby waives any and all rights which it has or may have under applicable law that would limit a general release to claims which are known or suspected at the time of executing this release, including the provisions of Section 1542 of the California Civil Code as now worded and as hereafter amended, which Section presently reads as follows:

> "A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR."

## 7. MISCELLANEOUS

**7.1 Binding Agreement.** The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, expressed or implied, is intended to confer upon any third party any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

**7.2 Governing Law.** This Agreement shall be governed by and construed under the laws of the State of California as applied to agreements among California residents, made and to be performed entirely within the State of California, without giving effect to conflicts of laws principles.

**7.3 Venue.** ANY SUIT, ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR ANY JUDGMENT ENTERED BY ANY COURT WITH RESPECT TO THIS AGREEMENT OR SUCH TRANSACTIONS SHALL BE BROUGHT AND MAINTAINED EXCLUSIVELY IN THE COURTS OF THE STATE OF CALIFORNIA LOCATED IN LOS ANGELES COUNTY OR IN THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA. EACH OF THE PARTIES HERETO IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE COURTS OF THE STATE OF CALIFORNIA LOCATED IN THE COUNTY OF LOS ANGELES AND OF THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA FOR THE PURPOSE OF ANY SUCH ACTION OR PRECEEDING SET FORTH ABOVE AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH ACTION OR PROCEEDING. EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY HAVE OR HEREAFTER MAY HAVE TO THE LAYING OF VENUE OF ANY SUCH ACTION OR PROCEEDING BROGHT IN ANY SUCH COURT REFERRED TO ABOVE

14.

AND ANY CLAIM THAT ANY SUCH ACTION OR PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

**7.4** **Counterparts.** This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic imaging means (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Agreement.

**7.5** **Titles and Subtitles.** The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

**7.6** **Notices.** All notices required or permitted hereunder shall be in writing, addressed to a party at the address, email address or fax number set forth in such party's signature block below, and shall be deemed effectively given: (a) upon personal delivery to the party to be notified, (b) when sent by confirmed telex, electronic mail or facsimile if sent during normal business hours of the recipient, if not, then on the next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.

**7.7** **Modification; Waiver.** No modification or waiver of any provision of this Agreement or consent to departure therefrom shall be effective unless in writing and approved by the Company and the Requisite Holders. Any provision of the Note may be amended or waived by the written consent of the Company and the Requisite Holders.

**7.8** **Expenses.** The Company shall bear the expenses and legal fees incurred with respect to the Loan Documents and the transactions contemplated herein and therein. The Company shall pay the reasonable and documented fees and expenses of Purchasers' counsel incurred in connection with the transactions contemplated by the Loan Documents.

**7.9** **Delays or Omissions.** It is agreed that no delay or omission to exercise any right, power or remedy accruing to any Purchaser, upon any breach or default of any Company Entity under this Agreement, the Notes or any other Loan Documents shall impair any such right, power or remedy, nor shall it be construed to be a waiver of any such breach or default, or any acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. It is further agreed that any waiver, permit, consent or approval of any kind or character by the Requisite Holders of any breach or default under any Loan Documents, or any waiver by the Requisite Holders of any provisions or conditions of any Loan Document must be in writing and shall be effective only to the extent specifically set forth in writing and that all remedies, either under a Loan Document, or by law or otherwise afforded to the Purchasers, shall be cumulative and not alternative.

**7.10** **Entire Agreement.** This Agreement and the other Loan Documents, and any separate letter agreements with respect to fees and expenses payable to the Collateral Agent and

15.

the Purchasers (or any of them), embodies the entire agreement of the parties relating to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, relating to the subject matter hereof. In the event of any conflict between the terms of this Agreement and any other Loan Document, the terms of this Agreement shall govern; *provided*, that the inclusion of supplemental rights or remedies in favor of the Collateral Agent in any Loan Document shall not be deemed a conflict with this Agreement. Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any part, but rather in accordance with the fair meaning

**7.11    Severability.**    Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

**7.12    Intercreditor Agreement.**    Notwithstanding anything to the contrary contained herein, each Purchaser acknowledges that the lien and security interest granted to the Collateral Agent pursuant to the Security Agreement, and the exercise of any right or remedy by such Collateral Agent thereunder are subject to the provisions of the Intercreditor Agreement. In the event of any conflict between the terms of the Intercreditor Agreement, on the one hand, and the Security Agreement, on the other hand, the terms of the Intercreditor Agreement shall govern and control.

[Signature Pages Follow]

Case: 15-31430   Doc# 3   Filed: 11/16/15   Entered: 11/16/15 16:34:05   Page 110 of 201

IN WITNESS WHEREOF, the parties have executed this NOTE PURCHASE AGREEMENT as of the date first written above.

COMPANY:

RDIO, INC.

By: _____

Name:   Anthony Bay

Title:   Chief Executive Officer

Address:

1550 Bryant Street, Ste 200

San Francisco, CA 94103

Tel:

Fax: (415) 626-8637

Email:

*Note Purchase Agreement*

**PURCHASERS:**

**ICONICAL INVESTMENTS II LP**
**By: Iconical Fund Partners II Ltd., its General Partner**

By: _____

Name: Murray Markiles

Title: Director

Address:

15260 Ventura Blvd. Suite 2000

Sherman Oaks CA 91403

Tel:
Fax:
Email:

*Note Purchase Agreement*

COLLATERAL AGENT:

**ICONICAL INVESTMENTS II LP**, as Collateral Agent
**By: Iconical Fund Partners II Ltd., its General Partner**

By: _____

Name: Murray Marketos

Title: Director

Address:

15260 Ventura Blvd. Suite 2000

Sherman Oaks  CA  91403

Tel:

Fax:

Email:

*Note Purchase Agreement*

## SCHEDULES AND EXHIBITS

Schedule of Purchasers

Exhibit A:  Form of Convertible Promissory Note

Exhibit B:  Security Agreement

Exhibit C:  Disclosure Schedules

## SCHEDULE OF PURCHASERS

| Name and Address | Maximum Loan Amount |
|---|---|
| Iconical Investments II LP | $5,000,000 |

**Exhibit A**

**Form of Convertible Secured Promissory Note**

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR SUCH LAWS COVERING THE TRANSFER OR AN OPINION OF COUNSEL SATISFACTORY TO THE MAKER THAT SUCH TRANSFER IS EXEMPT FROM SUCH REGISTRATION.

## RDIO, INC.

## FORM OF SECURED PROMISSORY NOTE

**Maximum Aggregate Amount: $_____**                    **DATE: _____, 201__**

FOR VALUE RECEIVED, the undersigned, RDIO, INC., a Delaware corporation (the "*Maker*"), promises to pay to _____ or its registered assigns (hereafter, together with any holder hereof, called "*Holder*"), at such place as Holder may designate in writing to the Maker, in lawful money of the United States of America, and in immediately available funds, an amount equal to the aggregate amount advanced by Holder to the Maker pursuant to Advances (as defined below) hereunder plus interest on each such Advance at the rate of twelve percent (12%) per annum accruing from and including the date of each such Advance through the date of repayment in full (the "*Payoff Amount*"); provided that the maximum aggregate amount of such Advances hereunder shall be _____ U.S. Dollars ($_____) (the "*Maximum Aggregate Amount*"). Such Advances may be endorsed from time to time on the Schedule of Advances attached hereto (the "*Schedule of Advances*") by the initials of Holder, but the failure to make such notations shall not affect the validity of the Maker's obligation hereunder. Holder is hereby authorized to record in its books and records, the date and amount of all Advances of borrowings under this Note, and those books and records, along with copies of the request(s) for Advance(s) together with payment confirmation details (e.g., wire confirmation number), shall be conclusive and binding absent manifest error.

This Note, and the other Secured Promissory Notes issued pursuant to the Note Purchase Agreement, dated as of October 19, 2015, by and among the Maker, Holder and any other parties signatory thereto (as amended, restated or otherwise modified from time to time, the "*Purchase Agreement*") (and any replacement promissory notes issued with respect hereto or thereto), are collectively referred to as the "*Notes*." Capitalized terms used but not otherwise defined in this Note shall have the meanings ascribed to them in the Purchase Agreement.

The following is a statement of the rights of Holder of this Note and the conditions to which this Note is subject to and to which Holder hereof, by the acceptance of this Note, agrees:

Funding of Advances. Subject to the terms hereof, Holder may, in its sole discretion, make advances of funds available hereunder ("*Advances*") to the Maker as and when requested by the Maker from time to time, but in no event shall Holder be obligated to make Advances. The Maker shall give Holder irrevocable written notice requesting an Advance at least three (3) business days before the date on which the Maker wishes to receive the Advance (unless a shorter period is consented to in writing by Holder), which notice shall certify on behalf of the Maker that (i) on the date of each Additional Closing, no Event of Default has occurred and is continuing both immediately before and immediately after giving effect to such Advance (it being understood that the making of any Advance on the date of the Initial Closing shall not be conditioned upon such compliance in respect of the Identified Defaults) and (ii) on the date of each Additional Closing, all of the representations and warranties of the Maker and Pulser set forth in the Loan Documents are true and correct as of the date of such notice (it being understood that the

933453.04A-CHISR01A - MSW

making of any Advance on the date of the Initial Closing shall not be conditioned upon the accuracy or correctness of any representation or warranty in respect of the Identified Defaults). Notwithstanding any term or provision of this Note that may be construed to the contrary, at no time shall Holder be required to make an Advance hereunder if a Default or an Event of Default (as defined below) shall have occurred and be continuing. *"Default"* means any event that, with the passing of time or the giving of notice or both, would become an Event of Default.

1.  Maturity Date. The Payoff Amount shall be due and payable in repayment of this Note on the earliest to occur of: (i) any Event of Default under clause (c) or (d) hereof; (ii) any (A) consolidation or merger of the Maker with or into any other corporation or other entity or person, or any other corporate reorganization of Maker, in which the stockholders of the Maker immediately prior to such consolidation, merger or reorganization, own less than 50% of the voting power of the surviving entity immediately after such consolidation, merger or reorganization of Maker with or into such surviving entity, (B) any transaction or series of related transactions to which the Maker is a party in which in excess of fifty percent (50%) of the Maker's voting power is transferred; or (C) any sale, lease, transfer, exclusive perpetual license or other disposition (directly or indirectly) of all or substantially all of the assets or technology of Pulser individually or the Maker and its subsidiaries, taken as a whole (a *"Change of Control"*); and (iii) November 25, 2015 (the date of such occurrence, the *"Maturity Date"*).

2.  Events of Default. Holder may declare the entire Payoff Amount of this Note to be immediately due and payable, by a notice in writing to the Maker if any of the following events shall occur (each an *"Event of Default"*):

(a)  (i) Default in the payment of the Payoff Amount or any other amount under any Loan Document when due or (ii) a breach or default any other obligation of the Maker under this Note or any of the other Loan Documents, in each case, upon notice thereof from such Holder to the Maker; or

(b)  If any material misstatement or misrepresentation exists now or hereafter in any warranty or representation made to the Purchasers or Collateral Agent by any Company Entity, or any officer, director or employee of any Company Entity; or

(c)  The institution by Pulser, the Maker or any Company Subsidiary (where for purposes of Sections 3(c) and 3(d) hereof Company Subsidiary means any Company Subsidiary other than Vdio, Inc.) of proceedings to be adjudicated as bankrupt or insolvent, or the consent by Pulser, the Maker or any Company Subsidiary to institution of bankruptcy or insolvency proceedings against any Company Entity under any federal or state law, or the consent by Pulser, the Maker or any Company Subsidiary to or acquiescence in the filing of any petition relating thereto, or the appointment of a receiver, liquidator, assignee, trustee or other similar official of Pulser, the Maker or any Company Subsidiary, or of any substantial part of its property, or the making by Pulser, the Maker or any Company Subsidiary of an assignment, for the benefit of creditors, or the admission by Pulser, the Maker or any Company Subsidiary in writing of its inability to pay its debts generally as such debts become due; or

(d)  Commencement of proceedings against Pulser, the Maker or any Company Subsidiary seeking any bankruptcy, insolvency, liquidation, dissolution or similar relief under any present or future statute, law or regulations which proceedings shall not have been dismissed or stayed within thirty (30) days of commencement thereof, or the setting aside of any such stay of any such proceedings, or the appointment without the consent or acquiescence of the equity holders of Pulser, the Maker or such Company Subsidiary of any trustee, receiver or liquidator of Pulser, the Maker or any Company Subsidiary or of all or any substantial portion of the properties of Pulser, the Maker or such Company Subsidiary which appointment shall not have been vacated within thirty (30) days thereof; or

Case: 15-31430    Doc# 3    Filed: 11/16/15    Entered: 11/16/15 16:34:05    Page 118 of 201

(e)     (i) Pulser, the Maker or any Company Subsidiary shall fail to make any payment on any indebtedness of Pulser, the Maker or any such Company Subsidiary (other than the indebtedness under the Notes) beyond the applicable grace period (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), (ii) any other event shall occur or condition shall exist under any agreement or instrument relating to any such indebtedness described in clause (i) above, if the effect of such event or condition is to accelerate, cause to become or be declared to be due and payable, or be required to be prepaid or repurchased (other than by a regularly scheduled required prepayment or mandatory prepayment due to asset sale, casualty, condemnation or debt or equity issuance), prior to the stated maturity thereof, or to permit the acceleration of, the maturity of any such indebtedness described in clause (i) above, or (iii) any "Default", "Event of Default" (or similar term) shall occur under the Intercompany Note or the Pulser Note Purchase Agreement, the Pulser Security Agreement or any other loan document related thereto; provided that this clause (e) shall not apply to secured indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such indebtedness if such sale or transfer is permitted hereunder and under the documents providing for such indebtedness; or

(f)     one or more money judgments or orders (or other similar process) involving an aggregate amount in excess of $500,000 shall be rendered against one or more of the Company Entities and not discharged or satisfied in full; or

(g)     any Loan Document after delivery thereof shall for any reason fail or cease to be valid and binding on, or enforceable against any Company Entity party thereto, or any Company Entity shall so state in writing; or

(h)     the Security Agreement (as defined below) shall for any reason fail or cease to create a valid and enforceable lien on any collateral purported to be covered thereby or any Company Entity shall so state in writing or, except as permitted by the Loan Documents, such lien shall fail or cease to be a perfected and first priority lien; or

(i)     there shall occur any Change of Control.

3.     _Secured and Senior Indebtedness._ [The obligations of (a) the Maker under this Note and (b) Pulser under the Guaranty, are secured by that certain Security Agreement dated as of the date hereof executed by Pulser and the Maker in favor of the Collateral Agent, for the benefit of the Purchasers (as amended, restated, supplemented or otherwise modified from time to time, the "*Security Agreement*").][1] [Pulser and the Maker have executed a Reaffirmation and Grant of Security Interest, dated as of the date hereof, in favor of the Collateral Agent, for the benefit of the Purchasers.][2] All payments due under this Note shall be senior to all other indebtedness of the Maker or any Company Subsidiary.

4.     _Waiver of Notice; Fees._ The Maker hereby waives notice, presentment, protest and notice of dishonor. Other than pursuant to a writing by Holder, no failure to exercise any right of Holder with respect to this Note, nor any delay in, or waiver of, the exercise thereof, shall impair any such right or be deemed to be a waiver thereof. If Holder is required to commence legal proceedings or incur any other cost to collect amounts due and payable hereunder or to enforce its rights under this Note, the Maker shall be liable to pay or reimburse Holder for all reasonable costs and expenses incurred in connection with the collection of such amounts and any such legal proceedings, including without limitation attorneys' fees.

---

[1] Use for initial Note.
[2] Use for Notes issued for Additional Closings.

933453.04A-CHISR01A - MSW

5.    Prepayment. The Maker may prepay all or a portion of the Payoff Amount of this Note upon five (5) days' prior written notice to Holder. Amounts repaid under this Note shall not be available for subsequent Advances.

6.    Excess Interest. Notwithstanding any provision to the contrary contained in this Note, Maker shall not be required to pay, and Holder shall not be permitted to collect any amount of interest in excess of the maximum amount of interest permitted by law ("*Excess Interest*"). If any Excess Interest is provided for or determined by a court of competent jurisdiction to have been provided for in this Note, then in such event: (a) the provisions of this paragraph shall govern and control; (b) Maker shall not be obligated to pay any Excess Interest; (c) any Excess Interest that Holder may have received hereunder shall be, at Holder's option, applied as a credit against the outstanding principal balance of this Note or the accrued and unpaid interest (not to exceed the maximum amount permitted by law), or refunded to the payor thereof, or any combination of the foregoing; (d) the interest rate provided for herein shall be automatically reduced to the maximum lawful rate allowed from time to time under applicable law (the "*Maximum Rate*"), and this Note shall be deemed to have been and shall be, reformed and modified to reflect such reduction; and (e) Maker shall not have any action against Holder for any damages arising out of the payment or collection of any Excess Interest. Notwithstanding the foregoing, if, for any period of time, interest on this Note is calculated at the Maximum Rate rather than the applicable rate under this Note, and thereafter the Maximum Rate exceeds the applicable rate, the rate of interest payable on this Note shall become the Maximum Rate until Holder shall have received the amount of interest which Holder would have received during such period on this Note had the rate of interest not been limited to the Maximum Rate during such period.

7.    Miscellaneous.

7.1.    Permitted Transfer. Subject to any applicable state or federal securities laws, Holder shall be entitled to assign or transfer all or any portion of this Note to any other person or entity.

7.2.    Successors and Assigns. Subject to the exceptions specifically set forth in this Note, the terms and conditions of this Note shall inure to the benefit of and be binding upon the respective executors, administrators, heirs, successors and assigns of the parties.

7.3.    Loss or Mutilation of Note. Upon receipt by the Maker of evidence satisfactory reasonably to the Maker of the loss, theft, destruction or mutilation of this Note, together with indemnity reasonably satisfactory to the Maker, in the case of loss, theft or destruction, or the surrender and cancellation of the Note, in the case of mutilation, the Maker shall execute and deliver to Holder a new Note of like tenor and denomination as this Note. The Payoff Amount is payable only to the registered Holder of the Note.

7.4.    Titles and Subtitles. The titles and subtitles of the Sections of this Note are used for convenience only and shall not be considered in construing or interpreting this Note.

7.5.    Notices. Any notice, request or other communication required or permitted hereunder shall be in writing and shall be delivered personally or by facsimile (receipt confirmed electronically) or by electronic mail message or shall be sent by a reputable express delivery service or by certified mail, postage prepaid with return receipt requested, addressed as follows:

Case: 15-31430    Doc# 3    Filed: 11/16/15    Entered: 11/16/15 16:34:05    Page 120 of 201

if to the Maker to

RDIO, Inc.
1550 Bryant St., Suite 220
San Francisco, CA 94103
Attn: Chief Executive Officer
Email : abay@rd.io

and

RDIO, Inc.
1550 Bryant St., Suite 220
San Francisco, CA 94103
Attn: Chief Legal Officer
Email : elliott.peters@rd.io

if to Holder to Holder's address or e-mail address set forth in the Purchase Agreement.

Either party hereto may change the above specified recipient or mailing address or e-mail address by notice to the other party given in the manner herein prescribed. All notices shall be deemed given on the day when actually delivered as provided above (if delivered personally or by facsimile, provided that any such facsimile is received during regular business hours at the recipient's location), on the day when such electronic mail message was delivered or on the day shown on the return receipt (if delivered by mail or delivery service).

        8.6     <u>Note Holder Not Stockholder</u>. This Note does not confer upon Holder any right to vote or to consent to or to receive notice as a stockholder of the Maker, as such, in respect of any matters whatsoever, or any other rights or liabilities as a stockholder, prior to the conversion hereof.

        8.7     <u>Governing Law</u>. The terms of this Note shall be construed in accordance with the laws of the State of California, as applied to contracts entered into by California residents within the State of California, which contracts are to be performed entirely within the State of California.

        8.8     <u>Venue</u>. ANY SUIT, ACTION OR PROCEEDING WITH RESPECT TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY OR ANY JUDGMENT ENTERED BY ANY COURT WITH RESPECT TO THIS NOTE OR SUCH TRANSACTIONS SHALL BE BROUGHT AND MAINTINED EXCLUSIVELY IN THE COURTS OF THE STATE OF CALIFORNIA LOCATED IN LOS ANGELES COUNTY OR IN THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA. EACH OF THE MAKER AND HOLDER IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE COURTS OF THE STATE OF CALIFORNIA LOCATED IN THE COUNTY OF LOS ANGELES AND OF THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA FOR THE PURPOSE OF ANY SUCH ACTION OR PRECEEDING SET FORTH ABOVE AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH ACTION OR PROCEEDING. EACH OF THE MAKER AND HOLDER IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY HAVE OR HEREAFTER MAY HAVE TO THE LAYING OF VENUE OF ANY SUCH ACTION OR PROCEEDING BROGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH ACTION OR PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

933453.04A-CHISR01A - MSW

8.10 <u>Waiver and Amendment</u>. Any term of this Note may be amended, waived or modified with the written consent of the Maker and the Requisite Holders. Any amendment, modification or waiver approved by the Maker and the Requisite Holders shall be binding on all of the Purchasers.

8.11 <u>Counterparts</u>. This Note may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. Delivery of an executed counterpart of a signature page of this Note by facsimile or other electronic imaging means (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Note.

8.12 <u>Entire Agreement</u>. This Note and the other Loan Documents, and any separate letter agreements with respect to fees and expenses payable to the Collateral Agent and the Purchasers (or any of them), embodies the entire agreement of the parties relating to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, relating to the subject matter hereof. Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any part, but rather in accordance with the fair meaning thereof.

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

Case: 15-31430    Doc# 3    Filed: 11/16/15    Entered: 11/16/15 16:34:05    Page 122 of 201

IN WITNESS WHEREOF, the undersigned has caused this Note to be signed in its name as of the date first set forth above.

RDIO, INC.

By:_____
Name:_____
Title:_____

933453.04A-CHISR01A - MSW

## SCHEDULE OF ADVANCES

| Date | Amount of Advance | Unpaid Principal Balance | Notes: |
|------|-------------------|--------------------------|--------|
|      |                   |                          |        |
|      |                   |                          |        |
|      |                   |                          |        |
|      |                   |                          |        |
|      |                   |                          |        |
|      |                   |                          |        |
|      |                   |                          |        |
|      |                   |                          |        |
|      |                   |                          |        |
|      |                   |                          |        |
|      |                   |                          |        |
|      |                   |                          |        |
|      |                   |                          |        |
|      |                   |                          |        |
|      |                   |                          |        |
|      |                   |                          |        |
|      |                   |                          |        |
|      |                   |                          |        |

933453.04A-CHISR01A - MSW

**Exhibit B**

**Security Agreement**

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (as amended, restated, supplemented, extended or otherwise modified from time to time, this "***Agreement***") dated as of October 19, 2015, is entered into by RDIO, INC., a Delaware corporation, as a debtor ("***RDIO***"), PULSER MEDIA, INC., a Delaware corporation, as a debtor ("***Pulser***" and together with RDIO, collectively, the "***Debtors***" and each, individually, a "***Debtor***"), in favor of Iconical Investments II LP, for the benefit of itself as collateral agent and for the benefit of the Purchasers referred to below (in such capacity the "***Collateral Agent***").

WHEREAS, RDIO is a party to that certain Note Purchase Agreement of even date herewith (including all annexes, exhibits and schedules thereto, as from time to time amended, restated, supplemented or otherwise modified, the "***Purchase Agreement***"), by and among RDIO, the Collateral Agent and each purchaser signatory thereto (collectively, the "***Purchasers***" and each, a "***Purchaser***"), pursuant to which RDIO has agreed to sell to Purchasers, and Purchasers may, in their discretion, purchase from RDIO, the Secured Promissory Notes described therein (as amended, restated, supplemented, extended or otherwise modified from time to time, the "***Secured Notes***").

WHEREAS, Pulser is a party to that certain Guaranty of even date herewith (as from time to time amended, restated, supplemented or otherwise modified, the "***Guaranty***"), by Pulser in favor of the Purchasers and the Collateral Agent.

WHEREAS, as a condition precedent to the Purchasers entering into the Purchase Agreement, Purchasers require that the Debtors enter into this Agreement and grant the security interests described herein in the Collateral in favor of Collateral Agent for the benefit of itself and the Purchasers.

NOW THEREFORE, in consideration of the premises and mutual covenants contained herein and for other good, valuable, and binding consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

1.  Definitions.

    (a) Capitalized terms used herein and not otherwise defined herein shall have the meanings provided in the Purchase Agreement or the Secured Notes, as applicable. This Agreement is the "Security Agreement" referred to in the Purchase Agreement. This Agreement is one of the "Loan Documents" referred to in the Purchase Agreement. To the extent that any terms or concepts defined or used herein are defined or used in the UCC (as defined below), such terms or concepts shall be interpreted for purposes hereof in a manner that is consistent with such definition or use in the UCC.

    (b)     The following terms shall have the meanings set forth below:

"***Account***" has the meaning given such term in Section 9102(a)(2) of the UCC.

"***Account Debtor***" has the meaning given such term in Section 9102(a)(3) of the UCC.

"***Certificate of Title***" has the meaning given such term in Section 9102(a)(10) of the UCC.

"***Certificated Security***" has the meaning given such term in Section 8102(a)(4) of the UCC.

"***Chattel Paper***" has the meaning given such term in Section 9102(a)(11) of the UCC.

Case: 15-31430    Doc# 3    Filed: 11/16/15    Entered: 11/16/15 16:34:05    Page 126 of 201

"*Collateral*" shall mean, with respect to any Debtor, all right, title, and interest of such Debtor in and to all of the following property of such Debtor, whether now owned or hereafter acquired and whether now existing or hereafter coming into existence:

    (i)    Accounts;

    (ii)    Chattel Paper and rights to receive monies included thereby;

    (iii)    Commercial Tort Claims;

    (iv)    Deposit Accounts;

    (v)    Documents;

    (vi)    Equity Collateral;

    (vii)    General Intangibles;

    (viii)    Goods, including Inventory and Equipment;

    (ix)    Instruments and rights to receive monies included thereby;

    (x)    Intellectual Property;

    (xi)    Investment Property, including Commodity Accounts and Commodity Contracts;

    (xii)    Letter-of-Credit Rights;

    (xiii)    Notes;

    (xiv)    Supporting Obligations

    (xv)    other tangible and intangible personal property and Fixtures of the Debtor;

    (xvi)    to the extent related to any property described in the clauses (i) through (xv), all books, correspondence, loan files, records, invoices, and other papers, including without limitation all tapes, cards, computer runs, and other papers and documents in the possession or under the control of such Debtor or any computer service company from time to time acting for such Debtor; and

    (xvii)    cash and non-cash Proceeds and products of any and all of the foregoing.

"*Collateral Agent*" means Iconical Investments II LP in its capacity as collateral agent, or any successor collateral agent appointed pursuant to the terms of this Agreement.

"*Commercial Tort Claim*" has the meaning given such term in Section 9102(a)(13) of the UCC and shall include, without limitation, those claims described on <u>Schedule 1</u> attached hereto.

"*Commodity Account*" has the meaning given such term in Section 9102(a)(14) of the UCC.

"*Commodity Contract*" has the meaning given such term in Section 9102(a)(15) of the UCC.

Case: 15-31430   Doc# 3   Filed: 11/16/15   Entered: 11/16/15 16:34:05   Page 127 of 201

"**Copyright Collateral**" shall mean, with respect to each Debtor, all Copyrights, whether now owned or hereafter acquired by such Debtor, and shall include, without limitation, those copyrights registered, or subject to pending applications, with the United States Copyright Office ("USCO"), or any similar office or agency in the United States of America, or elsewhere, listed on Schedule 2 attached hereto.

"**Copyrights**" shall mean all copyrights, copyright registrations, and applications for copyright registrations, including, without limitation, all renewals and extensions thereof, the right to recover for all past, present, and future infringements thereof, and all other rights of any kind whatsoever accruing thereunder or pertaining thereto.

"**Deposit Account**" has the meaning given such term in Section 9102(a)(29) of the UCC.

"**Documents**" has the meaning given such term in Section 9102(a)(30) of the UCC.

"**Equipment**" has the meaning given such term in Section 9102(a)(33) of the UCC.

"**Equity Collateral**" shall mean Pledged Equity and Pledged Equity Proceeds.

"**Event of Default**" shall have the meaning specified in Section 14 of this Agreement.

"**Fixtures**" has the meaning given such term in Section 9102(a)(41) of the UCC.

"**General Intangibles**" has the meaning given such term in Section 9102(a)(42) of the UCC.

"**Goods**" has the meaning given such term in Section 9102(a)(44) of the UCC, and shall include Motor Vehicles.

"**Instruments**" has the meaning given such term in Section 9102(a)(47) of the UCC.

"**Intellectual Property**" shall mean, collectively, with respect to each Debtor, all Copyright Collateral, all Patent Collateral, and all Trademark Collateral, together with (a) all inventions, processes, production methods, proprietary information, know-how, and trade secrets; (b) all licenses or user or other agreements granted to such Debtor with respect to any of the foregoing, in each case whether now or hereafter owned or used; (c) all information, customer lists, identification of suppliers, data, plans, blueprints, specifications, designs, drawings, recorded knowledge, surveys, engineering reports, test reports, manuals, materials standards, processing standards, performance standards, catalogs, computer and automatic machinery software and programs, splash screens, films, masters, and artwork; (d) all field repair data, sales data, and other information relating to sales or service of products now or hereafter manufactured; (e) all accounting information and all media in which or on which any information or knowledge or data or records may be recorded or stored and all computer programs used for the compilation or printout of such information, knowledge, records, or data; and (f) all licenses, consents, permits, variances, certifications, and approvals of governmental agencies now or hereafter held by such Debtor.

"**Intercreditor Agreement**" shall mean that certain Intercreditor Agreement, dated as of the date hereof, by and among Iconical Investments II LP, as first lien agent, and Pulser Media, Inc., as second lien agent, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Inventory**" has the meaning given such term in Section 9102(a)(48) of the UCC.

Case: 15-31430    Doc# 3    Filed: 11/16/15    Entered: 11/16/15 16:34:05    Page 128 of 201

"**Investment Property**" has the meaning given such term in 9102(a)(49) of the UCC.

"**Letter-of-Credit Right**" has the meaning given such term in Section 9102(a)(51) of the UCC.

"**Lien**" shall mean any mortgage, pledge, hypothecation, collateral assignment, security deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever.

"**Motor Vehicles**" shall mean motor vehicles, tractors, trailers, and other like property, whether or not the title thereto is governed by a certificate of title or ownership.

"**Notes**" shall mean all Promissory Notes or other debt instruments (including, without limitation, bonds and debentures of any nature whatsoever) from time to time issued to, or held by, the Debtor.

"**Obligations**" shall mean (i) (x) the aggregate Payoff Amount of all Secured Notes, and (y) all other obligations and liabilities of each Debtor, whether now existing or hereafter incurred, under, arising out of, or in connection with, the Purchase Agreement, the Secured Notes (or any one or more of them) or the other Loan Documents and the due performance and compliance by each Debtor with all of the terms, conditions, and agreements contained in the Purchase Agreement, the Secured Notes (or any one or more of them) and the other Loan Documents; (ii) any and all documented sums advanced by the Collateral Agent in order to preserve the Collateral or preserve its Lien and security interest in the Collateral; (iii) in the event of any proceeding for the collection or enforcement of any indebtedness, obligations, or liabilities referred to in clauses (i) and (ii) above, all documented costs and expenses of any exercise by the Collateral Agent of its rights hereunder, together with documented attorneys' fees and court costs; (iv) to the extent not otherwise included in clauses (i), (ii), or (iii) above, each Debtor's obligations set forth in this Agreement, including, without limitation, such Debtor's obligations set forth in Section 21; and (v) in the case of clauses (i) through (iv), together with any amounts constituting accrued and unpaid interest thereon (including interest accruing (or which would have accrued but for the commencement of any bankruptcy, insolvency, receivership or similar proceeding) after the commencement of any bankruptcy, insolvency, receivership or similar proceeding, regardless of whether allowed or allowable in such proceeding).

"**Patent Collateral**" shall mean, with respect to each Debtor, all Patents, whether now owned or hereafter acquired by the Debtor, and shall include, without limitation, those patents and applications, registrations and recordings described in Schedule 3 attached hereto.

"**Patents**" shall mean all patents and patent applications, including, without limitation, the inventions and improvements described and claimed therein together with the reissues, divisions, continuations, renewals, extensions, and continuations-in-part thereof, all income, royalties, damages, and payments now or hereafter due and/or payable under and with respect thereto, including, without limitation, damages and payments for past or future infringements thereof, the right to sue for past, present, and future infringements thereof, and all rights corresponding thereto throughout the world.

"**Permitted Liens**" shall mean (i) Liens for taxes, assessments and other governmental charges or levies not yet due or Liens for taxes, assessments and other governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves have been established in accordance with U.S. generally accepted accounting principles; (ii) carriers', warehousemen's and mechanics' Liens and statutory landlords' Liens arising in the ordinary course of business of the Debtors and which do not individually or in the aggregate materially detract from the value of the Collateral or materially impair the use thereof in the operation of the Debtors' business, and (iii) Liens granted pursuant to the Security Agreement or in favor of the Collateral Agent.

Case: 15-31430    Doc# 3    Filed: 11/16/15    Entered: 11/16/15 16:34:05    Page 129 of 201

**"Pledged Equity"** shall mean (i) the shares of stock of, or partnership, membership and other ownership interest in, any entity, including, without limitation, the equity interests described on Schedule 5, and any and all equity interests now or hereafter issued in substitution, exchange or replacement therefor or with respect thereto, and (ii) all ownership interests of any class or character of a successor entity formed by or resulting from a consolidation or merger in which any such issuer is not the surviving entity; in each case, whether now or hereafter owned directly by the Debtor, together with any certificates evidencing any of the foregoing.

**"Pledged Equity Proceeds"** shall mean all shares, securities, moneys, or property representing a dividend on any of the Pledged Equity, or representing a distribution or return of capital upon or in respect of the Pledged Equity, or resulting from a split-up, revision, reclassification, or other like change of the Pledged Equity or otherwise received in exchange therefor, and any subscription warrants, rights, or options issued to the holders of, or otherwise in respect of, the Pledged Equity.

**"Proceeds"** has the meaning given such term in Section 9102(a)(64) of the UCC.

**"Promissory Notes"** has the meaning given such term in Section 9102(a)(65) of the UCC.

**"Purchasers"** has the meaning for such term set forth in the recital to this Agreement, together with any of such Purchasers' respective successors and assigns that at any time and from time to time may hold an interest in any of the Secured Notes or the other Loan Documents.

**"Secured Notes"** has the meaning for such term set forth in the recitals to this Agreement, as the same may be amended, restated, supplemented, extended or otherwise modified from time to time.

**"Securities"** has the meaning given such term in Section 8102(a)(15) of the UCC.

**"Securities Account"** has the meaning given such term in Section 8501(a) of the UCC.

**"Supporting Obligations"** has the meaning given such term in Section 9102(a)(78) of the UCC.

**"Trademark Collateral"** shall mean, with respect to each Debtor, all Trademarks, whether now owned or hereafter acquired by such Debtor, and shall include, without limitation, those registered and applied for trademarks, terms, designs and applications described in Schedule 4 attached hereto (provided that Trademark Collateral shall not include intent-to-use trademark applications to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity or enforceability of any registration issuing from such intent-to-use trademark applications under applicable federal law).

**"Trademarks"** shall mean all trade names, trademarks and service marks, logos, domain names, trademark and service mark registrations, and applications for trademark and service mark registrations, including, without limitation, all renewals of trademark and service mark registrations, all rights corresponding thereto throughout the world, the right to recover for all past, present, and future infringements thereof, all other rights of any kind whatsoever accruing thereunder or pertaining thereto, together, in each case, with the product lines and goodwill of the business connected with the use of, and symbolized by, each such trade name, trademark, and service mark.

**"UCC"** shall mean the Uniform Commercial Code as in effect in the State of California from time to time.

**"Uncertificated Security"** has the meaning given such term in Section 8102(a)(18) of the UCC.

Case: 15-31430    Doc# 3    Filed: 11/16/15    Entered: 11/16/15 16:34:05    Page 130 of 201

2.     Grant of Liens.  As security for the due and punctual payment and performance in full of all Obligations (whether at the stated maturity, by acceleration, or otherwise and whether now owing or incurred in the future), each Debtor hereby pledges, assigns, charges, delivers, and grants to the Collateral Agent, for the benefit of itself and the Purchasers, a continuing security interest in and a general Lien upon all of such Debtor's right, title, and interest in and to the Collateral and all additions thereto and substitutions therefor, whether heretofore, now or hereafter received by or delivered or transferred to the Collateral Agent hereunder.

3.     Continuing Security Interest.  This Agreement creates an assignment, pledge, charge, continuing security interest in, and general Lien upon, the Collateral and shall (i) remain in full force and effect until all Obligations have been indefeasibly paid in full, (ii) be binding upon each Debtor and its successors, permitted transferees, and permitted assigns, and (iii) inure, together with the rights and remedies of the Collateral Agent hereunder, to the benefit of the Collateral Agent and its successors, transferees, and assigns, for the benefit of the Collateral Agent and the Purchasers.

4.     Debtors Remain Liable.  Anything herein to the contrary notwithstanding, (a) each Debtor shall remain liable under any agreements which have been (in whole or in part) pledged or assigned herein to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed; (b) the exercise by the Collateral Agent of any of the rights hereunder shall not release any Debtor from any of its duties or obligations under any such agreements; and (c) the Collateral Agent shall not have any obligation or liability under any such agreements by reason of this Agreement, nor shall the Collateral Agent be obligated to perform any of the obligations or duties of any Debtor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

5.     Delivery and Perfection.  Each Debtor hereby authorizes the Collateral Agent to file one or more financing or continuation statements, and amendments thereto, relating to all or any part of the Collateral including the filing of a financing statement describing the Collateral as "all assets now owned or hereafter acquired by the debtor or in which debtor otherwise has rights" or a similar description, and agrees to take all such other actions and to execute and deliver and file or cause to be filed such other instruments or documents, as the Collateral Agent may reasonably require in order to establish and maintain a perfected, valid, and continuing security interest and Lien in the Collateral in accordance with this Agreement and the UCC and other applicable law.

(a)     Each Debtor shall:

(i)     immediately deliver any and all Instruments, and Chattel Paper (including, without limitation, any Certificates of Title) and, at the request of the Collateral Agent, Documents, in each case evidencing or relating to the Collateral to the Collateral Agent promptly upon receipt thereof;

(ii)     at the request of the Collateral Agent, immediately execute (if applicable) and deliver to the Collateral Agent (or file or record in such offices as the Collateral Agent may deem necessary or appropriate) any and all financing and continuation statements, other agreements, instruments, or other documents or amendments thereto, and perform any acts which may be necessary or desirable (A) to create, perfect, preserve, or otherwise protect the security interest and Liens granted herein or (B) to enable the Collateral Agent to exercise and enforce its rights hereunder;

Case: 15-31430    Doc# 3    Filed: 11/16/15    Entered: 11/16/15 16:34:05    Page 131 of 201

(iii)    with respect to any Certificated Security not otherwise credited to a Securities Account, immediately, upon obtaining an interests in such Certificated Security, effect transfer thereof to the Collateral Agent (A) by physical delivery of such Certificated Security to the Collateral Agent endorsed to the Collateral Agent or its nominee or in blank or (B) in the case of a Certificated Security in registered form, by physical delivery of such Certificated Security to the Collateral Agent specially endorsed to the Collateral Agent or its nominee and thereafter reregistered in the name of the Collateral Agent or their nominee;

(iv)    with respect to any Uncertificated Security not otherwise credited to a Securities Account, immediately, upon obtaining an interests in such Uncertificated Security, (A) effect transfer thereof to the Collateral Agent by registration thereof on the books and records of the issuer in the name of the Collateral Agent or its nominee or (B) obtain the agreement of the issuer of such Uncertificated Securities that it will comply with instructions originated by the Collateral Agent without further consent by the registered owner, through a written agreement in form and substance satisfactory to the Collateral Agent;

(v)    mark all Certificates of Title in the manner specified in a written notice of the Collateral Agent to such Debtor requesting such marking, to evidence the fact that such Certificates of Title are subject to the security interest and Lien of the Collateral Agent granted herein; and

(vi)    with respect any Pledged Equity that is certificated, immediately upon possession of such certificate, deliver such Pledged Equity to the Collateral Agent including a stock power or endorsement, in each case, in form and substance acceptable to the Collateral Agent.

(b)    Upon receipt thereof, each Debtor agrees immediately to deliver to the Collateral Agent, appropriately endorsed to the Collateral Agent, any Notes, trade acceptance, Chattel Paper, or other Instrument in which a security interest can be perfected by delivery or transfer of such Collateral to a secured party, which are acquired by such Debtor from time to time.

(c)    Notwithstanding Section 9207 of the UCC, the Collateral Agent may hold as additional security any Proceeds, including money and funds and interest thereon, received from the Collateral, all of which shall constitute Collateral hereunder, and the Collateral Agent shall not be required to apply such money or funds to reduce the Obligations other than as expressly set forth herein.

6.    Proceeds of Sale. Nothing contained in this Agreement shall limit or restrict in any way the Collateral Agent's right to receive Proceeds of the Collateral in any form in accordance with the provisions of this Agreement. All Proceeds that are received by a Debtor contrary to the provisions of this Agreement shall be received in trust for the benefit of the Collateral Agent, shall be segregated from other property or funds of such Debtor and shall be forthwith paid over to the Collateral Agent as Collateral in the same form as so received (with any necessary endorsement, document or instrument of transfer).

7.    Records and Information. Each Debtor agrees to keep, at its office set forth in Section 11(d), its records concerning the Collateral. Each Debtor agrees to promptly furnish to the Collateral Agent such information concerning itself, the Collateral, and any Account Debtor as the Collateral Agent may reasonably request at any time and from time to time.

Case: 15-31430    Doc# 3    Filed: 11/16/15    Entered: 11/16/15 16:34:05    Page 132 of 201

8.    Inspection. Each Debtor agrees upon reasonable notice provided by the Collateral Agent, to permit the Collateral Agent, through its officers and agents, to examine and inspect the Collateral and all records pertaining thereto, and to make extracts from such records as the Collateral Agent may require.

9.    Use of Collateral. Except upon the occurrence and during the continuance of any Event of Default, each Debtor may in the ordinary course of its business use, consume, exhibit, demonstrate, sell, lease, or otherwise dispose of its Inventory in carrying on its businesses substantially in the same manner as now conducted; provided, however, that a sale, disposition or transfer in the ordinary course of business shall not include any sale, disposition or transfer in satisfaction, partial or complete, of a debt owed by such Debtor or any sale, disposition or transfer to any stockholder or affiliate of such Debtor; and provided further that any such sale, disposition or transfer shall be for fair equivalent value and shall not be unlawful or inconsistent with the terms of this Agreement or of any policy of insurance covering such Collateral.

10.    No Disposition. Each Debtor covenants and agrees that it will not sell, assign, transfer, exchange, or otherwise dispose of, or grant any option with respect to, any of the Collateral, except as provided for in Section 9 hereof, nor will it create, incur, or permit to exist any Lien on or with respect to any of the Collateral, any interest therein, or any Proceeds thereof, except for the Permitted Liens.

11.    Representations and Warranties. Each Debtor represents, warrants and covenants to the Collateral Agent throughout the term of this Agreement that:

(a)    Such Debtor is and will be the sole legal and beneficial owner of all of the Collateral now owned or hereafter acquired by it free and clear of any Lien, security interest, assignment, option, or other charge or encumbrance, except for (i) the Permitted Liens and, (ii) with respect to RDIO, the Liens granted to Pulser pursuant to the Intercompany Note (as defined in the Purchase Agreement) and (iii) with respect to Pulser, the Liens granted to Iconical Investments II LP, pursuant to the Pulser Security Agreement (as defined in the Purchase Agreement);

(b)    This Agreement has been duly and validly authorized by such Debtor and executed and delivered by such Debtor and constitutes the legal, valid, and binding obligation of the Debtor, enforceable against such Debtor in accordance with its terms (subject to applicable bankruptcy, reorganization, insolvency, moratorium, or similar laws affecting creditors' rights generally and general principles of equity) and, subject to the performance of the relevant procedures as specified in Section 5 herein with respect to such Collateral, creates a valid, binding, enforceable, and perfected security interest in and general first Lien upon all of the Collateral, and such Debtor is duly authorized to make all filings and take all other actions necessary or desirable to perfect and to continue the perfection of such security interest;

(c)    As of the date hereof and on the date of delivery or transfer to the Collateral Agent of any Collateral under this Agreement, such Debtor has good and marketable title to the Collateral;

(d)    The offices where the Debtors maintains all records relating to the Collateral are located at:

In the case of Pulser:

Pulser Media, Inc.
1550 Bryant Street, Suite 200
San Francisco, CA 94103

Case: 15-31430    Doc# 3    Filed: 11/16/15    Entered: 11/16/15 16:34:05    Page 133 of 201

In the case of RDIO:

RDIO, INC.
1550 Bryant Street, Suite 200
San Francisco, CA 94103

(e)     Such Debtor is a corporation duly organized and validly existing under the laws of the State of Delaware;

(f)     Such Debtor's exact legal name as that name appears on such Debtor's Certificate of Incorporation and such Debtor's organization identification number issued by its State of incorporation is as follows:

| Legal Name | Identification Number |
| --- | --- |
| PULSER MEDIA, INC. | 5108867 |
| RDIO, INC. | 4586007 |

(g)     All Pledged Equity in which such Debtor currently has or shall hereafter acquire an interest is and will be, as applicable, duly authorized, validly existing, fully paid, and non-assessable (in the case of any equity interest in a corporation) and duly issued and outstanding (in the case of any equity interest in any other entity), and except as otherwise set out in the Amended and Restated Stockholders Agreement, dated as of May 28, 2010, as may be amended from time to time, by and among RDIO and the stockholders of RDIO signatory thereto ("**Rdio Stockholders Agreement**"), in the case of RDIO, and the Stockholders Agreement, dated as of November 30, 2012, as may be amended from time to time, by and among Pulser and the stockholders of Pulser signatory thereto ("**Pulser Stockholders Agreement**"), in the case of Pulser, none of such Pledged Equity is or will be subject to any contractual restriction, or any restriction under the charter, by-laws, partnership agreement, or other organizational document of the respective issuer, upon the transfer of such Pledged Equity;

(h)     Except pursuant to licenses and other user agreements entered into by such Debtor in the ordinary course of business, such Debtor owns and possesses the right to use, and has done nothing to authorize or enable any other Person to use, any Copyright, Patent or Trademark owned or used by such Debtor on the date hereof, and all registrations therefor are valid and in full force and effect; and such Debtor owns or possesses the right to use all such Copyrights, Patents and Trademarks;

(i)     To such Debtor's knowledge, (i) there is no violation by others of any right of such Debtor with respect to any Copyright, Patent or Trademark of such Debtor and (ii) such Debtor is not infringing in any respect upon any Copyright, Patent or Trademark of any other Person; and no proceedings have been instituted or are pending against such Debtor or, to such Debtor's knowledge, threatened, and no claim against such Debtor has been received by such Debtor, alleging any such violation;

(j)     As of the date hereof except as otherwise set out in Schedule 3.7 of the Purchase Agreement, any and all equity interests owned directly by such Debtor in any Person are described on Schedule 5 attached hereto, and subject to the transfer restrictions set out on Schedule 5 attached hereto owns the equity interests set forth opposite its name on Schedule 5 free and clear of Liens;

Case: 15-31430    Doc# 3    Filed: 11/16/15    Entered: 11/16/15 16:34:05    Page 134 of 201

(k)     As of the date hereof, such Debtor has no Commercial Tort Claims other than those described in Schedule 1 attached hereto and Debtor hereby covenants and agrees that it shall provide Collateral Agent with prompt written notice of each Commercial Tort Claim, and any judgment, settlement or other disposition thereof and will immediately take such action as the Collateral Agent may reasonably request to grant and perfect a security interest therein in favor of the Collateral Agent;

(l)     As of the date hereof, such Debtor has no Copyrights registered, or subject to pending applications, with the United States Copyright Office ("USCO"), or any similar office or agency in the United States of America, or elsewhere other than those described on Schedule 2 attached hereto;

(m)     As of the date hereof, such Debtor has no Patents registered, or subject to pending applications, in the United States Patent and Trademark Office ("USPTO"), or to the best knowledge of Debtor, any similar office or agency in the United States of America other than those described on Schedule 3 attached hereto;

(n)     As of the date hereof, such Debtor has no Trademarks registered, or subject to pending applications, in the USPTO, or to the best knowledge of Debtor, any similar office or agency in the United States of America other than those described in Schedule 4 attached hereto;

(o)     As of the date hereof, Schedule 6 attached hereto sets forth each of the material licenses owned or held by or on behalf of such Debtor and all other Intellectual Property of such Debtor other than the Intellectual Property otherwise set forth in the other Schedules hereto;

(p)     To the best of such Debtor's knowledge, there are no actions, suits, proceedings or investigations pending or threatened in writing against such Debtor before any governmental authority which could reasonably be expected to cause any portion of the Intellectual Property to be adjudged invalid or unenforceable, in whole or in part;

(q)     Such Debtor authorizes Collateral Agent to modify this Agreement by amending the Schedules hereto to include any new Intellectual Property, renewal thereof or any Intellectual Property applied for and obtained hereafter; and such Debtor shall, from time to time execute and deliver to Collateral Agent any and all assignments, agreements, instruments, documents and such other papers to evidence the assignment of a security interest in each such Intellectual Property; and

(r)     As of the date hereof, such Debtor has no deposit, brokerage, securities or other similar accounts other than those set forth opposite its name on Schedule 7 attached hereto.

12.     Covenants.

(a)     Each Debtor shall:

(i)     Maintain, or cause to be maintained, all items of the Collateral in good condition and repair, ordinary wear and tear excepted in the case of Equipment, and pay, or cause to be paid, the costs of repairs to or maintenance of that Collateral which is of a type that could be repaired or maintained;

(ii)     Take all steps to preserve and protect the Collateral, including, with respect to the Intellectual Property, the filing of any renewal affidavits and applications;

Case: 15-31430    Doc# 3    Filed: 11/16/15    Entered: 11/16/15 16:34:05    Page 135 of 201

(iii)    Not use any Collateral in violation of law or any applicable policy of insurance;

(iv)    Pay or cause to be paid when due all taxes, assessments, and other charges relating to the Collateral or this Agreement and reimburse the Collateral Agent for all costs of and fees incurred in connection with any filing of the documents and instruments referred to in Section 5;

(v)    Not change its: (a) name or the name under which it does business; (b) chief executive office; (c) type of organization; (d) jurisdiction of incorporation; or (e) other legal structure that is reasonably likely to materially impair Collateral Agent's interest in the Collateral without at least 30 days' prior written notice to the Collateral Agent (or such lesser period as the Collateral Agent may agree in writing). Prior to effectuating any change described in the preceding sentence, such Debtor shall take or cause to be taken all actions deemed by the Collateral Agent to be necessary or desirable to prevent any financing or continuation statement from becoming seriously misleading or rendered ineffective, or the security interests granted herein from becoming unperfected or the relative priority thereof otherwise impaired, as a result of such removal or change;

(vi)    Perform and observe all the terms and provisions of any agreement for the sale or lease of goods, or any agreement for the rendering of services, giving rise to an Account to be performed or observed by it, maintain any such agreement in full force and effect, enforce any such agreement in accordance with its terms, and take all such action to such end as may be from time to time reasonably requested by the Collateral Agent;

(vii)    Immediately notify Collateral Agent if it knows or has reason to know of any reason why any applicable registration or recording of any Patent Collateral, Trademark Collateral or Copyright Collateral may become abandoned, canceled, invalidated or unenforceable;

(viii)    Render any assistance, as Collateral Agent may solely determine is necessary, to Collateral Agent in any proceeding before the USPTO, the USCO, any federal or state court, or any similar office or agency in the United States of America, or any State therein, to maintain any Patent Collateral, Trademark Collateral or Copyright Collateral and to protect Collateral Agent's security interest therein, including, without limitation, filing of renewals, affidavits of use, affidavits of incontestability and opposition, interference, and cancellation proceedings;

(ix)    Assume all responsibility and liability arising from the use of the Intellectual Property, and such Debtor hereby indemnifies and holds Collateral Agent harmless from and against any claim, suit, loss, damage or expense (including reasonable attorneys' fees) arising out of any alleged defect in any product or service manufactured, promoted, or sold by such Debtor in connection with any Intellectual Property or out of the manufacture, promotion, labeling, sale, or advertisement of any such product or service by such Debtor;

Case: 15-31430    Doc# 3    Filed: 11/16/15    Entered: 11/16/15 16:34:05    Page 136 of 201

(x)    Immediately notify Collateral Agent in writing of any adverse determination in any proceeding in the USPTO, USCO, or any other foreign or domestic governmental authority, court or body, such Debtor becomes aware of regarding such Debtor's claim of ownership in any of the Trademark Collateral, Patent Collateral or Copyright Collateral, and in the event of any infringement of any Trademark, Patent or Copyright owned by such Debtor by a third party which is adverse to such Debtor's business, such Debtor shall promptly notify Collateral Agent of such infringement and sue for and diligently pursue damages for such infringement, and if such Debtor shall fail to take such action within one (1) month after such notice is given to Collateral Agent, Collateral Agent may, but shall not be required to, itself take such action in the name of such Debtor, and such Debtor hereby appoints Collateral Agent the true and lawful attorney of such Debtor, for it and in its name, place and stead, on behalf of such Debtor, solely, without limitation on any other rights of Collateral Agent under this Agreement, to commence judicial proceedings in any court or before any other tribunal to enjoin and recover damages for such infringement, any such damages due to such Debtor, net of costs and reasonable attorneys' fees, to be applied to the Obligations;

(xi)    (A) Maintain, with responsible insurance companies, insurance covering the Collateral against such insurable losses as is consistent with sound business practice and, in any event, as is required by the Loan Documents and, (B) cause Collateral Agent to be designated as loss payee (as customary for secured parties based on the type of insurance) with respect to all insurance (whether or not required by the Loan Documents), (C) obtain the written agreement of the insurers that such insurance shall not be cancelled, terminated or materially modified to the detriment of Collateral Agent without at least 30 days' prior written notice to Collateral Agent, and (D) furnish copies of such insurance policies, certificates and endorsements to Collateral Agent immediately upon request therefor and otherwise comply with the terms and provisions of the Loan Documents with respect to such insurance coverage;

(xii)    with respect to the Copyright Collateral, at its sole expense, do, make, execute and deliver all such additional and further acts, things, deeds, assurances, and instruments, in each case in form and substance satisfactory to Collateral Agent, relating to the creation, validity, or perfection of the security interests provided for in this Agreement under 35 U.S.C. Section 261, 15 U.S.C. Section 1051 et seq., 17 U.S.C. Sections 101, 201 et seq., the UCC or other law of the United States of America, the State of California, other States or any other domestic or foreign jurisdiction as Collateral Agent may from time to time reasonably request, and shall take all such other action as Collateral Agent may reasonably require to perfect Collateral Agent's security interest in any of the Copyright Collateral and to completely vest in and assure to Collateral Agent its rights hereunder in any of the Copyright Collateral; and

(xiii)    within 10 days after the request of the Collateral Agent following execution and delivery of this Agreement, Debtor shall, and shall cause each depository or intermediary holding any of such Debtor's Deposit Accounts, Securities Accounts, or other deposit, brokerage, securities or other similar accounts to, enter into control agreements in favor of Collateral Agent, in form

Case: 15-31430    Doc# 3    Filed: 11/16/15    Entered: 11/16/15 16:34:05    Page 137 of
201

and substance satisfactory to Collateral Agent in its sole and absolute discretion, over such accounts;

13. <u>Further Assurances and Protections.</u>

(a)  Each Debtor shall at its expense do, file, record, make, execute, and deliver all such acts, notices, instruments, statements, or other documents as the Collateral Agent may reasonably request to obtain, perfect, preserve, or otherwise protect the security interest and Liens of the Collateral Agent in the Collateral or any part thereof or to give effect to the security interests, rights, powers, and remedies of the Collateral Agent under this Agreement;

(b)  Each Debtor shall, at its own expense, give prompt written notice to the Collateral Agent of, and defend the Collateral against, any suit, action, or proceeding related to the Collateral or which could materially adversely affect the security interests and Liens granted hereunder; and

(c)  Debtor authorizes Collateral Agent to have this or any other similar agreement, including, without limitation, any "short form" security agreements, recorded or filed with the USCO, USPTO or other appropriate federal, state or foreign government office.

14. <u>Events of Default.</u>  The occurrence of any of the following events or conditions shall constitute an event of default (each an "***Event of Default***") under this Agreement:

(a)  The occurrence and continuation of an Event of Default as defined in any of the Secured Notes or any of the other Loan Documents;

(b)  Any representation or warranty made in this Agreement, the Purchase Agreement, any Secured Note or any other Loan Document or any written statement pursuant hereto or thereto or any other report, financial statement or certificate made or delivered to the Collateral Agent shall be untrue or incorrect in any respect as of the date when made or deemed made; or

(c)  The failure or refusal by a Debtor to perform, or the breach or violation of, any of the material terms, obligations, covenants, or warranties of this Agreement, the Purchase Agreement, any of the Secured Notes or the other Loan Documents.

15. <u>Remedies upon an Event of Default.</u>  On and after the occurrence and continuance of an Event of Default, the Collateral Agent may (in its discretion), or at the direction of the Required Holders, shall:

(a)  request that each Debtor, and upon such request such Debtor shall, assemble the Collateral at such place or places convenient to the Collateral Agent designated in such request;

(b)  enforce collection of any of the Collateral by suit or any other lawful means available to the Collateral Agent, or demand, collect, or receive any money or property at any time payable or receivable on account of or in exchange for any of the Collateral;

(c)  surrender, release, or exchange or otherwise modify the terms of all or any part of the Collateral, or compromise or extend or renew for any period any indebtedness thereunder or evidenced thereby;

Case: 15-31430    Doc# 3    Filed: 11/16/15    Entered: 11/16/15 16:34:05    Page 138 of
201

(d)     assert all other rights and remedies of a secured party under the UCC (whether or not in effect in any applicable jurisdiction) and all other applicable law, including, without limitation, the right to take possession of, hold, collect, sell, lease, deliver, grant options to purchase, or otherwise retain, liquidate, or dispose of all or any portion of the Collateral. The proceeds of any collection, liquidation, or other disposition of the Collateral shall be applied by the Collateral Agent first to the payment of all expenses (including, without limitation, all documented fees, taxes, attorneys' fees and legal expenses) incurred by the Collateral Agent in connection with retaking, holding, collecting, or liquidating the Collateral. The balance of such proceeds, if any, shall, to the extent permitted by law, be applied to the payment of the Obligations in the order of application set forth in clause (j) of this Section 15. In case of any deficiency, each Debtor shall, whether or not then due, remain liable therefor. If notice prior to disposition of the Collateral or any portion thereof is necessary under applicable law, written notice mailed to the applicable Debtor at its notice address specified on the signature page hereof ten (10) business days prior to the date of such disposition shall constitute commercially reasonable notice, but notice given in any other reasonable manner shall be sufficient. Without precluding any other methods of sale or other disposition, the sale or other disposition of the Collateral or any portion thereof shall have been made in a commercially reasonable manner if conducted in conformity with commercial practices of creditors disposing of similar property; but in any event the Collateral Agent may sell, lease, deliver, grant options to purchase or otherwise retain, liquidate or dispose such Collateral on such terms and to such purchaser(s) (including the Collateral Agent or any Purchaser) as the Collateral Agent in its absolute discretion may choose, and for cash or for credit or for future delivery, without assuming any credit risk, at public or private sale or other disposition without demand of performance, and without any obligation to advertise or give notice of any kind other than that necessary under applicable law. Each Debtor hereby waives and releases to the fullest extent permitted by law any right or equity of redemption with respect to the Collateral, whether before or after sale or other disposition hereunder, and all rights, if any, of marshalling the Collateral and any other security for the Obligations or otherwise. At any such sale or other disposition, unless prohibited by applicable law, the Collateral Agent and the Purchasers may bid for and purchase all or any part of the Collateral so sold free from any such right or equity of redemption. The Collateral Agent shall not be liable for failure to collect or realize upon any or all of the Collateral or for any delay in so doing nor shall it be under any obligation to take any action whatsoever with regard thereto.

The Collateral Agent shall incur no liability as a result of the sale of the Collateral, or any part thereof, at any private sale pursuant to this Agreement. Each Debtor hereby waives any claims against the Collateral Agent arising by reason of the fact that the price at which the Collateral may have been sold at such a private sale was less than the price that might have been obtained at a public sale or was less than the aggregate amount of the Obligations, even if the Collateral Agent accepts the first offer received and does not offer the Collateral to more than one offeree.

Each Debtor recognizes that, by reason of certain prohibitions contained in the Securities Act of 1933, as amended, and applicable state securities laws, the Collateral Agent may be compelled, with respect to any sale of all or any part of the Collateral, to limit purchasers to those who will agree, among other things, to acquire the relevant Collateral for their own account, for investment and not with a view to the distribution or resale thereof. Each Debtor acknowledges that any such private sale may be at prices and on terms less favorable to the Collateral Agent than those obtainable through a public sale without such restrictions, and, notwithstanding such circumstances, agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner and that the Collateral Agent shall have no obligation to engage in public sales and no obligation to delay the sale of any Collateral for the period of time necessary to enable the registration of the Collateral or related transaction so as to permit a public offer to be made with respect thereto;

Case: 15-31430    Doc# 3    Filed: 11/16/15    Entered: 11/16/15 16:34:05    Page 139 of 201

(e)     license or sublicense, whether general, special or otherwise, and whether on an exclusive or non-exclusive basis, any Intellectual Property included in the Collateral throughout the world for such term or terms, on such conditions and in such manner as the Collateral Agent shall in its sole discretion determine;

(f)     without assuming any obligation or liability thereunder, at any time and from time to time, in its sole discretion, enforce (and shall have the exclusive right to enforce) against any licensee or sublicensee all rights and remedies of each Debtor in, to and under any of its Intellectual Property and take or refrain from taking any action under any thereof, and such Debtor releases the Collateral Agent from liability for, and agrees to hold the Collateral Agent free and harmless from and against any claims and expenses arising out of, any lawful action so taken or omitted to be taken with respect thereto;

(g)     make a request upon a Debtor (which shall not be construed as implying any limitation on the rights or powers of the Collateral Agent), and upon such request such Debtor shall, execute and deliver to the Collateral Agent a power of attorney, in form and substance satisfactory to the Collateral Agent, for the implementation of any sale, lease, license or other disposition of Intellectual Property owned by such Debtor or any such action related thereto. In connection with any such disposition, such Debtor will supply to the Collateral Agent its know-how and expertise relating to the relevant Intellectual Property, and its customer lists and other records relating to such Intellectual Property and to the distribution of said products or services;

(h)     to the extent not already so transferred, transfer all or any part of the Collateral into the Collateral Agent's names or the name of their nominee or nominees; and

(i)     give all consents, waivers, and ratifications in respect of the Collateral and otherwise act with respect thereto as though it were the outright owner thereof (each Debtor hereby irrevocably constituting and appointing the Collateral Agent the proxy and attorney-in-fact of such Debtor, with full power of substitution to do so, which power is coupled with an interest), including, without limitation, the exercise of all voting, consensual and other powers of ownership pertaining to the Collateral.

(j)     All proceeds of the Collateral shall be applied as follows:

(i)     first, to the payment of all documented fees and expenses (including, without limitation, all documented fees, taxes, attorneys' fees and legal expenses) incurred by the Collateral Agent in connection with retaking, holding, collecting, or liquidating the Collateral, until paid in full;

(ii)     second, to payment of all documented fees, expenses, indemnities and other amounts owed to the Collateral Agent under the Purchase Agreement or otherwise under this Agreement or the other Loan Documents, until paid in full;

(iii)     third, to payment of that portion of the Obligations owed to the Purchasers, ratably among the Purchasers in proportion to the respective amounts described in this clause third payable to them;

(iv)     last, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Debtor or as otherwise required by law;

Case: 15-31430     Doc# 3     Filed: 11/16/15     Entered: 11/16/15 16:34:05     Page 140 of 201

(k) For the purpose of enabling the Collateral Agent, during the continuance of an Event of Default, to exercise rights and remedies under any Loan Document at such time as the Collateral Agent shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, each Debtor hereby grants to the Collateral Agent an irrevocable, non-exclusive license and, to the extent permitted under any licenses of Intellectual Property granting such Debtor rights in Intellectual Property, sublicense (in each case, exercisable without payment of royalties or other compensation to such Debtor) to use, license or sublicense any of the Collateral constituting Intellectual Property now owned or hereafter acquired by such Debtor, wherever the same may be located. Such license shall include access to all media in which any of the licensed items may be recorded or stored and to all computer programs used for the compilation or printout hereof.

16.    <u>Collateral Agent Appointed Attorney-in-Fact</u>.  Without limiting any rights or powers granted to the Collateral Agent pursuant to this Agreement, applicable law or otherwise, each Debtor hereby appoints the Collateral Agent as its attorney-in-fact, with full power and authority in the place and stead of such Debtor and in the name of such Debtor or otherwise, from time to time in the Collateral Agent's discretion to take any and all action and to execute, file and record any and all instruments, agreements, and documents which the Collateral Agent may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation, to execute any assignment of Intellectual Property to the Collateral Agent or other transferee, to enforce this Agreement or exercise any of the Purchasers' or Collateral Agent's rights and privileges hereunder or under applicable law, to conduct any foreclosure sale or similar proceeding and to receive, endorse and collect all instruments made or payable to such Debtor representing any Collateral or Proceeds in respect of the Collateral or any part thereof and to give full discharge for the same.  The appointment set forth in this <u>Section 16</u> is coupled with an interest and is irrevocable.

17.    <u>Collateral Agent May Perform</u>.  If any Debtor fails to perform any agreement, covenant, or obligation contained herein, the Collateral Agent may itself perform, or cause performance of such agreement, covenant or obligation and the documented expenses and costs of the Collateral Agent incurred in connection therewith shall be payable by the Debtors.

18.    <u>Security Interest Absolute</u>.  All rights of the Collateral Agent and all Liens hereunder, and all obligations of each Debtor hereunder, shall be absolute and unconditional irrespective of:

(a)    lack of validity or enforceability of this Agreement, the Purchase Agreement, any Secured Note or any other Loan Document;

(b)    any change in the time, manner, or place of payment of, or in any other term of any or all of the Obligations or any amendment or waiver of any provision of this Agreement, the Purchase Agreement, any Secured Note or any other Loan Document;

(c)    any release or non-perfection of any portion of the Collateral or any exchange, release, or non-perfection of any other collateral, or any release, amendment, or waiver of any guaranty for all or any of the Obligations; or

(d)    any other circumstance which might otherwise constitute a defense available to, or a discharge of such Debtor in respect of the Obligations or this Agreement, the Purchase Agreement, any Secured Note or any other Loan Document.

19.    <u>Collateral Agent's Duties</u>.  The powers conferred to the Collateral Agent hereunder are solely to protect the Collateral Agent's interest in the Collateral and shall not impose any duty upon it to

Case: 15-31430   Doc# 3   Filed: 11/16/15   Entered: 11/16/15 16:34:05   Page 141 of 201

exercise any such powers except for the safe custody of any Collateral or any portion thereof in its possession, and the Collateral Agent shall exercise that standard of care with respect to the Collateral in its possession which it exercises in the administration of its own assets and property; provided, however, that the Collateral Agent shall not be liable for any action taken or omitted with respect to the Collateral or this Agreement unless such liability results solely from the gross negligence or willful misconduct of the Collateral Agent as determined by a final non-appealable judgment by a court of competent jurisdiction. The Collateral Agent shall have no duty as to the Collateral or as to the taking of any necessary steps to preserve rights against other parties or any other rights pertaining to the Collateral.

20. Rights Cumulative. The rights, powers, and remedies of the Collateral Agent under this Agreement shall be in addition to all rights, powers, and remedies given to the Collateral Agent by virtue of any statute or rule of law or any agreement, all of which rights, powers and remedies shall be cumulative and may be exercised successively or concurrently without impairing the Collateral Agent's security interest, Lien, and assignment in the Collateral.

21. Indemnity and Expenses.

(a) The Collateral Agent shall not have any liability to any person or entity and shall be indemnified and held harmless by each Debtor for any liability incurred by reason of taking or refraining from taking any action with respect to the Collateral, except in the case such liability results solely from the gross negligence or willful misconduct of the Collateral Agent as determined by a final non-appealable judgment by a court of competent jurisdiction. Such Debtor agrees to indemnify the Collateral Agent from and against any and all claims, losses, and liabilities arising out of or connected with this Agreement (including, without limitation, enforcement of this Agreement), except such claims, losses, or liabilities resulting solely from the Collateral Agent's gross negligence or willful misconduct as determined by a final non-appealable judgment by a court of competent jurisdiction. This Section 21(a) shall survive any termination of this Agreement.

(b) each Debtor agrees to pay all documented expenses, costs, and disbursements incurred by the Collateral Agent (including, without limitation, all documented attorneys' fees and other legal expenses incurred by the Collateral Agent in connection therewith) in connection with (i) retaking, holding, collecting, preparing for sale, and selling or otherwise realizing upon, liquidating, or disposing of the Collateral, (ii) the enforcement of its rights hereunder or under any other Loan Documents upon the occurrence and during the continuance of an Event of Default, (iii) the performance by the Collateral Agent of any agreement, covenant, or obligation of such Debtor contained herein that such Debtor has failed or refused to perform, and (iv) the participation or other involvement of the Collateral Agent and any Purchaser with (x) bankruptcy, insolvency, receivership, foreclosure, winding up, or liquidation proceedings, or any actual or attempted sale, or any exchange, enforcement, collection, compromise, or settlement in respect of any of the Collateral, and for the care of the Collateral and defending or asserting rights and claims of the Collateral Agent and the Purchasers in respect thereof, by litigation or otherwise, including expenses of insurance, (y) judicial or regulatory proceedings, and (z) workout, restructuring, or other negotiations or proceedings (whether or not the workout, restructuring or transaction contemplated thereby is consummated).

22. Amendment or Waiver. Neither this Agreement nor any terms hereof may be changed, waived, discharged, or terminated unless such change, waiver, discharge or termination is in writing signed by the parties hereto.

23. Notices. Except as otherwise expressly provided herein, all notices and other communications provided for hereunder shall be sent pursuant to the notice requirements set forth in the Purchase Agreement.

Case: 15-31430   Doc# 3   Filed: 11/16/15   Entered: 11/16/15 16:34:05   Page 142 of 201

24. <u>No Waiver</u>. No failure or delay on the part of the Collateral Agent in exercising any right, power or privilege hereunder or under the UCC or any other applicable law shall operate as a waiver hereof or thereof; nor shall any single or partial exercise of any right, power, or privilege hereunder or under the UCC or any other applicable law preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder. No notice to or demand on the Collateral Agent in any case shall entitle any Debtor to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Collateral Agent to any other or further action in any circumstances without notice or demand.

25. <u>Severability of Provisions</u>. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of that prohibition or unenforceability without invalidating the remaining provisions hereof or affecting the validity or enforceability of that provision in any other jurisdiction.

26. <u>Non-Assignment</u>. No Debtor shall have the right to assign its rights or delegate its obligations hereunder or any part thereof to any other person without the Collateral Agent's prior written consent. This Agreement shall be binding upon any successors or assigns of each Debtor, and shall benefit any successors or assigns of the Collateral Agent.

27. <u>Integration of Terms</u>. This Agreement contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all oral statements and prior writings with respect thereto.

28. <u>Governing Law</u>. In all respects, including matters of construction, validity and performance, this Agreement shall be governed by, and construed and enforced in accordance with, the internal laws of the State of California applicable to contracts made and performed in that state (without regard to the choice of law or conflicts of law provisions thereof).

29. <u>Venue</u>. ANY SUIT, ACTION OR PROCEEDING WITH RESPECT TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY OR ANY JUDGMENT ENTERED BY ANY COURT WITH RESPECT TO THIS NOTE OR SUCH TRANSACTIONS SHALL BE BROUGHT AND MAINTAINED EXCLUSIVELY IN THE COURTS OF THE STATE OF CALIFORNIA LOCATED IN LOS ANGELES COUNTY OR IN THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA. EACH OF THE MAKER AND HOLDER IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE COURTS OF THE STATE OF CALIFORNIA LOCATED IN THE COUNTY OF LOS ANGELES AND OF THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA FOR THE PURPOSE OF ANY SUCH ACTION OR PRECEEDING SET FORTH ABOVE AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH ACTION OR PROCEEDING. EACH OF THE MAKER AND HOLDER IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY HAVE OR HEREAFTER MAY HAVE TO THE LAYING OF VENUE OF ANY SUCH ACTION OR PROCEEDING BROGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH ACTION OR PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

30. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic imaging

Case: 15-31430    Doc# 3    Filed: 11/16/15    Entered: 11/16/15 16:34:05    Page 143 of 201

means (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Agreement.

31.     <u>Severability</u>.     Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

32.     <u>Entire Agreement</u>. This Agreement and the other Loan Documents, and any separate letter agreements with respect to fees and expenses payable to the Collateral Agent and the Purchasers (or any of them), embodies the entire agreement of the parties relating to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, relating to the subject matter hereof. Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any part, but rather in accordance with the fair meaning thereof.

30.     <u>INTERCREDITOR AGREEMENT GOVERNS</u>.  NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, THE LIEN AND SECURITY INTEREST GRANTED TO THE COLLATERAL AGENT, FOR THE BENEFIT OF THE PURCHASERS, PURSUANT TO THIS AGREEMENT AND THE EXERCISE OF ANY RIGHT OR REMEDY BY THE COLLATERAL AGENT AND THE PURCHASERS HEREUNDER ARE SUBJECT TO THE PROVISIONS OF THE INTERCREDITOR AGREEMENT.  IN THE EVENT OF ANY CONFLICT OR INCONSISTENCY BETWEEN THE PROVISIONS OF THE INTERCREDITOR AGREEMENT AND THIS AGREEMENT, THE PROVISIONS OF THE INTERCREDITOR AGREEMENT SHALL GOVERN AND CONTROL

[Signature Page Follows]

Case: 15-31430    Doc# 3    Filed: 11/16/15    Entered: 11/16/15 16:34:05    Page 144 of 201

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first written above.

**DEBTORS**

RDIO, INC.,
a Delaware corporation

By:_____
Name:_____
Title:_____

PULSER MEDIA, INC.,
a Delaware corporation

By:_____
Name:_____
Title:_____

**COLLATERAL AGENT:**

ICONICAL INVESTMENTS II LP,
as Collateral Agent
By: Iconical Fund Partners II Ltd., its General Partner

By:_____
Name:_____
Title:_____

# EXHIBIT C


## RDIO, INC.


Disclosure Schedules

To

Note Purchase Agreement

Dated October 19, 2015


The following disclosure schedules (the "*Schedules*") are provided in connection with the Note Purchase Agreement, dated as of October 19, 2015 (the "*Agreement*"), by and among RDIO, INC., a Delaware corporation ("*Company*"), Iconical Investments II LP, as the Collateral Agent, and each of other parties signatory thereto (each, a "*Purchaser*" and collectively, the "*Purchasers*"). Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Agreement.

The Schedules may include items or information which Company is not required to disclose under the Agreement and disclosure of such items or information shall not affect the interpretation of the Agreement or the scope of the disclosure obligations thereunder.

The Schedules are arranged in sections corresponding to the numbered and lettered sections and subsections contained in <u>Section 3</u> of the Agreement, and the disclosures in any section or subsection of the Schedules shall qualify other sections and subsections of <u>Section 3</u> of the Agreement where it is reasonably apparent on the face of such disclosure that the disclosure would apply in other sections and subsections.

The headings contained in these Schedules are for reference purposes only and shall not affect in any way the meaning or interpretation of these Schedules. Inclusion of any item in these Schedules: (a) does not represent a determination that such item is material nor shall it be deemed to establish a standard of materiality, (b) does not represent a determination that such item did not arise in the ordinary course of business and (c) shall not constitute, or be deemed to be, an admission to any third party concerning such item.

<u>Schedule 3.7 – Capitalization</u>

1. Rdio, Inc. – Summary Capitalization Table –

| Stockholder | Common | Options/Warrants | Total | Percentage (Fully Diluted) |
|---|---|---|---|---|
| Pulser Media, Inc. | 2,985,966 | | 2,985,966 | 73.24% |
| Microsoft Global Finance | 236,632 | | 236,632 | 5.80% |
| Employee Stockholders (Current and Former) | 192,693 | | 192,693 | 4.73% |
| SME | 126,356 | 90,924 | 217,280 | 5.33% |
| WMG | 75,814 | 54,554 | 130,368 | 3.20% |
| UMG | 79,921 | 50,447 | 130,368 | 3.20% |
| UMGi | 82,133 | 48,235 | 130,368 | 3.20% |
| Merlin | | 43,456 | 43,456 | 1.07% |
| Options | | 10,000 | 10,000 | 0.25% |
| TOTAL | 3,779,515 | 297,616 | 4,077,131 | 100.00% |

2. Pulser Media, Inc. – Summary Capitalization Table – see attached table.

3. Amended and Restated Stockholders Agreement, dated as of May 28, 2010, as amended, by and among the Company and the Company's stockholders signatory thereto.

4. Pulser is a party to separate Stockholder Deferred Exchange Agreements with certain stockholders of the Company pursuant to which such stockholders have the right, for a period of ten years, in the event of a change of control of Pulser, to exchange their shares of common stock of the Company for shares of common stock of Pulser. Pulser also has a corresponding right to require such exchange if not elected by the stockholder.

5. Pulser is a party to that certain Exchange Agreement dated as of November 30, 2012 (the "***Exchange Agreement***"), pursuant to which, among other matters, the majority stockholders of the Company and Vdio, Inc. exchanged all of their shares in the Company and Vdio, Inc. for shares of Pulser. In connection with the Exchange Agreement, Pulser, pursuant to a written consent of its Board of Directors, reserved a number of shares of the Common Stock of Pulser as would permit an exchange of shares, options and warrants between Pulser and the stockholders, option holders and warrant holders of the Company and Vdio, Inc., respectively, at the same exchange ratio as occurred under the Exchange Agreement. The shares reserved assume all stockholders, option holders and warrant holders will exchange their shares of the Company or Vdio, Inc., as applicable, into shares of the Common Stock of Pulser on the same terms and at the same exchange ratio as occurred under the Exchange Agreement.

6. Pursuant to the Cumulus Letter Agreement, Pulser agreed to provide Cumulus with unlimited piggyback registration rights (subject to customary cutback provisions for market conditions, underwriter requirements and applicable regulatory limitations (e.g., Rule 415)) commencing with a Qualified Public Offering (as defined in the Stockholders Agreement). The Cumulus Letter Agreement further provides Cumulus with participation rights in future equity financings and tag-along rights in connection with

certain transfers of securities of Pulser held by Iconical Investments LP (formerly Simul Investments, LP).

7. Advertising Sales and Platform Integration Agreement, dated September 13, 2013, by and between Pulser and Cumulus.

8. Pursuant to that certain Securities Purchase Agreement, dated September 13, 2013 (the "*Cumulus Securities Purchase Agreement*"), by and between Pulser and Cumulus, Pulser has agreed to issue shares of its common stock over a five-year period on the terms and conditions therein.

9. Pursuant to the Shaw Letter Agreement, Pulser granted to Shaw certain (i) participation rights in future equity financings, including the right to purchase up to $25,000,000 of the equity securities sold in the first equity financing of Pulser occurring after April 16, 2014 (if such financing is intended to raise at least $25,000,000 in gross proceeds), and (ii) tag-along rights in connection with certain transfers of securities of Pulser held by Iconical Investments LP (formerly Simul Investments, LP).

10. Pursuant to a second letter agreement, dated April 16, 2014 (the "*Shaw Reg Letter Agreement*"), from Pulser to Shaw, Pulser agreed to provide Shaw with unlimited piggyback registration rights (subject to customary cutback provisions for market conditions, underwriter requirements and applicable regulatory limitations (e.g., Rule 415)) commencing with an Initial Public Offering (as defined in the Shaw Reg Letter Agreement).

11. Pursuant to that certain Quotaholders Agreement dated April 16, 2014 (the "*Quotaholders Agreement*"), by and among Rdio Music (Brazil) Ltda., Radio E Televisao Bandeirantes Ltda. ("*Band*") and Rdio-Band Musica Ltda. (the "*JV*"), that certain Advertising Sales and Platform Integration Agreement dated April 16, 2014 (the "*Platform Agreement*"), by and among such parties, and the other transactions documents entered into in connection therewith, Band has rights to acquire additional securities of the JV based on specified performance milestones, none of which have been achieved as of the date hereof.

12. Pursuant to that certain Stock Acquisition Agreement dated as of May 28, 2010, by and between the Company and Warner Music, Inc. ("*WMG*"), WMG has the right to acquire additional shares of common stock and/or warrants to purchase common stock of the Company on the terms and conditions therein.

13. Pursuant to that certain Stock Acquisition Agreement dated as of May 28, 2010, by and between the Company and Sony Music Entertainment ("*SME*"), SME has the right to acquire warrants to purchase common stock of the Company on the terms and conditions therein.

14. Pursuant to that certain Stock Acquisition Agreement dated as of October 25, 2010, by and between the Company and Universal Music Investments, Inc. ("*UMG*"), UMG has the right to participate in any financing in which the Company has offered to sell and issue shares of its securities to any other major record label.

15. Pursuant to that certain Agreement for the Inclusion of Universal Sound Recordings in Online On-Demand Subscription Service dated as of May 20, 2010, as amended, UMG, UMG Recordings, Inc. and/or one or more of its affiliates, has the right to acquire warrants to purchase common stock of the Company on the terms and conditions therein.

16. Pursuant to that certain Stock Acquisition Agreement dated as of February 22, 2012, by and between the Company and Universal International Music B.V. ("*UMGi*"), UMGi has the right to acquire warrants to purchase common stock of the Company on the terms and conditions therein, and the right to participate in any financing in which the Company has offered to sell and issue shares of its securities to any other major record label.

17. Pursuant to that certain Warrant to Purchase Common Stock of Rdio, Inc. dated as of December 21, 2010, by and between the Company and Music and Entertainment Rights Licensing Independent Network BV ("*Merlin*"), Merlin has the right to acquire additional warrants to purchase common stock of the Company on the terms and conditions therein.

# Pulser Media, Inc. - Summary Cap Table

As of: 16-Oct-15

| | Common | Warrants | Options | Reserved Shares* | Reserved Warrants** | Fully Diluted* | Pct. |
|---|---|---|---|---|---|---|---|
| **Current Shareholders** | | | | | | | |
| Iconical Investments, LP | 80,139,497 | - | - | 4,578,973 | - | 84,718,470 | 47.40% |
| Iconical Investments II, LP | - | - | - | - | - | - | - |
| Baxima N.V. | 715,766 | - | - | - | - | 715,766 | 0.40% |
| Brilliant Digital Entertainment, Inc. | 4,500,000 | - | - | - | - | 4,500,000 | 2.52% |
| Atomico Ventures II, L.P. | 4,476,030 | - | - | - | - | 4,476,030 | 2.50% |
| Atomico Ventures Affiliates II, L.P. | 23,970 | - | - | - | - | 23,970 | 0.01% |
| Europlay Capital Advisors, LLC | 2,895,907 | - | - | - | - | 2,895,907 | 1.62% |
| Microsoft Global Finance | - | - | - | 2,366,320 | - | 2,366,320 | 1.32% |
| Cumulus Media Holdings Inc. | 5,029,438 | 8,836,210 | - | 16,177,554 | - | 30,043,202 | 16.81% |
| Shaw Ventures Ltd. | 7,068,936 | 2,945,378 | - | - | - | 10,014,314 | 5.60% |
| J23 Productions, Publishing & Record | - | 28,276 | - | - | - | 28,276 | 0.02% |
| **Partners** | | | | | | | |
| West Studios, LLC | - | 1,719,028 | - | - | - | 1,719,028 | 0.96% |
| Universal Music Group | - | - | - | 1,620,540 | 986,820 | 2,607,360 | 1.46% |
| Sony Music Group | - | - | - | 1,263,560 | 909,240 | 2,172,800 | 1.22% |
| Warner Music, Inc. | - | - | - | 758,140 | 545,540 | 1,303,680 | 0.73% |
| Merlin Entertainment | - | - | - | - | 434,560 | 434,560 | 0.24% |
| **Employees** | | | | | | | |
| Employee Shareholders | 225,114 | - | - | 1,997,612 | - | 2,222,726 | 1.24% |
| Options, Outstanding*** | - | - | 19,691,067 | - | 100,000 | 19,791,067 | 11.07% |
| Options, Available | - | - | 8,683,820 | - | - | 8,683,820 | 4.86% |
| **Total** | 105,074,658 | 13,528,892 | 28,374,886 | 28,762,699 | 2,976,160 | 178,717,295 | 100.00% |

\* Includes shares reserved for issuance to Rdio and Vdio shareholders under exchange agreements, unissued Cumulus shares (issued as services are rendered), and Vdio Convertible Note, gross, assuming re-contribution of $4M in Vdio assets. Excludes shares issuable upon elective conversion by Iconical Investments II of its Notes.

\*\* Includes warrants reserved for issuance pursuant to Rdio top-up warrants for music labels and an option for Rdio's independent board director.

Proprietary and Confidential

Case: 15-31430   Doc# 3   Filed: 11/16/15   Entered: 11/16/15 16:34:05   Page 150 of 201

Schedule 3.8 – Material Contracts

1. The Company has entered into a Partner Agreement (a marketing and customer acquisition arrangement) with AXS dated as of August 26, 2014 pursuant to which, among other matters, the Company's service is marketed to ticket purchasers on websites operated by AXS. AXS has recently asserted that the Company is in default under such agreement for failure to pay past due amounts. The Company disputes the assertion for a number of reasons. The Company is currently renegotiating the agreement and expects to modify the provisions thereof, eliminating the second year minimum guarantees of $3 million and satisfying any payables by year-end.

2. The Company is currently renegotiating certain aspects and terminating other aspects of its agreement with Roku for enhanced promotion and for the manufacturing of remote control devices with an Rdio button. The Company remains in payment arrears under the agreement while this renegotiation takes place. The Company believes it will finalize the amended terms in the coming 2 weeks.

3. The Company is currently renegotiating certain aspects of its agreement with Shazam for placement within the Shazam application. The Company remains in payment arrears under the agreement while this renegotiation takes place. The Company believes it will finalize the amended terms in the coming 2 weeks.

4. The Company believes Band is in breach of several of its material obligations under the Quotaholders Agreement and Platform Agreement, however, neither the Company nor its affiliates have provided written notice regarding such breach. The Company and its affiliates have been analyzing various remedies and alternatives, and in the meantime, the parties have been negotiating with respect to a mutually agreed restructuring of their JV.

<u>Schedule 3.9 -- Intellectually Property</u>

1. On or around July 2011, the Company received a written notice from Packet Video Corporation ("***Packet Video***") regarding the potential need to license technology underlying its identified United States patents. Packet Video's patents purported to protect "devices for the distribution of music information in digital form." The patents seem to lack specificity but may, at least theoretically, apply to any music streaming service. Patent Video made similar claims against a service similar to Rdio in 2011 that were dismissed with prejudice in 2012. The Company responded that it was looking into the matter but had no further correspondence with Packet Video. In or around October 2012, Rdio S.à.r.l received notice from patent counsel to Packet Video in Germany alleging Rdio's infringement of its US patent 5,636,276 and a European (German) patent (P4413451.7). After obtaining an extension to respond, Rdio S.à.r.l provided a written response to Packet Video's German counsel indicating, among other matters, the problems it had identified with the patents and its determination that no infringement was occurring. Concurrent with Rdio S.à.r.l's response, Rdio S.à.r.l's German patent counsel filed protective letters with the 12 governing patent courts in Germany as a preemptive position to, in summary, (i) make similar arguments to the applicable courts in advance – in the event Packet Video were to file a cause of action or for injunctive relief, (ii) require notice to Rdio S.à.r.l in the event of any filing (and prohibit ex parte filings), (iii) oppose any action for injunctive relief, (iv) require Packet Video to bear the cost of the dismissal of any action for injunctive relief (if dismissed), and (v) require the posting of a bond of at least $500,000 by Packet Video if it were successful in any action for injunctive relief. Rdio S.à.r.l sent a follow-up letter to Packet Video in November 2013. Neither the Company nor its Affiliates have received any further correspondence from Packet Video. In January 2015 Packet Video assigned US patent 5,636,276 to III Holdings 2, a Delaware LLC and wholly owned subsidiary of NTT DOCOMO, Inc. This U.S. patent expired on April 18, 2015 and the German patent lapsed on April 12, 2015.

2. On or around February 2013, the Company received a written notice from Personal Audio, the holder of U.S. Patent Nos. 6,199,076 and 7,509,178, regarding the potential application of its technology to the Rdio music service and the potential to obtain a non-exclusive license. Personal Audio made claims arising from two patents covering "music playlist technology." Personal Audio sued a large online music service and hardware provider on these patents in 2009 and reached a settlement. Following that settlement, they sued a variety of other device manufacturers and others who utilize music playlists. Without concluding whether any actual infringement has occurred, the Company commenced an ongoing dialogue with representatives of Personal Audio and continued to analyze the patent claims and the possibility of securing a non-exclusive license. Personal Audio made an initial settlement offer in early 2013 that was based on a number of assumptions about the Rdio user base. The Company informed Personal Audio that its assumptions were well off, and Personal Audio indicated that they would reevaluate their initial offer; however the Company has not heard from Personal Audio again on the matter and there has been no further communications between the parties since that time.

<u>Schedule 3.11 – No Liabilities</u>

1. Convertible Promissory Notes issued by Pulser to Iconical Investments II, LP pursuant to that certain Note Purchase Agreement dated December 19, 2014, as amended.

2. Partner Agreement, dated August 26, 2014, between AXS Digital, LLC and Rdio, Inc.

3. Channel Application Upgrade and Distribution Agreement, dated July 30, 2014, between Rdio, Inc. and Roku, Inc.

4. Media Insertion Orders between Rdio, Inc. and Shazam Media Services, Inc. (various dates) and Exhibit A, effective March 17, 2015, attached thereto.

5. The Company has entered into a contract extension with Sony Music whereby it agreed to make an advance payment of $2 million on November 1, 2015, to roll forward unearned minimum guarantees from the prior contract (which would be payable April 1, 2016 if not earned) and to provide for additional minimum guarantees of $7 million over the two year extension term. The minimum guarantee to Sony increases by $750,000 (decreasing after a year to $450,000) for each calendar month after October 1, 2015 in which the Company offers free to user on-demand services.

Schedule 3.12 -- Litigation

1. See items 1 and 2 of Schedule 3.9.

2. The Company is party to a Joint Venture ("*JV*") with Rádio e Televisão Bandeirantes Ltda. ("*Band*"). A former employee of Band, Massimo Tiso, has made employment related claims against both Band and the JV. Mr. Tiso was never in an employment relationship with the JV and his wages were paid by Band, however Mr. Tiso did perform administrative tasks for the JV and he was identified in the JV's organizational documents (including the Articles), and in a JV business plan attached as an annex to the JV's platform agreement. If Mr. Tiso has any employment related claims, the Company considers them more appropriately directed at Band than the JV, and accordingly, the Company is allowing preliminary discussions with Mr. Tiso to be handled by Band's local attorneys. Mr. Tiso's initial demand was for an amount less than $250,000. The Company continues to monitor the situation for purposes of avoiding JV liability.

THIS NOTE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR APPLICABLE STATE SECURITIES LAWS AND MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT OR SUCH LAWS COVERING THE TRANSFER OR AN OPINION OF COUNSEL SATISFACTORY TO THE MAKER THAT SUCH TRANSFER IS EXEMPT FROM SUCH REGISTRATION.

## RDIO, INC.

## SECURED PROMISSORY NOTE

**Maximum Aggregate Amount: $5,000,000**          **DATE: October, 2015**

FOR VALUE RECEIVED, the undersigned, RDIO, INC., a Delaware corporation (the "*Maker*"), promises to pay to Iconical Investments II LP or its registered assigns (hereafter, together with any holder hereof, called "*Holder*"), at such place as Holder may designate in writing to the Maker, in lawful money of the United States of America, and in immediately available funds, an amount equal to the aggregate amount advanced by Holder to the Maker pursuant to Advances (as defined below) hereunder plus interest on each such Advance at the rate of twelve percent (12%) per annum accruing from and including the date of each such Advance through the date of repayment in full (the "*Payoff Amount*"); provided that the maximum aggregate amount of such Advances hereunder shall be Five Million U.S. Dollars ($5,000,000) (the "*Maximum Aggregate Amount*"). Such Advances may be endorsed from time to time on the Schedule of Advances attached hereto (the "*Schedule of Advances*") by the initials of Holder, but the failure to make such notations shall not affect the validity of the Maker's obligation hereunder. Holder is hereby authorized to record in its books and records, the date and amount of all Advances or borrowings under this Note, and those books and records, along with copies of the request(s) for Advance(s) together with payment confirmation details (e.g., wire confirmation number), shall be conclusive and binding absent manifest error.

This Note, and the other Secured Promissory Notes issued pursuant to the Note Purchase Agreement, dated as of October 19, 2015, by and among the Maker, Holder and any other parties signatory thereto (as amended, restated or otherwise modified from time to time, the "*Purchase Agreement*") (and any replacement promissory notes issued with respect hereto or thereto), are collectively referred to as the "*Notes*." Capitalized terms used but not otherwise defined in this Note shall have the meanings ascribed to them in the Purchase Agreement.

The following is a statement of the rights of Holder of this Note and the conditions to which this Note is subject to and to which Holder hereof, by the acceptance of this Note, agrees:

Funding of Advances. Subject to the terms hereof, Holder may, in its sole discretion, make advances of funds available hereunder ("*Advances*") to the Maker as and when requested by the Maker from time to time, but in no event shall Holder be obligated to make Advances. The Maker shall give Holder irrevocable written notice requesting an Advance at least three (3) business days before the date on which the Maker wishes to receive the Advance (unless a shorter period is consented to in writing by Holder), which notice shall certify on behalf of the Maker that (i) on the date of each Additional Closing, no Event of Default has occurred and is continuing both immediately before and immediately after giving effect to such Advance (it being understood that the making of any Advance on the date of the Initial Closing shall not be conditioned upon such compliance in respect of the Identified Defaults) and (ii) on the date of each Additional Closing, all of the representations and warranties of the Maker and Pulser set forth in the Loan Documents are true and correct as of the date of such notice (it being understood that the

933766.01-CHISR01A - MSW

making of any Advance on the date of the Initial Closing shall not be conditioned upon the accuracy or correctness of any representation or warranty in respect of the Identified Defaults). Notwithstanding any term or provision of this Note that may be construed to the contrary, at no time shall Holder be required to make an Advance hereunder if a Default or an Event of Default (as defined below) shall have occurred and be continuing. "*Default*" means any event that, with the passing of time or the giving of notice or both, would become an Event of Default.

1.      Maturity Date.  The Payoff Amount shall be due and payable in repayment of this Note on the earliest to occur of: (i) any Event of Default under clause (c) or (d) hereof; (ii) any (A) consolidation or merger of the Maker with or into any other corporation or other entity or person, or any other corporate reorganization of Maker, in which the stockholders of the Maker immediately prior to such consolidation, merger or reorganization, own less than 50% of the voting power of the surviving entity immediately after such consolidation, merger or reorganization of Maker with or into such surviving entity, (B) any transaction or series of related transactions to which the Maker is a party in which in excess of fifty percent (50%) of the Maker's voting power is transferred; or (C) any sale, lease, transfer, exclusive perpetual license or other disposition (directly or indirectly) of all or substantially all of the assets or technology of Pulser individually or the Maker and its subsidiaries, taken as a whole (a "*Change of Control*"); and (iii) November 25, 2015 (the date of such occurrence, the "*Maturity Date*").

2.      Events of Default.  Holder may declare the entire Payoff Amount of this Note to be immediately due and payable, by a notice in writing to the Maker if any of the following events shall occur (each an "*Event of Default*"):

(a)      (i) Default in the payment of the Payoff Amount or any other amount under any Loan Document when due or (ii) a breach or default any other obligation of the Maker under this Note or any of the other Loan Documents, in each case, upon notice thereof from such Holder to the Maker; or

(b)      If any material misstatement or misrepresentation exists now or hereafter in any warranty or representation made to the Purchasers or Collateral Agent by any Company Entity, or any officer, director or employee of any Company Entity; or

(c)      The institution by Pulser, the Maker or any Company Subsidiary (where for purposes of Sections 3(c) and 3(d) hereof Company Subsidiary means any Company Subsidiary other than Vdio, Inc.) of proceedings to be adjudicated as bankrupt or insolvent, or the consent by Pulser, the Maker or any Company Subsidiary to institution of bankruptcy or insolvency proceedings against any Company Entity under any federal or state law, or the consent by Pulser, the Maker or any Company Subsidiary to or acquiescence in the filing of any petition relating thereto, or the appointment of a receiver, liquidator, assignee, trustee or other similar official of Pulser, the Maker or any Company Subsidiary, or of any substantial part of its property, or the making by Pulser, the Maker or any Company Subsidiary of an assignment, for the benefit of creditors, or the admission by Pulser, the Maker or any Company Subsidiary in writing of its inability to pay its debts generally as such debts become due; or

(d)      Commencement of proceedings against Pulser, the Maker or any Company Subsidiary seeking any bankruptcy, insolvency, liquidation, dissolution or similar relief under any present or future statute, law or regulations which proceedings shall not have been dismissed or stayed within thirty (30) days of commencement thereof, or the setting aside of any such stay of any such proceedings, or the appointment without the consent or acquiescence of the equity holders of Pulser, the Maker or such Company Subsidiary of any trustee, receiver or liquidator of Pulser, the Maker or any Company Subsidiary or of all or any substantial portion of the properties of Pulser, the Maker or such Company Subsidiary which appointment shall not have been vacated within thirty (30) days thereof; or

Case: 15-31430   Doc# 3   Filed: 11/16/15   Entered: 11/16/15 16:34:05   Page 156 of 201

(e)  (i) Pulser, the Maker or any Company Subsidiary shall fail to make any payment on any indebtedness of Pulser, the Maker or any such Company Subsidiary (other than the indebtedness under the Notes) beyond the applicable grace period (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), (ii) any other event shall occur or condition shall exist under any agreement or instrument relating to any such indebtedness described in clause (i) above, if the effect of such event or condition is to accelerate, cause to become or be declared to be due and payable, or be required to be prepaid or repurchased (other than by a regularly scheduled required prepayment or mandatory prepayment due to asset sale, casualty, condemnation or debt or equity issuance), prior to the stated maturity thereof, or to permit the acceleration of, the maturity of any such indebtedness described in clause (i) above, or (iii) any "Default", "Event of Default" (or similar term) shall occur under the Intercompany Note or the Pulser Note Purchase Agreement, the Pulser Security Agreement or any other loan document related thereto; provided that this clause (e) shall not apply to secured indebtedness that becomes due as a result of the voluntary sale or transfer of the property or assets securing such indebtedness if such sale or transfer is permitted hereunder and under the documents providing for such indebtedness; or

(f)  one or more money judgments or orders (or other similar process) involving an aggregate amount in excess of $500,000 shall be rendered against one or more of the Company Entities and not discharged or satisfied in full; or

(g)  any Loan Document after delivery thereof shall for any reason fail or cease to be valid and binding on, or enforceable against any Company Entity party thereto, or any Company Entity shall so state in writing; or

(h)  the Security Agreement (as defined below) shall for any reason fail or cease to create a valid and enforceable lien on any collateral purported to be covered thereby or any Company Entity shall so state in writing or, except as permitted by the Loan Documents, such lien shall fail or cease to be a perfected and first priority lien; or

(i)  there shall occur any Change of Control.

3.  <u>Secured and Senior Indebtedness</u>.  The obligations of (a) the Maker under this Note and (b) Pulser under the Guaranty, are secured by that certain Security Agreement dated as of the date hereof executed by Pulser and the Maker in favor of the Collateral Agent, for the benefit of the Purchasers (as amended, restated, supplemented or otherwise modified from time to time, the "***Security Agreement***"). All payments due under this Note shall be senior to all other indebtedness of the Maker or any Company Subsidiary.

4.  <u>Waiver of Notice; Fees</u>.  The Maker hereby waives notice, presentment, protest and notice of dishonor. Other than pursuant to a writing by Holder, no failure to exercise any right of Holder with respect to this Note, nor any delay in, or waiver of, the exercise thereof, shall impair any such right or be deemed to be a waiver thereof. If Holder is required to commence legal proceedings or incur any other cost to collect amounts due and payable hereunder or to enforce its rights under this Note, the Maker shall be liable to pay or reimburse Holder for all reasonable costs and expenses incurred in connection with the collection of such amounts and any such legal proceedings, including without limitation attorneys' fees.

5.  <u>Prepayment</u>.  The Maker may prepay all or a portion of the Payoff Amount of this Note upon five (5) days' prior written notice to Holder. Amounts repaid under this Note shall not be available for subsequent Advances.

933766.01-CHISR01A - MSW

3

6.     Excess Interest. Notwithstanding any provision to the contrary contained in this Note, Maker shall not be required to pay, and Holder shall not be permitted to collect any amount of interest in excess of the maximum amount of interest permitted by law ("***Excess Interest***"). If any Excess Interest is provided for or determined by a court of competent jurisdiction to have been provided for in this Note, then in such event: (a) the provisions of this paragraph shall govern and control; (b) Maker shall not be obligated to pay any Excess Interest; (c) any Excess Interest that Holder may have received hereunder shall be, at Holder's option, applied as a credit against the outstanding principal balance of this Note or the accrued and unpaid interest (not to exceed the maximum amount permitted by law), or refunded to the payor thereof, or any combination of the foregoing; (d) the interest rate provided for herein shall be automatically reduced to the maximum lawful rate allowed from time to time under applicable law (the "***Maximum Rate***"), and this Note shall be deemed to have been and shall be, reformed and modified to reflect such reduction; and (e) Maker shall not have any action against Holder for any damages arising out of the payment or collection of any Excess Interest. Notwithstanding the foregoing, if, for any period of time, interest on this Note is calculated at the Maximum Rate rather than the applicable rate under this Note, and thereafter the Maximum Rate exceeds the applicable rate, the rate of interest payable on this Note shall become the Maximum Rate until Holder shall have received the amount of interest which Holder would have received during such period on this Note had the rate of interest not been limited to the Maximum Rate during such period.

7.     Miscellaneous.

    7.1.     Permitted Transfer. Subject to any applicable state or federal securities laws, Holder shall be entitled to assign or transfer all or any portion of this Note to any other person or entity.

    7.2.     Successors and Assigns. Subject to the exceptions specifically set forth in this Note, the terms and conditions of this Note shall inure to the benefit of and be binding upon the respective executors, administrators, heirs, successors and assigns of the parties.

    7.3.     Loss or Mutilation of Note. Upon receipt by the Maker of evidence satisfactory reasonably to the Maker of the loss, theft, destruction or mutilation of this Note, together with indemnity reasonably satisfactory to the Maker, in the case of loss, theft or destruction, or the surrender and cancellation of the Note, in the case of mutilation, the Maker shall execute and deliver to Holder a new Note of like tenor and denomination as this Note. The Payoff Amount is payable only to the registered Holder of the Note.

    7.4.     Titles and Subtitles. The titles and subtitles of the Sections of this Note are used for convenience only and shall not be considered in construing or interpreting this Note.

    7.5.     Notices. Any notice, request or other communication required or permitted hereunder shall be in writing and shall be delivered personally or by facsimile (receipt confirmed electronically) or by electronic mail message or shall be sent by a reputable express delivery service or by certified mail, postage prepaid with return receipt requested, addressed as follows:

    if to the Maker to

    RDIO, Inc.
    1550 Bryant St., Suite 220
    San Francisco, CA 94103
    Attn: Chief Executive Officer
    Email : abay@rd.io

and

RDIO, Inc.
1550 Bryant St., Suite 220
San Francisco, CA 94103
Attn: Chief Legal Officer
Email : elliott.peters@rd.io

if to Holder to Holder's address or e-mail address set forth in the Purchase Agreement.

Either party hereto may change the above specified recipient or mailing address or e-mail address by notice to the other party given in the manner herein prescribed. All notices shall be deemed given on the day when actually delivered as provided above (if delivered personally or by facsimile, provided that any such facsimile is received during regular business hours at the recipient's location), on the day when such electronic mail message was delivered or on the day shown on the return receipt (if delivered by mail or delivery service).

8.6    Note Holder Not Stockholder. This Note does not confer upon Holder any right to vote or to consent to or to receive notice as a stockholder of the Maker, as such, in respect of any matters whatsoever, or any other rights or liabilities as a stockholder, prior to the conversion hereof.

8.7    Governing Law. The terms of this Note shall be construed in accordance with the laws of the State of California, as applied to contracts entered into by California residents within the State of California, which contracts are to be performed entirely within the State of California.

8.8    Venue. ANY SUIT, ACTION OR PROCEEDING WITH RESPECT TO THIS NOTE OR THE TRANSACTIONS CONTEMPLATED HEREBY OR ANY JUDGMENT ENTERED BY ANY COURT WITH RESPECT TO THIS NOTE OR SUCH TRANSACTIONS SHALL BE BROUGHT AND MAINTINED EXCLUSIVELY IN THE COURTS OF THE STATE OF CALIFORNIA LOCATED IN LOS ANGELES COUNTY OR IN THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA. EACH OF THE MAKER AND HOLDER IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE COURTS OF THE STATE OF CALIFORNIA LOCATED IN THE COUNTY OF LOS ANGELES AND OF THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA FOR THE PURPOSE OF ANY SUCH ACTION OR PRECEEDING SET FORTH ABOVE AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH ACTION OR PROCEEDING. EACH OF THE MAKER AND HOLDER IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY HAVE OR HEREAFTER MAY HAVE TO THE LAYING OF VENUE OF ANY SUCH ACTION OR PROCEEDING BROGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH ACTION OR PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

8.10    Waiver and Amendment. Any term of this Note may be amended, waived or modified with the written consent of the Maker and the Requisite Holders. Any amendment, modification or waiver approved by the Maker and the Requisite Holders shall be binding on all of the Purchasers.

8.11    Counterparts. This Note may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall

Case: 15-31430    Doc# 3    Filed: 11/16/15    Entered: 11/16/15 16:34:05    Page 159 of 201

be an original, but all of which shall together constitute one and the same instrument. Delivery of an executed counterpart of a signature page of this Note by facsimile or other electronic imaging means (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Note.

        8.12    <u>Entire Agreement</u>. This Note and the other Loan Documents, and any separate letter agreements with respect to fees and expenses payable to the Collateral Agent and the Purchasers (or any of them), embodies the entire agreement of the parties relating to the subject matter hereof and supersedes all prior agreements and understandings, oral or written, relating to the subject matter hereof. Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any part, but rather in accordance with the fair meaning thereof.

[THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

933766.01-CHISR01A - MSW

IN WITNESS WHEREOF, the undersigned has caused this Note to be signed in its name as of the date first set forth above.

RDIO, INC.

By: _____

Name: _____Anthony Bay_____

Title: _____Chief Executive Officer_____

*Note*

## SCHEDULE OF ADVANCES

| Date | Amount of Advance | Unpaid Principal Balance | Notes: |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

933766.01-CHISR01A - MSW

**EXHIBIT "7"**

GUARANTY

THIS GUARANTY (this "**Guaranty**") is made as of October 19, 2015 by Pulser Media, Inc., a Delaware corporation (the "**Guarantor**"), in favor of the Holders of Guaranteed Obligations (as defined below).

WITNESSETH

WHEREAS, Rdio, Inc., a Delaware corporation (the "Company"), on the one hand, and Iconical Investments II LP, as collateral agent ("Iconical") and each other purchaser which becomes party thereto, on the other hand, have entered into a certain Note Purchase Agreement dated as of October 19, 2015 (as the same may be amended, restated, amended and restated, supplemented and/or otherwise modified, and as in effect from time to time, the "Note Purchase Agreement"), providing, subject to the terms and conditions thereof, for the Company to sell its secured promissory notes from time to time (the notes so sold under the Note Purchase Agreement, as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Secured Notes");

WHEREAS, it is a condition precedent to the purchase of any Secured Notes by the Purchasers under the Note Purchase Agreement that the Guarantor shall have executed and delivered this Guaranty, whereby the Guarantor shall guarantee the payment and performance by the Company when due of all of the Guaranteed Obligations (as defined below); and

WHEREAS, in consideration of the direct and indirect financial and other support that the Company has provided, and such direct and indirect financial and other support as the Company may in the future provide, to the Guarantor, and in order to induce the Purchasers to purchase the Secured Notes, the Guarantor is willing to guarantee the Guaranteed Obligations.

NOW, THEREFORE, in consideration of the foregoing premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

SECTION 1.  Definitions.  Terms used herein but not defined herein have, as used herein, the respective meanings given such terms in the Note Purchase Agreement.

SECTION 2.  Representations and Warranties.  The representations and warranties set forth in Section 3 of the Note Purchase Agreement that expressly relate to the Guarantor (either specifically or in its capacity as a Company Entity), each of which is hereby incorporated herein by reference, are true and correct in all material respects on and as of the date hereof (except to the extent such representations and warranties specifically relate to an earlier date, in which case they shall have been true and correct in all material respects on and of such earlier date), and the Holders of Guaranteed Obligations shall be entitled to rely on each of them as if they were fully set forth herein; provided that, each such representation and warranty that is qualified as to materiality shall be true and correct in all respects (it being understood that the effectiveness of this Guaranty shall not be conditioned upon the accuracy or correctness of any representation or warranty in respect of the Identified Defaults).

SECTION 3.  Covenants.  The Guarantor covenants and agrees that, unless and until the Guaranteed Obligations have been paid in full in cash or terminated as set forth in Section 24, the Guarantor will perform and observe, and cause each of its subsidiaries to perform and observe, all of the terms, covenants and agreements set forth in the Loan Documents that the Company has agreed to cause the Guarantor or such subsidiaries to perform or observe (it being understood that the effectiveness of this Guaranty shall not be conditioned upon such performance and observance in respect of the Identified Defaults).

SECTION 4.  The Guaranty.  The Guarantor hereby unconditionally guarantees the full and punctual payment and performance by the Company when due (whether at stated maturity, or by required or optional prepayment or by acceleration or otherwise) of (i) the principal of, interest on, and any other amounts accruing or due or payable under the Secured Notes from time to time, together with any amounts constituting accrued and unpaid interest thereon (including interest accruing (or which would have accrued but for the commencement of any bankruptcy, insolvency, receivership or similar proceeding) after the commencement of any bankruptcy, insolvency, receivership or similar proceeding, regardless of whether allowed or allowable in such proceeding)), (ii) all other amounts payable by the Company under the Note Purchase Agreement and the other Loan Documents and (iii) the punctual and faithful performance, keeping, observance, and fulfillment by the Company of all of the agreements, conditions, covenants, and obligations of the Company contained in the Loan Documents (all of the foregoing being referred to collectively as the "Guaranteed Obligations," and the holders of the Secured Notes and Iconical being referred to collectively as the "Holders of Guaranteed Obligations").  Upon the occurrence of any Event of Default (as defined in the Secured Notes) under the Note Purchase Agreement, the Guarantor agrees that it shall forthwith on demand by any Holder of Guaranteed Obligations entitled thereto pay such amount or perform such obligation at the place and in the manner specified in the Note Purchase Agreement, the Secured Notes, or the relevant Loan Document, as the case may be.  The Guarantor hereby agrees that this Guaranty is an irrevocable guaranty of payment and is not a guaranty of collection.

SECTION 5.  Guaranty Unconditional.  The obligations of the Guarantor hereunder shall be unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged or otherwise affected by, and the Guarantor hereby waives any defenses it may have (now or in the future) by reason of:

(A)     (i) any extension, renewal, settlement, indulgence, compromise, waiver or release of the Guaranteed Obligations, any part thereof, any agreement relating thereto (including this Guaranty), whether (in any such case) by operation of law or otherwise, other than as a result of the indefeasible payment in full in cash of the Guaranteed Obligations; or (ii) any failure or omission to enforce any right, power or remedy with respect to the Guaranteed Obligations, any part thereof, or any agreement relating thereto (including this Guaranty);

(B)     any modification or amendment of or supplement to the Note Purchase Agreement, the Secured Notes, or any other Loan Document, including, without limitation, any such amendment which may increase the amount of, or the interest rates applicable to, any of the Guaranteed Obligations or the issuance from time to time of any Secured Notes;

2

Case: 15-31430   Doc# 3   Filed: 11/16/15   Entered: 11/16/15 16:34:05   Page 165 of 201

(C)     any release, surrender, compromise, settlement, waiver, subordination or modification, with or without consideration, of (i) any collateral securing the Guaranteed Obligations or any part thereof, (ii) any other guaranties with respect to the Guaranteed Obligations or any part thereof, or (iii) any other obligation of any person or entity with respect to the Guaranteed Obligations or any part thereof;

(D)     (i) any change in the corporate, partnership or other existence, structure or ownership of the Company or the Guarantor, (ii) any insolvency, bankruptcy, reorganization or other similar proceeding affecting the Company or the Guarantor, or any of their respective assets or any resulting release or discharge of any obligation of the Company or the Guarantor;

(E)     the existence of any claim, setoff or other rights which the Guarantor may have at any time against the Company, or the Purchasers of Guaranteed Obligations, whether in connection herewith or in connection with any unrelated transactions;

(F)     (i) the enforceability or validity of the Guaranteed Obligations or any part thereof or the genuineness, enforceability or validity of any agreement relating thereto or with respect to any collateral securing the Guaranteed Obligations or any part thereof, (ii) any other invalidity or unenforceability relating to or against the Company or any other guarantor of any of the Guaranteed Obligations, for any reason, related to any Loan Document, or (iii) any provision of applicable law decree, order or regulation of any jurisdiction purporting to prohibit the payment by the Company or any Guarantor of the Guaranteed Obligations, or otherwise affecting any term of any of the Guaranteed Obligations;

(G)     the election by, or on behalf of, any one or more of the Holders of Guaranteed Obligations, in any proceeding instituted under Chapter 11 of Title 11 of the United States Code (11 U.S.C. 101 et seq.) (the "Bankruptcy Code"), of the application of Section 1111(b)(2) of the Bankruptcy Code; or

(H)     any other act or omission to act or delay of any kind by the Company, the Guarantor, any other guarantor or any Holders of Guaranteed Obligations, or any other circumstance whatsoever which might, but for the provisions of this Section 4, constitute a legal or equitable discharge of the Guarantor's obligations hereunder except as provided in Section 5.

SECTION 6.    Discharge Only Upon Payment In Full: Reinstatement In Certain Circumstances. Subject to Section 25, the Guarantor's obligations hereunder shall remain in full force and effect until all Guaranteed Obligations shall have been indefeasibly paid in full in cash and any commitments in any Loan Documents to provide any financing shall have been terminated. If at any time any payment of the principal of or interest on any Secured Note or any other amount payable by the Company or any other party under the Note Purchase Agreement or any other Loan Document (including a payment effected through exercise of a right of setoff) is rescinded, or is or must be otherwise restored or returned upon the insolvency, bankruptcy or reorganization of the Company or otherwise (including pursuant to a settlement entered into by a

Case: 15-31430    Doc# 3    Filed: 11/16/15    Entered: 11/16/15 16:34:05    Page 166 of 201

Company Entity in its discretion), the Guarantor's obligations hereunder with respect to such payment shall be reinstated as though such payment had been due but not made at such time.

SECTION 7. <u>General Waivers; Additional Waivers</u>.

(A)     General Waivers. The Guarantor irrevocably waives notice of acceptance hereof, presentment, demand for performance, notice of protest and, to the fullest extent permitted by law, any notice not provided for herein, as well as any requirement that at any time any action be taken by any Person against the Company, any other guarantor of the Guaranteed Obligations, or this Guaranty (except if such notice is specifically required to be given to the Guarantor hereunder or under the Loan Documents).

(B)     Additional Waivers. Notwithstanding anything herein to the contrary, the Guarantor hereby absolutely, unconditionally, knowingly, and expressly waives:

(i)     any right it may have to revoke this Guaranty as to future indebtedness;

(ii)     (a) notice of any Secured Notes issued or other financial accommodations made or extended under the Loan Documents or the creation or existence of any Guaranteed Obligations; (b) notice of the amount of the Guaranteed Obligations, subject, however, to the Guarantor's right to make inquiry of the Holders of Guaranteed Obligations to ascertain the amount of the Guaranteed Obligations at any reasonable time; (c) notice of any adverse change in the financial condition of the Company or any other guarantor of any other fact that might increase the Guarantor's risk hereunder; and (d) notice of any Event of Default;

(iii)     its right, if any, to require the Holders of Guaranteed Obligations to institute suit against, or to exhaust any rights and remedies which the Holders of Guaranteed Obligations have or may have against any third party;

(iv)     (a) any rights to assert against the Holders of Guaranteed Obligations any defense (legal or equitable), set-off, counterclaim, or claim which the Guarantor may now or at any time hereafter have against any other party liable to the Holders of Guaranteed Obligations with respect to the Guaranteed Obligations; (b) any defense, set-off, counterclaim, or claim, of any kind or nature, arising directly or indirectly from the present or future lack of perfection, sufficiency, validity, or enforceability of the Guaranteed Obligations or any security therefor; and (c) any defense the Guarantor has to performance hereunder, and any right the Guarantor has to be exonerated, arising by reason of: the impairment or suspension of the Holders of Guaranteed Obligations' rights or remedies against the Guarantors; the alteration by the Holders of Guaranteed Obligations of the Guaranteed Obligations; or the acceptance by the Holders of Guaranteed Obligations of anything in partial satisfaction of the Guaranteed Obligations; and

(v)     any defense arising by reason of or deriving from (a) any claim or defense based upon an election of remedies by the Holders of Guaranteed Obligations; or (b) any election by the Holders of Guaranteed Obligations under Section 1111(b) of Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect (or any

4

Case: 15-31430    Doc# 3    Filed: 11/16/15    Entered: 11/16/15 16:34:05    Page 167 of 201

successor statute), to limit the amount of, or any collateral securing, its claim against the Guarantors.

SECTION 8.   Subordination of Subrogation; Subordination of Intercompany Indebtedness.

(A)   Subordination of Subrogation.   Until the Guaranteed Obligations have been fully, finally and indefeasibly performed and paid in full in cash, the Guarantor (i) shall have no right of subrogation with respect to such Guaranteed Obligations, (ii) waive any right to enforce any remedy which the Holders of Guaranteed Obligations now have or may hereafter have against the Company or the Guarantor of all or any part of the Guaranteed Obligations, and (iii) waive any benefit of, and any right to participate in, any security or collateral given to the Holders of Guaranteed Obligations to secure the payment or performance of all or any part of the Guaranteed Obligations or any other liability of the Company to the Holders of Guaranteed Obligations. Should the Guarantor have the right, notwithstanding the foregoing, to exercise its subrogation rights, the Guarantor hereby expressly and irrevocably (A) subordinates any and all rights at law or in equity to subrogation, reimbursement, exoneration, contribution, indemnification or set off with respect to the Guaranteed Obligations that the Guarantor may have to the payment in full in cash of the Guaranteed Obligations and (B) waives any and all defenses available to a surety, guarantor or accommodation co-obligor until the Guaranteed Obligations are paid in full in cash. The Guarantor acknowledges and agrees that this subordination is intended to benefit the Holders of Guaranteed Obligations and shall not limit or otherwise affect the Guarantor's liability hereunder or the enforceability of this Guaranty, and that the Holders of Guaranteed Obligations and their respective successors and assigns are intended third party beneficiaries of the waivers and agreements set forth in this Section 7(A).

(B)   Subordination of Intercompany Indebtedness.   The Guarantor agrees that any and all claims of the Guarantor against the Company hereunder with respect to any Intercompany Indebtedness (as hereinafter defined) shall be subordinate and subject in right of payment to the prior payment, in full and in cash, of all Guaranteed Obligations; provided that, unless otherwise prohibited as otherwise set forth below, the Guarantor may receive payments of principal and interest from the Company with respect to any indebtedness of the Company to the Guarantor ("Intercompany Indebtedness"). Upon acceleration of the Secured Notes pursuant to Section 4 of the Secured Notes, notwithstanding any right of the Guarantor to ask, demand, sue for, take or receive any payment from the Company , all rights, liens and security interests of the Guarantor, whether now or hereafter arising and howsoever existing, in any assets of the Company shall be and are subordinated to the rights of the Holders of Guaranteed Obligations in those assets. Upon acceleration of any of the Secured Notes pursuant to Section 4 of such Secured Notes, the Guarantor shall not have any right to possession of any such asset or to foreclose upon any such asset, whether by judicial action or otherwise, unless and until all of the Guaranteed Obligations shall have been fully, finally and indefeasibly paid and satisfied in full (in cash). The Guarantor agrees that until the Guaranteed Obligations have been fully, finally and indefeasibly paid in full (in cash) and satisfied,

933559.03A-CHISR01A - MSW

the Guarantor will not assign or transfer to any Person (other than the Holders of Guaranteed Obligations) any claim the Guarantor has or may have against any Obligor.

SECTION 9. <u>Limitation of Guaranty</u>. Notwithstanding any other provision of this Guaranty, the amount guaranteed by the Guarantor hereunder shall be limited to the extent, if any, required so that its obligations hereunder shall not be subject to avoidance under Section 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law. In determining the limitations, if any, on the amount of the Guarantor's obligations hereunder pursuant to the preceding sentence, it is the intention of the parties hereto that any rights of subrogation, indemnification or contribution which the Guarantor may have under this Guaranty, any other agreement or applicable law shall be taken into account.

SECTION 10. <u>Stay of Acceleration</u>. If acceleration of the time for payment of any amount payable by the Company under the Note Purchase Agreement, the Secured Notes, or any other Loan Document is stayed upon the insolvency, bankruptcy or reorganization of the Company, all such amounts otherwise subject to acceleration under the terms of the Note Purchase Agreement, the Secured Notes, or any other Loan Document shall nonetheless be payable by the Guarantor hereunder forthwith on demand by any holder or holders of Secured Notes at the time outstanding, to the extent such amount is payable to such holder.

SECTION 11. <u>Notices</u>. All notices, requests and other communications to any party hereunder shall be given in the manner prescribed in <u>Section 7.7</u> of the Note Purchase Agreement with respect to Iconical, at its notice address therein, with respect to any holder of any Secured Note, at the address specified therein, and with respect to the Guarantor, in care of the Company at the address of the Company set forth in the Note Purchase Agreement or such other address or telecopy number as such party may hereafter specify to the Company in writing.

SECTION 12. <u>No Waivers</u>. No failure or delay by any Holder of Guaranteed Obligations in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies provided in this Guaranty, the Note Purchase Agreement and the other Loan Documents shall be cumulative and not exclusive of any rights or remedies provided by law.

SECTION 13. <u>Successors and Assigns</u>. This Guaranty shall be enforceable by and is for the benefit of the Holders of Guaranteed Obligations and their respective successors and permitted assigns; it being understood and agreed that in the event that the Holders of Guaranteed Obligations assign or transfer all or a portion of their respective rights and obligations under Section 8.1 and 8.2 of the Secured Notes, then the rights hereunder, to the extent applicable to the rights and obligations so assigned, may be transferred with such rights and obligations. This Guaranty shall be binding upon the Guarantor and their respective successors and assigns; <u>provided</u>, that the Guarantor shall not have any right to assign its rights or obligations hereunder without the consent of all of the Required Holders, except as otherwise permitted pursuant to the Note Purchase Agreement or the Secured Notes, and any such assignment in violation of this Section 13 shall be null and void.

6

Case: 15-31430   Doc# 3   Filed: 11/16/15   Entered: 11/16/15 16:34:05   Page 169 of 201

SECTION 14. <u>Changes in Writing</u>. Neither this Guaranty nor any provision hereof may be changed, waived, discharged or terminated orally, but only in writing signed by the Guarantor and the Required Holders.

SECTION 15. <u>Governing Law</u>. This Agreement shall be governed by and construed under the laws of the State of California as applied to agreements among California residents, made and to be performed entirely within the State of California, without giving effect to conflicts of laws principles.

SECTION 16. <u>Venue</u>. ANY SUIT, ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR ANY JUDGMENT ENTERED BY ANY COURT WITH RESPECT TO THIS AGREEMENT OR SUCH TRANSACTIONS SHALL BE BROUGHT AND MAINTINED EXCLUSIVELY IN THE COURTS OF THE STATE OF CALIFORNIA LOCATED IN LOS ANGELES COUNTY OR IN THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA. EACH OF THE PARTIES HERETO IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE COURTS OF THE STATE OF CALIFORNIA LOCATED IN THE COUNTY OF LOS ANGELES AND OF THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA FOR THE PURPOSE OF ANY SUCH ACTION OR PRECEEDING SET FORTH ABOVE AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH ACTION OR PROCEEDING. EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY HAVE OR HEREAFTER MAY HAVE TO THE LAYING OF VENUE OF ANY SUCH ACTION OR PROCEEDING BROGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH ACTION OR PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

SECTION 17. <u>No Strict Construction</u>. The parties hereto have participated jointly in the negotiation and drafting of this Guaranty. In the event an ambiguity or question of intent or interpretation arises, this Guaranty shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any provisions of this Guaranty.

SECTION 18. <u>Taxes, Expenses of Enforcement, etc.</u>

(A)    <u>Taxes</u>. Any and all payments by or on account of any obligation of the Guarantor under this Guaranty shall be made without deduction or withholding for any Taxes, except as required by applicable law.

(B)    <u>Expenses of Enforcement, Etc.</u> The Guarantor agree to reimburse each Holder of Guaranteed Obligations for all reasonable and documented out-of-pocket expenses incurred by each such Holder of Guaranteed Obligations in enforcing Guarantor's obligations hereunder, in accordance with <u>Section 7.9</u> of the Note Purchase Agreement.

7

Case: 15-31430    Doc# 3    Filed: 11/16/15    Entered: 11/16/15 16:34:05    Page 170 of 201

SECTION 19. Setoff.    At any time after all or any part of the Guaranteed Obligations have become due and payable (by acceleration or otherwise), each Holder of Guaranteed Obligations may, without notice to the Guarantor and regardless of the acceptance of any security or collateral for the payment hereof, appropriate and apply toward the payment of all or any part of the Guaranteed Obligations: (i) any indebtedness due from such Holder of Guaranteed Obligations to the Guarantor, and (ii) any moneys, credits or other property belonging to the Guarantor, at any time held by or coming into the possession of such Holder of Guaranteed Obligations or any of their respective affiliates.

SECTION 20. Financial Information.    The Guarantor hereby assumes responsibility for keeping itself informed of the financial condition of the Company, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations, or any part thereof, that diligent inquiry would reveal, and each Guarantor hereby agrees that none of the Holders of Guaranteed Obligations shall have any duty to advise the Guarantor of information known to any of them regarding such condition or any such circumstances. In the event any Holder of Guaranteed Obligations, in its sole discretion, undertakes at any time or from time to time to provide any such information to the Guarantor, such Holder of Guaranteed Obligations shall be under no obligation (i) to undertake any investigation or (ii) to disclose any information to the Guarantor.

SECTION 21. Severability.    Wherever possible, each provision of this Guaranty shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Guaranty shall be prohibited by or invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity without invalidating the remainder of such provision or the remaining provisions of this Guaranty.

SECTION 22. Merger.    This Guaranty represents the final agreement of the Guarantor with respect to the matters contained herein and may not be contradicted by evidence of prior or contemporaneous agreements, or subsequent oral agreements, between the Guarantor and any Holder of Guaranteed Obligations.

SECTION 23. Headings.    Section headings in this Guaranty are for convenience of reference only and shall not govern the interpretation of any provision of this Guaranty.

SECTION 24. Termination of Guaranty.    Subject to reinstatement pursuant to Section 6 hereof, this Guaranty and all of the obligations of the Guarantor under this Guaranty shall terminate automatically and without further action upon termination of the Guaranteed Obligations and termination of any commitments in any Loan Documents to provide any financing.

8

Case: 15-31430    Doc# 3    Filed: 11/16/15    Entered: 11/16/15 16:34:05    Page 171 of 201

IN WITNESS WHEREOF, the Guarantor has caused this Guaranty to be duly executed by its authorized officer as of the day and year first above written.

PULSER MEDIA, INC.

By: _____

Name:    Anthony Bay

Title:    Chief Executive Officer

# EXHIBIT "8"

## UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

A. NAME & PHONE OF CONTACT AT FILER (optional)
UCC Filing Department        800-828-0938

B. E-MAIL CONTACT AT FILER (optional)
alb.UCC.filings@nationalcorp.com

C. SEND ACKNOWLEDGMENT TO: (Name and Address)

National Corporate Research, Ltd.
194 Washington Avenue
Suite 310
Albany, NY 12210

Delaware Department of State
U.C.C. Filing Section
Filed: 01:14 PM 10/20/2015
U.C.C. Initial Filing No: 2015 4794219

Service Request No: 20150569740

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Rdio, Inc. | | | |
| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1550 Bryant Street, Suite 200 | San Francisco | CA | 94103 | US |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |
| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Iconical Investments II LP, as Collateral Agent | | | |
| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 15260 Ventura Blvd. Suite 2000 | Sherman Oaks | CA | 91403 | US |

4. COLLATERAL: This financing statement covers the following collateral:
All assets of the Debtor whether now owned or hereafter acquired

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction   ☐ Manufactured-Home Transaction   ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien   ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
Filed with: DE - Secretary of State

F#493387
A#690610

FILING OFFICE COPY — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)      International Association of Commercial Administrators (IACA)

# EXHIBIT "9"

# INTERCREDITOR AGREEMENT

**THIS INTERCREDITOR AGREEMENT** (this "**Agreement**"), dated as of October 19, 2015, is made by and between **ICONICAL INVESTMENTS II LP**, as collateral agent for First Lien Secured Parties (as hereinafter defined) (together with any replacement or successor agent, "**First Lien Agent**"), and **PULSER MEDIA, INC.**, as lender under the Second Lien Note (as hereinafter defined) (together with any replacement or successor, the "**Second Lien Lender**"; and together with First Lien Agent, the "**Agents**"). Capitalized terms used but not defined in the recitals shall have the meanings given to such terms in Section 1 hereof.

## RECITALS:

**A.**     Pursuant to the First Lien Note Purchase Agreement, the First Lien Purchasers (together with the First Lien Agent, the "**First Lien Secured Parties**") may, in their sole discretion, provide to RDIO, INC., a Delaware corporation (the "**Company**"), an aggregate principal amount of up to **$5,000,000.00** against the issuance and delivery by the Company of convertible secured promissory notes for such aggregate principal amount, to be guaranteed by Pulser Media, Inc. ("**Holdings**"; and together with the Company, "**Debtors**"), and, in connection therewith, each Debtor has granted or will grant to the First Lien Agent, for the benefit of the First Lien Purchasers, Liens on the Collateral.

**B.**     The Debtors have executed and delivered to the First Lien Agent a Security Agreement dated as of the date hereof (the "**First Lien Security Agreement**").

**C.**     Pursuant to the Second Lien Note, the Second Lien Lender (together with the First Lien Secured Parties, the "**Secured Parties**") have agreed to provide to the Company loans in the aggregate principal amount of up to **$208,000,000.00**, and, in connection therewith, the Company has granted to the Second Lien Lender Liens on the Collateral.

**D.**     The Secured Parties desire to set forth their agreement with respect to, among other things, (i) the relative priorities of the Liens securing the First Lien Claims and the Liens securing the Second Lien Claims, (ii) the exercise of remedies with respect to the Collateral, and (iii) the allocation of any realizations upon the Collateral.

**NOW THEREFORE**, the parties hereto agree as follows:

**1.**     **Definitions**.  Unless otherwise specified herein, references to the Credit Documents and other contractual instruments shall be deemed to include all subsequent amendments, restatements, amendment and restatements, extensions, supplements and other modifications thereto to the extent entered into in accordance with the terms of the First Lien Note Purchase Agreement, the Second Lien Note and this Agreement.  All terms used in this Agreement in the singular form shall have comparable meanings when used in the plural form and vice versa.  As used herein (including in the recitals hereof), the following terms shall have the following meanings:

"**Agreements**" means, collectively, the First Lien Note Purchase Agreement and the Second Lien Note.

757768.04A-LACSR01A - MSW

"**Affiliate**", as applied to any Person, means any other Person directly or indirectly controlling, controlled by, or under common control with, that Person. For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling", "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

"**Bankruptcy Code**" means Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"**Business Day**" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of California or is a day on which banking institutions located in such state are authorized or required by law or other governmental action to close.

"**Cash**" means money, currency or a credit balance in a Deposit Account.

"**Claims**" means the First Lien Claims and the Second Lien Claims.

"**Collateral**" means all collateral pledged or secured or purported to be pledged or secured by the Collateral Documents.

"**Collateral Documents**" means the First Lien Collateral Documents and the Second Lien Note.

"**Collateral Enforcement Action**" means, with respect to the Collateral of any Secured Party, exercising any rights or remedies, including, without limitation, repossessing, selling, leasing or otherwise disposing by such Secured Party or its agent of all or any part of such Collateral, or exercising notification or collection rights with respect to all or any portion thereof, or attempting or agreeing to do so; commencing or prosecuting the enforcement with respect to such Collateral of any of the rights and remedies under any of the applicable agreements or documents to which such Secured Party is a party or applicable laws; offering or proposing to apply any of the Second Lien Claims as a credit on account of the purchase price for any Collateral payable by Second Lien Secured Parties at any public or private sale of the Collateral; appropriating, setting off, recouping or applying any part or all of such Collateral in the possession of, or coming into the possession of, such Secured Party or its agent or bailee, to such Secured Party's Claim; or exercising any other rights or remedies of a secured creditor under the UCC of any applicable jurisdiction or other applicable laws or under the Bankruptcy Code.

"**Collateral Records**" means books, records, ledger cards, files, correspondence, customer lists, blueprints, technical specifications, manuals, computer software, computer printouts, tapes, disks and related data processing software and similar items that at any time evidence or contain information relating to any of the Collateral or are otherwise necessary or helpful in the collection thereof or realization thereupon.

"**Company**" has the meaning assigned to that term in the introductory paragraph hereof.

"**Credit Documents**" means, collectively, the First Lien Loan Documents and the Second Lien Note, as applicable.

2

757768.04A-LACSR01A - MSW

**"Deposit Account"** means a demand, time, savings, passbook or similar account maintained with a Person engaged in the business of banking, including a savings bank, savings and loan association, credit union or trust company.

**"DIP Financing"** has the meaning assigned to that term in Section 5(b) hereof.

**"Enforcement Actions"** mean, collectively, Collateral Enforcement Actions and Payment Enforcement Actions.

**"First Lien Claims"** means all present and future claims of any one or more of First Lien Secured Parties against the Debtors, or any of them, for the payment of money arising out of or related to the First Lien Loans, and the purchase of notes or other financial accommodations by First Lien Secured Parties to the Debtors under the First Lien Note Purchase Agreement, any refinancing, replacement, refunding or restatement of all or any portion thereof, any of the other First Lien Loan Documents or a DIP Financing, including, without limitation, all claims for principal, interest, fees and costs (including but not limited to post-petition interest, fees and costs (whether accruing or which would have accrued but for a bankruptcy, insolvency, receivership or similar proceeding) even if such interest, fees and costs are not an allowed claim enforceable against any Debtor in a bankruptcy, insolvency, receivership or similar proceeding), indemnification obligations and reimbursement of fees, costs and expenses, or otherwise, whether fixed or contingent, matured or unmatured, liquidated or unliquidated.

**"First Lien Collateral Documents"** means the First Lien Security Agreement and any other document or instrument executed and delivered pursuant to the First Lien Note Purchase Agreement or any First Lien Loan Document at any time or otherwise pursuant to which a Lien is granted by a Debtor to secure the First Lien Claims or under which rights or remedies with respect to any such Lien are governed.

**"First Lien Loan Documents"** means the First Lien Note Purchase Agreement and the "Loan Documents" as defined in the First Lien Note Purchase Agreement.

**"First Lien Loans"** means the "Advances" made under, and as defined in, each First Lien Note.

**"First Lien Note Purchase Agreement"** means that certain Note Purchase Agreement, dated as of the date hereof, by and among the Company, the First Lien Purchasers party thereto, and the First Lien Agent, as amended, restated, amended and restated, supplemented or otherwise modified from time to time, and any replacement agreement or facility existing at any time to refund, refinance, replace or renew (including subsequent or successive refinancings, replacements and renewals), in whole or in part, amounts outstanding thereunder from time to time, commitments thereunder including without limitation any increases in the obligations thereunder from time to time.

**"First Lien Notes"** means the "Notes" as defined in the First Lien Note Purchase Agreement.

**"First Lien Purchasers"** means "Purchasers" as defined in the First Lien Note Purchase Agreement, together with their successors and assigns.

757768.04A-LACSR01A - MSW

"**Insolvency or Liquidation Proceeding**" means (i) any voluntary or involuntary case or proceeding under the Bankruptcy Code with respect to any Debtor as a debtor, (ii) any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding with respect to any Debtor as a debtor or with respect to any substantial part of their respective assets, (iii) any liquidation, dissolution, reorganization or winding up of any Debtor whether voluntary or involuntary and whether or not involving insolvency or bankruptcy or (iv) any assignment for the benefit of creditors or any other marshalling of assets and liabilities of any Debtor.

"**Lien**" means any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any conditional sale or other title retention agreement, any lease in the nature thereof, and any agreement to give any security interest) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing

"**Loans**" means the First Lien Loans and the Second Lien Loans.

"**Paid in Full**" means the irrevocable termination of all commitments to lend to the Company and to purchase First Lien Notes, the payment in full in cash of all First Lien Claims (except Unasserted Obligations), including (without limitation) principal, interest, fees, costs (including but not limited to post-petition interest, fees and costs (whether accruing or which would have accrued but for a bankruptcy, insolvency, receivership or similar proceeding) even if such interest, fees and costs are not an allowed claim enforceable against any Debtor in a bankruptcy, insolvency, receivership or similar proceeding) and premium (if any).

"**Payment Enforcement Action**" means (a) an affirmative action to take from or for the account of the Company by set-off or in any other manner, the whole or any part of any moneys which may now or hereafter be owing by the Company with respect to the Second Lien Claims or the First Lien Claims, as applicable, (b) to sue for payment of, or to initiate or participate with others in any suit, action or proceeding against the Company to (i) enforce payment of or to collect the whole or any part of the Second Lien Claims or the First Lien Claims, as applicable, (ii) commence or join with others to commence a proceeding in the capacity of the Second Lien Lender, or (iii) commence judicial enforcement of any of the rights and remedies under the Second Lien Note or applicable law with respect to the Second Lien Claims, or under the First Lien Note Purchase Agreement or applicable law with respect to the First Lien Claims, (c) to accelerate the Second Lien Claims or the First Lien Claims, as applicable, (d) to exercise any put option or to cause the Company to honor any redemption or mandatory prepayment obligation under the Second Lien Note, (e) to take any action under the provisions of any state or federal law, or other applicable law, or under any contract or agreement, to enforce, foreclose upon, take possession of or sell any property or assets of the Company in order to satisfy the Second Lien Note, or (f) to give a notice to any court or governmental authority or the Company indicating an intent to take any of the actions described above in this definition or appoint a receiver, interim receiver or trustee of the Company or of its assets if such actions are not otherwise permitted under the Second Lien Note, to the extent such actions are taken in the capacity of the Second Lien Lender.

"**Person**" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies,

757768.04A-LACSR01A - MSW

Case: 15-31430   Doc# 3   Filed: 11/16/15   Entered: 11/16/15 16:34:05   Page 179 of 201

joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and governments (whether Federal, state or local, domestic or foreign, and including political subdivisions thereof) and agencies or other administrative or regulatory bodies thereof.

"**Proceeds**" has the meaning given to such term in the UCC.

"**Second Lien Claims**" means all present and future claims of the Second Lien Lender against the Company for the payment of money arising out of or related to the extension of credit or other financial accommodations by the Second Lien Lender to the Company under the Second Lien Note, any refinancing, replacement refunding or restatement of all or any portion thereof, including, without limitation, all claims for principal and interest (including but not limited to post-petition interest, fees and costs even if such interest fees and costs are not an allowed claim enforceable against the Company in a bankruptcy case under applicable law), indemnification obligations and reimbursement of fees, costs and expenses, or otherwise, whether fixed or contingent, matured or unmatured, liquidated or unliquidated.

"**Second Lien Note**" means that certain Third Amended and Restated Secured Promissory Note, dated as of July 10, 2015, by and among the Company and the Second Lien Lender, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, and any replacement agreement or facility existing at any time to refund, refinance, replace or renew (including subsequent or successive refinancings, replacements and renewals), in whole or in part, amounts outstanding thereunder from time to time.

"**Second Lien Loan**" means each "Advance" as defined in the Second Lien Note.

"**UCC**" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

"**Unasserted Obligations**" means, at any time, obligations for taxes, costs, indemnifications, reimbursements, damages and other liabilities (except for the principal of and interest on, and fees relating to, any indebtedness) in respect of which no claim or demand for payment has been made (or, in the case of obligations for indemnification, no notice for indemnification has been issued by the indemnitee) at such time.

2.          **Lien Subordination**.

         (a) All Liens in favor of the Second Lien Lender now or hereafter existing with respect to any Collateral, including without limitation judgment Liens, shall be subject, subordinate and junior in all respects and at all times to the Liens in favor of the First Lien Secured Parties now or hereafter existing with respect to such Collateral (it being understood that no such Liens of the Second Lien Lender shall extend to or cover any assets other than the assets subject to the first priority Liens of the First Lien Secured Parties).

         (b) The foregoing allocation of priorities shall govern the relationship of the parties with respect to the Collateral irrespective of the time or order of attachment or perfection of any of such Liens, the time or order of filing of financing statements, the acquisition of purchase money or other Liens, the time of giving or failure to give notice of the acquisition or

757768.04A-LACSR01A - MSW

Case: 15-31430    Doc# 3    Filed: 11/16/15    Entered: 11/16/15 16:34:05    Page 180 of 201

expected acquisition of purchase money or other Liens, the rules for determining priority under the UCC or any other law or rule governing relative priorities of Secured Parties, the fact that any such Liens in favor of any First Lien Secured Party with respect to any Collateral are (i) subordinated to any Lien securing any obligation of any Debtor other than the Second Lien Claims or (ii) otherwise subordinated, voided, avoided, invalidated or lapsed, or any other circumstances whatsoever.

(c) The Second Lien Lender agrees that it shall not directly or indirectly take any action to contest or challenge the validity, legality, enforceability, perfection or priority of any of the First Lien Claims, any of the documents or instruments evidencing such First Lien Claims or any of the Liens of First Lien Agent on any of the Collateral.

(d) For the purposes of the foregoing allocation of priorities, any claim of a right of set-off shall be treated in all respects as a security interest, and no claimed right of set-off shall be asserted by the Second Lien Lender to defeat or diminish the rights or priorities of the Lien of any First Lien Secured Party provided for herein.

(e) The priorities set forth herein are solely for the purpose of establishing the relative rights of Secured Parties, and there are no other Persons who are intended to be benefited in any way by this Agreement. Nothing herein affects the relative priority of any other secured party of a Debtor who is not a party to this Agreement.

(f) Each Secured Party and each Debtor shall promptly execute and deliver to any Secured Party any and all financing statements, subordination agreements and other documents reasonably requested by such Secured Party to the extent necessary to effectuate the terms of this Agreement.

(g) The parties hereto agree that until all First Lien Claims have been Paid in Full, the Second Lien Lender shall not, without the consent of the First Lien Agent, acquire or hold any Lien on any assets of the Company securing any Second Lien Claims which assets are not also subject to the first priority Lien in favor of the First Lien Secured Parties under the First Lien Loan Documents. If the Second Lien Lender shall (whether or not in breach hereof) acquire or hold any Lien on any assets of any Debtor securing any Second Lien Claims which assets are not also subject to the first priority Lien in favor of First Lien Secured Parties under the First Lien Loan Documents, then the Second Lien Lender shall, notwithstanding anything to the contrary in any other Second Lien Loan Document, (i) be deemed to hold and have held such Lien for the benefit of First Lien Agent as security for the First Lien Claims and shall assign such Lien to First Lien Agent (in which case the Second Lien Lender may retain a junior Lien on such assets subject to the terms hereof) or (ii) if so requested by First Lien Agent, release such Lien.

(h) All Second Lien Loan Documents shall be submitted to the First Lien Agent for its review, and the First Lien Agent may require that any or all such Second Lien Loan Documents bear a legend disclosing the existence of this Intercreditor Agreement in form and substance reasonably satisfactory to the First Lien Agent.

6

Case: 15-31430   Doc# 3   Filed: 11/16/15   Entered: 11/16/15 16:34:05   Page 181 of 201

3. **Enforcement Rights**.

(a) <u>Exclusive Enforcement</u>.  The Second Lien Lender agrees that until all First Lien Claims have been Paid in Full, (i) it will not take any Collateral Enforcement Action with respect to any Collateral; and (ii) subject to the terms of this Agreement, First Lien Agent may, at its option at any time, take any action and exercise any right or remedy it deems appropriate with respect to the Collateral.

(b) <u>Cooperation</u>.  The Second Lien Lender agrees that it shall take such actions (at the sole cost and expense of Company) as First Lien Agent shall request in connection with the exercise by First Lien Secured Parties of its rights set forth herein.

(c) <u>No Additional Rights for Company Hereunder</u>.  Except as provided in <u>Section 3(d)</u> hereof, if any First Lien Secured Party or the Second Lien Lender shall enforce its rights or remedies in violation of the terms of this Agreement, Company shall not be entitled to use such violation as a defense to any action by any First Lien Secured Party or the Second Lien Lender, nor to assert such violation as a counterclaim or basis for set-off or recoupment against any First Lien Secured Party or the Second Lien Lender.

(d) <u>Actions upon Breach</u>.

(i)  If the Second Lien Lender, contrary to this Agreement, commences or participates in any Collateral Enforcement Action against Company or the Collateral, the Company, with the prior written consent of First Lien Agent, may interpose as a defense or dilatory plea the making of this Agreement, and any First Lien Secured Party may intervene and interpose such defense or plea in its or their name or in the name of Company.

(ii)  Should the Second Lien Lender, contrary to this Agreement, in any way take, or attempt to or threaten to take any action with respect to the Collateral (including, without limitation, any attempt to realize upon or enforce any remedy with respect to this Agreement), or fail to take any action required by this Agreement, any First Lien Secured Party (in its or their own name or in the name of Company) or, with the prior written consent of the First Lien Agent, Company may obtain relief against the Second Lien Lender by injunction, specific performance and/or other appropriate equitable relief, it being understood and agreed by the Second Lien Lender that (A) First Lien Secured Parties' damages from its actions may at that time be difficult to ascertain and may be irreparable, and (B) the Second Lien Lender waives any defense that Company and/or First Lien Secured Parties cannot demonstrate damage and/or be made whole by the awarding of damages.

4. **Standstill and Waivers**.  The Second Lien Lender agrees that until the First Lien Claims are Paid in Full:

(a) it will not take or cause to be taken any action, the purpose or effect of which is to make any Lien in respect of any Collateral *pari passu* with or senior to, or to give the Second Lien Lender any preference or priority relative to, the Liens in favor of First Lien Secured Parties with respect to such Collateral;

7

Case: 15-31430    Doc# 3    Filed: 11/16/15    Entered: 11/16/15 16:34:05    Page 182 of 201

(b) it will not oppose, object to, interfere with, hinder or delay, in any manner, whether by judicial proceedings (including without limitation the filing of an Insolvency or Liquidation Proceeding) or otherwise, any foreclosure, sale, lease, exchange, transfer or other disposition of the Collateral by First Lien Agent or any other First Lien Secured Party or any other Collateral Enforcement Action taken by or on behalf of First Lien Agent or any other First Lien Secured Party;

(c) it has no right to (i) direct either First Lien Agent or any other First Lien Secured Party to exercise any right, remedy or power with respect to the Collateral or pursuant to the First Lien Loan Documents or (ii) consent or object to the exercise by First Lien Agent or any other First Lien Secured Party of any right, remedy or power with respect to the Collateral or pursuant to the First Lien Loan Documents or to the timing or manner in which any such right is exercised or not exercised (or, to the extent it may have any such right described in this clause (c), whether as a junior lien creditor or otherwise, it hereby irrevocably waives such right);

(d) it will not institute any suit or other proceeding or assert in any suit, Insolvency or Liquidation Proceeding or other proceeding any claim against First Lien Agent or any other First Lien Secured Party seeking damages from or other relief by way of specific performance, instructions or otherwise, with respect to, and neither First Lien Agent nor any other First Lien Secured Party shall be liable for, any action taken or omitted to be taken by First Lien Agent or any other First Lien Secured Party with respect to the Collateral or pursuant to the First Lien Loan Documents;

(e) it will not make any judicial or nonjudicial claim or demand or commence any judicial or non-judicial proceedings against any Debtor or any of its subsidiaries or affiliates under or with respect to the Second Lien Note seeking payment or damages from or other relief by way of specific performance, instructions or otherwise under or with respect to the Second Lien Note (other than filing a proof of claim) or exercise any right, remedy or power under or with respect to, or otherwise take any action to enforce, other than filing a proof of claim, the Second Lien Note;

(f) it will not commence judicial or nonjudicial foreclosure proceedings with respect to, seek to have a trustee, receiver, liquidator or similar official appointed for or over, attempt any action to take possession of any Collateral, exercise any right, remedy or power with respect to, or otherwise take any action to enforce its interest in or realize upon, the Collateral or pursuant to the Second Lien Note; and

(g) it will not exercise any other rights (other than the right to perfect the Liens in favor of the Second Lien Lender) or remedies under the Second Lien Note with respect to any Collateral.

5.      **Insolvency or Liquidation Proceedings.**

(a)      _Filing of Motions._ Until the First Lien Claims are Paid in Full, the Second Lien Lender agrees that it shall not, in or in connection with any Insolvency or Liquidation Proceeding, file any pleadings or motions, take any position at any hearing or proceeding of any nature, or otherwise take any action whatsoever, in each case in respect of any of the Collateral,

8

Case: 15-31430    Doc# 3    Filed: 11/16/15    Entered: 11/16/15 16:34:05    Page 183 of 201

including, without limitation, with respect to the determination of any Liens or claims held by First Lien Agent (including the validity and enforceability thereof) or any other First Lien Secured Party or the value of any claims of such parties under Section 506(a) of the Bankruptcy Code or otherwise; provided that (i) the Second Lien Lender may defend against any action in a bankruptcy to avoid its Lien on the Collateral, (ii) the Second Lien Lender shall be entitled to file any necessary responsive or defensive pleadings in opposition to any motion, claim, adversary proceeding or other pleading made by any person objecting to or otherwise seeking the disallowance of the claims of the Second Lien Lender, including without limitation any claims secured by the Collateral, if any, in each case in accordance with the terms of this Agreement, and (iii) the Second Lien Lender shall be entitled to file any proof of claim and other filings and make any arguments and motions that are, in each case, in accordance with the terms of this Agreement, with respect to the Second Lien Claims and the Collateral.

(b)     _Financing Matters._  Until the First Lien Claims are Paid in Full, if any Debtor becomes subject to any Insolvency or Liquidation Proceeding, and if the First Lien Secured Parties desire to consent (or not object) to the use of cash collateral on which First Lien Secured Parties or any other creditor has a Lien or to provide financing to any Debtor under the Bankruptcy Code or to consent (or not object) to the provision of such financing to any Debtor by any third party ("**DIP Financing**"), then the Second Lien Lender agrees that it (i) will allow such DIP Financing to be secured by Liens on all or a part of the assets of the Company which shall be superior in priority to the Liens on the assets of the Company held by any other person, (ii) will be deemed to have consented to, and will raise no objection to, the use of such cash collateral or to such DIP Financing, (iii) will not request or accept any form of adequate protection or any other relief in connection with the use of such cash collateral or such DIP Financing except as set forth in _Section 5(d)_, and (iv) to the extent the Liens in favor of First Lien Secured Parties are subordinated or _pari passu_ with such DIP Financing, will subordinate (and will be deemed hereunder to have subordinated) the Liens in favor of the Second Lien Lender (x) to such DIP Financing with the same terms and conditions as the Liens in favor of First Lien Secured Parties are subordinated thereto (and such subordination will not alter in any manner the terms of this Agreement), (y) to any adequate protection provided to First Lien Secured Parties and (z) to any "carve-out" for administrative, professional and United States Trustee fees agreed to by First Lien Agent or First Lien Secured Parties.

(c)     _Relief From the Automatic Stay._  The Second Lien Lender agrees that until the First Lien Claims are Paid in Full, (i) it will not seek relief from the automatic stay or from any other stay in any Insolvency or Liquidation Proceeding or take any action in derogation thereof, in each case in respect of any Collateral, without the prior written consent of First Lien Agent (which consent shall not be unreasonably delayed, conditioned or withheld) and (ii) they will not oppose any action by First Lien Agent or the holders of First Lien Claims seeking relief from the automatic stay or any other stay.

(d)     _Adequate Protection._  The Second Lien Lender agrees that until the First Lien Claims are Paid in Full, it shall not object to, contest, or support any other Person objecting to or contesting, (i) any request by First Lien Agent or any other First Lien Secured Party for adequate protection, (ii) any objection by First Lien Agent or any other First Lien Secured Party to any motion, relief, action or proceeding based on a claim of a lack of adequate protection or (iii) the payment of interest, fees, expenses or other amounts to First Lien Agent or any other First Lien

9

Case: 15-31430   Doc# 3   Filed: 11/16/15   Entered: 11/16/15 16:34:05   Page 184 of 201

Secured Party under Section 506(b) or 506(c) of the Bankruptcy Code or otherwise. Notwithstanding anything contained in this Section and in Section 5(b) hereof, in any Insolvency or Liquidation Proceeding, (x) the Second Lien Lender may seek, support, accept or retain adequate protection (A) only if First Lien Secured Parties are granted adequate protection that includes replacement Liens on additional collateral and superpriority claims and (B) solely in the form of (1) a replacement Lien on such additional collateral, subordinated to the Liens in favor of First Lien Secured Parties and such DIP Financing on the same basis as the other Liens in favor of the Second Lien Lender are so subordinated to the First Lien Claims under this Agreement subject to the "carve-out" in Section 5(b)(iii)(z) above and (2) solely to the extent that the Collateral pledged or secured by the Second Lien Note has been diminished in connection with such Insolvency or Liquidation Proceeding, superpriority claims junior in all respects to the superpriority claims granted to First Lien Secured Parties and superpriority claims granted to lenders under any DIP Financing, and (y) in the event the Second Lien Lender receives adequate protection, including in the form of additional collateral, then the Second Lien Lender agrees that First Lien Administrative Agent shall have a senior Lien and claim on such adequate protection as security for the First Lien Claims and that any Lien on any additional collateral securing the Second Lien Claims shall be subordinated to the Liens on such collateral securing the First Lien Claims and any DIP Financing (and all Obligations relating thereto) and any other Liens granted to First Lien Secured Parties as adequate protection, with such subordination to be on the same terms that the other Liens securing the Second Lien Claims are subordinated to such First Lien Claims under this Agreement. For avoidance of doubt, the Second Lien Lender shall not seek or receive any adequate protection payments in the form of cash or cash equivalents. Notwithstanding anything to the contrary herein, the Second Lien Lender hereby irrevocably agrees pursuant to Section 1129(a)(9) of the Bankruptcy Code that any and all superpriority claims granted to the Second Lien Lender may be paid under any plan of reorganization in any combination of cash, debt, equity or other property having a value on the effective date of such plan equal to the allowed amount of such superpriority claims.

(e)     Waivers.  The Second Lien Lender agrees not to initiate or prosecute or join with any other Person to initiate or prosecute any claim, action or other proceeding (i) challenging the enforceability of the First Lien Secured Parties' claims as fully secured claims with respect to all or part of the First Lien Claims (including those consisting of post-petition interest, fees or expenses) or opposing any action by the First Lien Agent or the other First Lien Secured Parties to enforce their rights or remedies arising under the First Lien Loan Documents in a manner which is not prohibited by this Agreement, or (ii) challenging the enforceability, validity, priority or perfected status of any Liens on assets securing the First Lien Claims under the First Lien Loan Documents.

(f)     Asset Dispositions in an Insolvency or Liquidation Proceeding.  The Second Lien Lender shall not, in an Insolvency or Liquidation Proceeding or otherwise, oppose any sale or disposition of any assets of any Debtor that is supported by First Lien Secured Parties, and the Second Lien Lender will be deemed to have consented under Section 363 of the Bankruptcy Code (and otherwise) to any sale supported by First Lien Secured Parties and to have released its Liens in such assets upon the consummation of such sale. The First Lien Secured Parties agree that the Second Lien Lender shall be permitted to bid for or purchase Collateral that is subject to any sale in an insolvency or liquidation proceeding in accordance with Section 363(k) of the Bankruptcy Code; provided, that (i) the cash component of any such bid by the Second Lien

10

757768.04A-LACSR01A - MSW

Lender is no less than the highest cash component of any other bid or offer to purchase such Collateral approved by the First Lien Secured Parties and (ii) the First Lien Secured Parties reserve all rights to object to or oppose the terms of any such sale of Collateral.

(g)  Separate Grants of Security and Separate Classification. The Second Lien Lender acknowledges and agrees that (i) the grants of Liens pursuant to the First Lien Loan Documents and the Second Lien Note constitute two separate and distinct grants of Liens and (ii) because of, among other things, their differing rights in the Collateral, the Second Lien Claims are fundamentally different from the First Lien Claims and must be separately classified in any plan of reorganization proposed or adopted in an Insolvency or Liquidation Proceeding. To further effectuate the intent of the parties as provided in the immediately preceding sentence, if it is held that the claims of First Lien Secured Parties and the Second Lien Lender in respect of the Collateral constitute only one secured claim (rather than separate classes of senior and junior secured claims), then the Second Lien Lender hereby acknowledges and agrees that all distributions shall be made as if there were separate classes of senior and junior secured claims against Debtors in respect of the Collateral with the effect being that, to the extent that the aggregate value of the Collateral is sufficient (for this purpose ignoring all claims held by the Second Lien Lender), First Lien Secured Parties shall be entitled to receive, in addition to amounts distributed to them in respect of principal, pre-petition interest, reimbursement of expenses and other claims, all amounts owing in respect of post-petition interest before any distribution is made in respect of the claims held by the Second Lien Lender, with the Second Lien Lender hereby acknowledging and agreeing to turn over to First Lien Secured Parties amounts otherwise received or receivable by it to the extent necessary to effectuate the intent of this sentence, even if such turnover has the effect of reducing the claim or recovery of the Second Lien Lender.

(h)  No Waivers of Rights of First Lien Secured Parties. Nothing contained herein shall prohibit or in any way limit First Lien Agent or any other First Lien Secured Party from objecting in any Insolvency or Liquidation Proceeding or otherwise to any action taken by the Second Lien Lender, including the seeking by the Second Lien Lender of adequate protection or the asserting by the Second Lien Lender of any of its rights and remedies under the Second Lien Note or otherwise.

(i)  Payment Subordination.

(i)  All First Lien Claims shall first be Paid in Full before any distribution, whether in cash, securities or other property, shall be made to the Second Lien Lender on account of any Second Lien Claims.

(ii)  (1) Any distribution, whether in cash, securities or other property which would otherwise, but for the terms hereof, be payable or deliverable in respect of the Second Lien Claims shall be paid or delivered directly to the First Lien Agent (to be held and/or applied by the First Lien Agent to the First Lien Claims until all First Lien Claims are Paid in Full); (2) the Company irrevocably authorizes, empowers and directs any debtor, debtor in possession, receiver, interim receiver, trustee, liquidator, custodian, conservator or other person having authority, to pay or otherwise deliver all such distributions to the First Lien Agent (to be held and/or applied by the First Lien Agent to

11

Case: 15-31430   Doc# 3   Filed: 11/16/15   Entered: 11/16/15 16:34:05   Page 186 of 201

the First Lien Claims until all First Lien Claims are Paid in Full); and (3) the Company also irrevocably authorizes and empowers the First Lien Agent to demand, sue for, collect and receive any and all such distributions.

(j)     Other Matters.  To the extent that the Second Lien Lender has or acquires rights under Section 363 or Section 364 of the Bankruptcy Code with respect to any of the Collateral, the Second Lien Lender agrees not to assert any of such rights without the prior written consent of First Lien Agent; provided that if requested by First Lien Agent, the Second Lien Lender shall timely exercise such rights in the manner requested by First Lien Agent, including any rights to payments in respect of such rights.

(k)     Effectiveness in Insolvency or Liquidation Proceeding.  This Agreement, which the parties hereto expressly acknowledge is a "subordination agreement" under Section 510(a) of the Bankruptcy Code, shall be effective before and after the commencement of an Insolvency or Liquidation Proceeding.  All references in this Agreement to any Debtor shall include such Debtor as a debtor-in-possession and any receiver or trustee for such Debtor in any Insolvency or Liquidation Proceeding.

6.     **Distributions of Proceeds of Collateral**.  All realizations upon the Collateral or any part thereof (whether occurring before or after the commencement of a case under the Bankruptcy Code and including realizations resulting from sales by a Debtor under Section 363 of the Bankruptcy Code), including, without limitation, any realizations by way of a Collateral Enforcement Action and any realizations occurring after an Event of Default, shall be applied as follows:

(a)     First, to First Lien Agent's costs and expenses of sale, collection or other realization, including reasonable compensation to First Lien Agent and their respective agents and counsel, all expenses, liabilities and advances made or incurred by First Lien Agent in connection therewith, all amounts for which First Lien Agent is entitled to indemnification under the First Lien Loan Documents, all advances under the First Lien Loan Documents for the account of Debtors, and to the payment of all costs and expenses paid or incurred by First Lien Agent in connection with the exercise of any right or remedy under the First Lien Loan Documents;

(b)     Second, to the First Lien Claims until the First Lien Claims are Paid in Full in accordance with the Credit Documents;

(c)     Third, to Second Lien Lender's costs and expenses of sale, collection or other realization, including reasonable compensation to Second Lien Lender and its agents and counsel, all expenses, liabilities and advances made or incurred by Second Lien Lender in connection therewith, all amounts for which Second Lien Lender is entitled to indemnification under the Second Lien Note, all advances under the Second Lien Note for the account of the Company, and to the payment of all costs and expenses paid or incurred by Second Lien Lender in connection with the exercise of any right or remedy under the Second Lien Note;

(d)     Fourth, to the Second Lien Claims until the Second Lien Claims are Paid in Full in accordance with the Credit Documents; and

757768.04A-LACSR01A - MSW

(e) <u>Fifth</u>, to Company as its interests may appear or as otherwise required by applicable law.

**7.**      <u>Amendment of First Lien Loan Documents and Second Lien Note</u>.

(a) Until the First Lien Claims are Paid in Full in accordance with the Credit Documents, and notwithstanding anything to the contrary contained in the Second Lien Note, the Second Lien Lender shall not, without the prior written consent of First Lien Agent, agree to any amendment to, or waiver of any of its rights under, the Second Lien Note that increases the interest rate or fees in connection with the Second Lien Note, shortens the maturity of loans made thereunder or requires or permits any payment thereunder on a date that is earlier than provided for in the date hereof, adds or makes more rigorous any covenant, adds any event of default or is otherwise adverse to the First Lien Secured Parties or the First Lien Agent in the good faith judgment of the First Lien Agent. For the avoidance of doubt, nothing herein shall be deemed to require any consent from the Second Lien Lender, or otherwise limit any right of the First Lien Secured Parties or the First Lien Agent, to amend or waive any rights under any of the First Lien Loan Documents.

(b) In the event First Lien Agent enters into any amendment, waiver or consent in respect of any of the First Lien Collateral Documents for the purpose of adding to, or deleting from, or waiving or consenting to any departures from any provisions of, any First Lien Collateral Document or changing in any manner the rights of any parties thereunder, then such amendment, waiver or consent shall apply automatically to any comparable provision of the Second Lien Note without the consent of or action by the Second Lien Lender (with all such amendments, waivers and modifications subject to the terms hereof); <u>provided</u> that (other than with respect to amendments, modifications or waivers that secure additional extensions of credit and add additional secured creditors and do not violate the express provisions of the Second Lien Note), (i) no such amendment, waiver or consent shall have the effect of removing assets subject to the Lien of the Second Lien Note, except to the extent that a release of such Lien is permitted by <u>Section 9</u> hereof, and (ii) notice of such amendment, waiver or consent shall be given to the Second Lien Lender no later than 30 days after its effectiveness, provided that the failure to give such notice shall not affect the effectiveness and validity thereof.

**8.**      <u>Perfection of Possessory Security Interests</u>. For the limited purpose of perfecting the security interests of Secured Parties in those types or items of Collateral in which a security interest may be perfected by possession or control, each Agent hereby appoints the other Agent as its agent for the limited purpose of possessing or controlling on its behalf any such Collateral that may come into the possession or control of such other Agent from time to time, and each Agent agrees to act as the other Agent's agent for such limited purpose of perfecting such other Agent's security interest by possession or control through an agent, provided, that no Agent shall incur any liability to any other Agent by virtue of acting as such other Agent's agent hereunder, and either Agent may relinquish possession or control of Collateral in accordance with the terms of the applicable Credit Document without the consent of the other Agent, and without incurring liability to the other Agent, except as otherwise provided herein or unless there is an express written agreement to the contrary in effect between Agents. Promptly following the First Lien Claims being Paid In Full, if the Second Lien Note remains in effect First Lien Agent

13

Case: 15-31430    Doc# 3    Filed: 11/16/15    Entered: 11/16/15 16:34:05    Page 188 of 201

shall deliver to Second Lien Lender all items of Collateral held by First Lien Agent pursuant to the First Lien Security Agreement or as a court of competent jurisdiction otherwise directs.

9.        **Releases of Security Interests**.

(a) The Second Lien Lender will cooperate and provide any necessary or appropriate releases (without any representation, recourse or liability express implied or statutory) with respect to the Collateral to permit a Collateral Enforcement Action by First Lien Agent, free and clear of the Second Lien Lender's Lien.

(b) In the event of a sale or other disposition of Collateral pursuant to a Collateral Enforcement Action by First Lien Agent, or by a Debtor in compliance with the terms of the Second Lien Note, if such First Lien Secured Parties are releasing their first priority Lien in connection therewith, the Lien of Second Lien Lender on such Collateral automatically shall be released and discharged to the extent the Lien of First Lien Secured Parties on such Collateral is released and discharged, and Second Lien Administrative Agent shall promptly execute and deliver (without any representation, recourse or liability express implied or statutory) any releases or other documents requested by First Lien Agent to evidence such release and discharge; provided that the Liens of Secured Parties in such Collateral shall attach to the Proceeds of such sale or other disposition, and the provisions of this Agreement shall be otherwise applicable to such Proceeds (including any provisions with respect to priority of Liens in such Proceeds, or application thereof to the Claims of Secured Parties).

(c) Until the First Lien Claims are Paid in Full, the Second Lien Lender hereby irrevocably constitutes and appoints First Lien Agent and any officer or agent of First Lien Agent, with full power of substitution, as its true and lawful attorney-in-fact with full irrevocable power and authority in the place and stead of the Second Lien Lender or in First Lien Agent's own name, from time to time in First Lien Agent's discretion, for the purpose of carrying out the terms of this Section 9, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary to accomplish the purposes of this Section 9, including any endorsements or other instruments of transfer or release (without any representation, recourse or liability express implied or statutory).

(d) The Second Lien Lender agrees that First Lien Secured Parties may release the Second Lien Lender's Lien in the Collateral, to the same extent that First Lien Secured Parties release, if and to the extent the release of the Second Lien Lender's Lien is required by Section 9(b), without incurring any liability to Second Lien Lender.

10.        **Collateral Records**. If in the exercise of its respective rights, any Secured Party shall receive possession or control of any Collateral Records which contain information relating to any property of any Debtor, such Secured Party shall notify such other Secured Party that it has received such Collateral Records and shall, as promptly as practicable thereafter, make available to the other Secured Party such Collateral Records for inspection and/or duplication.

11.        **Waiver of Right to Require Marshaling**. The Second Lien Lender hereby expressly waives any right that it otherwise might have to require any First Lien Secured Party to marshal assets or to resort to Collateral in any particular order or manner, whether

14

provided for by common law or statute. No First Lien Secured Party shall be required to enforce any guaranty or any Lien given by any Person as a condition precedent or concurrent to the taking of any Enforcement Action.

12.     **Obligations Unconditional**.

(a) First Lien Obligations Unconditional.     All rights of First Lien Agent hereunder, and all agreements and obligations of Second Lien Lender, Company and the other Debtors (to the extent applicable) hereunder, shall remain in full force and effect irrespective of:

(i)     any lack of validity or enforceability of any First Lien Loan Document;

(ii)     any change in the time, place or manner of payment of, or in any other term of, all or any portion of the First Lien Claims, or any amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of any First Lien Loan Document;

(iii)     until the First Lien Claims have been Paid in Full, any exchange, release, voiding, avoidance or non-perfection of any security interest in any Collateral or any other collateral, or any release, amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of all or any portion of the First Lien Claims or any guarantee or guaranty thereof;

(iv)     any failure of any First Lien Secured Party to asset any claim or to enforce any rights or remedy against any other party hereto under the provisions of this Agreement or any Credit Document;

(v)     any reduction, limitation, impairment or termination of the First Lien Claims for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to (and the Company and the Second Lien Lender hereby waive any right to or claim of) any defense or setoff, counterclaim, recoupment or termination whatsoever (other than Payment in Full) by reason of invalidity, illegality, irregularity, compromise, unenforceability of, or any other event or occurrence affecting, any Debtor; or

(vi)     any other circumstances that otherwise might constitute a defense available to, or a discharge of, any Debtor in respect of the First Lien Claims, or of any of Second Lien Lender, or any Debtor, to the extent applicable, in respect of this Agreement.

(b) Second Lien Obligations Unconditional.     Subject to compliance with the terms of this Agreement, all rights and interests of Second Lien Lender under this Agreement, and all agreements and obligations of First Lien Agent, Company and the other Debtors, to the extent applicable, hereunder, shall remain in full force and effect irrespective of:

(i)     any lack of validity or enforceability of the Second Lien Note;

Case: 15-31430     Doc# 3     Filed: 11/16/15     Entered: 11/16/15 16:34:05     Page 190 of 201

(ii)     any change in the time, place or manner of payment of, or in any other term of, all or any portion of the Second Lien Claims, or any amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of the Second Lien Note;

(iii)     any exchange, release, voiding, avoidance or non-perfection of any security interest in any Collateral, or any release, amendment, waiver or other modification, whether by course of conduct or otherwise, or any refinancing, replacement, refunding or restatement of all or any portion of the Second Lien Claims or any guarantee or guaranty thereof; or

(iv)     any other circumstances that otherwise might constitute a defense available to, or a discharge of, any Debtor in respect of the Second Lien Claims, or of any of First Lien Agent or other Debtor, to the extent applicable, in respect of this Agreement.

**13.**     **Exercise of Remedies**.     Subject to any express provision of this Agreement that requires a Secured Party to take or refrain from taking an action, each Secured Party may exercise its good faith discretion with respect to exercising or refraining from exercising any of its rights and remedies or taking any Enforcement Action.

**14.**     **UCC Notices**.     In the event that any Secured Party shall be required by the UCC or any other applicable law to give any notice to any other Secured Party, such notice shall be given in accordance with Section 19(e) hereof and, as between Secured Parties, five days' notice shall be conclusively deemed to be commercially reasonable.

**15.**     **Preference and Avoidance Issues**.     If any Debtor makes a payment to a First Lien Secured Party and if such First Lien Secured Party is required in any Insolvency or Liquidation Proceeding or otherwise to turn over or otherwise pay to the estate of any Debtor any amount of such payment as a preference or for any other reason (a "**Recovery**"), then the First Lien Claims shall be revived to the extent of such Recovery and continue in full force and effect as First Lien Claims entitled to the benefits of this Agreement, as if such payment had not been received by such First Lien Secured Party. If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto from such date of reinstatement.

**16.**     **Amendments; Waivers**.     No amendment, modification, supplement, termination, consent or waiver of or to any provision of this Agreement nor any consent to any departure therefrom shall in any event be effective unless the same shall be in writing and signed by First Lien Agent (acting on instructions of such First Lien Purchasers as may be required under the First Lien Note Purchase Agreement) and Second Lien Lender, and, solely if such amendment, modification, supplement, termination, consent or waiver is materially adverse to or otherwise materially changes the obligations of Company, Company; provided, however, that Company shall be deemed to have given its consent five Business Days after the date notice of any such amendment, modification, supplement, termination, consent or waiver has been delivered to Company unless such consent is expressly refused by Company prior to such day. Any waiver of any provision of this Agreement, or any consent to any departure from the terms

16

Case: 15-31430     Doc# 3     Filed: 11/16/15     Entered: 11/16/15 16:34:05     Page 191 of 201

of any provisions of this Agreement, shall be effective only in the specific instance and for the specific purpose for which given.

**17.** **Payment Subordination**. Notwithstanding anything to the contrary in this Agreement:

(a) <u>Subordination of Second Lien Claims to First Lien Claims</u>. The Company covenants and agrees, and the Second Lien Lender likewise covenants and agrees, that the payment of any and all of the Second Lien Claims shall be subordinate and subject in right and time of payment, to the extent and in the manner hereinafter set forth, to the prior Payment in Full of all of the First Lien Claims. Each holder of First Lien Loans, whether now outstanding or hereafter created, incurred, assumed or guaranteed shall be deemed to have acquired the First Lien Loans in reliance upon the provisions of this <u>Section 17</u>.

(b) <u>Second Lien Claims Payment Restrictions</u>. The Company hereby agrees that it may not make, and the Second Lien Lender hereby agrees that it will not accept, any distribution with respect to the Second Lien Claims until all of the First Lien Claims are Paid in Full unless such distribution is not prohibited under the First Lien Note Purchase Agreement to be made at such time.

(c) <u>Incorrect Payments</u>. If any distribution on account of the Second Lien Claims prohibited from being made by the Company or accepted by the Second Lien Lender pursuant to the terms of this <u>Section 17</u> is received by the Second Lien Lender, such distribution shall be promptly paid (but in any event within ten (10) business days) over to the First Lien Agent (to be held and/or applied by the First Lien Agent to the First Lien Claims until all First Lien Claims are Paid in Full) and shall be held in trust by the Second Lien Lender for the benefit of the First Lien Agent until so paid.

(d) Notwithstanding anything to the contrary contained herein, in the event that any payment due hereunder is prohibited to be paid on the date it would otherwise be due (such date, an **"Initial Payment Date"**) by the Credit Documents or this Agreement, as applicable, such payment shall be due on the first Business Day on which such payment is no longer prohibited under the Credit Documents or this Agreement, as applicable, and such payment amount shall bear interest from the Initial Payment Date until the date such payment is actually made at the rate applicable to the applicable principal amount due on the Initial Payment Date, compounded continuously.

**18.** **Second Lien Standstill Provisions**. Until all of the First Lien Claims are Paid in Full, the Second Lien Lender agrees that it will not take any Payment Enforcement Action with respect to the Second Lien Claims, until the date on which all First Lien Loans are Paid in Full.

Notwithstanding the foregoing, (A) Second Lien Lender may file proofs of claim against the Company, and vote such proofs of claim, in any Insolvency or Liquidation Proceeding involving the Company and (B) Second Lien Lender may take actions that are necessary solely to prevent the tolling of an applicable statute of limitations on its ability to commence an action against the Company for payment of the Second Lien Claims.

757768.04A-LACSR01A - MSW

Case: 15-31430   Doc# 3   Filed: 11/16/15   Entered: 11/16/15 16:34:05   Page 192 of 201

19.     **Miscellaneous.**

(a) All terms used in this Agreement and not otherwise defined herein shall have the meanings as set forth in Article 9 of the Uniform Commercial Code as in effect in the State of California as in effect from time to time. Except as otherwise provided herein, priority shall be in accordance with the provisions of the UCC.

(b) This Agreement shall be binding upon, inure to the benefit of and be enforceable by First Lien Agent on behalf of itself and First Lien Secured Parties, and the Second Lien Lender, and in each case their respective successors and assigns, including without limitation in relation to any replacement agreement or facility existing at any time to refund, refinance, replace or renew (including subsequent or successive refinancings, replacements and renewals) the First Lien Note Purchase Agreement or the Second Lien Note. Each party hereto represents and warrants that it is authorized to enter into this Agreement.

(c) This Agreement is intended by the parties as a final expression of their agreement relating to the subject matter hereof and is intended as a complete statement of the terms and conditions of their agreement relating to the subject matter hereof.

(d) No failure or delay on the part of any Secured Party in the exercise of any power, right, remedy or privilege under this Agreement shall impair such power, right, remedy or privilege or shall operate as a waiver thereof; nor shall any single or partial exercise of any such power, right or privilege preclude any other or further exercise of any other power, right or privilege. The waiver of any such right, power, remedy or privilege with respect to particular facts and circumstances shall not be deemed to be a waiver with respect to other facts and circumstances.

(e) Each notice hereunder shall be in writing and may be personally served or sent by telefacsimile or United States mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of telefacsimile, or three Business Days after depositing it in the United States mail with postage prepaid and properly addressed. Unless otherwise specified in a notice mailed or delivered in accordance with the foregoing provisions of this Section 19(e), notices, demands, instructions and other communications in writing shall be given to or made upon the respective parties hereto at their respective addresses indicated on the signature pages hereof.

(f) This Agreement and any amendments, waivers, consents or supplements hereto or in connection herewith may be executed in any number of counterparts and by different parties hereto or thereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document. This Agreement shall become effective upon the execution of a counterpart hereof by each of the parties hereto.

(g) In case any provision in or obligation under this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the

18

Case: 15-31430   Doc# 3   Filed: 11/16/15   Entered: 11/16/15 16:34:05   Page 193 of 201

remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

(h) <u>Governing Law</u>. This Agreement shall be governed by and construed under the laws of the State of California as applied to agreements among California residents, made and to be performed entirely within the State of California, without giving effect to conflicts of laws principles.

(i) <u>Venue</u>. ANY SUIT, ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR ANY JUDGMENT ENTERED BY ANY COURT WITH RESPECT TO THIS AGREEMENT OR SUCH TRANSACTIONS SHALL BE BROUGHT AND MAINTINED EXCLUSIVELY IN THE COURTS OF THE STATE OF CALIFORNIA LOCATED IN LOS ANGELES COUNTY OR IN THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA. EACH OF THE PARTIES HERETO IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE COURTS OF THE STATE OF CALIFORNIA LOCATED IN THE COUNTY OF LOS ANGELES AND OF THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA FOR THE PURPOSE OF ANY SUCH ACTION OR PRECEEDING SET FORTH ABOVE AND IRREVOCABLY AGREES TO BE BOUND BY ANY JUDGMENT RENDERED THEREBY IN CONNECTION WITH ACTION OR PROCEEDING. EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY HAVE OR HEREAFTER MAY HAVE TO THE LAYING OF VENUE OF ANY SUCH ACTION OR PROCEEDING BROGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH ACTION OR PROCEEDING HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

(j) Anything contained in this Agreement to the contrary notwithstanding, each party to this Agreement shall no longer be a party from and after such time as all of the obligations owing such party from Debtors as contemplated hereunder (other than inchoate indemnification obligations) shall have ceased to be outstanding by virtue of the payment in full in cash thereof or the cancellation thereof or delivery for cancellation or cash collateralization thereof in accordance with their terms.

19

Case: 15-31430    Doc# 3    Filed: 11/16/15    Entered: 11/16/15 16:34:05    Page 194 of 201

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first above written.

ICONICAL INVESTMENTS II LP,
By: Iconical Fund Partners II Ltd., its General Partner
as First Lien Agent

By: _____
Name: Murray Markiles
Title: Director

**PULSER MEDIA, INC.,**
as Second Lien Lender

By: _____

    Name:  Anthony Bay
    Title:    Chief Executive Officer

## CONSENT OF DEBTOR AND AGREEMENT TO BE BOUND

Each of the undersigned Debtors has read the foregoing Agreement and consents thereto and agrees to be bound thereby. Each of the undersigned Debtors agrees not to take any action that would be contrary to the provisions of the foregoing Agreement and agrees that no Secured Party shall have any liability to any Debtor for acting in accordance with the provisions of the foregoing Agreement. Each Debtor understands that the foregoing Agreement is for the sole benefit of First Lien Secured Parties and Second Lien Lender and their respective successors and assigns, and that such Debtor is not an intended beneficiary or third party beneficiary thereof.

Dated as of October 19, 2015

RDIO, INC.

By: _____
Title:     Chief Executive Officer
Address:    1550 Bryant Street, Ste 200
               San Francisco, CA 94103

PULSER MEDIA, INC.

By: _____
Title:     Chief Executive Officer
Address:    1550 Bryant Street, Ste 200
               San Francisco, CA 94103

*Intercreditor Agreement*

**EXHIBIT "10"**

# NOTICE OF EVENTS OF DEFAULT AND RESERVATION OF RIGHTS

October 19, 2015

<u>Via Overnight Courier and Electronic Mail</u>

Pulser Media, Inc.
1550 Bryant Street, Suite 200
San Francisco, CA 94103
Attention: Elliott Peters
elliott.peters@rd.io

Rdio, Inc.
1550 Bryant Street, Suite 200
San Francisco, CA 94103
Attention: Elliott Peters
elliott.peters@rd.io

Re:    <u>Notice of Events of Default and Reservation of Rights under Loan Agreement</u>

Ladies and Gentlemen:

Reference is hereby made to (i) that certain Security Agreement, dated as of December 19, 2014 (as amended, restated or otherwise modified from time to time, the "***Existing Security Agreement***"), by Pulser Media, Inc. ("***Pulser***") in favor of Iconical Investments II LP, as collateral agent (the "***Existing Note Collateral Agent***"), (ii) that certain Note Purchase Agreement, dated as of December 19, 2014 (as amended, restated or otherwise modified from time to time, the "***Existing Note Purchase Agreement***"), among Pulser, as the borrower, Iconical Investments II LP, as purchaser (the "***Existing Notes Purchaser***") and the Existing Collateral Agent, (iii) that certain Convertible Secured Promissory Note issued by Pulser, dated December 19, 2014, (iv) that certain Convertible Secured Promissory Note issued by Pulser, dated January 27, 2015 and (v) that certain Convertible Secured Promissory Note issued by Pulser, dated August 28, 2015 (collectively, as amended, restated, supplemented or modified from time to time, the "***Existing Notes***", and together with the Existing Security Agreement and the Existing Note Purchase Agreement, the "***Existing Loan Documents***"), (vii) that certain Security Agreement, dated as of October 19, 2015 (as amended, restated or otherwise modified from time to time, the "***New Security Agreement***"), by Rdio, Inc. ("***Rdio***") and Pulser in favor of Iconical Investments II LP, as collateral agent (the "***New Note Collateral Agent***"), (viii) that certain Note Purchase Agreement, dated as of October 19, 2015 (as amended, restated or otherwise modified from time to time, the "***New Note Purchase Agreement***") among Rdio, as the borrower, Iconical Investments II LP, as purchaser (the "***New Note Purchaser***") and the New Collateral Agent and (ix) that certain Secured Promissory Note, dated October 19, 2015 (as amended, restated or otherwise modified from time to time, the "***New Note***", and together with the New Security Agreement and the New Note Purchase Agreement, the "***New Loan Documents***"), issued by Rdio pursuant to the New Note Purchase Agreement.  Capitalized terms used herein and not

933729.02-CHISR01A - MSW

otherwise defined shall have the meaning set forth in the Existing Loan Documents or the New Loan Documents, as context requires.

You have advised us of certain circumstances that are Events of Default under the Existing Loan Documents, and this letter serves as notice that Events of Default have occurred thereunder, including, but not limited to, (i) an Event of Default under Section 4(b) of the Existing Notes as a result of Pulser's failure to be in good standing in the State of Delaware at the time of the Advance made thereunder on September 3, 2015, and (ii) an Event of Default under Section 4(c) of the Existing Notes as a result of Pulser's and Rdio's admission in writing of its inability to pay its debts when such debts become due (the "*Existing Defaults*"). Because of exigent circumstances, the Purchasers under the New Loan Documents intend to proceed with an Advance under the New Note, and upon making such Advance, the Existing Defaults will result in Events of Default under the New Loan Documents (the "*New Defaults*"), and cross-defaults will be triggered at the time of such Advance resulting in additional Events of Default under the New Loan Documents and the Existing Loan Documents (the "*Cross-Defaults*" and together with the Existing Defaults and the New Defaults, the "*Specified Defaults*").

This letter is intended to inform you that the Existing Note Collateral Agent, the Existing Note Purchaser, the New Note Collateral Agent and the New Note Purchaser hereby expressly reserve all rights, remedies and claims available to them in their entirety, any of which may be exercised or otherwise pursued at any time, and from time to time, in the sole and absolute discretion of such person, as the case may be, in accordance with the Existing Loan Documents or the New Loan Documents, as applicable, or at law and in equity as a result of the occurrence and continuance of the Specified Defaults and any other Events of Default occurring at any time.

This letter shall not, and shall not be deemed to, establish a custom or course of dealing (including, without limitation, the establishment of a custom or course of dealing requiring the Existing Note Collateral Agent, the Existing Note Purchaser, the New Note Collateral Agent or the New Note Purchaser to notify Pulser or Rdio of (i) any Event of Default, (ii) its obligations under the Existing Loan Documents or the New Loan Documents, as applicable, or (iii) the exercise of any rights of the Existing Note Collateral Agent, the Existing Note Purchaser, the New Note Collateral Agent or the New Note Purchaser under the Existing Loan Documents and the New Loan Documents, as applicable, or at law and in equity) and does not, and shall not be deemed to, waive, limit or postpone Rdio's, Pulser's or any other Company Entities' obligations under the Existing Loan Documents, the New Loan Documents or otherwise, or any other person obligated thereunder, or any past, present or future violations of any Existing Loan Document or New Loan Document or any Event of Default (including the Specified Defaults), and any discussions (whether written or oral) that have occurred or may occur are not, and any actions taken or not taken by the Existing Note Collateral Agent, the Existing Note Purchaser, the New Note Collateral Agent or the New Note Purchaser, shall not be deemed to be, a waiver, limitation or postponement of any provision of, or of any rights and remedies of such person under the Existing Loan Documents or New Loan Documents, as applicable, or at law and in equity, all of which rights and remedies hereby are expressly reserved.

[Signature Page Follows]

933729.02-CHISR01A - MSW

Very truly yours,

**ICONICAL INVESTMENTS II LP,**
as the Existing Note Collateral Agent and the
Existing Note Purchaser

By: _____

    Name:
    Title:

**ICONICAL INVESTMENTS II LP**
as the New Note Collateral Agent and the New
Note Purchaser

By: _____

Name:
Title:

[Signature page to Reservation of Rights Letter]