RON BENDER (SBN 143364)
PHILIP A. GASTEIER (SBN 130043)
MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbyb.com; pag@lnbyb.com;
myk@lnbyb.com; kjm@lnbyb.com

Proposed Attorneys for Chapter 11 Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: | ) Case No. 15-31430 |
| | ) |
| RDIO, INC., | ) Chapter 11 Case |
| | ) |
| Debtor and Debtor in Possession. | ) **DEBTOR'S EMERGENCY MOTION** |
| | ) **FOR ORDER: (1) AUTHORIZING** |
| | ) **DEBTOR TO (A) PAY AND HONOR** |
| | ) **PRE-PETITION EMPLOYEE WAGES,** |
| | ) **RELATED PAYROLL TAXES,** |
| | ) **REIMBURSABLE EXPENSES AND** |
| | ) **OTHER EMPLOYEE OBLIGATIONS IN** |
| | ) **THE ORDINARY COURSE OF** |
| | ) **BUSINESS; (B) HONOR ACCRUED** |
| | ) **VACATION, LEAVE AND OTHER** |
| | ) **BENEFITS; AND (2) PROVIDING** |
| | ) **RELATED RELIEF; MEMORANDUM** |
| | ) **OF POINTS AND AUTHORITIES IN** |
| | ) **SUPPORT THEREOF** |
| | ) |
| | ) |
| | ) |
| | ) Date: November 18, 2015 |
| | ) Time: 10:00 a.m. |
| | ) Place: U.S. Bankruptcy Court |
| | ) Courtroom 22 |
| | ) 235 Pine St. |
| | ) San Francisco, CA 94104 |
| | ) Judge: The Hon. Dennis Montali |

Rdio, Inc., chapter 11 debtor and debtor in possession in the above-captioned, chapter 11 bankruptcy case (the "Debtor"), hereby moves, pursuant to 11 U.S.C. §§ 105(a), 363(b), 363(c), and 507 (a)(4) and (a)(5), as applicable (the "Motion"), for entry of an order, in substantially the same form and substance as the proposed form of order attached hereto as **Exhibit "1"** (the "Order"): (1) authorizing the Debtor to: (A) pay pre-petition wages, related payroll taxes, commissions, benefits and reimbursable expenses (collectively, "Wages") to employees, and (B) honor pre-petition accrued vacation and leave benefits in the ordinary course of the Debtor's business, provided that no employee shall receive in value over $12,475 on account of the foregoing pre-petition claims; and (2) providing related relief. This Motion is supported by the *Declaration of Maikao Grare in Support of Certain First-Day Motions* (the "Grare Declaration") which the Debtor is filing concurrently with this Motion.

As discussed further below and in the Grare Declaration, the Debtor was founded in 2008 as a digital music service. The Debtor's business operations were launched in 2010 after the Debtor secured requisite licenses from the applicable holders of music rights. Since that time, the Debtor has strived to grow into a worldwide music service and today is in 86 countries. One of the primary services provided by the Debtor is an unlimited, on demand music streaming service where for $9.99 per month the user has access to an entire library of songs with access to them through a computer, mobile device, etc. While the Debtor's monthly subscription service provides the Debtor with its primary revenue source, the Debtor also generates approximately $100,000-$150,000 of monthly revenue from advertisers who advertise in the Debtor's advertising-based free to consumer service offerings. The Debtor currently generates approximately $1.6-$1.65 million of total monthly revenue.

The Debtor's primary assets consist of the Debtor's (i) owned technology (e.g., website, mobile apps, content ingestion technology, reporting technology, software, databases, etc.), (ii) content license agreements, (iii) subscribers, (iv) employee talent pool, and (v) goodwill.

Under its current operating business model, the Debtor has monthly operating expenses of approximately $3.5-$4.0 million, comprising primarily payroll for the Debtor's approximately 140 U.S. employees (much of which is comprised of significant Silicon Valley engineering

talent), payment to the owners of music rights, costs of maintaining the service, rent, marketing costs, business development costs, technology maintenance costs, and foreign administrative expenses). With average monthly total revenue of approximately $1.6-$1.65 million and average monthly operating expenses of $3.5-$4.0 million, the Debtor's business operations under its current operating business model result in operating losses of approximately $1.85-$2.4 million per month, and the Debtor no longer has the economic means of funding its significant operating cash flow shortfall.

The Debtor has approximately $190,237,000 of secured debt and approximately $30,000,000 of unsecured debt. The details and more expansive explanation of the relationships involving the various secured creditors is set forth in the Debtor's emergency motion for use of cash collateral and approval of debtor-in-possession financing.

Pulser Media, Inc. (the Debtor's majority shareholder) employed a highly qualified investment bank in Moelis & Company ("Moelis") in the fall of 2014, initially with the goal of attempting to raise new equity capital. Despite extensive efforts by Moelis, it ultimately became clear that raising new equity capital was not going to be possible. At that point, Pulser Media charged Moelis with finding either substantial outside investment or a buyer or merger partner because the Debtor was not going to be able to continue to fund its significant operating losses indefinitely.

After conducting an extremely broad marketing process, the highest and best offer received by the Debtor was an all cash asset purchase offer from Pandora Media, Inc. ("Pandora") in the amount of $75 million, plus certain other consideration, to acquire the Debtor's technological assets. The final negotiated and signed asset purchase agreement being filed with the Court as part of the Debtor's emergency motion for approval of bid procedures contains a $75 million cash purchase price. Based on its due diligence, by the time of the execution of the LOI, Pandora had decided that it would only proceed with a transaction if that transaction were conducted as part of a Chapter 11 filing and a purchase pursuant to a sale under the Bankruptcy Code. Pandora has agreed that the Debtor can and should market Pandora's offer for overbid to insure that the highest and best price is paid for the Debtor's assets/business.

Additionally, like most tech companies in the current market, the Debtor operates in a very competitive environment, especially as concerns employees. The key employees who are associated with the Debtor's intellectual property assets are extremely important to the proposed sale. Employees with these types of skills and knowledge are also very much in demand from other technology companies. The Debtor's Chapter 11 filing may be cause for some of those employees to consider other employment opportunities, unless they can be relatively assured of a rapid transition. The timing of a sale is thus critical to Pandora in that the value of the assets is diminished if the key employees are no longer available. It is for this reason that the purchase agreement contains both provisions for price adjustments, and provisions allowing Pandora to terminate the purchase agreement if specified threshold numbers of employees of the Debtor do not accept employment with Pandora following the sale. Thus, it is critical that the Debtor's employees are retained by the Debtor.

The Debtor filed a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on November 16, 2015 (the "Petition Date"). The Debtor continues to operate its business, manage its financial affairs and administer its bankruptcy estate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

In order to ensure a smooth and effective bankruptcy sale process, and in order to ensure that the Debtor continues to receive services provided by its employees, and retain its employees, the Debtor requests Court authority to pay Wages and honor pre-petition accrued vacation and leave benefits in the ordinary course of the Debtor's business, provided that no employee shall receive in value over $12,475 on account of the foregoing pre-petition claims. The Debtor also seeks Court authority to pay all employee withholdings and employee payroll taxes related to the Wages.

The Debtor typically pays its respective employees' Wages twice per month. Employees that are considered "exempt" (meaning that they do not receive overtime pay) have been paid their Wages through November 15, 2015.[1] Employees that are considered "non-exempt"[2]

---

[1] The Debtor's key employees are "Exempt" employees. In that regard, they are not owed pre-petition Wages, but they are owed pre-petition vacation and leave benefits that this Motion seeks

(meaning that they do receive overtime pay) are owed Wages for the pre-petition period of November 11, 2015 through November 15, 2015.

On Monday, November 30, 2015, the Debtor is scheduled to pay non-exempt employees' Wages earned during the period of November 11, 2015, through November 25, 2015. The Wages earned during the period of November 11, 2015 through November 15, 2015 constitute pre-petition Wages.

The approximate amount of pre-petition Wages (plus payroll taxes and withholdings) and related obligations that the Debtor will owe to non-exempt employees on November 30, 2015, is $8,093.85, as set forth in Exhibit 1 to the Grare Declaration.

The Debtor is virtually current with all of its exempt employees' pre-petition Wages, except for some expense reimbursement claims in the total amount of approximately $1,340.22. Pre-petition, the Debtor paid its exempt employees' wages, commissions and salaries through November 15, 2015. Virtually all of the Debtor's employees received wire transfers of such wages, so as of the bankruptcy filing date, the Debtor believes that all such pre-petition wages have been paid. However, to the extent a wire transfer has not cleared or to the extent an employee receives a check instead of a wire transfer and the check has not been cashed, the Debtor requests Court authority to honor such payments post-petition. Concurrently herewith, the Debtor has filed a motion to maintain its payroll account, and to remove any freeze on accounts, pending the clearance of any outstanding payroll payments.

Additionally, the Debtor's employees (both exempt and non-exempt) have accrued vacation and leave benefits, which the Debtor requests authorization to continue to honor in the ordinary course of the Debtor's business. A detailed list of the Debtor's employees (by employee number)[3] and the amount of accrued vacation and leave benefits owed to such employees, is

---

Court authority to honor, up to the statutory cap. Additionally, pre-petition, the Debtor deducted from their payroll contributions to their respective 401k accounts, which the Debtor has transferred to the 401k provider. The Debtor expects that the transfer will clear by November 17, 2015. Such transfer is of property being held in trust for the Debtor's employees.

[2] Examples of "non-exempt" employees include the Debtor's receptionists, customer service representatives, and content coordinators.

[3] The Debtor has not disclosed the identity of the Debtor's employees in order to maintain privacy

attached as Exhibit 2 to the Grare Declaration. The total value of such benefits considering the statutory cap of $12,475 and required tax and related withholdings per employee is approximately $475,699. Irrespective of the amounts set forth in Exhibits 1 and 2 to the Grare Declaration, no employee will receive in value over $12,475 on account of their collective pre-petition claims for Wages and vacation and leave benefits.

Thus, by this Motion, the Debtor seeks authority to (i) pay and/or honor all pre-petition Wages of its employees (including any Wages which are unpaid as a result of a pre-petition payroll check being returned for insufficient funds which may be caused by a freeze on Debtor's pre-petition bank accounts or a conversion to debtor in possession accounts)**;** and (ii) honor accrued vacation and leave benefits in the ordinary course of business, provided that no employee shall receive in value over $12,475 on account of pre-petition claims for Wages and vacation and leave benefits.

The source of the funds to be used to pay and/or honor the pre-petition Wages and accrued vacation and leave benefits of the employees will be the Debtor's cash on hand, and any funds received pursuant to the Debtor's cash collateral and financing motion and/or development services agreement motion, which may constitute cash collateral. Concurrently herewith, the Debtor has filed an emergency motion for an order authorizing the Debtor to use cash collateral and obtain post-petition financing, including in order to pay the Wages and vacation and leave benefits described herein.

It is crucial for the Debtor to retain its employees and employee talent pool during this critical phase in the Debtor's operations, and it is critical for the Debtor to retain its key employees in connection with the proposed sale of assets to Pandora. Moreover, given that the Debtor with market its assets/business to potential overbidders, it is important for the Debtor to maintain its employee base. Furthermore, it is crucial that the Debtor retains its employees during this critical beginning phase of the Debtor's bankruptcy case, where additional administrative and other

with respect to employee's identities as well as the amount of vacation pay owed to each respective employee. Should the Court request a list of employee names, the Debtor will request that such information be provided to the Court under seal.

obligations are imposed upon the Debtor, and when the Debtor will require the efforts of its employees to, among other things, maintain the value of the Debtor's assets, assist the Debtor with the Debtor's operations, assist the Debtor with the Debtor's chapter 11 bankruptcy obligations, serve as resources to the Debtor's bankruptcy counsel, and otherwise fulfill their respective job responsibilities during the Debtor's bankruptcy case.

If the Debtor does not continue to pay the employees their ordinary and earned Wages and continue to honor employee benefits, the employees may quit, and the Debtor may lose its employee talent pool. Without the employees, the Debtor's value may be negatively impacted. Indeed, if key employees leave, the Debtor's proposed sale of its assets to Pandora could be impaired. The Debtor must retain its employees to preserve the value of the Debtor's respective assets. Moreover, the Debtor seeks the ability to be able to represent to its employees as soon as possible that the Bankruptcy Court has approved this Motion (or, alternatively, if the Bankruptcy Court has denied this Motion, to immediately advise their employees of such facts so that employees are aware of such facts and do not later claim that Debtor misrepresented or withheld facts from its employees). Based on the foregoing, the Debtor respectfully submits that the relief requested in the Motion is necessary to avoid immediate and irreparable harm. Accordingly, the Debtor requests a hearing on this Motion as soon as practical for the Bankruptcy Court, and no later than November 20, 2015, so that the Debtor has sufficient time prior to the Thanksgiving holiday to coordinate payroll payments with its payroll servicing company (which administers the Debtor's payroll using the Debtor's payroll account).

## ADDITIONAL INFORMATION

This Motion is based upon applicable Local Bankruptcy Rules11 U.S.C. §§ 105(a), 363(b), 363(c), and 507 (a)(4) and (a)(5), and Rule 6003 of the Federal Rules of Bankruptcy Procedure, the supporting Memorandum of Points and Authorities, the Grare Declaration, the arguments and statements of counsel to be made at the hearing on the Motion, and other admissible evidence properly brought before the Court.

In order to provide maximum notice of this Motion, on November 16, 2015, the Debtor will serve a copy of the Motion and all supportive papers upon the Office of the United States

Trustee, all secured creditors and their counsel (if known), the Debtor's twenty (20) largest unsecured creditors, and on those parties who have requested special notice, via overnight mail.

**WHEREFORE**, the Debtor respectfully requests that this Court hold a hearing on this Motion and issue an order:

1.      granting this Motion and entering the Order;

2.      affirming the adequacy of the notice given;

3.      finding that the relief requested in the Motion is necessary to avoid immediate and irreparable harm;

4.      authorizing the Debtor to (i) pay and/or honor all pre-petition Wages to their respective employees and related payroll taxes as requested herein; and (ii) honor accrued vacation and leave benefits in the ordinary course of business, provided that no employee shall receive in value over $12,475 on account of such pre-petition claims for Wages and vacation and leave benefits; and

5.      granting such other and further relief as the Court deems just and proper.

Dated: November 16, 2015                    RDIO, INC.

                                                        By:   _/s/ Krikor J. Meshefejian_
                                                                RON BENDER
                                                                PHILIP A. GASTEIER
                                                                MONICA Y. KIM
                                                                KRIKOR J. MESHEFEJIAN
                                                                LEVENE, NEALE, BENDER, YOO
                                                                    & BRILL L.L.P.
                                                                Proposed Attorneys for Chapter 11 Debtor
                                                                and Debtor in Possession

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    STATEMENT OF FACTS

**A.    Background**

The Debtor filed a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on November 16, 2015 (the "Petition Date").  The Debtor continues to operate its business, manage its financial affairs and administer its bankruptcy estate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

**B.    The Debtor's Business, Assets and Liabilities**

The Debtor was founded in 2008 as a digital music service.  The Debtor's business operations were launched in 2010 after the Debtor secured requisite licenses from the applicable holders of music rights.  Since that time, the Debtor has strived to grow into a worldwide music service and today is in 86 countries.

One of the primary services provided by the Debtor is an unlimited, on demand music streaming service where for $9.99 per month the user has access to an entire library of songs with access to them through a computer, mobile device, etc.  In other words, the Debtor's business model is based upon a monthly recurring subscription for full access to content rather than on an owned a la carte download model.  The Debtor also makes available other subscription tiers at lower costs per month with varying service offerings or functionality (e.g., a family tier, a student tier, and a select tier with alternative functionality).  The Debtor generates approximately $1.5 million of U.S. monthly revenue from its monthly subscription service.

While the Debtor's monthly subscription service provides the Debtor with its primary revenue source, the Debtor also generates approximately $100,000-$150,000 of monthly revenue from advertisers who advertise in the Debtor's advertising-based service offerings.  The Debtor, therefore, currently generates approximately $1.6-$1.65 million of total monthly revenue.

The Debtor's primary assets consist of the Debtor's (i) owned technology (e.g., website, mobile apps, content ingestion technology, reporting technology, software, databases, etc.), (ii) content license agreements, (iii) subscribers, (iv) employee talent pool, and (v) goodwill.

Under its current operating business model, the Debtor has monthly operating expenses of

approximately $3.5-$4.0 million, comprising primarily payroll for the Debtor's approximately 140 U.S. employees (much of which represents costs of retaining high caliber Silicon Valley engineering talent), payment to the owners of music rights, costs of maintaining the service, rent, marketing costs, business developmencosts t, technology maintenance costs, and foreign administrative expenses).  With average monthly total revenue of approximately $1.6-$1.65 million and average monthly operating expenses of $3.5-$4.0 million, the Debtor's business operations under its current operating business model result in operating losses of approximately $1.85-$2.4 million per month, and the Debtor no longer has the economic means of funding such significant operating cash flow shortfall.

The Debtor has approximately $190,237,000 of secured debt and approximately $30,000,000 of unsecured debt.  The details and more expansive explanation of the relationships involving the various secured creditors is set forth in the Debtor's emergency motion for use of cash collateral and approval of debtor-in-possession financing.

**C.**    **The Proposed Asset Sale**

In the fall of 2014, the Debtor's majority shareholder, Pulser Media, Inc. ("Pulser Media") employed a highly qualified investment bank in Moelis & Company ("Moelis") in the fall of 2014, initially with the goal of attempting to raise new equity capital. Despite extensive efforts by Moelis, it ultimately became clear that raising new equity capital was not going to be possible.  At that point, Pulser Media charged Moelis with finding either substantial outside investment or a buyer or merger partner because the Debtor was not going to be able to continue to fund its significant operating losses indefinitely.

After conducting an extremely broad marketing process, the highest and best offer received by the Debtor was an all cash asset purchase offer from Pandora Media, Inc. ("Pandora") in the amount of $75 million, plus certain other consideration, to acquire the Debtor's technological assets.  The final negotiated and signed asset purchase agreement, which is being filed with the Court as part of the Debtor's emergency motion for approval of bid procedures, contains a $75 million cash purchase price (the "Purchase Agreement").  Based on its due diligence, by the time of the execution of the LOI, Pandora had decided that it would only

proceed with a transaction if that transaction were conducted as part of a Chapter 11 filing and a purchase pursuant to a sale under the Bankruptcy Code. Pandora has agreed that the Debtor can and should market Pandora's offer for overbid to insure that the highest and best price is paid for the Debtor's assets/business.

Additionally, like most tech companies in the current market, the Debtor operates in a very competitive environment, especially as concerns employees. The key employees who are associated with the Debtor's intellectual property assets are extremely important to the proposed sale. Employees with these types of skills and knowledge are also very much in demand from other technology companies. The Debtor's Chapter 11 filing may be cause for some of those employees to consider other employment opportunities, unless they can be relatively assured of a rapid transition. The timing of a sale is thus critical to Pandora, in that the value of the assets is diminished if the key employees are no longer available. It is for this reason that the purchase agreement contains both provisions for price adjustments, and provisions allowing Pandora to terminate the purchase agreement, respectively, if specified threshold numbers of employees of the Debtor do not accept employment with Pandora following the sale. Thus, it is critical that the Debtor's employees are retained by the Debtor.

**D.** **Necessity To Pay Pre-Petition Priority Wages And Honor Vacation And Other Leave Benefits.**

In order to ensure a smooth and effective bankruptcy sale process, and in order to ensure that the Debtor continues to receive services provided by its employees, and retain its employees, the Debtor requests Court authority to pay Wages and honor pre-petition accrued vacation and leave benefits in the ordinary course of the Debtor's business, provided that no employee shall receive in value over $12,475 on account of the foregoing pre-petition claims. The Debtor also seeks Court authority to pay all employee withholdings and employee payroll taxes related to the Wages.

The Debtor typically pays its respective employees' Wages twice per month. Employees that are considered "exempt" (meaning that they do not receive overtime pay) have been paid

their Wages through November 15, 2015.[4]   Employees that are considered "non-exempt"[5] (meaning that they do receive overtime pay) are owed Wages for the pre-petition period of November 11, 2015 through November 15, 2015.

On Monday, November 30, 2015, the Debtor is scheduled to pay non-exempt employees' Wages earned during the period of November 11, 2015, through November 25, 2015.  The Wages earned during the period of November 11, 2015 through November 15, 2015 constitute pre-petition Wages.

The approximate amount of pre-petition Wages (plus payroll taxes and withholdings) and related obligations that the Debtor will owe to non-exempt employees on November 30, 2015, is $8,093.85, as set forth in Exhibit 1 to the Grare Declaration.

The Debtor is virtually current with all of its exempt employees' pre-petition Wages, except for some expense reimbursement claims in the total amount of approximately $1,340.22. Pre-petition, the Debtor paid its exempt employees' wages, commissions and salaries through November 15, 2015.  Virtually all of the Debtor's employees received wire transfers of such wages, so as of the bankruptcy filing date, the Debtor believes that all such pre-petition wages have been paid.  However, to the extent a wire transfer has not cleared or to the extent an employee receives a check instead of a wire transfer and the check has not been cashed, the Debtor requests Court authority to honor such payments post-petition.  Concurrently herewith, the Debtor has filed a motion to maintain its payroll account, and to remove any freeze on accounts, pending the clearance of any outstanding payroll payments.

Additionally, the Debtor's employees (both exempt and non-exempt) have accrued vacation and leave benefits, which the Debtor requests authorization to continue to honor in the

---

[4] The Debtor's key employees are "Exempt" employees.  In that regard, they are not owed pre-petition Wages, but they are owed pre-petition vacation and leave benefits that this Motion seeks Court authority to honor, up to the statutory cap.  Additionally, pre-petition, the Debtor deducted from their payroll contributions to their respective 401k accounts, which the Debtor has transferred to the 401k provider.  The Debtor expects that the transfer will clear by November 17, 2015.  Such transfer is of property being held in trust for the Debtor's employees.
[5] Examples of "non-exempt" employees include the Debtor's receptionists, customer service representatives, and content coordinators.

ordinary course of the Debtor's business. A detailed list of the Debtor's employees (by employee number)[6] and the amount of accrued vacation and leave benefits owed to such employees, is attached as Exhibit 2 to the Grare Declaration. The total value of such benefits considering the statutory cap of $12,475 and required tax and related withholdings per employee is approximately $475,699. Irrespective of the amounts set forth in Exhibits 1 and 2 to the Grare Declaration, no employee will receive in value over $12,475 on account of their collective pre-petition claims for Wages and vacation and leave benefits.

Thus, by this Motion, the Debtor seeks authority to (i) pay and/or honor all pre-petition Wages of its employees (including any Wages which are unpaid as a result of a pre-petition payroll check being returned for insufficient funds which may be caused by a freeze on Debtor's pre-petition bank accounts or a conversion to debtor in possession accounts); and (ii) honor accrued vacation and leave benefits in the ordinary course of business, provided that no employee shall receive in value over $12,475 on account of pre-petition claims for Wages and vacation and leave benefits.

The source of the funds to be used to pay and/or honor the pre-petition Wages and accrued vacation and leave benefits of the employees will be the Debtor's cash on hand, and any funds received pursuant to the Debtor's cash collateral and financing motion and/or development services agreement motion, which may constitute cash collateral. Concurrently herewith, the Debtor has filed an emergency motion for an order authorizing the Debtor to use cash collateral and obtain post-petition financing, including in order to pay the Wages and vacation and leave benefits described herein.

The Debtor makes the following disclosures in connection with the Motion:

1.     The employees are still employed by Debtor. The Wages and vacation and leave benefits the Debtor proposes to pay are for employees that the Debtor still employs and will continue to employ at this time.

---

[6] The Debtor has not disclosed the identity of the Debtor's employees in order to maintain privacy with respect to employee's identities as well as the amount of vacation pay owed to each respective employee. Should the Court request a list of employee names, the Debtor will request

13

2.  <u>The proposed payments to the employees are absolutely necessary</u>.  It is crucial for the Debtor to retain its employees and employee talent pool during this critical phase in the Debtor's operations, and it is critical for the Debtor to retain its key employees in connection with the proposed sale of assets to Pandora.  Moreover, given that the Debtor with market its assets/business to potential overbidders, it is important for the Debtor to maintain its employee base.  Furthermore, it is crucial that the Debtor retains its employees during this critical beginning phase of the Debtor's bankruptcy case, where additional administrative and other obligations are imposed upon the Debtor, and when the Debtor will require the efforts of its employees to, among other things, maintain the value of the Debtor's assets, assist the Debtor with the Debtor's operations, assist the Debtor with the Debtor's chapter 11 bankruptcy obligations, serve as resources to the Debtor's bankruptcy counsel, and otherwise fulfill their respective job responsibilities during the Debtor's bankruptcy case.

If the Debtor does not continue to pay the employees their ordinary and earned Wages and continue to honor employee benefits, the employees may quit, and the Debtor may lose its employee talent pool.  Without the employees, the Debtor's value may be negatively impacted.  Indeed, if key employees leave, the Debtor's proposed sale of its assets to Pandora could be impaired.  The Debtor must retain its employees to preserve the value of the Debtor's respective assets.  Moreover, the Debtor seeks the ability to be able to represent to its employees as soon as possible that the Bankruptcy Court has approved this Motion (or, alternatively, if the Bankruptcy Court has denied this Motion, to immediately advise their employees of such facts so that employees are aware of such facts and do not later claim that Debtor misrepresented or withheld facts from its employees).  Based on the foregoing, the Debtor respectfully submits that the relief requested in the Motion is necessary to avoid immediate and irreparable harm.    Accordingly, the Debtor requests a hearing on this Motion as soon as practical for the Bankruptcy Court, and no later than November 20, 2015, so that the Debtor has sufficient time prior to the Thanksgiving holiday to

that such information be provided to the Court under seal.

coordinate payroll payments with its payroll servicing company (which administers the Debtor's payroll using the Debtor's payroll account).

3. <u>The proposed payment procedures are beneficial to the Debtor</u>. The Debtor seeks to honor the Wages and other benefits which would constitute priority claims pursuant to Section 507 of the Bankruptcy Code. Such claims would otherwise be required to be paid in full under a plan of reorganization. However, if the Debtor does not honor such Wages and benefits now, the Debtor runs a serious risk of losing talented, valuable employees. The loss of employees would be severely detrimental to the Debtor's business.

4. <u>No Insiders are being Paid Pursuant to this Motion</u>. None of the Wages constitutes the Wages of any insiders of the Debtor.

5. <u>The employees' claims are within the limits established by Section 507 of the Bankruptcy Code.</u> The Debtor only seeks authority to (i) pay and/or honor all pre-petition Wages of the employees and related payroll taxes; and (ii) honor accrued vacation and leave benefits in the ordinary course of business, provided that no employee shall receive in value over $12,475 on account of pre-petition claims for Wages and vacation and leave benefits.

6. <u>The proposed payments will not render the Debtor's estate administratively insolvent.</u> The Debtor believes that its cash on hand, post-petition development services fees and post-petition financing will be collectively sufficient to pay the Wages without rendering the Debtor's estate administratively insolvent. The Debtor is current with its payroll obligations, and is seeking Court approval to pay the Wages solely due to the timing of its bankruptcy filing as compared to the Debtor's payroll schedule.

Based on the foregoing, the Debtor respectfully submits that the relief requested in the Motion is necessary to avoid immediate and irreparable harm.

## II. <u>DISCUSSION</u>

### A. <u>Payment Of Certain Pre-Petition Wages Is Permissible Under Section 507(a)(4).</u>

Section 507(a)(4) of the Bankruptcy Code provides priority to claimants, up to $12,475 per individual, for wages, salaries, or commissions, including vacation, insurance, and sick leave earned

by individuals within 180 days prior to the filing of a case under chapter 11 of the Bankruptcy Code.  Here, the Debtor only seeks to pay such Wages, salaries, or commissions, including vacation, insurance, and sick leave earned by individuals within 180 days prior to the filing of a case under chapter 11 of the Bankruptcy Code.

**B.      The Court Has The Authority To Grant The Relief Requested Herein.**

Pursuant to Section 105(a) of the Bankruptcy Code, "the court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  The basic purpose of Section 105(a) is "to assure the bankruptcy courts power to take whatever action is appropriate or necessary in aid in their jurisdiction."  2 Collier on Bankruptcy ¶ 105.01 at 105-3 (15th ed. rev. 1998).  Essentially, Section 105(a) codifies the bankruptcy court's inherent equitable powers. *See Green v. Drexler (In re Feit & Drexler, Inc.)*, 760 F.2d 406 (2d Cir. 1985).

Where business exigencies require, courts have authorized debtors to pay the pre-petition claims of particular creditors.  *In re Ionosphere Clubs, Inc.*, 98 B.R. l74 (Bankr. S.D.N.Y. l989). The "Necessity of Payment Rule" empowers a court to authorize a debtor to pay pre-petition claims essential to continued operations.  *Id.* at l75-76 (citing *Miltenberger v. Logansport, C. & S. W .R. Co.*, 106 U.S. 286 (1882)):

> The 'necessity of payment' doctrine permits immediate payment of claims of creditors where those creditors will not supply services or materials essential to the conduct of the business until their pre-reorganization claims have been paid.

*Ionosphere Clubs*, 98 B.R. at 176 (quoting *In re Leigh and New England Railway Company*, 657 F.2d 570, 581 (3rd Cir. 1981)).  This rule applies in all chapter 11 cases because "the rationale for the necessity of payment rule, i.e., facilitating the continued operation and rehabilitation of the debtor . . . is . . . a paramount goal of chapter 11."  *Ionospere Clubs*, 98 B.R. at 176 (citing *Dudley v. Mealey*, 147 F.2d 268 (2d Cir. 1945)).  Therefore, where continued operation and rehabilitation of the debtor require payment of pre-petition wages, the Court may authorize such payment under Sections 363(b) and/or 105(a) of the Bankruptcy Code.

In *Armstrong World Industries, Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.)*, 29 B.R. 391, 394 (S.D.N.Y. 1983), the district court recognized the "special status" of suppliers

holding unstayed lien rights, and authorized the debtor to pay their claims in the ordinary course of its business activities. *See also Dave Noake, Inc. v. Harold's Garage, Inc. (In re Dave Noake, Inc.)*, 45 B.R. 555 (Bankr. D. Vt. 1984) (rejecting a challenge under section 549 to post-petition payments made to creditor holding lien rights under local law). Similarly, one former bankruptcy judge has recognized that when "confronted with special circumstances . . . particularly in the early stages of the case, a court may preserve the potential for rehabilitation." Ordin, Finality of Order of Bankruptcy Court, 54 Am. Bankr. L.J. 173 (1980).

In *In re Gulf Air, Inc.*, 112 Bankr. 152 (Bankr. W.D. La. 1989), the court noted that cases decided both under the Act and the Code have recognized the "necessity of payment" doctrine under which payment of pre-petition employee claims is authorized prior to the time a plan of reorganization is confirmed so long as absent such payment there is a risk that the services of key employees will be lost to the debtor and without such employees, the debtor's going concern value will be impaired. *Id.* at 153.

**C.     The Relief Requested Herein Is Necessary To Avoid Immediate And Irreparable Harm And Is Therefore Warranted Under Rule 6003 Of The Federal Rules Of Bankruptcy Procedure.**

Rule 6003 of the Federal Rules of Bankruptcy Procedure states, in relevant part:

> Except to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, grant relief regarding the following:
>
> [...]
>
> (b) a motion to use, sell, lease, or otherwise incur an obligation, regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition, but not a motion under Rule 4001; and
>
> (c ) a motion to assume or assign an executory contract or unexpired lease in accordance with §365.

Fed. R. Bankr. P. 6003.

The Debtor's failure to pay pre-petition Wages to the employees and honor the accrued vacation and leave benefits will likely result in severe disruptions to the Debtor's operations and may jeopardize the Debtor's ability to preserve the full value of its business and assets, including the loss of the Debtor's employee talent pool, which any purchaser of the Debtor's assets/business would likely wish to maintain. Indeed, the Purchase Agreement contains both provisions for price adjustments (up to $15.0 million), and provisions constituting closing conditions, respectively, if specified individuals and threshold numbers of employees of the Debtor do not accept employment with the Purchaser following the Sale.

All of the payments being requested to be made herein are payments on account of claims which would be entitled to priority under the Bankruptcy Code, in that all such Wages and vacation and leave benefits were earned, within 180 days of the filing of the Debtors' bankruptcy petition.

Accordingly, Debtor respectfully submits that the payment of the employees' pre-petition Wages and related payroll taxes, and the honoring of the employees' accrued vacation and leave benefits, are necessary to avoid immediate and irreparable harm and are therefore warranted under Rule 6003 of the Federal Rules of Bankruptcy Procedure.

### III.    CONCLUSION

**WHEREFORE**, the Debtor respectfully requests that this Court hold a hearing on this Motion and issue an order:

1.    granting this Motion and entering the Order;

2.    affirming the adequacy of the notice given;

3.    finding that the relief requested in the Motion is necessary to avoid immediate and irreparable harm;

4.    authorizing the Debtor to (i) pay and/or honor all pre-petition Wages to their respective employees and related payroll taxes as requested herein; and (ii) honor accrued vacation and leave benefits in the ordinary course of business, provided that no employee shall receive in value over $12,475 on account of such pre-petition claims for Wages and vacation and leave benefits; and

///

1      5.      granting such other and further relief as the Court deems just and proper.

2

3   Dated: November 16, 2015          RDIO, INC.

4                                     By:   /s/ Krikor J. Meshefejian
                                            RON BENDER
5                                           PHILIP A. GASTEIER
                                            MONICA Y. KIM
6                                           KRIKOR J. MESHEFEJIAN
                                            LEVENE, NEALE, BENDER, YOO
7                                               & BRILL L.L.P.
                                            Proposed Attorneys for Chapter 11 Debtor
8                                           and Debtor in Possession

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "1"

RON BENDER (SBN 143364)
PHILIP A. GASTEIER (SBN 130043)
MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbyb.com; pag@lnbyb.com;
myk@lnbyb.com; kjm@lnbyb.com

Proposed Attorneys for Chapter 11 Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>RDIO, INC.,<br><br>          Debtor and Debtor in Possession. | Case No. 15-31430<br><br>Chapter 11 Case<br><br>**ORDER GRANTING DEBTOR'S EMERGENCY MOTION FOR ORDER: (1) AUTHORIZING DEBTOR TO (A) PAY AND HONOR PRE-PETITION EMPLOYEE WAGES, RELATED PAYROLL TAXES, REIMBURSEABLE EXPENSES AND OTHER EMPLOYEE OBLIGATIONS IN THE ORDINARY COURSE OF BUSINESS; (B) HONOR ACCRUED VACATION, LEAVE AND OTHER BENEFITS; AND (2) PROVIDING RELATED RELIEF**<br><br>Date:   November 18, 2015<br>Time:   10:00 a.m.<br>Place:  U.S. Bankruptcy Court<br>          Courtroom 22<br>          235 Pine St.<br>          San Francisco, CA 94104<br>Judge:  The Hon. Dennis Montali |

On November 18, 2015, the Court held a hearing to consider the emergency motion ("Motion") filed by Rdio, Inc., debtor and debtor in possession in the above-referenced chapter 11 case ("Debtor"), pursuant to 11 U.S.C. §§ 105(a), 363(b), 363(c), and 507 (a)(4) and (a)(5), as applicable (the "Motion"), for entry of an order: (1) authorizing Debtor to: (A) pay pre-petition wages, related payroll taxes, commissions, benefits and reimbursable expenses (collectively, "Wages") to employees, and (B) honor pre-petition accrued vacation and leave benefits in the ordinary course of Debtor's business, provided that no employee shall receive in value over $12,475 on account of the foregoing pre-petition claims; and (2) providing related relief.

The Court, having considered the Motion, the declaration of Maikao Grare in support of the Motion, all documents filed in support of the Motion, the statements and arguments made on the record at the hearing, the entire record in this case, having found that notice of the Motion was proper under the Local Bankruptcy Rules, the Federal Rules of Bankruptcy Procedure, and the Bankruptcy Code, as may have been modified by the Court under the circumstances, having determined that the approval of the Motion on an emergency basis is necessary and proper to avoid irreparable harm to the Debtor and its estate, and for other good cause appearing,

**HEREBY ORDERS AS FOLLOWS:**

1.     The Motion is granted.

2.     Subject to decretal paragraph 5, the Debtor is authorized to pay and/or honor the Wages of the employees in the ordinary course of business, including those Wages which are unpaid as a result of a pre-petition payroll check being returned for insufficient funds.

3.     The Debtors is authorized to pay any payroll taxes owed in connection with the Wages.

4.     The Debtor is authorized to honor pre-petition accrued vacation and leave benefits in the ordinary course of the Debtor's business.

5.      No employee shall receive in value over $12,475 on account of the foregoing pre-petition claims.

6.     Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in the Motion or this Order shall be deemed (a) an admission as to the validity

of any claim against the Debtor; (b) a waiver of the Debtor's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this Order or the Motion; (e) a request for authorization to assume any agreement, contract, or lease pursuant to Bankruptcy Code section 365; (f) a waiver of the Debtor's rights under the Bankruptcy Code or any other applicable law; or (g) to create any rights in favor of, or enhance the status of, any claim held by any person or entity.

**\*End of Order\***