RON BENDER (SBN 143364)
PHILIP A. GASTEIER (SBN 130043)
MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbyb.com; pag@lnbyb.com; myk@lnbyb.com;
kjm@lnbyb.com

Proposed Attorneys for Chapter 11 Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: | Case No. 15-31430 |
| RDIO, INC., | Chapter 11 |
| Debtor. | **OMNIBUS DECLARATION OF MAIKAO GRARE IN SUPPORT OF:** |
| | **(1) DEBTOR'S EMERGENCY MOTION FOR ORDER: (1) AUTHORIZING DEBTOR TO (A) PAY AND HONOR PRE-PETITION EMPLOYEE WAGES, RELATED PAYROLL TAXES, REIMBURSEABLE EXPENSES AND OTHER EMPLOYEE OBLIGATIONS IN THE ORDINARY COURSE OF BUSINESS; (B) HONOR ACCRUED VACATION, LEAVE AND OTHER BENEFITS; AND (2) PROVIDING RELATED RELIEF;** |
| | **(2) DEBTOR'S EMERGENCY MOTION FOR AN ORDER: (A) AUTHORIZING THE CONTINUED USE OF CERTAIN PORTION OF DEBTOR'S CASH MANAGEMENT SYSTEM, (B) AUTHORIZING THE MAINTENANCE OF PAYROLL AND RECEIVABLES BANK ACCOUNTS; AND (C) ORDERING BANKS TO RELEASE** |

) **ADMINISTRATIVE HOLDS AND/OR**
) **FREEZES ON THE DEBTOR'S PRE-**
) **PETITION ACCOUNTS; AND**
)
) **(3) DEBTOR'S EMERGENCY MOTION**
) **FOR ENTRY OF AN ORDER**
) **AUTHORIZING DEBTOR TO PROVIDE**
) **ADEQUATE ASSURANCE OF FUTURE**
) **PAYMENT TO UTILITY COMPANIES**
) **PURSUANT TO SECTION 366(c) OF**
) **THE BANKRUPTCY CODE**
)
) Court Scheduled Hearing:
) Date:  November 18, 2015
) Time:  10:00 a.m.
) Place:  U.S Bankruptcy Court
)          Courtroom 22
)          235 Pine St.
)          San Francisco, CA 94104
) Judge:  The Hon. Dennis Montali

I, Maikao Grare, hereby declare as follows:

1.      Unless indicated to the contrary, I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.      I am the Senior Vice President of Finance of Rdio, Inc., Chapter 11 Debtor and Debtor in Possession (the "Debtor").  I have held that position since approximately April 2011. As a result, I have acquired detailed knowledge of the Debtors business and financial affairs.

3.      I submit this Declaration in support of the following motions filed by the Debtor:

        a.      *Debtor's Emergency Motion For Order (1) Authorizing Debtor to (A) Pay and Honor Pre-petition Employee Wage, Related Payroll Taxes, Reimbursable Expenses And Other Employee Obligations In The Ordinary Course Of Business, and (B) Honor Accrued Vacation, Lease And Other Benefits; and (2) Providing Related Relief* (the "Payroll Motion");

b.   *Debtor's Emergency Motion For An Order: (A) Authorizing The Continued Use Of Certain Portion Of Debtor's Cash Management System; (B) Authorizing The Maintenance Of Payroll And Receivables Bank Accounts; And (C) Ordering Banks To Release Administrative Holds And/Or Freezes On The Debtor's Pre-Petition Accounts* (the "<u>Cash Management Motion</u>"); and

c.   *Debtor's Emergency Motion For Entry Of An Order Authorizing Debtor To Provide Adequate Assurance Of Future Payment To Utility Companies Pursuant To Section 366(c) Of The Bankruptcy Code* (the "<u>Utilities Motion</u>").

4.   The Debtor filed a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on November 16, 2015 (the "Petition Date").  The Debtor continues to operate its business, manage its financial affairs and administer its bankruptcy estate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

**A.**   **<u>Background</u>**

5.   The Debtor filed a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>") on November 16, 2015 (the "<u>Petition Date</u>").  The Debtor continues to operate its business, manage its financial affairs and administer its bankruptcy estate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

**B.**   **<u>The Debtor's Business, Assets and Liabilities</u>**

6.   The Debtor was founded in 2008 as a digital music service.  The Debtor's business operations were launched in 2010 after the Debtor secured requisite licenses from the applicable holders of music rights.  Since that time, the Debtor has strived to grow into a worldwide music service and today is in 86 countries.

7.   One of the primary services provided by the Debtor is an unlimited, on demand music streaming service where for $9.99 per month the user has access to an entire library of songs with access to them through a computer, mobile device, etc.  In other words, the Debtor's business

model is based upon a monthly recurring subscription for full access to content rather than on an owned a la carte download model. The Debtor also makes available other subscription tiers at lower costs per month with varying service offerings or functionality (e.g., a family tier, a student tier, and a select tier with alternative functionality). The Debtor generates approximately $1.5 million of U.S. monthly revenue from its monthly subscription service.

8. While the Debtor's monthly subscription service provides the Debtor with its primary revenue source, the Debtor also generates approximately $100,000-$150,000 of monthly revenue from advertisers who advertise in the Debtor's advertising-based service offerings. The Debtor, therefore, currently generates approximately $1.6-$1.65 million of total monthly revenue.

9. The Debtor's primary assets consist of the Debtor's (i) owned technology (e.g., website, mobile apps, content ingestion technology, reporting technology, software, databases, etc.), (ii) content license agreements, (iii) subscribers, (iv) employee talent pool, and (v) goodwill.

10. Under its current operating business model, the Debtor has monthly operating expenses of approximately $3.5-$4.0 million, comprising primarily payroll for the Debtor's approximately U.S. 140 employees (much of which represents costs of retaining high caliber Silicon Valley engineering talent), payment to the owners of music rights, costs of maintaining the service, rent, marketing costs, business development costs, technology maintenance costs, and foreign administrative expenses). With average monthly total revenue of approximately $1.6-$1.65 million and average monthly operating expenses of $3.5-$4.0 million, the Debtor's business operations under its current operating business model result in operating losses of approximately $1.85-$2.4 million per month, and the Debtor no longer has the economic means of funding such significant operating cash flow shortfall.

11. The Debtor has approximately $190,237,000 of secured debt and approximately $30,000,000 of unsecured debt. The details and more expansive explanation of the relationships involving the various secured creditors is set forth in the Debtor's emergency motion for use of cash collateral and approval of debtor-in-possession financing.

///

**C.** **The Proposed Asset Sale.**

12. In the fall of 2014, the Debtor's majority shareholder, Pulser Media, Inc. ("Pulser Media") employed a highly qualified investment bank in Moelis & Company ("Moelis") in the fall of 2014, initially with the goal of attempting to raise new equity capital. Despite extensive efforts by Moelis, it ultimately became clear that raising new equity capital was not going to be possible. At that point, Pulser Media charged Moelis with finding either substantial outside investment or a buyer or merger partner because the Debtor was not going to be able to continue to fund its significant operating losses indefinitely.

13. After conducting an extremely broad marketing process, the highest and best offer received by the Debtor was an all cash asset purchase offer from Pandora Media, Inc. ("Pandora") in the amount of $75 million, plus certain other consideration, to acquire the Debtor's technological assets. The final negotiated and signed asset purchase agreement, which is being filed with the Court as part of the Debtor's emergency motion for approval of bid procedures, contains a $75 million cash purchase price (the "Purchase Agreement"). Based on its due diligence, by the time of the execution of the LOI, Pandora had decided that it would only proceed with a transaction if that transaction were conducted as part of a Chapter 11 filing and a purchase pursuant to a sale under the Bankruptcy Code. Pandora has agreed that the Debtor can and should market Pandora's offer for overbid to insure that the highest and best price is paid for the Debtor's assets/business.

14. Additionally, like most tech companies in the current market, the Debtor operates in a very competitive environment, especially as concerns employees. The key employees who are associated with the Debtor's intellectual property assets are extremely important to the proposed sale. Employees with these types of skills and knowledge are also very much in demand from other technology companies. The Debtor's Chapter 11 filing may be cause for some of those employees to consider other employment opportunities, unless they can be relatively assured of a rapid transition. The timing of a sale is thus critical to Pandora, in that the value of the assets is diminished if the key employees are no longer available. It is for this reason

that the purchase agreement contains both provisions for price adjustments, and provisions allowing Pandora to terminate the purchase agreement, respectively, if specified threshold numbers of employees of the Debtor do not accept employment with Pandora following the sale. Thus, it is critical that the Debtor's employees are retained by the Debtor.

**D.** **Necessity To Pay Pre-Petition Priority Wages And Honor Vacation And Other Leave Benefits.**

15.     In order to ensure a smooth and effective bankruptcy sale process, and in order to ensure that the Debtor continues to receive services provided by its employees, and retain its employees, the Debtor requests Court authority to pay Wages and honor pre-petition accrued vacation and leave benefits in the ordinary course of the Debtor's business, provided that no employee shall receive in value over $12,475 on account of the foregoing pre-petition claims. The Debtor also seeks Court authority to pay all employee withholdings and employee payroll taxes related to the Wages.

16.     The Debtor typically pays its respective employees' Wages twice per month. Employees that are considered "exempt" (meaning that they do not receive overtime pay) have been paid their Wages through November 15, 2015.[1] Employees that are considered "non-exempt"[2] (meaning that they do receive overtime pay) are owed Wages for the pre-petition period of November 11, 2015 through November 15, 2015.

17.     On Monday, November 30, 2015, the Debtor is scheduled to pay non-exempt employees' Wages earned during the period of November 11, 2015, through November 25, 2015. The Wages earned during the period of November 11, 2015 through November 15, 2015 constitute pre-petition Wages.

---

[1] The Debtor's key employees are "Exempt" employees. In that regard, they are not owed pre-petition Wages, but they are owed pre-petition vacation and leave benefits that this Motion seeks Court authority to honor, up to the statutory cap. Additionally, pre-petition, the Debtor deducted from their payroll contributions to their respective 401k accounts, which the Debtor has transferred to the 401k provider. The Debtor expects that the transfer will clear by November 17, 2015. Such transfer is of property being held in trust for the Debtor's employees.

[2] Examples of "non-exempt" employees include the Debtor's receptionists, customer service representatives, and content coordinators.

18.     The approximate amount of pre-petition Wages (plus payroll taxes and withholdings) and related obligations that the Debtor will owe to non-exempt employees on November 30, 2015, is $8,093.85, as set forth in Exhibit 1 to this Declaration.

19.     The Debtor is virtually current with all of its exempt employees' pre-petition Wages, except for some expense reimbursement claims in the total amount of approximately $1,340.22.  Pre-petition, the Debtor paid its exempt employees' wages, commissions and salaries through November 15, 2015.  Virtually all of the Debtor's employees received wire transfers of such wages, so as of the bankruptcy filing date, the Debtor believes that all such pre-petition wages have been paid.  However, to the extent a wire transfer has not cleared or to the extent an employee receives a check instead of a wire transfer and the check has not been cashed, the Debtor requests Court authority to honor such payments post-petition.  Concurrently herewith, the Debtor has filed a motion to maintain its payroll account, and to remove any freeze on accounts, pending the clearance of any outstanding payroll payments.

20.     Additionally, the Debtor's employees (both exempt and non-exempt) have accrued vacation and leave benefits, which the Debtor requests authorization to continue to honor in the ordinary course of the Debtor's business.  A detailed list of the Debtor's employees (by employee number)[3] and the amount of accrued vacation and leave benefits owed to such employees, is attached as Exhibit 2 to this Declaration.  The total value of such benefits considering the statutory cap of $12,475 and required tax and related withholdings per employee is approximately $475,699. Irrespective of the amounts set forth in Exhibits 1 and 2 to this Declaration, no employee will receive in value over $12,475 on account of their collective pre-petition claims for Wages and vacation and leave benefits.

21.     The source of the funds to be used to pay and/or honor the pre-petition Wages and accrued vacation and leave benefits of the employees will be the Debtor's cash on hand, and any

---

[3] The Debtor has not disclosed the identity of the Debtor's employees in order to maintain privacy with respect to employee's identities as well as the amount of vacation pay owed to each respective employee.  Should the Court request a list of employee names, the Debtor will request that such information be provided to the Court under seal.

funds received pursuant to the Debtor's cash collateral and financing motion and/or development services agreement motion, which may constitute cash collateral. Concurrently herewith, the Debtor has filed an emergency motion for an order authorizing the Debtor to use cash collateral and obtain post-petition financing, including in order to pay the Wages and vacation and leave benefits described herein.

22. I make the following disclosures in connection with the Motion:

a. <u>The employees are still employed by Debtor</u>. The Wages and vacation and leave benefits the Debtor proposes to pay are for employees that the Debtor still employs and will continue to employ at this time.

b. <u>The proposed payments to the employees are absolutely necessary</u>. It is crucial for the Debtor to retain its employees and employee talent pool during this critical phase in the Debtor's operations, and it is critical for the Debtor to retain its key employees in connection with the proposed sale of assets to Pandora. Moreover, given that the Debtor with market its assets/business to potential overbidders, it is important for the Debtor to maintain its employee base. Furthermore, it is crucial that the Debtor retains its employees during this critical beginning phase of the Debtor's bankruptcy case, where additional administrative and other obligations are imposed upon the Debtor, and when the Debtor will require the efforts of its employees to, among other things, maintain the value of the Debtor's assets, assist the Debtor with the Debtor's operations, assist the Debtor with the Debtor's chapter 11 bankruptcy obligations, serve as resources to the Debtor's bankruptcy counsel, and otherwise fulfill their respective job responsibilities during the Debtor's bankruptcy case.

If the Debtor does not continue to pay the employees their ordinary and earned Wages and continue to honor employee benefits, the employees may quit, and the Debtor may lose its employee talent pool. Without the employees, the Debtor's value may be negatively impacted. Indeed, if key employees leave, the Debtor's proposed sale of its assets to Pandora could be impaired. The Debtor must retain its employees to preserve the value of the Debtor's respective assets. Moreover, the Debtor seeks the ability to be able to represent to its employees as soon as

possible that the Bankruptcy Court has approved this Motion (or, alternatively, if the Bankruptcy Court has denied this Motion, to immediately advise their employees of such facts so that employees are aware of such facts and do not later claim that Debtor misrepresented or withheld facts from its employees). Based on the foregoing, the Debtor respectfully submits that the relief requested in the Motion is necessary to avoid immediate and irreparable harm. Accordingly, the Debtor requests a hearing on this Motion as soon as practical for the Bankruptcy Court, and no later than November 20, 2015, so that the Debtor has sufficient time prior to the Thanksgiving holiday to coordinate payroll payments with its payroll servicing company (which administers the Debtor's payroll using the Debtor's payroll account).

        c. <u>The proposed payment procedures are beneficial to the Debtor</u>. The Debtor seeks to honor the Wages and other benefits which I understand would constitute priority claims pursuant to Section 507 of the Bankruptcy Code. I understand that such claims would otherwise be required to be paid in full under a plan of reorganization. However, if the Debtor does not honor such Wages and benefits now, the Debtor runs a serious risk of losing talented, valuable employees. The loss of employees would be severely detrimental to the Debtor's business.

        c. <u>No Insiders are being Paid Pursuant to this Motion</u>. None of the Wages constitutes the Wages of any insiders of the Debtor.

        d. <u>The employees' claims are within the limits established by Section 507 of the Bankruptcy Code.</u> No employee shall receive in value over $12,475 on account of pre-petition claims for Wages and vacation and leave benefits.

        e. <u>The proposed payments will not render the Debtor's estate administratively insolvent.</u> The Debtor's cash on hand, post-petition development services fees and post-petition financing will be collectively sufficient to pay the Wages without rendering the Debtor's estate administratively insolvent. The Debtor is current with its payroll obligations, and is seeking Court approval to pay the Wages solely due to the timing of its bankruptcy filing as compared to the Debtor's payroll schedule.

**E.     The Debtor's Cash Management System**

24.     The Debtor has a number of domestic and foreign bank accounts.  Other than the two accounts discussed in the Cash Management Motion, the Debtor will close all of its pre-petition bank accounts, including all of its foreign bank accounts, and open debtor in possession accounts as required by the Office of the United States Trustee.  However, the maintenance and continued use of the Debtor's pre-petition payroll account and pre-petition receivables account is necessary.

25.     Pursuant to the Cash Management Motion, the Debtor seeks to maintain its pre-petition payroll account with HSBC Bank USA (Bank Account Number *****9364) and its pre-petition receivables account with HSBC Bank USA (Bank Account Number *****7978).  The Debtor's pre-petition payroll account is used to make payroll payments to the Debtor's employees.  Concurrently herewith, the Debtor has filed a motion for an order authorizing the Debtor to pay certain pre-petition wage claims and honor certain vacation, leave and other benefits (the Payroll Motion) Assuming that the Court grants the Payroll Motion, maintenance of the Debtor's pre-petition payroll account will be necessary to ensure that payroll payments to the Debtor's employees are not disrupted or delayed.  Since virtually all of the Debtor's approximately 140 U.S. employees receive payroll payments via direct deposit, it would be impractical, costly, and an inefficient use of the Debtor's scarce resources to reschedule with each employee that receives a direct deposit of wages a new direct deposit connection.  Moreover, authority to maintain the bank account would be rendered meaningless if this Court did not also authorize the clearance of payroll checks written from the account.  As such, the Debtor requests that the Court authorize the Debtor to maintain its pre-petition payroll account, and authorize the clearance of pre-petition and post-petition checks issued from the payroll account.

26.     Pursuant to the Cash Management Motion, the Debtor also seeks to maintain its pre-petition receivables account.  As set forth above, the Debtor's primary source of revenue is monthly subscriptions which generate approximately $1.5 million per month, which customers typically pay for using credit cards which are automatically billed by the Debtor on a monthly

basis. A closure of the Debtor's pre-petition receivables account could disrupt the collection of subscription fees, and re-establishing and re-connecting credit card billings to a new account would be impractical, costly, and an inefficient use of the Debtor's scarce resources. As such, the Debtor requests that the Court authorize the Debtor to maintain its pre-petition receivables account, and authorize the clearance of transfers from the receivables account. The Debtor will transfer collections from the pre-petition receivables account into a debtor in possession account operating account. Upon entry of the interim order approving the Debtor's emergency motion for authority to use cash collateral and to obtain debtor in possession financing, the Debtor's postpetition debtor in possession operating account (and any other accounts opened postpetition) will constitute DIP Collateral, subject to the perfected DIP Liens of the DIP Lender and the Adequate Protection Liens of Prepetition Secured Parties, as such terms are defined in the Debtor's emergency financing motion, filed contemporaneously herewith.

27. The Debtors propose to maintain those bank accounts (the "Bank Accounts") for the reasons set forth in the Cash Management Motion and this Declaration. The Debtor understands that if it closed the Bank Accounts, there would be disruption to paying their employees, additional and unnecessary costs in transitioning direct deposits to new accounts, and a severe disruption in the receipt of revenue. Accordingly, the Debtor requests Court authority to maintain the Bank Accounts. The Debtor will still open required debtor-in-possession accounts at a depository approved by the Office of the United States Trustee. The Debtor believes that this structure will ensure that receipts and disbursements are not disrupted and are properly accounted.

**F.    Adequate Assurance Of Payment To The Utility Companies**

28. The Debtor's headquarters are located at 1550 Bryant Street, San Francisco, CA (Suites 200, 220 and 360) which the Debtor occupies pursuant to a lease agreement with DP 1550 Bryant, LLC (the "Landlord"). The Debtor receives utility services at its headquarters. Pursuant to the Debtor's lease, the Landlord pays for all utilities and janitorial services, and then charges the Debtor for the Debtor's share of the usage of utilities and janitorial services. As such, utility services such as water, electricity, gas, trash disposal, and the like, are not in the name of the

Debtor and are not separately metered for the Debtor.  The only utility services received by the Debtor which are contracted for directly by the Debtor, are telephone, cable and internet services. Specifically, Comcast provides internet and cable services to the Debtor, and Mosaic Networx provides telephone services to the Debtor (each a "Utility Company", and together, the "Utility Companies").

29.     The service provided by the Utility Companies are crucial to the Debtor's operations, ability to conduct business, ability to preserve assets, and ability to communicate and send/receive information, both internally and externally. Without such services, the Debtor's employees would be unable to carry out their job responsibilities, and the Debtor would be unable to function as a business entity or as a debtor in possession.  Given the importance of the services provided by the Utility Companies to the Debtor's assets/business, it is crucial that the means of providing adequate assurance to the Utility Companies which provide utility services to the Debtor be determined immediately so that there is no interruption in the services provided.  An interruption in the services provided would lead to an inability to conduct business, which may result in business disruption.

30.     Attached as Exhibit 3 to this Declaration is a list which sets forth, to the extent possible, on an account-by-account basis, the names and addresses of the Utility Companies that are currently providing utility services to the Debtor, the type of utility services provided by the Utility Company, and the average monthly payment to each Utility Company based on the total amount incurred by NAHC during the past approximately three months.

31.     For each account that the Debtor has with a Utility Company, the Debtor is proposing to provide each of its respective Utility Companies with cash deposits in an amount equal to the average monthly payment based on the amount incurred on the account during the past three billing cycles.

32.     The total amount of the cash deposits proposed to be paid by the Debtor to its Utility Companies is $4,245.46.  Specifically, during the past three billing cycles, Comcast charged the Debtor $354.45 - $354.46 per month .  Accordingly, the deposit the Debtor proposes

to pay to Comcast is $354.46.  During the past three billing cycles, Mosaic Networx charged the Debtor $3,900 per month for telephone services.  This amount does not include any taxes or surcharges, and this amount does not include "bandwidth" services which the Debtor does not consider to be a utility service.

33.   In addition to paying the foregoing cash deposits, the Debtor will bring the Utility Company current on all post-petition debts owed to such Utility Companies.

34.   The source of the funds to be used to pay the cash deposits to the Utility Companies will be the cash described in the Debtor's cash collateral motion and motion to approve development services agreement.  Approval to pay the proposed cash deposits to the Utility Companies will not render the Debtor's bankruptcy estate administratively insolvent.

I declare and verify under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on this 16th day of November, 2015, at San Francisco, California.

MAIKAO GRARE, Declarant

**EXHIBIT "1"**

| | 11-Nov | 12-Nov | 13-Nov | 14-Nov | 15-Nov | Reg Hours | OT | Gross | Net | EE State Withholding | EE CASDI | EE Fed Withholding | Med | SS | ER SS | ER Med |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Employee 1 | 8 | 8 | 8 | | | 24 | 5 | $878.34 | $650.19 | 5.23 | 7.91 | 59.98 | 12.74 | 54.46 | 12.74 | 54.46 |
| Employee 2 | 8 | 8 | 8 | | | 24 | 5 | $866.21 | $792.14 | 0 | 7.8 | 0 | 12.56 | 53.71 | 12.56 | 53.71 |
| Employee 3 | 8 | 8 | 8 | | | 24 | 5 | $908.62 | $670.18 | 5.83 | 8.18 | 64.07 | 13.17 | 56.33 | 13.17 | 56.33 |
| Employee 4 | 8 | 8 | 8 | | | 24 | 5 | $832.90 | $747.56 | 0 | 7.5 | 14.12 | 12.08 | 51.64 | 12.08 | 51.64 |
| Employee 5 | 8 | 8 | 8 | | | 24 | 5 | $908.62 | $642.49 | 1.28 | 8.18 | 41.8 | 13.17 | 56.32 | 13.17 | 56.32 |
| Employee 6 | 8 | 8 | | | 8 | 24 | 5 | $726.89 | $595.72 | 0 | 6.54 | 25.41 | 10.54 | 45.07 | 10.54 | 45.07 |
| Employee 7 | 8 | 8 | 8 | 8 | | 32 | 5 | $911.50 | $738.19 | 0 | 8.2 | 31.57 | 13.22 | 56.51 | 13.22 | 56.51 |
| Employee 8 | 8 | 8 | 8 | | | 24 | 5 | $708.72 | $620.16 | 0 | 6.38 | 27.96 | 10.28 | 43.94 | 10.28 | 43.94 |
| Employee 9 | 7 | 7 | 7 | | | 21 | n/a | $428.40 | $391.76 | 0 | 3.86 | 0 | 6.21 | 26.57 | 6.21 | 26.57 |
| Employee 10 | | 8 | 8 | | | 16 | n/a | $400.00 | $365.80 | 0 | 3.6 | 0 | 5.8 | 24.8 | 5.8 | 24.8 |
| Employee 11 | 7.5 | | | 8 | 8 | 23.5 | n/a | $523.65 | $452.76 | 0 | 4.71 | 26.12 | 7.59 | 32.47 | 7.59 | 32.47 |

$8,093.85

# EXHIBIT "2"

| Employee ID | PTO @ 11/15, subject to $12,475 cap, 180d cap + tax |
| --- | --- |
| 79 | $ 5,364 |
| 218 | $ 5,527 |
| 89 | $ 6,033 |
| 289 | $ 5,553 |
| 217 | $ 1,585 |
| 159 | $ 926 |
| 281 | $ 2,737 |
| 219 | $ 3,599 |
| 160 | $ 3,719 |
| 68 | $ 5,368 |
| 276 | $ 4,220 |
| 254 | $ 1,815 |
| 232 | $ 5,213 |
| 55 | $ 3,163 |
| 298 | $ 5,077 |
| 258 | $ 2,932 |
| 305 | $ 2,618 |
| 270 | $ 3,504 |
| 236 | $ 3,511 |
| 117 | $ 1,188 |
| 175 | $ 1,198 |
| 44 | $ 2,970 |
| 261 | $ 3,632 |
| 237 | $ 3,735 |
| 142 | $ 2,160 |
| 168 | $ 6,188 |
| 179 | $ 3,787 |
| 239 | $ 5,318 |
| 52 | $ 2,546 |
| 233 | $ 3,432 |
| 265 | $ 3,681 |
| 191 | $ 3,902 |
| 315 | $ 873 |
| 109 | $ 3,336 |
| 170 | $ 4,285 |
| 41 | $ 1,912 |
| 294 | $ 3,966 |
| 229 | $ 4,626 |
| 259 | $ 3,632 |
| 123 | $ 5,461 |
| 167 | $ 1,170 |
| 314 | $ 833 |

| Employee ID | PTO @ 11/15, subject to $12,475 cap, 180d cap + tax |
|---|---|
| 224 | $ 3,632 |
| 97 | $ 4,466 |
| 277 | $ 4,284 |
| 166 | $ 6,239 |
| 255 | $ 1,721 |
| 312 | $ 3,173 |
| 262 | $ 3,795 |
| 285 | $ 4,125 |
| 132 | $ 4,116 |
| 24 | $ 6,790 |
| 34 | $ 926 |
| 206 | $ 4,191 |
| 302 | $ 3,094 |
| 306 | $ 2,962 |
| 165 | $ 5,284 |
| 295 | $ 1,105 |
| 29 | $ 4,678 |
| 65 | $ 6,073 |
| 164 | $ 4,249 |
| 144 | $ 3,161 |
| 70 | $ 6,621 |
| 188 | $ 4,128 |
| 268 | $ 3,638 |
| 76 | $ 6,322 |
| 287 | $ 1,100 |
| 278 | $ 3,966 |
| 134 | $ 7,151 |
| 293 | $ 3,808 |
| 81 | $ 5,101 |
| 267 | $ 3,504 |
| 211 | $ 4,785 |
| 50 | $ 7,804 |
| 198 | $ 8,409 |
| 107 | $ 2,640 |
| 96 | $ 2,591 |
| 147 | $ 4,269 |
| 172 | $ 1,904 |
| 215 | $ 3,565 |
| 115 | $ 4,985 |
| 54 | $ 3,546 |

| Employee ID | PTO @ 11/15, subject to $12,475 cap, 180d cap + tax |
|---|---|
| 316 | $ 1,005 |
| 299 | $ 2,962 |
| 210 | $ 5,236 |
| 279 | $ 2,055 |
| 139 | $ 5,721 |
| 257 | $ 2,805 |
| 304 | $ 2,739 |
| 275 | $ 4,823 |
| 296 | $ 2,380 |
| 260 | $ 3,565 |
| 62 | $ 5,552 |
| 53 | $ 2,861 |
| 122 | $ 5,550 |
| 291 | $ 1,472 |
| 250 | $ 7,238 |
| 199 | $ 1,470 |
| 71 | $ 2,380 |
| 313 | $ 1,983 |
| 100 | $ 5,659 |
| 280 | $ 3,131 |
| 208 | $ 2,739 |
| 140 | $ 3,243 |
| 212 | $ 4,633 |
| 301 | $ 2,888 |
| 300 | $ 3,163 |
| 223 | $ 4,696 |
| 222 | $ 3,644 |
| 273 | $ 3,332 |
| 189 | $ 5,393 |
| 311 | $ 762 |
| 235 | $ 4,950 |
| 303 | $ 2,734 |
| 286 | $ 2,496 |
| 284 | $ 1,650 |
| 207 | $ 1,485 |
| 253 | $ 5,255 |
| 309 | $ 888 |
| 264 | $ 5,394 |
| 120 | $ 1,836 |
| 227 | $ 2,353 |

| Employee ID | PTO @ 11/15, subject to $12,475 cap, 180d cap + tax |
|---|---|
| 243 | $ 2,801 |
| 77 | $ 3,379 |
| 202 | $ 2,018 |
| 271 | $ 2,697 |
| 288 | $ 1,798 |
| 282 | $ 2,380 |
| 310 | $ 1,666 |
| 308 | $ 2,314 |
| 252 | $ 5,556 |
| 242 | $ 2,778 |
| | |
| | |
| | $ 475,699 |

**EXHIBIT "3"**

| Utility Company | Address | Account No. | Aug-15 | Sep-15 | Oct-15 | Average |
|---|---|---|---|---|---|---|
| Comcast | P.O. Box 34744, Seattle, WA 98124-1744 | 8155 20 001 6451512 | $354.46 | $354.46 | $354.46 | **$354.46** |
| Mosaic Networx | Dept LA 24111, Pasadena, CA 91185-4111 | 3676 | $3,900.00 | $3,900 | $3,900 | **$3,900** |
| | | | | | | |
| | | | | | Total: | **$4,254.46** |