RON BENDER (SBN 143364)
PHILIP A. GASTEIER (SBN 130043)
MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbyb.com; pag@lnbyb.com; myk@lnbyb.com;
kjm@lnbyb.com

Proposed Attorneys for Chapter 11 Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>RDIO, INC.,<br><br>       Debtor. | ) Case No. 15-31430<br>)<br>) Chapter 11<br>)<br>) **DEBTOR'S EMERGENCY MOTION FOR AN ORDER: (1) APPROVING BIDDING PROCEDURES; (2) APPROVING STALKING HORSE BID PROTECTIONS INCLUDING BREAK-UP FEE AND EXPENSE REIMBURSEMENT; (3) APPROVING FORM OF ASSET PURCHASE AGREEMENT FOR USE BY PROSPECTIVE OVERBIDDERS; (4) SCHEDULING AUCTION AND COURT HEARING TO CONSIDER APPROVAL OF THE SALE TO THE HIGHEST BIDDER; AND, (5) APPROVING FORM OF NOTICE TO BE PROVIDED TO INTERESTED PARTIES; MEMORANDUM OF POINTS AND AUTHORITIES**<br>)<br>) <u>Court Scheduled Hearing:</u><br>) Date: November 18, 2015<br>) Time: 10:00 a.m.<br>) Place: U.S Bankruptcy Court<br>)        Courtroom 22<br>)        235 Pine St., 23rd Floor<br>)        San Francisco, CA 94101<br>) Judge: The Hon. Denis Montali |

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES.................................................9

I.     STATEMENT OF JURISDICTION AND VENUE.......................................9

II.    STATEMENT OF FACTS...............................................................9

       A.     Company Background and Chapter 11 Bankruptcy Filing. ....................9

       B.     The Asset Sale Process.......................................................11

       C.     The Asset Purchase Agreement...............................................12

       D.     The Required Sale Process and Applicable Considerations...................15

III.   DISCUSSION AND AUTHORITIES ...................................................20

       A.     The Court Should Approve the Bidding Procedures as Reasonable. ...........20

       B.     The Court Should Approve the Bid Protection Including Break-Up Fee,
              Expense Reimbursement, and Repayment of Service Fees as Reasonable..........22

       C.     The Notices in Connection with the Auction Sale and Hearing,
              Successful Bidder, and Assignment of Contracts Are Reasonable and
              Should be Approved..........................................................25

       D.     Expedited Hearing and Approval of the Bidding Procedures and Entry of
              the Bidding Procedures Order Is Required in the Interest of the Debtor's
              Estate and Creditors........................................................26

IV.    CONCLUSION ........................................................................28

# TABLE OF AUTHORITIES

**Cases**

*Cf. Bennett v. Williams,*
    892 F.2d 822 (9th Cir.1989) .................................................................. 24

*Cottle v. Storer Communication Inc.,*
    849 F.2d 570 (11th Cir. 1988) ............................................................... 23

*In re 310 Associates,*
    346 F.3d 31 (2d Cir. 2003) ..................................................................... 23

*In re 995 Fifth Ave. Assoc., L.P.,*
    96 B.R. 24 (Bankr. S.D.N.Y. 1989) ................................................. 23, 24

*In re Ames Dep't Stores, Inc., Eastern Retailers Service Corp., et al.,*
    115 B.R. 34 (Bankr. S.D.N.Y. 1990) ...................................................... 21

*In re Atlanta Packaging Products, Inc.,*
    99 B.R. 124 (Bankr. N.D. Ga. 1988) ...................................................... 21

*In re Consolidated Auto Recyclers, Inc.,*
    123 B.R. 130 (Bankr.D.Me. 1991) .......................................................... 24

*In re Crowthers McCall Pattern, Inc.,*
    114 B.R. 877 (Bankr. S.D.N.Y. 1990) ..................................................... 21

*In re Financial News Network, Inc.,*
    126 B.R. 152 (Bankr. S.D.N.Y. 1991) ..................................................... 21

*In re Girard Medical Center,*
    1990 WL 56486 (Bankr.E.D.Pa. 1990) ................................................... 24

*In re Integrated Resources, Inc.,*
    147 B.R. 650 (S.D.N.Y. 1992) ...................................................... 23, 24, 26

*In re JW Res., Inc.,*
    536 B.R. 193 (Bankr. E.D. Ky. 2015) ..................................................... 23

*In re Wheeling-Pittsburgh Steel Corp.,*
    72 B.R. 845 (Bankr.W.D.Pa. 1987) ........................................................ 24

**Statutes**

11 U.S.C. §101 ........................................................................................... 2, 9

11 U.S.C. §105(a) .................................................................................... 1, 9, 20

11 U.S.C. §363 ................................................................................. 1, 9, 12, 20

11 U.S.C. §365 ............................................................................................... 9

11 U.S.C. §503 ............................................................................................... 9

11 U.S.C. §507 ............................................................................................... 9

11 U.S.C. §1107 ................................................................................................................. 9

11 U.S.C. §1108 ................................................................................................................. 9

28 U.S.C. §157 ................................................................................................................... 9

28 U.S.C. §1334 ................................................................................................................. 9

28 U.S.C. §1408 ................................................................................................................. 9

28 U.S.C. §1409 ................................................................................................................. 9

**Rules**

Fed. R. Bankr. P. 2002 ............................................................................................. 1, 9, 20

Fed. R. Bankr. P. 6003 ....................................................................................................... 1

Fed. R. Bankr. P. 6004 ............................................................................................. 1, 9, 20

Fed. R. Bankr. P. 6006 ....................................................................................................... 9

Fed. R. Bankr. P. 9006 ....................................................................................................... 9

Fed. R. Bankr. P. 9007 ....................................................................................................... 9

Fed. R. Bankr. P. 9014 ................................................................................................... 1, 9

Local Rule 6004-1 .............................................................................................................. 9

Local Rule 6006-1 .............................................................................................................. 9

Local Rule 9006-1 .............................................................................................................. 9

Local Rule 9014-1 .............................................................................................................. 9

**TO THE HONORABLE DENNIS MONTALI, UNITED STATES BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE, THE DEBTOR'S TWENTY LARGEST UNSECURED CREDITORS, THE DEBTOR'S SECURED CREDITORS AND OTHER PARTIES IN INTEREST:**

Pursuant to Sections 105(a) and 363 of the Bankruptcy Code, and Rules 2002, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure, Rdio, Inc., the Chapter 11 debtor and debtor in possession herein (the "Debtor"), hereby moves, by way of this Emergency Motion ("Motion"), for entry of the Order (the "Bidding Procedures Order"), in substantially the form attached hereto and made a part hereof as Exhibit "1", which, among other things, provides for:

(a)       approval of the auction sale format and Bidding Procedures in the form attached hereto and made a part hereof as Exhibit "2";

(b)       approval of the Debtor's proposed form of auction and sale hearing notice to be provided to creditors, prospective overbidders and other parties in interest in the form attached hereto and made a part hereof as Exhibit "3";

(c)       approval of  the form of asset purchase agreement for prospective overbidders to use by requiring prospective overbidders either to use the same form of asset purchase agreement as the Asset Purchase Agreement (the "Purchase Agreement") agreed to by the Debtor and Pandora Media, Inc. (the "Purchaser"), a copy of which is attached as Exhibit "1" to the Declaration of Elliott Peters filed concurrently herewith (the "Peters Declaration"), or to submit a redlined version of a proposed asset purchase agreement which indicates the prospective overbidder's changes to the Purchase Agreement;

(d)       approval of the Purchaser as the stalking horse bidder and approval of bid protections for the stalking horse bidder;

(e)       approval of the form of notice and procedures for objections relating to the proposed assumption and assignment of unexpired leases and executory contracts; and

1

(f)     the scheduling of an expedited Court hearing to consider approval of the sale of the Transferred Assets (defined below) to Purchaser, or such other prevailing bidder, pursuant to the terms and conditions of the Purchase Agreement and the Bidding Procedures.

1.     **Summary of Need for Emergency Relief**

This case was commenced November 16, 2015 (the "<u>Petition Date</u>") by the Debtor's filing of a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>"). The Debtor continues to operate its business, manage its financial affairs and operate its bankruptcy estate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

The timing of the Chapter 11 filing was necessitated by the Debtor's serious financial condition and by the need to proceed with a prompt sale of the Debtor's assets for the highest or otherwise best consideration to maximize recoveries for creditors.  The reasons may be briefly summarized as follows:

(a) The Debtor has incurred very large continuing operating losses, and has conducted a lengthy marketing search for an investor or buyer.

(b) The Debtor has just entered into an agreement to sell substantially all of its assets for a base purchase price of $75.0 million (subject to higher and better bids).

(c) To ensure that the Debtor has sufficient liquidity to complete the sale process in the timeframe contemplated by the Purchaser Agreement, the Debtor's secured creditors have agreed to permit the Debtor to use cash collateral subject to the terms and conditions described in the first-day financing motion filed contemporaneously herewith (the "DIP Motion"). In addition, one of the Debtor's prepetition secured creditors, Iconical Investments II, LP (in such capacity, the "DIP Lender") has agreed to provide up to $3 million in incremental liquidity in the form of a superpriority debtor-in-possession credit facility on the terms described in the DIP Motion. As described in more detail in the DIP Motion, the DIP Lender and the prepetition secured creditors have agreed to a "carve out" of $500,000 for all professionals

Case: 15-31430   Doc# 13   Filed: 11/16/15   Entered: 11/16/15 20:50:51   Page 6 of 64

employed in Debtor's Bankruptcy Estate (by both the Debtor and what the Debtor expects will be an Official Committee of Unsecured Creditors).

(d) The Debtor's secured debt substantially exceeds the $75 million purchase price under the Purchase Agreement. Accordingly, the Debtor's secured creditors are entitled to all of the proceeds of the sale in accordance with their respective priorities. Recognizing the benefits of a consensual and efficient chapter 11 process, however, the secured creditors have not excluded the possibility of negotiating with the Debtor and the creditors' committee (if appointed) a further "carve out" from the sale proceeds to fund administrative expenses and provide meaningful distribution to unsecured creditors.

(e) The Purchaser has required that the sale process be completed expeditiously, requiring approval of bid procedures by December 1, 2015 and entry of a sale order by December 23, 2015. The Purchaser is understandably concerned that the value of the Transferred Assets could deteriorate markedly if the sale process is extended beyond these dates. The Purchaser is not obligated to proceed with the transaction if these deadlines are not met.

(f) If the Debtor is unable to establish a sale process and complete the sale transaction promptly, the estate and creditors will suffer irreparable harm in that the Debtor may and likely will lose key employees, the Debtor's assets will likely be substantially devalued, the Debtor would be unable to continue to operate and any opportunity for unsecured creditors to recover anything may be lost.

Based on the facts and reasons discussed below, the Debtor believes that in order to avoid irreparable harm to the estate and creditors it is essential to immediately consider the relief requested in this Motion so that an order establishing bid procedures and protections may be entered by December 1, 2015, and to set a hearing on the proposed sale as soon as possible, but on any event no later than December 23, 2015.

### 2. Summary of the Debtor's Business, Assets and Liabilities

The Debtor was founded in 2008 as a digital music service. The Debtor's business operations were launched in 2010 after the Debtor secured all of the major record label rights. Since that time, the Debtor has strived to grow into a world wide music service, and today is in approximately 86 countries.

Unfortunately, the Debtor has experienced continuing and substantial operating losses. Under its current operating business model, the Debtor has monthly operating expenses of approximately $3.5-$4.0 million, comprising primarily payroll for the Debtor's approximately 140 employees (much of which represents the costs of retaining high caliber Silicon Valley engineering talent), payment to the owners of music rights, maintaining the service, rent, marketing, business development, technology maintenance costs, and foreign administrative expenses). With average monthly total revenue of approximately $1.6-$1.65 million and average monthly operating expenses of $3.5-$4.0 million, the Debtor's business operations under its current operating business model results in operating losses of approximately $1.85-$2.4 million per month. The Debtor has not been able to access additional operating funds, and the Debtor no longer has the economic means of funding its significant operating cash flow shortfall.

The Debtor's primary assets consist of the Debtor's (i) owned technology (e.g., website, mobile apps, content ingestion technology, reporting technology, software, data bases, etc.), (ii) content license agreements, (iii) subscribers, (iv) employee talent pool, and (v) good will.

The Debtor has approximately $190,237,000 of secured debt and approximately $30 million[1] of unsecured debt. A material portion of the secured debt, in the estimated amount of $186,024,000, is owed to Pulser Media, Inc. ("Pulser Media"), which is the majority owner of the Debtor (owning approximately 79% of the Debtor's equity interests) and has a security interest in substantially all of the Debtor's assets. The remaining portion of the secured debt, $4,213,467, is

---

[1] This figure is an estimate of current liquidated unsecured debt. This figure does not take into account any disputed, unliquidated or contingent unsecured debt, including any debt which may arise as a result of the Debtor's rejection of unexpired leases or executory contracts or breaches or terminations of license agreements.

owed to Iconical Investments II LP ("Iconical II"). The obligations of the Debtor to Iconical II are also secured by a security interest in substantially all of the Debtor's assets

### 3. The Proposed Asset Sale

Pulser Media employed a highly qualified investment bank in Moelis & Company ("Moelis") in the fall of 2014, initially with the goal of attempting to raise new equity capital. Despite extensive efforts by Moelis, it ultimately became clear that raising new equity capital was not going to be possible. At that point, Pulser Media charged Moelis with finding a buyer or merger partner because the Debtor was not going to be able to continue to fund such significant operating losses indefinitely.

After conducting an extremely broad marketing process, the Debtor and Pulser Media identified the Purchaser as the entity presenting the highest and best offer. After difficult and lengthy negotiations, the Debtor and the Purchaser entered into the Purchase Agreement on November 16, 2015, for the purchase and sale of the Debtor's technological and related assets[2] (the "Transferred Assets"). The Purchase Agreement provide for an all cash purchase price in the amount of $75 million plus certain other consideration. In addition, as described above, Pulser Media and Iconical II have agreed to permit the Debtor to use cash collateral on the terms described in the DIP Motion, and Iconical II has agreed to provide a DIP Facility of up to $3 million to provide additional liquidity support for the sale process. As described in more detail in the DIP Motion, the DIP Lender and the prepetition secured creditors have agreed to a "carve out" of $500,000 for professionals employed in Debtor's Bankruptcy Estate (by both the Debtor and what the Debtor expects will be an Official Committee of Unsecured Creditors). Also, the secured creditors have not excluded the possibility of negotiating with the Debtor and the creditors' committee (if appointed) a further 'carve out" from the sale proceeds to fund administrative expenses and provide a meaningful distribution to unsecured creditors.

---

[2] As more specifically identified and defined in the Purchase Agreement.

### 4. The Required Prompt Sale Process and Bid Procedures

The Purchaser was only willing to proceed with its purchase of the Transferred Assets if the asset sale was conducted through a chapter 11 bankruptcy process, but the Purchaser has agreed that the Debtor can and should market the Purchaser's offer for overbid to insure that the highest and best price is paid for the Debtor's assets/business. The Debtor has retained Moelis for the purpose of marketing the Debtor's assets/business for overbid and to assist the Debtor to conduct an auction process in the event of any successful overbids – recognizing that the Debtor's business and assets were extensively marketed prior to the Petition Date and that the Debtor has only a limited amount of time available to it to consummate a sale. Not only does the Debtor not have the financial means with which to continue to fund its operating losses on any long-term basis, as a result of the business uncertainty created by the Debtor's bankruptcy filing, particularly with regard to potential loss of its employee talent, the continuing desirability and value of the Debtor's and business is clearly jeopardized by delay. The Purchaser has understandably required a prompt sale process.

**The timing of the sale process is critical.** The Purchaser has conditioned its offer on the Debtor obtaining an entered Bidding Procedures Order on or prior to December 1, 2015, and the Debtor obtaining an entered order of the Court by December 23, 2015 approving the sale by the Debtor to Purchaser or a higher bidder. The Debtor has been assured by Moelis that this is a reasonable amount of time for Moelis to conduct an overbid process, particularly given the breadth of Moelis' pre-bankruptcy market process and Moelis' in-depth knowledge of this industry and marketplace and prospective overbidders, to insure that the highest and best price is obtained from the sale of the Debtor's assets.

As discussed more fully in the attached Memorandum of Points and Authorities, the Peterson Declaration, and the Declarations of Carlos Jimenez (the "Jimenez Declaration") and Jeremy Liegl (the "Liegl Declaration") filed concurrently herewith, the Debtor and Moelis believe that the Purchaser is uniquely situated in regard to the Debtor's assets, that the prospects for any overbid to Purchaser's offer are extremely remote, and that purchase price offered by Purchaser is

very likely to be substantially higher than the purchase price that any other buyer would be willing to pay. The Debtor and Moelis have therefore concluded that the foregoing overbid procedures and protections for Purchaser are reasonable and in the best interest of the estate and creditors in connection with this sale, and given the likely irreparable harm to the estate and creditors if the sale cannot be promptly completed.

Consistent with this very expedited time frame for conducting the hearing on the Sale Motion, the Debtor seeks a hearing on this Emergency Motion on shortened time.[3]

Concurrently with the filing of this Emergency Motion with the Court (on November 17 2015), the Debtor served a copy of this Emergency Motion and all supportive papers upon the Office of the United States Trustee, all known secured creditors, the Debtor's twenty largest unsecured creditors, Purchaser and all parties who have requested special notice, by overnight mail.

The relief sought in this Emergency Motion is based upon this Motion, the Memorandum of Points and Authorities annexed hereto; the Peters Declaration, Jimenez Declaration and Liegl Declaration filed concurrently with this Motion; the statements, arguments and representations of counsel to be made at the hearing on this Emergency Motion, and any other evidence properly presented to the Court at or prior to the hearing on this Emergency Motion.

**WHEREFORE,** the Debtor respectfully requests that this Court:

1.      Enter an order substantially in the form of Bidding Procedures Order attached hereto and made a part hereof as Exhibit "1", granting, among other relief:

(a)      approval of the auction sale format and Bidding Procedures in the form attached hereto and made a part hereof as Exhibit "2";

---

[3] While Section 9.1 (f)(iii) of the Purchase Agreement only requires that an order approving the relief requested in this Emergency Motion be entered on or prior to December 1, 2015, the Debtor believes that it would be beneficial to the bidding process to have the order entered before that date to provide the maximum number of days possible between the date of entry of the order approving the relief request in this Emergency Motion and the date of the hearing on the Sale Motion.

1      (b)      approval of the Debtor's proposed form of auction and sale hearing notice to be

provided to creditors, prospective overbidders and other parties in interest in the form attached

hereto and made a part hereof as Exhibit "3";

      (c)      approval of  the form of asset purchase agreement for prospective overbidders to

use by requiring prospective overbidders either to use the same form of asset purchase agreement

as the Asset Purchase Agreement (the "Purchase Agreement") agreed to by the Debtor and

Pandora Media, Inc. (the "Purchaser"), a copy of which is attached as Exhibit "1" to the

Declaration of Elliott Peters filed concurrently herewith, or to submit a redlined version of a

proposed asset purchase agreement which indicates the prospective overbidder's changes to the

Purchase Agreement;

      (d)      approval of the Purchaser as the stalking horse bidder and approval of bid

protections for the stalking horse bidder;

      (e)      approval of the form of notice and procedures for objections relating to the

proposed assumption and assignment of leases and executor contracts; and

      (f)      the scheduling of an expedited Court hearing to consider approval of the sale of the

Transferred Assets (defined below) to Purchaser, or such other prevailing bidder, pursuant to the

terms and conditions of the Purchase Agreement and the Bidding Procedures.

      2.      Grant such other and further relief as the Court deems just and proper.

Dated:  November 16, 2015        LEVENE, NEALE, BENDER, YOO
               & BRILL, L.L.P.

             By:   /s/ Philip A. Gasteier
              RON BENDER
              PHILIP A. GASTEIER
              MONICA Y. KIM
              KRIKOR J. MESHEFEJIAN
              LINDSEY L. SMITH
              Proposed Attorneys for Chapter 11 Debtor
              and Debtor in Possession

8

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## STATEMENT OF JURISDICTION AND VENUE

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter relates to the administration of the Debtor's bankruptcy estate and is accordingly a core proceeding pursuant to 28 U.S.C. § 157(b) (2) (A), (M) and (O).  Venue of this case is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief requested in this Sale Procedures Motion are (i) Sections 105(a) and 363(b), (f) and (m), 365, 503, and 507 of Title 11 of the United States Code (the "Bankruptcy Code"), (ii) Rules 2002(a)(2), , 6004 (a), (b), (c), (e), (f) and (h), 6006(a) and (c), 9006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure, and (iii) Bankruptcy Local Rules 6004-1, 6006-1, 9006-1 and 9014-1.

## II.

## STATEMENT OF FACTS

A.  Company Background and Chapter 11 Bankruptcy Filing.

Rdio, Inc. (the "Debtor") commenced its bankruptcy case by filing a voluntary petition under Chapter 11 of 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") on November 16, 2015 (the "Petition Date").  The Debtor continues to operate its business, manage its financial affairs, and operate its bankruptcy estate as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

The Debtor was founded in 2008 as a digital music service. The Debtor's business operations were launched in 2010 after the Debtor secured requisite licenses from the applicable holders of music rights.  Since that time, the Debtor has strived to grow into a world wide music service, and today is in approximately 86 countries.

One of the primary services provided by the Debtor is an unlimited, on demand music streaming service where for $9.99 per month, the user has access to an entire library of songs with access to them through a computer, mobile device, etc.  In other words, the Debtor's business model is based upon a monthly recurring subscription for full access to its content rather than on

an owned a la carte download model. The Debtor also makes available other subscription tiers at lower costs per month with varying service offerings or functionality (e.g., a family tier, a student tier, and a select tier with alternative functionality). The Debtor generates approximately $1.5 million of monthly revenue from its U. S. monthly subscription service.

While the Debtor's monthly subscription service provides the Debtor with its primary revenue source, the Debtor also generates approximately $100,000-$150,000 of monthly revenue from advertisers who advertise in the Debtor's advertising based service offerings. The Debtor, therefore, currently generates approximately $1.6-$1.65 million of total monthly revenue.

The Debtor's primary assets consist of the Debtor's (i) owned technology (e.g., website, mobile apps, content ingestion technology, reporting technology, software, data bases, etc.), (ii) content license agreements, (iii) subscribers, (iv) employee talent pool, and (v) good will.

Under its current operating business model, the Debtor has monthly operating expenses of approximately $3.5-$4.0 million, comprising primarily payroll for the Debtor's approximately 140 employees (much of which represents the costs of retaining high caliber Silicon Valley engineering talent), payment to the owners of music rights, cost of maintaining the service, rent, marketing costs, business development costs, technology maintenance costs, and foreign administrative expenses). With average monthly total revenue of approximately $1.6-$1.65 million and average monthly operating expenses of $3.5-$4.0 million, the Debtor's business operations under its current operating business model result in operating losses of approximately $1.85-$2.4 million per month, and the Debtor no longer has the economic means of funding its significant operating cash flow shortfall.

The Debtor has approximately $190,237,000 of secured debt and approximately $30 million[4] of unsecured debt. A material portion of the secured debt, in the estimated amount of $186,024,000, is owed to Pulser Media, Inc. ("Pulser Media"), which is the majority owner of the

---

[4] This figure is an estimate of current liquidated unsecured debt. This figure does not take into account any disputed, unliquidated or contingent unsecured debt, including any debt which may arise as a result of the Debtor's rejection of unexpired leases or executory contracts or breaches or terminations of license agreements.

1   Debtor (owning approximately 79% of the Debtor's equity interests) and has a security interest in
2   substantially all of the Debtor's assets. The remaining portion of the secured debt, $4,213,467, is
3   owed to Iconical Investments II LP ("Iconical II"). The obligations of the Debtor to Iconical II are
4   also secured by a security interest in substantially all of the Debtor's assets. A "*Notice of Events*
5   *of Default and Reservation of Rights*" ("Default Notice") was also issued by Iconical II as to both
6   the Debtor and Pulser Media on October 15, 2015.

7       B.   The Asset Sale Process.

8           Despite the investment of several hundred million dollars and years of efforts to build its
9   subscriber base (and to attract significant advertising dollars), the Debtor has been unable to
10  achieve profitability – or even to reduce its operating losses to sustainable levels.

11          In 2014, the existing lenders determined that they could not continue to loan the money
12  needed to fund the Debtor's ongoing losses indefinitely.  Without that continued new funding,
13  Pulser Media (whose primary asset is stock of the Debtor) would be unable to continue to loan
14  operating funds to the Debtor indefinitely. The Debtor therefore required either an influx of funds
15  from a new lender or investor, or a merger partner or sale.  Without realizing one of those options
16  the Debtor would be unable to continue to operate.

17          As a result, Pulser Media employed a highly qualified investment bank in Moelis &
18  Company ("Moelis") in the fall of 2014, initially with the goal of attempting to raise new equity
19  capital. Despite extensive efforts by Moelis, it ultimately became clear that raising new equity
20  capital was not going to be possible.  At that point, Pulser Media charged Moelis with finding a
21  buyer or merger partner because the Debtor was not going to be able to continue to fund such
22  significant operating losses indefinitely.

23          By June 2015, it became clear that Pandora Media, Inc. ("Pandora" or the "Purchaser")
24  was emerging as the most interested party and the party most likely to present the best offer and
25  to close a sale.  Pandora submitted a preliminary letter of intent ("LOI") on July 8, 2015.
26  Concurrent with the negotiations with Pandora on the LOI, Moelis continued its marketing
27  process, and over the subsequent three months the Debtor's management and Moelis continued

28

11

discussions with other interested parties which had been identified. The negotiations were long and intensive. Pandora advised the Debtor that it had approximately 125 people working on this transaction. Negotiations broke down several times. After substantial negotiation of the LOI and additional due diligence by Pandora, the parties executed a non-binding LOI on September 29, 2015.

Following the execution of the LOI, Pandora continued its due diligence and the parties commenced negotiations on the terms of a definitive transaction in earnest. Those negotiations were also very intense and extended, and the terms of the transaction continued to evolve, and Pandora continued its due diligence. By the time of the execution of the LOI, Pandora had decided that it would only proceed with a transaction if that transaction were conducted as part of a Chapter 11 filing and a purchase pursuant to a sale under 11 U.S.C. § 363. In addition, Pandora informed the Debtor that it would not purchase the Debtor's business in its present form, but would acquire only assets. These and other developments required extensive discussions and changes to the purchase agreement. The definitive Asset Purchase Agreement between the Debtor and Purchaser was not executed until November 16, 2015 (the "Purchase Agreement").

C. The Asset Purchase Agreement.

A true and correct copy of the Purchase Agreement entered into between the Debtor and Purchaser is attached as Exhibit "1" to the Peters Declaration.

Pursuant to the Purchase Agreement, Purchaser has agreed to purchase the Debtor's technology and certain other assets (the "Transferred Assets")[5] for a base purchase price of $75.0 million and certain other consideration, subject to adjustment as provided in the Purchase Agreement.

A description of the Transferred Assets to be purchased by Purchaser free and clear of all liens, claims and interests is set forth in full in Section 2.1 (a) of the Purchase Agreement. The Transferred Assets include specified Contracts and Additional Designated Contracts which the

---

[5] As more specifically identified and defined in the Purchase Agreement. Capitalized terms not defined herein shall have the meaning as defined in the Purchase Agreement.

Purchaser may elect to assume (collectively "Designated Contracts"), Transferred Technology and Transferred IPR (intellectual property rights), equipment and other tangible personal property, and related rights, property, records, causes of action, credits, deposits and benefits – all as more specifically set forth in the Purchase Agreement.

The Purchase Agreement provides for the assumption and assignment to Purchaser of the Contracts and Additional Designated Contracts, and requires advance approval and notice of procedures for notifying non-debtor parties to such contracts and determining cure amounts and objections.[6] The Purchaser is to assume liabilities under the Designated Contracts arising following assignment, and to pay cure costs in respect of Disclosed Additional Designated Contracts, all as more specifically provided in the Purchase Agreement. [7]

The Purchase Agreement contains certain representations and warranties.[8] Under the Purchase Agreement, the Debtor must indemnify the Purchaser for breaches of representations and warranties, breaches of covenants and Excluded Liabilities. The Purchase Agreement provides that 15% of the Aggregate Consideration will be deposited in an Escrow Account to backstop these indemnification obligations. Purchaser also required that Iconical II provide a guarantee of the Debtor's indemnification obligations under the Purchase Agreement, subject to various limitations and conditions. Iconical II agreed to provide such guarantee, the terms of which are set forth in an Indemnity and Guaranty Agreement between Iconical II and the Purchaser dated as of November 16, 2015.

The Purchase Agreement provides that prior to closing Purchaser will offer employment (post-closing) to certain Designated Employees of the Debtor. The Debtor will be responsible for compensation to employees prior to closing.[9] The Purchase Agreement contains both provisions for price adjustments (up to $15.0 million), and provisions constituting closing conditions,

---

[6] See Purchase Agreement, Section 2.1 (b).

[7] See Purchase Agreement, Section 2.1 (d).

[8] See Purchase Agreement, Article 3.

[9] See Purchase Agreement, Section 6.4.

13

respectively, if specified individuals and threshold numbers of employees of the Debtor do not accept employment with the Purchaser following the closing of the sale.[10]

The Purchaser's obligations under the Purchase Agreement are subject to certain deadlines. The Purchase Agreement requires the filing of a motion for an order approving bid and sale procedures (the "Bidding Procedures Order") within one day of the Petition Date.[11] The Debtor is also required to use commercially reasonable efforts to obtain the Bankruptcy Court's entry of the Bidding Procedures Order on or prior to December 1, 2015; and obtain the Bankruptcy Court's entry of the Sale Order on or prior to December 23, 2015.[12] The Purchaser may terminate the Purchase Agreement if such deadlines are not met.[13]

The Debtor is also required to seek and obtain approval of a Master Services Agreement ("Services Agreement") pursuant to which the Debtor will provide services of its employees to the Purchaser in order to advance the sale process, and the Purchaser will compensate the Debtor for such services (the "Service Fees"), in the aggregate amount of $2.5 million, payable in installments, the first of which is to be within three (3) days following the execution of the Services Agreement. The Purchaser's agreement to make the payments under the Services Agreement will allow the Debtor fund a substantial portion of its employee costs through a closing of the sale. The Purchase Agreement also requires that the Debtor file a motion for approval of the Services Agreement within one day following the Petition Date.[14]

The Purchase Agreement provides certain incentives to the Purchaser to induce the Purchaser to be the lead bidder. In the event that the Purchaser is not the Successful Bidder, it shall be entitled to a break-up fee of $2,250,000 (the "Break-Up Fee"), reimbursement of out-of-pocket costs and expenses (including legal) up to $500,000 (the "Expense Reimbursement"), and repayment of the Service Fees, in the event that the Purchaser is not the successful bidder.

---

[10] See Purchase Agreement, Sections 2.2 (c) and 7.2 (j).

[11] See Purchase Agreement, Section 6.1 (b) and (c).

[12] See Purchase Agreement, Section 6.1 (g).

[13] See Purchase Agreement, Section 9.1(f)(iii).

[14] See Purchase Agreement, Section 6.1 (e).

The discussion of the provisions of the Purchase Agreement contained herein is qualified in its entirety by and made subject to the Purchase Agreement itself. Parties in interest are urged to review the Purchase Agreement in its entirety.

The Break-Up Fee and Expense Reimbursement, as defined in the Purchase Agreement, were intensely negotiated. In addition, the Services Agreement, as defined in the Purchase Agreement, was intensely negotiated and is an integral part of the sale. The provisions for the Break-Up Fee, Expense Reimbursement, and repayment of the Services Fees, under the circumstances provided in the Purchase Agreement, were absolutely required in order that the Purchaser proceed with this sale transaction.

To the best knowledge of the Debtor, no insider of the Debtor has any interest in or connection with the Purchaser and no insider of the Debtor will be receiving any special benefit as a result of the Debtor's sale of the Transferred Assets to Purchaser. Pulser Media and Iconical II have agreed to permit the Debtor to use cash collateral on the terms described in the DIP Motion, and Iconical II has agreed to provide a DIP Facility of up to $3 million to provide additional liquidity support for the sale process. As described in more detail in the DIP Motion, the DIP Lender and the prepetition secured creditors have agreed to a "carve out" of $500,000 for professionals employed in Debtor's Bankruptcy Estate (by both the Debtor and what the Debtor expects will be an Official Committee of Unsecured Creditors). Also the secured creditors have not excluded the possibility of negotiating with the Debtor and the creditors' committee (if appointed) a further "carve out" from the sale proceeds to fund administrative expenses and to provide a meaningful distribution to unsecured creditors.

The Debtor has no other secured creditors, except for limited equipment security interests or leases.

D. The Required Sale Process and Applicable Considerations

The Purchaser was only willing to proceed with its purchase of the Transferred Assets if the asset sale was conducted through a chapter 11 bankruptcy process, but the Purchaser has agreed that the Debtor can and should market the Purchaser's offer for overbid to insure that the

highest and best price is paid for the Debtor's assets/business. The Debtor has retained Moelis for the purpose of marketing the Debtor's assets/business for overbid and to assist the Debtor to conduct an auction process in the event of any successful overbids – recognizing that the Debtor has only a limited amount of time available to it to consummate a sale. Not only does the Debtor does not have the financial means with which to continue to fund its operating losses on any long-term basis, as a result of the business uncertainty created by the Debtor's bankruptcy filing, particularly with regard to potential loss of its employee talent, the continuing desirability and value of the Debtor's and business is clearly jeopardized by delay. The Purchaser has understandably required a prompt sale process.

As indicated in Section 6.1 of the APA, certain bidding procedures ("Bidding Procedures")[15] have been agreed to by the Debtor and Purchaser, all of which the Debtor believes to be reasonable and appropriate under the circumstances of this case and in compliance with the law. The Bidding Procedures include, among other things, the following elements:

1.      Within three days following the entry of the Bidding Procedures Order, the Debtor will send the approved Auction Sale and Hearing Notice (substantially in the form attached hereto as Exhibit 3) to all potential purchasers identified by the Debtor; the Office of the United States trustee, counsel for any committee appointed, the 20 largest unsecured creditors, applicable taxing authorities, and other parties identified in the Bid Procedures.

2.      In order to overbid Purchaser's bid, the minimum initial overbid must be at least $1.0 million higher than Purchaser's bid made in the Purchase Agreement (plus an amount equal to the Break-Up Fee, the maximum Expense Reimbursement, and the Service Fee, which amounts may be repaid to Purchaser under the Purchase Agreement if it is not the Successful Bidder), with minimum subsequent bid increments of no less than $500,000 and by figures which are wholly divisible by $500,000.

---

[15] A copy of the proposed Bidding Procedures is attached hereto and made a part hereof as Exhibit "2".

3.     Bids must be delivered at least five days prior to the Bid Deadline, accompanied by a marked up version of the Purchase Agreement.

4.     In order to be considered a "qualified bidder", a bidder must, on or before five business days before the Auction, submit evidence of its financial ability to close the transaction.

5.     Prospective overbidders are required to provide a deposit equal to the sum of $7.6 million ( 10% of the Purchase Price plus the first bid increment), plus the aggregate amount equal to the Break-Up Fee, the maximum Expense Reimbursement, and the Service Fee.

The discussion of the Bidding Procedures contained herein is qualified in its entirety by and made subject to the Bidding Procedures attached hereto.  Parties in interest are urged to review the Bidding Procedures in their entirety, and may not rely on the summary of certain provisions contained herein.

**The timing of the sale process is critical.** The Purchaser has conditioned its offer on the Debtor obtaining an entered Bidding Procedures Order by on or prior to December 1, 2015, and the Debtor obtaining an entered Sale Order by on or prior to December 23, 2015.[16]  The Debtor has been assured by Moelis that this is a sufficient amount of time for Moelis to conduct an overbid process, particularly given the breadth of Moelis' pre-bankruptcy market process and Moelis' in-depth knowledge of this industry and marketplace and prospective overbidders, to insure that the highest and best price is obtained from the sale of the Debtor's assets/business.

The Debtor and Moelis believe that the Purchaser is uniquely situated in regard to the Debtor's assets, that the prospects for any overbid to Purchaser's offer are extremely remote, and that purchase price offered by Purchaser is very likely to be substantially higher than the purchase price that any other buyer would be willing to pay, based on the complimentary nature of the respective businesses.  Although the Debtor and the Purchaser have both been operating in the internet radio business the differences in their particular business models, and the way they have developed, make the Purchaser a particularly suitable purchaser for the Debtor's assets.  As

---

[16] See above discussion of Purchase Agreement.

17

1  compared to the Purchaser's music service, the Debtor's service involves more specific

2  (personalized) customer choice, a tiered-priced subscription service, and extensive direct

3  licensing.  The Debtor's digital music service provides both internet radio and subscription on-

4  demand listening experiences. It has secured extensive IP licensing agreements with music labels

5  and publishers, allowing it to offer a comprehensive library of over 35 million songs. While the

6  Purchaser will not be continuing the Debtor's existing internet service, the Debtor's technology is

7  advantageous to providing this type of service. These aspects of the Debtor's business are

8  complementary and offer opportunities for the Purchaser to expand its business model which

9  appear attractive in the present marketplace.

10      With the assistance of Moelis, the Debtor has been engaged for over one year in a

11  marketing process involving contacts with over 110 financially significant potential investors or

12  purchasers, substantial due diligence and discussions with a number of different prospective

13  buyers over the past many months. The negotiations with the Purchaser alone have continued for

14  over three months since the original signing of a letter of intent.  Moelis has continued to market

15  the Debtor's assets and to discuss interest with other prospective purchasers during the period of

16  intense negotiations with the Purchaser – and will continue efforts in that regard through the date

17  established for any overbids.  Notwithstanding its continued efforts to identify a more favorable

18  transaction, the Debtor has concluded that the Purchaser is likely the optimal buyer of the

19  Debtor's assets for several reasons.  First, as discussed above, the Purchaser is in a similar but

20  complimentary business as the Debtor, and the Debtor's assets appear to be particularly suited to

21  expanding the Purchaser's business.  Second, the Purchaser is for those reasons a strategic buyer,

22  as opposed to a financial buyer which may view the Debtor's large past losses unfavorably.

23  Third, the Purchaser has expressed the greatest interest in purchasing the Debtor's assets, and thus

24  far has offered a substantially higher price than any other prospective buyer.  Fourth, the

25  Purchaser clearly has the financial means to consummate its purchase of the Debtor's business.

26      The Debtor and Moelis therefore have concluded that the foregoing overbid procedures

27  and protections for Purchaser are very reasonable and are in the best interests of the Debtor's

28

18

estate and creditors in connection with this sale, given the likely irreparable harm to the estate and creditors if the sale cannot be promptly completed.

Given the extensive pre-petition marketing process that was undertaken for the sale of the Debtor's business, it appears unlikely that any other buyer will pay more for the Transferred Assets than Purchaser has offered. Moreover, the Debtors and Moelis do not believe that the prospect for a successful overbid would increase with the passage of time. To the contrary, it is critically imperative that the Debtor consummate an immediate sale of the Transferred Assets because of the severe risk of a deterioration of the Debtor's business resulting from the Debtor's bankruptcy filing, and irreparable harm to the Debtor's estate and creditors. The Purchaser and the Debtor operate in a very competitive environment, especially as concerns employees. The key employees who are associated with the Debtor's intellectual property assets are extremely important to the opportunity presented to the Purchaser. Such employees are also very much in demand from other technology companies. The Debtor's Chapter 11 filing may cause some of those employees to consider other employment opportunities, unless they can be relatively assured of a rapid transition.

The timing is thus critical to the Purchaser (or any other buyer), in that the value of the assets is diminished if the key employees are no longer available. If the associated expertise is not available, a buyer may well consider acquiring similar assets elsewhere or developing similar technology through internal research and development efforts. If the present sale is not timely consummated, there is an extremely high risk that the Debtor's assets will be devalued, the benefits of the sale to the Debtor's estate will be lost, and the Debtor and its creditors will as a result suffer irreparable harm.

Consistent with this very necessary expedited time frame for conducting the hearing on the Sale Motion, the Debtor requests a hearing on this Emergency Motion on shortened time.

**III.**

**DISCUSSION AND AUTHORITIES**

A. <u>The Court Should Approve the Bidding Procedures as Reasonable.</u>

Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate…." 11 U.S.C. § 363 (b)(1). Section 105(a) of the Bankruptcy Code provides in pertinent part that "[t]he Court may issue any order, process or judgment that is necessary and appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Bankruptcy Rules 2002 and 6004 govern the scope of the notice to be provided in the event a debtor elects to sell property of the estate under Section 363; however, with respect to the procedures to be adopted in conducting a sale outside the ordinary course of a debtor's business, Bankruptcy Rule 6004 provides only that such sale may be by private sale or public auction, and requires only that the debtor provide an itemized list of the property sold together with the prices received upon consummation of the sale. Bankr. R. 6004(f).

Neither the Bankruptcy Code nor the Bankruptcy Rules contain specific provisions with respect to the procedures to be employed by a debtor in conducting a public or private sale. Nonetheless, as one Court has stated, "It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the [Debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." *In re Atlanta Packaging Products, Inc.,* 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988). Preapproval of bid procedures and terms facilitates bidding by providing a fair and efficient process, ensuring fair comparability between competing bids, and protecting other bidders who have limited their bids to the announced terms. *See*, *In re Financial News Network, Inc.,* 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991).

A corollary to these principles is that a bankruptcy court will evaluate a proposed sale transaction in its totality and will approve the sale if the agreement as a whole is supported by an articulated business judgment. At least one bankruptcy court has expressly applied this principle

Case: 15-31430   Doc# 13   Filed: 11/16/15   Entered: 11/16/15 20:50:51   Page 24 of 64

to a transaction including breakup and overbid provisions in the sale of the debtor's business.  In *In re Crowthers McCall Pattern, Inc.,* 114 B.R. 877 (Bankr. S.D.N.Y. 1990), the Court approved a transaction including provisions relating to a breakup fee and minimum overbids.  In responding to objections to other provisions of the agreement, the Court held that:

> The Court is not to second guess the inclusion of some provisions as long as the Agreement as a whole is within reasonable business judgment, and the subject provisions do not distort the balance Congress struck in Chapter 11.  *Cf. In re Ames Dep't Stores, Inc., Eastern Retailers Service Corp., et al.,* 115 B.R. 34, 37-38 (Bankr. S.D.N.Y. 1990) … [some contractual] provisions may be justified by the need to attract a prospective investor….

114 B.R. at 888.

The Debtor, consistent with the advice and recommendations of Moelis, has concluded that the auction and bidding procedures outlined above (and in more detail in the Bidding Procedures) are designed to enable the Debtor's estate to obtain the highest price possible for the Transferred Assets and provide the greatest possible recovery for the Debtor's creditors. The Debtor believes that the sale process conducted by the Debtor and its professionals was and continues to be thorough and adequate to obtain the highest and best price for the Transferred Assets, subject to the opportunity for others to participate in accord with the proposed Bidding Procedures.

The Sale Procedures serve numerous legitimate purposes.  The Bidding Procedures (i) foster competitive bidding among any serious potential purchasers; (ii) eliminate from consideration purchasers who would waste the estate's time because they would not have the financial ability to consummate the transaction; (iii) insure that the highest possible price is obtained for the Transferred Assets; (iv) afford the broadest notice of the proposed sale as possible under the circumstances; and (v) compensate the Buyer for the Buyer's time, effort, costs and expenses incurred in connection with the Purchase Agreement.  In light of the competitive economic environment which continues to exist in the market in which the Debtor is engaged, the challenges faced in the marketing of the Transferred Assets as detailed above and in the Jimenez

Declaration, and the Debtor's history, the Debtor submits that the Purchase Agreement and the attendant proposed Bidding Procedures are in the best interests of the Debtor's estate and its creditors.

B. <u>The Court Should Approve the Bid Protection Including Break-Up Fee, Expense Reimbursement, and Repayment of Service Fees as Reasonable.</u>

The proposed Breakup Fee is reasonable given the amount of the proposed purchase price and the complexity of the transaction. The Debtor is informed that the Purchaser has expended substantial time and resources with respect to the formulation of its offer, negotiations with the Debtor, and due diligence with respect to the proposed transaction.

Breakup fees are generally permitting as long as they "enhance" the bidding by promoting an offer and the possibility of higher bids. *See, In re Integrated Resources, Inc.,* 147 B.R. 650, 659-60 (S.D.N.Y. 1992), *app dismissed on jurisdictional grounds,* 3 F.3d 49 (2d Cir. 1993). Break-up fees may be necessary to convince a stalking horse bidder to enter the bidding by providing some form of compensation for the risks it is undertaking; in assessing the incentive effect of the break-up fee, a court should determine whether the dollar amount of the fee is so substantial that it has a "chilling effect" on other prospective bidders. Id. at 660; *In re 995 Fifth Ave. Assoc., L.P.,* 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989). Breakup fees are authorized in the bankruptcy auction sale context because they provide an incentive for an initial bidder to serve as a so-called "stalking horse," whose initial research, due diligence, and subsequent bid may encourage later bidders; the breakup fee compensates the stalking horse for the risk it shoulders in being the first bidder. *In re 310 Associates*, 346 F.3d 31, 34 (2d Cir. 2003).

In the bankruptcy context, a break-up fee is generally permissible "if reasonably related to the bidder's efforts and the transaction's magnitude." *Cottle v. Storer Communication Inc.*, 849 F.2d 570, 578 (11th Cir. 1988); *In re 995 Fifth Ave., supra,* 96 B.R. at 28.

In examining business transactions, the Court employs a deferential "business judgment" rule. *In re JW Res., Inc.,* 536 B.R. 193, 197 (Bankr. E.D. Ky. 2015) (negotiated break-up fees based on the sound business judgment of the debtors). "A debtor-in-possession is accorded great

deference as to its business judgments." *In re Girard Medical Center*, 1990 WL 56486, *2 (Bankr.E.D.Pa. 1990). <u>*See also*</u>, *In re Wheeling-Pittsburgh Steel Corp.*, 72 B.R. 845, 849 (Bankr.W.D.Pa. 1987) ("courts accord the debtor's business judgment a great amount of deference").

The Breakup Fee and all of the other Bidding Procedures are reasonable in the business judgment of the Debtor. "So long as a [debtor in possession] conducts the affairs of the estate by exercising his business judgment in good faith, upon a reasonable basis, and within the scope of his authority under the Code, he may proceed without interference." *In re Consolidated Auto Recyclers, Inc.*, 123 B.R. 130, 140 (Bankr.D.Me. 1991). *Cf. Bennett v. Williams,* 892 F.2d 822, 824 (9th Cir.1989) (deference to business management decisions of bankruptcy trustee).

A court will uphold a decision by the board of directors if the decision was safeguarded by the scrutiny of disinterested directors or by other such means. *See In re Integrated Res., Inc.*, 147 B.R. at 657 (breakup fee approved by disinterested board); *In re 995 Fifth Ave. Assoc.,* 96 B.R. at 28. In the present case, the Debtor's board reviewed and approved the breakup fee. None of the board members is related in any way to the Purchaser.

In evaluating the appropriateness of a break-up fee, the appropriate question for the Court to consider is "whether the break-up fee served any of three possible useful functions: (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; or (3) to attract additional bidders." *In re Integrated Resources, Inc.,* 147 B.R. at 662.

The Debtor strongly believes that proceeding with an auction sale of the Transferred Assets with a locked-in buyer (as compared with proceeding with a blind auction with no actual sale agreement in hand) is in the overwhelming best interests of this estate and will result in the highest price possible being paid for the Transferred Assets. All of the prospective bidders, including Purchaser, would understandably only be willing to serve as the stalking horse bidder if they received various forms of benefits for doing so, including a break-up fee. Without giving such benefits to a stalking horse bidder, there would have been no way for the Debtor to obtain a

viable stalking horse bidder, and no buyer would have the incentive to serve as the stalking horse bidder. Purchaser's offer was substantially higher than any other offer the Debtor received, and Purchaser would never have been willing to serve as the stalking horse bidder without the various protections that are being afforded to Purchaser. The Debtor submits that these protections are fair, reasonable and consistent with market practice and unquestionably will result in the Debtor's estate receiving a substantially higher purchase price for the Transferred Assets than would otherwise be the case.

With the assistance of Moelis, the Debtor has been engaged for over one year in a marketing process involving contacts with over 110 financially significant potential investors or purchasers, substantial due diligence and discussions with a number of different prospective buyers over the past many months. The Transferred Assets have been widely marketed. Any buyer would insist on the same protections required by the Purchaser.

The Bidding Procedures are customary, and are reasonably designed to promote an orderly bid process which will permit the making and consideration of overbids by qualified buyers. The Bidding Procedures, including the Break-Up Fee and other reimbursement provisions, were negotiated as part of the Purchase Agreement, and have been found to be reasonable by the Debtor and Moelis. The Break-Up Fee is less than 3% of the base Purchase Price, which is well within common break-up fee levels, and likely reasonably representative of compensation for the time and effort put into this sale transaction by the Purchaser. The Expense Reimbursement is based on delivery of a reasonably detailed calculation of actual out-of-pocket costs and expenses. The Service Fees will consist of an amount actually paid by the Purchaser to the Debtor pursuant to the Services Agreement, which will allow the Debtor to fund a substantial portion of its ordinary course employee costs prior to closing and increase the likelihood of retaining that number of employees that is key to assuring a successful consummated transaction. These amounts are payable to the Purchaser only upon termination of the Purchase Agreement (by either Purchaser of the Debtor) due to (i) approval or consummation of a sale to some other party; (ii) conversion of the Chapter 11 case; or (iii) failure to meet the deadlines for entry of the Bidding

Procedures Order or the Sale Order.[17] Thus, the foregoing bid protection amounts are only payable if the Purchase Agreement is terminated for the foregoing reasons, and are based on the time, effort and actual costs and expenses of Purchaser in connection with this Transaction. Any other buyer would undoubtedly have required the same type of provisions.[18]

Accordingly, the Debtor believes that its proposed break-up fee and other protections in favor of Purchaser satisfy the standards identified in *Integrated Resources* (i.e., serving "any of three possible useful functions: (1) to attract or retain a potentially successful bid; (2) to establish a bid standard or minimum for other bidders to follow; or (3) to attract additional bidders." Id. at 662.

The Debtor therefore submits that the proposed bidding procedures and stalking horse bid protections described above and provided for in the Purchase Agreement are in the overwhelming best interests of this estate, are necessary and appropriate to maximize the value paid for the Transferred Assets, and should be approved by the Court as an exercise of the Debtor's sound business judgment.

C. The Notices in Connection with the Auction Sale and Hearing, Successful Bidder, and Assignment of Contracts Are Reasonable and Should be Approved.

The Bidding Procedures Order also calls for the approval of the form of (i) Auction and Sale Hearing Notice, in the form attached hereto as Exhibit "3"; (ii) the Notice to Successful Bidder, in the form attached to the Bidding Procedures Order as Exhibit "1"; and (iii) the form of the Assignment Notice, in the form attached to the Bidding Procedures Order as Exhibit "2". The Auction and Sale Hearing Notice is reasonably designed to alert parties to the Auction, the Bidding Procedures, the Sale Hearing, and time for objections. The Notice of Successful Bidder is reasonably designed to alert parties to any changes in the event the Purchaser is not the Successful Bidder. The Assignment Notice and procedure is reasonably designed to facilitate the

---

[17] See Purchase Agreement, Sections 9.1 (f) and 9.3.

[18] The proposed Bidding Procedures Order also provides that such Termination Fees payable shall constitute super-priority administrative expenses.

sale process by advising parties to contracts which may be assumed and assigned of the terms of assignment, including any cure amount, and to allow for objections to the assignment to Purchaser, or in the case of a successful overbidder, for objections to the revised proposed assignment. In the event no objection is timely made, the non-debtor parties to assumed contracts will be deemed to have consented to and waived objections to (i) the assumption and assignment; (ii) adequate assurance of future performance; (iii) the proposed cure amount; and (iv) the terms of the Sale Order.[19]

These notices and attendant procedures will provide interested creditors and contract parties adequate notice and opportunity to object, as well as notifying parties who may wish to bid.

D. Expedited Hearing and Approval of the Bidding Procedures and Entry of the Bidding Procedures Order Is Required in the Interest of the Debtor's Estate and Creditors.

Given the exhaustive marketing effort performed by Moelis over a very extended period of time, as well as Moelis' vast knowledge of the Debtor's industry, the Debtor and Moelis are highly confident that if any buyer exists who is willing to pay more money for the Transferred Assets than offered by Purchaser, they will submit an overbid and participate in the overbid process and no additional time is needed to facilitate bidding.

Moreover, the Debtor and Moelis believe strongly that there is no doubt that any theoretical benefit from having more time to attempt to obtain overbidders is dramatically

---

[19] A copy of the proposed Sale Order is attached as Exhibit F to the Purchase Agreement. The Debtor is aware that the proposed Sale Order required by the Purchaser contains findings and provisions in addition to those which are contained in this Court's Model Sale Order, some of which are of the type described as provisions which the Court "generally will not approve" in this Court's Guidelines Re Sale Orders Revised 3-19-09. However, the Debtor believes that many if not all of the "disfavored" provisions of the proposed Sale Order are similar to, if not more detailed than, provisions listed as provisions which the Court will approve, and that those which are truly of the "disfavored" type are provisions which sophisticated purchasers have come to expect in transactions of this size and nature. The Debtor therefore requests (and will request in the Sale Motion) that the Court accept such provisions in the Sale Order, or in accompanying findings and conclusions. The Debtor notes that, under the Purchase Agreement, the Sale Order must be identical to the form attached to the Purchase Agreement or otherwise acceptable to the Purchaser.

outweighed by the risks that the Debtor's business will deteriorate with the passage of time resulting in a reduction in the purchase price to be paid by Purchaser or, worse, enabling Purchaser to terminate the Purchase Agreement altogether. The more the process is delayed, the less likely it may be that another bidder would be interested.

The Debtor is engaged in a highly sensitive and extremely competitive industry, and the Debtor and Purchaser do not believe that the Debtor will be able to retain its key employees for any extended period of time while operating as a debtor in possession in bankruptcy. The Purchaser is considered to be uniquely situated insofar as the Debtor's assets can contribute to its business; however, if the Purchaser cannot acquire those assets quickly and in conjunction with the retention of key employees of the Debtor, the assets will not have the same value to the Purchaser, and it is likely to go elsewhere. Indeed, as noted above, the Purchaser may terminate the Purchase Agreement if the specified individuals and threshold numbers of employees of the Debtor do not accept employment with the Purchaser following the closing of the sale. In that event, the value of the assets will be greatly diminished and the Debtor's secured creditors are unlikely to offer value to the Debtor's estate and unsecured creditors as they are doing in connection with the present transaction. The Debtor therefore believes that an extremely expedited sale of the Debtor's business is necessary to avoid immediate and irreparable harm to the Debtor's business, creditors and bankruptcy estate.

As set forth in Section 9.1 (f) (iii) of the Purchase Agreement, the Purchase Agreement is subject to termination if the Bidding Procedures Order is not entered by the Bankruptcy Court on or prior to December 1, 2015, or the Sale Order is not entered by the Bankruptcy Court on or prior to December 23, 2015. The risks to the Debtor's estate of failing to close the sale of the Transferred Assets to Purchaser on an extremely expedited basis are therefore severe.

The Debtor believes that proceeding with a sale in such an expedited manner serves only to the substantial benefit of the Debtor's estate. Given the lengthy and exhaustive pre-petition sale process that the Debtor embarked upon, with the invaluable assistance of Moelis, the Debtor and Moelis are highly confident that any potential overbidder has been identified and is extremely

Case: 15-31430   Doc# 13   Filed: 11/16/15   Entered: 11/16/15 20:50:51   Page 31 of 64

knowledgeable about the Debtor's business and the opportunity to purchase the Transferred Assets. The Debtor and Moelis therefore believe that if there is any party willing and able to pay more for the Debtor's business than Purchaser has offered, they can do so within the time frame requested by the Debtor and nothing would change for the better if that time frame was expanded. To the contrary, the risk to the Debtor's business of customer and employee attrition and a corresponding reduction in the purchase price to be paid by Purchaser (or worse a complete walk away by Purchaser) from a protracted sale process is severe and infinitely greater than the possibility that a theoretical higher price could be obtained for the Transferred Assets.

The APA was extensively negotiated between Seller and Purchaser in good faith, arms-length negotiations, including exchanges of multiple drafts of asset purchase agreements over an extended period of time. The Debtor and Moelis have no doubt that the result obtained from the sale of the Transferred Assets to Purchaser is the overwhelmingly optimal result for the Debtor's estate. The time requirements are the same as would be required by any purchaser.

While the Purchase Agreement only requires that the Bidding Procedures Order be entered by December 1, 2015, and that the Sale Order be entered by December 23, 2015, the Debtor urges the Court in the strongest fashion imaginable to schedule a hearing on this Motion as soon as possible, to allow the maximum time for notice, and to permit a hearing on the Sale Motion in ample time to allow entry of the Sale Order no later than December 23, 2015.

## IV.

## CONCLUSION

Based upon all of the foregoing, the Debtor respectfully requests that this Court:

1.     Enter an order substantially in the form of Bidding Procedures Order attached hereto and made a part hereof as Exhibit "1", granting, among other relief:

(a)     approval of the auction sale format and Bidding Procedures in the form attached hereto and made a part hereof as Exhibit "2";

(b)    approval of the Debtor's proposed form of Auction and Sale Hearing notice to be provided to creditors, prospective overbidders and other parties in interest in the form attached hereto and made a part hereof as Exhibit "3";

(c)    approval of  the form of asset purchase agreement for prospective overbidders to use by requiring prospective overbidders either to use the same form of asset purchase agreement as the Asset Purchase Agreement (the "Purchase Agreement") agreed to by the Debtor and Pandora Media, Inc. (the "Purchaser"), a copy of which is attached as Exhibit "1" to the Declaration of Elliott Peters filed concurrently herewith (the "Peters Declaration"), or to submit a redlined version of a proposed asset purchase agreement which indicates the prospective overbidder's changes to the Purchase Agreement;

(d)    approval of the Purchaser as the stalking horse bidder and approval of bid protections for the stalking horse bidder;

(e)    approval of the form of notice and procedures for objections relating to the proposed assumption and assignment of leases and executor contracts; and

(f)    the scheduling of an expedited Court hearing to consider approval of the sale of the Transferred Assets to Purchaser, or such other prevailing bidder, pursuant to the terms and conditions of the Purchase Agreement and the Bidding Procedures.

2.    Grant such other and further relief as the Court deems just and proper.

Dated:  November 16, 2015          LEVENE, NEALE, BENDER, YOO  & BRILL, L.L.P.


By:    /s/ Philip A. Gasteier
       RON BENDER
       PHILIP A. GASTEIER
       MONICA Y. KIM
       KRIKOR J. MESHEFEJIAN

# EXHIBIT "1"

RON BENDER (SBN 143364)
PHILIP A. GASTEIER (SBN 130043)
MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbyb.com; pag@lnbyb.com;
myk@lnbyb.com; kjm@lnbyb.com

Proposed Attorneys for Chapter 11 Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>RDIO, INC.,<br><br>               Debtor and Debtor in Possession. | Case No. 15-31430<br><br>Chapter 11 Case<br><br>**ORDER (A) APPROVING BIDDING AND BIDDING PROCEDURES WITH RESPECT TO THE TRANSFER AND SALE OF CERTAIN ASSETS, (B) APPROVING BIDDING PROTECTIONS FOR THE STALKING HORSE BIDDER, (C) APPROVING PROCEDURES RELATED TO THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (D) APPROVING THE FORM AND MANNER OF NOTICES RELATED TO THE AUCTION AND SALE, (E) SCHEDULING THE SALE HEARING, AND (F) GRANTING RELATED RELIEF**<br><br>Date: To be set<br>Time: To be set<br>Place: U.S Bankruptcy Court<br>      235 Pine St., 23rd Floor<br>      San Francisco, CA 94101<br>Judge: The Hon. |

Upon the emergency motion (the "Motion") of Rdio, Inc., chapter 11 debtor and debtor in possession in the above-captioned, chapter 11 bankruptcy case (the "Debtor"), for, among other things, entry of an order (this "Bidding Procedures Order"): (a) approving (i) bidding and bidding procedures (the "Bidding Procedures")[1] with respect to the following: (x) the sale, assignment and transfer of certain assets and (y) the assumption and assignment of certain executory contracts and unexpired leases related thereto (the assets described in clauses "(x)" and "(y)", collectively, the "Transferred Assets"); (ii) the payment of the Break-Up Fee and Expense Reimbursement (collectively, the "Stalking Horse Bidder Fee") to Pandora Media, Inc. ("Purchaser"), which serves as the "stalking horse bidder" (in such capacity, the "Stalking Horse Bidder") pursuant to that certain Asset Purchase Agreement dated as of November 16, 2015, by and among the Debtor and Purchaser, attached as **Exhibit [ ]** to the Motion (as further described below, the "Asset Purchase Agreement"); (iii) approving procedures governing assumption and assignment (the "Assignment Procedures") of certain executory contracts and unexpired leases (as further described below, the "Designated Contracts"); (iv) approving the form and manner of certain notices related to the auction and sale of the Transferred Assets; (b) scheduling the Auction and a hearing (the "Sale Hearing") to approve the transfer and sale of the Transferred Assets, and the other transactions contemplated under the Asset Purchase Agreement (such transactions, the "Asset Purchase Transaction"); and (c) granting related relief, all as more fully set forth in the Motion; and the Court, having reviewed the Motion and other papers and pleadings filed in connection therewith and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and due, proper and sufficient notice of the Motion having been given; and the Court, having determined that the legal and factual bases set forth in the Motion, the Declarations of Elliott Peters, Carlos Jimenez and Jeremy Liegl filed in support of the Motion and proffered at the Hearing establish just cause for the relief granted herein, and that such relief is in the best interests of the Debtor, its bankruptcy estate and its creditors; and upon all of the pleadings and proceedings before the Court; and after due deliberation and sufficient cause

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

appearing therefor,

**THE COURT HEREBY FINDS AND CONCLUDES THAT:[2]**

A. <u>Jurisdiction and Venue.</u> The Court has jurisdiction over the Motion and the transactions contemplated by the Asset Purchase Agreement pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B. <u>Statutory Predicates.</u> The statutory bases for the relief requested in the Motion are (i) sections 105(a), 363(b), (f), and (m), 365, 503, and 507 of the Bankruptcy Code; (ii) Bankruptcy Rules 2002(a)(2), 6004(a), (b), (c), (e), (f), and (h), 6006(a) and (c), 9007, and 9014; and (iii) Local Bankruptcy Rules 9006-1 and 9014-1.

C. <u>Notice.</u> Good and sufficient notice of the Motion and the relief sought therein has been provided to notice parties specified in the Motion, and no other or further notice is required except as set forth herein. A reasonable opportunity to object or be heard regarding the relief provided herein has been afforded to parties-in-interest.

D. <u>Justification for Relief.</u> The Debtor has articulated good and sufficient reasons for the Court to (i) approve the Bidding Procedures; (ii) approve the Stalking Horse Bidder Fee; (iii) approve the manner and form of notice of certain matters related to the transfer and sale of the Transferred Assets; (iv) approve the procedures for the assumption and assignment of the Designated Contracts and the form of the Assignment Notice; (v) set the date for the Sale Hearing; and (vi) grant such additional relief as requested in the Motion as related to the foregoing. The entry of this Bidding Procedures Order is in the best interests of the Debtor, its estate and creditors of its estate and other parties-in-interest.

E. <u>Bidding Procedures.</u> The Debtor's proposed Bidding Procedures, attached as **Exhibit [ ]** to the Motion, (i) are designed to maximize the value to be achieved for the

---

[2] The findings of fact and conclusions of law set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these proceedings by Bankruptcy Rule 9014. To the extent any of the following findings constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Transferred Assets; (ii) will ensure a competitive and efficient bidding process; and (iii) are fair and reasonable under the circumstances.

F. <u>Stalking Horse Bidder Fee.</u> The Stalking Horse Bidder Fee set forth in Section 9.3 of the Asset Purchase Agreement, and described in the Motion, shall be paid in accordance with the Asset Purchase Agreement, and (i) if triggered, will be an actual and necessary cost and administrative expense of preserving the Debtor's estate, within the meaning of section 503(b)(1) of the Bankruptcy Code, (ii) is reasonable and appropriate, particularly in light of the size and nature of the Asset Purchase Transaction and the efforts and costs and expenses that have been, and are continuing to be, expended by the Stalking Horse Bidder notwithstanding that the proposed transaction is subject to higher and/or better offers for the Transferred Assets, (iii) was negotiated by the parties at arms-length and in good faith, and the Stalking Horse Bidder would not have entered into the Asset Purchase Agreement in the absence of the Debtor's obligation to pay such Stalking Horse Bidder Fee if triggered, and (iv) is necessary to ensure that the Stalking Horse Bidder will continue to pursue the proposed transaction on the terms set forth in the Asset Purchase Agreement.

G. <u>Auction and Sale Hearing Notice.</u> The Debtor's proposed Auction and Sale Hearing Notice, attached as **Exhibit [ ]** to the Motion, as approved and served in accordance herewith, is appropriate and reasonably calculated to provide all interested parties with timely and sufficient information that they may require about the auction process, including: (a) announcement that the Court has approved the bidding and auction process pursuant to the Bidding Procedures; (b) information on how to obtain a copy of the Bidding Procedures and the Bidding Procedures Order; (c) the Bid Deadline; (d) the time, date, and location of the Auction; (e) the time, date, and location of the Sale Hearing; and (f) procedures for objecting to the Auction and the transfer and sale contemplated by the Motion. The proposed Auction and Sale Hearing Notice complies with the requirements of the Bankruptcy Rules and the Local Bankruptcy Rules.

H. <u>Notice of Successful Bidder.</u> The Notice of Successful Bidder, attached hereto as **Exhibit "1"** (the "<u>Notice of Successful Bidder</u>"), as approved and served in accordance herewith, is reasonably calculated to provide to the Special Notice Parties (as defined below)

4

sufficient notice of (i) the Auction results, including the identity of the Successful Bidder, and (ii) if the Successful Bidder is not the Stalking Horse Bidder, any material differences between the terms of the Alternative Acquisition Agreement and the Asset Purchase Agreement. The Notice of Successful Bidder will include the Supplemental Assignment Notice, if one is required pursuant to the Bidding Procedures.

I.  <u>Assumption and Assignment Procedures.</u> The Debtor's proposed procedures for assumption and assignment of the Designated Contracts are designed to ensure that the Debtor assumes and assigns the Designated Contracts in accordance with section 365 of the Bankruptcy Code.

J.  <u>Assignment Notice.</u> The Debtor's proposed Assignment Notice, attached as **Exhibit "2"** hereto, as approved and served in accordance herewith, is reasonably calculated to provide all third-party counterparties (the "<u>Counterparties</u>") to the Designated Contracts with proper notice of the potential assumption and assignment of such Designated Contracts and any cure amounts relating thereto (the "<u>Cure Amount</u>") and will be served on such Counterparties in accordance with paragraph 14 hereof.

K.  <u>Compliance with Bankruptcy Law.</u> The Motion and this Bidding Procedures Order comply with all applicable provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Bankruptcy Rules.

**NOW THEREORE, IT IS HEREBY ORDERED THAT:**

1.  The relief requested in the Motion relating to the matters covered in this Bidding Procedures Order, is GRANTED and APPROVED as provided herein.

2.  Any and all objections and responses to the Motion relating to the matters covered in this Bidding Procedures Order that have not been withdrawn, waived, settled, or resolved, and all reservations of rights included therein, are overruled and denied.

**<u>Bidding Procedures</u>**

3.  The Bidding Procedures are hereby authorized and approved and incorporated herein to the fullest extent. The Bidding Procedures shall govern the bidding process and the Auction with respect to the Transferred Assets. The Debtor is authorized to take any and all

5

actions necessary to implement the Bidding Procedures.

4. On or before three business days after entry of this Bidding Procedures Order, the Debtor will cause the Auction and Sale Hearing Notice to be sent by first-class mail (postage prepaid) to the following parties: (i) all potential purchasers identified by the Debtor or its professionals; (ii) the Office of the United States Trustee (the "U.S. Trustee"); (iii) counsel for the official committee of unsecured creditors (if such committee has been appointed), (iv) all known creditors of the Debtor ; (v) the applicable taxing authorities; (vi) the Counterparties; (vii) any party in interest who has requested notice pursuant to Bankruptcy Rule 2002; and (viii) Purchaser and its counsel, (ix) counsel to Iconical Investments II, LP, Skadden, Arps, Slate, Meagher & Flom LLP, Attn: Van Durrer II (van.durrer@skadden.com) and Ron E. Meisler (ron.meisler@skadden.com), (the entities listed in (i) through (ix) are hereby collectively referred to as the "Special Notice Parties").

5. If, by the Bid Deadline, the only timely Qualified Bid received by the Debtor is from the Stalking Horse Bidder, the Debtor shall not conduct an Auction, and the Stalking Horse Bidder will be deemed the Successful Bidder and its bid the Successful Bid. If this occurs, the Debtor shall proceed to request at the Sale Hearing that the Court approve the transfer and sale of the Transferred Assets to the Stalking Horse Bidder in accordance with the Asset Purchase Agreement and the assumption and assignment of the Designated Contracts, and request that the Sale Order be entered by the Court and that the Sale Order shall be made immediately effective upon entry, notwithstanding the provisions of Rules 6004(h) and 6006(d) of the Bankruptcy Rules and Rule 62(g) of the Federal Rules of Civil Procedure.

**Stalking Horse Bidder and Stalking Horse Bidder Fee**

6. Purchaser is approved as the Stalking Horse Bidder with respect to the Auction and the Asset Purchase Transaction pursuant to the Asset Purchase Agreement.

7. Section 9.3 of the Asset Purchase Agreement, the Stalking Horse Bidder Fee and the other amounts payable in accordance with Section 9.3 of the Asset Purchase Agreement are approved, authorized, and binding upon the Debtor and its estate as a superpriority administrative expense with priority over any and all administrative expenses of any kind, including those in sections 503(b) or 507(b) of the Bankruptcy Code or provided for in any other Order of this

Court.

8.    The Debtor's obligations (i) to pay of the Stalking Horse Bidder Fee and (ii) repay any Transition Services Fees shall survive termination of the Asset Purchase Agreement (in accordance with the terms thereof) and shall be payable as provided herein and in the Asset Purchase Agreement.  The Debtor is authorized and directed, without further order of this Court, (i) to pay the Stalking Horse Bidder Fee to the Stalking Horse Bidder in full in cash (by wire transfer) in conjunction with the closing of an Alternative Transaction and (ii) to repay any Transition Services Fees to Purchaser in accordance with Section 9.3 of the Asset Purchase Agreement, which payments shall be indefeasible and free and clear of all liens and encumbrances.

**Notice of Successful Bidder**

9.    Within one business day following the Debtor's selection of the Successful Bid — either following the Bid Deadline (if the only Qualified Bid received by the Bid Deadline is that of Purchaser) or at the conclusion of the Auction (if more than one Qualified Bid has been received by the Bid Deadline) — the Debtor shall file with the Court and send to the Special Notice Parties (other than the Qualified Bidders) by first-class mail (postage prepaid) the Notice of Successful Bidder.  If the Successful Bidder is not the Stalking Horse Bidder, the Notice of Successful Bidder shall annex copies of the Alternative Acquisition Agreement and any Supplemental Assignment Notice of the Successful Bidder.

**Objections**

10. Objections, if any, to the transfer and sale of the Transferred Assets as contemplated by the Motion, must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Bankruptcy Rules; and (c) be filed with the clerk of the Court for the Northern District of California (or filed electronically via CM/ECF with the Court) and actually received by the following parties (collectively, the "Notice Parties"): (i) the Debtor's counsel, Levene, Neale, Bender, Yoo & Brill L.L.P., Attn: Ron Bender (rb@lnbyb.com) and Elliott Peters (elliott.peters@rd.io); (ii) counsel to the Stalking Horse Bidder, Wilson Sonsini Goodrich & Rosati PC, Attn: Benjamin Hoch (bhoch@wsgr.com) and Dorsey, Attn: Stephen O'Neill

7

(oneill.stephen@dorsey.com); (iii) counsel to Iconical, Skadden, Arps, Slate, Meagher & Flom LLP, Attn: Van Durrer II (van.durrer@skadden.com) and Ron E. Meisler (Ron.Meisler@skadden.com), (iv) the US Trustee, Attn: [ ● ]; and (v) counsel to the official committee of unsecured creditors, **on or before 4:00 p.m. [pacific] time on** [ ● ] (the "Sale Objection Deadline").

11. The following objections may be raised orally at the Sale Hearing: (a) objections to the conduct of the Auction; (b) objections to the selection of the Successful Bidder; and (c) objections to the terms of the Alternative Acquisition Agreement, provided, that such objection may only be raised with respect to those terms of the Alternative Acquisition Agreement that are materially different from the terms of the Asset Purchase Agreement.

**Sale Hearing**

12. The Sale Hearing shall be held before the Court on [ ● ] at [ ● ] (prevailing [Pacific Standard Time). The Sale Hearing may be adjourned without need for any further notice by announcement of the adjourned Sale Hearing date in open Court or by filing a notice thereof as soon as reasonably practicable before the Sale Hearing date with the Court.

13. At the Sale Hearing, the Debtor will request that the Court (a) approve the Asset Purchase Transaction, or, if the Successful Bidder is not the Stalking Horse Bidder, the sale transaction contemplated by such Successful Bid; (b) approve the Successful Bid; and (c) enter the Sale Order providing for this relief.

**Assignment Procedures**

14. On or before four business days after the entry of this Bidding Procedures Order, the Debtor shall file with the Court and serve, by first-class mail (postage prepaid), on the Counterparties (and such party's attorney, if such attorney has filed a notice of appearance in the Debtor's Chapter 11 case), the initial Assignment Notice (the "Initial Assignment Notice") for the Designated Contracts (as defined in the Asset Purchase Agreement) to be assumed and assigned in accordance with the Asset Purchase Agreement.

15. If the Successful Bid includes (i) a different list of Designated Contracts to be assumed and assigned, or (ii) different Cure Amount(s) than those listed in the Initial Assignment

Notice, then the Notice of Successful Bidder shall include an exhibit identifying changes to the Initial Assignment Notice (the "Supplemental Assignment Notice"). The Supplemental Assignment Notice shall include, to the extent the Successful Bidder is not the Stalking Horse Bidder, a description of the Successful Bidder and a statement as to its ability to perform the Debtor's obligations thereunder in accordance with section 365 of the Bankruptcy Code.

16. For the avoidance of doubt, the listing of any Designated Contracts on any Assignment Notice does not require or guarantee that such agreements will be assumed and assigned, and all rights of the Debtor with respect to such agreements are reserved.

17. Objections to any matter pertaining to the assumption and assignment of the Designated Contracts, including without limitation the adequate assurance or the Cure Amount, must be filed with the Court no later than (a) [ ● ] (the "Initial Objection Deadline"), with respect to the Initial Assignment Notice, and (b) [ ● ] (the "Supplemental Objection Deadline"), with respect to the Supplemental Assignment Notice. Any such objections must be served so as to be actually received by the Notice Parties and the Successful Bidder no later than the Initial Objection Deadline or the Supplemental Objection Deadline (as applicable).

18. To the extent that any Counterparty or other party in interest does not timely serve an objection to the Assignment Notice as set forth above, such party will be deemed to have (i) consented to the assumption and assignment of the applicable Designated Contracts; (ii) agreed that the Successful Bidder has provided adequate assurance of future performance within the meaning of section 365(b)(1)(C) of the Bankruptcy Code; (iii) consented to the relevant Cure Amount; (iv) agreed to the terms of the Sale Order; and (v) waived any and all objections in connection with items (i) through (iv) hereof.

19. Upon the filing of an objection by a Counterparty, the Debtor will contact the objecting party to attempt to consensually resolve any timely filed objection. The Debtor will work with the Successful Bidder in this regard. If the Debtor is unable to resolve such an objection in response to the Assignment Notice, such objection will be heard at the Sale Hearing (as may be adjourned by the Debtor without the Counterparty's consent); provided, further, that in the event an objection relates solely to a Cure Amount (a "Cure Objection"), then such objecting

9

party will be deemed to consent to the assumption of its Designated Contract, notwithstanding such objection. In the event the Debtor or the Successful Bidder is unable to resolve a Cure Objection prior to the Sale Hearing, the Successful Bidder may elect not to request assumption and assignment of the underlying Designated Contract.

**<u>Other Matters</u>**

20. The Debtor's obligations under this Bidding Procedures Order, the provisions of this Bidding Procedures Order, and the portions of the Asset Purchase Agreement pertaining to the obligations to pay the Stalking Horse Bidder Fee, or repay the Transition Services Fees shall survive confirmation of any chapter 11 plan or discharge of claims thereunder and shall be binding upon the Debtor, the reorganized or reconstituted Debtor, the Debtor's estate, any successor to the Debtor, and any trustee that may be appointed in this case (including any chapter 7 trustee).

21. The DIP Lender and the Prepetition Secured Parties (as such terms are defined in the Interim DIP Order) shall have standing to be heard on all matters relating to the sale of the Transferred Assets, including the conduct of the Auction and the interpretation of the Bidding Procedures.

22. The stays provided for in Bankruptcy Rules 6004(h) and 6006(d) are waived, and this Bidding Procedures Order shall be effective immediately upon its entry.

23. All time periods set forth in this Bidding Procedures Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

24. The Debtor is authorized to take any and all actions necessary to effectuate and implement the relief granted pursuant to this Bidding Procedures Order.

25. The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Bidding Procedures Order.

**\*End of Order\***

# EXHIBIT "1"

RON BENDER (SBN 143364)
PHILIP A. GASTEIER (SBN 130043)
MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbyb.com; pag@lnbyb.com;
myk@lnbyb.com; kjm@lnbyb.com

Proposed Attorneys for Chapter 11 Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: | ) Case No. 15-31430 |
| | ) |
| RDIO, INC., | ) Chapter 11 Case |
| | ) |
| Debtor and Debtor in Possession. | ) |
| | ) **NOTICE OF SUCCESSFUL BIDDER** |
| | ) **FROM AUCTION SALE** |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) Date:  To be set |
| | ) Time:  To be set |
| | ) Place: U.S Bankruptcy Court |
| | )        235 Pine St., 23rd Floor |
| | )        San Francisco, CA 94101 |
| | ) Judge: The Hon. |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

PLEASE TAKE NOTICE that in accordance with the Bidding Procedures Order entered by the Court on November __, 2015 as Docket Number ___, Rdio, Inc., chapter 11 debtor and debtor in possession in the above-captioned, chapter 11 bankruptcy case (the "Debtor"), conducted an auction (the "Auction") on December __, 2015, with the respect to the sale, assignment and transfer of certain of the Debtor's assets and the assumption and assignment of certain of the Debtor's executory contracts and unexpired leases (collectively, the "Transferred Assets"). All capitalized terms which are not defined in this Notice shall have the same definitions as such terms have in the Bidding Procedures Order.

A total of ____ Qualified Bids were received by the Debtor, and a total of ___ Qualified Bidders (inclusive of the Stalking Horse Bidder) appeared at the Auction. The identity of the Successful Bidder at the Auction is _____. The results of the Auction were as follows:

The following is a description of the material differences between the terms of the Alternative Acquisition Agreement and the Asset Purchase Agreement.

Attached hereto is a copy of the Supplemental Assignment Notice from the Successful Bidder.

Dated: December __, 2015                    RDIO, INC.


                                            By:    /s/ Ron Bender
                                                Ron Bender
                                                Philip A. Gasteier
                                                Monica Y. Kim
                                                Krikor J. Meshefejian
                                                Levene, Neale, Bender, Yoo & Brill L.L.P.
                                                Attorneys for Chapter 11 Debtor and
                                                Debtor in Possession

# EXHIBIT "2"

RON BENDER (SBN 143364)
PHILIP A. GASTEIER (SBN 130043)
MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
Email: rb@lnbyb.com; pag@lnbyb.com;
myk@lnbyb.com; kjm@lnbyb.com

Proposed Attorneys for Chapter 11 Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: | ) Case No. 15-31430 |
| | ) |
| RDIO, INC., | ) Chapter 11 Case |
| | ) |
| Debtor and Debtor in Possession. | ) |
| | ) **NOTICE OF DEBTOR'S PROPOSED** |
| | ) **ASSUMPTION AND ASSIGNMENT TO** |
| | ) **SUCCESSFUL BIDDER FROM** |
| | ) **AUCTION SALE OF EXECUTORY** |
| | ) **CONTRACTS AND UNEXPIRED** |
| | ) **LEASES AND ESTABLISHING CURE** |
| | ) **AMOUNTS** |
| | ) |
| | ) |
| | ) Date:  To be set |
| | ) Time:  To be set |
| | ) Place: U.S Bankruptcy Court |
| | )        235 Pine St., 23rd Floor |
| | )        San Francisco, CA 94101 |
| | ) Judge: The Hon. |
| | ) |
| | ) |

PLEASE TAKE NOTICE that in accordance with the Bidding Procedures Order entered by the Court on November __, 2015 as Docket Number ___, Rdio, Inc., chapter 11 debtor and debtor in possession in the above-captioned, chapter 11 bankruptcy case (the "Debtor"), will conduct an auction (the "Auction") on December __, 2015, with the respect to the sale, assignment and transfer of certain of the Debtor's assets and the assumption and assignment of certain of the Debtor's executory contracts and unexpired leases (collectively, the "Transferred Assets").  All capitalized terms which are not defined in this Notice shall have the same definitions as such terms have in the Bidding Procedures Order.

PLEASE TAKE FURTHER NOTICE that on December __, 2015, at the above-referenced Court, a hearing will be held for the Bankruptcy Court to consider approval of (i) the Debtor's sale of the Transferred Assets to the Successful Bidder at the Auction, and (ii) the Debtor's assumption and assignment to the Successful Bidder of all of the Debtor's executory contracts and unexpired leases that the Successful Bidder wishes to assume.

PLEASE TAKE FURTHER NOTICE that attached hereto as Exhibit "1" is a schedule (the "Executory Contract/Unexpired Lease Schedule") of all of the Debtor's known executory contracts and unexpired leases and the amount of each (i) cure, if any, the Debtor believes needs to be paid to the other party to such executory contract or unexpired lease to enable the Debtor to assume and assign such particular executory contract and unexpired lease to the Successful Bidder to comply with the provisions of Section 365(b)(1)(A) of the Bankruptcy Code ("Cure Amount"), and (ii) actual pecuniary loss, if any, incurred by the other party to such executory contract or unexpired lease to enable the Debtor to assume and assign such particular executory contract and unexpired lease to the Successful Bidder to comply with the provisions of Section 365(b)(1)(B) of the Bankruptcy Code ("Pecuniary Loss Amount").

PLEASE TAKE FURTHER NOTICE that the Executory Contract/Unexpired Lease Schedule is marked to show which executory contracts and unexpired leases the Stalking Horse Bidder has preliminarily indicated it intends to cause the Debtor to assume and assign to it if the Stalking Horse Bidder is the Successful Bidder.  The Stalking Horse Bidder reserves the right to add to or delete from the Executory Contract/Unexpired Lease Schedule, and, if the Successful

Bidder is someone other than the Stalking Horse Bidder, that Successful Bidder also reserves the right to add to or delete from the Executory Contract/Unexpired Lease Schedule. The Debtor will file with the Court and serve any affected counter-parties to any executory contracts and/or unexpired leases in the event of any change(s) to the Executory Contract/Unexpired Lease Schedule.

PLEASE TAKE FURTHER NOTICE that if you (i) oppose the Debtor's assumption and assignment to the Successful Bidder of your executory contract or unexpired lease, (ii) dispute the Debtor's belief as to the Cure Amount existing under your executory contract or unexpired lease, or (iii) dispute the Debtor's belief as to the Pecuniary Loss Amount existing under your executory contract or unexpired lease, you must, not later than December __, 2015, file a written objection with the Clerk of the Bankruptcy Court for the Northern District of California, San Francisco Division, setting forth all of the bases for your objection, and you must serve your objection upon all of the following parties: (i) the Debtor's counsel, Levene, Neale, Bender, Yoo & Brill L.L.P., Attn: Ron Bender (rb@lnbyb.com) and Elliott Peters (elliott.peters@rd.io); (ii) counsel to the Stalking Horse Bidder, Wilson Sonsini Goodrich & Rosati PC, Attn: Benjamin Hoch (bhoch@wsgr.com) and Dorsey, Attn: Stephen O'Neill (oneill.stephen@dorsey.com); (iii) counsel to Iconical, Skadden, Arps, Slate, Meagher & Flom LLP, Attn: Van Durrer II (van.durrer@skadden.com) and Ron E. Meisler (Ron.Meisler@skadden.com), (iv) the US Trustee, Attn: [ ● ]; and (v) counsel to the official committee of unsecured creditors, **on or before 4:00 p.m. [pacific] time on** [ ● ].

PLEASE TAKE FURTHER NOTICE that your failure to file and serve a timely objection to the Debtor's proposed assumption and assignment to the Successful Bidder of your executory contract or unexpired lease may be deemed by the Court to constitute your consent to (i) the Debtor's assumption and assignment to the Successful Bidder of your executory contract or unexpired lease may be deemed by the Court to constitute, (ii) the Debtor's asserted Cure Amount with respect to your executory contract or unexpired lease, and (iii) the Debtor's asserted Pecuniary Loss Amount with respect to your executory contract or unexpired lease.

Dated:  December __, 2015                    RDIO, INC.


By:___*/s/ Ron Bender*_____
        Ron Bender
        Philip A. Gasteier
        Monica Y. Kim
        Krikor J. Meshefejian
        Levene, Neale, Bender, Yoo & Brill L.L.P.
        Attorneys for Chapter 11 Debtor and
        Debtor in Possession

# EXHIBIT "2"

# BIDDING PROCEDURES[1]

Set forth below are the bidding procedures (the "Bidding Procedures") that will govern the bidding and auction (the "Auction") for the following: (i) the transfer and sale by the Rdio, Inc. (the "Debtor") of certain assets, and (ii) the assumption and assignment of certain contracts and leases related thereto (the assets identified in the preceding clauses (i) and (ii) being, collectively, the "Transferred Assets").

These Bidding Procedures have been approved by an order of the United States Bankruptcy Court for the Northern District of California (the "Court"), entered by the Court on November __, 2015 (the "Bidding Procedures Order") in Bankruptcy Case No. [ ● ], the chapter 11 case of the Debtor.

The Debtor has entered into that certain Asset Purchase Agreement dated November 16, 2015 (the "Asset Purchase Agreement"), by and among the Debtor and Pandora Media, Inc. ("Purchaser" or the "Stalking Horse Bidder") pursuant to which the Debtor shall, among other things, transfer and sell to Purchaser the Transferred Assets as set forth set forth in the Asset Purchase Agreement. A copy of the Asset Purchase Agreement is attached as Exhibit [ ● ] to the Debtor's motion to approve the bidding procedures (the "Bidding Procedures") related to an auction sale of the Transferred Assets (the "Auction"). The transaction contemplated by the Asset Purchase Agreement (the "Sale Transaction") is subject to higher and better offers as set forth in these Bidding Procedures.

**As more fully described in the Bidding Procedures, below are important dates relating to the bidding, the Auction and the transfer and sale of the Transferred Assets:**

| | |
|---|---|
| **Bid Deadline** | **December __, 2015** |
| **Auction** | **December __, 2015** |
| **Sale Hearing** | **December __, 2015** |

## 1. Assets to be Transferred and Sold

The Debtor is offering for sale the Transferred Assets. Except as otherwise agreed to in the definitive sale documents, all of the Debtor's rights, title and interest in and to the Transferred Assets shall be sold, transferred and assigned free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and any other interests thereon and therein (collectively, the "Encumbrances").

## 2. Stalking Horse Bidder

The Asset Purchase Agreement provides and the Court has authorized Purchaser (a) to act as the Stalking Horse Bidder in the Auction (if any) for the Transferred Assets, and (b) to receive, in the event that Purchaser is not the winning bidder at the Auction and subject to the Asset Purchase Agreement, the Expense Reimbursement (as defined in the Asset Purchase Agreement) subject to a

---

[1] All capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Order

cap of $500,000 plus the Break-Up Fee of $2,250,000 plus the Master Services Fee (as defined in the Asset Purchase Agreement), with all of the foregoing collectively defined here as the "Stalking Horse Bidder Fee").

### 3. Confidentiality Agreement/Due Diligence

Prior to the Bid Deadline (defined below), the Debtor shall afford any potential bidder whom the Debtor (with input from Moelis & Company ("Moelis") – the Debtor's financial advisor) reasonably determines has the financial wherewithal to submit a Qualified Bid the opportunity to conduct a reasonable due diligence review, in the manner determined by the Debtor, in its discretion (subject to input from Moelis and the timing of the Auction), of the Transferred Assets in order to make a bid. The Debtor may, but shall not be obligated to, furnish any due diligence information after the Bid Deadline.

In order to receive any due diligence from the Debtor or from Moelis, a potential bidder must submit to the Debtor and/or to Moelis an executed confidentiality agreement (which shall inure to the benefit of the Successful Bidder and otherwise be in form and substance consistent with Section 6.3 of the Asset Purchase Agreement), such agreement to be provided to such bidder by the Debtor or Moelis, and submitted in electronic form by the potential bidder to Moelis, Attn: Carlos Jimenez (carlos.jimenez@moelis.com), with a copy to the Debtor's counsel, Ron Bender of Levene, Neale, Bender, Yoo & Brill L.L.P. (rb@lnbyb.com) and Elliott Peters (elliott.peters@rd.io). Parties interested in bidding should contact Carlos Jimenez (carlos.jimenez@moelis.com) of Moelis to request a copy of the confidentiality agreement.

Information relevant to the Debtor and the Transferred Assets shall be made available to financial qualified potential bidders as soon as practicable following the execution by such financial qualified potential bidders of the confidentiality agreement; provided, however that the Debtor may, in its discretion (with input from Moelis), require that the potential bidder also provide information set forth in section 4 hereof before receiving any due diligence information.

### 4. Participation Requirements

To be qualified to submit an initial bid, a potential bidder must submit to Moelis, no later than five (5) days before the Bid Deadline, current audited financial statements and the latest unaudited financial statements of the potential bidder or, if such potential bidder is an entity formed for the purpose of acquiring the Transferred Assets, evidence of the potential bidder's financial ability to submit a qualifying overbid and to demonstrate adequate assurance of future performance with respect to any executory contracts and unexpired leases that the potential bidder wishes to have assigned to it, including any current audited financial statements and the latest unaudited financial statements of any equity holders or sponsors of such potential bidder who intend to guarantee the obligations of such potential bidder, or such other form of financial disclosure and/or credit quality support or enhancement, if any, that will allow Moelis to make a reasonable determination as to such potential bidder's financial and other capabilities to consummate the Sale Transaction.

The Debtor (with input from Moelis) shall determine whether any potential bidder that has timely submitted these materials qualifies to submit a bid (such bidder, an "Overbidder," which term, for the avoidance of doubt, does not include Purchaser).

### 5. __Bid Deadline__

The Overbidders' bid packages must be delivered in electronic form[2] to the parties listed below so as to be actually received no later than 5:00 p.m. (prevailing Pacific Standard Time) (the "Bid Deadline"), which is five (5) days before the Auction:

        (i)      the Debtor, Attn: Elliott Peters (elliott.peters@rd.io);

        (ii)     financial advisor to the Debtor, Moelis, Attn: Carlos Jimenez (carlos.jimenez@moelis.com);

        (iii)    counsel to the Debtor, Levene, Neale, Bender, Yoo & Brill L.L.P. Attn: Ron Bender (rb@lnbyb.com);

        (iv)    counsel to Iconical, , Skadden, Arps, Slate, Meagher & Flom LLP, Attn: Ron E. Meisler (Ron.Meisler@skadden.com),

        (v)     counsel to the Stalking Horse Bidder, Wilson Sonsini Goodrich & Rosati PC, Attn: Benjamin Hoch (bhoch@wsgr.com);[3] and

        (vi)    counsel to the official committee of unsecured creditors (the "Committee").

### 6. __Qualified Bid Requirements__

In order to participate at the Auction, each Overbidder must submit, by the Bid Deadline, a bid satisfying the following criteria:

        (a)    __Alternative Acquisition Agreement.__ The bid shall include an executed Agreement, as modified by the Overbidder (the "Alternative Acquisition Agreement"), along with an electronic mark-up showing all changes to the Asset Purchase Agreement, which Alternative Acquisition Agreement is on substantially the same terms as the Asset Purchase Agreement.

        (b)    __Minimum Overbid.__ The proposed purchase price to be paid for the Transferred Assets must be in an amount (i) at least $1,000,000 more than the maximum "Aggregate Consideration" contained in the Asset Purchase Agreement, plus (ii) the amount of the Stalking Horse Bidder Fee (for purposes hereof, the amount of the Expense Reimbursement included in the Stalking Horse Bidder Fee shall be deemed to be $500,000, the maximum amount set forth in Section 9.3(a)(i) of the Asset Purchase Agreement), plus an amount equal to the Master Services Fees (as defined in the Asset Purchase Agreement) paid by Purchaser which shall be estimated in good faith by the Debtor (with input from Moelis and the Committee) two days prior to the Bid Deadline.

---

[2] The Debtor may also request physical copies of any such documents.

[3] An Overbidders' bid package will be delivered to counsel to the Stalking Horse Bidder only after the Overbidder has been deemed to constitute a Qualified Bidder and the bid of the Qualified Bidder has been deemed to constitute a Qualified Bid, which determination and delivery shall occur no later than 5:00 p.m. PST of the day after the Overbidders' bid package has been received by the Debtor.

(c)     <u>Closing Deadline.</u> The bid shall contain a proposed closing date that is no later than the Closing Date as defined in the Asset Purchase Agreement (the "Closing Deadline").

(d)     <u>Bid Irrevocable.</u> The bids shall remain binding and irrevocable until the Sale Hearing or, if the bid is the Successful Bid, until the earlier of the closing of the sale or the Closing Deadline.

(e)     <u>No Breakup Fee.</u> The bid must not request or entitle the Overbidder to receive any fee analogous to the Stalking Horse Bidder Fee, any transaction or breakup fee, expense reimbursement or similar fee or payment. **For the avoidance of doubt, by submitting a bid, the Overbidder agrees that it shall not be entitled to any such fee.**

(f)     <u>Deposit.</u> An Overbidder must provide a cashier's check payable to the Debtor, or a wire transfer to the Debtor, in either case, to be deposited into a separate debtor-in-possession account or into a segregated trust account maintained by the Debtor's bankruptcy counsel, in an amount equal to the sum of: (i) the Stalking Horse Bidder Fee (defined above) and (ii) $7,500,000, (the sum of (i) and (ii), the "Deposit"). The Overbidder shall forfeit the Deposit if (A) it is determined to be a Qualified Bidder (defined below) and withdraws or modifies its bid at any time (other than as provided herein) before the conclusion of the Auction, or (B) the Overbidder is the Successful Bidder and (x) modifies or withdraws the bid without the Debtor's consent before the consummation of the sale contemplated by the bid, or (y) breaches the Alternative Acquisition Agreement. The Deposit shall be returned to the Overbidder (1) as soon as practicable if the bidder is not determined to be a Qualified Bidder or (2) no later than five business days following Court approval of the Sale Transaction to the Successful Bidder if the Overbidder is determined to be a Qualified Bidder but is not deemed to be the Successful Bidder. The Debtor (or its bankruptcy counsel, as the case may be) will not be required to maintain any Deposit in an interest bearing account, but any interest earned on any Deposit will be remitted to the appropriate Qualified Bidder if the Deposit is returned to the Qualified Bidder pursuant to the above.

(g)     <u>Due Diligence.</u> The bid must not contain any due diligence or financing contingencies, and must acknowledge and represent that (i) the Overbidder has had an opportunity to conduct any and all due diligence regarding the Debtor and the Transferred Assets before making any bids; (ii) it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Debtor and/or the Transferred Assets in making its bid; (iii) it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Debtor and the Transferred Assets, or the completeness of any information provided in connection therewith (in all cases, other than as set forth in the Alternative Acquisition Agreement) and (iv) it consents to be bound by the terms of these Bidding Procedures.

(h)     <u>Identity of Bidders.</u> The Overbidder must fully disclose the identity of each entity that will be bidding for the Transferred Assets or otherwise participating in connection with such bid, and the complete terms of any such participation, as well as disclose the organization form and the business conducted by each entity.

(i)     <u>Consents.</u> The Overbidder must represent that it obtained all necessary organizational approvals to make its bid and to enter into and perform the Alternative Acquisition Agreement and include evidence of authorization and approval from the

Case: 15-31430   Doc# 13   Filed: 11/16/15   Entered: 11/16/15 20:50:51   Page 57 of 64

Overbidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Alternative Acquisition Agreement.

(j)     Contracts. The Overbidder shall designate an initial list of executory contracts and unexpired leases that it wishes to have assumed and assigned.

(k)     Additional Information. The Overbidder must furnish (i) information sufficient to establish that the Overbidder is capable and qualified, legally, and otherwise, of (A) unconditionally (except as set forth in the Alternative Acquisition Agreement) performing all obligations under the Alternative Acquisition Agreement, including to pay the purchase price, and (B) obtaining all required regulatory approvals to perform all of its obligations under the Alternative Acquisition Agreement and closing the transactions contemplated thereby not later than the Closing Deadline; and (ii) such other information as the Debtor or the Committee may request.

Each Person that submits a bid shall be deemed to have consented to the Debtor making the contents of such bid public, including in filings in the Court.

To be a "Qualified Bid," a bid received from an Overbidder must meet the requirements set forth above. The Debtor (with input from Moelis and the Committee) shall have the right to determine whether a bid received from an Overbidder (and any bid submitted at the Auction by an Overbidder) meets such requirements if, in the good faith opinion of the Debtor, after consulting with Moelis and the Committee, (i) the requirements set forth above are met; (ii) such bid is determined not to be materially more burdensome or conditional than the terms of the Asset Purchase Agreement; and (iii) such bid can be consummated before the Closing Deadline if selected as a Successful Bid (defined below). The Debtor (through Moelis) will notify each of the Overbidders whether its bid is a Qualified Bid as soon as practical after the Bid Deadline and before the Auction. For the avoidance of doubt, Purchaser's bid, as set forth in the Asset Purchase Agreement, and each bid received from Purchaser at the Auction that complies with the Bidding Procedures shall be a Qualified Bid. Purchaser and any entity that is determined by the Debtor to have submitted a Qualified Bid shall each be deemed a "Qualified Bidder."

Any entity that is not a Qualified Bidder shall not be permitted to attend and shall be disqualified from bidding for the Transferred Assets at the Auction. The Debtor (through Moelis) shall, as soon as reasonably practical after receipt of a bid that is determined to be a Qualified Bid, provide copies of such Qualified Bid to Purchaser.

**7.     No Auction if Only One Qualified Bid**

If, by the Bid Deadline, the only timely Qualified Bid received by the Debtor is from the Stalking Horse Bidder, the Debtor shall not conduct an Auction and the Stalking Horse Bidder will be deemed the Successful Bidder and its bid the Successful Bid. If this occurs, the Debtor shall proceed to request at the Sale Hearing (defined below) that the Court approve the transfer and sale of the Transferred Assets to the Stalking Horse Bidder in accordance with the Asset Purchase Agreement and request that the Sale Order be entered by the Court and that the Sale Order shall be made immediately effective upon entry, notwithstanding the

provisions of Rule 6004(h) and 6006(d) of the Bankruptcy Rules and Rule 62(g) of the Federal Rules of Civil Procedure.

**8.**      <u>Auction</u>

If by the Bid Deadline, more than one timely Qualified Bid has been received by the Debtor, the Debtor will conduct the Auction with all Qualified Bidders. The Auction will be held on December __, 2015, at a location selected by the Debtor, which location will be provided to all Qualified Bidders and filed with the Court. Counsel to the Committee and members of the Committee will be invited to attend the Auction.

**9.**      <u>**Bidding Procedures**</u>

(a)      The following procedures will govern the Auction:

(i)      <u>Bankruptcy Court Jurisdiction.</u> All Qualified Bidders shall be deemed to have consented to the exclusive and core jurisdiction of the Court and to have waived any right to jury trial in connection with any disputes relating to the bidding process, the Auction, the transfer and sale of the Transferred Assets, and any other matter relating to, or contemplated by, the Asset Purchase Agreement and any Alternative Acquisition Agreement. Any and all disputes related to the Auction shall be determined solely by the Court with no right to appeal.

(ii)      <u>Anti-Collusion.</u> At the commencement of the Auction, each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with any other bidder or prospective bidder, or with the Debtor with respect to the bidding process, the Auction, or the sale transaction.

(iii)      <u>Bids.</u> The bidding at the Auction shall commence at the amount of the highest or otherwise best Qualified Bid submitted by the Bid Deadline, as determined by the Debtor (with input from Moelis and the Committee). Each subsequent bid shall be in increments of no less than $500,000 and by figures which are wholly divisible by $500,000.

(iv)      <u>Calculating Bids.</u> In valuing bids, and for purposes of calculating each successive overbid by Purchaser, the Debtor shall deem each bid by an Overbidder to have been automatically reduced by the amount of the Stalking Horse Bidder Fee.

(v)      <u>Successful Bidder.</u> The Auction shall continue until there is only one offer that the Debtor (with input from Moelis and the Committee) determines, subject to Court approval, is the highest or otherwise best offer (the "Successful Bid") from among the bids submitted by the Qualified Bidders at the Auction. The bidder submitting such Successful Bid shall become the "Successful Bidder" and shall have such rights and responsibilities of the purchaser, as set forth in the Alternative Acquisition Agreement, or the Asset Purchase Agreement, as applicable. If, at the Auction's conclusion, and consistent with these Bidding Procedures, Purchaser's final bid is greater than the highest bid made by any other

Case: 15-31430    Doc# 13    Filed: 11/16/15    Entered: 11/16/15 20:50:51    Page 59 of 64

Qualified Bidder, the amount of Purchaser's final bid shall constitute the "Aggregate Consideration" under section 2.2(a) of the Asset Purchase Agreement.

(vi)    Other Procedures. In addition to the procedures outlined above, the Debtor (with input from Moelis and the Committee) may announce and employ at the Auction other procedural rules that are reasonable under the circumstances for conducting the Auction; *provided, however,* that such rules are (i) not materially inconsistent with these Bidding Procedures, the Bankruptcy Code, or any order of the Court and (ii) disclosed to each Qualified Bidder prior to the commencement of the Auction.

(b)    Within one (1) business day after the conclusion of the Auction, the Debtor shall file with the Court and serve upon all Qualified Bidders and other entities set forth in the Bidding Procedures Order a notice identifying the Successful Bidder. If the Successful Bidder is not the Stalking Horse Bidder, the notice will summarize any material differences between the terms of the Alternative Acquisition Agreement and the Asset Purchase Agreement, and will annex a copy of the Alternative Acquisition Agreement. The notice will include the supplemental Assignment Notice, if one is required pursuant to the Bidding Procedures.

(c)    Under no circumstances shall the Debtor consider any bid made after the conclusion of the Auction.

## 10.    Sale Hearing

(a)    The Successful Bid will be subject to approval of the Court, through entry of a sale order (substantially in the form annexed to the Motion as Exhibit A) (the "Sale Order"), at a hearing that will take place at [ ● ] on December __, 2015 in the Court (the "Sale Hearing"). The closing of the transfer and sale of the Transferred Assets to the Successful Bidder shall occur on the date as provided in, and otherwise in accordance with, the Asset Purchase Agreement or the Alternative Acquisition Agreement of the Successful Bidder, as applicable.

(b)    Purchaser, and any other entity that becomes the Successful Bidder, shall have standing and are deemed to be parties in interest with standing to be heard on any motion, hearing or other matter related to the Auction, the Asset Purchase Agreement or any bid, or other transfer and sale of the Transferred Assets.

## 11.    Objections

Objections, if any, to the transfer and sale of the Transferred Assets as contemplated by the Motion (whether under the Asset Purchase Agreement or in general), must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Bankruptcy Rules; and (c) be filed with the clerk of the Court for the Northern District of California (or filed electronically via CM/ECF with the Court) and actually received by all of the parties entitled to receive the bid packages as set forth in section 5 above as well as counsel to the United States Trustee, Attn: [ ● ], **on or before 5:00 p.m. (Pacific Standard Time) on** December __, 2015 **(the "Sale Objection Deadline").**

Case: 15-31430    Doc# 13    Filed: 11/16/15    Entered: 11/16/15 20:50:51    Page 60 of 64

The following objections may be raised orally at the Sale Hearing: (a) objections to the conduct of the Auction; (b) objections to the selection of the Successful Bidder; and (c) objections to the terms of the Alternative Acquisition Agreement, *provided, that* objections with respect to the terms of the Alternative Acquisition Agreement may only be raised with respect to terms that are materially different from the terms of the Asset Purchase Agreement.

### 12.     Application of the Deposit

If the Successful Bidder is not the Purchaser, then in conjunction with the closing of the Alternative Acquisition Agreement with the Successful Bidder, the Debtor shall pay to Purchaser the Stalking Horse Bidder Fee.  If the transfer and sale to such Successful Bidder does not close on or before the Closing Deadline, the amount of such Successful Bidder's Deposit shall, unless otherwise agreed to by the Debtor, be forfeited to and retained by the Debtor.

### 13.     Jurisdiction

The Court shall retain exclusive jurisdiction over any matter or dispute relating to the transfer and sale of the Transferred Assets, the Bidding Procedures, the Sale Hearing, the Auction, the Successful Bid, and/or any other matter that in any way relates to the foregoing.

# EXHIBIT "3"

1   RON BENDER (SBN 143364)
    PHILIP A. GASTEIER (SBN 130043)
2   MONICA Y. KIM (SBN 180139)
    KRIKOR J. MESHEFEJIAN (SBN 255030)
3   LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
    10250 Constellation Boulevard, Suite 1700
4   Los Angeles, California 90067
    Telephone:  (310) 229-1234
5   Facsimile:  (310) 229-1244
    Email: rb@lnbyb.com; pag@lnbyb.com;
6   myk@lnbyb.com; kjm@lnbyb.com

7   Proposed Attorneys for Chapter 11 Debtor and Debtor in Possession

8

9                   **UNITED STATES BANKRUPTCY COURT**

10                  **NORTHERN DISTRICT OF CALIFORNIA**

11                     **SAN FRANCISCO DIVISION**

12  In re:                                  ) Case No. 15-31430
                                            )
13  RDIO, INC.,                             ) Chapter 11 Case
                                            )
14           Debtor and Debtor in Possession. ) **NOTICE OF (1) AUCTION SALE OF**
15                                          ) **DEBTOR'S ASSETS AND**
                                            ) **OPPORTUNITY TO OVERBID, AND (2)**
16                                          ) **HEARING FOR THE BANKRUPTCY**
                                            ) **COURT TO CONSIDER APPROVAL OF**
17                                          ) **THE DEBTOR'S MOTION TO SELL ITS**
                                            ) **ASSETS AND ASSIGN EXECUTORY**
18                                          ) **CONTRACTS AND UNEXPIRED**
                                            ) **LEASES TO THE SUCCESSFUL BIDDER**
19                                          ) **FROM THE AUCTION SALE**
                                            )
20                                          )
                                            )
21                                          ) Date:   To be set
22                                          ) Time:   To be set
                                            ) Place:  U.S Bankruptcy Court
23                                          )         235 Pine St., 23rd Floor
                                            )         San Francisco, CA 94101
24                                          ) Judge:  The Hon.
25                                          )
26

27

28

1       PLEASE TAKE NOTICE that in accordance with the Bidding Procedures Order entered

2   by the Court on November __, 2015 as Docket Number ___, Rdio, Inc., chapter 11 debtor and

3   debtor in possession in the above-captioned, chapter 11 bankruptcy case (the "Debtor"), will

4   conduct an auction (the "Auction") on December __, 2015, with the respect to the sale,

5   assignment and transfer of certain of the Debtor's assets and the assumption and assignment of

6   certain of the Debtor's executory contracts and unexpired leases (collectively, the "Transferred

7   Assets").   All capitalized terms which are not defined in this Notice shall have the same

8   definitions as such terms have in the Bidding Procedures Order.

9       PLEASE TAKE FURTHER NOTICE that on December __, 2015, at the above-referenced

10  Court, a hearing will be held for the Bankruptcy Court to consider approval of (i) the Debtor's

11  motion for a sale of the Transferred Assets to the Successful Bidder at the Auction, and (ii) the

12  Debtor's motion to assume and assign to the Successful Bidder all of the Debtor's executory

13  contracts and unexpired leases that the Successful Bidder wishes to assume.

14      PLEASE TAKE FURTHER NOTICE that the purchase offer made by the Stalking Horse

15  Bidder is subject to overbid, and the Successful Bidder will be determined at the Auction.

16  Attached hereto as Exhibit "1" is a copy of the Bidding Procedures that have been approved by

17  the Bankruptcy Court for Qualified Bidders to use if they wish to submit a Qualified Bid.   The

18  Debtor has retained Moelis & Company as its financial advisor.   Parties desiring additional

19  information about the Auction and the steps that must be taken to become a Qualified Bidder and

20  to submit a Qualified Bid should contact Carlos R. Jimenez, Managing Director of Moelis &

21  Company (carlos.jimenez@moelis.com); office phone number is (310) 443-2338.

22  Dated:  December __, 2015                    RDIO, INC.

23

24                                         By:___/s/ Ron Bender_____
                                               Ron Bender
25                                             Philip A. Gasteier
                                               Monica Y. Kim
26                                             Krikor J. Meshefejian
                                               Levene, Neale, Bender, Yoo & Brill L.L.P.
27                                             Attorneys for Chapter 11 Debtor and
                                               Debtor in Possession
28