1 | RON BENDER (SBN 143364)
PHILIP A. GASTEIER (SBN 130043)
2 | MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
3 | LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
4 | Los Angeles, California 90067
Telephone: (310) 229-1234
5 | Facsimile: (310) 229-1244
Email: rb@lnbyb.com; pag@lnbyb.com; myk@lnbyb.com;
6 | kjm@lnbyb.com
Proposed Attorneys for Chapter 11 Debtor and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re | Case No.: 15-31430 |
| RDIO, INC., | Chapter 11 |
| Debtor. | **DECLARATION OF CARLOS JIMENEZ IN SUPPORT OF DEBTOR'S EMERGENCY MOTION FOR AN ORDER: (1) APPROVING BIDDING PROCEDURES; (2) APPROVING STALKING HORSE BID PROTECTIONS INCLUDING BREAK-UP FEE AND EXPENSE REIMBURSEMENT; (3) APPROVING FORM OF ASSET PURCHASE AGREEMENT FOR USE BY PROSPECTIVE OVERBIDDERS; (4) SCHEDULING AUCTION AND COURT HEARING TO CONSIDER APPROVAL OF THE SALE TO THE HIGHEST BIDDER; AND (5) APPROVING FORM OF NOTICE TO BE PROVIDED TO INTERESTED PARTIES** |
| | Date: November 18, 2015 |
| | Time: 10:00 a.m. |
| | Place: U.S Bankruptcy Court |
| | Courtroom 22 |
| | 235 Pine St., 23rd Floor |
| | San Francisco, CA 94101 |
| | Judge: The Hon. Dennis Montali |

**DECLARATION OF CARLOS JIMENEZ**

I, Carlos Jimenez, hereby declare as follows:

1. I am a Managing Director of Moelis & Company LLC ("Moelis"), an investment banking firm having extensive expertise in arranging and advising in significant media company transactions. Moelis is headquartered in New York, and has offices throughout the United States and overseas, including an office located at 1999 Avenue of the Stars, Suite 1900, Los Angeles, California 90067. Except as otherwise indicated, all statements in this declaration (the "Declaration"), are based on my personal knowledge of Rdio, Inc.'s (the "Debtor") operations and finances, my discussions with the Debtor's senior management, other members of the Moelis team and the Debtor's other advisors and my review of relevant documents and/or my opinion based upon my experience. If called to testify, I could and would testify to each of the facts set forth herein based on such personal knowledge, discussions, review of documents and/or opinion.

2. I submit this Declaration in support of the *Debtor's Emergency Motion for an Order (1) Approving Bidding Procedures; (2) Approving Stalking Horse Bid Protections Including Break-Up Fee and Expense Reimbursement; (3) Approving Form of Asset Purchase Agreement for Use by Prospective Overbidders; (4) Scheduling Auction and Court Hearing to Consider Approval of the Sale to the Highest Bidder; and (5) Approving Form of Notice to Be Provided to Interested Parties* (the "Motion").[1]

## Qualifications

3. Moelis was founded in 2007 and is a wholly owned subsidiary of Moelis & Company Holdings LLC. Moelis & Company Holdings LLC, together with its subsidiaries, has approximately 650 employees located in New York, Los Angeles, Boston, Chicago, Houston, Palo Alto, Washington D.C., Paris, London, Frankfurt, Sydney, Melbourne, Hong Kong, Beijing, Mumbai, and Dubai.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion.

4. Moelis provides a broad range of financial advisory services to its clients, including: (a) general corporate finance; (b) mergers, acquisitions, and divestitures; (c) corporate restructurings; (d) special committee assignments; and (e) capital raising. Moelis and its senior professionals have extensive experience in the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 cases, including in providing financial and strategic advice to its clients in the media and technology industry. Moelis has extensive experience in the valuation of media and technology assets. Moelis' business reorganization professionals have served as financial advisors in numerous cases, including: *In re Quicksilver Resources Inc.*, No. 15-10585 (LSS) (Bankr. D. Del. May 8, 2015); *In re Allied Nevada Gold Corp.*, No. 15-10503 (MFW) (Bankr. D. Del. April 15, 2015); *In re ITR Concession Company LLC*, No. 14-34284 (Bankr. N.D. Ill. Oct. 28, 2014); *In re GSE Environmental, Inc.*, No. 14-11126 (MFW) (Bankr. D. Del. May 30, 2014); *In re MACH Gen, LLC*, No. 14-10461 (MFW) (Bankr. D. Del. Apr. 11, 2014); *In re Sorenson Commc'ns, Inc.*, No. 14-10454 (BLS) (Bankr. D. Del. Mar. 25, 2014); *In re Sbarro LLC*, No. 14-10557 (MG) (Bankr. D. Del. April 7, 2014); *In re Cengage Learning, Inc.*, No. 13-44106 (ESS) (Bankr. E.D.N.Y. Sept. 13, 2013); *In re OSH 1 Liquidating Corp. f/k/a Orchard Supply Hardware Stores Corp.*, No. 13-11565 (CSS) (Bankr. D. Del. July 15, 2013); *In re Revel AC, Inc.*, No. 13-16253 (JHW) (Bankr. D.N.J. Apr. 17, 2013); *In re AMF Bowling Worldwide, Inc.*, No. 12-36495 (KRH) (Bankr. E.D. Va. Dec. 20, 2012); *In re Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Aug. 30, 2012); *In re AMR Corp.*, No. 11-15463 (SHL) (Bankr. S.D.N.Y. Mar. 7, 2012); *In re NewPage Corp.*, No. 11-12804 (KG) (Bankr. D. Del. Dec. 27, 2011); *In re Gen. Maritime Corp.*, No. 11-15285 (MG) (Bankr. S.D.N.Y. Dec. 15, 2011); *In re Jackson Hewitt Tax Serv., Inc.*, No. 11-11587 (MFW) (Bankr. D. Del. June 30, 2011); *In re Appleseed's Intermediate Holdings LLC*, No. 11-10160 (KG) (Bankr. D. Del. Feb. 23, 2011); *In re Innkeepers USA Trust*, No. 10-13800 (SCC) (Bankr. S.D.N.Y. Aug. 12, 2010); *In re Almatis B.V.*, No. 10-12308 (MG) (Bankr. S.D.N.Y. June 9, 2010); *In re Atrium Corp.*, No. 10-10150 (BLS) (Bankr. D. Del. Mar. 17, 2010); *In re Int'l Aluminum Corp.*,

No. 10-10003 (MFW) (Bankr. D. Del. Jan. 27, 2010); *In re Reader's Digest Ass'n Inc.*, No. 09-23529 (RDD) (Bankr. S.D.N.Y. Aug. 24, 2009); *In re NV Broad. LLC*, No. 09-12473 (KG) (Bankr. D. Del. Aug. 5, 2009); *In re Fontainebleau Las Vegas Holdings, LLC*, No. 09-21481 (AJC) (Bankr. S.D. Fla. Nov. 25, 2009); *In re ION Media Networks Inc.*, No. 09-13125 (JMP) (Bankr. S.D.N.Y. July 13, 2009); *In re JGW Holdco, LLC f/k/a J.G. Wentworth LLC*, No. 09-11731 (CSS) (Bankr. D. Del. June 16, 2009); *In re Source Interlink Cos.*, No. 09-11424 (KG) (Bankr. D. Del. May 21, 2009); *In re Dayton Superior Corp.*, No. 09-11351 (BLS) (Bankr. D. Del. May 18, 2009); *In re Idearc Inc.*, No. 09-31828 (BJH) (Bankr. N.D. Tex. May 27, 2009); *In re Muzak Holdings LLC*, No. 09-10422 (KJC) (Bankr. D. Del. Apr. 6, 2009); *In re Chemtura Corp.*, No. 09-11233 (REG) (Bankr. S.D.N.Y. Mar. 18, 2009); *In re Old AII, Inc. f/k/a Aleris Int'l Inc.*, No. 09-10478 (BLS) (Bankr. D. Del. Mar. 16, 2009); *In re XMH Corp. f/k/a Hartmarx Corp.*, No. 09-02046 (BWB) (Bankr. N.D. Ill. Mar. 4, 2009); *In re Lyondell Chemical Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 6, 2009).

5. I hold a B.A. in Economics with distinction from Yale University. My primary focus at Moelis is on the media, entertainment and technology industries. I have over 13 years of investment banking experience and have completed numerous corporate finance transactions, including mergers and acquisitions, debt and equity financings, leveraged buyouts and restructurings. Prior to joining Moelis, I was an Associate at Lehman Brothers in the Leveraged Finance Group working on leveraged buyouts, recapitalizations and strategic acquisition financings. In the course of my career, I have provided strategic advice and innovative solutions to a broad spectrum of marquee clients focused on digital media, e-commerce, film and television, music, sports, gaming, marketing, talent management and restaurants.

**Moelis Retention**

6. I have been principally responsible for the services rendered by Moelis relating to the Debtor's parent company, Pulser Media, Inc. ("Pulser") since September 2014, although other individuals have also been involved. As explained below, Moelis was initially

engaged by Pulser with the goal of attempting to raise new equity capital. However, it ultimately became clear that raising new equity capital was not feasible and Pulser instead requested Moelis attempt to find a buyer or merger partner for the Debtor. After conducting an extremely broad marketing process, the highest and best offer received by the Debtor was negotiated as an all cash offer from Pandora Media, Inc., ("Pandora"). Pandora requested to effectuate a purchase pursuant to a sale under 11 U.S.C. § 363. Pandora, however, agreed that the Debtor could and should market Pandora's offer for overbid to ensure that the highest and best price is paid for the Debtor's assets/business. At that point, Moelis and Pulser mutually terminated their prior engagement and Moelis was retained by the Debtor for the purpose of marketing the Debtor's assets/business for overbid and to assist the Debtor in conducting an auction process in the event of any successful overbids.

7. I am advised that the Debtor is filing a separate application seeking the approval of Moelis' employment as the Debtor's financial advisor in this chapter 11 case pursuant to the engagement agreement entered into between the Debtor and Moelis dated November 13, 2015 (the "Engagement Agreement").

**The Sale Process**

8. As described above, prior to Moelis' engagement with the Debtor, on September 30, 2014, Moelis was engaged by Pulser to act as placement agent and financial advisor in connection with a potential financing transaction or sale transaction, respectively. As part of its engagement by Pulser, during October 2014, Moelis conducted due diligence regarding the Debtor, met with the Debtor's management, created marketing materials (including a promotional summary and management presentation), and initiated outreach to potential buyers or investors. Moelis conducted a full and extensive marketing process from November 2014 through August 2015. Moelis and the Debtor held introductory telephone calls with potential interested parties to walk through the opportunity and initiated contact with 110 potential buyers or investors based throughout the world. These included "strategic" parties with business interests which could use the Debtor's assets and technology, and

"financial" parties who may be interested from a purely investment and return view. The strategic parties included internet/digital media companies, media/broadcasting companies, telecom companies, cable and similar companies, technology/device companies, advertising agencies and others. Although it was recognized that potential financial partners may be less interested than strategic parties, due to the Debtor's continuing substantial losses, Moelis and the Debtor also contacted many potential investment groups and funds.

9.  The Debtor ultimately executed non-disclosure agreements with 32 parties and Moelis and the Debtor provided copies of the Debtor's management presentation marketing materials to all of them. This produced in-person meetings or calls between the Debtor's management team and 16 interested parties, so that the interested parties could engage directly with management and get a better understanding of the Debtor's business and potential. In addition to producing initial preliminary diligence information, Moelis and the Debtor prepared detailed due diligence materials which were made available once the non-disclosure agreements were executed.

10. Moelis was provided time to conduct an extensive process and was not given a formal target date for completion – even though the Debtor was experiencing significant losses during this period. However, by June 2015 it became clear that Pandora was emerging as the most interested party and the party most likely to present the best offer and to close a sale. Pandora submitted a preliminary letter of intent (the "<u>July LOI</u>") on July 8, 2015. Subsequent to the July LOI being submitted, Moelis and the Debtor provided Pandora due diligence materials in the online data room. Concurrent with the negotiations with Pandora on the LOI, Moelis continued its marketing process, and over the subsequent three months the Debtor's management and Moelis continued discussions with other interested parties which had been identified. After substantial negotiation of the July LOI and additional due diligence by Pandora, the parties executed a non-binding LOI on September 29, 2015 (the "<u>September LOI</u>").

11. Following execution of the September LOI, Pandora continued its due diligence and the parties commenced negotiations on the terms of a definitive transaction in earnest. As a result of its diligence, during negotiations, Pandora decided that it would not purchase the Debtor's business in its present form, but would acquire only assets and requested to effectuate a purchase pursuant to a sale under 11 U.S.C. § 363. These and other developments required extensive discussions and changes to the purchase agreement. The definitive asset purchase agreement was executed on November 16, 2015 (as identified in the Motion, the "<u>Purchase Agreement</u>"). Pursuant to the Purchase Agreement, Pandora has agreed to purchase the Debtor's technology and certain other assets (the "<u>Purchased Assets</u>") for a purchase price of $75.0 million.

12. In providing services to Pulser, Moelis has worked closely with the Debtor's management and has become well-acquainted with the Debtor's assets, business, capital structure, financial affairs, and related matters. As a result, I am very familiar with the Debtors' business and assets, the market within which the Debtor conducts business, the perceived value of the Debtor's business and assets, and the prospects for a sale of the Debtor's business and/or assets. On the basis of my knowledge and experience, and the extensive efforts of Moelis since September 2014, I am satisfied that the offer of Pandora as set forth in the Purchase Agreement is the highest and best offer which is likely to be obtained for the Debtor's assets and business under the circumstances. Subject to the receipt of any higher bids, I believe that the exhaustive process which Moelis conducted has produced the highest and best bid from Pandora under the circumstances.

13. Although the Debtor and Pandora have both been operating in the internet radio business the differences in their particular business models, and the way they have developed, make Pandora a particularly suitable purchaser for the Debtor's assets. As compared to Pandora's music service, the Debtor's service involves more specific (personalized) customer choice, a tiered-priced subscription service, and extensive direct licensing. The Debtor's digital music service provides both internet radio and subscription on-demand listening

experiences. It has secured extensive IP licensing agreements with music labels and publishers, allowing it to offer a comprehensive library of over 35 million songs. While Pandora will not be continuing the Debtor's existing internet service, the Debtor's technology is advantageous to providing this type of service. These aspects of the Debtor's business are complementary and offer opportunities for Pandora to expand its business model which appear attractive in the present marketplace. Based on our due diligence and discussions with interested parties extending over a year, the most likely buyer for the Debtor's assets is not an investor desiring to buy the business as it now operates, but rather a strategic party such as Pandora which can use the assets and knowledge of key employees to enhance its own existing business.

13. To facilitate obtaining the highest price for the Purchased Assets, the Debtor and Pandora have agreed to various overbid procedures, as detailed in the Purchase Agreement. Accordingly, Moelis will work with the Debtor to notify potentially interested parties of the bidding process and proposed sale agreement, and will take the following steps to follow up with potential bidders: assist the Debtor in identifying and contacting potential overbidders in connection with the auction sale and overbid process ("<u>Auction Sale</u>") expected to be conducted during the case, facilitate the due diligence process with prospective overbidders (including the execution of appropriate confidentiality agreements), maintain a log of potential overbidders who have been contacted and track their responses, advise potential overbidders of the overbid process, work with the Debtor to determine the financial qualifications of prospective overbidders who express an interest in participating in the Auction Sale, and assist the Debtor in conducting the Auction Sale, meet with prospective overbidders and provide them such information about the Debtor as may be appropriate and acceptable to the Debtor, subject to customary business confidentiality, assist the Debtor in

preparing any additional and appropriate marketing materials to distribute to prospective overbidders.

14. I am aware that the Purchase Agreement requires that bidding procedures be approved on or prior to December 1, 2015, and that a sale be approved on or prior to December 23, 2015. In my experience this should be adequate time for a truly interested party to present a qualified overbid. The Purchase Agreement provides for an asset sale, for a cash purchase price. The remaining terms are not unduly complicated, in the sense that qualified prospective buyers should be able to meet or adapt those terms and make a decision within the time provided. I believe that the broad and lengthy marketing process conducted by Moelis prepetition has given potentially interested parties ample time to consider this opportunity and the assets being sold. Moreover, based on the Debtor's financial circumstances, including substantial continuing operating losses, and on discussions with interested parties during the extensive marketing period, I believe the chances that a going concern bidder would surface for a higher price are remote.

15. In contrast, I believe that there are compelling reasons underlying Pandora's requirement of a prompt sale process. Pandora and the Debtor operate in a very competitive environment, especially as concerns employees. The key employees who are associated with the Debtor's intellectual property assets are extremely important to the opportunity presented to Pandora. Such employees are also very much in demand from other technology companies. The Debtor's chapter 11 filing may be cause for some of those employees to consider other employment opportunities, unless they can be relatively assured of a rapid transition. The timing is critical to Pandora (and other potential buyers), in that the value of the assets is diminished if the key employees are no longer available. If the associated expertise is not available, a buyer may well consider acquiring similar assets elsewhere and

9

building its own operations and technology.  If the present sale is not timely consummated, there is a risk that the Debtor's assets will be devalued, the benefits of the sale to the Debtor's estate will be reduced, and the Debtor and its creditors will as a result suffer irreparable harm.

16.  As identified in the Purchase Agreement, specific bid inducements to Pandora and Bidding Procedures have been agreed to by the Debtors and Pandora.  I have reviewed the Bidding Procedures and believe that they are reasonable and appropriate under the circumstances of this case.  The inducements to Pandora as the stalking horse bidder include a Break-Up Fee of $2.25 million and Expense Reimbursement of up to $500,000.  These aggregate amounts are not unreasonable as compared to $75 million base purchase price being paid by Pandora. Based on my experience, the Break-Up Fee and Expense Reimbursement provided for in the Purchase Agreement are reasonable and within the range for transactions of this kind and size.

17.  For the above reasons, I believe that the auction and bidding procedures outlined above (and in more detail in the Purchase Agreement) are reasonably designed to enable the Debtor's estate to obtain the highest and best offer possible for the Purchased Assets and provide the greatest possible recovery for the Debtor's creditors under the circumstances. I also believe that the time requirements for approval of bid procedures and of a sale of the Debtor's assets are reasonable, critical to completing the sale, and will not hinder interested parties in presenting an overbid.  I believe that the proposed bidding procedures and stalking horse bid protections described above and provided for in the Purchase Agreement are in the best interests of the Debtor's estates and are necessary and appropriate to maximize the value paid for the Purchased Assets.

1 | I declare and verify under penalty of perjury under the laws of the United States of
2 | America that the foregoing is true and correct to the best of my knowledge.
3 | Executed on this 16th day of November, 2015, at New York, New York.

*/s/ Carlos Jimenez*
Carlos Jimenez, Declarant