RON BENDER (SBN 143364)
PHILIP A. GASTEIER (SBN 130043)
MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbyb.com; pag@lnbyb.com; myk@lnbyb.com;
kjm@lnbyb.com

Proposed Attorneys for Chapter 11 Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: | Case No. 15-31430 |
| RDIO, INC., | Chapter 11 |
| | **DECLARATION OF JEREMY LIEGL IN SUPPORT OF DEBTOR'S EMERGENCY MOTIONS FOR:** |
| Debtor. | **(A) AN ORDER: (1) APPROVING BIDDING PROCEDURES; (2) APPROVING STALKING HORSE BID PROTECTIONS INCLUDING BREAK-UP FEE AND EXPENSE REIMBURSEMENT; ETC.; AND** |
| | **(B) FOR AN ORDER APPROVING MASTER SERVICES AGREEMENT AND AUTHORIZING DEBTOR TO PERFORM SERVICES THEREUNDER** |
| | Court Scheduled Hearing: |
| | Date: November 18, 2015 |
| | Time: 10:00 a.m. |
| | Place: U.S Bankruptcy Court |
| | Courtroom 22 |
| | 235 Pine St., 23rd Floor |
| | San Francisco, CA 94101 |
| | Judge: The Hon. Dennis Montali |

## DECLARATION OF JEREMY LIEGL

I, Jeremy Liegl, hereby declare as follows:

2.     I am the Chief Corporate Counsel of Pandora Media, Inc. ("Pandora").  I have held that position since January of 2011.  Unless indicated to the contrary, I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

3.     I submit this Declaration in support of the (a) *Debtor's Emergency Motion for an Order (1) Approving Bidding Procedures; (2) Approving Stalking Horse Bid Protections Including break-Up Fee and Expense Reimbursement; (3) Approving Form of Asset Purchase Agreement for Use by Prospective Overbidders; (4) Scheduling Auction and Court Hearing to Consider Approval of the Sale to the Highest Bidder; and (5) Approving Form of Notice to Be Provided to Interested Parties* (the "Procedures Motion"); and (b) *Debtor's Emergency Motion for an Order Approving Development Services Agreement and Authorizing Debtor to Perform Services Thereunder*  (the "Services Motion" and collectively with the Procedures Motion, the "Motions"), filed by Rdio, Inc., the debtor and debtor in possession herein (the "Debtor").

4.     Pandora and the Debtor have entered into the Asset Purchase Agreement dated November 16, 2015 (the "Purchase Agreement") for the purchase and sale (the "Sale") of substantially all operating assets of the Debtor (the "Purchased Assets"), as discussed in the Motions and as more specifically provided the Purchase Agreement. The Purchase Agreement contains certain deadlines for taking actions and obtaining approvals, including but not limited to requirements that an order granting the relief requested in the Procedures Motion must be entered not later than December 1, 2015, and an order approving the Sale must be entered by December 23, 2015. I submit this declaration for the information of the Court and parties in interest concerning the reasons why meeting these requirement and other deadlines contained in the Purchase Agreement are critical to concluding the Sale, as well as in support of remainder of the relief requested in the Motions.

5.     Pandora has been aware of the Debtor's business for some time, since it is a related and potentially complimentary business to the business of Pandora.  However, Pandora became aware of the possible sale of the Debtor's assets or business through the marketing efforts of

Moelis & Company. After substantial discussion and review of information, Pandora submitted a preliminary letter of intent ("LOI") to the Debtor on July 8, 2015. The subsequent negotiations were long and intensive. Pandora had approximately 125 people working on this transaction. After substantial negotiation of the LOI and additional due diligence, Pandora and the Debtor executed a non-binding LOI on September 29, 2015.

6.      Following the execution of the LOI, Pandora continued its due diligence and the parties commenced negotiations on the terms of a definitive transaction in earnest. Those negotiations were also very intense and extended, and the terms of the transaction continued to evolve.  The definitive Purchase Agreement was not executed until November 16, 2015.

7.  Pandora had determined early in the process that it would only be willing to acquire the Purchased Assets through a Chapter 11 filing for the Debtor and pursuant to a sale under 11 U.S.C. § 363.  Particularly in light of the need for a Chapter 11 filing, an extremely prompt sale process is critical to maintaining the value to be acquired by Pandora in the Sale.  The continuing desirability and value of the Debtor's assets and business is clearly jeopardized by delay, due the business uncertainty created by the Debtor's bankruptcy filing, particularly with regard to potential loss of its employee talent.

8.      Like most tech companies in the current market, the Debtor operates in a very competitive environment, especially as concerns employees.  The key employees who are associated with the Debtor's intellectual property assets are extremely important to the Sale. Employees with these types of skills and knowledge are also very much in demand from other technology companies.  The Debtor's Chapter 11 filing may be cause for some of those employees to consider other employment opportunities, unless they can be relatively assured of a rapid transition.  The timing is thus critical to Pandora, in that the value of the assets is diminished if the key employees are no longer available. It is for this reason that the Purchase Agreement contains both provisions for price adjustments, and provisions allowing Pandora to terminate the Purchase Agreement, respectively, if specified threshold numbers of employees of the Debtor do not accept employment with Pandora following the Sale.

9.   The Purchase Agreement also provides for a Master Services Agreement ("Services Agreement") pursuant to which the Debtor will provide services of its employees to Pandora in order to advance the Sale process, and Pandora will compensate the Debtor for such services (the "Service Fees").  This is an integral part of the Sale. The services to be provided will promote and hopefully expedite the closing of the Sale, and may assist in the retention of the requisite employees. In addition, it will allow the Debtor to fund a substantial portion of its employee costs prior to the closing of the Sale and will make it more likely that a sufficient number of employees are retained to avoid any reduction in Purchase Price or a termination if a sufficient number of employees are not retained. However, it is my understanding that the Services Agreement will not be effective until it is approved by the Court.  Accordingly, the Purchase Agreement requires that the Debtor seek and obtain approval of the Services Agreement as quickly as possible.

10.   Pandora has invested a great deal of time and money in this Sale transaction. In addition to substantial out-of-pocket fees and expenses, Pandora has committed a huge amount of in house employee time and resources to the Sale process.  Pandora is aware, and has agreed, that its offer will be subjected to the possibility of higher bids during the Sale process.  However, Pandora would not have gone forward with this transaction without a clear understanding that it would be entitled to bid protection in the form of a break-up fee and expense reimbursement in the event it is not the successful bidder.  The Break-Up Fee and Expense Reimbursement, as defined in the Purchase Agreement, were intensely negotiated.   In addition, the Services Agreement, as defined in the Purchase Agreement, was intensely negotiated and is an integral part of the Sale.  The Purchase Agreement appropriately provides that the order approving the bidding procedures must approve the repayment of the Service Fees in the event that Pandora is not the successful bidder. The provisions for the Break-Up Fee, Expense Reimbursement, and repayment of the Services Fees, under the circumstances provided in the Purchase Agreement, were absolutely required in order that Pandora proceed with this Sale transaction, and will at least partially compensate Pandora for its investment of time and money in the event it is not the successful bidder.

11. In addition to the matters discussed above, Pandora also required that Iconical II provide a guarantee of the Debtor's indemnification obligations under the Purchase Agreement, subject to various limitations and conditions. Iconical II agreed to provide such guarantee, the terms of which are set forth in an Indemnity and Guaranty Agreement between Iconical II and the Purchaser dated as of November 16, 2015. Pandora would not have proceeded with the Sale transaction absent this guarantee.

12. Notwithstanding that it has invested a great deal of time and money in this Sale transaction, Pandora, given the likelihood of losing key employees if the Sale is delayed and the resulting erosion in value of the Purchased Assets, negotiated adjustments in Purchase Price and the ability to terminate the Transaction if the passage of time causes the loss of specified levels of retained employees. The time deadlines included in the Purchase Agreement were negotiated with an eye to what time frames could reasonably be expected to maintain the required employees and asset value. It is critically important to Pandora that these deadlines be met. Accordingly, I respectfully urge that all parties do everything possible to meet these deadlines, and urge that the Court set hearings on the Motion and related motions in order to accomplish this.

///
///
///
///
///
///
///
///
///
///
///
///
///

1          I declare and verify under penalty of perjury that the foregoing is true and correct to the

2     best of my knowledge, information and belief.

3          Executed on this __th day of November, 2015, at _____, California.

4

5                                Jeremy Liegl, Declarant

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[Signature Page to Declaration of Jeremy Liegl]