RON BENDER (SBN 143364)
PHILIP A. GASTEIER (SBN 130043)
MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbyb.com; pag@lnbyb.com;
myk@lnbyb.com; kjm@lnbyb.com

Proposed Attorneys for Chapter 11 Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: | ) Case No. 15-31430 |
| | ) |
| RDIO, INC., | ) Chapter 11 Case |
| | ) |
| Debtor and Debtor in Possession. | ) **DEBTOR'S EMERGENCY MOTION** |
| | ) **FOR AUTHORITY TO HONOR PRE-** |
| | ) **PETITION CASH BONUS INCENTIVE** |
| | ) **AGREEMENTS; MEMORANDUM OF** |
| | ) **POINTS AND AUTHORITIES** |
| | ) |
| | ) |
| | ) |
| | ) Date:   November 18, 2015 |
| | ) Time:   10:00 a.m. |
| | ) Place:  U.S Bankruptcy Court |
| | )          235 Pine St., 23rd Floor |
| | )          San Francisco, CA 94104 |
| | ) Judge:  The Hon. Dennis Montali |
| | ) |
| | ) |
| | ) |
| | ) |

1

Rdio, Inc., chapter 11 debtor and debtor in possession in the above-captioned, chapter 11 bankruptcy case (the "Debtor"), hereby moves, pursuant to Sections 363 and 105 of the Bankruptcy Code, for entry of an order authorizing the Debtor to honor pre-petition cash bonus incentive agreements with key employees. The full bases for the Motion are set forth in the Memorandum of Points and Authorities which is annexed hereto. This Motion is also supported by the concurrently filed *Declaration of Elliott Peters In Support Of Debtor's Emergency Motion For Authority To Honor Pre-Petition Cash Bonus Incentive Agreements* (the "Declaration").

## SUMMARY OF REQUESTED RELIEF AND BASIS FOR RELIEF

The Debtor was founded in 2008 as a digital music service. The Debtor's business operations were launched in 2010 after the Debtor secured requisite licenses from the applicable holders of music rights. Since that time, the Debtor has strived to grow into a worldwide music service and today is in 86 countries. One of the primary services provided by the Debtor is an unlimited, on demand music streaming service where for $9.99 per month the user has access to an entire library of songs with access to them through a computer, mobile device, etc. While the Debtor's monthly subscription service provides the Debtor with its primary revenue source (approximately $1.5 million of U.S. monthly revenue), the Debtor also generates approximately $100,000-$150,000 of monthly revenue from advertisers who advertise in the Debtor's advertising-based service offerings. The Debtor currently generates approximately $1.6-$1.65 million of total monthly revenue.

The Debtor operates in a very competitive environment, especially as concerns employees. According to the State of California Unemployment Report that was issued on October 15, 2015, the Debtor understands that the current unemployment rate in San Francisco is 3.1% and is much lower for experienced high technology workers. The key employees who are associated with the Debtor's intellectual property assets are extremely important to Debtor's value and to any purchaser of the Debtor's assets. Such employees are also very much in demand from other technology companies located in the same region as the Debtor (such that, relocation costs and location advantages are not necessarily applicable considerations for the Debtor's employees). The Debtor believes that the industry standard provides for technology companies to provide

highly competitive incentives, perquisites, bonuses, and benefits to its employees, who are in high demand.

The timing of the Chapter 11 filing was necessitated by the Debtor's serious financial condition and by the need to proceed with a prompt sale of the Debtor's assets in order to preserve their value for the benefit of creditors. One of the primary assets of the Debtor is the Debtor's employee talent pool. The Debtor's other primary assets consist of the Debtor's owned technology (e.g., website, mobile apps, content ingestion technology, reporting technology, software, data bases, etc.), content license agreements, subscribers, and good will.

Pre-petition, the Debtor entered into a purchase agreement (the "Purchase Agreement") with Pandora Media, Inc. ("Pandora") to purchase the Debtor's assets. The Debtor's employee talent pool is a critical component of Pandora's offer to purchase the Debtor's assets. The Purchase Agreement contains both provisions for price adjustments (up to $15.0 million), and provisions constituting closing conditions, respectively, if specified individuals and threshold numbers of employees of the Debtor do not accept employment with the proposed purchaser following the sale.

In light of these industry realities and Pandora's requirements, pre-petition, the Debtor determined that, in order to preserve and maximize the value of its assets, and in order to properly incentivize its key employees to and through the closing of a sale of the Debtor's assets and during the Debtor's chapter 11 case, the Debtor would offer to its key employees cash incentive bonuses, in the forms attached as Exhibits 1, 2 and 3 to the Declaration. Accordingly, pre-petition, the Debtor entered into cash incentive bonus agreements (the "Bonus Agreements") with certain employees in the ordinary course of its business, which the Debtor requests Court authority to honor in the ordinary course of the Debtor's business.[1] The Bonus Agreements are designed to incentivize the Debtor's key employees to preserve and maximize the value of the

---

[1] Virtually all of the Debtor's employees have executed and returned their respective Bonus Agreements to the Debtor. To the extent an employee has not executed and returned a Bonus Agreement, given the Debtor's oral agreement with such employees, the Debtor respectfully requests Court authority for the Debtor to honor pre-petition Bonus Agreements that are executed and/or returned post-petition.

Debtor's assets/business for the benefit of creditors, and to help the Debtor achieve a successful sale of the Debtor's assets/business.

Furthermore, the employees receiving bonuses are crucial to the Debtor's efforts to efficiently and effectively administer the Debtor's chapter 11 bankruptcy case and navigate a successful sale process. Without the continued commitments of these key employees, particularly executives, the Debtor's chances of a successful sale are diminished.

Finally, the Debtor's secured lenders have agreed that the proceeds for collateral from the sale of the Debtor's assets may be used to pay the bonuses.

There are three forms of Bonus Agreements, depending on the type of employee, though the terms of each are substantively the same, with the primary difference being the amount of the bonuses agreed upon by and between the Debtor and the respective employee. The aggregate amount of bonuses expected to be paid pursuant to the Bonus Agreements is approximately $1,717,750.

A.    Key employees who do not hold executive positions have entered into the Bonus Agreements in the form attached as Exhibit 1 to the Declaration. Such employees will receive bonuses of up to $50,000. These employees include, but are not limited to, engineers, architects, designers, technical personnel, managers, etc.

The primary terms of the Bonus Agreements with non-executive key employees are as follows:

- If (i) Pulser Media, Inc. and/or the Debtor consummate a Change of Control[2] at any time following the date of this letter, *and* (ii) the employee continues to be employed by the Debtor through the closing date of such Change of Control (the "***Closing Date***"), the employee will receive a cash bonus equal to $_____, less applicable withholding and payroll taxes (the "Cash Bonus"), payable on or before the seventh (7th) business day following the Closing Date (the "Payment Date").

---

[2] As defined in the Bonus Agreements.

- Notwithstanding the foregoing paragraph, if Pulser and/or the Debtor enter into a definitive binding agreement with respect to a Change of Control (the execution date of such definitive binding agreement will be referred to as the "Execution Date"), _and_ such Change of Control is consummated at any time following the Execution Date, _and_ employment is terminated by the Debtor without Cause (not including your death or permanent disability) at any time following the Execution Date but prior to the Closing Date, the Debtor agrees to nevertheless pay the Cash Bonus within seven (7) business days of the closing date of such Change of Control.

- For the avoidance of doubt, if, prior to the Closing Date, (a) the employee terminates her employment with the Debtor for any reason; (b) employment is terminated by the Debtor for Cause; or (c) there occurs the employee's death or permanent disability, then the employee (including the employee's heirs, successors and assigns) will not be entitled to the Cash Bonus, and the Bonus Agreement will be deemed terminated and null and void upon the effective date or occurrence of one of the foregoing events.

- Iconical Investments II, LP ("Iconical") and Pulser Media, Inc. ("Pulser"), the Debtor's secured lenders, will permit the Debtor to use proceeds of collateral generated from such Change of Control transaction to pay up to an amount sufficient to fund the total Cash Bonus pool.

- As a condition to the payment of the Cash Bonus, the employee will be required to execute and deliver a general release of claims in a form acceptable to the Debtor and Iconical.

- Nothing in the Bonus Agreement shall change the employee's "at-will" employment status with the Debtor or confer upon the employee any right to continue the employee's employment with the Debtor for any period of specific duration or interfere with or otherwise restrict in any way the rights of the Debtor or you, which rights are hereby expressly reserved by each of you and the Debtor,

to terminate the employee's employment with the Debtor at any time and for any reason, with or without Cause.

**B.** Employees who are senior executives of the Debtor, have entered into the Bonus Agreements in the forms attached as Exhibit 2 or Exhibit 3 to the Declaration, as applicable. Their incentive package value ranges from approximately $115,000 to $313,750. All but three of these individuals have entered into the Bonus Agreement attached as Exhibit 2 to the Declaration. These senior executives manage the Debtor's technology product engineering and operations, and are crucial to the preservation of the value of the Debtor's assets, the sale process, and the transition of assets. Without their services, the Debtor will be hard-pressed to effectively coordinate and consummate the sale of assets, particularly the Debtor's intellectual property assets, which are primary assets. If the Debtor obtains gross sale proceeds of at least $50 million, these individuals will receive their bonuses, subject to the terms of the Bonus Agreements attached as Exhibit 2 to the Declaration. The three other employees who are company executives have entered into the Bonus Agreements in the form attached as Exhibit 3 to the Declaration. If the Debtor receives no less than $50 million in gross sale proceeds, then these individuals will earn a $100,000 bonus each. If the Debtor receives gross sale proceeds of $52,500,000 or greater, these individuals will receive an additional bonus amount which is reflected in their Bonus Agreements as the greater of a fixed sum and a percentage of their then-current base annual salary, up to $213,750. The senior vice president/general counsel, who has the highest incremental bonus opportunity of $213,750, and the senior vice president of finance are the primary individuals serving lead roles in the Debtor's operations, the bankruptcy filing, sale transactions, financial affairs, and other transactions, and are necessary to facilitate a smooth transition to the purchaser and to wind up the Debtor's estate efficiently and in a manner that will maximize value for all stakeholders. The third executive included in this incremental bonus opportunity is the global head of content licensing and catalog who manages every aspect of the Debtor's relationships with artists, labels, music publishers and collection societies. This individual is crucial to preserving the Debtor's licenses, maintaining relationships with licensors, and maximizing the value of the Debtor's intellectual property assets.

The primary terms of the Bonus Agreements attached as Exhibits 2 and 3 to the Declaration are as follows:

- Payments under the Bonus Agreement will be contingent upon and will incentivize and reward the maximization of value in a Change of Control as measured by the cash or other proceeds generated by such Change of Control and increases in overall stakeholder recoveries.

- If (a) Pulser Media, Inc. and/or the Debtor consummate a Change of Control at any time following the date of this letter, _and_ (b) the employee continues to be employed by the Debtor through the closing date of such Change of Control (the "Closing Date"), _and_ (c) no less than $50 million of gross sale proceeds are received by Pulser and/or the Debtor or its designees (the "Gross Proceeds Target"), the employee will receive a cash bonus in the amount of $100,000 less any amounts required or authorized to be withheld by law (the "Cash Bonus"), payable on or before the seventh (7th) business day following the Closing Date (the "Payment Date"). The amount of the Cash Bonus will be tied to the achievement of and any increases to the Gross Proceeds Target.

- If, prior to the Closing Date, (a) the employee terminates her employment with the Debtor for any reason; (b) her employment is terminated by the Debtor for Cause; or (c) there occurs the employee's death or permanent disability, then the employee (including the employee's heirs, successors and assigns) will not be entitled to the Cash Bonus. If Pulser and/or the Debtor enter into a definitive binding agreement with respect to a Change of Control (the execution date of such definitive binding agreement will be referred to as the "Execution Date"), _and_ such Change of Control is consummated at any time following the Execution Date, _and_ employment is terminated by the Debtor without Cause (not including your death or permanent disability) at any time following the Execution Date but prior to the Closing Date, the Debtor will nevertheless pay the Cash Bonus within seven (7) business days following the Closing Date.

- Iconical and Pulser, the Debtor's secured lenders, will permit the Debtor to use proceeds of collateral generated from such Change of Control transaction to pay up to an amount sufficient to fund the total Cash Bonus pool.
- As a condition to the payment of the Cash Bonus, the employee will be required to execute and deliver a general release of claims in a form reasonably acceptable to the Debtor and Iconical.
- Nothing in the Bonus Agreement shall change the employee's "at-will" employment status with the Debtor or confer upon the employee any right to continue the employee's employment with the Debtor for any period of specific duration or interfere with or otherwise restrict in any way the rights of the Debtor or you, which rights are hereby expressly reserved by each of you and the Debtor, to terminate the employee's employment with the Debtor at any time and for any reason, with or without Cause.

All of the employees who have entered into the Bonus Agreement are critical to the Debtor's operations going-forward and the Debtor's sale efforts. The total amount of bonuses proposed to be ultimately paid is approximately $1,717,750.

The Debtor believes that it may honor the Bonus Agreements in the ordinary course of the Debtor's business, and files this Motion out of an abundance of caution and to ensure its employees that the Debtor is authorized to honor the Bonus Agreements. The Debtor respectfully submits that it is critical that the Court authorize the Debtor to honor the Bonus Agreements in the ordinary course of the Debtor's business, in order to ensure that a primary asset of the Debtor (its employee talent pool) is preserved, in order to ensure that the Debtor receives maximum possible value under the Purchase Agreement, and in order to ensure that the Debtor's sale process while in chapter 11 is not disrupted and that the Debtor's employees are properly incentivized and rewarded for preserving and maximizing the Debtor's value in a highly competitive industry where employee talent is at a high premium. The Debtor respectfully submits that the pre-petition Bonus Agreements constituted an exercise of sound business judgment and the determination to honor the Bonus Agreements constitute a sound exercise of sound business judgment. The

Debtor's failure to honor the Bonus Agreements will result in additional claims against the estate, and more importantly, is likely to result in a dissipation of assets. The Debtor requests the relief set forth herein on an emergency basis given the importance of the timing of the sale, the need to immediately advise the Debtor's employees that the Debtor has been authorized to honor the Bonus Agreements once the Debtor's employees are advised of the Debtor's chapter 11 bankruptcy filing and proposed sale process. It is critical that the Debtor be able to advise its employees that the Debtor has filed this Motion and has obtained an emergency hearing so that there is not an employee "exodus" which would be severely detrimental to the Debtor's sale efforts.

## ADDITIONAL INFORMATION

This Motion is based upon applicable Local Bankruptcy Rules, 11 U.S.C. §§ 105(a), 363(b) and 363(c), the supporting Memorandum of Points and Authorities, the Declaration, the arguments and statements of counsel to be made at the hearing on the Motion, and other admissible evidence properly brought before the Court.

In order to provide maximum notice of this Motion, on November 16, 2015, the Debtor will overnight a copy of the Motion and all supportive papers upon the Office of the United States Trustee, and emailed a copy of the Motion and all supportive papers upon all secured creditors and their counsel (if known), the Debtor's twenty (20) largest unsecured creditors, and on those parties who have requested special notice.

**WHEREFORE**, the Debtor respectfully requests that this Court hold a hearing on this Motion and issue an order:

1.      granting this Motion;

2.      affirming the adequacy of the notice given;

3.      finding that the relief requested in the Motion is necessary to avoid immediate and irreparable harm;

4.      authorizing the Debtor honor the Bonus Agreements, including any pre-petition Bonus Agreements which are executed or returned by an employee post-petition; and

5.      granting such other and further relief as the Court deems just and proper.

Dated: November 16, 2015

RDIO, INC.

By:   _/s/ Krikor J. Meshefejian_
RON BENDER
PHILIP A. GASTEIER
MONICA Y. KIM
KRIKOR J. MESHEFEJIAN
LEVENE, NEALE, BENDER, YOO
& BRILL L.L.P.
Proposed Attorneys for Chapter 11 Debtor
and Debtor in Possession

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.     STATEMENT OF FACTS

### A.     Background

The Debtor filed a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on November 16, 2015 (the "Petition Date").   The Debtor continues to operate its business, manage its financial affairs and administer its bankruptcy estate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

### B.     The Debtor's Business, Assets and Liabilities

The Debtor was founded in 2008 as a digital music service.   The Debtor's business operations were launched in 2010 after the Debtor secured requisite licenses from the applicable holders of music rights.   Since that time, the Debtor has strived to grow into a worldwide music service and today is in 86 countries.

One of the primary services provided by the Debtor is an unlimited, on demand music streaming service where for $9.99 per month the user has access to an entire library of songs with access to them through a computer, mobile device, etc.  In other words, the Debtor's business model is based upon a monthly recurring subscription for full access to content rather than on an owned a la carte download model.   The Debtor also makes available other subscription tiers at lower costs per month with varying service offerings or functionality (e.g., a family tier, a student tier, and a select tier with alternative functionality).   The Debtor generates approximately $1.5 million of U.S. monthly revenue from its monthly subscription service.

While the Debtor's monthly subscription service provides the Debtor with its primary revenue source, the Debtor also generates approximately $100,000-$150,000 of monthly revenue from advertisers who advertise in the Debtor's advertising-based service offerings.   The Debtor, therefore, currently generates approximately $1.6-$1.65 million of total monthly revenue.

The Debtor's primary assets consist of the Debtor's (i) owned technology (e.g., website, mobile apps, content ingestion technology, reporting technology, software, databases, etc.), (ii) content license agreements, (iii) subscribers, (iv) employee talent pool, and (v) goodwill.

Under its current operating business model, the Debtor has monthly operating expenses of

approximately $3.5-$4.0 million, comprising primarily payroll for the Debtor's approximately 140 U.S. employees (much of which represents costs of retaining high caliber Silicon Valley engineering talent), payment to the owners of music rights, costs of maintaining the service, rent, marketing costs, business development costs, technology maintenance costs, and foreign administrative expenses). With average monthly total revenue of approximately $1.6-$1.65 million and average monthly operating expenses of $3.5-$4.0 million, the Debtor's business operations under its current operating business model result in operating losses of approximately $1.85-$2.4 million per month, and the Debtor no longer has the economic means of funding such significant operating cash flow shortfall.

The Debtor has approximately $190,237,000 of secured debt and approximately $30,000,000 of unsecured debt. The details and more expansive explanation of the relationships involving the various secured creditors is set forth in the Debtor's emergency motion for use of cash collateral and approval of debtor-in-possession financing.

**C.** **The Proposed Asset Sale**

In the fall of 2014, the Debtor's majority shareholder, Pulser Media, Inc. ("Pulser Media") employed a highly qualified investment bank in Moelis & Company ("Moelis") in the fall of 2014, initially with the goal of attempting to raise new equity capital. Despite extensive efforts by Moelis, it ultimately became clear that raising new equity capital was not going to be possible. At that point, Pulser Media charged Moelis with finding either substantial outside investment or a buyer or merger partner because the Debtor was not going to be able to continue to fund its significant operating losses indefinitely.

After conducting an extremely broad marketing process, the highest and best offer received by the Debtor was an all cash asset purchase offer from Pandora Media, Inc. ("Pandora") in the amount of $75 million, plus certain other consideration, to acquire the Debtor's technological assets. The final negotiated and signed asset purchase agreement, which is being filed with the Court as part of the Debtor's emergency motion for approval of bid procedures, contains a $75 million cash purchase price (the "Purchase Agreement"). Based on its due diligence, by the time of the execution of the LOI, Pandora had decided that it would only

1    proceed with a transaction if that transaction were conducted as part of a Chapter 11 filing and a
2    purchase pursuant to a sale under the Bankruptcy Code.    Pandora has agreed that the Debtor can
3    and should market Pandora's offer for overbid to insure that the highest and best price is paid for
4    the Debtor's assets/business.

5    **D.    The Debtor's Employee Talent Pool Is A Primary Asset That Needs To Be Preserved**

6           The Debtor operates in a very competitive environment, especially as concerns employees.
7    According to the State of California Unemployment Report that was issued on October 15, 2015,
8    the Debtor understands that the current unemployment rate in San Francisco is 3.1% and is much
9    lower for experienced high technology workers.  The key employees who are associated with the
10   Debtor's intellectual property assets are extremely important to Debtor's value and to any
11   purchaser of the Debtor's assets.  Such employees are also very much in demand from other
12   technology companies located in the same region as the Debtor (such that, relocation costs and
13   location advantages are not necessarily applicable considerations for the Debtor's employees).
14   The Debtor believes that the industry standard provides for technology companies to provide
15   highly competitive incentives, perquisites, bonuses, and benefits to its employees, who are in high
16   demand.

17          The Debtor's employee talent pool is a critical component of Pandora's offer to purchase
18   the Debtor's assets.  The Purchase Agreement contains both provisions for price adjustments (up
19   to $15.0 million), and provisions constituting closing conditions, respectively, if specified
20   individuals and threshold numbers of employees of the Debtor do not accept employment with the
21   proposed purchaser following the sale.

22   **E.    The Bonus Agreements**

23          In light of these industry realities and Pandora's requirements, pre-petition, the Debtor
24   determined that, in order to preserve and maximize the value of its assets, and in order to properly
25   incentivize its key employees through the closing of a sale of the Debtor's assets and during the
26   Debtor's chapter 11 case, the Debtor would offer to its key employees cash incentive bonuses, in
27   the forms attached as Exhibits 1, 2 and 3 to the Declaration.  Accordingly, pre-petition, the Debtor
28   entered into cash incentive bonus agreements (the "Bonus Agreements") with certain employees

in the ordinary course of its business, which the Debtor requests Court authority to honor in the ordinary course of the Debtor's business.[3] The Bonus Agreements are designed to incentivize the Debtor's key employees to preserve and maximize the value of the Debtor's assets/business for the benefit of creditors, and to help the Debtor achieve a successful sale of the Debtor's assets/business. The value of the Debtor's assets will diminish if the key employees are no longer available. If the associated expertise is not available, a buyer may well consider acquiring similar assets elsewhere and building its own expansion from the beginning. The aggregate amount of the bonuses is approximately $1,717,750.

Furthermore, the employees receiving bonuses are crucial to the Debtor's efforts to efficiently and effectively administer the Debtor's chapter 11 bankruptcy case and navigate a successful sale process. Without the continued commitments of these key employees, particularly executives, the Debtor's chances of a successful sale are diminished.

Finally, the Debtor's secured lenders have agreed that the proceeds for collateral from the sale of the Debtor's assets may be used to pay the bonuses.

There are three forms of Bonus Agreements, depending on the type of employee, though the terms of each are substantively the same, with the primary difference being the amount of the bonuses agreed upon by and between the Debtor and the respective employee.

1.      Key employees who do not hold executive positions have entered into the Bonus Agreements in the form attached as Exhibit 1 to the Declaration. Such employees will receive bonuses of up to $50,000. These employees include, but are not limited to, engineers, architects, designers, technical personnel, managers, etc.

The primary terms of the Bonus Agreements with non-executive key employees are as follows:

---

[3] Virtually all of the Debtor's employees have executed and returned their respective Bonus Agreements to the Debtor. To the extent an employee has not executed and returned a Bonus Agreement, given the Debtor's oral agreement with such employees, the Debtor respectfully requests Court authority for the Debtor to honor pre-petition Bonus Agreements that are executed and/or returned post-petition.

- If (i) Pulser Media, Inc. and/or the Debtor consummate a Change of Control[4] at any time following the date of this letter, *and* (ii) the employee continues to be employed by the Debtor through the closing date of such Change of Control (the "***Closing Date***"), the employee will receive a cash bonus equal to $_____, less applicable withholding and payroll taxes (the "Cash Bonus"), payable on or before the seventh (7th) business day following the Closing Date (the "Payment Date").

- Notwithstanding the foregoing paragraph, if Pulser and/or the Debtor enter into a definitive binding agreement with respect to a Change of Control (the execution date of such definitive binding agreement will be referred to as the "Execution Date"), *and* such Change of Control is consummated at any time following the Execution Date, *and* employment is terminated by the Debtor without Cause (not including your death or permanent disability) at any time following the Execution Date but prior to the Closing Date, the Debtor agrees to nevertheless pay the Cash Bonus within seven (7) business days of the closing date of such Change of Control.

- For the avoidance of doubt, if, prior to the Closing Date, (a) the employee terminates her employment with the Debtor for any reason; (b) employment is terminated by the Debtor for Cause; or (c) there occurs the employee's death or permanent disability, then the employee (including the employee's heirs, successors and assigns) will not be entitled to the Cash Bonus, and the Bonus Agreement will be deemed terminated and null and void upon the effective date or occurrence of one of the foregoing events.

- Iconical Investments II, LP ("Iconical") and Pulser Media, Inc. ("Pulser"), the Debtor's secured lenders, will permit the Debtor to use proceeds of collateral

---

[4] As defined in the Bonus Agreements.

generated from such Change of Control transaction to pay up to an amount sufficient to fund the total Cash Bonus pool.

- As a condition to the payment of the Cash Bonus, the employee will be required to execute and deliver a general release of claims in a form acceptable to the Debtor and Iconical.

- Nothing in the Bonus Agreement shall change the employee's "at-will" employment status with the Debtor or confer upon the employee any right to continue the employee's employment with the Debtor for any period of specific duration or interfere with or otherwise restrict in any way the rights of the Debtor or you, which rights are hereby expressly reserved by each of you and the Debtor, to terminate the employee's employment with the Debtor at any time and for any reason, with or without Cause.

2.      Employees who are senior executives of the Debtor, have entered into the Bonus Agreements in the forms attached as Exhibit 2 or Exhibit 3 to the Declaration, as applicable. Their incentive package value ranges from approximately $115,000 to $313,750. All but three of these individuals have entered into the Bonus Agreement attached as Exhibit 2 to the Declaration. These senior executives manage the Debtor's technology product engineering and operations, and are crucial to the preservation of the value of the Debtor's assets, the sale process, and the transition of assets. Without their services, the Debtor will be hard-pressed to effectively coordinate and consummate the sale of assets, particularly the Debtor's intellectual property assets, which are primary assets. If the Debtor obtains gross sale proceeds of at least $50 million, these individuals will receive their bonuses, subject to the terms of the Bonus Agreements attached as Exhibit 2 to the Declaration. The three other employees who are company executives have entered into the Bonus Agreements in the form attached as Exhibit 3 to the Declaration. If the Debtor receives no less than $50 million in gross sale proceeds, then these individuals will earn a $100,000 bonus each. If the Debtor receives gross sale proceeds of $52,500,000 or greater, these individuals will receive an additional bonus amount which is reflected in their Bonus Agreements as the greater of a fixed sum and a percentage of their then-current base annual

salary, up to $213,750. The senior vice president/general counsel, who has the highest incremental bonus opportunity of $213,750, and the senior vice president of finance are the primary individuals serving lead roles in the Debtor's operations, the bankruptcy filing, sale transactions, financial affairs, and other transactions, and are necessary to facilitate a smooth transition to the purchaser and to wind up the Debtor's estate efficiently and in a manner that will maximize value for all stakeholders. The third executive included in this incremental bonus opportunity is the global head of content licensing and catalog who manages every aspect of the Debtor's relationships with artists, labels, music publishers and collection societies. This individual is crucial to preserving the Debtor's licenses, maintaining relationships with licensors, and maximizing the value of the Debtor's intellectual property assets.

The primary terms of the Bonus Agreements attached as Exhibits 2 and 3 to the Declaration are as follows:

- Payments under the Bonus Agreement will be contingent upon and will incentivize and reward the maximization of value in a Change of Control as measured by the cash or other proceeds generated by such Change of Control and increases in overall stakeholder recoveries.

- If (a) Pulser Media, Inc. and/or the Debtor consummate a Change of Control at any time following the date of this letter, _and_ (b) the employee continues to be employed by the Debtor through the closing date of such Change of Control (the "Closing Date"), _and_ (c) no less than $50 million of gross sale proceeds are received by Pulser and/or the Debtor or its designees (the "Gross Proceeds Target"), the employee will receive a cash bonus in the amount of $100,000 less any amounts required or authorized to be withheld by law (the "Cash Bonus"), payable on or before the seventh (7th) business day following the Closing Date (the "Payment Date"). The amount of the Cash Bonus will be tied to the achievement of and any increases to the Gross Proceeds Target.

- If, prior to the Closing Date, (a) the employee terminates her employment with the Debtor for any reason; (b) her employment is terminated by the Debtor for Cause;

or (c) there occurs the employee's death or permanent disability, then the employee (including the employee's heirs, successors and assigns) will not be entitled to the Cash Bonus. If Pulser and/or the Debtor enter into a definitive binding agreement with respect to a Change of Control (the execution date of such definitive binding agreement will be referred to as the "Execution Date"), *and* such Change of Control is consummated at any time following the Execution Date, *and* employment is terminated by the Debtor without Cause (not including your death or permanent disability) at any time following the Execution Date but prior to the Closing Date, the Debtor will nevertheless pay the Cash Bonus within seven (7) business days following the Closing Date.

- Iconical and Pulser, the Debtor's secured lenders, will permit the Debtor to use proceeds of collateral generated from such Change of Control transaction to pay up to an amount sufficient to fund the total Cash Bonus pool.

- As a condition to the payment of the Cash Bonus, the employee will be required to execute and deliver a general release of claims in a form reasonably acceptable to the Debtor and Iconical.

- Nothing in the Bonus Agreement shall change the employee's "at-will" employment status with the Debtor or confer upon the employee any right to continue the employee's employment with the Debtor for any period of specific duration or interfere with or otherwise restrict in any way the rights of the Debtor or you, which rights are hereby expressly reserved by each of you and the Debtor, to terminate the employee's employment with the Debtor at any time and for any reason, with or without Cause.

All of the employees who have entered into the Bonus Agreement are critical to the Debtor's operations going-forward and the Debtor's sale efforts. The total amount of bonuses proposed to be ultimately paid is approximately $1,717,750.

**F.**     **Basis For Honoring The Bonus Agreements On An Expedited Basis**

The Debtor believes that it may honor the Bonus Agreements in the ordinary course of the Debtor's business, and files this Motion out of an abundance of caution and to ensure its employees that the Debtor is authorized to honor the Bonus Agreements. The Debtor respectfully submits that it is critical that the Court authorize the Debtor to honor the Bonus Agreements in the ordinary course of the Debtor's business, in order to ensure that a primary asset of the Debtor (its employee talent pool) is preserved, in order to ensure that the Debtor receives maximum possible value under the Purchase Agreement, and in order to ensure that the Debtor's sale process while in chapter 11 is not disrupted and that the Debtor's employees are properly incentivized and rewarded for preserving and maximizing the Debtor's value in a highly competitive industry where employee talent is at a high premium. The Debtor respectfully submits that the pre-petition Bonus Agreements constituted an exercise of sound business judgment and the determination to honor the Bonus Agreements constitute a sound exercise of sound business judgment. The Debtor's failure to honor the Bonus Agreements will result in additional claims against the estate, and more importantly, is likely to result in a dissipation of assets. The Debtor requests the relief set forth herein on an emergency basis given the importance of the timing of the sale, the need to immediately advise the Debtor's employees that the Debtor has been authorized to honor the Bonus Agreements once the Debtor's employees are advised of the Debtor's chapter 11 bankruptcy filing and proposed sale process. It is critical that the Debtor be able to advise its employees that the Debtor has filed this Motion and has obtained an emergency hearing so that there is not an employee "exodus" which would be severely detrimental to the Debtor's sale efforts.

## II.    DISCUSSION

**A.    The Debtor Should Be Authorized To Honor The Bonus Agreements In The Ordinary Course Of Business.**

The Debtors seek authority, pursuant to Sections 105(a), 363(b)(1) and 363(c)(1) of the Bankruptcy Code to honor the Bonus Agreements and make the payments proposed thereunder.

Section 105(a) of the Bankruptcy Code provides, in pertinent part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provision of this title."

With certain exceptions not applicable in this case, Section 1107 states that "a debtor in possession shall have all the rights ... and powers, and shall perform all the functions and duties ... of a trustee...." 11 U.S.C. § 1107. Section 363(b)(1) of the Bankruptcy Code provides that a trustee (or debtor in possession in this case) "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 102(1) of the Bankruptcy Code defines "after notice and a hearing" as after such notice as is appropriate in the particular circumstances, and such opportunity for hearing as is appropriate in the particular circumstances.

Section 363(c)(1) of the Bankruptcy Code provides, in pertinent part, that "[i]f the business of the debtor is authorized to be operated under section 721, 1108 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice of a hearing."

The use, sale or lease of property of the estate, other than in the ordinary course of business, is authorized when a "sound business purpose" justifies the action. *See*, *e.g.*, *In re Delaware & Hudson R.R. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (explaining that the Third Circuit has adopted the "sound business purpose" standard for sales proposed pursuant to section 363(b)); *see also Stephen Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986) (adopting the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)); *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991) (same).

Incentive plans, such as the Bonus Agreements, have been approved by bankruptcy courts as transactions in the ordinary course of a debtor's business and under the business judgment standard of Section 363 of the Bankruptcy Code. *See In re Dana Corporation*, 358 B.R. 567

Case: 15-31430   Doc# 22   Filed: 11/16/15   Entered: 11/16/15 22:17:52   Page 20 of 25

(Bankr. S.D.N.Y. 2006); *See also In re Global Home Products, LLC*, 369 B.R. 778 (Bankr. D. Del. 2007); *In Nellson Nutraceutical, In*c., 369 B.R. 787 (Bankr. D. Del. 2007); *In re Velo Holdings, Inc.*, 472 B.R. 201 (Bankr. S.D.N.Y. 2012).

If a court determines that a transaction is in the ordinary course of a debtor's business, the court will not entertain an objection to the transaction, provided that the conduct involves a business judgment made in good faith upon a reasonable basis and within the scope of authority under the Bankruptcy Code. *In re Curlew Valley Associates*, 14 B.R. 506, 513 (Bankr. D. Utah 1981). While the Bankruptcy Code does not provide guidance whether a particular transaction is conducted in the "ordinary course of business," courts have applied both "horizontal" and "vertical" tests to consider the reasonableness of a transaction and whether it was conducted in the ordinary course. *In re Roth American, Inc.*, 975 F.2d 949, 952-93 (3d Cir. 1992). The test for horizontal dimension "is whether, from an industry-wide perspective, the transaction is of the sort commonly undertaken by companies in that industry." Id. at 953.

The vertical dimension which is also known as the creditor's expectation test, "analyzes the transactions from the vantage point of a hypothetical creditor and the inquiry is whether the transaction subjects a creditor to economic risk of a nature different from those he accepted when he decided to extend credit." *Id.* (quotations omitted). Under the vertical test, "the touchstone of ordinariness is the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the ordinary course of business. *Id.* Therefore, a debtor's pre-petition business practices and conduct are the primary focus of the vertical analysis. *Id.* The court must "also consider the changing circumstances inherent in the hypothetical creditor's expectations. *Id.* (citations omitted).

Here, the Debtor and the Debtor's key employees entered into the Bonus Agreements pre-petition, which the Debtor seeks to honor in order to preserve and maximize the value of the Debtor's primary assets. The Bonus Agreements satisfy both the horizontal and vertical dimensions tests, and, thus, is within the ordinary course of the Debtors' businesses. First, with regard to the horizontal dimension test, as set forth in the Declaration of Elliott Peters, who is the Debtor's Senior Vice President and general counsel, the Debtor operates in a very competitive

environment, especially as concerns employees. The Debtor believes that the industry standard provides for technology companies to provide highly competitive incentives, perquisites, bonuses, and benefits to its employees, who are in high demand. Here, the key employees who are associated with the Debtor's intellectual property assets are extremely important to Debtor's value and to any purchaser of the Debtor's assets. Such employees are also very much in demand from other technology companies located in the same region as the Debtor (such that, relocation costs and location advantages are not necessarily applicable considerations for the Debtor's employees). Accordingly, the Debtor submits that it is within the norm to offer key employees with unique and valuable skills and knowledge cash incentives to maintain the intellectual property value and employee talent pool of a company such as the Debtor. Thus, the horizontal dimension test is satisfied.

With regard to the vertical dimensions test, the proposed Bonus Agreements are pre-petition agreements with the Debtor's employees that the Debtor seeks to honor. The purpose of the Bonus Agreements are to preserve and maximize the value of assets for the benefit of the Debtor and the Debtor's creditors.

As described above, the Bonus Agreements satisfy both the horizontal and vertical dimensions tests, and, therefore, are well within the ordinary course of the Debtor's business and the Debtor's business judgment. The total amounts of the bonuses are reasonable and consistent with the Debtor's practices. Accordingly, this Court should find that the Debtor may honor the Bonus Agreements in the ordinary course of the Debtor's business.

**B.      Alternatively, the Debtor Should Be Authorized To Honor The Bonus Agreements Outside The Ordinary Course Of Business**

To the extent the Court determines that honoring the Bonus Agreements is outside the ordinary course of business, the Debtor respectfully submits that the Court should authorize the Debtor to honor the Bonus Agreements pursuant to 11 U.S.C. § 363(b)(1).

In *In re Walter*, 83 B.R. 14 (9th Cir. B.A.P. 1988), the Bankruptcy Appellate Panel adopted the Second Circuit's analysis for approval of transactions outside the ordinary course of business:

Case: 15-31430   Doc# 22   Filed: 11/16/15   Entered: 11/16/15 22:17:52   Page 22 of 25

> We also agree with the Second Circuit that implicit in § 363(b) is the further requirement of justifying the proposed transaction. In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir.1983). That is, for the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business.... Whether the proffered business justification is sufficient depends on the case. As the Second Circuit held in *Lionel,* the bankruptcy judge should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike.

*In re Walter*, 83 B.R. at 19. *See also In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir.1983); In re Burke Mountain Recreation, Inc.*, 56 B.R. 72 (Bankr. D. Vt. 1985); *In re Naron & Wagner, Chartered*, 88 B.R. 85 (Bankr. D. Md. 1988); *In re Continental Air Lines, Inc.*, 780 F.2d 1223 (5th Cir. 1986).

The vast majority of reported decisions, as well as the foregoing factors, relate to sale of property outside the ordinary course of business. The Bonus Agreements are directly tied to the ultimate sale of the Debtor's assets, and are critical to the Debtor's sale of assets, as discussed above. Indeed, the Debtor's employee talent pool is a critical component of Pandora's offer to purchase the Debtor's assets.

The Purchase Agreement contains both provisions for price adjustments (up to $15.0 million), and provisions constituting closing conditions, respectively, if specified individuals and threshold numbers of employees of the Debtor do not accept employment with the proposed purchaser following the sale. Accordingly, it is crucial for the Debtor to be able to preserve its employee talent pool.

The Debtor operates in a very competitive environment, especially as concerns employees. The key employees who are associated with the Debtor's intellectual property assets are extremely important to Debtor's value and to any purchaser of the Debtor's assets. Such employees are also very much in demand from other technology companies located in the same region as the Debtor (such that, relocation costs and location advantages are not necessarily applicable considerations for the Debtor's employees).

In light of these industry realities and Pandora's requirements, pre-petition, the Debtor must be able to honor the Bonus Agreements in order to preserve and maximize the value of its assets, and in order to properly incentivize its key employees through the closing of a sale of the Debtor's assets and during the Debtor's chapter 11 case.

The Debtor respectfully submits that it is critical that the Court authorize the Debtor to honor the Bonus Agreements in the ordinary course of the Debtor's business, in order to ensure that a primary asset of the Debtor (its employee talent pool) is preserved, in order to ensure that the Debtor receives maximum possible value under the Purchase Agreement, and in order to ensure that the Debtor's sale process while in chapter 11 is not disrupted and that the Debtor's employees are properly incentivized and rewarded for preserving and maximizing the Debtor's value and assisting the Debtor with closing a sale in a highly competitive industry where employee talent is at a high premium. The Debtor respectfully submits that the pre-petition Bonus Agreements constituted an exercise of sound business judgment and the determination to honor the Bonus Agreements constitute a sound exercise of sound business judgment. The Debtor's failure to honor the Bonus Agreements will result in additional claims against the estate, and more importantly, is likely to result in a dissipation of assets.

## C. The Inability To Honor The Bonus Agreements Will Result In Immediate And Irreparable Harm

The Debtor requests the relief set forth herein on an emergency basis given the importance of the timing of the sale, the need to immediately advise the Debtor's employees that the Debtor has been authorized to honor the Bonus Agreements once the Debtor's employees are advised of the Debtor's chapter 11 bankruptcy filing and proposed sale process. It is critical that the Debtor be able to advise its employees that the Debtor has filed this Motion and has obtained an emergency hearing so that there is not an employee "exodus" which would be severely detrimental to the Debtor's sale efforts.

## III. CONCLUSION

**WHEREFORE**, the Debtor respectfully requests that this Court hold a hearing on this Motion and issue an order:

Case: 15-31430   Doc# 22   Filed: 11/16/15   Entered: 11/16/15 22:17:52   Page 24 of 25

1.    granting this Motion;

2.    affirming the adequacy of the notice given;

3.    finding that the relief requested in the Motion is necessary to avoid immediate and irreparable harm;

4.    authorizing the Debtor honor the Bonus Agreements, including any pre-petition Bonus Agreements which are executed or returned by an employee post-petition; and

5.    granting such other and further relief as the Court deems just and proper.

Dated: November 16, 2015          RDIO, INC.

By: _/s/ Krikor J. Meshefejian_____
     RON BENDER
     PHILIP A. GASTEIER
     MONICA Y. KIM
     KRIKOR J. MESHEFEJIAN
     LEVENE, NEALE, BENDER, YOO
       & BRILL L.L.P.
     Proposed Attorneys for Chapter 11 Debtor
     and Debtor in Possession