RON BENDER (SBN 143364)
PHILIP A. GASTEIER (SBN 130043)
MONICA Y. KIM (SBN 180139)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone:  (310) 229-1234
Facsimile:  (310) 229-1244
Email: rb@lnbyb.com; pag@lnbyb.com;
myk@lnbyb.com; kjm@lnbyb.com

Proposed Attorneys for Chapter 11 Debtor and Debtor in Possession

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>RDIO, INC.,<br><br>        Debtor and Debtor in Possession. | ) Case No. 15-31430<br>)<br>) Chapter 11 Case<br>)<br>) **DECLARATION OF ELLIOTT PETERS**<br>) **IN SUPPORT OF DEBTOR'S**<br>) **EMERGENCY MOTION FOR**<br>) **AUTHORITY TO HONOR PRE-**<br>) **PETITION CASH BONUS INCENTIVE**<br>) **AGREEMENTS**<br>)<br>) Date:  November 18, 2015<br>) Time:  10.00 a.m.<br>) Place:  U.S Bankruptcy Court<br>)        Courtroom 22<br>)        235 Pine St.<br>)        San Francisco, CA 94104<br>) Judge:  The Hon. Dennis Montali<br>) |

I, Elliott Peters, hereby declare as follows:

     1.     Unless indicated to the contrary, I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2.     I am the Senior Vice President and General Counsel of Rdio, Inc., Chapter 11 Debtor and Debtor in Possession (the "Debtor"). I have served in my role as Senior Vice President of the Debtor and general counsel to the Debtor since August 7, 2013. As such, I have acquired knowledge of the Debtor's business and financial affairs, I am familiar with the Debtor's creditors, and I have been designated by the Debtor's Board of Directors to serve as one of the Debtor's designated representative. This Declaration is in support of the *Debtor's Emergency Motion For Authority To Honor Pre-Petition Cash Bonus Incentive Agreements* (the "Motion").

**A.     Background**

4.     The Debtor filed a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on November 16, 2015 (the "Petition Date"). The Debtor continues to operate its business, manage its financial affairs and administer its bankruptcy estate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

**B.     The Debtor's Business, Assets and Liabilities**

5.     The Debtor was founded in 2008 as a digital music service. The Debtor's business operations were launched in 2010 after the Debtor secured requisite licenses from the applicable holders of music rights. Since that time, the Debtor has strived to grow into a worldwide music service and today is in 86 countries.

6.     One of the primary services provided by the Debtor is an unlimited, on demand music streaming service where for $9.99 per month the user has access to an entire library of songs with access to them through a computer, mobile device, etc. In other words, the Debtor's business model is based upon a monthly recurring subscription for full access to content rather than on an owned a la carte download model. The Debtor also makes available other subscription tiers at lower costs per month with varying service offerings or functionality (e.g., a family tier, a student tier, and a select tier with alternative functionality). The Debtor generates approximately $1.5 million of U.S. monthly revenue from its monthly subscription service.

7.     While the Debtor's monthly subscription service provides the Debtor with its primary revenue source, the Debtor also generates approximately $100,000-$150,000 of monthly revenue from advertisers who advertise in the Debtor's advertising-based service offerings. The

Debtor, therefore, currently generates approximately $1.6-$1.65 million of total monthly revenue.

8. The Debtor's primary assets consist of the Debtor's (i) owned technology (e.g., website, mobile apps, content ingestion technology, reporting technology, software, databases, etc.), (ii) content license agreements, (iii) subscribers, (iv) employee talent pool, and (v) goodwill.

9. Under its current operating business model, the Debtor has monthly operating expenses of approximately $3.5-$4.0 million, comprising primarily payroll for the Debtor's approximately U.S. 140 employees (much of which represents costs of retaining high caliber Silicon Valley engineering talent), payment to the owners of music rights, costs of maintaining the service, rent, marketing costs, business development costs, technology maintenance costs, and foreign administrative expenses). With average monthly total revenue of approximately $1.6-$1.65 million and average monthly operating expenses of $3.5-$4.0 million, the Debtor's business operations under its current operating business model result in operating losses of approximately $1.85-$2.4 million per month, and the Debtor no longer has the economic means of funding such significant operating cash flow shortfall.

10. The Debtor has approximately $190,237,000 of secured debt and approximately $30,000,000 of unsecured debt. The details and more expansive explanation of the relationships involving the various secured creditors is set forth in the Debtor's emergency motion for use of cash collateral and approval of debtor-in-possession financing.

## C. The Proposed Asset Sale

11. In the fall of 2014, the Debtor's majority shareholder, Pulser Media, Inc. ("Pulser Media") employed a highly qualified investment bank in Moelis & Company ("Moelis") in the fall of 2014, initially with the goal of attempting to raise new equity capital. Despite extensive efforts by Moelis, it ultimately became clear that raising new equity capital was not going to be possible. At that point, Pulser Media charged Moelis with finding either substantial outside investment or a buyer or merger partner because the Debtor was not going to be able to continue to fund its significant operating losses indefinitely.

12. After conducting an extremely broad marketing process, the highest and best offer received by the Debtor was an all cash asset purchase offer from Pandora Media, Inc. ("Pandora")

in the amount of $75 million, plus certain other consideration, to acquire the Debtor's technological assets. The final negotiated and signed asset purchase agreement, which is being filed with the Court as part of the Debtor's emergency motion for approval of bid procedures, contains a $75 million cash purchase price (the "Purchase Agreement"). Based on its due diligence, by the time of the execution of the LOI, Pandora had decided that it would only proceed with a transaction if that transaction were conducted as part of a Chapter 11 filing and a purchase pursuant to a sale under the Bankruptcy Code. Pandora has agreed that the Debtor can and should market Pandora's offer for overbid to insure that the highest and best price is paid for the Debtor's assets/business.

**D.**     **The Debtor's Employee Talent Pool Is A Primary Asset That Needs To Be Preserved**

        13.     The Debtor operates in a very competitive environment, especially as concerns employees. I am informed that the current unemployment rate in San Francisco is 3.1% and is much lower for experienced high technology workers. The key employees who are associated with the Debtor's intellectual property assets are extremely important to Debtor's value and to any purchaser of the Debtor's assets. Such employees are also very much in demand from other technology companies located in the same region as the Debtor (such that, relocation costs and location advantages are not necessarily applicable considerations for the Debtor's employees). I believe that the industry standard provides for technology companies to provide highly competitive incentives, perquisites, bonuses, and benefits to its employees, who are in high demand.

        14.     The Debtor's employee talent pool is a critical component of Pandora's offer to purchase the Debtor's assets. The Purchase Agreement contains both provisions for price adjustments (up to $15.0 million), and provisions constituting closing conditions, respectively, if specified individuals and threshold numbers of employees of the Debtor do not accept employment with the proposed purchaser following the sale.

**E.**     **The Bonus Agreements**

        15.     In light of these industry realities and Pandora's requirements, pre-petition, the Debtor determined that, in order to preserve and maximize the value of its assets, and in order to

properly incentivize its key employees through the closing of a sale of the Debtor's assets and during the Debtor's chapter 11 case, the Debtor would offer to its key employees cash incentive bonuses, in the forms attached as Exhibits 1, 2 and 3 to this Declaration. Accordingly, pre-petition, the Debtor entered into cash incentive bonus agreements (the "Bonus Agreements") with certain employees in the ordinary course of its business, including myself, which the Debtor requests Court authority to honor in the ordinary course of the Debtor's business.[1] The Bonus Agreements ensure that the Debtor's key employees employed by the Debtor are incentivized to preserve and maximize the value of the Debtor's assets/business for the benefit of creditors. The aggregate amount of bonuses expected to be paid pursuant to the Bonus Agreements is approximately $1,717,750.

16.     Additionally, the Debtor's Chapter 11 filing may be cause for some of those employees to consider other employment opportunities, unless they can be relatively and immediately assured that the Debtor will be able to honor the Bonus Agreements. The value of the Debtor's assets will diminish if the key employees are no longer available. If the associated expertise is not available, a buyer may well consider acquiring similar assets elsewhere and building its own expansion from the beginning.

17.     Furthermore, the employees receiving bonuses are crucial to the Debtor's efforts to efficiently and effectively administer the Debtor's chapter 11 bankruptcy case and navigate a successful sale process. Without the continued commitments of these key employees, particularly executives, the Debtor's chances of a successful sale are diminished.

18.     Finally, the Debtor's secured lenders have agreed that the proceeds for collateral from the sale of the Debtor's assets may be used to pay the bonuses.

---

[1] Virtually all of the Debtor's employees have executed and returned their respective Bonus Agreements to the Debtor. To the extent an employee has not executed and returned a Bonus Agreement, given the Debtor's oral agreement with such employees, the Debtor respectfully requests Court authority for the Debtor to honor pre-petition Bonus Agreements that are executed and/or returned post-petition.

19. There are three forms of Bonus Agreements, depending on the type of employee, though the terms of each are substantively the same, with the primary difference being the amount of the bonuses agreed upon by and between the Debtor and the respective employee.

a. Key employees who do not hold executive positions have entered into the Bonus Agreements in the form attached as Exhibit 1 to this Declaration. Such employees will receive bonuses of up to $50,000. These employees include, but are not limited to, engineers, architects, designers, technical personnel, managers, etc.

The primary terms of the Bonus Agreements with non-executive key employees are as follows:

- If (i) Pulser Media, Inc. and/or the Debtor consummate a Change of Control[2] at any time following the date of this letter, *and* (ii) the employee continues to be employed by the Debtor through the closing date of such Change of Control (the "***Closing Date***"), the employee will receive a cash bonus equal to $_____, less applicable withholding and payroll taxes (the "Cash Bonus"), payable on or before the seventh (7th) business day following the Closing Date (the "Payment Date").

- Notwithstanding the foregoing paragraph, if Pulser and/or the Debtor enter into a definitive binding agreement with respect to a Change of Control (the execution date of such definitive binding agreement will be referred to as the "Execution Date"), *and* such Change of Control is consummated at any time following the Execution Date, *and* employment is terminated by the Debtor without Cause (not including your death or permanent disability) at any time following the Execution Date but prior to the Closing Date, the Debtor agrees to nevertheless pay the Cash Bonus within seven (7) business days of the closing date of such Change of Control.

---

[2] As defined in the Bonus Agreements.

- For the avoidance of doubt, if, prior to the Closing Date, (a) the employee terminates her employment with the Debtor for any reason; (b) employment is terminated by the Debtor for Cause; or (c) there occurs the employee's death or permanent disability, then the employee (including the employee's heirs, successors and assigns) will not be entitled to the Cash Bonus, and the Bonus Agreement will be deemed terminated and null and void upon the effective date or occurrence of one of the foregoing events.

- Iconical Investments II, LP ("Iconical") and Pulser Media, Inc. ("Pulser"), the Debtor's secured lenders, will permit the Debtor to use proceeds of collateral generated from such Change of Control transaction to pay up to an amount sufficient to fund the total Cash Bonus pool.

- As a condition to the payment of the Cash Bonus, the employee will be required to execute and deliver a general release of claims in a form acceptable to the Debtor and Iconical.

- Nothing in the Bonus Agreement shall change the employee's "at-will" employment status with the Debtor or confer upon the employee any right to continue the employee's employment with the Debtor for any period of specific duration or interfere with or otherwise restrict in any way the rights of the Debtor or you, which rights are hereby expressly reserved by each of you and the Debtor, to terminate the employee's employment with the Debtor at any time and for any reason, with or without Cause.

b. Employees who are senior executives of the Debtor, including me, have entered into the Bonus Agreements in the forms attached as Exhibit 2 or Exhibit 3, as applicable. Our incentive package value ranges from approximately $115,000 to $313,750. All but three of these individuals have entered into the Bonus Agreement attached as Exhibit 2 to the Declaration. These senior executives manage the Debtor's technology product engineering and operations, and are crucial to the preservation of the value of the Debtor's assets, the sale process, and the transition of assets. Without their services, the Debtor will be hard-pressed to effectively

coordinate and consummate the sale of assets, particularly the Debtor's intellectual property assets, which are primary assets. If the Debtor obtains gross sale proceeds of at least $50 million, these individuals will receive their bonuses, subject to the terms of the Bonus Agreements attached as Exhibit 2. The two other employees who are company executives and I have entered into the Bonus Agreements in the form attached as Exhibit 3. If the Debtor receives no less than $50 million in gross sale proceeds, then we will earn a $100,000 bonus each. If the Debtor receives gross sale proceeds of $52,500,000 or greater, then we will receive an additional bonus amount which is reflected in their Bonus Agreements as the greater of a fixed sum and a percentage of their then-current base annual salary, up to $213,750. The senior vice president of finance and I are the primary individuals serving lead roles in the Debtor's operations, the bankruptcy filing, sale transactions, financial affairs, and other transactions, and will help facilitate a smooth transition to the purchaser and to wind up the Debtor's estate efficiently and in a manner that will maximize value for all stakeholders. The third executive included in this incremental bonus opportunity is the global head of content licensing and catalog who manages every aspect of the Debtor's relationships with artists, labels, music publishers and collection societies. This individual is crucial to preserving the Debtor's licenses, maintaining relationships with licensors, and maximizing the value of the Debtor's intellectual property assets.

The primary terms of the Bonus Agreements attached as Exhibits 2 and 3 are as follows :

- Payments under the Bonus Agreement will be contingent upon and will incentivize and reward the maximization of value in a Change of Control as measured by the cash or other proceeds generated by such Change of Control and increases in overall stakeholder recoveries.

- If (a) Pulser Media, Inc. and/or the Debtor consummate a Change of Control at any time following the date of this letter, _and_ (b) the employee continues to be employed by the Debtor through the closing date of such Change of Control (the "Closing Date"), _and_ (c) no less than $50 million of gross sale proceeds are received by Pulser and/or the Debtor or its designees (the "Gross Proceeds Target"), the employee will receive a cash bonus in the amount of $100,000 less

8

any amounts required or authorized to be withheld by law (the "Cash Bonus"), payable on or before the seventh (7th) business day following the Closing Date (the "Payment Date"). The amount of the Cash Bonus will be tied to the achievement of and any increases to the Gross Proceeds Target.

- If, prior to the Closing Date, (a) the employee terminates her employment with the Debtor for any reason; (b) her employment is terminated by the Debtor for Cause; or (c) there occurs the employee's death or permanent disability, then the employee (including the employee's heirs, successors and assigns) will not be entitled to the Cash Bonus. If Pulser and/or the Debtor enter into a definitive binding agreement with respect to a Change of Control (the execution date of such definitive binding agreement will be referred to as the "Execution Date"), *and* such Change of Control is consummated at any time following the Execution Date, *and* employment is terminated by the Debtor without Cause (not including your death or permanent disability) at any time following the Execution Date but prior to the Closing Date, the Debtor will nevertheless pay the Cash Bonus within seven (7) business days following the Closing Date.

- Iconical and Pulser, the Debtor's secured lenders, will permit the Debtor to use proceeds of collateral generated from such Change of Control transaction to pay up to an amount sufficient to fund the total Cash Bonus pool.

- As a condition to the payment of the Cash Bonus, the employee will be required to execute and deliver a general release of claims in a form reasonably acceptable to the Debtor and Iconical.

- Nothing in the Bonus Agreement shall change the employee's "at-will" employment status with the Debtor or confer upon the employee any right to continue the employee's employment with the Debtor for any period of specific duration or interfere with or otherwise restrict in any way the rights of the Debtor or you, which rights are hereby expressly reserved by each of you and the Debtor,

Case: 15-31430    Doc# 23    Filed: 11/16/15    Entered: 11/16/15 22:25:17    Page 9 of 28

1   to terminate the employee's employment with the Debtor at any time and for any

2   reason, with or without Cause.

3       20.     All of the employees who have entered into the Bonus Agreement are critical to

4   the Debtor's operations going-forward and the Debtor's sale efforts. The total amount of bonuses

5   proposed to be ultimately paid is approximately $1,717,750.

6   **F.   Basis For Honoring The Bonus Agreements On An Expedited Basis**

7       21.     I respectfully submit that it is critical that the Court authorize the Debtor to honor

8   the Bonus Agreements in the ordinary course of the Debtor's business, in order to ensure that a

9   primary asset of the Debtor (its employee talent pool) is preserved, in order to ensure that the

10  Debtor receives maximum possible value under the Purchase Agreement, and in order to ensure

11  that the Debtor's sale process while in chapter 11 is not disrupted and that the Debtor's employees

12  are properly incentivized and rewarded for preserving and maximizing the Debtor's value in a

13  highly competitive industry where employee talent is at a high premium.

14      22.     I respectfully submit that the Debtor's failure to honor the Bonus Agreements will

15  result in additional claims against the estate, and more importantly, is likely to result in a

16  dissipation of assets. We respectfully request the relief set forth in the Motion on an

17  ///

18  ///

19  ///

20  [See Next Page]

21

22

23

24

25

26

27

28

1  emergency basis given the importance of the timing of the sale, the need to immediately advise
2  the Debtor's employees that the Debtor has been authorized to honor the Bonus Agreements once
3  the Debtor's employees are advised of the Debtor's chapter 11 bankruptcy filing and proposed
4  sale process. It is critical that the Debtor be able to advise its employees that the Debtor has filed
5  this Motion and has obtained an emergency hearing so that there is not an employee "exodus"
6  which would be severely detrimental to the Debtor's sale efforts.

7      I declare and verify under penalty of perjury that the foregoing is true and correct to the
8  best of my knowledge, information and belief.

9      Executed on this 16th day of November, 2015, at San Francisco, California.

                                    ELLIOTT PETERS, Declarant

11

# EXHIBIT "1"

Rdio, Inc.
1550 Bryant Street, Ste. 220
San Francisco, CA 91403

October __, 2015

_____

Re:    **Cash Incentive Bonus**

Dear _____:

I am pleased to inform you that to facilitate an appropriate incentive program to properly compensate our hard working employees and to position the Company to consummate a successful Change of Control, Rdio, Inc. (the "***Company***") has adopted a cash incentive bonus plan subject to the terms and conditions set forth in this letter. Capitalized terms used but not otherwise defined in this letter will have the meanings ascribed to such terms in Exhibit A attached hereto.

It is intended that payments under the cash incentive bonus plan will be contingent upon and will incentivize and reward the completion of a Change of Control.

Specifically, if (i) Pulser Media, Inc. ("***Pulser***") and/or the Company consummate a Change of Control at any time following the date of this letter, *and* (ii) you continue to be employed by the Company through the closing date of such Change of Control (the "***Closing Date***"), you will receive a cash bonus equal to $_____, less applicable withholding and payroll taxes (the "***Cash Bonus***"), payable on or before the seventh (7th) business day following the Closing Date (the "***Payment Date***").

If, prior to the Closing Date, (a) you terminate your employment with the Company for any reason; (b) your employment is terminated by the Company for cause; or (c) there occurs your death or permanent disability, then you (including your heirs, successors and assigns) will not be entitled to the Cash Bonus. If Pulser and/or the Company enter into a definitive binding agreement with respect to a Change of Control (the execution date of such definitive binding agreement will be referred to as the "***Execution Date***"), *and* such Change of Control is consummated at any time following the Execution Date, *and* your employment is terminated by the Company without cause (not including your death or permanent disability) at any time following the Execution Date but prior to the Closing Date, the Company agrees to nevertheless pay you the Cash Bonus within seven (7) business days following the Closing Date.

Iconical Investments II, LP, the secured lender to Pulser Media, Inc. and the Company ("***Iconical***"), is supportive of your continuing efforts and accordingly has agreed to permit Pulser and the Company to use proceeds of Iconical's collateral to pay up to an amount sufficient to fund the total Cash Bonus pool if the Company is unable to pay so you can take comfort in knowing that you will receive the Cash Bonus.

As a condition to the payment of the Cash Bonus, you will be required to execute and deliver a general release of claims in a form acceptable to the Company and/or Iconical, as applicable.

Nothing in this letter constitutes a contract for employment nor does anything in this letter change your "at-will" employment status with the Company or confer upon you any right to continue your employment with the Company for any period of specific duration or interfere with or otherwise restrict in any way the rights of the Company or you, which rights are hereby expressly reserved by each of you and the Company, to terminate your employment with the Company at any time and for any reason, with or without cause.

All of the provisions of this letter will be construed in accordance with the laws of the State of California, without reference to its conflicts of law principles. Furthermore, this letter contains the entire agreement of the parties with respect to the subject matter hereto and into which all prior agreements and negotiations are merged. The Company shall have the right to assign its rights and obligations under this letter agreement to any party which assumes the Company's obligations hereunder. This letter will be binding on each of your and the Company's heirs, successors and assigns. This letter may be executed in two or more counterparts, each of which will be deemed an original. For purposes hereof, a facsimile or PDF copy of this letter, including the signature pages hereto, will be deemed to be an original.

If the terms and conditions of this letter meet with your approval, please indicate such approval by signing where indicated below whereupon this letter will constitute a binding agreement between you and the Company.

Sincerely,

**Rdio, Inc.**

By:_____
Name:
Title:

**ACKNOWLEDGED AND AGREED:**

_____
Name:

<u>**EXHIBIT A**</u>

**DEFINITIONS**

For purposes of this letter:

(1) "***Change of Control***" means any of the following:

(i) the acquisition, directly or indirectly, in one transaction or a series of related transactions, by any person or group (within the meaning of Section 13(d)(3) of the Exchange Act) of the beneficial ownership of securities of Pulser or the Company possessing more than eighty percent (80%) of the total combined voting power of all outstanding securities of Pulser or the Company; *provided*, *however*, that a Change of Control shall not result upon such acquisition of beneficial ownership if it occurs as a result of a public offering of the securities of Pulser or the Company or any equity financing transaction or series of equity financing transactions;

(ii) the consummation of a merger, consolidation, reorganization or share exchange involving Pulser or the Company or an acquisition of Pulser or the Company by another entity pursuant to which shares of capital stock of Pulser or the Company are converted into cash or securities or other property of the acquiring entity or any of its subsidiaries or parent entities, in each case which results in the holders of voting securities (excluding securities of the surviving entity held by holders of the capital stock of Pulser or the Company acquired by means other than the exchange or conversion of the capital stock of Pulser or the Company for securities of the surviving entity) of Pulser or the Company immediately prior to such merger, consolidation, share exchange, reorganization or other transaction beneficially owning, directly or indirectly, less than eighty percent (80%) of the combined voting power of the surviving entity resulting from such transaction; or

(iii) the sale, transfer or other disposition (in one or a series of related transactions) of all or substantially all of the shares of stock or assets of Pulser or the Company (which for clarity will include, without limitation, any transaction pursuant to which the assets comprising the Rdio music service (and its associated software code and ingestion technology), whether or not including its associated content licenses or strategic business agreements, are transferred to a third party).

(2) "***permanent disability***" means if, for physical or mental reasons, you are, with reasonable accommodation, unable to perform the essential functions of your job duties for a period of 90 consecutive days or 180 days in the aggregate during any 12-month period.

# EXHIBIT "2"

Rdio, Inc.
1550 Bryant Street, Ste. 220
San Francisco, CA 91403

November 2, 2015

_____

Re:     **Cash Incentive Bonus**

Dear _____:

I am pleased to inform you that to facilitate an appropriate incentive program to properly compensate our hard working employees and to position the Company to consummate a successful Change of Control, Rdio, Inc. (the "***Company***") has adopted a cash incentive bonus plan subject to the terms and conditions set forth in this letter. Capitalized terms used but not otherwise defined in this letter will have the meanings ascribed to such terms in <u>Exhibit A</u> attached hereto.

It is intended that payments under the cash incentive bonus plan will be contingent upon and will incentivize and reward the maximization of value in a Change of Control as measured by the cash or other proceeds generated by such Change of Control and increases in overall stakeholder recoveries.

Specifically, if (a) Pulser Media, Inc. ("***Pulser***") and/or the Company consummate a Change of Control at any time following the date of this letter, <u>*and*</u> (b) you continue to be employed by the Company through the closing date of such Change of Control (the "***Closing Date***"), <u>*and*</u> (c) no less than $50 million of gross sale proceeds are received by Pulser and/or the Company or its designees (the "***Gross Proceeds Target***"), you will receive a cash bonus in the amount of $100,000 less any amounts required or authorized to be withheld by law (the "***Cash Bonus***"), payable on or before the seventh (7th) business day following the Closing Date (the "***Payment Date***"). The amount of the Cash Bonus will be tied to the achievement of and any increases to the Gross Proceeds Target. You and all other executives reporting directly to Anthony Bay will be measured against the same target and will receive the same corresponding Cash Bonus amount.

If, prior to the Closing Date, (a) you terminate your employment with the Company for any reason; (b) your employment is terminated by the Company for Cause; or (c) there occurs your death or permanent disability, then you (including your heirs, successors and assigns) will not be entitled to the Cash Bonus. If Pulser and/or the Company enter into a definitive binding agreement with respect to a Change of Control (the execution date of such definitive binding agreement will be referred to as the "***Execution Date***"), <u>*and*</u> such Change of Control is consummated at any time following the Execution Date, <u>*and*</u> your employment is terminated by the Company without Cause (not including your death or permanent disability) at any time following the Execution Date but prior to the Closing Date, the Company agrees to nevertheless pay you the Cash Bonus within seven (7) business days following the Closing Date.

Iconical Investments II, LP, the secured lender to Pulser Media, Inc. and the Company ("***Iconical***"), is supportive of your continuing efforts and accordingly has agreed to permit Pulser and the Company to use proceeds of Iconical's collateral generated from such Change of Control transaction to pay up to an amount sufficient to fund the total Cash Bonus pool if the Company is unable to pay.

In view of the foregoing, you can take comfort in knowing that you will receive the Cash Bonus.

As a condition to the payment of the Cash Bonus, you will be required to execute and deliver a general release of claims in a form reasonably acceptable to the Company and/or Iconical, as applicable.

Nothing in this letter constitutes a contract for employment nor does anything in this letter change your "at-will" employment status with the Company or confer upon you any right to continue your employment with the Company for any period of specific duration or interfere with or otherwise restrict in any way the rights of the Company or you, which rights are hereby expressly reserved by each of you and the Company, to terminate your employment with the Company at any time and for any reason, with or without Cause.

All of the provisions of this letter will be construed in accordance with the laws of the State of California, without reference to its conflicts of law principles. Furthermore, this letter contains the entire agreement of the parties with respect to the subject matter hereto and into which all prior agreements and negotiations are merged. The Company shall have the right to assign its rights and obligations under this letter agreement to any party which assumes the Company's obligations hereunder. This letter will be binding on each of your and the Company's heirs, successors and assigns. This letter may be executed in one or more counterparts, each of which will be deemed an original. For purposes hereof, a facsimile or PDF copy of this letter, including the signature pages hereto, will be deemed to be an original.

If the terms and conditions of this letter meet with your approval, please indicate such approval by signing where indicated below whereupon this letter will constitute a binding agreement between you and the Company.

Sincerely,

**Rdio, Inc.**

By:_____
Name:
Title:

**ACKNOWLEDGED AND AGREED:**

_____
Name: _____

**ACKNOWLEDGED AND AGREED WITH RESPECT TO THE FIFTH PARAGRAPH:**

By:_____
Name: _____
Iconical Investments II, LP
An Authorized Signatory

<u>**EXHIBIT A**</u>

**DEFINITIONS**

For purposes of this letter:

(1) "***Cause***" means any of the following:

(i) your engaging in any act of fraud, theft, embezzlement, or any other act of willful misconduct that causes material harm or injury to, or is contrary to the best interests of, the Company and/or any of its affiliates;

(ii) your unreasonable neglect or refusal to perform any of the duties and responsibilities: (A) assigned to you by the Board of Directors of the Company (the "***Board***") (or of the board of directors of Pulser) or your direct supervisor, (B) assigned to you pursuant to any employment agreement or other agreement that you now have or later will have with the Company and/or any of its affiliates, and/or (C) otherwise associated with your position, but in each case only upon your failure to perform the subject duties and responsibilities for 30 days following written notice from the applicable board of directors or supervisor of such neglect or refusal;

(iii) your failure to carry out any reasonable directive of the Board (or of the board of directors of Pulser) concerning the operations of the Company or its affiliates, but only upon your failure to carry out the directive for 30 days following written notice from the applicable board of directors or supervisor of such failure;

(iv) your engaging in any act of dishonesty, disloyalty, or moral turpitude in connection with your responsibilities to the Company and/or any of its affiliates as an employee, officer, director, or otherwise;

(v) your conviction for any felony, including any plea of guilty or nolo contendere; or

(vi) your material violation of any policies or procedures of the Company and/or any of its affiliates (including, without limitation, policies relating to confidentiality and reasonable workplace conduct) for 30 days following written notice from the applicable board of directors or supervisor of such violation;

(2) "***Change of Control***" means any of the following:

(i) the acquisition, directly or indirectly, in one transaction or a series of related transactions, by any person or group (within the meaning of Section 13(d)(3) of the Exchange Act) of the beneficial ownership of securities of Pulser or the Company possessing more than eighty percent (80%) of the total combined voting power of all outstanding securities of Pulser or the Company; *provided*, *however*, that a Change of Control shall not result upon such acquisition of beneficial ownership if it occurs as a result of a public offering of the securities of Pulser or the Company or any equity financing transaction or series of equity financing transactions that occurs more than ninety (90) days after the date hereof;

(ii) the consummation of a merger, consolidation, reorganization or share exchange involving Pulser or the Company or an acquisition of Pulser or the Company by another entity pursuant to which shares of capital stock of Pulser or the Company are converted into cash or securities or other property of the acquiring entity or any of its subsidiaries or parent entities, in each case which results in the holders of voting securities (excluding securities of the surviving entity held by holders of the capital stock of Pulser or the Company acquired by means other than the exchange or conversion of the capital stock of Pulser or the Company for securities of the surviving entity) of Pulser or the Company immediately prior to such merger, consolidation, share exchange, reorganization or other transaction beneficially owning, directly or indirectly, less than eighty percent (80%) of the combined voting power of the surviving entity resulting from such transaction; or

(iii) the sale, transfer or other disposition (in one or a series of related transactions) of all or substantially all of the shares of stock or assets of Pulser or the Company (which for clarity will include, without limitation, any transaction pursuant to which the assets comprising the Rdio music service (namely, the associated software code and ingestion technology), whether or not including its associated content licenses or strategic business agreements, and whether or not such assets are transferred as a going concern, are transferred to a third party).

(3) "*permanent disability*" means if, for physical or mental reasons, you are, with reasonable accommodation, unable to perform the essential functions of your job duties for a period of 90 consecutive days or 180 days in the aggregate during any 12-month period.

# EXHIBIT "3"

Rdio, Inc.
1550 Bryant Street, Ste. 200
San Francisco, CA 91403

November 16, 2015

Re:     **Cash Incentive Bonus**

Dear [Name]:

I am pleased to inform you that to facilitate an appropriate incentive program to properly compensate our hard working employees and to position the Company to consummate a successful Change of Control, Rdio, Inc. (the "***Company***") has adopted a cash incentive bonus plan subject to the terms and conditions set forth in this letter. Capitalized terms used but not otherwise defined in this letter will have the meanings ascribed to such terms in Exhibit A attached hereto. This letter agreement amends and restates the prior versions of this letter, between you and Rdio, Inc., dated October 22, 2015 and November __, 2015.

It is intended that payments under the cash incentive bonus plan will be contingent upon and will incentivize and reward the maximization of value in a Change of Control as measured by the cash or other proceeds generated by such Change of Control and increases in overall stakeholder recoveries.

Specifically, if (a) Pulser Media, Inc. ("***Pulser***") and/or the Company consummate a Change of Control at any time following the date of this letter, _and_ (b) you continue to be employed by the Company through the closing date of such Change of Control (the "***Closing Date***"), _and_ (c) no less than $50 million of gross sale proceeds are received by Pulser and/or the Company or its designees (the "***Gross Proceeds Target***"), you will receive a cash bonus in the amount of $100,000 less any amounts required or authorized to be withheld by law (the "***Cash Bonus***"), payable on or before the seventh (7th) business day following the Closing Date (the "***Payment Date***"). The amount of the Cash Bonus will be tied to the achievement of and any increases to the Gross Proceeds Target. You and all other executives reporting directly to Anthony Bay will be measured against the same target and will receive the same corresponding Cash Bonus amount.

If, prior to the Closing Date, (a) you terminate your employment with the Company for any reason; (b) your employment is terminated by the Company for Cause; or (c) there occurs your death or permanent disability, then you (including your heirs, successors and assigns) will not be entitled to the Cash Bonus. If Pulser and/or the Company enter into a definitive binding agreement with respect to a Change of Control (the execution date of such definitive binding agreement will be referred to as the "***Execution Date***"), _and_ such Change of Control is consummated at any time following the Execution Date, _and_ your employment is terminated by the Company without Cause (not including your death or permanent disability) at any time following the Execution Date but prior to the Closing Date, the Company agrees to nevertheless pay you the Cash Bonus within seven (7) business days following the Closing Date.

In addition to the Cash Bonus and as recognition of your significant contributions to the Company's restructuring and sale, if the Company realizes Gross Proceeds of $52,500,000 million or greater in a Change of Control, you will receive an additional cash payment in an amount equal to the greater of (i) $[_____] and (ii) [__]% of your then-current base annual salary (the "***Incremental Bonus Opportunity***"). The Incremental Bonus Opportunity will be paid to you within seven (7) business days following the Closing Date.

Iconical Investments II, LP, the secured lender to Pulser Media, Inc. (or any subsequent successors and assigns) and the Company ("*Iconical*"), is supportive of your continuing efforts and accordingly has agreed to permit Pulser and the Company to use gross proceeds of Iconical's collateral generated from such Change of Control Transaction to pay  up to an amount sufficient to fund the total Cash Bonus pool, including the Incremental Bonus Opportunity, in each case if the Company is unable to pay. Iconical agrees to consider any of your payment timing requests in its good faith sole discretion with the aim of optimizing the tax treatment to you of any payments to you hereunder.

As a condition to the payment of the Cash Bonus, including the Incremental Bonus Opportunity, you will be required to execute and deliver a general release of claims in a form reasonably acceptable to the Company and/or Iconical, as applicable and substantially in the form as attached hereto.

Nothing in this letter constitutes a contract for employment nor does anything in this letter change your "at-will" employment status with the Company or confer upon you any right to continue your employment with the Company for any period of specific duration or interfere with or otherwise restrict in any way the rights of the Company or you, which rights are hereby expressly reserved by each of you and the Company, to terminate your employment with the Company at any time and for any reason, with or without Cause.

All of the provisions of this letter will be construed in accordance with the laws of the State of California, without reference to its conflicts of law principles. Furthermore, this letter contains the entire agreement of the parties with respect to the subject matter hereto and into which all prior agreements and negotiations are merged. The Company shall have the right to assign its rights and obligations under this letter agreement to any party which assumes the Company's obligations hereunder. This letter will be binding on each of your and the Company's heirs, successors and assigns. This letter may be executed in one or more counterparts, each of which will be deemed an original.  For purposes hereof, a facsimile or PDF copy of this letter, including the signature pages hereto, will be deemed to be an original.

If the terms and conditions of this letter meet with your approval, please indicate such approval by signing where indicated below whereupon this letter will constitute a binding agreement between you and the Company.

Sincerely,

**Rdio, Inc.**


By:_____
Name:
Title:

**ACKNOWLEDGED AND AGREED:**


_____
Name: _____

**ACKNOWLEDGED AND AGREED WITH RESPECT TO THE SIXTH PARAGRAPH:**


By: _____

Name: _____

Iconical Investments II, LP

An Authorized Signatory

**EXHIBIT A**

**DEFINITIONS**

For purposes of this letter:

(1) "***Cause***" means any of the following:

(i) your engaging in any act of fraud, theft, embezzlement, or any other act of willful misconduct that causes material harm or injury to, or is contrary to the best interests of, the Company and/or any of its affiliates;

(ii) your unreasonable neglect or refusal to perform any of the duties and responsibilities: (A) assigned to you by the Board of Directors of the Company (the "***Board***") (or of the board of directors of Pulser) or your direct supervisor, (B) assigned to you pursuant to any employment agreement or other agreement that you now have or later will have with the Company and/or any of its affiliates, and/or (C) otherwise associated with your position, but in each case only upon your failure to perform the subject duties and responsibilities for 30 days following written notice from the applicable board of directors or supervisor of such neglect or refusal;

(iii) your failure to carry out any reasonable directive of the Board (or of the board of directors of Pulser) concerning the operations of the Company or its affiliates, but only upon your failure to carry out the directive for 30 days following written notice from the applicable board of directors or supervisor of such failure;

(iv) your engaging in any act of dishonesty, disloyalty, or moral turpitude in connection with your responsibilities to the Company and/or any of its affiliates as an employee, officer, director, or otherwise;

(v) your conviction for any felony, including any plea of guilty or nolo contendere; or

(vi) your material violation of any policies or procedures of the Company and/or any of its affiliates (including, without limitation, policies relating to confidentiality and reasonable workplace conduct) for 30 days following written notice from the applicable board of directors or supervisor of such violation;

(2) "***Change of Control***" means any of the following:

(i) the acquisition, directly or indirectly, in one transaction or a series of related transactions, by any person or group (within the meaning of Section 13(d)(3) of the Exchange Act) of the beneficial ownership of securities of Pulser or the Company possessing more than eighty percent (80%) of the total combined voting power of all outstanding securities of Pulser or the Company; *provided*, *however*, that a Change of Control shall not result upon such acquisition of beneficial ownership if it occurs as a result of a public offering of the securities of Pulser or the Company or any equity financing transaction or series of equity financing transactions that occurs more than ninety (90) days after the date hereof;

(ii) the consummation of a merger, consolidation, reorganization or share exchange involving Pulser or the Company or an acquisition of Pulser or the Company by another entity pursuant to which shares of capital stock of Pulser or the Company are converted into cash or securities or other property of the acquiring entity or any of its subsidiaries or parent entities, in each case which results in the holders of voting securities (excluding securities of the surviving entity held by holders of the capital stock of Pulser or the Company acquired by means other than the exchange or conversion of the capital stock of Pulser or the Company for securities of the surviving entity) of Pulser or the Company immediately prior to such merger, consolidation, share exchange, reorganization or other transaction beneficially owning, directly or indirectly, less than eighty percent (80%) of the combined voting power of the surviving entity resulting from such transaction; or

(iii) the sale, transfer or other disposition (in one or a series of related transactions) of all or substantially all of the shares of stock or assets of Pulser or the Company (which for clarity will include, without limitation, any transaction pursuant to which the assets comprising the Rdio music service (namely, the associated software code and ingestion technology), whether or not including its associated content licenses or strategic business agreements, and whether or not such assets are transferred as a going concern, are transferred to a third party).

(3) "*permanent disability*" means if, for physical or mental reasons, you are, with reasonable accommodation, unable to perform the essential functions of your job duties for a period of 90 consecutive days or 180 days in the aggregate during any 12-month period.

## FORM OF R E L E A S E

The undersigned, _____, in consideration of and as a precondition to the agreement by Rdio, Inc. (the "**Company**") to provide certain incentive payments to me as set forth in a letter dated November 16, 2015 and in my offer letter (as amended), for and on behalf of myself, my agents, heirs, executors, administrators, and assigns, do hereby release and forever discharge the Company and its successors and assigns, and all of its respective agents, directors, officers, partners, employees, representatives, insurers, attorneys, parent companies (including without limitation, Pulser Media, Inc.), subsidiaries, affiliates (including, without limitation, Iconical Investments LP and its affiliates and representatives), lenders (including, without limitation, Iconical Investments II LP and its affiliates and representatives) and joint venturers, and each of them, from any and all claims, counterclaims, demands, actions, causes of action, liabilities, damages, costs, loss of services, expenses, compensation, third-party actions, suits at law or equity, under common law, state or federal law, or any other law, or otherwise (collectively, "**Claims**") that are based upon acts or events that occurred on or before the date on which this Release becomes enforceable, including any Claims arising under any state or federal statute or common law, including without limitation all claims relating to my employment with the Company and the termination thereof, and all claims for or under, among other things, Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. sections 2000e, et seq.), the Fair Labor Standards Act, including the Equal Pay Act (29 U.S.C. section 206(d) and interpretive regulations), the Employment Retirement Income Security Act of 1974 (29 U.S.C. sections 100, et seq.), the Family and Medical Leave Act (29 U.S.C. sections 2601, et seq. and 29 C.F.R. Part 825), the Americans with Disabilities Act (42 U.S.C. sections 12101, et seq.), the Age Discrimination in Employment Act, including the Older Worker Benefits Protection Act (29 U.S.C. sections 623, et seq.), the Worker Adjustment and Retraining Notification Act (29 U.S.C. sections 2101, et seq.), the California Fair Employment and Housing Act (California Government Code sections 12940, et seq.), the California Family Rights Act (California Government Code section 12945.2), the California Labor Code (expressly including Sections 203, 206, 218.5 and the Equal Pay Act, Section 1197.5), the United States and California Constitutions, and any other federal or state law, whether statutory or common law.

I acknowledge and agree that this Release constitutes a voluntary waiver of any and all rights and claims I may have as of this date, including rights or claims arising under the ADEA. I have waived rights or claims pursuant to this Release in exchange for consideration, the value of which exceeds payment or remuneration to which I was entitled, and one-eighth of the consideration paid to me is attributable to this ADEA portion of the Release. I have been advised that I may consult with the attorney of my choosing concerning this Release prior to executing it. I also have been allowed a period of at least twenty-one (21) days to consider the terms of this Release, and in the event I decide to execute this Agreement in fewer than twenty-one (21) days, I have done so with the express understanding that I have been given and declined the opportunity to consider this Release for a full twenty-one (21) days. I also understand that I may revoke the release contained in this Paragraph only (regarding claims under the ADEA), at any time during the seven (7) days following the date of execution of this Agreement, and the release contained in this Paragraph only shall not become effective or enforceable until such revocation period has expired.

I am familiar with section 1542 of the California Civil Code, which reads as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

I am releasing unknown claims and waive all rights I have or may have under Civil Code Section 1542 or under any other statute or common law principle of similar effect. However, I am not waiving any rights or claims (i) that may arise out of acts or events that occur after the date on which I sign this Release, (ii) for unemployment compensation and workers' compensation, (iii) claims for health insurance benefits under the Consolidated Omnibus Budget Reconciliation Act (COBRA), (iv) with respect to vested benefits under a pension or retirement plan governed by the Employee Retirement Income Security Act, and (iv) any claims that, as a matter of applicable law, are not waivable or otherwise subject to release.

While employed by the Company, I have had access to trade secrets, financial information, and other proprietary or confidential information pertaining to the Company and its customers, and I executed and delivered to the Company that certain Employee Proprietary Information and Inventions Agreement (the "**Employee Inventions Agreement**"). I acknowledge and understand that the Employee Inventions Agreement survives termination of my employment and continues to be binding on me notwithstanding this Release. I will not communicate or disclose any such information to any person, employer, or other entity at any time in the future unless required or asked to do so by an officer of the Company.

I agree to refrain from taking actions or making statements, written or oral, that might disparage or defame the goodwill or reputation of the Company and/or its directors, officers, executives and employees or that could adversely affect the morale of other employees of the Company.

While employed by the Company, I have received certain property, including, but not limited to, computer data and computer. In regards to my computer, I will erase all Rdio related files on my last day of employment, but will otherwise retain the computer. As a further condition of this agreement, I agree promptly to return in good condition any and all property in my possession belonging to the Company other than my computer.

I have read this Release and understand all of its terms. I also have had the opportunity to consult with the counsel of my choice. I acknowledge and agree that the released parties described above are third party beneficiaries of this Release having the rights set forth herein as if they were direct parties hereto. I execute this Release voluntarily and with full knowledge of its significance, and I understand that this Release will be governed by California law.

Signed at _____, California, this ___ day of _____, 2015.


_____
[Name]