1  RON BENDER (SBN 143364)
   PHILIP A. GASTEIER (SBN 130043)
2  MONICA Y. KIM (SBN 180139)
   KRIKOR J. MESHEFEJIAN (SBN 255030)
3  LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
   10250 Constellation Boulevard, Suite 1700
4  Los Angeles, California 90067
   Telephone: (310) 229-1234
5  Facsimile: (310) 229-1244
   Email: rb@lnbyb.com; pag@lnbyb.com; myk@lnbyb.com;
6  kjm@lnbyb.com

7  Proposed Attorneys for Chapter 11 Debtor and Debtor in Possession

8

9

10              **UNITED STATES BANKRUPTCY COURT**

11              **NORTHERN DISTRICT OF CALIFORNIA**

12              **SAN FRANCISCO DIVISION**

13

14  In re                           ) Case No.: 15
                                     )
15  RDIO, INC.,                      ) Chapter 11
                                     )
16              Debtor.              ) **APPLICATION OF DEBTOR AND**
                                     ) **DEBTOR IN POSSESSION TO EMPLOY**
17                                   ) **MOELIS & COMPANY AS FINANCIAL**
                                     ) **ADVISOR TO DEBTOR PURSUANT TO**
18                                   ) **11 U.S.C. §§ 327, 328 AND 330**
                                     )
19                                   )
                                     ) Date:   December 10, 2015
20                                   ) Time:   10:00 a.m.
                                     ) Place:  U.S Bankruptcy Court
21                                   )         Courtroom 22
                                     )         235 Pine St., 23rd Floor
22                                   )         San Francisco, CA 94101
                                     ) Judge:  The Hon. Dennis Montali
23                                   )
                                     )
24                                   )
                                     )
25  _____ )

26

27

28

Rdio, Inc., the debtor and debtor in possession in the above-captioned chapter 11 bankruptcy case (the "Debtor") files this application (the "Application") pursuant to sections 327(a) and 328(a) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 2014(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order, substantially in the form attached hereto as Exhibit A, (a) authorizing the employment and retention of Moelis & Company LLC ("Moelis") as financial advisor to the Debtor in accordance with the terms and conditions of that certain engagement letter, dated as of November 13, 2015 (the "Engagement Letter"), attached hereto and made a part hereof as Exhibit B and (b) granting related relief. In support of this Application, the Debtor submits. In further support of this Application, the Debtor respectfully represents as follows:

**A.    Jurisdiction and Venue**

1.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. sections 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. section 157(b). Venue for this matter is proper in this district pursuant to 28 U.S.C. sections 1408 and 1409.

**B.    Background**

2.    The Debtor filed a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on November 16, 2015 (the "Petition Date"). The Debtor continues to operate its business, manage its financial affairs and operate its bankruptcy estate as a debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

**C.    The Debtor's Business**

3.    The Debtor was founded in 2008 as a digital music service. The Debtor's business operations were launched in 2010 after the Debtor secured requisite licenses from the applicable holders of music rights. Since that time, the Debtor has strived to grow into a worldwide music service, and today is in 86 countries.

4.    One of the services provided by the Debtor is an unlimited, on demand music streaming service where for $9.99 per month, the user has access to an entire library of songs with the access to them through a computer, mobile device, etc. In other words, the Debtor's business model is based upon a monthly recurring subscription model for full access to content

rather than on an owned a la carte download model. The Debtor also makes available other subscription tiers at lower costs per month with varying service offerings or functionality (e.g., a family tier, a student tier, and a select tier with alternative functionality). The Debtor generates approximately $1.5 million of monthly revenue from its U. S. monthly subscription service.

5. While the Debtor's monthly subscription service provides the Debtor with its primary revenue source, the Debtor also generates approximately $100,000-$150,000 of monthly revenue from advertisers who advertise in the Debtor's advertising based service offerings. The Debtor therefore currently generates approximately $1.6-$1.65 million of total monthly revenue.

6. The Debtor's primary assets consist of the Debtor's (i) owned technology (e.g., website, mobile apps, content ingestion technology, reporting technology, software, data bases, etc.), (ii) content license agreements, (iii) subscriber agreements, (iv) employee talent pool, and (v) good will.

7. Under its current operating business model, the Debtor has monthly operating expenses of approximately $3.5 to $4.0 million, comprising primarily payroll for the Debtor's approximately 140 employees (much of which represents the cost of retaining high caliber Silicon Valley engineering talent), payment to the owners of music rights, costs of maintaining the service, rent, marketing costs, business development costs, technology maintenance costs, and foreign administrative expenses. With average monthly total revenue of approximately $1.6-$1.65 million and average monthly operating expenses of $3.5-$4.0 million, the Debtor's business operations under its current operating business model result in operating losses of approximately $1.85-$2.4 million per month, and the Debtor no longer has the economic means of funding such significant operating cash flow shortfall.

8. The Debtor has approximately $190,237,000 of secured debt and approximately $30 million of unsecured debt. A material portion of the secured debt is owed to Pulser Media, Inc. ("Pulser Media"), which is the majority owner of the Debtor (owning approximately 79% of the Debtor's equity interests) and has a security interest in substantially all of the Debtor's

assets.  The remaining portion of the secured debt, $4,213,467, is owed to Iconical Investments II LP, which also holds a security interest in substantially all assets of the Debtor.

**D.      The Proposed Asset Sale**

9.      Moelis was initially engaged by Pulser Media in September 2014, with the goal of attempting to raise new equity capital.  However, it ultimately became clear that raising new equity capital was not feasible.  At that point, Pulser Media charged Moelis with finding either a buyer or merger partner for the Debtor because the Debtor was not going to be able to continue to fund such significant operating losses indefinitely.

10.      After conducting an extremely broad marketing process, the highest and best offer received by the Debtor was negotiated as an all cash offer from Pandora Media, Inc., ("Pandora") in the amount of $75 million plus certain other consideration, to acquire the Debtor's technological assets.  Pandora requested to effectuate a purchase pursuant to a sale under 11 U.S.C. § 363.  Pandora, however, agreed that the Debtor could and should market Pandora's offer for overbid to ensure that the highest and best price is paid for the Debtor's assets/business.  At that point, Moelis and Pulser Media mutually terminated their prior engagement and Moelis was retained by the Debtor for the purpose of marketing the Debtor's assets/business for overbid and to assist the Debtor in conducting an auction process in the event of any successful overbids.

11.      Pandora has conditioned its offer on the court entering orders (i) approving bid procedures for any overbid by December 1, 2015 and (ii) approving the Debtor's technological asset sale by December 23, 2015.  Moelis believes that this is a sufficient amount of time to conduct an overbid process, particularly given the breadth of Moelis' pre-bankruptcy market process and Moelis' in-depth knowledge of this industry and prospective overbidders.

**E.      Moelis' Qualifications**

12.      Moelis was founded in 2007 and is a wholly owned subsidiary of Moelis & Company Holdings LLC.  Moelis & Company Holdings LLC, together with its subsidiaries, has approximately 650 employees located in New York, Los Angeles, Boston, Chicago, Houston,

Palo Alto, Washington D.C., Paris, London, Frankfurt, Sydney, Melbourne, Hong Kong, Beijing, Mumbai, and Dubai.

13. Moelis provides a broad range of financial advisory services to its clients, including: (a) general corporate finance; (b) mergers, acquisitions, and divestitures; (c) corporate restructurings; (d) special committee assignments; and (e) capital raising. Moelis and its senior professionals have extensive experience in the reorganization and restructuring of distressed companies, both out-of-court and in chapter 11 cases, including in providing financial and strategic advice to its clients in the media and technology industry. Moelis has extensive experience in the valuation of media and technology assets. Moelis' business reorganization professionals have served as financial advisors in numerous cases, including: *In re Quicksilver Resources Inc.*, No. 15-10585 (LSS) (Bankr. D. Del. May 8, 2015); *In re Allied Nevada Gold Corp.*, No. 15-10503 (MFW) (Bankr. D. Del. April 15, 2015); *In re ITR Concession Company LLC*, No. 14-34284 (Bankr. N.D. Ill. Oct. 28, 2014); *In re GSE Environmental, Inc.*, No. 14-11126 (MFW) (Bankr. D. Del. May 30, 2014); *In re MACH Gen, LLC*, No. 14-10461 (MFW) (Bankr. D. Del. Apr. 11, 2014); *In re Sorenson Commc'ns, Inc.*, No. 14-10454 (BLS) (Bankr. D. Del. Mar. 25, 2014); *In re Sbarro LLC*, No. 14-10557 (MG) (Bankr. D. Del. April 7, 2014); *In re Cengage Learning, Inc.*, No. 13-44106 (ESS) (Bankr. E.D.N.Y. Sept. 13, 2013); *In re OSH 1 Liquidating Corp. f/k/a Orchard Supply Hardware Stores Corp.*, No. 13-11565 (CSS) (Bankr. D. Del. July 15, 2013); *In re Revel AC, Inc.*, No. 13-16253 (JHW) (Bankr. D.N.J. Apr. 17, 2013); *In re AMF Bowling Worldwide, Inc.*, No. 12-36495 (KRH) (Bankr. E.D. Va. Dec. 20, 2012); *In re Residential Capital, LLC*, No. 12-12020 (MG) (Bankr. S.D.N.Y. Aug. 30, 2012); *In re AMR Corp.*, No. 11-15463 (SHL) (Bankr. S.D.N.Y. Mar. 7, 2012); *In re NewPage Corp.*, No. 11-12804 (KG) (Bankr. D. Del. Dec. 27, 2011); *In re Gen. Maritime Corp.*, No. 11-15285 (MG) (Bankr. S.D.N.Y. Dec. 15, 2011); *In re Jackson Hewitt Tax Serv., Inc.*, No. 11-11587 (MFW) (Bankr. D. Del. June 30, 2011); *In re Appleseed's Intermediate Holdings LLC*, No. 11-10160 (KG) (Bankr. D. Del. Feb. 23, 2011); *In re Innkeepers USA Trust*, No. 10-13800 (SCC) (Bankr. S.D.N.Y. Aug. 12, 2010); *In re Almatis B.V.*, No. 10-12308 (MG) (Bankr. S.D.N.Y. June 9, 2010); *In re Atrium Corp.*,

No. 10-10150 (BLS) (Bankr. D. Del. Mar. 17, 2010); *In re Int'l Aluminum Corp.*, No. 10-10003 (MFW) (Bankr. D. Del. Jan. 27, 2010); *In re Reader's Digest Ass'n Inc.*, No. 09-23529 (RDD) (Bankr. S.D.N.Y. Aug. 24, 2009); *In re NV Broad. LLC*, No. 09-12473 (KG) (Bankr. D. Del. Aug. 5, 2009); *In re Fontainebleau Las Vegas Holdings, LLC*, No. 09-21481 (AJC) (Bankr. S.D. Fla. Nov. 25, 2009); *In re ION Media Networks Inc.*, No. 09-13125 (JMP) (Bankr. S.D.N.Y. July 13, 2009); *In re JGW Holdco, LLC f/k/a J.G. Wentworth LLC*, No. 09-11731 (CSS) (Bankr. D. Del. June 16, 2009); *In re Source Interlink Cos.*, No. 09-11424 (KG) (Bankr. D. Del. May 21, 2009); *In re Dayton Superior Corp.*, No. 09-11351 (BLS) (Bankr. D. Del. May 18, 2009); *In re Idearc Inc.*, No. 09-31828 (BJH) (Bankr. N.D. Tex. May 27, 2009); *In re Muzak Holdings LLC*, No. 09-10422 (KJC) (Bankr. D. Del. Apr. 6, 2009); *In re Chemtura Corp.*, No. 09-11233 (REG) (Bankr. S.D.N.Y. Mar. 18, 2009); *In re Old AII, Inc. f/k/a Aleris Int'l Inc.*, No. 09-10478 (BLS) (Bankr. D. Del. Mar. 16, 2009); *In re XMH Corp. f/k/a Hartmarx Corp.*, No. 09-02046 (BWB) (Bankr. N.D. Ill. Mar. 4, 2009); *In re Lyondell Chemical Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 6, 2009). [1]

**F.**       **The Need To Employ A Financial Advisor.**

14.       The Debtor has selected Moelis as its financial advisor based upon, among other things: (a) the Debtor's need to retain a skilled financial advisory and investment banking firm to provide advice with respect to the Debtor's bankruptcy proceeding; (b) Moelis' extensive experience and excellent reputation in providing financial advisory and investment banking services in chapter 11 cases such as these; and (c) Moelis' extensive knowledge of the Debtor, as described below.  For these reasons, the Debtor requires the services of a capable and experienced financial advisor such as Moelis.

15.       Moelis began interacting with the Debtor in September 2014, when it was engaged by Pulser Media to act as placement agent and financial advisor in connection with a potential financing transaction or sale transaction, respectively.  In providing services to Pulser

---

[1]    Because of the voluminous nature of the orders cited herein, such orders are not attached to this Application.  Copies of these orders are available upon request of the Debtors' proposed counsel.

Media, Moelis worked closely with the Debtor's management and became well-acquainted with the Debtor's assets, business, capital structure, financial affairs, and related matters. Moelis therefore will not need to spend time or resources to "get up to speed" in the Debtor's case. The experience Moelis gained before the Petition Date will help Moelis better assist the Debtor post-petition in conducting the overbid process. Accordingly, and as more fully set forth in the Jimenez Declaration, the Debtor believes that Moelis is well qualified and able to represent the Debtor in this chapter 11 bankruptcy case.

16.     On November 13, 2015, Moelis was engaged by the Debtor for the purpose of marketing the Debtor's assets/business for an overbid and to assist the Debtor in conducting an auction process in the event of any successful overbids. In this regard, Moelis has been, or will be, providing, the following services, among others, to the Debtor in connection with their sale efforts and will, or will continue to, provide such services during the chapter 11 case at the request of the Debtor:

(a) assist the Debtor in conducting a business and financial analysis of the Debtor;

(b) assist the Debtor in identifying and contacting potential overbidders in connection with the auction sale and overbid process ("Auction Sale") expected to be conducted during the case, facilitate the due diligence process with prospective overbidders (including the execution of appropriate confidentiality agreements), maintain a log of potential overbidders who have been contacted and track their responses, advise potential overbidders of the overbid process, work with the Debtor to determine the financial qualifications of prospective overbidders who express an interest in participating in the Auction Sale, and assist the Debtor in conducting the Auction Sale. Moelis will meet with prospective overbidders and provide them such information about the Debtor as may be appropriate and acceptable to the Debtor, subject to customary business confidentiality;

(c) assist the Debtor in preparing any additional and appropriate marketing materials to distribute to prospective overbidders;

(d) assist the Debtor in negotiating the form of bid procedures order with Pandora and assist the Debtor in obtaining Bankruptcy Court approval of the bid procedures order, including reviewing pleadings prepared by the Debtor's counsel that are necessary for the Bankruptcy Court to approve the bid procedures order, and providing a declaration relating to Moelis' services and advice provided to the Debtor in connection with this agreement (and providing testimony in Bankruptcy Court regarding its services and advice) in support of the Debtor's motion for Bankruptcy Court approval of the bid procedures order;

(e) meet with the Debtor's management and Board of Directors, as requested, to discuss any proposed sale transaction and its financial implications; and

(f) assist the Debtor in obtaining Bankruptcy Court approval of the proposed asset sale to Pandora or to a successful overbidder, including reviewing pleadings prepared by the Debtor's counsel that are necessary for the Bankruptcy Court to approve the proposed asset sale and providing a declaration relating to Moelis' services and advice provided to the Debtor in connection with this agreement (and providing testimony in Bankruptcy Court regarding its services and advice) in support of the Debtor's sale motion.

17. As a result of its work with the Debtor, Moelis has developed valuable institutional knowledge regarding the Debtor's business, financial affairs, operations, capital structure, and other material information. Having worked with the Debtor's management and their other advisors, Moelis has developed relevant experience and expertise regarding the Debtor that will assist it in providing effective and efficient services in this chapter 11 case. Accordingly, the Debtor believes Moelis is well-qualified to represent it in a cost-effective,

efficient, and timely manner, and the Debtor submits that the employment and retention of Moelis is in the best interests of the Debtor, its creditors, and all parties in interest

18.     If the Debtor requests that Moelis perform services not contemplated by the Engagement Letter, Moelis and the Debtors will agree, in writing, on the terms for such services and seek the Court's approval thereof.

**G.     Fees And Terms Of Proposed Retention**

19.     Moelis' decision to advise and assist the Debtor in connection with this chapter 11 cases is subject to its ability to be retained in accordance with the terms of the Engagement Letter pursuant to section 328(a), and not section 330, of the Bankruptcy Code

20.     As set forth more fully in the Engagement Letter, and subject thereto, Moelis will be compensated as follows (the "Fee Structure"):  (a) a monthly fee of $100,000 (the "Monthly Fee") payable in advance of each month, through the conclusion of the Auction Sale; plus (b) at the closing of a Sale Transaction (as defined in the Engagement Agreement), a non-refundable cash fee (the "Sale Transaction Fee") of: (i) $2,250,000, plus (ii) 1.0% of Transaction Value (as defined in Annex A to the Engagement Agreement) in excess of $75 million up to and including $100 million; plus (iii) 2.5% of Transaction Value for amounts in excess of  $100 million.  The Monthly Fees shall not, under any circumstance, be less than $100,000 or more than $200,000.  The Sale Transaction Fee will be reduced by the amount of any Monthly Fees previously paid.

21.     If at any time prior to the expiration of 12 months following the termination of the Engagement Letter, the Debtor enters into an agreement that subsequently results in any Sale Transaction, or consummates any Sale Transaction, then the Debtor will pay Moelis the Sale Transaction Fee specified above in cash promptly upon the closing of any such Sale Transaction.

22.     In addition to any fees payable to Moelis, the Debtor will reimburse Moelis for all of its reasonable expenses as they are incurred in entering into and performing services under the Engagement Letter, including the costs of Moelis' outside counsel (without the need for such legal counsel to be retained as a professional in these chapter 11 cases and without

regard to whether such legal counsel's services satisfy section 330(a)(3)(C) of the Bankruptcy Code), provided that reimbursement for expenses exceeding $50,000 in the aggregate, and reimbursement for legal fees exceeding $50,000 in the aggregate, will each require the prior written consent of the Debtor (in each case, such consent not to be unreasonably withheld).

23.     Moelis intends to apply for compensation for professional services rendered and reimbursement of expenses incurred in connection with this chapter 11 case, subject to the Court's approval and in compliance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the U.S. Trustee Guidelines (as defined below), and any other applicable procedures and orders of the Court, including any order approving this Application (to the extent compliance is not waived) and consistent with the proposed compensation set forth in the Engagement Letter.

24.     Moelis will maintain records in support of any actual, necessary costs and expenses incurred in connection with the rendering of its services in these chapter 11 cases. However, because:  (a) it is not the general practice of investment banking firms such as Moelis to keep detailed time records similar to those customarily kept by attorneys; (b) Moelis does not ordinarily keep time records on a "project category" basis; and (c) Moelis' compensation is based on a fixed fee structure, the Debtor respectfully requests that only Moelis' restructuring professionals be required to maintain records in summary format containing reasonably detailed descriptions of those services provided to the Debtor. Moreover, the Debtor respectfully requests that Moelis' restructuring professionals not be required to keep time records on a "project category" basis, that its professionals not be required to maintain any time records, and that it not be required to provide or conform to any schedule of hourly rates.  To the extent that Moelis would otherwise be required to submit more detailed time records for its professionals by the Bankruptcy Code, the Bankruptcy Rules, the U.S. Trustee Guidelines or other applicable procedures and orders of the Court, the Debtor respectfully requests that this Court waive such requirements

25.     The Debtor believes the Fee Structure is consistent with, and typical of, compensation arrangements entered into by Moelis and other comparable firms in connection

with the rendering of similar services under similar circumstances, both in and out of bankruptcy proceedings. Based on discussions and arm's-length negotiations between Moelis and the Debtor, the Debtor believes that the Fee Structure is reasonable, market-based and designed to compensate Moelis fairly for its work

26. Moelis' strategic and financial expertise, as well as its capital markets knowledge, financing skills, and restructuring capabilities, some or all of which has and will be required by the Debtor during the term of Moelis' engagement, were important factors to the Debtor in determining the Fee Structure. The Debtor believes that the ultimate benefits of Moelis' services hereunder cannot be measured by reference to the number of hours to be expended by Moelis' professionals in the performance of such services. The Debtor and Moelis agreed upon the Fee Structure in anticipation that a substantial commitment of professional time and effort would be required of Moelis and in light of the fact that (a) such commitment could have and may still foreclose other opportunities for Moelis and (b) the actual time and commitment required of Moelis and its professionals to perform the requested services may vary substantially from week to week and month to month, creating "peak load" issues for Moelis.

27. Prior to the Petition Date, according to the Debtors' books and records, in the 90-day period before the Petition Date, the Debtors paid Moelis $100,000, which is the first month's advance payment to which Moelis is entitled under the Engagement Agreement, which advance payment will be held pending entry of an order approving Moelis engagement by the Debtor. As of the Petition Date, the Debtors do not owe Moelis any fees for services performed or expenses incurred under the Engagement Letter in excess of $10,000, which Moelis is holding on account for expenses incurred in connection with the Engagement Letter.[2] Moelis has not been paid any other amount as a retainer for its services to be rendered and expenses incurred by Moelis as financial advisor to the Debtor in the Debtor's chapter 11

---

[2] To the extent Moelis' prepetition expenses are less than $10,000, Moelis will, at the Debtor's option, either return such excess amounts to the Debtor or apply such amounts to Moelis' postpetition fees and expenses approved by the Court.

case, and will be compensated for such services and expenses pursuant to the terms of the Engagement Agreement.

28.     Prior to the Petition Date, Moelis received the total aggregate sum of $35,860.30 from Pulser Media for out-of-pocket expenses in connection with the search for a potential financing or sale transaction (the "Prior Compensation"). The Debtor is informed that the Prior Compensation paid to Moelis by Pulser Media was not derived from revenues generated by the Debtor. The Prior Compensation has been applied on account of fees and expenses incurred prior to this chapter 11 bankruptcy case. As explained above, Moelis and Pulser Media have mutually terminated their prior engagement and Moelis has been paid all compensation due to it under its prior engagement with Pulser Media. Moelis is therefore not entitled to receive any additional compensation from Pulser Media under any such prior engagement or otherwise.

29.     Moelis has not been paid any money by the Debtor or any other entity for services relating to the Debtor at any time other than the amounts described in paragraphs 26 and 27 above. Moelis has not received any lien or other interest in property of the Debtor or of a third party to secure payment of Moelis' fees or expenses in the Debtor's case.

30.     As part of the overall compensation payable to Moelis under the terms of the Engagement Letter, the Debtor has agreed to certain indemnification, contribution and reimbursement obligations, set forth in **Annex B** of the Engagement Letter (the "Indemnification Agreement"). The Indemnification Agreement provides, among other things, that the Debtor will indemnify and hold harmless Moelis, its affiliates and their respective current or former directors, officers, partners, managers, agents, representatives, or employees (each, an "Indemnified Person," and collectively, the "Indemnified Persons") from and against any losses, claims, damages or liabilities (collectively, "Losses") incurred by an Indemnified Person (A) related to or arising out of oral or written statements or omissions made or information provided by the Debtor or its agents or (B) otherwise arising out of, related to or in connection with the Engagement Letter or Moelis' performance, except that Clause (B) shall not apply to Losses that are

finally judicially determined to have resulted primarily from the bad faith or gross negligence of such Indemnified Person.

31.    The Engagement Letter's indemnification and contribution provisions were fully negotiated by the Debtor and Moelis at arm's-length and in good faith and the Debtor respectfully submits that these indemnification and contribution provisions of the Engagement Letter are reasonable.  The Debtor believes that the indemnification provisions in the Engagement Letter are appropriate and reasonable for financial advisory engagements both out of court and in chapter 11 cases.

**H.    No Duplication of Service**

32.    The Debtor believes that the services provided by Moelis will complement, not duplicate, the services that other professionals will be providing to the Debtor in this chapter 11 case.  Specifically, Moelis will carry out unique functions and will use reasonable efforts to coordinate with the Debtor and their professionals retained in this chapter 11 case to avoid the unnecessary duplication of services.

**I.    Moelis's Disinterestedness.**

33.    Moelis has reviewed the list of parties in interest provided by the Debtor.  To the best of the Debtor's knowledge, information, and belief, and except to the extent disclosed herein and in the Jimenez Declaration, Moelis:  (a) is a "disinterested person" within the meaning of section 101(14) of the Bankruptcy Code; (b) does not hold or represent an interest materially adverse to the Debtor's estates; and (c) has no connection to the Debtor, its creditors, or related parties herein except as disclosed in the Jimenez Declaration.  Although Moelis provided services to Pulser Media prior to the Petition Date, such prior representation does not present a conflict that bars Moelis's retention by the Debtor in connection with this chapter 11 case.  Although Moelis was engaged by Pulser Media as the majority shareholder of the Debtor, the services provided by Moelis inured to the benefit of the Debtor and its creditors in that the services involved an expansive effort to identify and complete a beneficial financing or sale transaction.  Further, Moelis and Pulser Media mutually agreed to terminate Moelis' engagement by Pulser Media prior to Moelis beginning its engagement with the Debtor to

pursue an overbid process in the Debtor's chapter 11 case. Given these facts, the Debtor's current retention of Moelis will insure efficiency and cost-effectiveness as a result of Moelis' familiarity with the Debtor and its business.

34.     Given the large number of parties in interest in this chapter 11 case, despite the efforts to identify and disclose Moelis' relationships with parties in interest in this chapter 11 case, Moelis is unable to state with certainty that every client relationship or other connection has been disclosed in the Jimenez Declaration. Moelis will make continued inquiries following the filing of the Application, on a periodic basis, with additional disclosures to this Court if necessary or otherwise appropriate.

35.     The Debtor is informed that Moelis will not share any compensation to be paid by the Debtors, in connection with services to be performed after the Petition Date, with any other person, other than principals and employees of Moelis, to the extent required by section 504 of the Bankruptcy Code.

36.     Notice of this Application will be filed and served as directed by the Court.

///
///
///
///
///
///
///
///
///
///
///
///
///
///

DocuSign Envelope ID: 1DF69413-6146-4A87-9FDE-75FB8B986BF0

1

2          **WHEREFORE**, the Debtor respectfully requests entry of an order, substantially in the

3   form attached hereto as Exhibit A.

4

5   Dated: November ___, 2015          Rdio, Inc.

6                                      _____
                                       By:    Elliott Peters
7                                      Its: Senior Vice President and General Counsel

8   Submitted by:

9   LEVENE, NEALE, BENDER, YOO
10       & BRILL, L.L.P.

11  By:_____
        RON BENDER
12      PHILIP A. GASTEIER
        MONICA Y. KIM
13      KRIKOR J. MESHEFEJIAN
    Proposed Attorneys for Chapter 11 Debtor
14  and Debtor in Possession

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**WHEREFORE**, the Debtor respectfully requests entry of an order, substantially in the form attached hereto as Exhibit A.

Dated: November 18, 2015                 Rdio, Inc.

_____
By:      Elliott Peters
Its: Senior Vice President and General Counsel

Submitted by:

LEVENE, NEALE, BENDER, YOO
   & BRILL L.L.P.

By:___*/s/ Philip A. Gasteier*_____
         RON BENDER
         PHILIP A. GASTEIER
         MONICA Y. KIM
         KRIKOR J. MESHEFEJIAN
Proposed Attorneys for Chapter 11 Debtor
and Debtor in Possession

1

**Exhibit A**

2

**Proposed Order**

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re | ) Case No.: 15 |
| | ) |
| RDIO, INC., | ) Chapter 11 |
| | ) |
|            Debtor. | ) **ORDER AUTHORIZING THE** |
| | ) **EMPLOYMENT AND RETENTION OF** |
| | ) **MOELIS & COMPANY AS FINANCIAL** |
| | ) **ADVISOR TO DEBTOR PURSUANT TO** |
| | ) **11 U.S.C. §§ 327, 328 AND 330** |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |

Upon the application (the "*Application*")[1] of the above-captioned debtor and debtor in possession (collectively, the "*Debtor*") for employment and retention of Moelis & Company LLC ("*Moelis*") as financial advisor to the Debtor; and the Court being satisfied that Moelis has the capability and experience to provide the services described in the Application; and the Court being satisfied based on the representations made in the Application and the Jimenez Declaration that (a) Moelis does not hold or represent an interest adverse to the Debtor's estate and (b) Moelis is a "disinterested person" as defined in section 101(14) of the Bankruptcy Code as required by section 327(a) of the Bankruptcy Code and Bankruptcy Rule 2014(a); and the Court having jurisdiction to consider the Application and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the Application and the relief requested therein being a core proceeding in accordance with 28 U.S.C.

§§ 157(b)(2) on which the Court may enter a final order consistent with Article III of the United States Constitution; and venue being proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Application being adequate and appropriate under the particular circumstances; and a hearing having been held to consider the relief requested in the Application, if applicable; and upon the Jimenez Declaration, the record of the hearing, and all proceedings had before the Court; and the Court having found and determined that the relief sought in the Application is in the best interests of the Debtor's estate, its creditors and other parties in interest, and that the legal and factual bases set forth in the Application establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED:

1. The Application is approved as set forth herein. All objections to the relief requested in the Application, whether filed or not, are hereby overruled.

2. The Debtor is authorized to retain and employ Moelis as its financial advisor in this chapter 11 case, pursuant to the terms and conditions set forth in the Application and the Engagement Letter.

3. Except to the extent set forth herein, the Engagement Letter (together with all annexes thereto), a copy of which is attached to the Application as Exhibit B, including, without limitation, the Fee Structure, is approved pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, and the Debtor is authorized and directed to perform its payment, reimbursement, contribution and indemnification obligations and its non-monetary obligations in accordance with the terms and conditions, and at the times specified, in the Engagement Letter. Subject to paragraph six of this Order, all compensation, reimbursement of expenses, indemnification, contribution and reimbursement to Moelis and any Indemnified Person (as

---

[1] Capitalized terms used but not otherwise defined herein have the meanings

3

defined in the Engagement Letter) under the Engagement Letter shall be subject to review only pursuant to the standards set forth in section 328(a) of the Bankruptcy Code, and shall not be subject to any other standard of review including but not limited to that set forth in section 330 of the Bankruptcy Code.

4.   The Debtor is authorized to pay Moelis' fees and to reimburse Moelis for its reasonable, documented, out of pocket costs and expenses as provided in the Engagement Letter, including but not limited to in-sourced document production costs, travel costs, meals, and the reasonable, actual, documented, out-of-pocket costs fees, disbursements and other charges of Moelis' external legal counsel (without the need for such legal counsel to be retained as a professional in these chapter 11 cases and without regard to whether such legal counsel's services satisfy section 330(a)(3)(C) of the Bankruptcy Code).

5.   Moelis shall file interim and final fee applications for the allowance of compensation for services rendered and reimbursement of expenses incurred in accordance with applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, the U.S. Trustee Guidelines and any applicable orders of the Court; *provided, however*, that the requirements of the Bankruptcy Code, the Bankruptcy Rules, the U.S. Trustee Guidelines and any other orders and procedures of this Court are hereby modified such that Moelis' restructuring professionals shall be required only to maintain records in summary format containing reasonably detailed descriptions of those services provided to the Debtor, Moelis' professionals shall not be required to keep any time records or be required to keep time records on a project category basis, and Moelis shall not be required to provide or conform to any schedule of hourly rates.

6. Moelis shall be compensated in accordance with the terms of the Engagement Letter and, in particular, all of Moelis' fees and expenses in this chapter 11 case

ascribed to them in the Application.

4

are hereby approved pursuant to section 328(a) of the Bankruptcy Code. Notwithstanding anything to the contrary herein, the fees and expenses payable to Moelis pursuant to the Engagement Letter shall be subject to review only pursuant to the standards set forth in section 328(a) of the Bankruptcy Code and shall not be subject to the standard of review set forth in section 330 of the Bankruptcy Code, except by the U.S. Trustee. This Order and the record relating to the Court's consideration of the Application shall not prejudice or otherwise affect the rights of the U.S. Trustee to challenge the reasonableness of Moelis' compensation and expense reimbursements under sections 330 and 331 of the Bankruptcy Code; *provided*, *however*, that "reasonableness" shall be evaluated by comparing (among other things) the fees payable in these cases to fees paid to comparable investment banking firms with similar experience and reputation offering comparable services in other chapter 11 cases and shall not be evaluated primarily on an hourly or length-of-case based criteria. Accordingly, nothing in this Order or the record shall constitute a finding of fact or conclusion of law binding on the U.S. Trustee, on appeal or otherwise, with respect to the reasonableness of Moelis' compensation.

7. The indemnification, contribution, and reimbursement provisions included in **Annex B** to the Engagement Letter are approved in their entirety.

8. Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, or 9014, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

9. To the extent that there may be any inconsistency between the terms of the Application, the Engagement Letter, and this Order, the terms of this Order shall govern.

10. Notice of the Application satisfies the requirements of Bankruptcy Rule 6004(a).

5

1       11. The Debtor is authorized to take all actions necessary to effectuate the relief

2 granted in this Order in accordance with the Application.

3       12. This Court retains exclusive jurisdiction with respect to all matters arising from or

4 related to the implementation, interpretation, and enforcement of this Order.

5 Dated: _____, 2015            _____

6

7                                 United States Bankruptcy Judge

**Exhibit B**

**Engagement Letter**

MOELIS & COMPANY

November 13, 2015

CONFIDENTIAL

Rdio, Inc.
1550 Bryant St., Suite 200
San Francisco, CA 94103

Attention: Elliott Peters, SVP and General Counsel

Dear Mr. Peters:

We are pleased to confirm that Rdio, Inc. ("Company") has engaged Moelis & Company LLC ("Moelis" or "we") to act as its exclusive financial advisor in connection with its impending chapter 11 bankruptcy case (the "Case") and expected Sale Transaction (as defined below).

A "Sale Transaction" means (i) the sale of all or a majority of the equity securities of the Company to a third party (an "Acquirer"), (ii) the merger or combination of the Company with that of an Acquirer (if more than 50% of the outstanding voting stock of the continuing or surviving entity immediately after such merger or combination is not owned by the stockholders of the Company who held voting stock of the Company immediately prior to the closing of the merger or combination) or (iii) an Acquirer's acquisition of all or substantially all of the assets, properties or business of the Company, whether or not any such Sale Transaction is effected through a plan of reorganization or liquidation (a "Plan") in connection with the Case.

We understand that the Company expects to be signing an asset purchase agreement with Pandora Media, Inc. ("Pandora") within the next week and then immediately thereafter commence the Case in which the Company will be seeking Bankruptcy Court approval of a Sale Transaction to Pandora or to a successful overbidder pursuant to Section 363 of the Bankruptcy Code.

1.  As part of our engagement by the Company, Moelis will perform, among others, the following functions:

(a) assist the Company in conducting a business and financial analysis of the Company;

(b) assist the Company in identifying and contacting potential overbidders in connection with the auction sale and overbid process ("Auction Sale") expected to be conducted during the Case, facilitate the due diligence process with prospective overbidders (including the execution of appropriate confidentiality agreements), maintain a log of all potential overbidders who have been contacted and track their responses, advise potential overbidders of the overbid process, work with the Company to determine the financial qualifications of prospective overbidders who express an interest in participating in the Auction Sale, and assist the Company to conduct the Auction Sale. Moelis will meet with prospective overbidders and provide them such information about the Company as may be appropriate and acceptable to the Company, subject to customary business confidentiality;

(c) assist the Company in preparing any additional and appropriate marketing materials to distribute to prospective overbidders;

(d) assist the Company to negotiate the form of bid procedures order with Pandora and assist the Company to obtain Bankruptcy Court approval of the bid procedures order, including reviewing pleadings prepared by the Company's counsel that are necessary for the Bankruptcy Court to approve the bid procedures order, and providing a declaration relating to Moelis' services and advice provided to the Company in connection with this agreement (and providing testimony in Bankruptcy Court regarding its services and advice) in support of the Company's motion for Bankruptcy Court approval of the bid procedures order;

(e) meet with the Company's management and Board of Directors, as requested, to discuss any proposed Sale Transaction and its financial implications; and

(f) assist the Company to obtain Bankruptcy Court approval of the proposed asset sale to Pandora or to a successful overbidder, including reviewing pleadings prepared by the Company's counsel that are necessary for the Bankruptcy Court to approve the proposed asset sale and providing a declaration relating to Moelis' services and advice provided to the Company in connection with this agreement (and providing testimony in Bankruptcy Court regarding its services and advice) in support of the Company's sale motion.

Please note that Moelis does not provide legal, tax, accounting or actuarial advice.

2. As compensation for our services hereunder, the Company agrees to pay us the following nonrefundable cash fees:

Monthly Fee

(i) During the term of this agreement, a fee of $100,000 per month (the "Monthly Fee"), payable in advance of each month, through the conclusion of the Auction Sale. The Company will pay the first Monthly Fee immediately upon the execution of this agreement, and all subsequent Monthly Fees prior to each monthly anniversary of the date of this agreement. Whether or not a Sale Transaction occurs, we shall earn and be paid the Monthly Fee every month through the conclusion of the Auction Sale. The Monthly Fees shall not under any circumstance be less than $100,000 or more than $200,000. The Sale Transaction Fee, as defined below, will be reduced by the amount of any Monthly Fees previously paid.

Sale Transaction Fee

(ii) At the closing of a Sale Transaction a non-refundable cash fee (the "Sale Transaction Fee") of:

(a) $2,250,000; plus

(b) 1.0% of Transaction Value (as defined in *Annex A*) in excess of $75 million up to and including $100 million; plus

(c) 2.5% of Transaction Value for amounts in excess of $100 million.

-2-

If, at any time prior to the expiration of 12 months following the termination of this agreement, the Company enters into an agreement that subsequently results in any Sale Transaction, or consummates any Sale Transaction, then the Company will pay us the Sale Transaction Fee specified above in cash promptly upon the closing of any such Sale Transaction.

(b)     Whether or not any Sale Transaction is consummated, the Company will reimburse us for all of our reasonable expenses as they are incurred in entering into and performing services pursuant to this agreement, including the reasonable costs of our legal counsel, provided that reimbursement for expenses exceeding $50,000 in the aggregate, and reimbursement for legal fees exceeding $50,000 in the aggregate, will each require the prior written consent of the Company (in each case, such consent not to be unreasonably withheld). The foregoing proviso will not apply to *Annex B*. We agree to provide the Company with reasonable support for our expenses at the Company's request or at the Bankruptcy Court's direction.  Prior to commencing the Case, the Company will reimburse all of our reasonable out-of-pocket expenses that we incurred up to such Case commencement.

(c)     The Company's obligation to pay any fee, expense or indemnity set forth herein is not subject to any reduction by way of setoff, recoupment or counterclaim.

(d)     Moelis will make a substantial commitment of professional time and effort hereunder, which may foreclose other opportunities for us. Moreover, the actual time and effort required for the engagement may vary substantially from time to time. In light of the numerous issues that may arise in engagements such as this, Moelis' commitment of the time and effort necessary to address the issues that may arise in this engagement, Moelis' expertise and capabilities that the Company will require in this engagement, and the market rate for professionals of Moelis' stature and reputation, the parties agree that the fee arrangement provided herein is just and reasonable, fairly compensates Moelis for the services agreed to be provided by Moelis in this agreement, and provides the requisite certainty to the Company.

3.   If the Case is commenced:

(a) The Company will use its reasonable best efforts to seek the entry of an order of the Bankruptcy Court as early as possible authorizing our employment as the Company's exclusive financial adviser under this agreement pursuant to, and subject to the standards of review set forth in, section 328(a) of the Bankruptcy Code (and not subject to the standards of review set forth in section 330 of the Bankruptcy Code), nunc pro tunc to the date of the filing of the Case. The retention application and any order authorizing Moelis' retention must be acceptable to Moelis. Prior to commencing the Case, the Company will pay all amounts then earned and payable to Moelis pursuant to this agreement.  The Company will vigorously respond to any objection filed to the Company's application to employ Moelis, and the Company will vigorously prosecute and seek to defeat any appeal of any Moelis employment order.

(b) Moelis will have no obligation to provide services unless the Bankruptcy Court approves Moelis' retention in an order reasonably acceptable to Moelis under section 328(a) of the Bankruptcy Code within 60 days following the filing of the Case. If the Company is not able to obtain a Bankruptcy Court order approving the Company's employment of Moelis in accordance with the terms of this agreement, Moelis may terminate this agreement, and, in the event of such a termination and subject to the approval of the Bankruptcy Court, the Company shall reimburse Moelis for all fees owing and expenses incurred prior to the date of termination, and Moelis shall be entitled to a contingent claim with respect to any fees that become payable under the last paragraph of Section 2(a).

(c) Moelis' post-petition compensation, expense reimbursements and payment received pursuant to the provisions of *Annex B* shall be entitled to priority as expenses of administration under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code, and shall be entitled to the benefits of any "carve-outs" for professional fees and expenses in effect pursuant to one or more financing orders entered by the Bankruptcy Court. Following entry of an order authorizing our retention, the Company will assist Moelis in preparing, filing and serving fee statements, interim fee applications, and a final fee application. The Company will support Moelis' fee applications that are consistent with this agreement in papers filed with the Bankruptcy Court and during any Bankruptcy Court hearing. The Company will pay promptly pay our fees and expenses approved by the Bankruptcy Court and in accordance with the Bankruptcy Rules.

(d) The Company will use its reasonable best efforts to ensure that, to the fullest extent permitted by law, any confirmed plan of reorganization or liquidation in the Case contains typical and customary releases (both from the Company and from third parties) and exculpation provisions releasing, waiving, and forever discharging Moelis, its divisions, affiliates, any person controlling Moelis or its affiliates, and their respective current and former directors, officers, partners, members, agents and employees from any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities related to the Company or the engagement described in this agreement.

The terms of this Section 3 are solely for the benefit of Moelis, and may be waived, in whole or in part, only by Moelis.

4. The Company will furnish us with all information concerning the Company as we reasonably deem appropriate (collectively, the "Information") to execute this engagement and will provide us with access to the Company's officers, directors, employees, accountants, counsel and other representatives of the Company. To the best of the Company's knowledge, the Information will be true and correct in all material respects and will not contain any material misstatement of fact or omit to state any material fact necessary to make the statements contained therein not misleading. The Company will advise us promptly of any material event or change in the business, affairs, condition (financial or otherwise) or prospects of the Company during the term of this agreement. In performing our services hereunder, we will be entitled to use and rely upon the Information as well as publicly available information without independent verification. We are not required to conduct a physical inspection of any of the properties or assets, or to prepare or obtain any independent evaluation or appraisal of any of the assets or liabilities of the Company. We will be entitled to assume that financial forecasts and projections the Company makes available to us have been reasonably prepared on bases reflecting the best currently available estimates and judgments of the management of the Company as to the matters covered thereby. The Company authorizes us to transmit any Information to potential overbidders who execute appropriate confidentiality agreements with the Company. The Company will be solely responsible for the contents of any Information Memo and all other information provided to prospective overbidders.

We will keep Information concerning the Company provided to us in connection with this agreement confidential pursuant to the Confidentiality Agreement between the Company and Moelis, dated August 25, 2014 for the term thereof; provided we may provide such Information to prospective overbidders who execute appropriate confidentiality agreements which have been approved by the Company.

The Company will provide Moelis for review with a copy of any other information the Company proposes to deliver to any prospective overbidder and will coordinate with Moelis prior to delivering any such information to any prospective overbidder. The Company shall not transmit the Information to any prospective overbidder without first consulting Moelis.

5.   The Company will not disclose, summarize or refer to any of our advice publicly or to any third party without our prior written consent. In the event disclosure is required by subpoena or court order, the Company will provide us reasonable advance notice and permit us to comment on the form and content of the disclosure. We may, at our option and expense after announcement of any Sale Transaction, place announcements and advertisements or otherwise publicize such Sale Transaction and our role in it (which may include the reproduction of the Company's logo and a hyperlink to the Company's website) on our website and in such financial and other newspapers and journals as we may choose, stating that we have acted as exclusive financial advisor to the Company in connection with any Sale Transaction. If we request, the Company shall include a mutually acceptable reference to us in any public announcement of any Sale Transaction.

6.   We are an independent contractor with the contractual obligations described herein owing solely to the Company. We expressly disclaim any fiduciary duty. Since we will be acting on the Company's behalf, the Company and we agree to the indemnity and other provisions set forth in the attached *Annex B*. The Company's obligations set forth therein are in addition to any rights that any Indemnified Person may have at common law or otherwise. Other than the Indemnified Persons, there are no third party beneficiaries of this agreement. The Company hereby agrees to the acknowledgements and disclosures set forth in *Annex C*.

7.   This engagement will continue until the closing of a Sale Transaction. Either the Company or we may terminate our engagement earlier than such closing, with or without cause, upon 15 days' prior written notice thereof to the other party, and our engagement may be extended by mutual written agreement of the Company and us. In the event of any completion, termination (other than unilateral written termination of this agreement by Moelis) or expiration, (i) we will continue to be entitled to the fees and expenses that became payable hereunder prior to any such termination or expiration and (ii) *Annex B*, the last paragraph of Section 2(a) and Sections 3 through 9 shall remain in full force and effect after any such completion, termination or expiration of this agreement.  If Moelis unilaterally terminates this agreement in writing without the prior written consent of the Company, Moelis will forfeit its right to the payment of any further fees or expenses (except, for the avoidance of doubt, for fees and expenses payable as of such termination date) by the Company or the Company's bankruptcy estate.

8.   Moelis is an independent investment bank which is engaged in a range of investment banking activities. Certain affiliates of Moelis are engaged in asset management and other activities for their own account and otherwise.  Moelis and its affiliates may have interests that differ from the Company's interests.  Moelis and its affiliates have no duty to disclose to the Company, or use for the Company's benefit, any information acquired in the course of providing services to any other party, engaging in any transaction or carrying on any other businesses.  Moelis' employees, officers, partners and affiliates may at any time own the Company's securities or those of any other entity involved in any transaction contemplated by this agreement.  Moelis recognizes its obligations under applicable securities laws in connection with the purchase and sale of such securities.

9.   This agreement and any dispute or claim that may arise out of this agreement shall be governed by and construed in accordance with the internal laws of the State of New York, and this agreement embodies the entire agreement and supersedes any prior written or oral agreement relating to the subject matter hereof, and may only be amended or waived in writing signed by both the Company and us. If any part of this agreement is judicially determined to be unenforceable, it shall be interpreted to the fullest extent enforceable so as to give the closest meaning to its intent, and the remainder of this agreement shall remain in full force and effect. Any proceeding arising out of this agreement before the commencement of the Case shall be heard exclusively in a New York state or federal court sitting in the city and county of

Case: 15-31430   Doc# 42   Filed: 11/19/15   Entered: 11/19/15 16:11:07   Page 28 of 38

New York, to whose jurisdiction and forum Moelis and the Company irrevocably submit. Any proceeding arising out of this agreement after the commencement of the Case shall be heard exclusively by the Bankruptcy Court, to whose jurisdiction and forum Moelis and the Company irrevocably submit. The Company also irrevocably consents to the service of process in any such proceeding by mail to the Company's address set forth above. This agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same agreement, and electronically transmitted signature pages to this agreement shall have the same force and effect as original signatures. This agreement shall be binding upon the Company and us and its and our respective successors and permitted assigns. WE AND THE COMPANY (ON ITS OWN BEHALF AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ON BEHALF OF ITS CREDITORS AND SECURITY HOLDERS) WAIVE ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY PROCEEDING ARISING OUT OF THIS AGREEMENT.

*(Signature page follows)*

MOELIS & COMPANY

We are delighted to accept this engagement and look forward to working with the Company. Please sign and return the enclosed duplicate of this agreement. The individuals signing this agreement each represent that he or she is authorized to execute and deliver it on behalf of the entity whose name appears above his or her signature.

Very truly yours,

MOELIS & COMPANY LLC

By: _____

    Name:    Carlos Jimenez
    Title:    Managing Director

Agreed to as of the date first written above:

RDIO, INC.

By: _____
    Name:    Elliott Peters
    Title:    SVP and General Counsel

-7-

## ANNEX A

"Transaction Value" shall equal the sum of (A) in the case of the sale, issuance or exchange of equity securities, the total consideration received or to be received for such securities (including amounts payable to holders of options, warrants and convertible securities and amounts held in escrow, and including amounts that are paid, at the direction of the Company, to retire or defease indebtedness of the acquired company or any of its subsidiaries or to cure defaults under executory contracts to be assumed), plus payments made in installments, amounts payable in connection with the Sale Transaction under consulting agreements, agreements not to compete or similar arrangements (including such payments to management), and contingent payments (whether or not related to future earnings or operations); (B) in the case of a sale or disposition of assets, the total consideration paid or received or to be paid or received for such assets (including amounts held in escrow and installment payments, and including amounts that are paid, at the direction of the Company, to retire or defease indebtedness of the acquired company or any of its subsidiaries or to cure defaults under executory contracts to be assumed), plus contingent payments (whether or not related to future earnings or operations); (C) (i) in the case of the sale, issuance or exchange of equity securities, the principal amount of all indebtedness for borrowed money as set forth on the most recent consolidated balance sheet (the "Balance Sheet") of the acquired company prior to the consummation of the Sale Transaction (less the amount of cash and cash equivalents up to but not exceeding the total amount of indebtedness set forth on the Balance Sheet) and (ii) in the case of a sale or disposition of assets, the principal amount of all indebtedness for borrowed money as set forth on the Balance Sheet that Pandora or a successful overbidder assumes or acquires; and (D) the value implied in the Sale Transaction of any equity or assets retained by the security holders of the acquired company upon consummation of the Sale Transaction (such equity to be valued at the same price per share as paid in the Sale Transaction).

In the case of a joint or collaborative venture, strategic alliance or similar transaction (a "Joint Venture"), Transaction Value shall equal (i) the aggregate value, as we and the Company mutually agree in good faith, of the proceeds, assets and other consideration all parties to the Joint Venture pay or contribute in connection with the Sale Transaction, including, without limitation, cash, notes, securities, installment or contingent amounts, intellectual property, licenses, distribution agreements and other property; or (ii) in the event the Sale Transaction does not involve the payment or contribution of consideration to a Joint Venture, such amount as we and the Company mutually agree in good faith.

Transaction Value also shall include any (i) dividends or other distributions paid on the acquired company's securities, other than normal recurring cash dividends in amounts not materially greater than currently paid; and (ii) amounts the acquired company pays to repurchase any of its securities (excluding repurchases pursuant to and consistent with any current stock repurchase program of the acquired company).

The Company will pay any portion of the Sale Transaction Fee attributable to contingent payments constituting Transaction Value upon consummation of the Sale Transaction, based on the present value of such amounts, using a discount rate and probability of payment that the Company and we mutually agree; provided amounts paid into escrow shall be deemed paid at closing.

For purposes of calculating the Transaction Value, equity securities constituting a part of the consideration payable in the Sale Transaction that are traded on a national securities exchange shall be valued at the volume-weighted average price thereof on the 10 trading days immediately prior to the closing of the Sale Transaction. Any debt or other securities or other non-cash consideration shall be valued as the Company and we may mutually agree.

## ANNEX B

In the event that Moelis & Company LLC or our affiliates or any of our or our affiliates' respective current or former directors, officers, partners, managers, agents, representatives or employees (including any person controlling us or any of our affiliates) (collectively, "Indemnified Persons") becomes involved in any capacity in any actual or threatened action, claim, suit, investigation or proceeding (an "Action") arising out of, related to or in connection with this agreement or any matter referred to herein, the Company will reimburse such Indemnified Person for the reasonable out-of-pocket costs and expenses (including counsel fees) of investigating, preparing for and responding to such Action or enforcing this agreement, as they are incurred. The Company will also indemnify and hold harmless any Indemnified Person from and against, and the Company each agrees that no Indemnified Person shall have any liability to the Company or its affiliates, or their respective owners, directors, officers, employees, security holders or creditors for, any losses, claims, damages or liabilities (collectively, "Losses") (A) related to or arising out of oral or written statements or omissions made or information provided by the Company or its agents (including the Information and any other information provided by or on behalf of the Company) or (B) otherwise arising out of, related to or in connection with this agreement or our performance thereof, except that this clause (B) shall not apply to Losses that are finally judicially determined to have resulted primarily from the bad faith or gross negligence of such Indemnified Person.

If such indemnification or limitation of liability are for any reason not available or insufficient to hold an Indemnified Person harmless, the Company agrees to contribute to the Losses in such proportion as is appropriate to reflect the relative benefits received (or anticipated to be received) by the Company, on the one hand, and by us, on the other hand, with respect to this agreement or, if such allocation is judicially determined to be unavailable, in such proportion as is appropriate to reflect the relative benefits and relative fault of the Company, on the one hand, and of us, on the other hand, and any other equitable considerations; *provided, however,* that, to the extent permitted by applicable law, in no event shall the Indemnified Persons be responsible for amounts that exceed the fees actually received by us from the Company in connection with this agreement. Relative benefits to the Company, on the one hand, and us, on the other hand, with respect to this agreement shall be deemed to be in the same proportion as (i) the total value paid or proposed to be paid or received or proposed to be received by the Company or its security holders, as the case may be, pursuant to the transaction(s), whether or not consummated, contemplated by this agreement bears to (ii) the fees actually received by us in connection with this agreement.

The Company will not without our prior written consent (not to be unreasonably withheld), settle, compromise, consent to the entry of any judgment in or otherwise seek to terminate (a "Settlement") any Action in respect of which indemnification is or may be sought hereunder (whether or not an Indemnified Person is a party thereto) unless such Settlement includes a release of each Indemnified Person from any Losses arising out of such Action. The Company will not permit any such Settlement to include a statement as to, or an admission of, fault or culpability by or on behalf of an Indemnified Person without such Indemnified Person's prior written consent. No Indemnified Person seeking indemnification, reimbursement or contribution under this agreement will, without the Company's prior written consent (not to be unreasonably withheld), agree to the Settlement of any Action.

Prior to effecting any proposed sale, exchange, dividend or other distribution or liquidation of all or substantially all of its assets that does not explicitly or by operation of law provide for the assumption of the obligations of the Company set forth herein, the Company will notify us in writing of its arrangements for the Company's obligations set forth herein to be assumed by another creditworthy party (for example through insurance, surety bonds or the creation of an escrow) upon terms and conditions reasonably satisfactory to the Company and us.

Case: 15-31430   Doc# 42   Filed: 11/19/15   Entered: 11/19/15 16:11:07   Page 32 of 38

MOELIS & COMPANY

Case: 15-31430    Doc# 42    Filed: 11/19/15    Entered: 11/19/15 16:11:07    Page 33 of 38

MOELIS & COMPANY

## ANNEX C

**FINRA Suitability**. Pursuant to FINRA Rule 2111, the Company acknowledges that (i) the Company is capable of evaluating investment risks independently, both in general and with regard to transactions and investment strategies involving a security or securities and will exercise independent judgment in evaluating recommendations (if any) of Moelis and its associated persons, and (ii) the Company is an Institutional Account as defined in FINRA Rule 4512(c).

**USA Patriot Act**. Moelis is required to obtain, verify, and record information that identifies the Company in a manner that satisfies the requirements of and in accordance with the USA Patriot Act.

**Business Continuity**. Moelis maintains a business continuity plan that is reviewed annually and is updated as necessary. Our disclosure statement is available on our website at www.moelis.com and a copy can be requested by contacting us at compliance@moelis.com.

- C-1 -

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
10250 Constellation Blvd., Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled (*specify*): **APPLICATION OF DEBTOR AND DEBTOR IN POSSESSION TO EMPLOY MOELIS & COMPANY AS FINANCIAL ADVISOR TO DEBTOR PURSUANT TO 11 U.S.C. §§ 327, 328 AND 330** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) ___***November 19, 2015***___, I checked the CM/ECF docket for this bankruptcy case and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) On (*date*) ___***November 19, 2015***___, I, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**US MAIL**
Rdio, Inc.
1550 Bryant Street, Suite 200
San Francisco, CA 94103

**THE ATTACHED SERVICE LIST WILL BE SERVED BY FEDEX INTERNATIONAL OR US MAIL, AS DESCRIBED**

☒  Service information continued on attached page

**3.  SERVED BY EMAIL**:  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) ___***November 19, 2015***___, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**Email Service**
Rdio, Inc.
abay@rd.io
elliott.peters@rd.io
greg.norman@rd.io
maikao.grare@rd.io

**THE ATTACHED SERVICE LIST WILL BE SERVED VIA EMAIL**

☒  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| November 19, 2015    Megan Wertz | | /s/ Megan Wertz |
| *Date*            *Printed Name* | | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                      **F 9013-3.1.PROOF.SERVICE**

**1. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF):**

- Ron Bender    rb@lnbyb.com
- Philip A. Gasteier    pag@lnbrb.com
- Julie M. Glosson    julie.m.glosson@usdoj.gov
- Monica Y. Kim    myk@lnbyb.com, mayra@lnbyb.com
- Andy S. Kong    kong.andy@arentfox.com
- Krikor J. Meshefejian    kjm@lnbyb.com
- Ramon Naguiat    ramon.naguiat@skadden.com
- Office of the U.S. Trustee / SF    USTPRegion17.SF.ECF@usdoj.gov, ltroxas@hotmail.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

Case: 15-31430    Doc# 42    Filed: 11/19/15    Entered: 11/19/15 16:11:07    Page 36 of 38

Rdio, Inc.
File: 7682

## **20 Largest Unsecured Creditors**

**Service by E-Mail
and US Mail**

AXS Digital, LLC
Attn: Erin Ross
800 W Olympic Blvd Ste 305
Los Angeles, CA 90015
213-763-7713
eross@aegworldwide.com

China Basin Ballpark Company LLC
Attn: Brian Hastings
San Francisco Giants Baseball Organization
24 Willie Mays Plaza
San Francisco , CA 94107
415-972-2032
bhastings@sfgiants.com

Dell Financial Services
Attn: Jason M. Marble
Payment Processing Center
PO Box 6549
Carol Stream, IL 60197-6549
512-513-1068
Jason_Marble@dell.com
Renee_Godfrey@Dell.com

Digital Realty Trust LP
Attn: David Murillo
Digital 720 2nd LLC
P.O. Box 742203
Los Angeles, CA 90074
415-848-9309
dmurillo@digitalrealty.com
mvega@digitalrealty.com

Facebook.com Ads
Attn: Franchesca Bagasbas
Facebook Inc.
15161 Collections Center Drive
Chicago, IL 60693
650-543-4800
fbagasbas@fb.com
ar@fb.com

Intervision Systems Technologies, Inc.
(Rdio Inc.)
Attn: Samantha Vo
2250 Walsh Avenue
Santa Clara, CA 95050-2514
408-567-4232
samantha@intervision.com
NorCalTeam@intervision.com

Kahuna, Inc.
555 Bryant Street,
Suite 322
Palo Alto, CA 94301-1704
650285-0210
billing@kahuna.com

Mosaic NetworX LLC
Dept LA 24111
Pasadena, CA 91185
415233-4504
billing@mosaicnetworx.com

Music Reports, Inc.
Attn: Bob Braunstein
21122 Erwin Street
Woodland Hills, CA 91367
818558-1400
rbraun@musicreports.com
accounting_group@musicreports.com

Orchard Enterprises, Inc.
Attn: Michael Beauchamp
PO Box 10251
Uniondale, NY 11555-0251
212300-2867
mbeauchamp@theorchard.com
bshimkin@theorchard.com

Roku, Inc
Attn: Nadine Jordan
Dept 3118
PO Box 123118
Dallas, TX 75312-3118
408915-0981
njordan@roku.com
mnakashima@roku.com

Shazam Media Services
Attn: Edward Quintanilla
52 Vanderbilt Ave, 19th Floor
New York, NY 10017
609642-4757
edward.quintanilla@shazam.com
autumn.martin@shazam.com

Sony Music Entertainment
Attn: Brian Walters
550 Madison Avenue
New York, NY 10022
212833-5852
Brian.Walters@sonymusic.com
colleen.jackson.spantech@sonymusic.com

Tunecore
Attn: Jaqua Curiel
45 Main St, Suite 705
Brooklyn, NY 11201
347694-4910
jaqua@tunecore.com
andrew@tunecore.com

Universal Music Group Distribution
Attn: DeMille, Debbie
3905 W. Vincennes Road, Suite 400
Indianapolis, IN 46268
317599-4334
Debbie.DeMille@umusic.com
Raheela.Majid@umusic.com

Warner Music Group
Attn: Ayala, Jose
3400 W. Olive Ave
Mail Stop P-4-14
Burbank, CA 91505
818238-6482
Jose.Ayala@wmg.com

## Service by E-Mail and International FedEx

Merlin BV
Attn: Becky Bishop
Music and Entert Rights Licensing Ind Net
Damrak 277 Kamer 38
Amsterdam, - 1012 ZJ
+ 44 (0) 207 439 8492
becky@merlinnetwork.org
charlie@merlinnetwork.org
charles@merlinnetwork.org
ryan@merlinnetwork.org

nventive inc.
Attn: Julie Rose
215 St-Jacques
Suite 500
Montreal, - H2Y 1M6
514312-4969
julie.rose@nventive.com
accounting@nventive.com

T-series
Attn: Shiv Chanana
E 2/16 White House, Ansari Road,
Darya Ganj, New Delhi,
Delhi 110002
India
+91 120 2515104
shivchanana@tseries.net

Triton is Ando Media aka Triton Digital
Attn: Robert German
1440 Sainte Catherine West, Suite 1200
Montreal, QC H3G 1R8 Canada
514-448 4037 x 2606
866-448 4037 x2606
F: (514) 807-1861
Robert.German@tritondigital.com

## Service by E-Mail and US Mail

## Secured Creditors

Dell Financial Services L.L.C.
One Dell Way
Round Rock, TX 78682
512-513-1068
Jason_Marble@dell.com
Renee_Godfrey@Dell.com

Dell Financial Services L.L.C.
Mail Stop-PS2DF-23 One Dell Way
Round Rock, TX
512-513-1068
Jason_Marble@dell.com
Renee_Godfrey@Dell.com

Counsel for Iconical
Ron E. Meisler
Skadden, Arps, Slate, Meagher & Flom
LLP
155 N. Wacker Drive
Chicago | Illinois | 60606-1720
T: 312.407.0549 | F: 312.407.8641 | M:
312.282.1111
ron.meisler@skadden.com

Counel for Pulser Media, Inc.
Greg Akselrud
Stubbs Alderton & Markiles, LLP
15260 Ventura Blvd., 20th Floor
Sherman Oaks, CA 91403
818-444-4503 (Direct)
818-444-6303 (Direct - Facsimile)
gakselrud@stubbsalderton.com