RON BENDER (SBN 143364)
PHILIP A. GASTEIER (SBN 130043)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbyb.com; pag@lnbyb.com; kjm@lnbyb.com

Attorneys for Chapter 11 Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>RDIO, INC.,<br><br>　　　　Debtor and Debtor in Possession. | Case No. 15-31430<br><br>Chapter 11 Case<br><br>**AMENDED APPLICATION OF DEBTOR AND DEBTOR IN POSSESSION TO EMPLOY WINSTON & STRAWN LLP AS SPECIAL LITIGATION COUNSEL PURSUANT TO 11 U.S.C. § § 327(e)**<br><br>Date:　June 3, 2016<br>Time:　10:30 a.m.<br>Place:　U.S. Bankruptcy Court<br>　　　　Courtroom 17<br>　　　　450 Golden Gate Ave., 16th Floor<br>　　　　San Francisco, CA 94102<br>Judge:　The Hon. Dennis Montali |

　　　　Rdio, Inc., chapter 11 debtor and debtor in possession in the above-captioned, chapter 11 bankruptcy case (the "Debtor"), hereby submits this amended application (the "Application") for Court approval of its employment of Winston & Strawn LLP ("WS") as special litigation counsel to the Debtor, effective as of May 23, 2016, upon the terms and conditions described below,

pursuant to 11 U.S.C. §§ 327(e), with the compensation to be paid to WS to be reviewed pursuant to the standard of 11 U.S.C. §§ 328 as further set forth below,. This Application replaces and supersedes the Debtor's original application to employ WS, which the Debtor filed on May 23, 2016 as docket number 290 (the "Original Application"). In support of this Application, the Debtor respectfully represents as follows:

**A.    Background**

1. The Debtor commenced its bankruptcy case by filing a voluntary petition under Chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") on November 16, 2015 (the "Petition Date"). The Debtor continues to manage its financial affairs and bankruptcy estate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

**B.    The Debtor's Business, Assets and Liabilities**

2. The Debtor was founded in 2008 as a digital music service. The Debtor's business operations were launched in 2010 after the Debtor secured requisite licenses from the applicable holders of music rights. Since that time, the Debtor grew into a worldwide music service, ultimately operating in 86 countries.

3. One of the primary services the Debtor provided was an unlimited, on demand music streaming service where, for $9.99 per month in the U.S., the user had access to an entire library of songs with access to them through a computer, mobile device, etc. In other words, the Debtor's primary business model was based upon a monthly recurring subscription for full access to its content rather than on an owned a la carte download model. The Debtor also made available other subscription tiers at lower costs per month with varying service offerings or functionality (e.g., a family tier, a student tier, and a select tier with alternative functionality) as well as a "free to the user" advertising supported Internet radio service.

4.	Despite the investment of several hundred million dollars and years of efforts to build its subscriber base (and to attract meaningful advertising dollars), the Debtor was unable to achieve profitability – or even to reduce its operating losses to tolerable levels.

5.	No streaming music service the Debtor is aware of is currently profitable, and the Debtor believes that collective losses to date from streaming music companies totals over $1 billion.  In fact, the Debtor understands that almost all streaming music companies are losing more money than the Debtor lost.  This is documented in a recent article in Music Business Worldwide.  (see http://www.musicbusinessworldwide.com/the-great-music-biz-money-pit-how-streaming-services-lost-1bn/).

6.	In contrast, the Debtor understands that music label revenues from streaming music are at all time highs and increasing rapidly.  Music labels generate substantial profits from the revenues they receive from streaming music companies, while the on demand music streaming segment, apart from services that rely on user uploaded content, all lose money.  Streaming music services are obligated to pay approximately 70% of their subscription revenues in recorded music and music publishing royalties and a per stream royalty for ad supported services that is in many cases higher than the total revenues… e.g., royalties of over 100%.

7.	Sony: (see https://www.themusicnetwork.com/news/streaming-now-makes-up-24-of-sony-music-revenue).   Executives at Japan's Sony Corp are citing the growth of its streaming revenue as an example that its music division's bleak days are starting to see light.  Sony Corp Executive Deputy President and CFO Kenichiro Yoshida said that the "significant momentum in music streaming" showed that the 15-year decline of the music industry was "finally bottoming out."  He added, "We're very positive [about] the growth in the streaming market. To some extent, it's replacing the download business, but the growth is positive. "We expect it to keep going and accelerate… we expect [Sony's] Music business to be on the rise again."

8. Warner: Streaming music has become Warner Music's biggest business. The company announced that money from services like Spotify and Apple Music was the single biggest source of recorded music revenue in the first quarter of the year, surpassing both physical sales and sales of digital downloads.

9. Universal: (see http://www.musicbusinessworldwide.com/universal-is-musics-first-billion-dollar-streaming-record-company/). UMG has become the first recorded music business to generate a billion dollars of revenue from streaming services in a calendar year. According to the Q4 results of its French parent Vivendi, the major's streaming income was up 43.2% at constant currency in 2015 to €954m.

10. As a result of these challenges, the Debtor's majority shareholder, Pulser Media, Inc. ("Pulser"), employed a highly qualified investment bank in Moelis & Company ("Moelis") in the fall of 2014, initially with the goal of attempting to raise new equity capital. Despite extensive efforts by Moelis, however, the prospects for raising new debt or equity capital were not promising at the time. At that point, Pulser extended the Moelis mandate to including seeking a buyer or merger partner because the Debtor was not going to be able to continue to fund such significant operating losses indefinitely.

11. By June 2015, Pandora Media, Inc. ("Pandora") was emerging as the most interested party and the party most likely to present the best offer and to close a sale. Pandora submitted a signed preliminary letter of intent (the "Initial LOI") on July 8, 2015, which was never counter-signed by the Debtor. Concurrent with the continuing negotiations with Pandora regarding the Initial LOI, Moelis continued its marketing efforts, and, over the subsequent three months, the Debtor's management and Moelis continued discussions with other interested parties that had been identified. The negotiations with Pandora were long and intensive. Pandora advised the Debtor that it had approximately 125 people working on this transaction.

4
Case: 15-31430    Doc# 305    Filed: 06/01/16    Entered: 06/01/16 13:03:44    Page 4 of 17

Negotiations broke down several times. After substantial negotiation of the Initial LOI and several subsequent versions, and additional due diligence by Pandora, the parties executed a non-binding LOI on September 29, 2015 (the "Executed Non-Binding LOI").

12. Following the execution of the Executed Non-Binding LOI, Pandora continued its due diligence and the parties commenced negotiations on the terms of a definitive transaction. Those negotiations were also very intense and extended. The Executed Non-Binding LOI provided that upon the election of Pandora, the Debtor's asset sale to Pandora would be conducted as part of a Chapter 11 bankruptcy process and an asset purchase pursuant to a sale under 11 U.S.C. § 363. After the Executed Non-Binding LOI, the Debtor and Pandora held several discussions regarding potential alternatives to a chapter 11 bankruptcy process, and the Debtor pursued financing transactions with other parties. Negotiations between the Debtor and Pandora continued all the way until the definitive Asset Purchase Agreement between the Debtor and Pandora was executed on November 16, 2015 (the "APA"). Pursuant to the APA, Pandora required that its asset purchase be consummated through a chapter 11 bankruptcy process by the Debtor and an asset sale under 11 U.S.C. § 363.

13. Pursuant to the APA, Pandora agreed to pay a base purchase price of $75.0 million, subject to adjustment as provided in the APA. Pandora also agreed to enter into a Master Services Agreement, which provided for a payment of $2.5 million to the Debtor.

14. The Debtor went through an auction process to determine if there was any qualified buyer willing to pay more. No party submitted any qualifying overbid. The Court approved the Debtor's asset sale to Pandora at a hearing held on December 21, 2015, and the Debtor's asset sale to Pandora closed two days later on December 23, 2015.

15. On May 9, 2016, the Debtor filed its *Debtor's First Amended Plan of Reorganization (Dated May 9, 2016)* (Doc #278) (the "Plan") and related *Disclosure Statement*

5

Case: 15-31430  Doc# 305  Filed: 06/01/16  Entered: 06/01/16 13:03:44  Page 5 of 17

(Doc #279) (the "Disclosure Statement"). The Debtor believes that it has substantial and valuable claims against Sony Music Entertainment and any affiliates ("Sony"); Warner Music Group Corp. and any affiliates ("Warner"); and UMG Recordings, Inc. and any affiliates ("Universal", and collectively with Sony and Warner, the "Labels"), as a result of wrongful conduct by the Labels, which, if pursued, will likely result in a substantial affirmative recovery by the Debtor. The Debtor believes that the pursuit of these claims against the Labels will likely result in the complete disallowance of the claims of the Labels or, at a minimum, the complete equitable subordination of the claims of the Labels to all other allowed claims. In the Plan, the Labels are provided with a settlement proposal, which the Debtor hopes will be accepted by the Labels. Any of the Labels that accept the Debtor's settlement proposal will receive a full and complete release from the Debtor and its estate. The Debtor intends to investigate its claims against the Labels through Bankruptcy Rule 2004 discovery and, if appropriate, pursue its claims against any of the Labels who do not accept the settlement proposal.

16. The Debtor scheduled Sony as having a royalty claim in the amount of $147,403.76 and a contract claim of $2,599,232.82 for a total claim of $2,746,636.58. The Debtor scheduled Orchard Enterprises, Inc. as having a claim of $493,945.89. Sony filed a proof of claim for Sony Music Entertainment asserting a claim in the amount of $12,419,314.00 for Service Fees plus various other claims. Orchard Enterprises, Inc. filed a proof of claim asserting a claim in the amount of $4,583,096.96. The Debtor understands that Sony and Orchard Enterprises, Inc. are affiliates or that Sony owns Orchard Enterprises, Inc. The claims filed by Sony and Orchard, totaling the sum of $17,002,410.96, are collectively referred to as the "Sony Claims"). The Debtor scheduled Warner as having a royalty claim in the amount of $137,500 and a contract claim of $432,909.22 for a total claim of $570,409.22. Warner has filed a proof of claim asserting a claim in the amount of $619,796.62 (the "Warner Claim"). The Debtor

scheduled Universal as having a royalty claim in the amount of $219,267.65 and a contract claim of $590,724.06 for a total claim of $809,991.71. Universal filed three proofs of claim asserting a claim in the amount of $482,496.68 for Universal International Music B.V., a claim in the amount of $629,374.16 for UMG Recordings, Inc., and a claim in the amount of $189,305 for Universal Music Canada, Inc. (for total claims of $1,301,175.84, collectively, the "Universal Claims". The Debtor scheduled Universal Music Group Distribution as having a claim in the amount of $590,724.06. That specific Universal entity did not file any proof of claim, but the Debtor assumes that this claim is subsumed in the three claims filed by Universal. The Sony Claims, the Warner Claim and the Universal Claims, which are in the collective amount of $18,923,383.42, are collectively referred to herein as the "Label Claims".

17. In the Plan, (i) Sony was offered a cash settlement of $775,000 in full settlement and satisfaction of the Sony Claims (the "Sony Settlement Figure"); (ii) Warner was offered a cash settlement of $100,000 in full settlement and satisfaction of the Warner Claim; and (iii) Universal was offered a cash settlement of $125,000 in full settlement and satisfaction of the Universal Claims.

C. **Employment of Special Litigation Counsel**

18. The Debtor requires the services of special litigation counsel to assist the Debtor to analyze and, if appropriate, pursue the claims referenced above against those Labels who do not accept the Debtor's settlement proposal in the Plan. That would involve taking Bankruptcy Rule 2004 discovery and potentially seeking an affirmative recovery against the Labels, as well as the complete disallowance and equitable subordination of the claims asserted by the Labels. The Debtor understands that Warner and Universal intend to accept the settlement proposal under the Plan, but that Sony does not intend to accept the settlement proposal under the Plan. As a result, for now, the Debtor is seeking to employ WS as special litigation counsel only with respect to

Sony and its affiliates, including Orchard Enterprises, Inc. (references herein to "Sony" shall be deemed to include Orchard Enterprises, Inc.), and the Sony Claims.

19. The Debtor has determined that WS is best suited to represent the Debtor taking into account firm size, experience, skill level and cost. In that regard, the Debtor seeks to employ WS as its special litigation counsel for these purposes, at the expense of the Debtor's bankruptcy estate, and to have the Debtor's employment of WS be deemed effective as of May 23, 2016.

20. The Debtor seeks to employ WS as its special litigation counsel (with W. Gordon Dobie to serve as lead counsel) to render, among others, the following types of professional services:

    a. reviewing and analyzing the Debtor's licensing agreements with Sony and the Debtor's related records and the Sony Claims;

    b. advising the Debtor as to the nature and extent of any anti-trust related claims, claim disallowance, equitable subordination claims or any other claims or causes of action that the Debtor has or might have against Sony, including analyzing Sony's compliance (or non-compliance) with the Sherman Act;

    c. taking Bankruptcy Rule 2004 discovery and potentially preparing, filing and prosecuting lawsuits against Sony and objections to the Sony Claims; and

    d. performing any other services that may be appropriate in WS's representation of the Debtor as special litigation counsel during the Debtor's bankruptcy case.

21. WS is a full service and national law firm. Mr. Dobie serves as lead partner in trial court and appellate cases with a focus on antitrust, unfair competition, business torts and fraud, Racketeer Influenced and Corrupt Organizations Act (RICO), and securities litigation matters. He represents leading corporations and corporate executives worldwide. A copy of Mr. Dobie's resume is attached as Exhibit "1" to the Declaration of W. Gordon Dobie, Esq. (the "Dobie

Declaration"), which was filed on May 23, 2016 as Docket Number 291. While Mr. Dobie will serve as lead counsel, Mr. Dobie reserves the right to staff this representation as Mr. Dobie deems reasonably appropriate.

22. WS is being retained on a fixed fee, contingency fee and hourly billing basis pursuant to the terms set forth below. In addition to its fee, WS will seek reimbursement of all of its expenses in accordance with the rates set forth in the guidelines promulgated by the Office of the United States Trustee. The specific economic terms of the Debtor's employment of WS are set forth immediately below.

D. **Terms Of Compensation**

23. The Debtor will pay a post-petition retainer in the amount of One Hundred Thousand Dollars ($100,000.00) to WS immediately following the Court's approval of the Debtor's employment of WS, which retainer will be a fixed fee paid in exchange for WS providing the services described below(the "Fixed Fee Component"). In exchange for the Fixed Fee Component, WS will (i) assist the Debtor and the Debtor's bankruptcy counsel to seek and obtain the Court's approval of the Debtor's employment of WS; (ii) review and analyze the Debtor's licensing agreements with Sony and the Debtor's related records and the Sony Claims; (iii) advise the Debtor as to the nature and extent of any anti-trust related claims, claim disallowance and equitable subordination claims that the Debtor has or might have against Sony; (iv) assist the Debtor and the Debtor's bankruptcy counsel to conduct pre-litigation discovery of Sony (and, if appropriate, the other Labels) pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure, including addressing any objections asserted, analyze the discovery and advise the Debtor regarding the outcome of the discovery, and (v) assist the Debtor and the Debtor's bankruptcy counsel in the preparation of any objection to the Sony Claims and/or the preparation of any lawsuit against Sony – whether for anti-trust, equitable subordination, or any

other appropriate grounds. The Fixed Fee Component will also cover any expenses incurred by WS incurred in connection with any of the foregoing services. The Fixed Fee Component will be paid out of the "Estate Funds" (as defined in the Plan). The Fixed Fee Component will not be "non-refundable" as set forth in the Original Application. Rather, the Fixed Fee Component will be subject to further Court approval following notice and a hearing, but will be subject to the review standard of 11 U.S.C. §§ 328.

24. If a settlement agreement is reached with Sony before any lawsuit against Sony or objection to the Sony Claims has been filed, WS will be paid a contingency fee (the "Pre-Litigation Contingency Fee Component") computed as the extent to which (x) 1.35 multiplied by WS' cumulative hourly rate billings computed at 85% of WS' standard hourly billing rates as set forth in the Dobie Declaration when added to (y) the third party expenses incurred by WS exceeds (z) the $100,000 Fixed Fee Component paid to WS. For example, if WS' hourly billings computed at 85% of WS standard hourly billing rates when multiplied by 1.35 and then added to the third party expenses incurred by WS equals $150,000, WS will be paid an additional $50,000. The Pre-Litigation Contingency Fee Component will be paid out of the "Unsecured Creditors Fund" (as defined in the Plan) provided that any settlement payment agreed to be paid to Sony when coupled with the Pre-Litigation Contingency Fee Component does not exceed the Sony Settlement Figure. In the event that any settlement payment agreed to be paid to Sony coupled with the Pre-Litigation Contingency Fee Component exceeds the Sony Settlement Figure, the first $775,000 will be paid out of the Unsecured Creditors Fund and the balance will be paid out of the Estate Funds. The Pre-Litigation Contingency Fee Component will be subject to further Court approval following notice and a hearing but will be subject to the review standard of 11 U.S.C. §§ 328.

25. If a settlement agreement is reached with Sony after any lawsuit against Sony or objection to the Sony Claims has been filed, WS will be paid a contingency fee (the "Post-Litigation Contingency Fee Component") computed as follows:

    i. In the event of an affirmative monetary recovery from Sony, WS will be paid thirty percent (30%) of any money paid by Sony to the Debtor or the Debtor's estate, with such payment to be paid from the litigation recoveries themselves, upon receipt in the event of an affirmative recovery.

    ii. In the event of a reduction in the final allowed amount of the Sony Claims, WS will be paid thirty percent (30%) of the extent to which the aggregate amount of money which is received by the non-Label general unsecured creditors under the Plan (excluding Pulser) is increased as a result of the final allowed amount of the Sony Claims being less than $17,002,410.96, regardless of whether the reduction is the result of settlement or adjudication, with such payment to be made to WS from the Unsecured Creditors Fund.

    iii. If the cumulative payments to WS from subsections 25(i) and 26(ii) above are less than 65% of WS' cumulative hourly rate billings computed at 85% of WS' standard hourly billing rates as set forth in the Dobie Declaration (the "Minimum WS Payment"), the difference will be paid to WS from the Estate Funds, unless the distribution to Sony from the Unsecured Creditors Fund is less than $775,000, in which case the extent to which the distribution to Sony from the Unsecured Creditors Fund is less than $775,000 will be paid to WS from the Unsecured Creditors Fund and the balance of the Minimum WS Payment will be paid to WS From the Estate Funds. WS shall have the right to seek to be paid the Minimum WS Payment on a quarterly basis (i.e., every three months), and the Prepetition Secured Creditors (as defined in the Plan) consent to such quarterly payments being made out of their cash collateral subject to their prior approval of WS' litigation budgets. If no settlement is reached with Sony prior to the

confirmation of the Plan, Pulser agrees to maintain a sufficient amount of funds in a reserve account (after consultation with WS) to insure that a source of funding exists to enable payment of the Minimum WS Payment to be made to WS.

    iv.    All expenses incurred by WS after any lawsuit against Sony or objection to the Sony Claims is filed will be paid out of the Estate Funds.

The Post-Litigation Contingency Fee Component will be subject to further Court approval following notice and a hearing but will be subject to the review standard of 11 U.S.C. §§ 328.

26.    By their signatures below, the Prepetition Secured Creditors are consenting to the Debtor's use of their cash collateral to enable the Debtor to pay out of the Estate Funds the Fixed Fee Component to WS and the other payments to WS which are designed to be paid out of the Estate Funds as provided in this Application, including the Minimum WS Payment.

**E.**     **Disclosures By WS Pursuant to Rule 2014 of the Federal Rules of Bankruptcy Procedure.**

27.    WS has not been paid any money by the Debtor at any time.

28.    WS has not received any lien or other interest in property of the Debtor or of a third party to secure payment of WS's fees or expenses.

29.    WS has no prepetition claim against the Debtor.

30.    WS has not shared or agreed to share its compensation for representing the Debtor with any other person or entity, except among its members.

31.    WS understands the provisions of 11 U.S.C. Sections 327, 328, 330 and 331 which require, among other things, Court approval of the Debtor's employment of WS as bankruptcy counsel and of all legal fees and reimbursement of expenses that WS will receive from the Debtor and the Debtor's estate. WS seeks to be employed pursuant to 11 U.S.C. § 327(e) with its compensation to be reviewed pursuant to the standards of 11 U.S.C. §§ 328.

32. WS is not a creditor, an equity security holder or an insider of the Debtor.

33. WS is not and was not an investment banker for any outstanding security of the Debtor. WS has not been within three years before the Petition Date an investment banker for a security of the Debtor, or an attorney for such an investment banker in connection with the offer, sale or issuance of any security of the Debtor.

34. Neither WS nor any member of WS is, nor was, within two years before the Petition Date, a director, officer or employee of the Debtor or of any investment banker for any security of the Debtor.

35. As set forth in the Dobie Declaration, to the best of WS's knowledge, WS does not hold or represent any interest materially adverse to the interest of the Debtor's estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the Debtor or an investment banker for any security of the Debtor, or for any other reason.

36. As further set forth in the Dobie Declaration, to the best of WS' knowledge, WS does not hold or represent any interest materially adverse to the Debtor or the Debtor's estate, and WS is a "disinterested person" as that term is defined in Section 101(14) of the Bankruptcy Code. As further set forth in the Dobie Declaration, to the best of WS' knowledge, other than as set forth in the Dobie Declaration, WS has no prior connection with the Debtor, any creditors of the Debtor or the Debtor's estate, or any other party in interest in this case, or their respective attorneys or accountants, the United States Trustee or any person employed by the United States Trustee.

37. A copy of the written retention agreement prepared by WS that the Debtor intends to enter into with WS following the Court's approval of this Application is attached as Exhibit "2" to the Dobie Declaration. In the event of any inconsistency between the written retention agreement and this Application, the provisions of this Application will control.

38. The Debtor believes that its employment of WS upon the terms and conditions set forth above is in the best interest of the Debtor's estate.

**WHEREFORE**, the Debtor respectfully requests that the Court approve the Debtor's employment of WS as its special litigation counsel, effective as of May 23, 2016, upon the terms and conditions set forth above.

Dated: May 31, 2016

Submitted by:

RDIO, INC.

By: */s/ Peter Kravitz*
PETER KRAVITZ, Independent Board Member

Submitted by:

LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.

By: */s/ Ron Bender*
RON BENDER
Attorneys for Chapter 11 Debtor and Debtor in Possession

Approved:

STUBBS ALDERTON & MARKILES, LLP

By: */s/ Greg Akselrud*
GREG AKSELRUD
Attorneys for secured creditor Pulser Media, Inc.

Approved:

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

By: */s/ Van C. Durrer II*
VAN C. DURRER II
Attorneys for secured creditor Iconical Investments II LP

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document: **AMENDED APPLICATION OF DEBTOR AND DEBTOR IN POSSESSION TO EMPLOY WINSTON & STRAWN LLP AS SPECIAL LITIGATION COUNSEL PURSUANT TO 11 U.S.C. § § 327(e)** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **June 1, 2016**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Ron Bender    rb@lnbyb.com
- Kathryn M.S. Catherwood    kcatherwood@foley.com, vgoldsmith@foley.com
- Andrea Cheuk    acheuk@teslamotors.com, scastro@teslamotors.com
- John D. Fiero    jfiero@pszjlaw.com, ocarpio@pszjlaw.com
- Robert A. Franklin    Franklin.Robert@Dorsey.com, bobf_94303@yahoo.com
- Philip A. Gasteier    pag@lnbrb.com
- Julie M. Glosson    julie.m.glosson@usdoj.gov
- Debra I. Grassgreen    dgrassgreen@pszjlaw.com, hphan@pszjlaw.com
- Stephan Hornung    hornung@lsellp.com
- Thomas T. Hwang    Hwang.Thomas@Dorsey.com
- Lynette C. Kelly    lynette.c.kelly@usdoj.gov, ustpregion17.oa.ecf@usdoj.gov
- Monica Y. Kim    myk@lnbyb.com
- Andy S. Kong    kong.andy@arentfox.com
- Paul J. Laurin    plaurin@btlaw.com, slmoore@btlaw.com
- Annie Li    annie.li@skadden.com, Brigitte.Travaglini@skadden.com
- John William Lucas    jlucas@pszjlaw.com, ocarpio@pszjlaw.com
- Thor D. McLaughlin    tmclaughlin@allenmatkins.com
- Krikor J. Meshefejian    kjm@lnbyb.com
- Stephen T. O'Neill    ONeill.Stephen@Dorsey.com
- Office of the U.S. Trustee / SF    USTPRegion17.SF.ECF@usdoj.gov, ltroxas@hotmail.com
- J. Alexandra Rhim    arhim@hrhlaw.com
- Richard A. Rogan    rrogan@jmbm.com, jb8@jmbm.com
- Jason Rosell    jrosell@pszjlaw.com, sshoemaker@pszjlaw.com
- Harvey S. Schochet    Harveyschochet@dwt.com
- Jane K. Springwater    jspringwater@friedmanspring.com
- Michael St. James    ecf@stjames-law.com
- Sabrina L. Streusand    streusand@slollp.com, prentice@slollp.com
- Bennett G. Young    byoung@jmbm.com, jb8@jmbm.com

**2. <u>SERVED BY UNITED STATES MAIL</u>**: On **June 1, 2016**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012    **F 9013-3.1.PROOF.SERVICE**

Case: 15-31430    Doc# 305    Filed: 06/01/16    Entered: 06/01/16 13:03:44    Page 15 of 17

☒ *Service information continued on attached page*

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **June 1, 2016**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

***Served by Overnight Mail***
The Hon. Dennis Montali
U.S Bankruptcy Court
450 Golden Gate Avenue, 16th Floor
Courtroom 17
San Francisco, CA 94102

☐ *Service information continued on attached page*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| June 1, 2016 | Lourdes Cruz | /s/ Lourdes Cruz |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012* **F 9013-3.1.PROOF.SERVICE**

| Rdio, Inc.<br>File: 7682<br>**RSN**<br>**Service by U.S. Mail or NEF if marked with an \*** | Debtor<br>Rdio, Inc.<br>1550 Bryant Street, Suite 200<br>San Francisco, CA 94103 | Julie M. Glosson **NEF\***<br>Lynette C. Kelly<br>Office of the United States Trustee<br>235 Pine St. #700<br>San Francisco, CA 94104 |
|---|---|---|
| Committee Counsel<br>John D. Fiero/ Debra I. Grassgreen **NEF\***<br>John W. Lucas/ Jason Rosell<br>Pachulski, Stang, Ziehl, and Jones<br>150 California St. 15th Fl.<br>San Francisco, CA 94111-4500 | Committee Member<br>Joseph Hollinger<br>Roku, Inc.<br>12980 Saratoga Avenue<br>Saratoga, CA 95070 | Committee Member<br>Ryan E. Davis<br>AXS Digital LLC<br>800 W. Olympic Blvd., Ste. 305<br>Los Angeles, CA 90015 |
| Committee Member<br>Antonious Porch<br>Shazam Media Services<br>52 Vanderbilt Avenue, 19th fl.<br>New York, NY 10017 | Committee Member<br>Joe Flores<br>Universal Music Group Recording<br>21301 Burbank Blvd.<br>Woodland Hills, CA 91367 | Committee Member<br>Denis McCarthy<br>Mosaic Networx LLC<br>700 Larkspur Landing Circle, Ste. 214<br>Larkspur, CA 94939 |
| **Secured Creditors**<br>Dell Financial Services L.L.C.<br>Mail Stop-PS2DF-23 One Dell Way<br>Round Rock, TX | Counel for Pulser Media, Inc.<br>Greg Akselrud<br>Stubbs Alderton & Markiles, LLP<br>15260 Ventura Blvd., 20th Floor<br>Sherman Oaks, CA 91403 | Counsel for Iconical<br>Ron E. Meisler/Christopher M. Dressel<br>Skadden, Arps, Slate, Meagher & Flom LLP<br>155 N. Wacker Drive<br>Chicago \| Illinois \| 60606-1720 |
| **Secured Creditors**<br>Dell Financial Services L.L.C.<br>One Dell Way<br>Round Rock, TX 78682 | Counsel for Pandora Media, Inc.<br>Wilson Sonsini Goodrich & Rosati<br>Attention: Todd Cleary<br>One Market Plaza<br>Spear Tower, Suite 3300<br>San Francisco, CA 94105 | Counsel for Pandora Media, Inc.<br>Wilson Sonsini Goodrich & Rosati<br>Attention: Benjamin Hoch<br>1301 Avenue of the Americas<br>40th Floor<br>New York, NY 10019-6022 |
| RSN<br>City and County of San Francisco<br>Office of the Treasurer/Tax Collector<br>Attn: Stephanie Profitt, Tax Collector Atty<br>P.O. Box 7027<br>San Francisco, CA 94120-7027 | RSN – Counsel for Talentica Software<br>Habbu & Park<br>95 South Market St, Suite 530<br>San Jose, CA 95113 | Counsel for Pandora Media, Inc.<br>Stephen T. O'Neill **NEF\***<br>Thomas T. Hwang<br>DORSEY & WHITNEY LLP<br>305 Lytton Avenue<br>Palo Alto, CA 94301 |
| RSN<br>Paul Laurin, Esq. **NEF\***<br>Barnes & Thornburg LLP<br>2029 Century Park East, Suite 300<br>Los Angeles, California 90067-2904 | RSN<br>ARENT FOXLLP **NEF\***<br>Richard D. Buckley, Jr./ Andy Kong<br>555 West Fifth Street, 48th Floor<br>Los Angeles, CA 90013-1065 | RSN<br>Sabrina L. Streusand **NEF\***<br>Streusand, Landon & Ozburn LLP<br>811 Barton Springs Road, Suite 811<br>Austin, Texas 78704 |
| RSN **NEF\***<br>Van C. Durrer, II/Ramon M. Naguiat<br>SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP<br>300 South Grand Avenue, Suite 3400<br>Los Angeles, California 90071-3144 | RSN Attorneys for Bank Of The West<br>J. ALEXANDRA RHIM **NEF\***<br>HEMAR, ROUSSO & HEALD, LLP<br>15910 Ventura Boulevard, 12th Floor<br>Encino, California 91436 | RSN<br>GIBBONS P.C.<br>Attn: David N. Crapo, Esq.<br>One Gateway Center<br>Newark, New Jersey 07102-5310 |