RON BENDER (SBN 143364)
PHILIP A. GASTEIER (SBN 130043)
IRV M. GROSS (SBN 53659)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbyb.com; pag@lnbyb.com; img@lnbyb.com; kjm@lnbyb.com

W. GORDON DOBIE (IL ARDC No. 6193308 )
KARI M. ROLLINS (IL ARDC No. 6287218)
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, Illinois 60601
Telephone: (312) 558-5600
Facsimile: (312 558-5700
Email: wdobie@winston.com; karollins@winston.com
*Pro Hac Vice Applications Pending*

Attorneys for Chapter 11 Debtor and Debtor in Possession

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re: | ) Case No. 15-31430 |
| | ) |
| RDIO, INC., | ) Chapter 11 |
| | ) |
| Debtor and Debtor in Possession. | ) **DEBTOR'S MOTION FOR ORDER** |
| | ) **PURSUANT TO RULE 2004 OF THE** |
| | ) **FEDERAL RULES OF BANKRUPTCY** |
| | ) **PROCEDURE DIRECTING THE** |
| | ) **PRODUCTION OF DOCUMENTS BY** |
| | ) **SONY MUSIC ENTERTAINMENT AND** |
| | ) **ORCHARD ENTERPRISES NY, INC;** |
| | ) **AND ORAL EXAMINATIONS OF** |
| | ) **PERSONS MOST KNOWLEDGEABLE** |
| | ) **FOR SONY MUSIC ENTERTAINMENT** |
| | ) **AND ORCHARD ENTERPRISES NY,** |
| | ) **INC.; MEMORANDUM OF POINTS AND** |
| | ) **AUTHORITIES** |
| | ) |
| | ) **[Declaration of Kari M. Rollins Filed In** |
| | ) **Support]** |
| | ) |

# TABLE OF CONTENTS

**MEMORANDUM OF POINTS AND AUTHORITIES** ................................................**5**

**I.     INTRODUCTION** .....................................................................................**5**

**II.    STATEMENT OF RELEVANT FACTS** ...................................................**7**

      **A.     Background** ................................................................................**7**

      **B.     The Outreach to Investors or Purchasers and the Sale Process** ...................**9**

      **C.     The Debtor's Plan** ...................................................................**11**

      **D.     Sony's Claims Against The Debtor** .........................................**11**

      **E.     Orchard's Claims Against The Debtor** ....................................**12**

      **F.     The Debtor's Claims Against Sony And Orchard** ...................**13**

      **G.     The Debtor's Request to Sony and Orchard to Meet and Confer and Sony's And Orchard's Inadequate Response** ...................**14**

      **H.     Circumstances Make It Imperative That The Motion Be Heard As Soon As Possible** ..............................................................**17**

**III.   ARGUMENT** .........................................................................................**19**

**IV.    CONCLUSION** ......................................................................................**21**

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*In re Analytical Sys., Inc.*
    71 B.R. 408 (Bankr. N.D. Ga. 1987)....................................................................20

*In re Bennett Funding Group, Inc.*
    203 B.R 24 (Bankr. N.D.N.Y. 1996)...................................................................20

*In re Coffee Cupboard, Inc.*
    128 B.R. 509 (Bankr. E.D.N.Y. 1991)................................................................20

*In re Cousins Barricades & Metal Prods. Inc.*
    No. Civ. A. 99-2035, 2000 WL 245860 (E.D. La. Mar. 2, 2000).........................19

*In re Ecam Publ'ns*
    131 B.R. 556 (Bankr. S.D.N.Y. 1991) ...............................................................19

*In re Ionosphere Clubs, Inc.*
    156 B.R. 414 (S.D.N.Y. 1993), *aff'd,* 17 F.3d 600 (2d Cir. 1994).....................19

*In re Teleglobe Commc'ns Corp.*
    493 F.3d 345 (3d Cir. 2007)...............................................................................20

*Snyder v. Society Bank*
    181 B.R. 40 (S.D. Tex. 1994)..............................................................................19

*Starr v. Sony BMG Music Entm't*
    592 F.3d 314 (2d Cir. 2010), cert. denied, 131 S. Ct. 901 (2011).........................13

**OTHER CASES**

*Sony Music Entertainment v. Anthony Bay, Elliott Peters, and Jim Rondinelli*
    Case 1:16-cv-02505-RJS................................................................................5, 2

**FEDERAL STATUTES**

11 U.S.C. § 363 ..............................................................................................................9

11 U.S.C. § 1107 ..........................................................................................................11

11 U.S.C. § 1108 ..........................................................................................................11

**FEDERAL RULES**

Fed.R.Bankr.P. 2004-1 ........................................................................................2, 4, 17

Fed.R.Bankr.P. 2004 .............................................................................................. passim

1  Fed.R.Bankr.P. 2004(a)..................................................................................19

2  Fed.R.Bankr.P. 2004(b)..................................................................................19

3  Fed.R.Bankr.P. 7030 .....................................................................................21

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Rdio, Inc., debtor and debtor in possession in the above-referenced chapter 11 case (the "Debtor"), will and hereby does move (the "Motion") pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rule 2004-1 ("Rule 2004") for an order (the "Rule 2004 Exam Order") requiring Sony Music Entertainment ("Sony") and Orchard Music NY, Inc. ("Orchard")[1], which purport to hold liquidated and unliquidated claims against the Debtor, and which are subject to antitrust and other claims by the Debtor, to:

(i)    produce and permit inspection of all documentation in the possession, custody or control of Sony and Orchard, respectively, including their respective agents, officers, and employees, listed on Exhibit "A" (the "Documents") to the proposed Rule 2004 Exam Order annexed hereto as Exhibit "1," by delivering the Documents to the offices of Winston & Strawn, 200 Park Avenue, New York, New York 10166 (the "Examination Location"), by no later than ten (10) business days from the entry of the Rule 2004 Exam Order;

(ii)    appear for oral examinations (together with production of the Documents, the "Rule 2004 Exams") through the persons they each designate as the persons most knowledgeable (the "Sony PMKs" and the "Orchard PMKs", respectively) regarding the following areas of inquiry:

1.    Any matters related to the acts, conduct, or property or to the liabilities and financial condition of the Debtor;

2.    Any matters which may affect the administration of the Debtor's estate;

3.    Any matters related to the Debtor's bankruptcy case;

4.    Any other matter relevant to the Debtor's bankruptcy case or to the formulation of a plan;

5.    With respect to the Sony PMKs, Sony's claims for (i) liquidated amounts asserted to be due and owing under written agreements between the Debtor and Sony; (ii) unliquidated claims for indemnification rights asserted under written agreements between the

---

[1] The Debtor is informed and believes that Orchard is a Sony affiliate.

2

Debtor and Sony; (iii) Sony's unliquidated fraudulent inducement claims against the Debtor; and (iv) unliquidated unjust enrichment claims against the Debtor;

6.      With respect to the Orchard PMKs, Orchard's claims for (i) liquidated amounts asserted to be due and owing under the written agreements between the Debtor and Orchard; and (ii) unliquidated claims for indemnification rights asserted under the written agreements between the Debtor and Orchard;

7.      All aspects of the "Most Favored Nation" clauses ("MFNs") in any and all written agreements between (i) the Debtor and Sony, and (ii) the Debtor and Orchard;

8.      The market conditions which existed during the Debtor's pre-petition relationships with Sony and Orchard, including but not limited to the market conditions that existed when the written agreements that included the MFNs were negotiated and entered into;

9.      All aspects of Sony's and Orchard's business relationships, including but not limited to written and oral communications, conversations and meetings with Universal Music Group and its affiliates ("Universal") and Warner Music, Inc. and its affiliates ("Warner"), in connection with or related to the Debtor; and

10.     The Documents, the subject matter of the Documents, and any matter related to the Documents.

This list is meant to be illustrative and not exhaustive, and the Debtor reserves the right to seek examination of additional person or persons in the event disagreement arises over the identification by Sony of Sony PMKs and by Orchard of Orchard PMKs.

Sony shall produce the Sony PMKs for their Rule 2004 Exams at the Examination Location thirty (30) days from the entry of the Rule 2004 Exam Order or as otherwise agreed by counsel for the Debtor and Sony.

Orchard shall produce the Orchard PMKs for their Rule 2004 Exams at the Examination Location thirty (30) days from the entry of the Rule 2004 Exam Order or as otherwise agreed by counsel for the Debtor and Orchard.

Each and all of the 2004 Exams shall continue from day to day until completed, Sundays and holidays excluded.

Pursuant to Local Bankruptcy Rule 2004-1, the Court may grant the Motion without a hearing. In the event the Court deems it appropriate to have a hearing on the Motion, the Debtor respectfully requests the Court set the hearing on the earliest date convenient to the Court, excluding July 6, 9 and 28, 2016.

**WHEREFORE**, the Debtor respectfully requests the Court to enter an order:

(1)     Granting the Motion in its entirety;

(2)     Approving and entering the Rule 2004 Exam Order annexed hereto as Exhibit "1"; and

(3)     Granting such other and further relief as the Court deems just and proper.

Dated: June 27, 2016          LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.

By: ___*/s/ Ron Bender*_____
RON BENDER
PHILIP A. GASTEIER
IRV M. GROSS
KRIKOR J. MESHEFEJIAN
Attorneys for Chapter 11 Debtor and Debtor in Possession

Dated: June 27, 2016          WINSTON & STRAWN LLP

By: ___*W. Gordon Dobie*_____
W. GORDON DOBIE
KARI M. ROLLINS
Attorneys for Chapter 11 Debtor and Debtor in Possession
*Pro Hac Vice Applications Pending*

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>[2]

## I. INTRODUCTION

The Debtor was engaged in the relatively new and developing business of operating an online music service. Sony is one of three major labels (together with Universal and Warner) controlling the rights to the vast array of music desired by the Debtor's former subscribers. Sony claims that it is the "second-largest recorded music company in the world." *See Sony Music Entertainment v. Anthony Bay, Elliott Peters, and Jim Rondinelli*, Case 1:16-cv-02505-RJS, S.D.N.Y. (April 4, 2016). Sony is also the alleged largest unsecured creditor of the Debtor's bankruptcy estate[3], having asserted a general unsecured claim (Claim No. 54) in excess of $12 million (the "Sony Claim").

Orchard is the alleged third largest unsecured creditor of the Debtor's bankruptcy estate, having asserted a general unsecured claim (Claim No. 53) in excess of $4.5 million (the "Orchard Claim"), allegedly based on content agreements between Orchard and the Debtor.

Prior to commencing its service, the Debtor entered into a written agreement with Sony to obtain rights to use music controlled by Sony for a specified term. Thereafter, the Debtor and Sony negotiated additional agreements and numerous extensions of the term of the agreements. The final extension agreement was signed approximately one and one half months before the Debtor filed its voluntary petition under Chapter 11 of the Bankruptcy Code.[4]

Like almost all online music service businesses, the Debtor did not generate a profit, and experienced only significant losses. As a result, the Debtor eventually engaged an investment banker to identify additional funding sources, or alternatively a merger partner or buyer. At about the time the Debtor signed the last extension agreement with Sony, it also signed a non-

---

[2] Unless otherwise stated, all defined terms have the same meaning ascribed to them in the preceding Motion.

[3] Excluding the unsecured claim of Pulser Media, Inc. ("Pulser"), the Debtor's majority shareholder.

[4] The final extension agreement is dated as of approximately seven months earlier to reflect the fact that the Debtor and Sony had been negotiating a longer extension over a period of time, and that in the interim they had entered into a series of short extensions.

binding term sheet with a potential purchaser. During this time, the Debtor continued to operate its business and continued discussions with the potential purchaser about selling its business as a going concern. Indeed, the Debtor continued to market its business as a going concern right through the filing of the Chapter 11 case and up to the time of the auction sale scheduled by the Bankruptcy Court. Unfortunately, however, no bidder emerged (other than the stalking horse bidder).

Sony is now attempting to leverage its position in the Chapter 11 case by, among other things, asserting in the Sony Claim that not only should it have a claim for $12,419,314 based on the unearned minimum guarantees stated in its agreements with the Debtor, but that it should also have additional unspecified and unliquidated claims. These additional claims are based on purported indemnification rights as well as Sony's contention that it was "fraudulently induced" by the Debtor to enter into the last extension agreement, as a result of which the Debtor was purportedly "unjustly enriched". Sony's asserted claims are (by a substantial amount) the largest non-insider general unsecured claim against the Debtor's estate.

Similarly, Orchard is asserting in the Orchard Claim that not only should it have a claim for $4,583,096.96 based on unearned minimum guarantees stated in its agreements with the Debtor, but that it should also have an additional unspecified and unliquidated indemnification claim.

The Debtor is confident that it has defenses to Sony's and Orchard's respective claims, and, in fact, that all or a substantial portion of Sony's and Orchard's claims may be equitably subordinated. The Debtor also strongly believes that it has affirmative claims against Sony and Orchard, including meritorious and valuable antitrust claims.[5] However, as baseless as Sony's and Orchard's claims are, and as strongly as the Debtor feels about its own claims against them, the Debtor recognizes that further investigation is required, including further inquiry into the

---

[5] With the approval of the Court, the Debtor has already engaged Winston Strawn LLP as special litigation counsel to investigate and, if appropriate, prosecute antitrust or other claims against Sony and its affiliates (which would include Orchard) and/or file an objection to claims asserted by Sony and/or its affiliates.

facts surrounding Sony's and Orchard's alleged claims and particularly Sony's claim of fraudulent conduct by the Debtor, of Sony's and Orchard's intent in connection with agreements they entered into with the Debtor and whether those agreements were unconscionable under the circumstances, the payments Sony and Orchard received prior to the Petition Date, and Sony's and Orchard's anticompetitive conduct.

The Debtor respectfully submits that the investigation described above is precisely what Rule 2004 is intended to accomplish. The investigation of the largest asserted unsecured claims against the Debtor's estate, as well as the investigation of potentially highly valuable claims of the Debtor's estate and the ultimate disposition of such claims, clearly implicate the "liabilities and financial condition of the debtor", are "matters which may affect the administration of the debtor's estate", and certainly are "relevant to the case or to the formulation of a plan." In these circumstances, a Rule 2004 examination is not only permitted and necessary, it is the most efficient manner in which the Debtor can undertake its investigation without immediately taxing the estate with the considerable expense of contentious litigation.

## II. STATEMENT OF RELEVANT FACTS

### A. Background

The Debtor was founded in 2008 as a digital music service. The Debtor's business operations were launched in 2010 after it secured the requisite licenses from the holders of music rights. Since that time, the Debtor strived to grow into a worldwide music service, and as of the Petition Date was conducting business in approximately 86 countries. Nevertheless, and despite the investment of several hundred million dollars and years of effort to build its subscriber base (and to attract meaningful advertising dollars), the Debtor was unable to achieve profitability – or even to reduce its operating losses to tolerable levels.[6]

---

[6] The Debtor is not aware of any streaming music service that is currently profitable, and believes that collective losses to date from streaming music companies total over $1 billion. In fact, the Debtor understands that almost all streaming music companies are losing more money than the Debtor lost. This is documented in a recent article in Music Business Worldwide. (see *http://www.musicbusinessworldwide.com/the-great-music-biz-money-pit-how-streaming-services-lost-1bn/*).

While streaming music services remain unprofitable and continue to lose money, the music labels' streaming music revenues appear to be at record highs and increasing rapidly. Undoubtedly one significant reason for this disparity is that the streaming music services are obligated to pay the music labels, such as Sony, approximately 70% of their subscription revenues in recorded music and music publishing royalties and a per stream royalty for ad supported services that is in many cases higher than their total revenues.

With respect to Sony in particular, the Debtor is informed and believes that revenues from streaming music constitute a growing portion of its music-related revenue. *See* https://www.themusicnetwork.com/news/streaming-now-makes-up-24-of-sony-music-revenue). Indeed, senior executives at Sony, such as its Executive Deputy President and Chief Financial Officer, Kenichiro Yoshida, have pointed to the growth of Sony's streaming revenue as an example of why its music division's bleak days are starting to see light.[7] *See id.*

**B.**     <u>**The Outreach to Investors or Purchasers and the Sale Process**</u>

As a result of these challenges, in the fall of 2014, Pulser (the Debtor's largest shareholder) employed a highly qualified investment bank, Moelis & Company ("<u>Moelis</u>") to raise new equity capital. Despite extensive efforts by Moelis, the prospects for raising new debt or equity capital were not promising at the time, and it was also apparent the Debtor was not able to continue funding its significant operating losses indefinitely. Accordingly, Pulser broadened Moelis's mandate to include seeking a buyer or merger partner.

Moelis and the Debtor held introductory telephone calls with potential interested parties to walk through the opportunity and initiated contact with 110 potential buyers or investors

---

[7] Sony Corp Executive Deputy President and CFO Kenichiro Yoshida has said that the "significant momentum in music streaming" showed that the 15-year decline of the music industry was "finally bottoming out." He added, "We're very positive [about] the growth in the streaming market. To some extent, it's replacing the download business, but the growth is positive. "We expect it to keep going and accelerate… we expect [Sony's] Music business to be on the rise again." *See* https://www.themusicnetwork.com/news/streaming-now-makes-up-24-of-sony-music-revenue.

throughout the world. The Debtor and Moelis eventually executed non-disclosure agreements with 32 interested parties and provided the Debtor's management marketing materials to all of them. This produced in-person meetings or calls between the Debtor's management team and 16 interested parties.

By June 2015, Pandora Media, Inc. ("Pandora") was emerging as the most interested party and the party most likely to present the best offer and to close a sale. On July 8, 2015, Pandora submitted a preliminary letter of intent (the "Initial LOI"), which was never counter-signed by the Debtor. Concurrent with the continuing negotiations with Pandora regarding the Initial LOI, Moelis continued its marketing efforts, and over the subsequent three months the Debtor's management and Moelis continued discussions with other interested parties that had been identified.

On September 29, 2015, after vigorous negotiations, several iterations of the Initial LOI and continuing due diligence by Pandora, the parties executed a non-binding LOI (the "Executed Non-Binding LOI"). Following the execution of the Executed Non-Binding LOI, Pandora continued its due diligence and the parties commenced negotiations on the terms of a potential definitive transaction. Those negotiations were also very intense and extended, and throughout the negotiations Pandora was proceeding with its due diligence. Although the Executed Non-Binding LOI provided *inter alia* that Pandora could elect to have the Debtor's asset sale conducted as part of a Chapter 11 bankruptcy process and an asset purchase pursuant to a sale under 11 U.S.C. § 363, the Debtor and Pandora continued to discuss potential alternatives to a Chapter 11 bankruptcy filing, and the Debtor continued to pursue potential transactions with other parties.

On November 16, 2015, the Debtor and Pandora executed a definitive Asset Purchase Agreement (the "APA"). Pursuant to the APA, Pandora required that its asset purchase be consummated through a Chapter 11 bankruptcy process by the Debtor and an asset sale under 11 U.S.C. § 363. Thus, on the same day the APA was executed (the Petition Date), the Debtor filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code.

Throughout the negotiation between the Debtor and Pandora, and until shortly before the

parties executed the APA, it was anticipated that Pandora would acquire the Debtor's assets in a manner that would allow Pandora to continue to operate the Debtor's business as a going concern. Ultimately, however, Pandora decided that it would not purchase the Debtor's business as a going concern, but would acquire only certain assets, consisting primarily of the Debtor's core technology and related engineering and product/design staff.

As part of the Debtor's proposed sale of substantially all of its assets to Pandora (and as evidenced by the Debtor's filing of the Bid Procedures Motion), Pandora agreed that the Debtor could and should market Pandora's offer for overbid to ensure that the highest and best price was paid for the Debtor's assets. As part of the bidding process, the Debtor served notice of the proposed sale and overbid opportunity upon all potential purchasers identified by the Debtor, and the Debtor and Moelis continued to actively seek qualified overbidders. Several parties executed non-disclosure agreements, obtained access to an overbid electronic data room established by the Debtor, and conducted extensive due diligence to better understand the Debtor's business. Moelis reported that it reached out to over 90 parties in connection with the proposed sale, negotiated and obtained 5 executed confidentiality agreements, and continued to be in discussions with several parties through close to the deadline for submitting bids. While a number of financially qualified parties engaged in various stages of due diligence, ultimately no party submitted an overbid. As a result, the Debtor proceeded with the Sale Motion at a scheduled hearing on December 21, 2015, seeking Court approval of its asset sale to Pandora in accordance with the terms of the APA.

On December 22, 2015, the Court entered an order approving the sale to Pandora. On December 23, 2015, the Debtor and Pandora closed the sale of substantially all of the Debtor's assets to Pandora pursuant to the terms of the APA and the Court's sale order.

Throughout the sale process, the Debtor maintained the operation of its streaming service in order to allow consideration by prospective purchasers who might be interested in purchasing the Debtor as a going concern and continuing its operations and its relationship with millions of subscribers. This included maintaining the service after the Petition Date, even though the costs had to be paid or would constitute administrative claims in the Chapter 11 case.

The Debtor continues to manage its financial affairs and administer its bankruptcy estate as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

**C.      The Debtor's Plan**

On June 1, 2016, the Debtor filed that certain *Debtor's Second Amended Plan Of Reorganization (Dated June 1, 2016)* (Doc #312) (the "Plan").  The Debtor intends to further amend the Plan in accordance with the discussions at the disclosure statement hearing held on June 16, 2016.  With the conditional support of the Committee, the Debtor is moving forward with the Plan (as amended or to be amended) as rapidly as possible.  Under the Plan (as amended or to be amended), the estate's claims and causes of action are preserved for the benefit of creditors, and the reduction or subordination of the Sony Claim and the Orchard Claim will result in significant benefits to the Debtor's other general unsecured creditors. Moreover, there will undoubtedly be litigation before the Court to determine the extent to which, if any, the Sony Claim and the Orchard Claim should be entitled to vote to accept or reject the Plan.  For these reasons, the Debtor believes it is critically important to investigate the Sony Claim and the Orchard Claim as well as the Debtor's claims against Sony and Orchard as expeditiously as possible.

**D.      Sony's Claims Against The Debtor**

On March 18, 2016, Sony filed the Sony Claim; a true and correct copy of the Sony Claim is marked as Exhibit "2" and is attached hereto and incorporated herein by reference. The Sony Claim asserts claims against the Debtor for (a) certain liquidated amounts allegedly due and owing under agreements between the Debtor and Sony in the amount of $12,419,314 (the "Sony Liquidated Claim"), (b) unliquidated claims for indemnification rights asserted under such agreements, (c) fraudulent inducement, and (d) unjust enrichment (collectively the "Sony Unliquidated Claims").

The Sony Liquidated Claim is the largest general unsecured claim asserted by a non-insider against the Debtor's estate.  The Sony Liquidated Claim appears to be comprised of, among other things, $4 million of unearned "minimum guarantees."

The Sony Unliquidated Claim purportedly arises out of or relates to a certain Content

Distribution Agreement dated as of May 28, 2010 (the "Content Agreement"), and a 2015 Renewal Amendment dated as of April 15, 2015 (the "2015 Renewal Amendment"). Sony has included only certain portions of the Content Agreement and 2015 Renewal Agreement in the Sony Claim.

According to Sony, the Sony Claim (both the Sony Unliquidated Claims and the Sony Liquidated Claim) reflects the purported damage it suffered as a result of the Debtor's bankruptcy filing and inability to pay Sony's unearned minimum guarantees in full. The Sony Claim is spurious. Obviously, filing Chapter 11 is not an actionable tort. Furthermore, Sony comprehends full well the nature of the online music streaming business, in addition to which the Debtor provided its financials to Sony. In short, Sony knew, or surely had reason to know, there was a significant risk of failure for any music streaming service, including the Debtor.

In the present Motion, the Debtor intends to investigate the Sony Liquidated Claim and the Sony Unliquidated Claims to determine whether any of them are valid, whether there are defenses to these claims, whether the claims should be subordinated, whether the agreements that gave rise to the claims are unconscionable, what other bases there are to object to these claims, and what damages, if any, Sony actually incurred.

**E.      Orchard's Claims Against The Debtor**

On March 18, 2016, Orchard filed the Orchard Claim; a true and correct copy of the Claim is marked as Exhibit "3" and is attached hereto and incorporated herein by reference. The Orchard Claim asserts claims against the Debtor for (a) certain liquidated amounts allegedly due and owing under agreements between the Debtor and Orchard in the amount of $4,583,096.96 (the "Orchard Liquidated Claim"), and (b) unliquidated claims for indemnification rights asserted under such agreements (the "Orchard Unliquidated Claim").

The Orchard Liquidated Claim is the third largest general unsecured claim asserted by a non-insider against the Debtor's estate. The Orchard Liquidated Claim appears to be comprised of, among other things, unearned "minimum guarantees."

In the present Motion, the Debtor intends to investigate the Orchard Liquidated Claim and the Orchard Unliquidated Claim to determine whether any of them are valid, whether there

are defenses to these claims, whether the claims should be subordinated, whether the agreements that gave rise to the claims are unconscionable, what other bases there are to object to these claims, and what damages, if any, Orchard actually incurred.

**F.     The Debtor's Claims Against Sony And Orchard**

The Debtor believes it has meritorious and valuable antitrust claims against Sony and Orchard.  In particular, the Debtor believes that Sony and Orchard have engaged in anticompetitive conduct to fix and control prices and unreasonably restrain trade for the licensing, marketing, and use of music by services, like the Debtor, for the digital streaming of music to consumers worldwide.  For example, one of the Debtor's preliminary antitrust theories relates to what are commonly known as Most Favored Nations clauses ("MFNs") which play a major role in Sony's agreements with Rdio and in Orchard's agreements with Rdio.  This should not come as a surprise to Sony and Orchard in that the Second Circuit in *Starr v. Sony BMG Music Entertainment* ruled in favor of a Section 1 Sherman Act claim against Sony, concluding that allegations that firms comprising 80 percent of sales in a market engaged in parallel pricing conduct—including charging the same "unreasonably high prices" and "us[ing] the MFNs to enforce a wholesale price floor"—were "sufficient to plausibly suggest that the parallel conduct alleged was the result of an agreement among the defendants." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 323 (2d Cir. 2010), cert. denied, 131 S. Ct. 901 (2011).  *Starr v. Sony* involved principally the use of MFNs in Sony's sale of music, and it now appears that similar questionable conduct by Sony has spread to its streaming music business with Rdio

Antitrust enforcement agencies and courts have applied greater scrutiny to MFNs as they have become concerned that the use of MFNs in certain market conditions may result in higher prices and decreased competition.[8]  There are two prevailing theories of competitive harm caused by MFNs: (1) collusion (where several sellers in a concentrated market agree with one another—tacitly or explicitly—to not discount prices to their customers through the use of

---

[8] For the Court's convenience, marked as Exhibit "4" and attached hereto and incorporated herein by reference is a recently published article in the National Law Review addressing the issue of MFNs and the interest taken in them by the Department of Justice.

MFNs); and (2) <u>exclusion</u> (where MFNs are used by a dominant firm, or group of firms, to exclude competition from smaller rivals or preserve their market share).  Among other causes of action, the Debtor preliminarily believes that it has very valuable causes of action against Sony and Orchard under a collusion theory.

Accordingly, the Debtor respectfully submits that further inquiry concerning this potentially valuable claim is warranted, as is further inquiry into other antitrust theories relating to Sony's and Orchard's restraint of trade in the market for digital music streaming and any related tort and unfair competition claims.  The Debtor respectfully submits that the 2004 Exam is the most expeditious manner for undertaking at least a preliminary investigation of these valuable claims.

**G.** **The Debtor's Request to Sony and Orchard to Meet and Confer and Sony's And Orchard's Inadequate Response**

On June 8, 2016, the Debtor, through its special litigation counsel, sent Sony and Orchard an amended copy of the Debtor's informal request for production of documents (*see* Exhibit A to the proposed Rule 2004 Exam Order annexed hereto as Exhibit 1).  In the same letter, the Debtor's counsel requested that Sony and Orchard meet and confer to discuss an agreeable timeline for response and production of the requested documents (the "<u>Meet and Confer Letter</u>").  A true and correct copy of the Meet and Confer Letter is marked as Exhibit "5" and is attached hereto and incorporated herein by reference.  Although the Debtor was under no obligation to meet and confer at this stage, the Debtor's counsel proposed to meet and confer in a good faith effort to expedite the document production process and in an attempt to resolve informally, in advance of this Motion, any disputes the parties may have.

On June 10, 2016, Sony's and Orchard's counsel responded to the Meet and Confer Letter with a boilerplate response that "the requests appear to be exceedingly broad and overly burdensome", and "requested" the Debtor to provide Sony and Orchard with a description of its claims and theories as a condition to Sony's and Orchard's participation in a meet and confer.

On June 13, 2016, one of the Debtor's special litigation counsel, Kari M. Rollins, responded to Mr. Hornung's June 10, 2016 email.  Despite having no obligation to do so, Ms.

1  Rollins provided Mr. Hornung with an explanation of the claims underlying the document

2  requests submitted in the Meet and Confer Letter.

3       On June 15, 2016, Mr. Hornung responded to Ms. Rollins' June 13, 2016 email.

4  Although Mr. Hornung proposed a meet and confer on June 21, 2016, he effectively signaled

5  Sony's and Orchard's refusal to participate in "a meaningful meet and confer" ("It is hard for us

6  to have a meaningful discussion with you about the information you may need . . . if we do not

7  receiver answers to these basic question.") unless the Debtor first answered questions directed

8  to specific aspects of its claims. The aforementioned email exchanges of June 10-15, 2016

9  between Mr. Hornung and Ms. Rollins are collectively marked as Exhibit "6" and are attached

10 hereto and incorporated herein by reference.

11      While the questions posed by Mr. Hornung might be permissible in discovery served

12 by Sony and Orchard, they are clearly impermissible as a condition to participating in good faith

13 in a meet and confer. Nevertheless, the Debtor's counsel (special litigation counsel and

14 bankruptcy counsel) participated in a telephonic meet and confer on the date requested by Mr.

15 Hornung, June 21, 2016. Unfortunately, despite the fact that the meet and confer occurred

16 approximately two weeks after the Debtor's special counsel delivered the original Meet and

17 Confer Letter to Sony's and Orchard's counsel, Sony's and Orchard's counsel (also Sony's

18 antitrust counsel and bankruptcy counsel) made it abundantly clear from the outset of the

19 telephone call that neither Sony nor Orchard would produce any of the requested documents

20 unless the Debtor's counsel first responded (as if being deposed) to endless and hostile

21 questions directed to the Debtor's legal theories and whatever evidence and information the

22 Debtor had in its possession to support those theories. The Debtor's counsel repeatedly, but

23 unsuccessfully, attempted to bring the discussion back to the production of documents. After

24 almost an hour, the meet and confer ended with Sony's and Orchard's counsel stating that they

25 would respond in 24 hours as to what documents, if any, Sony and Orchard would produce or at

26 least provide a status update.

27      On June 23, 2016, Sony's counsel emailed Sony's response to the Debtor's counsel

28 (the "Sony Response Letter"); a true and correct copy of the Sony Response Letter is marked as

Exhibit "7" and is attached hereto and incorporated herein by reference. Although the Sony Response Letter offers "a compromise", Sony's "cooperation" is largely illusory.

Sony has offered to produce only three very narrow and limited categories of documents (*see* Sony Response Letter), the majority of which will likely prove useless to the Debtor in investigating whether Sony and Orchard have colluded with other Labels to fix prices and/or otherwise restrain trade. Indeed, telling of their purported usefulness is the condition placed by Sony on their production: if these few, self-servingly Sony-selected documents "do not show any collusion, then Sony should not be burdened with the costs of any further document production." Sony Response Letter at 3. Of course, however, Sony has cherry-picked categories of documents which they know will likely offer little-to-no evidence of collusion. In fact, one of the categories of documents Sony has offered to produce—its license agreements with six of the Debtor's competitors—is a category of documents the Debtor did not even request, and for the very reason that the Debtor knew such documents would do nothing to prove, support, or advance the Debtor's claims.[9] What is more, of the eight (8) custodians from which Sony has agreed to produce only a small category of documents, three (3) of those custodians are in-house legal counsel and two (2) more attorneys. The likelihood that these **attorneys** will have any documents reflecting anticompetitive conduct, agreements, or collusive behavior seems slight, and the existence of any non-privileged documents even less likely than that. As a result, the Debtor is left with only three (3) Sony custodians, and no proffered Orchard representatives—reflecting only a small percentage of the individuals which the Debtor

---

[9] Sony offered to produce copies of its U.S. license agreements with six streaming music service providers: Spotify, Amazon, Apple, Google, Rhapsody, and Microsoft. Sony Response Letter at 3. While the Debtor would typically love the opportunity to see those license agreements and their terms, the Debtor never actually submitted a discovery request to Sony for this category of documents. And for good reason. The license agreements themselves will do nothing to prove, support, or advance the Debtor's claims that Sony has engaged in anticompetitive conduct *with the other Labels* to fix prices and/or restrain trade. That is because Sony's license agreements with the Debtor's competitors cannot alone offer evidence of collusion or agreement amongst the Labels, no matter how similar they are in form and substance. For that reason, in thoughtfully and judiciously crafting its discovery requests to seek only those documents that will prove useful in investigating its antitrust claims, the Debtor did not request this category documents.

believes will have information responsive to its document requests.[10] But, even if the few documents Sony agreed to produce did show evidence of collusion, Sony would never agree nor admit as such, and, thus, Sony's offer of "compromise" ultimately rings hollow.

As noted above, the documents offered ***do not include*** a number of categories that are critical to the proposed inquiry. For example, a particularly important category that is missing, and one that is arguably easy to produce, is documents relating to any nonpublic investigation undertaken by any regulatory agency. *See* Exhibit A at Document Request No. 6. During the June 21, 2016 meet and confer, rather than confirm or deny the existence of any such investigation, Sony's counsel pressed ***Debtor's counsel*** to identify ***for Sony*** the governmental investigation ***into Sony*** to which it was referring. But these governmental investigations by their very nature are non-public; and, thus, the demand that ***Debtor*** identify ***for Sony*** the responsive and relevant governmental investigations ***into Sony's conduct***–investigations that could, in fact, be highly probative of Debtor's claims—is absurd. And Sony's refusal to produce such potentially probative and responsive documents for such a reason is even more preposterous.

The Debtor respectfully submits that the Sony Response Letter is evidence, not of Sony's cooperation, but of Sony's intransigence with respect to producing documents that are plainly discoverable and necessary to the Debtor's inquiry into its antitrust claims. The Sony Response Letter, in fact, merely confirms the need for the immediate issuance of the Rule 2004 Exam Order by this Court.

/ / /

/ / /

---

[10] Upon information and belief, the Debtor believes, in addition to the few individuals identified in the Sony Response Letter, the following Sony and Orchard individuals may have documents and information responsive to its requests: (1) Doug Morris, (2) Darren Stupak, (3) Achim Matthes, (4) Andrea Finkelstein, (5) Mel Lewitner, (6) Edgar Berger, (7) Kevin Kelleher, (8) Martin Bandier, (9) Antony Bebawi, (10) Peter Brodsky, (11) Robert Stringer, (12) Peter Edge, (13) Randy Goodman, (14) Gary Overton, (15) Antonio M. "L.A." Reid, (16) Liz Young, (17) Michael Lynton, (18) Moses Martiny, (19) Tom Wheeley, (20) Prashant Bahadur, (21) Colleen Theis, (22) Brad Navin, (23) Jonathan Kim, (24) Daniel Alick, (25) Edwin Yee, and (26) Blanche Chow.

Pursuant to Local Bankruptcy Rule 2004-1, the Court may grant the Motion without a hearing. Sony, however, expressly stated in the Sony Response Letter that it opposes the application for a Rule 2004 order and asked that the application be set for hearing with an opportunity for it to respond. Accordingly, if the Court is inclined to set the Motion for hearing, the Debtor respectfully submits that for the reasons that follow it is imperative that the Motion be heard and ruled on at the earliest possible date if the Debtor is to have a full and fair opportunity to confirm its Plan and, if appropriate, to file an objection to the Sony Claim and the Orchard Claim, and/or to seek affirmative recovery from Sony and/or Orchard.

Given the timing of the Court's consideration of the Debtor's disclosure statement and the anticipated consideration of the Plan, it is critical to the Debtor's plan confirmation efforts that it be able to immediately investigate, and if appropriate object to, the Sony Claim and the Orchard Claim, in addition to investigating and prosecuting its own claims against Sony and Orchard. This is because the existence and outcome of such claims and claim objections will dictate, among other things: (i) whether Sony or Orchard has an allowed claim in this case and is entitled to vote on the Plan, which Sony and Orchard have indicated they will oppose; (ii) whether and when Sony's and Orchard's disputed claims will be estimated for plan confirmation or any other purposes; and (iii) if Sony and/or Orchard has an allowed claim in this case, the allowed amount of that claim or the estimated amount of that claim that each of them would be entitled to vote on the Plan.

In addition, since the Sony Claim and the Orchard Claim will now be classified in class 4 of the Plan (with all other general unsecured creditors other than class 5 and class 6 creditors) as the Court directed at the prior disclosure statement hearing, an important component of the Plan involving class 4 acceptance of the Plan will be (i) the actual size of Sony's and Orchard's respective allowed claims, if any, (ii) whether all or any portion of Sony's and Orchard's allowed claims should be equitably subordinated, and (iii) whether the Debtor's claims against Sony and/or Orchard will offset Sony's and/or Orchard's claims against the Debtor. These determinations may need to be made before confirmation of the Plan is considered because they

18

may determine whether class 4, as a class, is determined to have voted to accept the Plan and whether the threshold figures for class acceptance dictated by Section 1126(c) have been met.

For the foregoing reasons, "time is of the essence" aptly applies to the present situation. Sony's and Orchard's opposition to a proposed 2004 Exam Order, even as summarily described in the Sony Response Letter, will significantly delay the 2004 Exam if the Motion is heard on regular notice. Given the strong desires of the Debtor and the Committee to confirm the Plan and distribute funds to creditors as soon as possible, the Debtor urges the Court to enter the Rule 2004 Exam Order annexed hereto as Exhibit "1" on an expedited basis or to schedule a hearing on the Motion on the earliest date convenient to the Court.[11]

## III.    **ARGUMENT**

Rule 2004 (a) provides in relevant part that, "[o]n motion of any party in interest, the Court may order the examination of any entity." The permissible scope of an examination under Rule 2004 is very broad and is set forth in Rule 2004(b), which provides, in relevant part:

> "The examination...may relate only to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate...[.] In a...reorganization case under chapter 11 of the Code,...the examination may also relate to the operation of any business and the desirability of its continuance, the source of any money or property acquired or to be acquired by the debtor for purposes of consummating a plan and the consideration given or offered therefore, and any other matter relevant to the case or to the formulation of a plan."

Rule 2004(b).

Rule 2004 grants parties in interest "broad rights of examination of a third-party's records." *Snyder v. Society Bank,* 181 B.R. 40, 41 (S.D. Tex. 1994); *see also In re Cousins Barricades & Metal Prods. Inc.,* No. Civ. A. 99-2035, 2000 WL 245860, *3 (E.D. La. Mar. 2, 2000). Emphasizing the broad purpose of Rule 2004, courts permit examination of any third party that has "knowledge of the debtor's affairs," *In re Ecam Publ'ns,* 131 B.R. 556, 559 (Bankr. S.D.N.Y. 1991), or who can be shown to have had dealings with the debtor, *In re*

---

[11] Because of other scheduled hearings and long standing travel commitments of counsel, the Debtor requests that the hearing, if required, not be set on July 6, 19 or 28, 2016.

1  *Ionosphere Clubs, Inc.,* 156 B.R. 414, 432 (S.D.N.Y. 1993), *aff'd,* 17 F.3d 600 (2d Cir. 1994).

2  *See* Bankruptcy Rule 2004(b) (noting that Rule 2004 examination may concern "any matter

3  which may affect the administration of the debtor's estate").

4          The purpose of a Rule 2004 examination is to assist a party in interest in determining the

5  nature and extent of the bankruptcy estate, revealing assets and examining transactions. *See In*

6  *re Bennett Funding Group, Inc.,* 203 B.R 24, 28 (Bankr. N.D.N.Y. 1996). Its objective is "'to

7  show the condition of the estate and to enable the court to discover its extent and whereabouts

8  and to come into possession of it that the rights of creditors may be preserved.'" *In re Coffee*

9  *Cupboard, Inc.,* 128 B.R. 509, 514 (Bankr. E.D.N.Y. 1991) (*citing Cameron v. United States,*

10 231 U.S. 710, 717 (1914)). Rule 2004 is frequently employed by debtors who seek to compel

11 discovery of information maintained by creditors or third parties where such information is

12 critical to the effective administration of the estate and its assets. *See, e.g., In re Teleglobe*

13 *Commc'ns Corp.,* 493 F.3d 345, 354 n.6 (3d Cir. 2007) (discussing debtors' use of Rule 2004 to

14 conduct discovery concerning possibility of bringing claims on behalf of the estate); *In re*

15 *Analytical Sys., Inc.,* 71 B.R. 408, 413 (Bankr. N.D. Ga. 1987) (granting debtor's motion to

16 compel discovery of information maintained by creditor and examination of creditor's officers,

17 directors or managing agents pursuant to Rule 2004).

18          The information and documentation being sought by the Debtor from Sony and Orchard

19 in connection with their respective claims against the Debtor and the Debtor's claims against

20 Sony and Orchard relate directly to the "liabilities and financial condition of the debtor,"

21 "matters which may affect the administration of the debtor's estate," and "any other matter

22 relevant to the case or to the formulation of a plan." The Debtor's investigation of the largest

23 non-insider asserted unsecured claims against its estate, the investigation of potentially highly

24 valuable claims of the Debtor's estate against Sony and Orchard, and the ultimate disposition of

25 these respective claims, will certainly affect the administration of the Debtor's estate.  As such,

26

27

28

there is no question that the document production and examination requested in this Motion fall squarely within the scope of Rule 2004.[12]

### IV.   CONCLUSION

For the reasons set forth above, the Debtor respectfully requests the Court to enter an order:

(1)    Granting the Motion in its entirety;

(2)    Approving and entering the 2004 Exam Order annexed hereto as Exhibit "1"; and

(3)    Granting such other and further relief as the Court deems just and proper.

Dated: June 27, 2016            LEVENE, NEALE, BENDER, YOO
                                & BRILL L.L.P.

                                By:    _/s/ Ron Bender_
                                       RON BENDER
                                       PHILIP A. GASTEIER
                                       IRV M. GROSS
                                       KRIKOR J. MESHEFEJIAN
                                       Attorneys for Chapter 11 Debtor and
                                       Debtor in Possession

Dated: June 27, 2016            WINSTON & STRAWN LLP

                                By:   _W. Gordon Dobie_
                                       W. GORDON DOBIE
                                       KARI M. ROLLINS
                                       Attorneys for Chapter 11 Debtor and
                                       Debtor in Possession
                                       _Pro Hac Vice Applications Pending_

---

[12] The Rule 2004 document production and examination requested herein cannot proceed under Rules 7030 or 9014 because there is currently no adversary proceeding or contested matter pending between the Debtor and Sony regarding Sony's claims against the Debtor, and vice versa, or between the Debtor and Orchard regarding Orchard's claims against the Debtor, and vice versa. Based on the foregoing, the Debtor believes that discovery under Rule 7030 or 9014 is unavailable to the Debtor at this time.

# EXHIBIT "1"

1 RON BENDER (SBN 143364)
PHILIP A. GASTEIER (SBN 130043)
2 IRV M. GROSS (SBN 53659)
KRIKOR J. MESHEFEJIAN (SBN 255030)
3 LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
4 Los Angeles, California 90067
Telephone: (310) 229-1234
5 Facsimile: (310) 229-1244
Email: rb@lnbyb.com; pag@lnbyb.com; img@lnbyb.com; kjm@lnbyb.com
6

7 W. GORDON DOBIE (IL ARDC No. 6193308)
KARI M. ROLLINS (IL ARDC No. 6287218)
8 WINSTON & STRAWN LLP
35 W. Wacker Drive
9 Chicago, Illinois 60601
Telephone: (312) 558-5600
10 Facsimile: (312 558-5700
Email: wdobie@winston.com; karollins@winston.com
11
Pro Hac Vice Applications Pending
12

13 Attorneys for Chapter 11 Debtor and Debtor in Possession

14

15 **UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
16 **SAN FRANCISCO DIVISION**

17 In re:                                          ) Case No. 15-31430
                                                   )
18 RDIO, INC.,                                     ) Chapter 11
                                                   )
19         Debtor and Debtor in Possession.        )
                                                   )
20                                                 ) **ORDER DIRECTING THE**
                                                   ) **PRODUCTION OF DOCUMENTS BY**
21                                                 ) **SONY MUSIC ENTERTAINMENT AND**
                                                   ) **ORCHARD ENTERPRISES NY, INC.;**
22                                                 ) **AND ORAL EXAMINATIONS OF**
                                                   ) **PERSONS MOST KNOWLEDGABLE**
23                                                 ) **FOR SONY MUSIC ENTERTAINMENT**
                                                   ) **AND ORCHARD ENTERPRISES NY,**
24                                                 ) **INC., PURSUANT TO RULE 2004 OF**
                                                   ) **THE FEDERAL RULES OF**
25                                                 ) **BANKRUPTCY PROCEDURE**
                                                   )
26                                                 )
                                                   )
27                                                 )
                                                   )
28

The Court has considered the motion (the "Motion") filed by Rdio, Inc., debtor and debtor in possession in the above-referenced chapter 11 case (the "Debtor"), for entry of an order pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure and Local Bankruptcy Rule 2004-1, directing the production of documents by Sony Music Entertainment ("Sony") and Orchard Enterprises NY, Inc. ("Orchard"), and oral testimony of the persons most knowledgeable of Sony and Orchard (the "Sony PMKs" and the "Orchard PMKs", respectively), respectively, regarding the following areas of inquiry:

1. Any matters related to the acts, conduct, or property or to the liabilities and financial condition of the Debtor;

2. Any matter which may affect the administration of the Debtor's estate;

3. Any matters related to the Debtor's bankruptcy case;

4. Any other matter relevant to the Debtor's bankruptcy case or to the formulation of a plan;

5. With respect to the Sony PMKs, Sony's claims for (i) liquidated amounts asserted to be due and owing under written agreements between the Debtor and Sony; (ii) unliquidated claims for indemnification rights asserted under written agreements between the Debtor and Sony; (iii) Sony's unliquidated fraudulent inducement claims against the Debtor; and (iv) unliquidated unjust enrichment claims against the Debtor;

6. With respect to the Orchard PMKs, Orchard's claims for (i) liquidated amounts asserted to be due and owing under the written agreements between the Debtor and Orchard; and (ii) unliquidated claims for indemnification rights asserted under the written agreements between the Debtor and Orchard;

7. All aspects of the "Most Favored Nation" clauses ("MFNs") in any and all written agreements between (i) the Debtor and Sony, and (ii) the Debtor and Orchard;

8. The market conditions which existed during the Debtor's pre-petition relationships with Sony and Orchard, including but not limited to the market conditions that existed when the written agreements that included the MFNs were negotiated and entered into;

9. All aspects of Sony's and Orchard's business relationships, including but not

2

limited to written and oral communications, conversations and meetings with Universal Music Group and its affiliates ("Universal") and Warner Music, Inc. and its affiliates ("Warner"), in connection with or related to the Debtor; and

10.      The Documents, the subject matter of the Documents, and any matter related to the Documents.

This list is non-exhaustive, and is meant to be illustrative of the topics the Debtor intends to address in connection with its Rule 2004 examinations of Sony and Orchard, and this order shall not preclude the Debtor from seeking examination of additional person or persons.

Proper notice of the Motion having been provided and good cause appearing therefor, this Court orders as follows:

1.      The Motion is granted.

2.      Sony and Orchard shall produce and permit inspection of all documentation in the possession, custody or control of Sony and Orchard, respectively, including their respective agents, officers, and employees, listed in Exhibit "A" hereto (the "Documents") by delivering the Documents to the offices of Winston & Strawn, 200 Park Avenue, New York, New York 10166 (the "Examination Location"), no later than ten (10) business days after the entry of this Order.

3.      Sony shall produce at the Examination Location the person most knowledgeable regarding the Documents and the matters listed above for an oral examination within thirty (30) calendar days from the entry of this Order or as otherwise agreed by counsel for the Debtor and Sony.

4.      Orchard shall produce at the Examination Location the person most knowledgeable regarding the Documents and the matters listed above for an oral examination within thirty (30) calendar days from the entry of this Order or as otherwise agreed by counsel for the Debtor and Sony.

**IT IS SO ORDERED.**

**EXHIBIT "A"**

**<u>DEFINITIONS</u>**

    **A.**    **"API"** means application programming interface, and shall have the meaning set forth by each of the Labels, as defined herein, in their respective agreements with Rdio or any Competitor, as defined herein.

    **B.**    **"Bankruptcy Case"** means the Chapter 11 bankruptcy case of Rdio.

    **C.**    **"Communications"** means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise) and includes all oral and written communications of any nature, type or kind including, but not limited to, any Documents, telephone conversations, discussions, meetings, facsimiles, e-mails, texts, memoranda, and any other medium through which any information is conveyed or transmitted.

    **D.**    **"Competitor"** means an entity participating in the market for music streaming or downloading services worldwide.

    **E.**    **"Documents"** means and includes all written, recorded, transcribed or graphic matter of every nature, type and kind, however and by whoever produced, reproduced, disseminated or made. This includes, but is not limited to, Communications, phone records, electronically stored information, "writings" as defined by Rule 1001 of the Federal Rules of Evidence, copies or drafts, and any tangible or intangible thing or item that contains any information. Any Document that contains any comment, notation, addition, insertion, or marking of any type or kind which is not part of another Document, is to be considered a separate Document.

    **F.**    **"Grant of Rights"** shall have the meaning set forth by each of the Labels in their respective agreements with Rdio or any Competitor.

    **G.**    **"IFPI"** means IFPI the global not-for-profit organization that represents the interests of approximately 1,300 record companies from around the world.

    **H.**    **"Labels"** means the collective of Merlin, Orchard, Warner, Sony, and Universal, as defined herein.

    **I.**    "**MFN**" means a Most Favored Nation clause, or any term or clause intended to achieve comparable pricing, pricing results, equity, or promotional or marketing opportunities.

    **J.**    "**Merlin**" means the Merlin Netwok B.V., its current and former parents, subsidiaries, affiliates, divisions, predecessors, officers, directors, agents, employees, representatives, and any other person acting on their behalf.

**K.** **"Orchard"** means Orchard Enterprises NY, Inc., its current and former parents, subsidiaries, affiliates, divisions, predecessors, officers, directors, agents, employees, representatives, and any other person acting on their behalf.

**L.** **"Orchard Bankruptcy Claim"** means that certain proof of claim filed by Orchard against Rdio in the Bankruptcy Case, designated as Claim No. 53 on the Bankruptcy Court's docket.

**M.** **"Orchard Liquidated Claim"** means that certain portion of the Orchard Bankruptcy Claim described by Orchard as "Service Fees."

**N.** **"Rdio"** means Rdio, Inc., its parents, subsidiaries, affiliates, divisions, predecessors, officers, directors, agents, employees, representatives, and any other person acting on their behalf .

**O.** **"RIAA"** means the Recording Industry Association of America and all of its subsidiaries, affiliates, agents, employees, representatives, and any other person acting on their behalf.

**P.** **"Sony"** means Sony Music Entertainment, Inc., its current and former parents, subsidiaries, affiliates, divisions, predecessors, officers, directors, agents, employees, representatives, and any other person acting on their behalf.

**Q.** **"Sony Bankruptcy Claim"** means that certain proof of claim filed by Sony against Rdio in the Bankruptcy Case, designated as Claim No. 54 on the Bankruptcy Court's docket.

**R.** **"Sony Liquidated Claim"** means that certain portion of the Sony Bankruptcy Claim described by Sony as "Service Fees."

**S.** **"Universal"** means Universal Music Group, along with Universal Music Group International, and all of their current and former parents, subsidiaries, affiliates, divisions, predecessors, officers, directors, agents, employees, representatives, and any other person acting on their behalf.

**T.** **"Warner"** means Warner Music, Inc., along with WEA International Inc., Warner Music Brasil LTDA., and all of their current and former parents, subsidiaries, divisions, predecessors, officers, directors, affiliates, agents, employees, representatives, and any other person acting on their behalf.

**U.** **"You"** and **"Your"** mean and refer to Sony or Orchard, including without limitation, their members, managers, officers, directors, shareholders, employees, agents, attorneys, accountants, security personnel (including third party contractors), representatives, predecessors in interest or other persons acting or who purport to act or have acted or have purported to act on behalf of Sony or Orchard.

**Documents To Be Produced**

## <u>INSTRUCTIONS</u>

1.  When answering the requests herein, You are required to furnish all information that is known or available to You, Your attorneys, or to any investigators, employees, agents or other persons acting on Your behalf. If after making a reasonable investigation, You are still unable to respond fully to such request, You are required to answer to the fullest extent possible, specifying its reasons for Your inability to answer the request.

2.  Each request shall be accorded a separate answer, and each subpart of any request shall be accorded a separate answer. Requests or subparts thereof shall not be combined for the purpose of supplying a common answer.

**Possession, Custody or Control**

3.  A Document is deemed to be in Your possession, custody or control if it is in Your actual possession or custody, or if it is in the custody of another person and You own the Document in whole or in part, or have a right to inspect, examine or copy such Document, or have any express or implied understanding that You may use, inspect, examine or copy such Document when or if You seek to do so.

4.  If You know of the existence, past or present, of any Documents described herein, but are unable to produce such Documents because they are not presently in Your possession, custody or control (including the possession, custody or control of Your agents), You shall so state in Your response and shall identify (by name, address and telephone number) the person or entity in whose possession, custody or control the Document was last known to reside.

**Organization of Production**

5.  You are to produce the Documents called for herein as they are kept in the usual course of business, or to organize and label them to correspond with the information sought in the requests.

**Explanation for Not Producing a Document**

6.  If You decline to produce any requested Document, state with respect to each such Document whether You decline to produce it because:

(a)     You claim it is privileged;

(b)     It never existed;

(c)     It once existed but no longer can be located;

(d)     It has been destroyed; or

(e)     Other specified reasons.

**Claims of Privilege**

7.     If any Communications or Documents that are requested in response to these requests are claimed to be privileged, identify such Documents by giving the date, subject matter, author, addressee, where made or created, persons to whom copies were furnished and to whom the substance of the Documents was communicated, and the privilege claimed.

**Documents that are Lost, Discarded or Destroyed**

8.     In the event that any of the Documents that would have been responsive to these requests have been lost, discarded or destroyed, the Document so lost, discarded or destroyed shall be identified as completely as possible in Your response to the particular request, including, without limitation, the following information:

(a)     Date, content, author(s) and recipient(s) of the Documents;

(b)     Manner of disposal and persons or entity disposing of the Documents;

(c)     When and why such Documents were disposed of or destroyed;

(d)     The information contained in such Documents;

(e)     Any person or entity having knowledge as to the contents of such Documents;

(f)     The name, address, and telephone number of the person or entity in whose possession, custody or control the Document was last known to reside;

(g)     Any person or entity having knowledge of the circumstances under which such Documents were destroyed.

**Continuing Request**

9.     These requests shall be deemed continuing so as to require further and supplemental production of Documents if You obtain or discover additional Documents between the time of initial production and later events.

## DOCUMENTS TO BE PRODUCED

## DOCUMENT REQUESTS

1.     All Documents and Communications that constitute or reflect Communications between or among the Labels, or that refer to or concern Communications between or among the Labels, relating to the following:

    a.     the terms or negotiations of any pricing term or pricing structure of any licensing agreement or potential licensing agreement made or considered by one or more of the Labels with Rdio or any Competitor;

    b.     the terms or negotiations of any Grant of Rights and/or any definitions of content, content restriction, or limitations of any licensing agreement made by one or more of the Labels with Rdio or any Competitor;

    c.     the terms or negotiations of API Rights of or related to any licensing agreement made by one or more of the Labels with Rdio or any Competitor;

    d.     the terms or negotiations of any contractual term, requirement, or provision of any licensing agreement made by one or more of the Labels with Rdio or any Competitor relating to marketing, promotion, business models, hardware, or the functionality of music streaming or downloading;

    e.     the potential or realized impact of the use of a MFN on licensing fees, retail prices, market composition, or the realization of any other strategic goal;

    f.     the use, scope, purpose, or enforcement of a MFN, generally or specifically;

    g.     the use, terms, and scope of any MFN discussed during the negotiations of or included in any licensing agreement made or considered by one or more of the Labels with Rdio or any Competitor;

    h.     the enforcement of a MFN by any Label against Rdio or any Competitor, including any audit related thereto or performed in service thereof;

    i.     any enforcement action taken against any other entity, excluding unlicensed infringers, worldwide based on content restrictions or the use of a MFN;

    j.     the potential or realized impact of the market power associated with any library

of musical works;

k. the potential or realized impact of any competition between or among the Labels for the business of Rdio or any Competitor;

l. the proposed joint venture among the Labels and Rdio targeting Asia;

m. Rdio's joint venture with Nova Entertainment (formerly DMG Radio) targeting Australia;

n. Rdio's co-marketing agreement with Telus Communications Company relating to the co-marketing of the Rdio music service in Canada;

o. Rdio's co-branding agreement with TNL PCS S.A. (commonly referred to as "Oi") relating to the co-branding of the Rdio music service in Brazil;

p. Rdio's joint venture with Grupo Bandeirantes relating to the operation of the Rdio music service in Brazil;

q. The acquisition of Rdio's assets by Pandora Media Inc.; and

r. Rdio's bankruptcy case.

2. All Documents and Communications that constitute or reflect internal Sony or Orchard Communications with respect to Rdio relating to the following: (a) any pricing term or pricing structure, including minimum royalty guarantees; (b) any Grant of Rights and/or any definitions of content or content restrictions; (c) any API Rights; (d) any MFN; (e) any marketing, promotional, and advertising restrictions; (f) any proposed features of the Rdio product; or (g) any business model proposed by Rdio.

3. All Documents and Communications that constitute, reflect, or refer to a competing Label's pricing, pricing structure, equity, or MFN contained in that competing Label's licensing agreement or potential licensing agreement with Rdio or any Competitor.

4. Any Documents and Communications between any one or more of the Labels and Keith Bernstein of the Royalty Review Council or any other audit firm relating to:

a. the terms or negotiations of the pricing or any pricing structure, the Grant of Rights or any content definition, restriction, or limitation, the API Rights, or any MFN contained in any licensing agreement between any of the Labels and

1    Rdio or any Competitor; and

2    b.    the use, compliance, terms, scope, purpose, or enforcement of any MFN

3          contained in any licensing agreement between any one or more of the Labels

4          and Rdio or any Competitor.

5    5.    Any Documents and Communications between any one or more of the Labels

6    and any trade association or member of a trade association, including, but not limited to, RIAA

7    and IFPI, and any Documents and Communications transmitted or made by any of the Labels to

8    or through any such trade association or in conjunction with activities related to the trade

9    association concerning any of the topics listed above under Request No. l(a)-(r).

10   6.    Any Documents and Communications produced to and the transcript of any

11   deposition or witness interview conducted or taken by any government agency, including but

12   not limited to the U.S. Federal Trade Commission, the U.S. Department of Justice, the

13   European Commission, or any other international trade or competition enforcement body, in

14   connection with an inquiry, investigation, or action related to any one or more of the Labels'

15   pricing or distribution practices, or any other allegation of anticompetitive behavior in a market

16   for music streaming, music downloading, Internet radio, or any other digital music service.

17   7.    Documents sufficient to show Sony's, Orchard's, or any other Label's market

18   share in the market for music streaming, music downloading, Internet radio, or any other digital

19   music service for each fiscal year from 2008 to the present in both the United States and

20   worldwide.

21   8.    Documents sufficient to show Sony's and Orchard's revenues and profit

22   margins earned from music, music downloading, Internet radio, or any other digital music

23   service for each fiscal year from 2008 to the present in both the United States and worldwide.

24   9.    Any and all Communications and Documents relied upon by You in connection

25   with preparing the Sony Bankruptcy Claim and Orchard Bankruptcy Claim.

26   10.    Any and all Communications and Documents that support the Sony Bankruptcy

27   Claim and Orchard Bankruptcy Claim.

28

11.     All Communications and Documents in Your possession that refer or relate to the Bankruptcy Claim, the Bankruptcy Case, or Rdio.

## TOPICS OF ORAL EXAMINATION

The Debtor shall obtain the oral testimony of the persons most knowledgeable of Sony and Orchard, in connection with, among others, the following matters:

1.      Any matters related to the acts, conduct, or property or to the liabilities and financial condition of the Debtor;

2.      Any matter which may affect the administration of the Debtor's estate;

3.      Any matters related to the Debtor's bankruptcy case;

4.      Any other matter relevant to the Debtor's bankruptcy case or to the formulation of a plan;

5.      With respect to the Sony PMKs, Sony's claims for (i) liquidated amounts asserted to be due and owing under written agreements between the Debtor and Sony; (ii) unliquidated claims for indemnification rights asserted under written agreements between the Debtor and Sony; (iii) Sony's unliquidated fraudulent inducement claims against the Debtor; and (iv) unliquidated unjust enrichment claims against the Debtor;

6.      With respect to the Orchard PMKs, Orchard's claims for (i) liquidated amounts asserted to be due and owing under the written agreements between the Debtor and Orchard; and (ii) unliquidated claims for indemnification rights asserted under the written agreements between the Debtor and Orchard;

7.      All aspects of the "Most Favored Nation" clauses ("MFNs") in any and all written agreements between (i) the Debtor and Sony, and (ii) the Debtor and Orchard;

8.      The market conditions which existed during the Debtor's pre-petition relationships with Sony and Orchard, including but not limited to the market conditions that existed when the written agreements that included the MFNs were negotiated and entered into;

9.      All aspects of Sony's and Orchard's business relationships, including but not limited to written and oral communications, conversations and meetings with Universal Music Group and its affiliates ("Universal") and Warner Music, Inc. and its affiliates ("Warner"), in connection with or related to the Debtor; and

1          10.     The Documents, the subject matter of the Documents, and any matter related to
2  the Documents.
3          This list is non-exhaustive, and is meant to be illustrative of the topics the Debtor intends
4  to address in connection with its Rule 2004 examinations of Sony and Orchard.

# EXHIBIT "2"

**Fill in this information to identify the case:**

Debtor 1        Rdio, Inc.

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the:  Northern District of California

Case number   15-31430

Official Form 410

# Proof of Claim

12/15

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense.** Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| Part 1: | Identify the Claim |
|---------|-------------------|

**1. Who is the current creditor?**

Sony Music Entertainment
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom?

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Susan Meisel, Esq.
Name

25 Madison Avenue
Number        Street

New York          NY          10010
City              State         ZIP Code

Contact phone  (212) 833-4537

Contact email  susan.meisel@sonymusic.com

**Where should payments to the creditor be sent?** (if different)

Name

Number        Street

City              State         ZIP Code

Contact phone

Contact email

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ — __ __ __ __ __ — __ __ __ __ __ — __ __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$_____See attached rider_____ . **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See attached rider.

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed) _____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

Case 15-31430   Claim 84-1 Filed 06/28/16   Entered 06/27/16 17:31:53 Page 2 of 31

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

☑ No

☐ Yes. *Check one:*

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/16 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3:  Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  03/18/2016
                  MM / DD / YYYY

_Signature_

Print the name of the person who is completing and signing this claim:

| Name | Susan Meisel, Esq. | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Senior Vice President and Deputy General Counsel | | |
| Company | Sony Music Entertainment | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 25 Madison Avenue | | |
| | Number        Street | | |
| | New York | NY | 10010 |
| | City | State | ZIP Code |
| Contact phone | (212) 833-4537 | Email | susan.meisel@sonymusic.com |

Case 15-31430    Doc# 884-1 Filed 06/28/16    Entered 06/27/16 17:31:53    Page 42 of 118

# RIDER TO PROOF OF CLAIM OF
## SONY MUSIC ENTERTAINMENT

       1.    <u>Claimant</u>.  Sony Music Entertainment ("<u>SME</u>" or "<u>Claimant</u>") files this claim (the "<u>Claim</u>") against Rdio, Inc. ("<u>Rdio</u>"), as a debtor and debtor-in-possession (the "<u>Debtor</u>").

       2.    <u>Bar Date</u>.  On November 23, 2015, the United States Bankruptcy Court for the Northern District of California, San Francisco Division (the "<u>Court</u>") entered a *Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, and Deadlines* (the "<u>Bar Date Notice</u>"). [Docket No. 71.]  Pursuant to the Bar Date Notice, each person or entity asserting a prepetition claim or claims against the Debtor is required to file a proof of claim by March 21, 2016 (the "<u>Bar Date</u>").

       3.    <u>Amount of Claim</u>.  As of the Petition Date, the Claimant has four claims against the Debtor:

       (a)    <u>Service Fees</u>.  Claimant has a claim against the Debtor pursuant to the terms of the Content Agreement (as defined below) in the total amount of $12,419,314.00 as set forth in Schedule A.

       (b)    <u>Indemnification</u>.  The Claimant has a contingent and unliquidated claim for indemnification pursuant to Section 6(d)(1) of the Content Agreement.

       (c)    <u>Fraudulent Inducement</u>.  The Claimant has a claim against the Debtor for fraudulently inducing the Claimant to enter into the 2015 Renewal Amendment (as defined below).

       (d)    <u>Unjust Enrichment</u>.  The Claimant has a claim against the Debtor for unjust enrichment arising out of its fraudulent conduct.

       4.    <u>Basis of Service Fee and Indemnification Claims</u>.

       (a)    The Service Fee and Indemnification Claims arise out of a certain agreement dated as of May 28, 2010 [NT 10-64.3(1)] between Rdio, on the one hand, and SME, on the other hand, in connection with, *inter alia*, the distribution and exploitation of content

owned or controlled by SME through Rdio's online and mobile music subscription service (as amended, modified, or otherwise supplemented from time to time, the "Content Agreement").

(b)     Pursuant to a letter agreement dated as of April 1, 2015 (the "2015 Renewal Amendment"), the parties agreed to amend the Content Agreement and to extend the term of the Content Agreement for two years, effective April 1, 2015, through March 31, 2017.

(c)     Under the 2015 Renewal Amendment, Rdio was required to pay SME a total minimum revenue guarantee (the "Minimum Revenue Guarantee") for the two-year extension as set forth below:

- Year 1 Guarantee:  $7,917,404, consisting of the sum of $3 million and $4,917,404, which represents the remaining minimum revenue guarantee owed pursuant to a certain January 2013 Amendment to the Content Agreement (the "March 2015 Unrecouped Balance").  If the Limited Free Offering and Unlimited Free Offering (as those terms are defined in the Content Agreement) were not fully removed from all territories before October 1, 2015, the amount of the Year 1 Guarantee increased by $750,000 for each calendar month after September 2015 in which these offerings were still in effect in year 1.

- Year 2 Guarantee:  $4,000,000.00.

(d)     Pursuant to Section 5(b) of the Content Agreement, upon the termination or expiration of the term of the Content Agreement, all monies then due or to become due to the Claimant are immediately due and payable.

(e)     Pursuant to Section 6(d)(1) of the Content Agreement, the Debtor agreed to indemnify the Claimant from and against any and claims asserted by a third party arising out of (x) any breach or alleged breach by the Debtor of any representation, warranty, covenant or agreement made by the Debtor in the Content Agreement, (y) the distribution or operation of the Rdio subscription service, or (z) any allegation that any materials used or exploited by or on behalf of the Debtor in connection with the Subscription Service, in whole or in part, directly or

Case 15-31430   Claim 884-1 Filed 06/27/16   Desc Main Document   Page 5 of 41
Case 15-31430   Doc 884-1 Filed 06/27/16   Entered 06/27/16 17:81:53   Page 5 of 118

indirectly, infringe upon, misappropriate or otherwise violate the rights of any third party.

Section 6(d)(1) provides:

>    (d)    (1) [The Debtor] will at all times indemnify and hold harmless the SME and its Affiliates and each of their respective officers, agents, employees, directors, and advisors (collectively, the "<u>SME Indemnified Parties</u>") from and against any and all claims asserted by a third party against any of the SME Indemnified Parties for damages, liabilities, costs and expenses (including court expenses and reasonable counsel fees) arising out of (x) any breach or alleged breach by [the Debtor] of any representation, warranty, covenant or agreement made by [the Debtor] herein, (y) the distribution or operation of the Subscription Service, or (z) any allegation that any materials used or exploited by or on behalf of [the Debtor] in connection with the Subscription Service (except for SME Materials or any other materials substantially in the form provided to [the Debtor] by SME for use in connection with this Agreement and where [the Debtor]'s use thereof is authorized hereunder but including, without limitation, use of any content licensed from third parties), in whole or in part, directly or indirectly, infringe upon, misappropriate or otherwise violate the rights of any third party (the "Company Claims").  Nothing contained in clause (z) of the preceding sentence shall be deemed to limit the applicability of [the Debtor]'s indemnification obligations, which, for the avoidance of doubt, shall apply with full force and effect regardless of the state of [the Debtor]'s knowledge concerning the infringement or violation of any such proprietary or intellectual property rights of any such third party. In the event of any Company Claim: (i) the applicable SME Indemnified Party shall notify [the Debtor] of the Company Claim concerned immediately following the date that such SME Indemnified Party becomes aware of it (provided that such failure to immediately notify [the Debtor] shall not affect any SME Indemnified Party's right to indemnification hereunder if such delay did not materially prejudice the defense of such claim); (ii) [the Debtor] shall defend against the Company Claim concerned (at [the Debtor]'s own expense) through legal counsel selected by [the Debtor]; and (iii) each party shall reasonably cooperate with the other in the defense of the Company Claim concerned. [The Debtor] shall be solely responsible for the amount of any settlement or judgment for such Company Claim and all legal expenses and counsel fees incurred by [the Debtor] in connection therewith; provided, however, that any settlement acknowledging any wrongdoing on behalf of any of the SME Indemnified Parties or creating any additional obligations or payments or potential liabilities for any of the SME Indemnified Parties shall be subject to the written approval of such SME Indemnified Parties. The applicable SME Indemnified Parties shall have the right at all times to actively participate in the defense thereof, and to employ legal counsel selected by such SME Indemnified Parties at their own expense, it being understood that [the Debtor] shall have the right at all times, in [the Debtor]'s sole discretion, to maintain control of the conduct of the defense.

(f)     As of October 1, 2015, and November 1, 2015, the Limited Free Offering and Unlimited Free Offering (as those terms are defined in the Content Agreement) had not been fully removed from all territories.  Accordingly, the Year 1 Guarantee increased by $750,000 for the month of October 2015 and by an additional $750,000 for the month of November 2015.

(g)     The Claimant terminated the Content Agreement by letter dated November 16, 2015 (the "Termination Notice").

(h)     On December 18, 2015, Rdio filed a *Supplemental Notice of Debtor's Determination to Reject Executory Contracts and Unexpired Leases* [Docket No. 141], indicating that it intended to reject the Content Agreement.

(i)     On December 22, 2015, the Court entered an order approving the sale of certain of the Debtor's assets to Pandora (the "Sale Order").  [Docket No. 151.]  Pursuant to Paragraph 30 of the Sale Order, the Content Agreement was deemed rejected as of the Closing Date of the sale to Pandora.[1]

(j)     On December 23, 2015, the asset sale to Pandora closed.

(k)     As a result of the termination of the Content Agreement, whether pursuant to the Termination Notice or the Sale Order, the entire Minimum Revenue Guarantee is due to the Claimant.

5.     Basis of Fraudulent Inducement and Unjust Enrichment Claims.

(a)     The Debtor fraudulently induced the Claimant to enter into the 2015 Renewal Agreement.

---

[1] The Claimant reserves the right to argue that the Content Agreement was terminated pre-petition pursuant to the Termination Notice.

(b)     Beginning in or around October 2014, Rdio sought to renegotiate its Content Agreement with SME, under which Rdio was required to pay SME a Minimum Revenue Guarantee of approximately $5.5 million by December 31, 2014.

(c)     SME initially agreed to an extension of the term of the Content Agreement to March 31, 2015, and then agreed to a series of extensions of the Content Agreement, which provided Rdio uninterrupted access to SME's library of digital content and enabled Rdio to deliver millions of additional streams to its customers, even though Rdio had not paid the Minimum Revenue Guarantee that it owed SME.

(d)     On September 30, 2015, SME and Rdio executed the 2015 Renewal Amendment.

(e)     Upon information and belief, and unbeknowst to SME, at the same time that Rdio was negotiating the 2015 Renewal Agreement with SME, Rdio was also negotiating with Pandora, which expressed an interest in June 2015 or earlier in purchasing Rdio's assets through a bankruptcy sale.  Throughout this period, Rdio fraudulently misrepresented to SME that it intended to meet its minimum revenue guarantee obligations to SME, even though it was negotiating a sale agreement to be implemented in bankruptcy which it knew would render Rdio unable to meet its obligations under the 2015 Renewal Agreement.  SME relied on these misrepresentations in agreeing to extend the Content Agreement while the parties negotiated.

(f)     Rdio's planned bankruptcy would have been a material consideration for SME in deciding whether to continue extending the Content Agreement or enforce its contractual rights.  Indeed, Rdio fraudulently concealed this fact from SME precisely because it knew that disclosure of the truth could result in termination of Rdio's access to SME's catalog, which would have damaged the value of Rdio and jeopardized reaching a deal with Pandora.

(g)     Also unbeknownst to SME at the time, by the time the parties executed the 2015 Renewal Amendment on September 30, 2015, Pandora and Rdio had *already* executed a letter of intent formalizing the plan for Pandora's acquisition of Rdio's assets through the bankruptcy sale.  The 2015 Renewal Agreement obligated Rdio to remit to SME a prepayment of $2 million on October 1, 2015.  Because of its preexisting agreement with Pandora, Rdio could not have intended to make that payment.  Even at the time Rdio entered into the 2015 Renewal Amendment, it knew that it did not intend to perform.

(h)     The existence of the letter of intent between Pandora and Rdio would have been a material consideration for SME in deciding whether to enter into the 2015 Renewal Amendment.  SME obviously would not have entered into the 2015 Renewal Amendment if it knew that Rdio had no intention to perform, and indeed was contractually committed not to perform.  Rdio knowingly and fraudulently failed to disclose the letter of intent, in order to induce SME to enter into the 2015 Renewal Agreement, preserve Rdio's uninterrupted access to SME's catalogue of digital content, and enable Rdio to pursue its deal with Pandora.

(i)     On September 30, 2015—immediately following execution of the 2015 Renewal Amendment—Rdio requested a one-month extension of the prepayment deadline.  Rdio falsely represented to SME that it was on the verge of signing new agreements to raise capital out of which the $2 million would be paid, and that it likely would be able to pay the $2 million prepayment by October 28, 2015, and in any event no later than November 1, 2015.  These representations were knowingly false; again, unbeknownst to SME, Rdio had already signed a letter of intent with Pandora pursuant to which Rdio would file for bankruptcy.  SME granted Rdio the extension in reliance on these false representations, again ensuring Rdio the

uninterrupted access to SME's digital content that was necessary in order for Rdio to finalize its deal with Pandora.

(j)     SME did not learn about Rdio's planned bankruptcy until Rdio filed for Chapter 11 relief on November 16, 2015.

(k)     SME was damaged as the result of its reasonable reliance on Rdio's knowing and material misrepresentations and omissions.  Rdio never paid SME the $5.5 million Minimum Revenue Guarantee, nor did it pay the $2 million prepayment under the 2015 Renewal Agreement, nor did it pay anything at all to SME for use of SME's content in August, September, or October 2015 (SME received limited amounts for the use of its content in November and December 2015), even though its users continued to stream recordings owned by SME.  SME would neither have continued to extend the Content Agreement, nor signed the 2015 Renewal Amendment, had it known about Rdio's negotiations with Pandora.  SME would have cut off negotiations and enforced its existing contractual rights.

(l)     Rdio, however, was enriched by its material misrepresentations and omissions.  It maintained uninterrupted distribution rights to millions of SME-owned recordings, which was critical to its business.  Had Rdio lost the rights to distribute SME content, its business would have collapsed and its contemplated deal with Pandora would never have been finalized.

(m)     Rdio was unjustly enriched at SME's expense for the reasons described in paragraphs 5(a)-(l), *supra*.  It would be against equity and good conscience to permit Rdio to retain the benefits described above.

6.     <u>Supporting Documents</u>.  The Claim is based upon the Content Agreement, the 2015 Renewal Amendment, and the Termination Notice described in Paragraph 4 above.

The Content Agreement is lengthy and contains confidential and proprietary information. Accordingly, redacted copies of the Content Agreement (without exhibits) and the 2015 Renewal Amendment are attached as <u>Exhibit A</u> and <u>Exhibit B</u>, respectively. A copy of the Termination Notice is attached as <u>Exhibit C</u>. The Claimant believes that the Debtor has a complete copy of the Content Agreement and all amendments thereto, including the 2015 Renewal Amendment. Complete copies of the Content Agreement and the amendments thereto are available upon request from the Claimant's counsel.

7. <u>Judgment</u>. No judgment has been rendered on the Claim.

8. <u>Credits</u>. The amount of all pre and post-petition payments on the Claim have been credited and deducted for the purposes of filing this proof of claim.

9. <u>Setoff</u>. The Claim is not subject to any setoff or counterclaim.

10. <u>Notices</u>. All payments and notices to the Claimant concerning the Claim should be sent to:

> Sony Music Entertainment
> 25 Madison Avenue
> New York, New York 10010
> Attention:     Susan Meisel, Esq.
>                Alison Dow, Esq.

Copies of all notices to the Claimant concerning the Claim should be sent to:

> Luskin, Stern & Eisler LLP
> Eleven Times Square
> New York, New York 10036
> Attention:     Richard Stern, Esq.
>                Stephan E. Hornung, Esq.

11. <u>Protective Filing/Amendments</u>. This proof of claim is filed under compulsion of the Bar Date Notice entered in this case, and is filed to protect the Claimant from forfeiture of the Claim. The execution and filing of this proof of claim are not (i) a waiver or release of any of the Claimant's rights against any entity or person liable for all or part of the

Claim, (ii) a waiver or release of the Claimant's rights under the Bar Date Notice, (iii) a consent by the Claimant to the jurisdiction of the Court with respect to any proceeding commenced in this case against or otherwise involving the Claimant, (iv) a waiver of the Claimant's right to move to withdraw the reference or otherwise object to the jurisdiction of this Court with respect to the subject matter of the Claim, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving the Claimant, (v) an election of remedy which waives or otherwise affects any other remedy, or (vi) a waiver or release of any of the Claimant's rights against any third party.

12. <u>Reservation of Rights</u>. The Claimant expressly reserves its rights (i) to file any separate proof of claim with respect to the Claim set forth herein or otherwise (which proof of claim, if so filed, shall not be deemed to supersede this proof of claim), (ii) to amend or supplement this proof of claim in any respect, and (iii) to file additional proofs of claim against the Debtor or any of its affiliates for claims not covered by this proof of claim.

## Schedule A

| Fee Due | Amount |
|---|---|
| March 2015 Unrecouped Balance | $4,917,404.00 |
| Year 1 Guarantee | $3,000,000.00 |
| October 2015 Unlimited Free Offering Fee | $750,000.00 |
| November 2015 Unlimited Free Offering Fee | $750,000.00 |
| Year 2 Guarantee | $4,000,000.00 |
| **Subtotal** | **$13,417,404.00** |
| Less Payments Received | -$998,090.00 |
| **Total Amount Due** | **$12,419,314.00** |

# EXHIBIT A

As of May 28, 2010 (the "<u>Effective Date</u>")


Rdio, Inc.
62 First Street, Suite 500
San Francisco, CA 94105

**Re: <u>Rdio, Inc./Content Distribution Agreement</u>**

This letter agreement together with the term sheet (the "<u>Term Sheet</u>") and any schedules attached hereto, which are incorporated herein by reference, will constitute the entire agreement between SONY MUSIC ENTERTAINMENT ("<u>SME</u>") and Rdio, Inc. ("<u>Company</u>" or "<u>Rdio</u>") regarding, <u>inter alia</u>, the exploitation of audio recordings embodying the performances of various musical recording artists via Company's online and mobile music subscription service, as owned, controlled and operated by Company (the "<u>Agreement</u>"). Any terms used in this Agreement but not defined herein will have the meanings ascribed to them in the Term Sheet. Unless expressly provided to the contrary herein, to the extent that any provision of this Agreement conflicts with any provision of the Term Sheet, the provisions set forth in the Term Sheet shall govern and control.

**A.    <u>Download Agreement</u>.**



Case 15-31430    Doc# 341-1    Filed 06/27/16    Entered 06/27/16 17:81:59    Page 54 of 118

**Redacted Pages 2 through 5**

Case 15-31430    Doc#341-1    Filed 06/27/16    Entered 06/27/16 17:31:59    Page 55 of 118



## 5.   Termination:

(a)   (1)   Upon the occurrence of any Default Event, in addition to any other rights and remedies which SME has under this Agreement or otherwise, SME may terminate the Term upon notice to Company, following any applicable cure period set out below. No exercise of any right or remedy hereunder will limit SME's right to recover damages by reason of Company's default, SME's right to exercise any other right or remedy under this paragraph, or any of SME's other rights or remedies. Notwithstanding the foregoing or anything elsewhere herein, if the Default Event arises by reason, alone, of a "change of control" pursuant to clause (viii) of paragraph 5(a)(2) below, SME's sole remedy shall be termination of the Term of the Agreement by notice to Company.

(2)   "Default Event" means: (i) Company's failure to timely make payments required hereunder or render reports or accountings as and when due or cooperate or render any information or documents required to be furnished or otherwise made available to SME as and when required hereunder; provided, however, that, with respect to any such breach which is non-repetitive, Company shall have a period of fifteen (15) business days from its receipt of SME's notice of such breach in which to cure said breach before it shall be considered a "Default Event"; (ii) Company's breach of any of Company's representations, warranties, covenants or obligations hereunder, or

6

**264319 v16**
05/20/10

LK/NM [NT 10-64.3(1)]

Company's failure to fulfill any of Company's material obligations hereunder; provided, however, that, with respect to any such breach in respect of which a shorter cure period is not expressly provided herein, and provided that the breach concerned is non-repetitive, Company shall have a period of fifteen (15) business days from the date of SME's notice of such breach in which to cure said breach before it shall be considered a "Default Event"; (iii) Company's bankruptcy or insolvency, or the dissolution or the liquidation of Company's assets, or the filing of a petition in bankruptcy or insolvency for an arrangement or reorganization by, for or against Company, or the appointment of a receiver or a trustee for all or a portion of Company's property, or Company's making an assignment for the benefit of creditors; provided, however, that Company shall have a period of sixty (60) consecutive days from its receipt of any involuntary petition in bankruptcy filed against Company in which to cure said breach before it shall be considered a "Default Event"; (iv) Company's attempt to assign any of Company's rights under this Agreement in contravention of this Agreement without SME's prior written consent, or the succession of any of those rights to any other person or entity by operation of law; (v) If as a result of Company's acts or omissions any person or entity obtains access to the SME Materials in contravention of the terms, limitations and eligibility criteria regarding access thereto prescribed in the Term Sheet; (vi) If for any reason Company ceases doing business in the ordinary course and/or there is a substantial diminution in the ability of Company to effectively carry on its business in general or any aspect thereof, or in particular the business of distributing SME Materials and/or the other products referred to in this Agreement; (vii) in the event of a Default Event (as defined in the Download Agreement) under the Download Agreement; and/or (viii) In the event of a Change of Control of Company, where such control passes to an entity: (aa) that is a direct competitor of SME, (bb) with whom SME is involved in a then-current litigation, (cc) that operates or supports a service facilitating infringing activity in relation to SME's or other parties' content and exclusive rights thereto, (dd) is failing, in a material manner, to comply with applicable laws, (ee) with whom conduct of business on the terms set out in this Agreement would raise a regulatory issue, or (ff) which SME has objectively reasonable grounds to believe lacks the resources to meet the financial obligations imposed on Company hereunder.

      (b)     Upon termination or earlier expiration of the Term: (1) all rights granted to Company herein will immediately terminate, and Company will not thereafter have any right to make any use of any SME Materials or any other materials provided by SME to Company; (2) Company will immediately return, delete or destroy all materials furnished or selected by SME for use by Company, including all SME Materials and any phonorecords or copies derived therefrom in any and all forms, formats and media, as SME will direct in SME's sole discretion; (3) Company will immediately remove all links to web sites or other properties owned or controlled by SME; and (4) all monies then due or to become due to SME will become immediately due and payable.

      (c)     The following provisions shall survive the termination or expiration of the Term: 1, 2(c), 3, 4, 6(d), 10, 13(d), 14, 15(e).



Case 15-31430   Doc# 341-1   Filed 06/27/16   Entered 06/27/16 17:31:59   Page 57 of
118



(d)    (1)    Company will at all times indemnify and hold harmless the SME and its Affiliates and each of their respective officers, agents, employees, directors, and advisors (collectively, the "SME Indemnified Parties") from and against any and all claims asserted by a third party against any of the SME Indemnified Parties for damages, liabilities, costs and expenses (including court expenses and reasonable counsel fees) arising out of (x) any breach or alleged breach by Company of any representation, warranty, covenant or agreement made by Company herein, (y) the distribution or operation of the Subscription Service, or (z) any allegation that any materials used or exploited by or on behalf of Company in connection with the Subscription Service (except for SME Materials or any

8

other materials substantially in the form provided to Company by SME for use in connection with this Agreement and where Company's use thereof is authorized hereunder but including, without limitation, use of any content licensed from third parties), in whole or in part, directly or indirectly, infringe upon, misappropriate or otherwise violate the rights of any third party (the "Company Claims"). Nothing contained in clause (z) of the preceding sentence shall be deemed to limit the applicability of Company's indemnification obligations, which, for the avoidance of doubt, shall apply with full force and effect regardless of the state of Company's knowledge concerning the infringement or violation of any such proprietary or intellectual property rights of any such third party. In the event of any Company Claim: (i) the applicable SME Indemnified Party shall notify Company of the Company Claim concerned immediately following the date that such SME Indemnified Party becomes aware of it (provided that such failure to immediately notify Company shall not affect any SME Indemnified Party's right to indemnification hereunder if such delay did not materially prejudice the defense of such claim); (ii) Company shall defend against the Company Claim concerned (at Company's own expense) through legal counsel selected by Company; and (iii) each party shall reasonably cooperate with the other in the defense of the Company Claim concerned. Company shall be solely responsible for the amount of any settlement or judgment for such Company Claim and all legal expenses and counsel fees incurred by Company in connection therewith; provided, however, that any settlement acknowledging any wrongdoing on behalf of any of the SME Indemnified Parties or creating any additional obligations or payments or potential liabilities for any of the SME Indemnified Parties shall be subject to the written approval of such SME Indemnified Parties. The applicable SME Indemnified Parties shall have the right at all times to actively participate in the defense thereof, and to employ legal counsel selected by such SME Indemnified Parties at their own expense, it being understood that Company shall have the right at all times, in Company's sole discretion, to maintain control of the conduct of the defense.

(2)     SME will at all times indemnify and hold harmless the Company Parties and their Affiliates and each of their respective officers, agents, employees, directors, and advisors (collectively, the "Company Indemnified Parties") from and against any and all claims asserted by a third party against any of the Company Indemnified Parties for damages, liabilities, costs and expenses (including court expenses and reasonable counsel fees) arising out of (x) any breach or alleged breach by SME of any representation, warranty, covenant or agreement made by SME herein, or (y) any claims that items of SME Materials (excluding any copyrighted musical compositions embodied therein in respect of which the acquisition, administration and financial for required licenses is Company's responsibility under the Agreement, whether pursuant to paragraph 4(b)(v) above or otherwise) exploited by Company in accordance with the terms, conditions and limitations prescribed elsewhere in this Agreement, infringe upon misappropriate or otherwise violate the rights of any third party  (the "SME Claims").  In the event of any SME Claim: (i) the applicable Company Party shall notify SME of the SME Claim concerned immediately following the date that such Company Party becomes aware of it (provided that such failure to immediately notify SME shall not affect any Company Indemnified Party's right to indemnification hereunder if such delay did not materially prejudice the defense of such claim); (ii) SME shall defend against the SME Claim concerned (at SME's own expense) through legal counsel selected by SME; and (iii) each party shall reasonably cooperate with the other in the defense of the SME Claim concerned.  SME shall be solely responsible for the amount of any settlement or judgment for such SME Claim and all legal expenses and counsel fees incurred by SME in connection therewith; provided, however, that any settlement acknowledging any wrongdoing on behalf of any of the Company Parties or creating any additional obligations or payments or potential liabilities for any of the Company Parties shall be subject to the written approval of such Company Parties.  The applicable Company Parties shall have the right at all times to actively participate in the defense thereof, and to employ legal counsel selected by such Company Parties at their own expense, it being understood that SME shall have the right at all times, in SME's sole discretion, to maintain control of the conduct of the defense.

9

LKWM INT 10-64.3(1)]

Case 15-31430    Doc# 341-1    Filed 06/27/16    Entered 06/27/16 17:31:52    Page 59 of
118

(e)    Except with respect to the parties' respective indemnification obligations pursuant to Section 8(d), neither party to this Agreement shall be liable to the other under or in connection with this Agreement whether in contract, tort (including negligence), misrepresentation (other than where made fraudulently), breach of statutory duty or otherwise for any indirect or consequential loss whatsoever incurred by either party whether or not the party was advised in advance of the possibility of any such loss. Nothing in this Agreement shall restrict or limit the liability of either party for fraud or fraudulent misrepresentation or death or personal injury caused by negligence.

(f)    No amendment to this Agreement shall be binding upon SME unless it is made by an instrument signed by an authorized officer of SME. A waiver by either party of any provision of this Agreement in any instance will not be deemed a waiver of such provision, or any other provision hereof, as to any future instance or occurrence. All remedies, rights, undertakings, and obligations contained in this Agreement will be cumulative and none of them will be in limitation of any other remedy, right, undertaking, or obligation of either party. If any part of this Agreement, or the application thereof to any party, will be adjudged by a court of competent jurisdiction to be invalid, such judgment will not affect the remainder of this Agreement, which will continue in full force and effect, or the application of this Agreement to the remaining parties.

(g)    SME shall be responsible for ensuring SME's Affiliates provide the SME Materials required pursuant to Section 6 of the Term Sheet (solely to the extent not provided centrally by SME) and otherwise reasonably co-operate with Company to the extent such co-operation may be required in order to give effect to the spirit of this Agreement.

Very truly yours,

SONY MUSIC ENTERTAINMENT

By: _____

Executive Vice President
Head of Business & Legal Affairs
Global Digital Business
Sony Music Entertainment

ACCEPTED AND AGREED:

RDIO, INC.

By: _____

264319 v16
05/20/10

LK/NM [NT 10-64.3(1)]

# EXHIBIT B

Dated as of April 1, 2015
(the "2015 Renewal Amendment Effective Date")

Rdio, Inc.
1550 Bryant St., Ste. 220
San Francisco, CA 94103

Re: Rdio, Inc. – Agreement Renewal

Reference is hereby made to the agreement dated as of May 28, 2010 [NT 10-64.3(1)]
between Rdio, Inc. ("Company"), on the one hand, and Sony Music Entertainment ("SME"), on the
other hand, in connection with, inter alia, the distribution and exploitation of content owned or
controlled by SME by Company through Company's online and mobile music subscription service,
as amended, modified or otherwise supplemented to date (the "Content Agreement"). Without
limiting the generality of the foregoing, reference is also specifically made to the amendment to the
Content Agreement between SME and Company effective as of January 1, 2013 (the "January 2013
Amendment"), and the amendment to the Content Agreement between SME and Company effective
as of September 1, 2014 (the "September 2014 Amendment").

This letter agreement, together with the summary of amended terms attached hereto as
Appendix A (collectively, the "2015 Renewal Amendment"), when executed by Company and by
SME, will modify the Content Agreement effective as of the 2015 Renewal Amendment Effective
Date. Unless otherwise specified, terms used but not defined shall have the meanings assigned to
them in the Content Agreement.

Following the full execution of this 2015 Renewal Amendment, the parties hereby agree to
negotiate in good faith as expeditiously as is reasonably practicable, with a view toward having a
finalized and fully executed document by March 31, 2016, with respect to an amended and restated
agreement that will incorporate the terms, conditions and limitations prescribed in the Content
Agreement and subsequent amendments (including this 2015 Renewal Amendment), and will
include, for the avoidance of doubt, necessary conforming and technical changes to the terms set
forth in the Agreement as the parties may deem necessary and appropriate in order to effectuate
and implement the incorporation of the amended terms agreed upon by the parties, and which
amended and restated agreement shall supersede the Agreement (the "Amended and Restated
Agreement"); provided, however, unless and until the parties enter into such Amended and
Restated Agreement, the Content Agreement, as amended (including by this 2015 Renewal
Amendment) shall remain in full force and effect for the duration of the Term, unless sooner
terminated pursuant to the Content Agreement.

287039.6 1 NT [AD 15-82]

Except as otherwise expressly modified herein, the Content Agreement shall continue unchanged and shall remain in full force and effect. This 2015 Renewal Amendment may be executed in one or more counterparts, each of which when taken together, will be deemed to constitute one and the same instrument.

Very truly yours,

SONY MUSIC ENTERTAINMENT

By: _____
Name:
Title:
Date:

SONY MUSIC ENTERTAINMENT (BRASIL)
LTDA. (solely with respect to the terms,
conditions, authorizations and obligations herein
as they pertain to Brazil)

By: _____
Name: NADYA ROMOES BOECHAT DOS SANTOS / WILSON VIEIRA
Title: LEGAL & BUSINESS AFFAIRS DIRECTOR/ VP FINANCE AND OPERATIONS
Date: OCTOBER, O2 nd 2015

ACCEPTED AND AGREED:

RDIO, INC.

By: _____
Name: Anthony Bay
Title: CEO
Date:

RDIO MUSIC (BRAZIL) LTDA.
(solely with respect to the terms,
conditions, authorizations and obligations
herein as they pertain to Brazil)

By: _____          Elias da Silveira Cerqueira
Name:                                 CPF: 545.861.807-30
Title:                                CRC RJ053136 O-2 T-SP
Date:

287039.6                              3                    NT [AD 15-82]

| Term | The Term will be extended for two (2) years, from April 1, 2015 through March 31, 2017. "Year 1" of the renewal term is April 1, 2015 – March 31, 2016, and "Year 2" of the renewal term is April 1, 2016 – March 31, 2017. |
|---|---|
| **Minimum Guarantee** | The entire remaining Minimum Revenue Guarantee balance under the January 2013 Amendment (effective as of March 31, 2015, including amounts payable in respect of the March 2015 accounting period) (the "March 2015 Unrecouped Balance") will "roll forward" and be added to the minimum revenue guarantee hereunder for Year 1. Accordingly, such minimum revenue guarantee for Year 1 will be equal to the sum of $3M plus the March 2015 Unrecouped Balance (such sum, the "Year 1 Guarantee"). |
| | The Year 1 Guarantee will be payable as follows: |
| | • Monthly service fees in respect of Year 1 will be payable on a monthly basis, per the standard agreement terms. |
| | • In addition, on or before October 1, 2015, Company will make a $2M prepayment to be credited against the Year 1 Guarantee, subject to the following: |
| |    ○ the payment of such $2M amount will be waived if Company pays SME $5.5M (or more) in total monthly service fees in respect of Year 1 prior to October 1, 2015; and |
| |    ○ following the payment of such $2M, Company will continue making monthly service fee payments per the standard agreement terms, but if at any time the total amount of service fees payable by Company to SME in respect of Year 1 exceeds the amount of the Year 1 Guarantee minus $2M, then the previously paid $2M prepayment will be treated as an advance recoupable on a prospective basis from any additional monthly service fees payable solely in respect of Year 1. For example, if the total amount of the Year 1 Guarantee is $7.5M, then once Company has paid SME the $2M prepayment plus $5.5M in monthly service fees for Year 1, the $2M prepayment would be an advance recoupable from any additional service fees payable thereafter in respect of Year 1. |
| | • Any remaining balance of the Year 1 Guarantee (i.e., the amount of the Year 1 Guarantee less the $2M prepayment and all service fees payable in respect of Year 1) will be paid as a true-up payment together with the submission of reporting and service fee payments for the March 2016 accounting period. |
| | The minimum revenue guarantee for Year 2 will be $4M (the "Year 2 Guarantee"). Any remaining balance of the Year 2 Guarantee (i.e., the amount of the Year 2 Guarantee less all service fees payable in respect of Year 2) will be paid as a true-up payment together with the submission of reporting and service fee payments for the March 2017 accounting period. |
| | Notwithstanding the foregoing, if the Limited Free Offering and Unlimited Free Offering are not fully removed from all territories before October 1, 2015, then the |



Case 15-31430   Doc# 541-1   Filed 06/27/16   Entered 06/27/16 17:81:53   Page 25 of 41 of
118

amount of the Year 1 Guarantee will be increased by $750,000 for each calendar month after September 2015 (i.e., not including September 2015 or any previous calendar month) in which these offerings are still in effect during Year 1 (to a maximum of $4.5M extra for Year 1), and the amount of the Year 2 Guarantee will be increased by $437,500 for each month these offerings are still in effect during Year 2 (to a maximum of $5.25M extra for Year 2).

Case 15-31430    Doc# 541-1    Filed 06/27/16    Entered 06/27/16 17:31:59    Page 26 of 30
118

**Redacted Pages 5 through 8**



| Change of Control | Section 5(a)(2) of the letter agreement portion of the Content Agreement is hereby deleted in its entirety and replaced with the following:

"(2) "Default Event" means: (i) Company's failure to timely make payments required hereunder or render reports or accountings as and when due or Company's failure to deliver Monthly Reports (excluding the information required pursuant to (x) Section 5 of the March 2011 Amendment (as amended by this January 2013 Amendment) and (y) Section 15(e) of this January 2013 Amendment)) as and when due; provided, however, that, with respect to any such breach, Company shall have a period of thirty (30) calendar days from its receipt of SMB's notice of such breach in which to cure said breach before it shall be considered a "Default Event"; (ii) Company's breach of any of Company's material representations, warranties, covenants or obligations hereunder, or Company's failure to fulfill any of Company's material obligations hereunder; provided, however, that, with respect to any such breach in respect of which a shorter cure period is not expressly provided herein, Company shall have a period of thirty (30) calendar days from the date of SMB's notice of such breach in which to cure said breach before it shall be considered a "Default Event"; (iii) Company's bankruptcy or insolvency, or the dissolution or the liquidation of Company's assets, or the filing of a petition in bankruptcy or insolvency for an arrangement or reorganization by, for or against Company, or the appointment of a receiver or a trustee for all or a portion of Company's property, or Company's making an assignment for the benefit of creditors; provided, however, that Company shall |

Case 15-31430    Doc# 341-1    Filed 06/27/16    Entered 06/27/16 17:51:53    Page 28 of 118

have a period of sixty (60) consecutive days from its receipt of any involuntary petition in bankruptcy filed against Company in which to cure said breach before it shall be considered a "Default Event"; (iv) Company's attempt to assign any of Company's rights under this Agreement in contravention of this Agreement without SME's prior written consent, or the succession of any of those rights to any other person or entity by operation of law; (v) If a suspension period for a Server Security Breach, Approved Format Security Breach or Device Security Breach under paragraphs 11(b), 11(c) or 11(d) of the Term Sheet lasts for more than sixty (60) consecutive days, or ninety (90) days in any period of one hundred and eighty (180) consecutive days; (vi) If for any reason Company ceases doing business in the ordinary course and/or there is a substantial diminution in the ability of Company to effectively carry on its business in general or any aspect thereof, or in particular the business of distributing SME Materials and/or the other products referred to in this Agreement; (vii) in the event of (x) a Default Event (as defined in the Download Agreement) under the Download Agreement, (y) SME's termination of the Ex US Download Agreement pursuant to Paragraph 11 of the Ex US Download Agreement or (z) SME's termination of the Brazil Download Agreement pursuant to Paragraph 11 of the Brazil Download Agreement; (viii) In the event of a Change of Control of Company; and/or (ix) If Company launches a Locker Service without SME's prior written consent. "Locker Service" means any service, feature set or functionality that enables, induces and/or facilitates the remote storage and/or access to digital files of any kind, whether or not they embody copyrighted materials, including without limitation sound recordings, audiovisual works, pictorial or graphical works, or textual materials, and whether or not based upon or arising out of materials possessed by the end user or otherwise, and regardless of whether matched based upon fingerprinting or other content identification technologies or techniques or digital data actually uploaded by end users, whether directly or indirectly, in whole or in part. Notwithstanding the foregoing, or anything to the contrary provided herein, Company shall have a period of ten (10) days from the date of SME's notice of such default in which to cure such default event before it shall be considered a "Default Event" hereunder."

If SME terminates the Agreement because of a Change of Control, the minimum revenue guarantee(s) otherwise due and payable to SME shall be proportionately reduced based on the number of months remaining in the Term. By way of example, if SME terminates the Agreement in month 8 of Year 1, then the Year 1 Guarantee shall be 8/12ths of the total Year 1 Guarantee, and there will be no Year 2 Guarantee. Notwithstanding the foregoing, if SME terminates the Agreement due to any other type of Default Event, the full amount of the Year 1 Guarantee and the Year 2 Guarantee will become immediately due and payable to SME.

Case 15-31430   Doc# 341-1   Filed 06/27/16   Entered 06/27/16 17:51:58   Page 68 of 118

# EXHIBIT C

**SONY MUSIC ENTERTAINMENT**
550 Madison Avenue
New York, New York 10022-3211

November 16, 2015

Rdio, Inc.
1550 Bryant St., Ste. 220
San Francisco, CA 94103
Attn: President

Re: <u>Rdio, Inc. – Agreement Termination</u>

   Reference is hereby made to the agreement dated as of May 28, 2010 [NT 10-64.3(1)] between Rdio, Inc. ("<u>Rdio</u>"), on the one hand, and Sony Music Entertainment ("<u>SME</u>"), on the other hand, in connection with, <u>inter alia</u>, the distribution and exploitation of content owned or controlled by SME through Rdio's online and mobile music subscription service, as amended, modified or otherwise supplemented to date (the "<u>Content Agreement</u>").

   Please be advised that SME hereby terminates the Content Agreement with immediate effect in accordance with Sections 5(a)(1), 5(a)(2)(iii) and 5(a)(2)(iv) of the Content Agreement because of Rdio's insolvency and Rdio's attempt to assign its rights under the Content Agreement without SME's prior written consent. SME hereby specifically withholds its approval of any assignment of the Content Agreement in accordance with paragraph 6(c) of the Content Agreement.

   The foregoing is not intended as a full statement of the facts in this matter. This letter is sent without prejudice to any of SME's right and remedies under the Content Agreement, all of which are expressly reserved.

      Sincerely,

      J. Jeff Walker
      EVP, Business & Legal Affairs
      Global Digital Business

288660.1

**EXHIBIT "3"**

**Fill in this information to identify the case:**

Debtor 1    Rdio, Inc.

Debtor 2    _____
(Spouse, if filing)

United States Bankruptcy Court for the:   Northern District of California

Case number    15-31430

Official Form 410

# Proof of Claim

12/15

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Orchard Enterprises NY, Inc.
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Neil Ross, Esq.
Name

23 East 4th Street, 3rd Floor
Number    Street

New York      NY      10003
City          State          ZIP Code

Contact phone (646) 237-3783

Contact email nross@theorchard.com

**Where should payments to the creditor be sent?** (if different)

Name _____

Number    Street _____

City          State          ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____

Filed on _____
MM   /   DD   /   YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

6. **Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

7. **How much is the claim?** $_____ See attached rider . **Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See attached rider.

9. **Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

10. **Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

11. **Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

|  | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/16 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3:  Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  3/18/2016
　　　　　　　　　MM / DD / YYYY

_____
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Neil Ross, Esq. |
|---|---|
|  | First name　　　　　Middle name　　　　　Last name |
| Title | General Counsel and Senior Vice President |
| Company | Orchard Enterprises NY, Inc. |
|  | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 23 East 4th Street, 3rd Floor |
|  | Number　　Street |
|  | New York　　　　　　　　　NY　　10003 |
|  | City　　　　　　　　　　　State　　ZIP Code |
| Contact phone | (646) 237-3783 |
| Email | nross@theorchard.com |

# RIDER TO PROOF OF CLAIM OF
# ORCHARD ENTERPRISES NY, INC.

1.      <u>Claimant</u>.  Orchard Enterprises NY, Inc. (the "<u>Claimant</u>") files this claim (the "<u>Claim</u>") against Rdio, Inc. ("<u>Rdio</u>"), as a debtor and debtor-in-possession (the "<u>Debtor</u>").

2.      <u>Bar Date</u>.  On November 23, 2015, the United States Bankruptcy Court for the Northern District of California, San Francisco Division (the "<u>Court</u>") entered a *Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, and Deadlines* (the "<u>Bar Date Notice</u>"). [Docket No. 71.]  Pursuant to the Bar Date Notice, each person or entity asserting a prepetition claim or claims against the Debtor is required to file a proof of claim by March 21, 2016 (the "<u>Bar Date</u>").

3.      <u>Amount of Claim</u>.  As of the Petition Date, the Claimant has two claims against the Debtor:

      (a)      <u>Service Fees</u>.  The Claimant has a claim against the Debtor in the total amount of $4,583,096.96 pursuant to the terms of the Orchard Content Agreement and the Tri-Party Agreement (each as defined below) as set forth in Schedule A.

      (b)      <u>Indemnification</u>.  The Claimant has a contingent and unliquidated claim for indemnification pursuant to Section 10(a) of the Orchard Content Agreement.

4.      <u>Basis of Claim</u>.

      (a)      The Claim is based upon the Debtor's obligations to the Claimant pursuant to (i) a certain Content Distribution Agreement entered into on August 17, 2015, and made effective as of January 31, 2015, between Rdio, on the one hand, and Orchard, on the other hand, in connection with, *inter alia*, the distribution and exploitation of content owned or controlled by Orchard through Rdio's online and mobile music subscription service (as amended, modified or

otherwise supplemented from time to time, the "Orchard Content Agreement"),[1] and (ii) a certain tri-party content distribution agreement (the "Tri-Party Agreement") dated January 1, 2015, between Orchard, Rdio, and an additional party.

        (b)      Pursuant to Section 4A of the Orchard Content Agreement, Rdio was required to pay Orchard a total minimum revenue guarantee (the "Orchard Guarantee") of $5,200,000 during the two-year term of the Orchard Content Agreement.

        (c)      Pursuant to Section 10(b) of the Orchard Content Agreement, Rdio was obligated to indemnify Orchard from and against any losses suffered due to any claim by a third-party based on facts that, if true, would constitute a breach of the Orchard Content Agreement by Rdio.  Section 10(b) provides:

> (b) By Rdio: Rdio agrees to defend, indemnify and hold harmless [Orchard], its subsidiaries, affiliates, successors, licensees, agents, attorneys and assigns, and the officers, directors, shareholders, contractors, members and employees of the foregoing, from and against any and all Losses due to any claim, suit, proceeding, or assertion by a third party based on facts that, if true, would constitute a breach by Rdio of [the Orchard Content Agreement], including any warranty, representation, agreement or covenant made in [the Orchard Content Agreement] by Rdio.

        (d)      Pursuant to Sections 2.1 and 2.2 of the Tri-Party Agreement, Rdio was required to pay to Orchard guaranteed amounts (the "Tri-Party Guarantee") during the two-year term of the Tri-Party Agreement.  The Tri-Party Guarantee was:

- Year 1 Guarantee:  18,00,000 INR;[2] and

- Year 2 Guarantee:  29,00,000 INR.[3]

---

[1] The Orchard Content Agreement amended and restated a prior Digital Content License Agreement dated as of September 15, 2009 (the "Original Agreement").

[2] As of the Petition Date, this was equal to $27,320.08.

(e)     On December 16, 2015, Rdio filed a *Notice of Debtor's Determination to Reject Executory Contracts and Unexpired Leases* [Docket No. 132], indicating that it intended to reject the Orchard Content Agreement.

(f)     On December 22, 2015, the Court entered an order (the "Sale Order") approving the sale of certain of the Debtor's assets to Pandora Media, Inc. ("Pandora"). [Docket No. 151.]  Pursuant to Paragraph 30 of the Sale Order, the Orchard Content Agreement was deemed rejected as of the Closing Date of the sale to Pandora.

(g)     On December 23, 2015, the asset sale to Pandora closed.

(h)     On January 29, 2016, Rdio filed a *Notice of Debtor's Determination to Reject Executory Contracts and Unexpired Leases* [Docket No. 175], indicating that it intended to reject the Tri-Party Agreement.  Pursuant to Paragraph 30 of the Sale Order, the Tri-Party Agreement was deemed rejected as of the Closing Date of the sale to Pandora.

(i)     As a result of the rejection of the Orchard Content Agreement and the Tri-Party Agreement, the Orchard Guarantee and the Tri-Party Guarantee are due to the Claimant.

5.     <u>Supporting Documents</u>.  The Claim is based upon the Orchard Content Agreement and the Tri-Party Agreement described in Paragraph 4(a)-(i) above.  The Orchard Content Agreement and the Tri-Party Agreement contain confidential and proprietary information.  Redacted copies of the Orchard Content Agreement (without exhibits) and the Tri–Party Agreement are attached as <u>Exhibit A</u> and <u>Exhibit B</u>, respectively.  The Claimant believes the Debtor has complete copies of the Orchard Content Agreement and the Tri-Party Agreement, and they are available from the Claimant's counsel upon request.

---

[3] As of the Petition Date, this was equal to $44,015.69.

6.      Judgment.  No judgment has been rendered on the Claim.

7.      Credits.  The amount of all pre and post-petition payments on the Claim have been credited and deducted for the purposes of filing this proof of claim.

8.      Setoff.  The Claim is not subject to any setoff or counterclaim.

9.      Notices.  All payments and notices to the Claimant concerning the Claim should be sent to:

> Orchard Enterprises NY, Inc.
> 23 East 4th Street, 3rd Floor
> New York, New York 10003
> Attention:      Neil Ross, Esq.

Copies of all notices to the Claimant concerning the Claim should be sent to:

> Luskin, Stern & Eisler LLP
> Eleven Times Square
> New York, New York  10036
> Attention:      Richard Stern, Esq.
>                 Stephan E. Hornung, Esq.

10.      Protective Filing/Amendments.  This proof of claim is filed under compulsion of the Bar Date Notice entered in this case, and is filed to protect the Claimant from forfeiture of the Claim.  The execution and filing of this proof of claim are not (i) a waiver or release of any of the Claimant's rights against any entity or person liable for all or part of the Claim, (ii) a waiver or release of the Claimant's rights under the Bar Date Notice, (iii) a consent by the Claimant to the jurisdiction of the Court with respect to any proceeding commenced in this case against or otherwise involving the Claimant, (iv) a waiver of the Claimant's right to move to withdraw the reference or otherwise object to the jurisdiction of this Court with respect to the subject matter of the Claim, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving the

Claimant, (v) an election of remedy which waives or otherwise affects any other remedy, or (vi) a waiver or release of any of the Claimant's rights against any third party.

        11.    <u>Reservation of Rights</u>.  The Claimant expressly reserves its rights (i) to file any separate proof of claim with respect to the Claim set forth herein or otherwise (which proof of claim, if so filed, shall not be deemed to supersede this proof of claim), (ii) to amend or supplement this proof of claim in any respect, and (iii) to file additional proofs of claim against the Debtor or any of its affiliates for claims not covered by this proof of claim.

## Schedule A

| Fee Due | Amount |
|---|---|
| Orchard Guarantee | $5,200,000.00 |
| Less Payments Received | -$687,567.64 |
| **Orchard Outstanding** | **$4,512,432.36** |
|  |  |
| Tri-Party Guarantee | $71,335.77 |
| Less Payments Received | -$671.17 |
| **Tri-Party Outstanding** | **$70,664.60** |
|  |  |
| **Total Amount Due** | **$4,583,096.96** |

# EXHIBIT A

**CONTENT DISTRIBUTION AGREEMENT**

THIS CONTENT DISTRIBUTION AGREEMENT ("Agreement") is entered into on August 17, 2015 (the "Execution Date"), and made effective as of January 31, 2015 (the "Effective Date"), by and between Rdio, Inc., with offices at 1550 Bryant Street, Suite 200, San Francisco, California 94103 ("Rdio"), and Orchard Enterprises NY, Inc., with offices at 23 E. 4th Street, 3rd Floor, New York, New York 10003 ("Company").



1

**Redacted Pages 2 through 7**



**4A.** <u>Minimum Revenue Guarantee</u>:

(a)     Rdio guarantees to Company that the aggregate amount of Service Fees payable to Company hereunder, ███████████████████████████████████████████████████

████████████████ shall be no less than (x) One Million Nine Hundred Thousand US Dollars (USD$1,900,000) (the "Year 1 Guarantee") solely in respect of the period of the Term commencing as of January 31, 2015 and continuing through and until January 31, 2016 (such period is sometimes referred to as "Extension Year 1"), and (y) Four Million Eight Hundred Thousand US Dollars (USD$4,800,000) (the "Extension Period Guarantee") solely in respect of the period of the Term commencing as of January 31, 2015 and continuing through and until the expiration of the Initial Period (such period is sometimes referred to as the "Extension Period"). Accordingly, Rdio shall pay Company the following:

(b)     Rdio guarantees to Company that the aggregate amount of Service Fees payable to Company hereunder in respect of the ████████████████ shall be no less than (x) One Hundred Thousand US Dollars (USD$100,000) ████████████████ solely in respect of Extension Year 1, and (y) Four Hundred Thousand US Dollars (USD$400,000) ████████████████████████ solely in respect of the Extension Period. Accordingly, Rdio shall pay Company the following:

9

connection therewith, such amounts shall be payable to Company within thirty (30) days following Rdio's receipt of an invoice therefor.



10

**Redacted Pages 11 through 12**



10. <u>Indemnification</u>:

(a) <u>By Company</u>: Company agrees to defend, indemnify and hold harmless Rdio, its subsidiaries, affiliates. successors, licensees, agents, attorneys and assigns, and the officers, directors, shareholders, contractors, members and employees of the foregoing, from and against any and all Losses due to any claim, suit, proceeding, or assertion by a third party: (i) based on facts that, if true, would constitute a breach by Company of this Agreement, including any warranty, representation, agreement or covenant made in this Agreement by Company; or (ii) arising from or related to the rights and authorizations granted to Rdio in this Agreement or the exercise thereof.

(b) <u>By Rdio</u>: Rdio agrees to defend, indemnify and hold harmless Company, its subsidiaries, affiliates, successors, licensees, agents, attorneys and assigns, and the officers, directors, shareholders, contractors, members and employees of the foregoing, from and against any and all Losses due to any claim, suit, proceeding, or assertion by a third party based on facts that, if true, would constitute a breach by Rdio of this Agreement, including any warranty, representation, agreement or covenant made in this Agreement by Rdio.

(c) <u>Indemnification Procedure</u>: The persons and entities entitled to be indemnified under Sections 10(a) and 10(b), above (individually and collectively, "<u>Indemnitee</u>") shall: (i) promptly inform the

13

**Redacted Pages 14 through 16**



RDIO, INC.

By: _____

Name: _Elliott Peters_

Title: _SUP / G.C._

_9/1/2015_

ORCHARD ENTERPRISES NY, INC.

By: _____

Name: _____

Title: _8/26/15_

Jason L. Pascal
VP of Catalog Development
& Associate General Counsel

17

**Redacted Pages 18 through 27**

# EXHIBIT B



23 East 4th Street
Floor 3
New York, NY 10003

T: + 1 (212) 201-9280
F: +1 (866) 625-7384
www.theorchard.com

This Agreement is made as of January 1, 2015 and shall be effective from launch of commercial service by Rdio in the Territory, which shall not be later than January 15 2015 **(Effective Date)**





**2 Minimum Guaranteed Amounts**

2.1 In consideration of the rights granted under clause 1.1 above, Rdio guarantees the following amounts in respect of the exploitation of ▮▮▮▮▮▮▮▮ on the Rdio Service in the Territory /India during the ▮▮▮▮▮ Term (together, **Minimum Guaranteed Amounts**):

    (a)    During the first year of the ▮▮▮▮ Term: Indian Rs. 18,00,000/- (INR Eighteen Lacs only); and

    (b)    During the second year of the ▮▮▮▮ Term: Indian Rs. 29,00,000/- (INR Twenty-Nine Lacs).

2.2 Rdio shall pay Orchard the sums due for exploitation of ▮▮▮▮▮▮▮ in accordance with the terms of the Orchard Agreement. ▮▮▮▮▮▮▮▮▮▮▮▮▮

2.3

2.4

2.5

2.6



**3    Miscellaneous**

3.1    No party shall at any time, whether before or after the termination of this Agreement, use or disclose any confidential information available with it, relating to any other party's business or affairs (including, without limitation, the and provisions of this Agreement), except as authorised or required for the purposes of this Agreement, subject to prior written approval of the owner of such confidential information or to the extent required by law or any competent authority or in confidence to each party's professional advisers, shared under similar confidentiality obligations. Confidential information shall not include information which (a) at or prior to the time of disclosure was known to or independently developed by the receiving party, except to the extent unlawfully appropriated by the receiving party; (b) or at or after the time of disclosure becomes generally available to the public through no wrongful or negligent act or omission on the receiving party's part; or (c) the receiving party receives from a third party free to make such disclosure without breach of any legal obligation.

3.2    This Agreement contains the entire agreement of the parties in relation to its subject matter. This Agreement does not create any rights in favour of third parties. This Agreement shall be governed by, and construed in accordance with, New York law, and each party irrevocably submits for all purposes in connection with this Agreement to the exclusive jurisdiction of the US District court for the Southern District of New York, or the Supreme Court of the state of New York, New York County.

Signed by the parties or their duly authorised representatives as of the date of this Agreement.

Signed by **Anthony Bay**                    )
duly authorised for and on behalf of          )
**Rdio, Inc.**                                )    .....................................

Signed by **Alexis Shapiro**                  )
duly authorised for and on behalf of          )
**Orchard Enterprises NY, Inc.**              )

# EXHIBIT "4"

**June 15, 2016**

THE

NATIONAL LAW REVIEW

*Advertisement*

**Potential Antitrust Implications of Most Favored Nation Clauses**

Thursday, March 10, 2016

Both in the automotive and other industries, parties have turned to ***most favored nation (MFN)*** clauses—or clauses having the same effect—as a means to assure the lowest possible input costs. MFN clauses offer pro-competitive, cost-saving benefits including efficiencies in negotiations; buyers need not haggle for the last nickel in cost reduction when an MFN clause guarantees the best available price. Despite these pro-competitive benefits, MFN clauses have drawn increased scrutiny for their possible misuse and potential for creating antitrust exposure.

**DOJ's Growing Concerns**

We previously wrote regarding MFN pricing provisions reviewed the growing debate among antitrust practitioners over whether such provisions are pro-competitive or anticompetitive. We noted the Department of Justice Antitrust Division's (DOJ) concerns over such provisions when imposed by a buyer with a large market share. Indeed, the DOJ had filed several antitrust actions alleging that particular MFN clauses violated Sherman Act § 1 and caused anticompetitive effects.

A more recent action offers a cautionary tale of how MFN clauses signed by several competitors can draw DOJ scrutiny: *U.S. v. Apple, Inc.*, 952 F. Supp. 2d 638 (S.D.N.Y. 2013), *aff'd*, 791 F.3d 290 (2d Cir. 2015). In *Apple*, MFN provisions allegedly were used to affect a conspiracy among sellers to raise prices rather than reduce costs. We set forth the DOJ allegations in *Apple* below, but a principal lesson of *Apple* is that MFN clauses and other contract terms cannot be used as a means to ensure that competitors agree not to compete with one another.

**A Cautionary Tale: U.S. v Apple, Inc.**

According to the published court decisions, the facts of *Apple* are as follows. In 2009, Apple was on the verge of releasing its new tablet computer, the iPad. In connection with the release, Apple wanted to create an ebook marketplace, which came to be known as the iBookstore. At the time, however, Amazon, and its Kindle e-reader, controlled 90% of the ebook marketplace. Amazon's market position was attributed to its "loss-leading strategy" whereby it purchased ebooks from publishers at a given wholesale price, and then sold those ebooks at or below wholesale price. This strategy was most pronounced with new releases and *New York Times* bestsellers, which Amazon sold for one invariable figure: $9.99.

Apple knew of Amazon's aggressive pricing, and it knew that if it set similarly low prices, its iBookstore would be unprofitable. But Apple also knew that the book industry's major publishers—the "Big Six"—were decidedly unhappy with Amazon's pricing. Apple allegedly leveraged the Big Six's discontent during contract negotiations. Apple's publisher contracts adopted agency model pricing under which each publisher retained pricing authority within a range of price caps while agreeing to pay Apple a fixed percentage of each sale. The agency agreements each included an MFN clause requiring publishers to set ebook prices in Apple's iBookstore no higher than any of the publishers' other retailers.

By way of example, under the MFN clause, if a publisher charged $15 for Book-X in the iBookstore, but Amazon sold the book for $10, the publisher would be required to lower the price of Book-X in the iBookstore to no more than $10. Thus, not only would the publisher be required to lower the price to $10, but after paying Apple its 30% fee, the publisher would only receive $7 from the sale—even less than its wholesale prices. Therefore, in order for agency pricing to be viable from a publisher's perspective, the publisher needed to move its Amazon contract to the agency model or otherwise cause Amazon to price at a higher level. Otherwise, the MFN clause would not only perpetuate the $9.99 price point, but it would cause the publisher to lose even more money. The DOJ alleged that the Big Six knew that any one publisher acting alone could not coerce Amazon into renegotiations—but if they collectively insisted upon an agency model, Amazon would comply.

Ultimately, five of the Big Six agreed to terms with Apple (after Apple allegedly assured each publisher that the others were agreeing to the same terms), and shortly thereafter each publisher moved its respective contract with Amazon to agency model pricing. Accordingly, Apple successfully entered the market and the price of ebooks rose.

### Potential Antitrust Implications of Most Favored Nation Clauses

Apple and the publishers never agreed to set particular ebook prices, but the DOJ contended that they conspired to eliminate Amazon's $9.99 price point and increase prices generally. Thus, although the MFN was arguably "pro-competitive" insofar that it facilitated Apple's entrance into the ebook marketplace, thereby de-concentrating Amazon's near monopoly, the MFN clauses also provided the means, as well as the motivation, to effect a conspiracy among the publishers to raise ebook prices. In the antitrust jargon of a "hub and spoke" conspiracy, the DOJ in effect alleged that Apple served as the hub of a conspiracy among five publishers.

The district court held that Apple orchestrated a conspiracy among the publishers to eliminate price competition and to raise ebook prices, and the Second Circuit affirmed. The Supreme Court recently denied Apple's petition for a writ of certiorari, putting an end to yet another interesting demonstration of how MFN clauses can attract DOJ scrutiny and lead to potential antitrust liability. Unlike previous DOJ actions, which challenged parties' alleged use of MFN clauses to prevent smaller competitors from entering a given market, the MFN clause in *Apple* was used by a party that possessed no market share whatsoever. It was only after Apple allegedly rallied the

publishers together—emboldened by the MFN clause—that it became possible to raise ebook prices.

**Key Takeaway**

The lesson for suppliers in the automotive and other industries is that MFN clauses—like other restrictions in supply agreements—need to be considered not only in the context of how they may reduce input costs but also for what potential anticompetitive effects they may have in the market. When the effect or intent of using an MFN clause may be to limit competition or preclude competition by a competitor, a closer look at the MFN clause is warranted.

# EXHIBIT "5"

WINSTON
&STRAWN
LLP     North America   Europe   Asia

35 W. Wacker Drive
Chicago, IL 60601
T +1 312 558 5600
F +1 312 558 5700

June 8, 2016


**Via E-Mail**
Donald W. Fitzgerald
Paul J. Pascuzzi
Jason E. Rios
Felderstein Fitzgerald Willoughby & Pascuzzi LLP
400 Capitol Mall, Suite 1750
Sacramento, California 95814
dfitzgerald@ffwplaw.com
ppascuzzi@ffwplaw.com
jrios@ffwplaw.com


Richard Stern
Stephan E. Hornung
Luskin, Stern & Eisler LLP
Eleven Times Square
New York, New York 10036
stern@lsellp.com
horning@lsellp.com


        **Re: Rdio, Inc./ Chapter 11 Bankruptcy Case No. 15:31430**

Dear Gentlemen,

        Pursuant to 11 U.S.C. § 327(e) and Judge Montali's June 7, 2016 Order (Dkt. #322), I write as special litigation counsel to Debtor Rdio, Inc. ("Rdio") in connection with the above-captioned chapter 11 bankruptcy case.

        Following Rdio's January 20, 2016 letter, please find attached an amended copy of Rdio's informal requests for production of documents to Sony and Orchard (entitled, "Debtor's First Amended Request for Documents To Be Produced By Sony and Orchard").

        In conjunction with the submission of these amended requests, we would like to request a meet and confer with you to discuss an agreeable timeline for response and production of documents. We would propose holding such a meet and confer call on one of the following dates:  June 13, 2016 (any time between 2:30pm ET and 6pm ET), June 15, 2016 (any time between 1pm ET and 4pm ET), June 20, 2016 (any time from 12pm ET to 6pm ET), or June 21, 2016 (any time from 12pm ET to 6pm ET). Please let us know if any of these dates work for you.

1

WINSTON
&STRAWN
LLP

North America   Europe   Asia

35 W. Wacker Drive
Chicago, IL 60601
T +1 312 558 5600
F +1 312 558 5700

We look forward to your prompt response.

Sincerely,

W. Gordon Dobie

Cc:     Ron Bender
        Kari M. Rollins

2

# DEBTOR'S FIRST AMENDED REQUEST FOR DOCUMENTS
## TO BE PRODUCED BY SONY AND ORCHARD

## DEFINITIONS

A.     **"API"** means application programming interface, and shall have the meaning set forth by each of the Labels, as defined herein, in their respective agreements with Rdio or any Competitor, as defined herein.

B.     **"Communications"** means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise) and includes all oral and written communications of any nature, type or kind including, but not limited to, any Documents, telephone conversations, discussions, meetings, facsimiles, e-mails, texts, memoranda, and any other medium through which any information is conveyed or transmitted.

C.     **"Competitor"** means an entity participating in the market for music streaming or downloading services worldwide.

D.     **"Documents"** means and includes all written, recorded, transcribed or graphic matter of every nature, type and kind, however and by whoever produced, reproduced, disseminated or made. This includes, but is not limited to, Communications, phone records, electronically stored information, "writings" as defined by Rule 1001 of the Federal Rules of Evidence, copies or drafts, and any tangible or intangible thing or item that contains any information. Any Document that contains any comment, notation, addition, insertion, or marking of any type or kind which is not part of another Document, is to be considered a separate Document.

E.     **"Grant of Rights"** shall have the meaning set forth by each of the Labels in their respective agreements with Rdio or any Competitor.

F.     **"IFPI"** means IFPI the global not-for-profit organization that represents the interests of approximately 1,300 record companies from around the world.

G.     **"Labels"** means the collective of Merlin, Orchard, Warner, Sony, and Universal, as defined herein.

H.     "**MFN**" means a Most Favored Nation clause, or any term or clause intended to achieve comparable pricing, pricing results, equity, or promotional or marketing opportunities.

I.     "**Merlin**" means the Merlin Netwok B.V.,  its current and former parents, subsidiaries, affiliates, divisions, predecessors, officers, directors, agents, employees, representatives, and any other person acting on their behalf.

J.     **"Orchard"** means Orchard Enterprises NY, Inc., its current and former parents,

2

subsidiaries, affiliates, divisions, predecessors, officers, directors, agents, employees, representatives, and any other person acting on their behalf.

K. **"Rdio"** means Rdio, Inc., its parents, subsidiaries, affiliates, divisions, predecessors, officers, directors, agents, employees, representatives, and any other person acting on their behalf .

L. **"RIAA"** means the Recording Industry Association of America and all of its subsidiaries, affiliates, agents, employees, representatives, and any other person acting on their behalf.

M. **"Sony"** means Sony Music Entertainment, Inc., its current and former parents, subsidiaries, affiliates, divisions, predecessors, officers, directors, agents, employees, representatives, and any other person acting on their behalf.

N. **"Universal"** means Universal Music Group, along with Universal Music Group International, and all of their current and former parents, subsidiaries, affiliates, divisions, predecessors, officers, directors, agents, employees, representatives, and any other person acting on their behalf.

O. **"Warner"** means Warner Music, Inc., along with WEA International Inc., Warner Music Brasil LTDA., and all of their current and former parents, subsidiaries, divisions, predecessors, officers, directors, affiliates, agents, employees, representatives, and any other person acting on their behalf.

## DOCUMENT REQUESTS

1. All Documents and Communications that constitute or reflect Communications between or among the Labels, or that refer to or concern Communications between or among the Labels, relating to the following:

a. the terms or negotiations of any pricing term or pricing structure of any licensing agreement or potential licensing agreement made or considered by one or more of the Labels with Rdio or any Competitor;

b. the terms or negotiations of any Grant of Rights and/or any definitions of content, content restriction, or limitations of any licensing agreement made by one or more of the Labels with Rdio or any Competitor;

3

c.     the terms or negotiations of API Rights of or related to any licensing agreement made by one or more of the Labels with Rdio or any Competitor;

d.     the terms or negotiations of any contractual term, requirement, or provision of any licensing agreement made by one or more of the Labels with Rdio or any Competitor relating to marketing, promotion, business models, hardware, or the functionality of music streaming or downloading;

e.     the potential or realized impact of the use of a MFN on licensing fees, retail prices, market composition, or the realization of any other strategic goal;

f.     the use, scope, purpose, or enforcement of a MFN, generally or specifically;

g.     the use, terms, and scope of any MFN discussed during the negotiations of or included in any licensing agreement made or considered by one or more of the Labels with Rdio or any Competitor;

h.     the enforcement of a MFN by any Label against Rdio or any Competitor, including any audit related thereto or performed in service thereof;

i.     any enforcement action taken against any other entity, excluding unlicensed infringers, worldwide based on content restrictions or the use of a MFN;

j.     the potential or realized impact of the market power associated with any library of musical works;

k.     the potential or realized impact of any competition between or among the Labels for the business of Rdio or any Competitor;

l.     the proposed joint venture among the Labels and Rdio targeting Asia;

m.     Rdio's joint venture with Nova Entertainment (formerly DMG Radio) targeting Australia;

4

n.      Rdio's co-marketing agreement with Telus Communications Company relating to the co-marketing of the Rdio music service in Canada;

o.      Rdio's co-branding agreement with TNL PCS S.A. (commonly referred to as "Oi") relating to the co-branding of the Rdio music service in Brazil;

p.      Rdio's joint venture with Grupo Bandeirantes relating to the operation of the Rdio music service in Brazil;

q.      The acquisition of Rdio's assets by Pandora Media Inc.; and

r.      Rdio's bankruptcy case.

2.      All Documents and Communications that constitute or reflect internal Sony or Orchard Communications with respect to Rdio relating to the following: (a) any pricing term or pricing structure, including minimum royalty guarantees; (b) any Grant of Rights and/or any definitions of content or content restrictions; (c) any API Rights; (d) any MFN; (e) any marketing, promotional, and advertising restrictions; (f) any proposed features of the Rdio product; or (g) any business model proposed by Rdio.

3.      All Documents and Communications that constitute, reflect, or refer to a competing Label's pricing, pricing structure, equity, or MFN contained in that competing Label's licensing agreement or potential licensing agreement with Rdio or any Competitor.

4.      Any Documents and Communications between any one or more of the Labels and Keith Bernstein of the Royalty Review Council or any other audit firm relating to:

a.      the terms or negotiations of the pricing or any pricing structure, the Grant of Rights or any content definition, restriction, or limitation, the API Rights, or any MFN contained in any licensing agreement between any of the Labels and Rdio or any Competitor; and

b.      the use, compliance, terms, scope, purpose, or enforcement of any MFN contained in any

licensing agreement between any one or more of the Labels and Rdio or any Competitor.

5. Any Documents and Communications between any one or more of the Labels and any trade association or member of a trade association, including, but not limited to, RIAA and IFPI, and any Documents and Communications transmitted or made by any of the Labels to or through any such trade association or in conjunction with activities related to the trade association concerning any of the topics listed above under Request No. l(a)-(r).

6. Any Documents and Communications produced to and the transcript of any deposition or witness interview conducted or taken by any government agency, including but not limited to the U.S. Federal Trade Commission, the U.S. Department of Justice, the European Commission, or any other international trade or competition enforcement body, in connection with an inquiry, investigation, or action related to any one or more of the Labels' pricing or distribution practices, or any other allegation of anticompetitive behavior in a market for music streaming, music downloading, Internet radio, or any other digital music service.

7. Documents sufficient to show Sony's, Orchard's, or any other Label's market share in the market for music streaming, music downloading, Internet radio, or any other digital music service for each fiscal year from 2008 to the present in both the United States and worldwide.

8. Documents sufficient to show Sony's and Orchard's revenues and profit margins earned from music, music downloading, Internet radio, or any other digital music service for each fiscal year from 2008 to the present in both the United States and worldwide.

# EXHIBIT "6"

**From:** Stephan Hornung [mailto:hornung@lsellp.com]
**Sent:** Wednesday, June 15, 2016 9:09 AM
**To:** Rollins, Kari M.
**Cc:** Richard Stern; Paul Pascuzzi (ppascuzzi@ffwplaw.com); Don Fitzgerald; Ron Bender; Dobie, W. Gordon
**Subject:** RE: In re Rdio, Inc., Case No. 15-31430 (Bankr. N.D. Cal.) (DM)

Dear Kari:

Thank you for the response. We propose a meet and confer on Tuesday, June 21, 2016 at 2:00p.m. EST.

However, we still need a bit more information to allow us to have a meaningful meet and confer. We request that you respond to the following questions in advance of our call:

1. How do you contend that the MFNs in the labels' content agreements are anticompetitive?

2. Are you aware of any potential antitrust claim or other claims unrelated to MFN's? If so, what are the specific claims?

3. What is the basis of the claims you believe Rdio has against Orchard, which is merely a music distributor?

4. What is the basis of the claims you believe Rdio has against Sony and Orchard with respect to music downloading services?

It is hard for us to have a meaningful discussion with you about the information you may need to investigate your antitrust claims if we do not receive answers to these basic questions. We look forward to hearing back from you.

Regards,

Stephan

1

**From:** Rollins, Kari M. [mailto:KaRollins@winston.com]
**Sent:** Monday, June 13, 2016 4:36 PM
**To:** Stephan Hornung
**Cc:** Richard Stern; Paul Pascuzzi (ppascuzzi@ffwplaw.com); Don Fitzgerald; Rollins, Kari M.; Ron Bender (RB@lnbyb.com); Dobie, W. Gordon
**Subject:** RE: In re Rdio, Inc., Case No. 15-31430 (Bankr. N.D. Cal.) (DM)

Dear Stephan,

As indicated in its initial and supplemented Disclosure Statement (Dkts. #314 & 326), Rdio believes that it has valuable antitrust claims against Sony, Orchard, and the other Labels under Section 1 of the Sherman Act, 15 U.S.C. §1. In particular, Rdio believes that Sony, Orchard, and the other Labels have engaged in anticompetitive conduct to fix and control prices and unreasonably restrain trade for the licensing, marketing, and use of music by services, like Rdio, for the digital streaming and downloading of music to consumers worldwide.

The documents requests submitted to Sony and Orchard are designed to gather information to evaluate the factual basis for these potential antitrust claims, as well as related tort and unfair competition claims and the claims levied by the Labels in the bankruptcy proceeding. These requests have been narrowly tailored to seek only that which we believe will be needed to support such claims and assist the bankruptcy estate in evaluating whether to commence formal litigation. And given the recent investigations initiated by the DOJ, FTC, and state attorneys general involving allegations of anticompetitive conduct in the market for music streaming, we believe these requests more than well-founded and appropriate here.

We look forward to meeting with you to discuss these requests in greater detail and a timeline for production. Please let us know which of the dates proposed work best for you and your team.

Kindest,

Kari


**Kari M. Rollins**
**Partner**

Winston & Strawn LLP
200 Park Avenue
New York, NY 10166-4193
D: +1 (212) 294-2664
F: +1 (212) 294-4700
Bio | VCard | Email | winston.com


**From:** Stephan Hornung [mailto:hornung@lsellp.com]
**Sent:** Friday, June 10, 2016 12:47 PM
**To:** Rollins, Kari M.; Dobie, W. Gordon; Ron Bender (RB@lnbyb.com)
**Cc:** Richard Stern; Paul Pascuzzi (ppascuzzi@ffwplaw.com); Don Fitzgerald
**Subject:** In re Rdio, Inc., Case No. 15-31430 (Bankr. N.D. Cal.) (DM)

Dear Counsel:

We have received your June 8 letter, including your informal requests for production. Upon first review, the requests appear to be exceedingly broad and overly burdensome, but it is difficult to fully evaluate these requests without understanding the claims you intend to allege.

To make a meet and confer meaningful and productive, please provide us with a short email describing the claims and theory you intend to advance sufficient to allow us to assess relevance and relative burden, and be prepared to discuss these issues with you.

Promptly following our review of your description and assessment of your requests, we will be able to schedule a meet and confer. We reserve all rights.

Regards,

Stephan

Stephan Hornung
Luskin, Stern & Eisler LLP
Eleven Times Square
New York, NY 10036

Direct: 212-597-8245
Main:  212-597-8200
Fax:  212-974-3205


hornung@lsellp.com
www.lsellp.com

This email and any attachments accompanying it are only for the use of the intended recipient and may contain material that is confidential or privileged. Any review, use, disclosure, copying or distribution of this transmission by anyone other than the intended recipient is strictly prohibited. If you are not an intended recipient, please immediately notify the sender by reply email and delete all copies of this transmission.

The contents of this message may be privileged and confidential. If this message has been received in error, please delete it without reading it. Your receipt of this message is not intended to waive any applicable privilege. Please do not disseminate this message without the permission of the author. Any tax advice contained in this email was not intended to be used, and cannot be used, by you (or any other taxpayer) to avoid penalties under applicable tax laws and regulations.


This email and any attachments accompanying it are only for the use of the intended recipient and may contain material that is confidential or privileged. Any review, use, disclosure, copying or distribution of this transmission by anyone other than the intended recipient is strictly prohibited. If you are not an intended recipient, please immediately notify the sender by reply email and delete all copies of this transmission.

# EXHIBIT "7"

RONALD L. OLSON¹
ROBERT E. DENHAM
JEFFREY I. WEINBERGER
CARY B. LERMAN
GREGORY P. STONE
BRAD D. BRIAN
BRADLEY S. PHILLIPS
GEORGE M. GARVEY
WILLIAM D. TEMKO
STEPHEN M. KRISTOVICH
JOHN W. SPIEGEL
TERRY E. SANCHEZ
STEVEN M. PERRY
MARK B. HELM
JOSEPH D. LEE
MICHAEL R. DOYEN
MICHAEL E. SOLOFF
GREGORY D. PHILLIPS
KATHLEEN M. McDOWELL
GLENN D. POMERANTZ
THOMAS B. WALPER
PATRICK J. CAFFERTY, JR
JAY M. FUJITANI
O'MALLEY M. MILLER
SANDRA A. SEVILLE-JONES
MARK H. EPSTEIN
HENRY WEISSMANN
KEVIN S. ALLRED
JEFFREY A. HEINTZ
JUDITH T. KITANO
KRISTIN A. LINSLEY
MARC T.G. DWORSKY
JEROME C. ROTH
STEPHEN D. ROSE
GARTH T. VINCENT
TED DANE
STUART N. SENATOR
MARTIN D. BERN
DANIEL P. COLLINS
ROBERT L. DELL ANGELO
BRUCE A. ABBOTT
JONATHAN E. ALTMAN
MARY ANN TODD
MICHAEL J. O'SULLIVAN
KELLY M. KLAUS
DAVID B. GOLDMAN
KEVIN S. MASUDA
DAVID H. FRY
LISA J. DEMSKY
MALCOLM A. HEINICKE
GREGORY J. WEINGART

SUSAN E. NASH
TAMERLIN J. GODLEY
JAMES C. RUTTEN
RICHARD ST. JOHN
ROHIT K. SINGLA
LUIS LI
CAROLYN HOECKER LUEDTKE
C. DAVID LEE
FRED A. ROWLEY, JR.
KATHERINE M. FORSTER
BLANCA FROMM YOUNG
RANDALL G. SOMMER
ROSEMARIE T. RING
TODD J. ROSEN
MELINDA EADES LeMOINE
SETH GOLDMAN
GRANT A. DAVIS-DENNY
JONATHAN H. BLAVIN
DANIEL B. LEVIN
MIRIAM KIM
MISTY M. SANFORD
KATHERINE KU
HAILYN J. CHEN
BETHANY W. KRISTOVICH
JACOB S. KREILKAMP
JEFFREY Y. WU
LAURA D. SMOLOWE
ANJAN CHOUDHURY
KYLE W. MACH
HEATHER E. TAKAHASHI
ERIN J. COX
BENJAMIN J. HORWICH
E. MARTIN ESTRADA
KIMBERLY A. CHI
ADAM R. LAWTON
AARON SEIJI LOWENSTEIN
MATTHEW A. MACDONALD
MARGARET G. MARASCHINO
BENJAMIN J. MARO
JOEL M. PURLES
JESLYN A. EVERITT
MARK R. SAYSON
JEREMY A. LAWRENCE
BENJAMIN E. FRIEDMAN
CHRISTOPHER M. LYNCH
RAY S. SEILIE
ADAM I. KAPLAN
AMELIA L.B. SARGENT
BRYAN H. HECKENLIVELY
LAURA WIRTH

JASMINE M. ROBERTS
LAURA K. LIN
GREGORY M. SERGI
ACHYUT J. PHADKE
MARI OVERBECK
JESSE MAX CREED
JOHN M. GILDERSLEEVE
ERIC K. CHIU
SARAH L. GRAHAM
JESSICA BARCLAY-STROBEL
ZACHARY M. BRIERS
JENNIFER M. BRODER
SAMUEL T. GREENBERG
CAROLINE M. CUNNINGHAM
EMILY B. VIGLIETTA
KEVIN L. BRADY
EMILY R.D. MURPHY
ELLEN MEDLIN RICHMOND
JORDAN D. SEGALL
WESLEY T.L. BURRELL
CHRISTA L. CULVER
KAREN A. LORANG
KURUVILLA J. OLASA
JUSTIN P. RAPHAEL
HANNAH E. SHEARER
CRAIG A. LAVOIE
ROBERT W. GRAY, JR.
THOMAS P. CLANCY
JOSHUA PATASHNIK
ERIC C. TUNG
GUHA KRISHNAMURTHI
JOSHUA S. MELTZER
SARA E. CROLL
THANE REHN
ADAM B. WEISS
ROSE LEDA EHLER
AMY L. GREYWITT
NASSIM NAZEMI
CATHLEEN H. HARTGE
JOON S. HUR
MARIA JHAI
ADAM P. BARRY
JENNIFER L. BRYANT
JUSTIN T. HELLMAN
ANDREW CATH RUBENSTEIN
RIO PIERCE
JEFFREY A. PAYNE

VARUN BEHL
HANNAH L. DUBINA
ADAM GOTTESFELD
NICHOLAS D. FRAM
JOSHUA L. BENESH
JOHN F. MULLER
BRIONNA H. NED
LAURA C. ZARAGOZA
JOHN L. SCHWAB
SARA N. TAYLOR
ALEXANDER D. TEREPKA
MAXIMILLIAN L. FELDMAN
SAMUEL T. BOYD
PETER E. BOOS
SETH J. FORTIN
DAVID T. RYAN
ANKUR MANDHANIA
J'ME K. FORREST
ASHLEY D. KAPLAN
JESSICA REICH BARIL
JULIANA M. YEE
JEREMY K. BEECHER
MATTHEW K. DONOHUE
ALLYSON R. BENNETT
ARIEL GREEN
ELIZABETH A. LAUGHTON
EMILY CURRAN-HUBERTY
TIMOTHY J. MOON
JORDAN X. NAVARRETTE
JOHN B. MAJOR
BRYN A. WILLIAMS
DAVID J. FEDER
LAUREN C. BARNETT
NICHOLAS R. SIDNEY
C. HUNTER HAYES
KIMBERLY D. OMENS
EMILY BUSSIGEL
BRADLEY E. MARKANO
USHA C. VANCE

OF COUNSEL
ROBERT K. JOHNSON¹
ALAN V. FRIEDMAN¹
PETER A. DETRE
MARK H. KIM
ALLISON B. STEIN
BRAD SCHNEIDER
ERIC P. TUTTLE
PETER E. GRATZINGER

E. LEROY TOLLES
(1922-2008)

¹A PROFESSIONAL CORPORATION

355 SOUTH GRAND AVENUE
THIRTY-FIFTH FLOOR
LOS ANGELES, CALIFORNIA 90071-1560
TELEPHONE (213) 683-9100
FACSIMILE (213) 687-3702

560 MISSION STREET
SAN FRANCISCO, CALIFORNIA 94105-2907
TELEPHONE (415) 512-4000
FACSIMILE (415) 512-4077

June 23, 2016

Writer's Direct Contact
(213) 683-9132
Glenn.Pomerantz@mto.com

**VIA E-MAIL**

W. Gordon Dobie, Esq.
Winston & Strawn LLP
35 W. Wacker Drive
Chicago, IL 60601

Re:   In re Rdio, Inc., Case No. 15-31430 (DM) (Bankr. N.D. Cal.)

Dear Mr. Dobie:

  I write to follow up on the meet-and-confer call we participated in on Tuesday, June 21, 2016. As we advised you at that time, our firm is co-counsel to Sony Music Entertainment ("Sony") in the Rdio chapter 11 case.

  I had hoped that, during our call, you would have been willing to tell us what antitrust concerns you were investigating and what documents you have already reviewed. This information would allow us to identify the documents you really needed to fairly investigate your concerns. For example:

- You have access to Rdio's agreements with Sony and its competitors and therefore, unlike us, have the ability to compare the terms of the agreements. Do those agreements have similar terms that you think raise a concern about improper collusion? If they are not similar, why do you still think that any collusive behavior occurred? You declined to answer those questions.

- You claim that most-favored-nation clauses ("MFNs") may raise unspecified antitrust concerns. I asked you to clarify that concern in view of Deloitte's MFN audit report that Rdio already possesses, which says that Sony's MFN was not triggered, and indicated that another label received a guaranteed payment that was materially greater than Sony's guaranteed payment. Again, you declined to answer my question.

- Your document requests refer to unspecified governmental investigations, and you mentioned these investigations again on our call. I asked you to identify the governmental investigations regarding Sony's relationships with streaming services that you think may have sought documents similar to the documents in your request. You did not identify one.

- Your document requests seek documents relating to music *downloading*. We asked you how such documents could be relevant given the testimony of Elliot Peters, Rdio's General Counsel, in his first day affidavit, that Rdio's "business model is based upon a monthly recurring *subscription* for full access to content rather than on an owned a la carte download model." You did not answer this question. As you should already know from Rdio's own documents, the May 28, 2010 download agreement between Sony and Rdio does not contain an MFN, and was structured as an agency arrangement for music download sales in which Rdio acted only as Sony's agent and neither purchased music downloads from Sony nor set the retail price for such downloads. Did Rdio have a similar agency agreement with Universal Music Group and Warner Music Group, or did those record companies sell downloads to Rdio at a wholesale price and allow Rdio to set retail prices?

Contrary to your suggestion during the call, I was not asking these questions to "depose" or "cross-examine" you. Rather, I am asking these questions in the hope that you would engage in a dialogue that would clarify your concerns so that we could identify the documents that you really needed to conduct an investigation without imposing unnecessary and extremely costly burdens on Sony and the Rdio estate, of which Sony is the largest unsecured creditor. That is the whole point of a meet and confer.

While it is true that discovery pursuant to Bankruptcy Rule 2004 is broad, it is not without limits. As you know, "[a] Rule 2004 examination must be both 'relevant and reasonable' and 'may not be used to annoy, embarrass or oppress the party being examined.'" *Clark v. Farris-Ellison (In re Farris-Ellison)*, No. 2:11-bk-33861-RK, 2015 Bankr. LEXIS 3057, *9 (Bankr. C.D. Cal. Sept. 10, 2015) (citing *In re Symington*, 209 B.R. 678, 685 (Bankr. D. Md. 1997)).

Your document requests are not "reasonable." A fair investigation does not require a review of years of emails about Rdio or any of its streaming competitors that are not tethered to

anything that you have identified as raising even a remote antitrust concern. Nor does it require looking at "all documents" reflecting internal Sony communications regarding "any proposed features of the Rdio product," or documents relating to Pandora Media Inc.'s acquisition of Rdio's assets. And a fair investigation of Rdio's concerns certainly does not require reviewing Sony's documents and communications without regard to any date limitations. These examples merely illustrate, rather than exhaust, our concerns over the sweeping overbreadth of what you have requested.

Nonetheless, as a compromise, we are willing to conduct a reasonable search for documents that will tell you whether your cursory allegation of "collusion" among Sony and its competitors has any merit (you probably have a pretty good idea that it has no merit just by a comparison of the agreements Rdio reached with Sony and other labels and by the fact that the price terms in Rdio's agreement with Sony have actually changed in Rdio's favor over time). We believe that if the documents identified below do not show any collusion, then Sony should not be burdened with the costs of any further document production. Here's what we propose to produce:

1. Copies of the U.S. license agreements between Sony and the following six streaming music service providers, which together represented approximately 95% of Sony's streaming music business in the United States in 2015: Spotify, Amazon, Apple, Google, Rhapsody, and Microsoft.

2. Non-privileged email communications between the following 8 custodians and Universal Music Group or Warner Music Group concerning MFNs, pricing terms, or marketing commitments in U.S. license agreements with Rdio or any of the six music streaming subscription services identified in Paragraph 1: Dennis Kooker, Jeff Walker, Mark Piibe, Andre Stapleton, Darrelle Spears, Alison Dow, Brooke Eplee, and James Finley. These 8 custodians are the most senior U.S. members of Sony's Global Digital Business Development and Business & Legal Affairs groups.

3. Non-privileged email communications between the custodians identified in Paragraph 2 and Deloitte regarding the Rdio MFN audit performed by Deloitte.

Sony's offer to produce the foregoing documents is subject to agreement upon reasonable search terms and date restrictions, agreement to a reasonable schedule for the production of documents, agreement on appropriate confidentiality restrictions regarding the dissemination and use of these documents, and is without prejudice to Sony's rights and remedies all of which are expressly reserved. In addition, Sony's offer to produce copies of the license agreements identified above is subject to the confidentiality restrictions, if any, contained in those agreements, which may require Sony to seek the services' consent or require Sony to comply with a notification procedure.

MUNGER, TOLLES & OLSON LLP

W. Gordon Dobie, Esq.
June 23, 2016
Page 4

We are happy to discuss any concerns you have with the above proposal. If you reject our offer and file an application for a Rule 2004 Order, we request that you inform the Court of our opposition and ask that the application be set for hearing with an opportunity for Sony to respond.

Very truly yours,

Glenn Pomerantz /K.O.

Glenn D. Pomerantz

cc:     Richard Stern,
        Ron Bender

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document: **DEBTOR'S MOTION FOR ORDER PURSUANT TO RULE 2004 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE DIRECTING THE PRODUCTION OF DOCUMENTS BY SONY MUSIC ENTERTAINMENT AND ORCHARD ENTERPRISES NY, INC; AND ORAL EXAMINATIONS OF PERSONS MOST KNOWLEDGEABLE FOR SONY MUSIC ENTERTAINMENT AND ORCHARD ENTERPRISES NY, INC.; MEMORANDUM OF POINTS AND AUTHORITIES** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1. <u>TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)</u>:** Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **June 27, 2016**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Ron Bender**   rb@lnbyb.com
- **Kathryn M.S. Catherwood**   kcatherwood@foley.com, vgoldsmith@foley.com
- **Andrea Cheuk**   acheuk@teslamotors.com, scastro@teslamotors.com
- **Shawn M. Christianson**   schristianson@buchalter.com
- **David N. Crapo**   dcrapo@gibbonslaw.com
- **John D. Fiero**   jfiero@pszjlaw.com, ocarpio@pszjlaw.com
- **Stephen D. Finestone**   sfinestone@pobox.com
- **Donald W. Fitzgerald**   dfitzgerald@ffwplaw.com, shoang@ffwplaw.com
- **Philip A. Gasteier**   pag@lnbrb.com
- **Julie M. Glosson**   julie.m.glosson@usdoj.gov
- **Debra I. Grassgreen**   dgrassgreen@pszjlaw.com, hphan@pszjlaw.com
- **Irvin M. Gross**   img@lnbyb.com
- **Stephan Hornung**   hornung@lsellp.com
- **Lynette C. Kelly**   lynette.c.kelly@usdoj.gov, ustpregion17.oa.ecf@usdoj.gov
- **Monica Y. Kim**   myk@lnbyb.com
- **Andy S. Kong**   kong.andy@arentfox.com
- **Paul J. Laurin**   plaurin@btlaw.com, slmoore@btlaw.com
- **Annie Li**   annie.li@skadden.com, Brigitte.Travaglini@skadden.com
- **John William Lucas**   jlucas@pszjlaw.com, ocarpio@pszjlaw.com
- **Thor D. McLaughlin**   tmclaughlin@allenmatkins.com
- **Krikor J. Meshefejian**   kjm@lnbyb.com
- **Office of the U.S. Trustee / SF**   USTPRegion17.SF.ECF@usdoj.gov, ltroxas@hotmail.com
- **Paul J. Pascuzzi**   ppascuzzi@ffwplaw.com, JNiemann@ffwplaw.com
- **Valerie Bantner Peo**   vbantnerpeo@buchalter.com
- **J. Alexandra Rhim**   arhim@hrhlaw.com
- **Richard A. Rogan**   rrogan@jmbm.com, jb8@jmbm.com
- **Jason Rosell**   jrosell@pszjlaw.com, sshoemaker@pszjlaw.com
- **Jane K. Springwater**   jspringwater@friedmanspring.com
- **Michael St. James**   ecf@stjames-law.com
- **Sabrina L. Streusand**   streusand@slollp.com, prentice@slollp.com
- **Bennett G. Young**   byoung@jmbm.com, jb8@jmbm.com

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                    **F 9013-3.1.PROOF.SERVICE**

**2. SERVED BY UNITED STATES MAIL**: On **June 27, 2016**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ *Service information continued on attached page*

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **June 27, 2016**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ *Service information continued on attached page*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| June 27, 2016 | Stephanie Reichert | /s/ Stephanie Reichert |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**