1  Donald W. Fitzgerald  (State Bar No. 095348)
   Paul J. Pascuzzi  (State Bar No. 148810)
2  Jason E. Rios  (State Bar No. 190086)
   FELDERSTEIN  FITZGERALD
3  WILLOUGHBY  & PASCUZZI LLP
   400 Capitol Mall, Suite 1750
4  Sacramento, CA 95814
   Telephone:    (916) 329-7400
5  Facsimile:    (916) 329-7435
   dfitzgerald@ffwplaw.com
6  ppascuzzi@ffwplaw.com
   jrios@ffwplaw.com
7
   Glenn D. Pomerantz (State Bar No. 112503)        Richard Stern (NY Bar No. 1668060)
8  Melinda E. Lemoine (State Bar No. 235670)        (Admitted  *Pro Hac Vice*)
   Kuruvilla J. Olasa (State Bar No. 281509)        Stephan E. Hornung  (NY Bar No. 4599379)
9  MUNGER, TOLLES & OLSON LLP                       (Admitted  *Pro Hac Vice*)
   355 South Grand Avenue Thirty-Fifth Floor        LUSKIN, STERN & EISLER LLP
10 Los Angeles, California 90071-1560               Eleven Times Square
   Telephone:    (213) 683-9100                     New York, NY 10036
11 Facsimile:    (213) 687-3702                     Telephone:    (212) 597-8200
   glenn.pomerantz@mto.com                          Facsimile:    (212) 974-3205
12 melinda.lemoine@mto.com                          stern@lsellp.com
   kuruvilla.olasa@mto.com                          horning@lsellp.com
13
   Attorneys for Sony Music Entertainment  and
14 Orchard Enterprises NY, Inc.

15              UNITED STATES BANKRUPTCY COURT

16              NORTHERN  DISTRICT OF CALIFORNIA

17                  SAN FRANCISCO DIVISION

18 In re                              Case No. 15-31430

19 RDIO, INC.,                        Chapter 11

20            Debtor and Debtor in    **OPPOSITION  TO DEBTOR'S MOTION FOR
21            Possession.             ORDER PURSUANT TO RULE 2004 (Docket
                                      No. 341)**

22                                    **[Declaration of Jeff Walker]**

23                                    **[Declaration of Neil Ross]**

24                                    **[Declaration of Glenn Pomerantz (Filed
25                                    Concurrently  Under Seal)]**

26

27

28

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................ 1

II. LEGAL STANDARD ......................................................................................... 4

III. DEBTOR'S SUPPOSED ANTITRUST CLAIM DOES NOT SUPPORT A RULE 2004 EXAMINATION .................................................................................. 6

    A. Debtor Lacks A Reasonable Basis To Use A Rule 2004 Examination To Investigate Its Purported Antitrust Claim. ......................................... 6

        1. Debtor's settlements with Universal and Warner contradict its supposed belief in its claims. .................................................... 7

        2. Debtor's own documents show that it does not have a viable antitrust claim. ................................................................................ 9

        3. Case law and basic economics also show that Debtor has no reasonable basis for its Rule 2004 examination. ......................... 10

    B. Debtor's Discovery Requests Are Extraordinarily Broad And Will Impose Significant and Unreasonable Costs On Sony Music and Orchard. ........................ 13

    C. Debtor's Rejection Of Sony Music's Compromise Offer Demonstrates That Debtor Is Seeking To Misuse The Rule 2004 Examination Process ........................ 17

    D. If The Court Were To Permit Any Rule 2004 Examination, It Should Enter A Cost-Shifting Order ....................................................................... 19

IV. DEBTOR'S OTHER REASONS FOR SEEKING A RULE 2004 EXAMINATION ARE MERITLESS ............................................................................................ 20

V. THERE IS NO URGENCY FOR THE 2004 EXAMINATION ........................... 21

VI. CONCLUSION ................................................................................................ 22

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*In re Analytical Sys., Inc.,*
　71 B.R. 408 (Bankr. N.D. Ga. 1987) ................................................................ 6

*Applera Corp. v. MJ Research Inc.,*
　2004 WL 5683983 (D. Conn. Dec. 17, 2004) ................................................. 11

*Bell Atlantic Corp. v. Twombly,*
　550 U.S. 544 (2007) ................................................................................ 1, 13, 16

*In re Big Rivers Elec. Corp.,*
　233 B.R. 739 (W.D. Ky. 1998) ........................................................................ 7

*Blue Cross & Blue Shield of Wis. v. Marshfield Clinic,*
　65 F.3d 1406 (7th Cir. 1995) (Posner, J.) .................................................... 2, 10

*In re Buccaneer Res., LLC,*
　2015 WL 8527424 (Bankr. S.D. Tex. Dec. 10, 2015) ................................. 19, 20

*Car Carriers, Inc. v. Ford Motor Co.,*
　745 F.2d 1101 (7th Cir. 1984) ........................................................................ 16

*In re Coffee Cupboard, Inc.,*
　128 B.R. 509 (Bankr. E.D.N.Y. 1991) ........................................................... 5, 6

*Cont'l Airlines, Inc. v. Goodyear Tire & Rubber Co.,*
　819 F.2d 1519 (9th Cir. 1987) ........................................................................ 21

*In re Countrywide Home Loans, Inc.,*
　384 B.R. 373 (Bankr. W.D. Pa. 2008) ............................................................. 5

*In re Cousins Barricades & Metal Products, Inc.,*
　2000 WL 245860 (E.D. La. Mar. 2, 2000) ...................................................... 6

*In re Dinubilo,*
　177 B.R. 932 (E.D. Cal. 1993) ......................................................................... 4

*In re Drexel Burnham Lambert Group, Inc.,*
　123 B.R. 702 (Bankr. S.D.N.Y. 1991) ............................................................. 6

*In re Express One Int'l, Inc.,*
　217 B.R. 215 (Bankr. E.D. Tex. 1998) .................................................... passim

**TABLE OF AUTHORITIES**

Page(s)

*In re Farris-Ellison*,
    2015 WL 5306600 (Bankr. C.D. Cal. Sept. 10, 2015) ............................................. 5, 6

*In re Golden Grove Pecan Farm*,
    460 B.R. 349 (Bankr. M.D. Ga. 2011) ................................................................... 3, 20

*Kitsap Physicians Service v. Washington Dental Service*,
    671 F. Supp. 1267 (W.D. Wash.1987) ...................................................................... 11

*Ocean State Physicians Health Plan v. Blue Cross & Blue Shield of Rhode Island*,
    883 F.2d 1101 (1st Cir. 1989) .................................................................................. 10

*Paper Sys. Inc. v. Nippon Paper Indus. Co.*,
    281 F.3d 629 (7th Cir. 2002) ...................................................................................... 7

*Snyder v. Society Bank*,
    181 B.R. 40 (S.D. Tex. 1994) ...................................................................................... 6

*Starr v. Sony Music BMG Music Entm't.*,
    592 F.3d 314 (2d Cir. 2010) ........................................................................... 2, 11, 12

*Stern v. Marshal*,
    564 U.S. 462 (2011) ................................................................................................... 22

*In re Symington*,
    209 B.R. 678 (Bankr.D.Md.1997) ............................................................................... 5

*In re W & S Investments, Inc.*,
    1993 WL 18272 (9th Cir. 1993) (unpublished) .......................................................... 4

*Matter of Wilcher*,
    56 B.R. 428 (Bankr. N.D. Ill. 1985) .................................................................. 1, 6, 7

**STATE CASES**

*Cont'l Heller Corp. v. Amtech Mech. Servs., Inc.*,
    53 Cal. App. 4th 500 (1997) ...................................................................................... 21

*Jet Acceptance Corp. v. Quest Mexicana A.S. de C.V.*,
    87 A.D.3d 850 (N.Y. App. Div. 2011) ..................................................................... 21

**FEDERAL STATUTES**

11 U.S.C. § 157(d) .......................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**RULES - OTHER**

Fed. R. Bankr. P. 2004 ..............................................................................................passim

Fed. R. Bankr. P. 9011(b)(1) ................................................................................... 5

Fed. R. Bankr. P. 9016 ........................................................................................... 19

Fed. R. Civ. P. 26 ...................................................................................................... 8

Fed. R. Civ. P. 45 .................................................................................................... 19

Fed. R. Evid. 1006 ..................................................................................................... 9


**OTHER AUTHORITIES**

Statement by Assistant Attorney General R. Hewitt Pate Regarding the Closing of
    the Digital Music Investigation (Dec. 23 2003),
      https://www.justice.gov/archive/atr /public/press_releases/ 2003/ 201946.htm ........................ 12

## I.   INTRODUCTION

Debtor claims that it needs Rule 2004 examinations to investigate whether Sony Music Entertainment, Orchard Enterprises NY, Inc., Warner Music Group, Universal Music Group, and Merlin Network B.V. conspired to fix prices to audio subscription streaming services by using contracts containing most-favored-nation clauses ("MFNs"). Debtor's Mot. for Order Pursuant to Rule 2004 at 16 – 17, Dkt. No. 341 ("Motion" or "Mot."). But Debtor's antitrust claim is based on nothing but speculation and conjecture. Balanced against Debtor's speculative claim are the millions of dollars in concrete costs and business interruption that its broad discovery requests would inflict upon Sony Music and its subsidiary, Orchard.

"Although the scope of the examination permitted under Bankruptcy Rule 2004 is broad it is not without limits." *Matter of Wilcher*, 56 B.R. 428, 433 (Bankr. N.D. Ill. 1985). The Court should not allow Debtor to subject Sony Music and Orchard to the intrusive and expensive discovery it seeks unless Debtor can offer "actual evidence" and "facts" to support its antitrust claim. *Id.* at 434. Nor should the Court permit Debtor to proceed with the requested Rule 2004 examinations "if the cost and disruption" to Sony Music and Orchard "outweigh the benefits" to Debtor. *In re Express One Int'l, Inc.*, 217 B.R. 215, 217 (Bankr. E.D. Tex. 1998). These sensible safeguards, which apply to all Rule 2004 discovery, are particularly important here given the "potentially enormous expense of discovery in antitrust cases." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 559 (2007).

This brief addresses four points:

**1.   Debtor does not have a valuable antitrust claim:**

Debtor's separate license agreements with Sony Music and Orchard put the lie to its accusation that Sony Music and Orchard conspired with Universal, Warner, and Merlin to fix prices. These agreements show that Sony Music and Orchard agreed to materially different prices, not a supposed "fixed" price. Further demonstrating the incoherence of Debtor's MFN theory, the Orchard agreement *did not even have an MFN clause* until 2015, and the MFN clause it did eventually include is nothing like the MFN in Sony Music's agreement with Rdio. Another document in Debtor's possession, an MFN audit report issued by Deloitte (Debtor's own auditor),

reveals that Sony Music's price terms differ materially from an unspecified other record label, a fact that is fundamentally inconsistent with Debtor's price-fixing theory. Debtor did not mention any of this evidence in its Motion.

Debtor has also not been forthcoming on the law, which recognizes that MFNs are widely used in many industries, including the entertainment industry, and typically are entirely proper. *See, e.g.*, *Blue Cross & Blue Shield of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995) (Posner, J.). The MFN in the Sony Music/Rdio agreement requires Rdio (the buyer) to give Sony Music (the seller) an overall deal that is at least as good as it offers anyone else. Debtor has not cited a *single* case finding that this type of MFN leads to anticompetitive collusion.[1] And for good reason: this type of MFN cannot prevent any record company from providing Rdio or any other audio subscription streaming service a lower price.

Instead of discussing the type of MFN actually at issue here, Debtor attached to its Motion a law review article that focuses on and describes the anticompetitive effects of a completely different type of MFN—an MFN in which a *seller* promises to give a *buyer* the best price it offers anyone else. Mot. Ex. 4, at 1. With respect to MFNs in general, Debtor's article actually confirms that "MFN clauses offer pro-competitive, cost-saving benefits including efficiencies in negotiations." Mot. Ex. 4, at 1.

In any event, Debtor's conduct demonstrates that it does not really believe that its antitrust claims are valuable. Debtor's settlements with Universal and Warner, the purported co-conspirators in this price-fixing scheme, reveal that *at best* Debtor values these claims at thousands of dollars. Sony Music and Orchard should not be subjected to intrusive discovery that will cost orders of magnitude more than even Debtor believes its claims are worth.

**2. Debtor seeks to impose an unwarranted and significant burden on Sony Music:**

Debtor's requests for documents and testimony ("Requests") are literally boundless—they contain no limits whatsoever as to custodians, time frame, geographic scope, business unit,

---

[1] *Starr v. Sony Music BMG Music Entm't.*, 592 F.3d 314, 323 (2d Cir. 2010), does not support Debtor's antitrust theory, as explained in detail below.

business model, or nature of the documents (*i.e.*, internal documents versus external communications). Declaration of Jeff Walker ("Walker Decl.), ¶ 5. Nor are the Requests limited to the effect of MFNs on audio subscription streaming services operating in the United States or to the documents in the possession of Sony Music custodians in the United States. To the contrary, the Requests seek documents from every corner of the globe and from individuals who have no connection to the negotiation of audio subscription streaming agreements. Of the 26 potential custodians Debtor suggests "may" have relevant information, only 2 are actually employed in the division that negotiates audio subscription streaming agreements, and many have never been employed by Sony Music at all. *Id.*, ¶7.

Sony Music anticipates that the collection, search, review and production of documents and testimony pursuant to the Requests would cost millions of dollars and consume months of employee and outside counsel time. *Id.*, ¶¶ 35-38. If Debtor insists, notwithstanding these costs, that it needs to conduct this discovery, then it and not Sony Music should bear the costs. *See, e.g., In re Golden Grove Pecan Farm*, 460 B.R. 349, 354 (Bankr. M.D. Ga. 2011) (requiring Rule 2004 requesting party to pay costs of copying documents).

**3. Debtor's Rule 2004 Requests are designed to coerce Sony Music to abandon its rights:**

So why is Debtor seeking to impose a multi-million dollar burden on Sony Music if it knows its antitrust claim is meritless? The answer is transparent: it seeks to force Sony Music to drop its legal claims. Specifically, Sony Music has valid reason for opposing Debtor's Amended Plan, and Sony Music has valid claims against individuals connected to Debtor who deliberately misled Sony Music. Debtor should not be permitted to use the threat of a multi-million dollar discovery expense to investigate a claim it knows has no merit in order to pressure an opposing party to drop otherwise valid legal positions.

Notwithstanding that Debtor's antitrust claims are completely baseless, Sony Music offered a compromise that would have been more than fair to Debtor and that would have conserved both Debtor's and Sony Music's resources. Sony Music offered to search the files of key individuals in the U.S. at Sony Music responsible for negotiating its agreements with audio subscription

streaming services operating in the U.S., including Rdio, and to produce any communications with Sony Music's purported co-conspirators—Universal and Warner—on the specific subject matters raised by Debtor. Sony Music also offered to produce its agreements with the six largest audio subscription streaming services operating in the U.S (based on Sony Music's 2015 U.S. revenue from these services). As part of this offer, Sony Music proposed that if these documents, along with the documents that Debtor already has in its possession, provided evidence of collusion, the parties could discuss appropriate follow-up discovery. But if these documents did not support Debtor's purported claim (which is precisely what Sony Music expects will be the outcome), then that would have been the end of the matter. Debtor's rejection of this proposed compromise is further evidence that it is seeking the Rule 2004 examinations for an improper purpose.

### 4. **Debtor's non-antitrust reasons for Rule 2004 examinations are meritless:**

While Debtor is entitled to reasonable discovery concerning Sony Music's and Orchard's proofs of claim, there is nothing more for it to investigate regarding these straightforward contract-based claims. The relevant portions of Debtor's license agreements with Sony Music and Orchard are attached to the proofs of claim and Debtor already has complete copies of the agreements and records of all payments made to Sony Music and Orchard. Debtor's reasonable investigation does not require an examination of Sony Music's and Orchard's state of mind at the time Debtor signed the license agreements and does not require all communications that refer to or relate in any way to Debtor, the Bankruptcy Case, or Sony Music's and Orchard's bankruptcy claim.[2]

## II. LEGAL STANDARD

As the proponent of Rule 2004 discovery, Debtor bears "the burden of showing good cause for the examination which it seeks." *In re Express One Int'l, Inc.*, 217 B.R. 215, 217 (Bankr. E.D. Tex. 1998); *In re W & S Investments, Inc.*, 1993 WL 18272, at *2 (9th Cir. 1993) (unpublished); *In*

---

[2] What is most troubling about Debtor's non-antitrust Requests is its patently false representation to the Court that it met and conferred with Sony Music about the document requests attached to its Proposed Order. Motion at 14. In fact, as the documents attached to Debtor's own Motion reveal, Debtor *never* asked Sony Music or Orchard for documents relating to their claims. *Compare* Mot. Ex. 1 at 10-11 (Debtor's proposed order containing new Requests 9-11) *with* Mot. Ex. 5 at 6 (Debtor's Informal Requests to Sony Music, which do not contain Requests 9-11).

*re Dinubilo*, 177 B.R. 932, 943 (E.D. Cal. 1993). To establish "good cause," Debtor must show that it satisfies the following commonsense limitations on Rule 2004 discovery:

- Rule 2004 discovery must be **reasonable and relevant**. *In re Farris-Ellison*, 2015 WL 5306600, at *3 (Bankr. C.D. Cal. Sept. 10, 2015) (quoting *In re Symington*, 209 B.R. 678, 685 (Bankr.D.Md.1997)).

- The burden imposed by Rule 2004 discovery must be **proportional** to the benefits of such discovery. *In re Express One Int'l, Inc.*, 217 B.R. 215, 217 (Bankr. E.D. Tex. 1998) ("[I]f the cost and disruption to the examinee attendant to a requested examination outweigh the benefits to the examiner, the request should be denied."); *In re Countrywide Home Loans, Inc.*, 384 B.R. 373, 393 (Bankr. W.D. Pa. 2008) ("[T]he level of good cause . . . will vary depending on the potential intrusiveness involved.").

- Rule 2004 discovery must serve a **proper purpose**. Rule 2004 discovery must not be used to "burden and harass" the target of the discovery in order to gain an advantage in the proceeding. *See In re Farris-Ellison*, 2015 WL 5306600, at *3. And a motion for Rule 2004 discovery, like any motion, must not be made for an improper purpose, including needlessly increasing the cost of litigation. Fed. R. Bankr. P. 9011(b)(1).

The cases cited by Debtor confirm that Rule 2004 incorporates these critical safeguards. Mot. at 19 – 20. *Coffee Cupboard* explains that "there are important limits to the scope of an examination taken pursuant to Rule 2004." *In re Coffee Cupboard, Inc.*, 128 B.R. 509, 514 (Bankr. E.D.N.Y. 1991). In particular:

Rule 2004 requires that we balance the compelling interests of the parties, weighing the relevance of and necessity of the information sought by examination. That documents meet the requirement of relevance does not alone demonstrate that there is good cause for requiring their production. The burden of showing good cause is an affirmative one in that it is not satisfied merely by a showing that justice would not be impeded by production of the documents.

*Id.* (quoting *In re Drexel Burnham Lambert Group, Inc.*, 123 B.R. 702, 712 (Bankr. S.D.N.Y. 1991)). Applying this standard, *Coffee Cupboard* limited the scope of the requested Rule 2004 examination. Similarly, in *Snyder* the court *denied* the requested examination and held that Rule 2004 discovery "cannot be used to harass or oppress [a] party." *Snyder v. Society Bank*, 181 B.R. 40, 42 (S.D. Tex. 1994). In *Analytical Systems*, the court held that an application and order for a Rule 2004 examination is subject to the court's authority to "fashion protective orders to safeguard rights of parties to the examination." *In re Analytical Sys., Inc.*, 71 B.R. 408, 412 (Bankr. N.D. Ga. 1987). And *Cousins Barricades* confirms that the scope of Rule 2004 discovery "is not limitless." *In re Cousins Barricades & Metal Products, Inc.*, 2000 WL 245860, at *3 (E.D. La. Mar. 2, 2000). There, a creditor's application for a Rule 2004 examination of a potential alter ego of the debtor was supported by specific facts, including evidence that the individual in question had written a letter on the debtor's letterhead that suggested that he was continuing the debtor's business under another entity. *Id.* at *2.

## III. DEBTOR'S SUPPOSED ANTITRUST CLAIM DOES NOT SUPPORT A RULE 2004 EXAMINATION

Debtor has not satisfied Rule 2004's "good cause" standard. In Section A, below, we explain why the antitrust theory described in Debtor's Motion cannot possibly provide the required "reasonable basis" for the examination. *Matter of Wilcher*, 56 B.R. 428, 434 (Bankr. N.D. Ill. 1985). In Section B, below, we explain in detail the unreasonable burden that Debtor nonetheless seeks to impose on Sony Music and Orchard. *Express One Int'l, Inc.*, 217 B.R. at 217. Subsection C then addresses why Debtor's refusal to accept Sony Music's discovery compromise highlights the improper purpose of the requested examination. *Farris-Ellison*, 2015 WL 5306600, at *3.

### A. Debtor Lacks A Reasonable Basis To Use A Rule 2004 Examination To Investigate Its Purported Antitrust Claim.

Debtor claims that it "strongly believes" that it has "meritorious and valuable antitrust claims" against Sony Music and Orchard. Mot. 5. But "if this is just a matter of [Debtor's] 'belief,' [its] request for Rule 2004 examination may not be relevant, nor reasonable." *Farris-Ellison*, 2015 WL 5306600, at *3 (denying Rule 2004 discovery).

Here, Debtor has not attempted to even put forth a scrap of evidence that supports its belief. *See Wilcher*, 56 B.R. at 434 (Rule 2004 examination must be supported by "actual evidence"). That is because there isn't any. First, Debtor's supposed "belief" in its antitrust claims is flatly contradicted by its settlements with supposed co-conspirators Universal and Warner. Second, documents in Debtor's possession (but withheld from this Court) demonstrate that MFNs were not used to fix prices. Third, Debtor's antitrust theory is inconsistent with established case law and basic economics.

**1.   Debtor's settlements with Universal and Warner contradict its supposed belief in its claims.**

Debtor claims that it "preliminarily believes" that it has "very valuable causes of action against Sony Music and Orchard under a collusion theory." Mot. at 14. Its motion and Second Amended Plan identify the sellers with whom Sony Music and Orchard purportedly colluded: Universal and Warner. Mot. at 5; Mot. Ex. 1, at 4; Second Amended Plan at 8, Dkt. No. 312. This would make Universal and Warner jointly liable to Debtor—to the same extent as Sony Music—for damages caused by the conspiracy. *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 632 (7th Cir. 2002). And if Debtor truly believed that its claims against Warner and Universal were valuable, it would have been obliged to pursue them. *In re Big Rivers Elec. Corp.*, 233 B.R. 739, 751 (W.D. Ky. 1998) ("A debtor-in-possession owes a fiduciary duty to maximize the value of the estate to all its creditors.").

But Debtor's settlements with Universal and Warner tell a very different story. Specifically, Debtor settled its supposedly valuable antitrust claim against Warner by agreeing to *pay* Warner $100,000—a 16% distribution on its claim—and to provide releases from Debtor, Pulser, Iconical II, and Pandora. If Warner were to instead receive a pro rata distribution under the proposed Plan, it would have received between $90,000 (a 14.5% distribution) and $117,000 (an 18.8% distribution), meaning that the Debtor valued these antitrust claims at a few thousand dollars *at best*. At worst, Warner may actually receive *more* as a result of its settlement than will other creditors against which the Debtor did not have alleged antitrust claims. In addition, unlike other creditors, Warner will receive broad general releases from the Debtor, as well as Pulser, Iconical II

and Pandora, and a promise by Debtor not to pursue any discovery of Warner relating to Debtor's antitrust claims or otherwise. Debtor's settlement with Universal is slightly better, but still insufficient to show that these claims have value. Debtor settled its antitrust claim against Universal by agreeing to *pay* Universal $125,000—a 9.6% distribution on its claim—in addition to the broad releases from Debtor, Pulser, Iconical II, and Pandora. Were Universal to receive a pro rata distribution under the proposed Plan, it would have received between $189,000 and $244,000, meaning that Debtor was able to obtain a settlement that could, *at best*, be valued at $120,000 (not including the value of the broad releases and Debtor's promise to not conduct any discovery against Universal relating to the antitrust claims or otherwise).

Debtor's paltry settlements with Warner and Universal show that its "preliminary belie[f]" that its antitrust claims are "very valuable" is pure concoction. Mot. at 14. Debtor properly placed no value on its antitrust claim when it settled with Warner and Universal. Those settlements speak volumes about whether Debtor should be allowed to impose *millions of dollars* of discovery costs on Sony Music when its own conduct shows it believes the supposed claim is essentially worthless. *In re Express One Int'l, Inc.*, 217 B.R. 215, 217 (Bankr. E.D. Tex. 1998) (Rule 2004 discovery is improper if the benefits do not outweigh the costs); *c.f.* Fed. R. Civ. P. 26(b)(1) (discovery must be "proportional to the needs of the case"). Indeed, the cost of this Motion alone, let alone the discovery sought by this Motion, exceeds by many multiples the demonstrated *de minimis* value Debtor has already placed on the antitrust claim.

The Universal and Warner settlements are important also because they preclude Debtor from disparaging Universal and Warner and from obtaining discovery from them. Second Amended Disclosure Statement at 93, Dkt. 314. It is unclear how Debtor will be able to pursue an antitrust claim against Sony Music that requires it to accuse Universal and Warner of participating in a price-fixing conspiracy, and prove that they did so.

**2. Debtor's own documents show that it does not have a viable antitrust claim.**

Debtor already has key documents in its possession that allow it to test whether its antitrust theory has merit. Its failure to mention these documents in its Motion reinforces the conclusion that it lacks good cause for a Rule 2004 examination here.

*First*, Debtor has possession of its own license agreements with Sony Music, Orchard, Universal, Warner, and Merlin. In its motion (and in the prior meet and confer), Debtor declined to state whether these agreements actually contain comparable price terms—what one would expect if price-fixing was occurring. Although Sony Music, unlike Debtor, does not have access to Debtor's agreements with Warner, Universal, and Merlin it does have access to Debtor's agreements with Sony Music and Orchard. These agreements show material differences in the pricing terms.

The Declaration of Glenn Pomerantz includes a chart laying out material differences between the Sony Music and Orchard agreements.[3] For example, one company's agreement with Debtor for its Radio Plus service tier has a per stream minimum, while the other does not. In addition, the minimum revenue share that each company earned for its Radio Plus service tier is different. And, tellingly, until August 2015, Orchard's agreement with Rdio did not even have an MFN. Pomerantz Decl. ¶¶ 3, 5 (charts). And when Orchard's agreement did introduce an MFN, that MFN was completely different from the MFN in Sony's agreement with Rdio. Pomerantz Decl. ¶ 5 (chart). Debtor has no reason to conduct a Rule 2004 examination when its basis for doing so is so fundamentally undermined by documents in its possession.

*Second*, Debtor has an audit report in its possession that was prepared by its own independent auditor, Deloitte. The audit report assesses whether Debtor is in compliance with its MFN representations in the Sony Music/Rdio agreement. Pomerantz Decl. Ex. 1. Deloitte's report finds that Sony Music received a materially larger "content preparation fee" than another record company, that another company received a materially larger "upfront recoupable payment" than Sony Music received, and that Sony Music had a different cost per stream as compared to certain

---

[3] Counsel will have copies of these agreements at the July 6 hearing, in the event the Court wants to review them. *See* Fed. R. Evid. 1006.

other record labels. Pomerantz Decl. Ex. 1 at 7. The auditor also found that Sony Music's MFN had not been triggered, which meant Sony Music would continue to be paid based on the individual terms it had negotiated with Debtor. The report's finding of material differences in the contracts' respective price terms is compelling evidence that there was no collusion among those companies. Again, Debtor inexplicably fails to mention the Deloitte audit findings in its Motion, and why, in the face of these findings, it still has a good faith basis for the claim it "believes" it has.

Third, Debtor has possession of its own communications with the supposed conspirators. These communications should show whether any of these companies used MFNs to extract higher payments from Debtor, or conversely show that *Debtor* used the MFNs to keep prices *lower*. Debtor chose not to provide *any* of these communications to the Court to support its burden of showing good cause for the examination.

### 3. Case law and basic economics also show that Debtor has no reasonable basis for its Rule 2004 examination.

Debtor's antitrust theory involves "several sellers in a concentrated market agree[ing] with one another—tacitly or explicitly—to not discount prices to their customers through the use of MFNs." Mot. 13 – 14. But Debtor does not offer any explanation for why this theory makes any economic sense. In fact, it makes no sense. The MFN at issue here requires Debtor to offer Sony Music terms that are at least as favorable as the overall terms it offers other record companies. Pomerantz Decl. Ex. 1 at 3-4. This type of an MFN does not stop anyone from discounting. If a record company chooses to discount its price to Debtor to entice Debtor to play more of its music (or for any other reason), there is nothing in the MFN that stops that discounting (or informs Sony Music that such discounting is occurring). Nor would an agreement among record companies to impose MFNs on Debtor change this simple fact. Nothing in Sony Music's agreement with Debtor, for example, *forces* it to adopt any specific rates or terms. Each record company would still remain free to discount its prices for any reason. Debtor's theory does not pass the straight-face test.

Established law also undermines Debtor's MFN claim. Courts recognize that MFNs are used widely in business and are not inherently suspect. *Blue Cross & Blue Shield of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995) (Posner, J.) (describing most favored nations

clauses as "standard devices," "the sort of conduct that the antitrust laws seek to encourage," and "not price-fixing"); *accord Applera Corp. v. MJ Research Inc.*, 2004 WL 5683983, at *11 (D. Conn. Dec. 17, 2004); *Ocean State Physicians Health Plan v. Blue Cross & Blue Shield of Rhode Island*, 883 F.2d 1101, 1109–13 (1st Cir. 1989); *Kitsap Physicians Service v. Washington Dental Service*, 671 F. Supp. 1267, 69 (W.D. Wash.1987).

Debtor has not cited a single case that finds that an MFN comparable to the MFN at issue here is anticompetitive. Nor does Debtor explain how such an MFN *could* be evidence of a price fixing agreement. The Sony Music/Rdio MFN did not preclude discounting to Debtor by one or more record companies, it did not preclude discounting to any other streaming service, and it did not provide Sony Music with any way to detect if one of its competitors was discounting.

Debtor attached to its Motion a law review article that focuses on a completely different type of MFN—an MFN in which a *seller* promises to give a *buyer* the best price it offers anyone else—and describes the potential anticompetitive effects of that specific type of MFN. With respect to MFNs in general, that article confirms that "MFN clauses offer pro-competitive, cost-saving benefits including efficiencies in negotiations." Mot. Ex. 4, at 1.

According to Debtor, *Starr v. Sony Music BMG Music Entertainment*, 592 F.3d 314 (2d Cir. 2010), supports its MFN theory. But that case does not hold that the mere fact that a contract contains an MFN plausibly suggests a price-fixing conspiracy. In *Starr*, which was decided at the motion to dismiss stage based solely on the allegations in the plaintiffs' complaint, the Second Circuit allowed an antitrust case to go forward where the plaintiffs' complaint contained "factual allegations" of parallel conduct. *Id.* at 323. These factual allegations included: (1) that the defendants had formed joint ventures to sell music downloads to consumers, which provided "a forum and means through which defendants could communicate about pricing;" *id.* at 318, 323; (2) that the defendants jointly boycotted a leading music retailer; *id.* at 323; and that (3) "all defendants raised wholesale prices from about $0.65 per song to $0.70 per song" at the same time. *Id.* Although the Second Circuit does discuss the MFNs in the defendants' contracts with the joint ventures, its conclusion that the case could go forward was based on the sum of these and other allegations of parallel pricing. *Id.* (noting that the allegations "taken together" raise a suggestion of

parallel conduct). If the mere presence of MFNs were sufficient to suggest collusion, there would have been no need for the Second Circuit's detailed analysis.[4]

Notably, when the Department of Justice actually analyzed the same joint ventures at issue in *Starr*, it concluded, with the benefit of evidence, that the record companies had *not* colluded on price. *See* Statement by Assistant Attorney General R. Hewitt Pate Regarding the Closing of the Digital Music Investigation (Dec. 23 2003), https://www.justice.gov/archive/atr /public/press_ releases/ 2003/ 201946.htm ("None of the several theories of competitive harm that the Division considered were ultimately supported by the facts. The Division found no impermissible coordination among the record labels as to the terms on which they would individually license their music to third-party services.").

In this case, unlike in *Starr*, Debtor's Motion tellingly does not state that Sony Music, Orchard, Universal, Warner, and Merlin engaged in parallel pricing towards Debtor—despite the fact that Debtor already has access to everything it needs to see if this is the case. And, as noted, the evidence the Debtor already has demonstrates that there was no parallel pricing—prices varied significantly. In short, there is no basis in antitrust law, economics or fact to question the garden variety MFN here.

Finally, Debtor's speculative antitrust claim is even more ephemeral when applied to Orchard. As Debtor knows, Orchard did not even have an MFN in its agreement with Debtor until August 2015. Pomerantz Decl. ¶¶ 3, 5 (charts). And that MFN is very narrow and applies only to a single term in Orchard's agreement. Pomerantz Decl. ¶ 5 (chart). It appears that Debtor has included Orchard in its request for Rule 2004 examinations solely because Orchard is affiliated with Sony and has not accepted Debtor's settlement offer.

---

[4] *Starr*'s relevance is further attenuated because it involved allegations of price fixing of a different service than the service Debtor actually offers. Debtor has not explained how it was harmed by an alleged conspiracy in the music download market, given that its "business model is based upon monthly recurring subscription for full access to content *rather than on an owned a la carte download model*." Peters Decl. ¶ 8, Dkt. No. 3 (emphasis added).

**B.** **Debtor's Discovery Requests Are Extraordinarily Broad And Will Impose Significant and Unreasonable Costs On Sony Music and Orchard.**

The Supreme Court has noted the "potentially enormous expense of discovery" in antitrust cases, and has warned federal courts that, without their intervention, the cost of discovery in such cases "will push cost-conscious defendants to settle even anemic cases." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 559 (2007). Debtor's sweeping Requests—based on nothing more than speculation and in aid of claims that have no value—are exactly what the Supreme Court was concerned about. As explained in detail in the accompanying declarations from Jeff Walker and Neil Ross, responding to these requests would likely cost millions of dollars and disrupt Sony Music's and Orchard's business for months. Walker Decl. ¶¶ 2, 35-38; Declaration of Neil Ross ("Ross Decl."), ¶ 5

Debtor's Requests are unreasonable on their face. The Requests, which consist of eleven compound document requests and additional deposition topics, are literally limitless—they contain no limits whatsoever as to custodians, time frame, geographic scope, business unit, business model, nature of documents (*i.e.*, internal documents versus external communications), or relationship to Debtor's antitrust theory. Mot. at 8-11. Described below are just a few of the ways in which these broad Requests would impose crushing discovery costs on Sony Music. For further specific details regarding the burden each of the Requests would impose, Sony Music directs the Court to the Walker and Ross declarations.

- **Business Model**: Debtor claims that it suspects "anticompetitive conduct" that fixed artificially high prices with regard to "services, like the Debtor, *for the digital streaming of music* to consumers." Mot. at 16 (emphasis added). Yet the Requests as written would reach documents wholly unconnected to this theory, including documents related to downloads (including ringtones), non-subscription streaming services, services based on user-generated content, etc. Walker Decl. ¶¶ 8, 14. Sony Music and Orchard should not, under any circumstances, be forced to search for, review, and produce documents that are completely untethered to Debtor's antitrust theory and business model. *See* Peters Decl. ¶ 6 Dkt. No. 3 (Debtor's General

Counsel declaring under oath that Debtor's "business model is based upon monthly recurring subscription for full access to content rather than on an owned a la carte download model"). Requiring Sony Music to do so would impose significant burdens by increasing the number of potential custodians and documents dramatically. Walker Decl. ¶¶ 8, 14-15, 24.

- **Business Unit:** The Sony Music/Rdio deal was negotiated by Sony Music's Global Digital Business group, the business unit responsible for the negotiation of deals with audio subscription streaming music services like Rdio. Walker Decl. ¶ 3. Within the larger Global Digital Business group, only two divisions are charged with negotiating terms with streaming services like Rdio. *Id*. To the extent Debtor's collusion theory has any merit, which it does not, the relevant evidence would be in the hands of those individuals within GDB who actually negotiated with Rdio. Yet, Debtor seeks sweeping discovery from any and all Sony Music custodians and many *non*-Sony Music custodians. In its motion, Debtor states that it seeks discovery from at least 26 additional custodians (notably, it does not limit its actual Requests to these custodians). But only 2 of these 26 additional custodians work in the Global Digital Business group. Walker Decl. ¶ 7. Several of these individuals do not work at Sony Music or Orchard at all. *Id*.

- **Geographic Scope:** The Global Digital Business group that negotiated the Rdio deal is in the United States. Yet Debtor seeks discovery from Sony Music employees and entities *worldwide*, across Sony Music's 40 global affiliates. These international affiliates are responsible for local agreements with DSPs, not agreements covering a number of territories like the Rdio deal. Those multi-territory deals are negotiated by the Global Digital Business group, which, with the exception of a few individuals, is located in the U.S. Requiring Sony Music to produce documents from files in countries outside the United States will prolong this process and drive up costs unreasonably, and for no reason. Sony Music would have to retain expert counsel just to investigate the patchwork of data privacy and

notification laws for every jurisdiction in which it conducts business and determine whether and how it could collect and review documents from persons located in each jurisdiction without violating that jurisdiction's data privacy laws. These affiliates conduct business in numerous foreign languages, which would also require Sony Music to enlist the aid of translators to review and identify responsive documents or hire local counsel in multiple territories to review documents in the local languages. At the end of the day, the incremental benefit of this dramatic effort would be nonexistent. Debtor gains nothing by exploring the local territory deals in the far corners of the world, except the imposition of a crushing burden on Sony Music. Walker Decl., ¶¶ 20-21, 32.

- **Internal Documents:** Debtor's Requests seek documents both internal and external to Sony Music, including Sony Music's internal communications regarding Debtor. Reviewing these internal documents will require an expensive privilege review even though Debtor's antitrust theory is necessarily based on *external* communications in which Sony Music purportedly agreed to fix prices. Walker Decl. ¶¶ 23, 33

- **Timeframe**: Debtor's Requests are not limited in scope to any particular period of time. As written, they could force Sony Music to locate and search the files of former employees whose tenure at Sony Music ended before Debtor's entry into the market for audio subscription streaming services. And even with respect to current employees, Sony should not have to search for files that predated Debtor's entry into the market. These files could not possibly be relevant to an antitrust conspiracy to fix the prices offered to Debtor.

Sony Music has not had to conduct this kind of global discovery effort in the past, so it cannot be certain how long it would take to complete, how many employee hours it would consume, and how much it would cost to undertake. Walker Decl. ¶¶ 10, 35. But based on experience with much narrower document collection and review efforts, Sony Music believes it could take many months (and potentially over a year) to conclude, consuming countless employee hours. Walker Decl. ¶¶ 35-38. Based on the costs of document productions that are at a much

1  smaller scale, Sony Music anticipates that such an effort could cost in the millions of dollars.

2  Walker Decl. ¶ 35. For example, Sony Music recently produced documents from just eight

3  custodians in the United States in a non-antitrust matter, and its share of costs for that production

4  was nearly half a million dollars. Walker Decl. ¶¶ 35-38.

5       Orchard would face many of the same burdens if compelled to respond to these Requests, as

6  described in the Ross Declaration. Ross Decl., ¶¶ 1-8

7       Also, as detailed in the accompanying Walker and Ross declarations, the burden imposed

8  by the extraordinarily broad topics for testimony would be significant. Walker Decl. ¶ 31 Ross

9  Decl. ¶ 8. For instance, the topics for testimony include "the market conditions which existed

10  during the Debtor's pre-petition relationships with Sony and Orchard." Mot. Ex. 1 at 2. This topic,

11  unbounded by specific timeframe or geographic scope, would presumably require Sony and

12  Orchard to find an employee or employees with knowledge of the market conditions in every

13  market in which they participate around the world or, as is more likely the case, spend weeks trying

14  to prepare an employee with adequate information to respond to questions on this topic. Another

15  topic is: "Any other matter relevant to the Debtor's bankruptcy case." Mot. Ex. 1 at 2. This

16  catchall topic provides Sony and Orchard with no notice whatsoever regard the questions or topics

17  Debtor intends to cover.

18       In light of the specious and speculative theory Debtor advances, the limited value it attaches

19  to these claims, and its apparent failure to conduct any cost-benefit analysis regarding the burden

20  its claims would impose, Sony Music should not be forced to undertake the burdensome discovery

21  Debtor has requested. As the Supreme Court has explained, "the costs of modern federal antitrust

22  litigation and the increasing caseload of the federal courts counsel against sending the parties into

23  discovery when there is no reasonable likelihood that the plaintiffs can construct a claim."

24  *Twombly*, 550 U.S. at 558 (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th

25  Cir. 1984)); *see also Express One Int'l, Inc.*, 217 B.R. at 217 (Rule 2004 discovery should be

26  denied "if the cost and disruption to the examinee . . . outweigh the benefits to the examiner").

27

28

**C.  Debtor's Rejection Of Sony Music's Compromise Offer Demonstrates That Debtor Is Seeking To Misuse The Rule 2004 Examination Process**

Although Debtor is not entitled to *any* Rule 2004 discovery because it has not articulated a viable basis for its purported claim and has not demonstrated good cause, Sony Music nonetheless offered Debtor the following additional documents that would have allowed it to further investigate its claims:

> "1. Copies of the U.S. license agreements between Sony [Music] and the following six streaming music service providers, which together represented approximately 95% of Sony [Music's] streaming music business in the United States in 2015: Spotify, Amazon, Apple, Google, Rhapsody, and Microsoft.
>
> 2. Non-privileged email communications between the following 8 custodians and Universal Music Group or Warner Music Group concerning MFNs, pricing terms, or marketing commitments in U.S. license agreements with Rdio or any of the six music streaming subscription services identified in Paragraph 1: Dennis Kooker, Jeff Walker, Mark Piibe, Andre Stapleton, Darrelle Spears, Alison Dow, Brooke Eplee, and James Finley. These 8 custodians are the most senior U.S. members of Sony [Music's] Global Digital Business Development and Business & Legal Affairs groups.
>
> 3. Non-privileged email communications between the custodians identified in Paragraph 2 and Deloitte regarding the Rdio MFN audit performed by Deloitte."

Mot. Ex. 7, at 3.

Debtor declined this offer—which was not contingent on it giving up any future Rule 2004 motion to obtain additional documents; rather, Sony Music's offer merely provided that Debtor would evaluate the documents that were provided and proceed to seek more only if there was a basis to do so.

Sony Music's offer was eminently reasonable. If Debtor's claim that Sony Music colluded with Universal and Warner had any basis, then there would likely be communications evidencing such collusion. For example, there should be emails or letters between Sony Music and Universal or Warner agreeing on price or MFNs, or at least *discussing* price or MFNs. Debtor's motion does not dispute this. Debtor merely quibbles with the custodians offered by Sony Music.

First, Debtor quibbles that because some of these individuals are *lawyers*, their internal communications will be privileged. Mot. at 15. But that misses the point: these lawyers (and non-lawyers) are key negotiators and decision makers on deal terms with streaming services—in fact,

many of them were the negotiators with Debtor itself—and Sony Music is agreeing to produce all of their non-privileged communications with Warner and Universal, its alleged co-conspirators.

Second, Debtor provides a list of 26 additional custodians and claims that "upon information and belief," these individuals "may have documents and information responsive to its requests." Mot. at 17 n.10. Debtor does not identify the source of its "information and belief," and the source appears to be at best uninformed. Walker Decl. ¶ 7. Only two of these 26 custodians actually work in the Sony Music business unit responsible for the negotiation of deals with audio subscription streaming music services like Rdio. *Id*. Indeed, several of these individuals do not even work at Sony Music or Orchard *at all*. *Id*. And several are the heads of record labels— creative executives who sign recording artists and market and promote their music. They have no role in negotiating deals with digital music services, much less audio subscription streaming services like Rdio. The only common thread connecting these individuals is that seeking discovery from them will cause as much disruption as possible at the highest-level within Sony Music and other Sony companies.

Sony Music's offer to Debtor went beyond producing communications about the Sony Music, Universal and Warner deals with Rdio; Sony Music also offered to produce its deals with six other streaming services that, together, constitute 95% of Sony Music's domestic streaming music business. Debtor says these agreements are meaningless without being able to compare them to agreements reached by Universal and Warner with these same services. [5] Mot. at 16 n.9. Not so. Sony Music's agreements with these other services will show that the terms vary considerably from service to service, further undermining the plausibility of an overarching price-fixing conspiracy among the record companies.

It is, of course, true that Debtor would have *more* evidence refuting a price-fixing conspiracy if it could look at Universal's and Warner's agreements with other streaming services,

---

[5] This argument also highlights the fact that, at a minimum, Debtor *does* have access to both Sony Music's and Orchard's agreements with Debtor and can compare their terms. Debtor's strategy is transparent: where it does have evidence that would refute its antitrust theory, it refuses to review that evidence. And when it is offered additional evidence that would show whether its theory has any merit, it claims it needs different evidence.

and compare them to Sony Music's agreements. But Debtor's inability to make this comparison is of Debtor's own making. As part of its settlement agreements, Debtor expressly agreed with Warner and Universal not to pursue any discovery from them. Amended Disclosure Statement at 93, Dkt No. 312.

Debtor also argues that Sony Music's compromise was unreasonable because it did not offer to produce documents from some unspecified government investigation. As Sony Music told Debtor's counsel in the meet-and-confer, Sony Music is not aware of any investigation covering the broad scope of what Debtor is seeking here. Sony Music asked Debtor what government investigation Debtor was referring to, and Debtor did not answer the question. This hardly shows unreasonableness on Sony Music's part. To the extent Debtor's reference to government investigations is meant to reference the investigation conducted by the government regarding music *downloads*, that investigation was completed in 2005—half a decade before Debtor signed its agreement with Sony Music—and, according to Debtor's own submissions, did not involve the business Debtor was in.

If Debtor were pursuing the Rule 2004 examination in good faith, it would have agreed to Sony Music's compromise as an interim step. Not only did it reject the compromise, but it then sought a Rule 2004 examination that was even *broader* than its initial proposal to Sony Music.[6]

### D. If The Court Were To Permit Any Rule 2004 Examination, It Should Enter A Cost-Shifting Order

The Court's power to compel discovery under Bankruptcy Rule 2004 is governed by Rule 9016. *See* Fed. R. Bankr. P. 2004(c); *In re Buccaneer Res., LLC*, 2015 WL 8527424, at *6 (Bankr. S.D. Tex. Dec. 10, 2015). "Bankruptcy Rule 9016 makes Federal Rule of Civil Procedure 45 applicable to bankruptcy proceedings." *Buccaneer Res., LLC*, 2015 WL 8527424, at *6; Fed. R. Bankr. P. 9016.

Federal Rule of Civil Procedure 45, in turn, requires a court to quash or modify a discovery request that subjects a person to undue burden. Fed. R. Civ. P. 45(d)(1), (d)(3)(A)(iv); *Buccaneer*

---

[6] *Compare* Mot. Ex. 1 at 10-11 (Debtor's proposed order containing Requests 9-11) *with* Mot. Ex. 5 at 6 (Debtor's Informal Requests to Sony Music, which do not contain Requests 9-11).

*Res., LLC*, 2015 WL 8527424, at *6. One reasonable modification is to allocate the costs of the discovery to the party seeking the discovery. *See, e.g.*, *In re Golden Grove Pecan Farm*, 460 B.R. 349, 354 (Bankr. M.D. Ga. 2011) (requiring Rule 2004 requesting party to pay costs of copying documents); *Buccaneer Res., LLC*, 2015 WL 8527424, at *6.

To the extent that the Court authorizes Debtor to seek discovery that is broader than the discovery offered in Sony Music's reasonable compromise offer, the Court should require that Debtor and not Sony Music pay for it. Debtor then can then decide for itself whether the extensive and burdensome discovery it seeks is actually worth the cost.

## IV. DEBTOR'S OTHER REASONS FOR SEEKING A RULE 2004 EXAMINATION ARE MERITLESS

Debtor does not need Rule 2004 discovery to determine whether Sony Music's and Orchard's contract and indemnification claims are viable. These are straightforward contract claims, and the relevant portions of the agreements and a breakdown of the amounts outstanding are attached to the respective proofs of claim. Debtor has complete copies of the content agreements, all reporting information (indeed, this information was generated by Debtor), all of the information regarding what payments were made to Sony Music and Orchard,[7] and all the information it needs regarding what amounts remain outstanding.[8] If Debtor believes that Sony Music's and Orchard's claims were calculated incorrectly, it should say so and provide its calculation to Sony Music and Orchard. It did not, and in fact, Debtor never even asked for

---

[7] It is unclear why Debtor needs to investigate "the payments Sony Music and Orchard received prior to the Petition Date." Mot. at 7. Debtor has already concluded that there is no basis to assert any preference claims against Sony Music, Orchard or anyone else. *See* Second Amended Disclosure Statement at 86, Dkt. No. 314. Indeed, Debtor specifically concluded that it should not pursue a preference claim against Sony Music because Sony Music had a new value defense to any payments received during the 90-day look back period. *Id.* at Ex 5. This is hardly surprising considering that, as Debtor concedes, it continued to operate its streaming service for months even after it stopped making payments to Sony Music. *Id.* at 11–12. Debtor also concedes that it has no basis to assert any fraudulent conveyance actions, and, in any event, all avoidance actions will be permanently waived upon confirmation of the Plan. *Id.* at 86–87.

[8] Sony Music's and Orchard's indemnification claims are contingent unliquidated claims based upon the indemnification provisions in the agreements. As pre-petition claims, Sony Music and Orchard were required to assert them in their proofs of claim. There is no possible need to investigate these claims further.

supporting documents until it filed this Rule 2004 Motion. Had Debtor *ever* asked Sony Music and Orchard for documents supporting their claims, Sony Music and Orchard would have produced copies of the agreements and supporting payment records, notwithstanding the fact that they are already in Debtor's possession.

Debtor's new claim—also raised for the first time in its Rule 2004 Motion—that Sony Music's and Orchard's content agreements might be unconscionable should be dismissed for the nonsense it is. The doctrine of unconscionability is wholly inapplicable to agreements negotiated by sophisticated business entities like Debtor. *See Jet Acceptance Corp. v. Quest Mexicana A.S. de C.V.*, 87 A.D.3d 850, 856 (N.Y. App. Div. 2011).[9] There is no basis for the Debtor to investigate this frivolous claim—especially given that it was represented by experienced in house and outside counsel in its negotiations with Sony Music. Nor is there any basis for Debtor to seek discovery related to Sony Music's and Orchard's subjective "intent" at the time the content agreements were signed.

## V.        THERE IS NO URGENCY FOR THE 2004 EXAMINATION

Any supposed urgency is of Debtor's own making. By letter dated January 20, 2016, Debtor's counsel propounded six overly-broad and unduly-burdensome informal discovery requests, and requested a "meet and confer" by January 27, 2016, to discuss Debtor's requests. Sony Music's and Orchard's Objection to Less than Full Notice of Hearing on Amended Disclosure Statement, Ex. A at 19, Dkt. 268. Sony Music's counsel promptly contacted Debtor's counsel by email on January 22, 2016, by email again on January 25, 2016, and a third time by letter dated January 27, 2016, requesting Debtor's counsel's availability for the proposed meet-and-confer call. Debtor never responded. Instead, Debtor waited until May 23, 2016, to retain antitrust counsel and until June 8, 2016, to contact Sony Music and Orchard regarding newer, broader discovery requests.

---

[9] Sony Music's content agreement is governed by New York law, but California law is no different. *See Cont'l Airlines, Inc. v. Goodyear Tire & Rubber Co.*, 819 F.2d 1519, 1527 (9th Cir. 1987) (applying California law); *Cont'l Heller Corp. v. Amtech Mech. Servs., Inc.*, 53 Cal. App. 4th 500, 507 (1997).

Debtor has known since at least April that Sony Music intended to object to and vote against the Plan,[10] and it should come as no surprise to Debtor that Sony Music's and Orchard's claims, as the claims of the first and third largest non-insider unsecured creditors, would be important to the confirmability of the Plan. However, the only amounts that are relevant for purposes of voting on the Plan are Sony Music's and Orchard's liquidated contract claims, and Debtor already has sufficient information in its possession to evaluate these claims.[11] There is no justifiable basis to reduce the amount of Sony Music's and Orchard's claims for voting purposes based upon the unarticulated, unsupportable antitrust counterclaims that cannot be investigated or adjudicated in advance of the confirmation hearing and will never be heard in the Bankruptcy Court. *See Stern v. Marshall*, 564 U.S. 462, 499-503 (2011); 11 U.S.C. § 157(d).[12]

## VI. CONCLUSION

The Court should deny Debtor's Rule 2004 Motion. To the extent the Court deems some discovery appropriate, it should enter a cost allocation order that requires Debtor, not Sony Music and Orchard, to shoulder the costs of this discovery.[13]

---

[10] *See, e.g.*, Sony's and Orchard's Motion to Appoint an Examiner or to Convert Case to Chapter 7 at 6, Dkt. No. 266.

[11] Sony Music's and Orchard's indemnification and fraud claims can be estimated at some nominal amount or zero solely for purposes of voting on the Plan.

[12] Nor is there any basis to equitably subordinate Sony Music's and Orchard's claims, but even if there were, it would be wholly irrelevant to the allowance of Sony Music's and Orchard's claims (indeed, equitable subordination presumes an allowed claim) and their ability to vote on the Plan.

[13] To the extent the Court concludes that Debtor may proceed with Rule 2004 Discovery, Sony Music and Orchard reserve all rights to object, in a manner consistent with the Court's ruling on this Motion, to specific Definition, Instructions and Requests that Debtor serves

DATED: July 5, 2016

FELDERSTEIN FITZGERALD
WILLOUGHBY & PASCUZZI LLP
Donald W. Fitzgerald
Paul J. Pascuzzi
Jason E. Rios

By:     /s/ Donald W. Fitzgerald
          Donald W. Fitzgerald

MUNGER, TOLLES & OLSON LLP
Glenn D. Pomerantz
Melinda E. Lemoine
Kuruvilla J. Olasa

     /s/ Glenn D. Pomerantz
By:     Glenn D. Pomerantz

LUSKIN, STERN & EISLER LLP
Richard Stern
(Admitted *Pro Hac Vice*)
Stephan E. Hornung
(Admitted *Pro Hac Vice*)

     /s/ Richard Stern
By:     Richard Stern

Attorneys for Sony Music Entertainment and
Orchard Enterprises NY, Inc.

23