Donald W. Fitzgerald (State Bar No. 095348)
Paul J. Pascuzzi (State Bar No. 148810)
Jason E. Rios (State Bar No. 190086)
FELDERSTEIN FITZGERALD
WILLOUGHBY & PASCUZZI LLP
400 Capitol Mall, Suite 1750
Sacramento, CA 95814
Telephone: (916) 329-7400
Facsimile: (916) 329-7435
dfitzgerald@ffwplaw.com
ppascuzzi@ffwplaw.com
jrios@ffwplaw.com

-and-

Richard Stern (NY Bar No. 1668060)
(Admitted *Pro Hac Vice*)
Stephan E. Hornung (NY Bar No. 4599379)
(Admitted *Pro Hac Vice*)
LUSKIN, STERN & EISLER LLP
Eleven Times Square
New York, NY 10036
Telephone:    (212) 597-8200
Facsimile:    (212) 974-3205
stern@lsellp.com
hornung@lsellp.com

*Attorneys for Sony Music Entertainment*
*and Orchard Enterprises NY, Inc.*

## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| RDIO, INC., | Case No. 15-31430 |
| Debtor. | Date: July 26, 2016<br>Time: 11:00 a.m.<br>Place: U.S. Bankruptcy Court<br>Courtroom 17<br>450 Golden Gate Ave., 16th Floor<br>San Francisco, CA 94102<br>Judge: Honorable Dennis Montali |

## SONY MUSIC ENTERTAINMENT'S AND ORCHARD ENTERPRISES NY, INC.'S
## OBJECTION TO THE PROPOSED DISCLOSURE STATEMENT

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................ 1

I.     STATEMENT OF FACTS .......................................................... 4

       A.     Sony and Orchard ...................................................... 4

       B.     The Plan and Disclosure Statement ................................. 5

OBJECTIONS TO THE DISCLOSURE STATEMENT ................................. 8

II.    THE COURT SHOULD REJECT THE DISCLOSURE STATEMENT BECAUSE THE PLAN IS UNCONFIRMABLE AS A MATTER OF LAW ................................. 8

       A.     The Plan Unfairly Discriminates Against Sony and Orchard in Violation of Sections 1129(a)(1) and 1123(a)(4) of the Bankruptcy Code Because It Requires Sony to Release Its Unique Claim Against the Debtor's Officers to Receive an Equal Percentage Distribution Under the Plan ........................... 9

       B.     The Debtor Improperly Classifies Universal's Claim in Class 5 and Warner's Claim in Class 6 to Gerrymander an Accepting Class of Impaired Creditors .................. 11

       C.     There is No Basis to Continue the Automatic Stay Beyond Confirmation of the Plan ................................................................. 15

III.   THE DISCLOSURE STATEMENT SHOULD BE REJECTED BECAUSE IT DOES NOT CONTAIN ADEQUATE INFORMATION ................................. 15

       A.     All False Allegations Against Sony and Orchard Should Be Removed from the Disclosure Statement ...................................... 16

              1.     The Debtor Has No Factual Basis to Allege An Antitrust Conspiracy ....... 17

              2.     The Debtor Has No Legal Basis to Allege an Antitrust Conspiracy ........... 17

              3.     The Debtor Knows That Its Antitrust Claim Is Worthless ...................... 18

       B.     The Disclosure Statement Should Provide an Accurate Description of the Settlement of the Challenge Lawsuit ................................. 20

IV.    RESERVATION OF RIGHTS ................................................... 22

CONCLUSION ................................................................................ 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atalanta Corp. v. Allen (In re Allen),*
    300 F.3d 1055 (9th Cir. 2002) ........................................................................... 15

*Barakat v. Life Ins. Co. of Va. (In Re Barakat),*
    99 F.3d 1520 (9th Cir. 1996) ...................................................................... 11, 14

*Blue Cross & Blue Shield United of Wisc. v. Marshfield Clinic,*
    65 F.3d 1406 (7th Cir. 1995) ............................................................................. 17

*Boston Post Rd. Ltd. P'ship v. FDIC (In re Boston Post Rd. Ltd. P'ship),*
    21 F.3d 477 (2d Cir. 1994) ............................................................................... 14

*El Salto, S. A. v. PSG Co.,*
    444 F.2d 477 (9th Cir. 1971) ............................................................................ 13

*In re AOV Indus., Inc.,*
    792 F.2d 1140 (D.C. Cir. 1986) ...................................................................... 9, 10

*In re Beyond.com Corp.,*
    289 B.R. 138 (Bankr. N.D. Cal. 2003) ............................................................... 8

*In re J.B. Lovell Corp.,*
    88 B.R. 459 (Bankr. N.D. Ga. 1988) ................................................................ 13

*In re Nat'l Health & Safety Corp.,*
    No. 99-18339DWS, 2000 Bankr. LEXIS 745 (Bankr. E.D. Pa. July 5, 2000) ........................... 16

*In re Pac. Shores Dev., Inc.,*
    No. 10-113251MM-11, 2011 Bankr. LEXIS 785 (Bankr. S.D. Cal. Feb. 25, 2011) ................. 15

*In re The Vaughan Co., Realtors,*
    543 B.R. 325 (Bankr. D.N.M. 2015) ................................................................... 9

*In re Union Meeting Partners,*
    165 B.R. 553 (Bankr. E.D. Pa. 1994) ............................................................... 10

*Oxford Life Ins. Co. v. Tucson Self-Storage, Inc.*
    *(In re Tucson Self-Storage, Inc.),* 166 B.R. 892 (B.A.P. 9th Cir. 1994) .................... 11

*Starr v. Sony BMG Music Entertainment,*
    592 F.3d 314 (2d Cir. 2010) ........................................................................ 17, 18

*Steelcase, Inc. v. Johnston (In re Johnston),*
    21 F.3d 323 (9th Cir. 1994) ....................................................................... 11, 14

**Statutes and Rules**

11 U.S.C. § 105 ...................................................................................................... 15

11 U.S.C. § 362 ...................................................................................................... 15

11 U.S.C. § 1122(a) ................................................................................. 2, 9, 11, 13, 14

11 U.S.C. § 1123(a)(4) ................................................................................ 2, 9, 10, 14

11 U.S.C. § 1125(a)(1) ................................................................................................ 15

11 U.S.C. § 1125(b) ................................................................................................... 15

11 U.S.C. § 1126(e) ................................................................................................ 4, 6

11 U.S.C. § 1129(a)(1) ............................................................................................ 2, 9

11 U.S.C. § 1129(a)(8) ............................................................................................... 4

11 U.S.C. § 1129(a)(10) ........................................................................................ 3, 12

Fed. R. Bankr. P. 9019 ................................................................................................ 2

TO THE HONORABLE DENNIS MONTALI, UNITED STATES BANKRUPTCY JUDGE:

Creditors Sony Music Entertainment ("Sony") and Orchard Enterprises NY, Inc. ("Orchard") submit this objection ("Objection") to the Debtor's Proposed Disclosure Statement (as amended, modified, or supplemented, the "Disclosure Statement") Describing the Debtor's Third Amended Plan of Reorganization (dated July 12, 2016) (as amended, modified or supplemented, the "Plan")[1] and, in support thereof, respectfully represent as follows:

**PRELIMINARY STATEMENT**

This is now the Debtor's fourth attempt at drafting a confirmable plan and adequate disclosure statement. At the June 16, 2016, hearing to consider the Debtor's prior effort (the Second Amended Plan), the Court identified multiple issues with both the Second Amended Plan and the disclosure statement describing it (the "Second Amended Disclosure Statement"). In particular, the Court directed the Debtor (i) to make the non-consensual, "opt out" third-party releases "opt in" (the "Third-Party Releases"); (ii) to remove the unfair restrictions tied to participation in the so-called Pulser Allocation Amount, which did not appear to serve any legitimate purpose; (iii) to fix the classification scheme, which, among other issues, improperly classified Sony and Orchard depending on whether they voted in favor of the Plan; and (iv) to revise both the Second Amended Plan and Second Amended Disclosure Statement because they were confusing, repetitive, and contained impermissible provisions.

The Debtor has now filed revised versions of both the Plan and the Disclosure Statement which address certain of the Court's concerns, but the Debtor has done nothing to fix numerous fundamental defects in the Plan (and indeed, has made some worse), and the Plan remains designed primarily to benefit Pulser Media Inc. ("Pulser," the Debtor's majority equity holder), Iconical Investments LP II ("Iconical II," Pulser's affiliate), and the officers and directors they share with the Debtor. The Third Amended Plan, like its predecessors, is not confirmable because it (i) grants an insider, Pulser, a $100 million deficiency claim in a transparent attempt to

---

[1] Unless stated otherwise, all references to the "Plan" or the "Disclosure Statement" are to the Debtor's Third Amended Plan of Reorganization Dated July 12, 2016 [Dkt. No. 358], and Disclosure Statement Describing Debtor's Third Amended Plan of Reorganization Dated July 12, 2016 [Dkt. No. 357], respectively. All capitalized terms not otherwise defined, shall have the meanings given to them in the Plan and the Disclosure Statement.

neutralize improperly the voting rights of Sony and Orchard; (ii) separately classifies Universal's and Warner's unsecured claims in an improper attempt to gerrymander an accepting class of impaired creditors; and (iii) unfairly discriminates against Sony by requiring it to release its fraud claims against Anthony Bay, Elliott Peters, and Jim Rondinelli to receive the same percentage distribution under the Plan as other similarly situated creditors. The Plan fails to comply with Sections 1122(a), 1123(a)(4), and 1129(a)(1) of the Bankruptcy Code and cannot be confirmed as a matter of law.

The cornerstone of the Plan remains the insufficient "settlement" of the Committee's threatened challenge lawsuit (the "Challenge Lawsuit") that awards Pulser and Iconical II more than 80% of the estate's cash (approximately $53 million) and grants broad third-party releases to Pulser, Iconical II, the officers and directors they share with the Debtor, and Pandora Media, Inc. ("Pandora," and with the other third-party releasees, the "Third Party Releasees"). The Debtor, Pulser, Iconical II, and the Committee (together, the "Plan Supporters") claim that the settlement of the Committee's Challenge Lawsuit is worth $8 million, but the Debtor's and Pulser's own statements make clear that the settlement of the Challenge Lawsuit is worth no more than $2.5 to $3 million. [2] Approximately $5 million of the $8 million allegedly required to be paid by Pulser to settle the Challenge Lawsuit will actually be given back to Pulser on account of its alleged $100 million deficiency claim. Pulser proposes to use the $5 million distribution it will receive on account of its Class 4 Claim (the so-called "Pulser Allocation Amount") to settle direct claims held by creditors against the Third-Party Releasees. This distribution scheme unfairly discriminates against Sony and Orchard because to receive a pro rata share of the $5 million Pulser Allocation Amount, Sony is required to abandon its valuable, pending fraud action against the Debtor's officers – something that no other creditor must do.

To obtain acceptances for its discriminatory Plan, the Debtor and its majority shareholder, Pulser, propose gerrymandered classes of unsecured creditors that, if allowed, would improperly

---

[2] The Original Plan proposed to settle the Challenge Lawsuit and distribute $5 million to non-insider unsecured creditors without requiring those creditors to provide the Third-Party Releases. (*See* Dkt. No. 221 at 39-42, 46.) No matter how one analyzes it, the consideration to be paid to the non-insider creditors solely from settlement of the Challenge Lawsuit dropped by at least $2.5 million from the original version of the plan to the current plan, presenting an insurmountable hurdle for the Committee and the Debtor to show that the settlement satisfies Bankruptcy Rule 9019.

disenfranchise Sony and Orchard (the first and third largest non-insider creditors). The Debtor's gerrymandering scheme has two prongs:

First, in an attempt to satisfy Section 1129(a)(10) of the Bankruptcy Code, the Debtor improperly classifies Warner and Universal separately from other similarly situated unsecured creditors, placing Universal by itself in Class 5, and Warner by itself in Class 6, while placing all other general unsecured creditors – including Sony and Orchard – in Class 4. However, Warner's and Universal's contract claims against the Debtor are indistinguishable from the claims asserted by other unsecured creditors, and the Debtor's classification of virtually identical claims – including the claims of Sony, Orchard, Merlin, Isolation Networks, and dozens of other content providers – in Class 4 makes this clear.

The only justification the Debtor offers in the Disclosure Statement for the separate classification of Universal's and Warner's contract claims is the existence of potential antitrust claims against Universal and Warner, which the Debtor claims may reduce the amount of their claims against the Debtor. However, this is pure sophistry. The Debtor has asserted identical antitrust claims against Sony and Orchard; the basis of those antitrust claims is that Sony, Orchard, Warner, Universal, and Merlin colluded together to fix prices through the use of most favored nations ("MFN") clauses in their content agreements. Yet the Debtor has classified the claims of Sony, Orchard, Merlin and other content providers whose content agreements contain MFN clauses in Class 4. (*See, e.g.*, Isolation Networks' Proof of Claim [Claim No. 48] at 8.)

Worse, Elliott Peters – the Debtor's General Counsel and court-appointed responsible individual – worked at Warner Music Group for approximately 10 years, including when the Debtor's license agreement with Warner was negotiated and signed. At the time, Peters was a Senior Vice President and the Head of Digital Legal Affairs; it appears that he led the group at Warner with responsibility for negotiating Warner's streaming agreement with the Debtor in 2010. If there was an antitrust conspiracy to price fix among Warner, Universal, Sony, Orchard, and Merlin, Peters would have known about it. Yet the Debtor settled its purported antitrust claim with Warner for virtually nothing, showing that Peters knows this antitrust claim is worthless.

<u>Second</u>, with two classes of impaired creditors (really just Universal and Warner) lined up to vote in favor of the Plan, the Debtor has provided Pulser, its majority shareholder, a $100 million deficiency claim so that it can attempt to outvote Sony and Orchard in Class 4, potentially allowing the Debtor to satisfy Section 1129(a)(8) of the Bankruptcy Code. However, there is no set of circumstances under which Pulser's vote should be counted for purposes of determining whether Class 4 votes to accept the Plan. As Pulser concedes, as the controlling equity holder in the Debtor with overlapping board members and officers, Pulser is unquestionably a statutory insider. If Universal's and Warner's claims are classified in Class 4 where they belong, Pulser's $100 million insider claim cannot be counted for voting purposes because Class 4 would be the only class of non-insider impaired creditors. If the Court allows the Debtor to place Universal's and Warner's claims in Classes 5 and 6, Pulser's claims should be designated under Section 1126(e) of the Bankruptcy Code. Pulser cannot be allowed to determine whether the settlement of claims against itself is accepted by holders of Class 4 Claims.

If, despite these deficiencies, the Court allows the Debtor to solicit acceptances of the Plan, the Court should still reject the Disclosure Statement because it contains (i) incorrect, unsupported, and misleading statements regarding the alleged claims against Sony and Orchard, and (ii) inadequate and deliberately misleading statements regarding the settlement of the Challenge Lawsuit. Accordingly, the Disclosure Statement does not contain "adequate information" and should, therefore, be rejected.

## I.   STATEMENT OF FACTS

### A.   Sony and Orchard

Sony and Orchard are the Debtor's first and third largest unsecured creditors, together holding more than $17 million in claims, arising out of several content agreements pursuant to which Sony and Orchard made audio content available to the Debtor for use on its music subscription service.

Sony timely filed a proof of claim asserting claims totaling more than $12.4 million arising out of the parties' content agreement, which the Debtor's executives – Anthony Bay, Elliot Peters, and Jim Rondinelli – fraudulently induced Sony to amend and extend. (Proof of Claim No. 54.)

On April 4, 2016, Sony commenced an action in the United States District Court for the Southern District of New York asserting fraudulent inducement and unjust enrichment claims against Bay, Peters, and Rondinelli. *See Sony Music Entertainment v. Anthony Bay et al.*, No. 16-cv-02505 (RJS) (S.D.N.Y.). The complaint details how Bay, Peters and Rondinelli misled Sony into extending its content agreement and deferring substantial payments totaling more than $5.5 million, even though each of the executives knew that the Debtor had no intention of performing under the agreement, that the Debtor would be filing for bankruptcy protection and ceasing operations, and that the Debtor would be selling substantially all of its assets to Pandora.

Sony was on the Committee until March 10, 2016. Sony resigned when it determined it was going to file its fraud lawsuit. Following Sony's resignation from the Committee, the Committee and its counsel aligned themselves with the other Plan Supporters in a concerted effort to increase distributions to the remaining creditors on the Committee at the expense of Sony and Orchard.

Orchard timely filed a proof of claim asserting claims totaling more than $4.5 million arising out of its separate content agreements with the Debtor. (Proof of Claim No. 53.)

Sony's and Orchard's claims together account for approximately one-third of the approximately $49 million of non-insider unsecured claims. (Disclosure Statement at 63–67.)

No objection to Sony's or Orchard's claims has been filed, and other than the unsupported antitrust allegations the Debtor has concocted, the Debtor has been unable to articulate any reason why Sony's or Orchard's claims are not allowable in full.

**B.      The Plan and Disclosure Statement**

The Plan is purportedly funded through an insufficient settlement of the Committee's Challenge Lawsuit.[3] Pulser will release its disputed lien on $8 million in cash (the "Settlement Fund"), part of which will be used to make distributions to non-insider holders of Class 4 Claims

---

[3] As discussed more fully in Sony's objection to the Second Amended Disclosure Statement, the Committee's limited investigation (both in terms of time and budget) of the Challenge claims was inadequate. For example, the Committee did not put any of the Debtor's executives under oath, did not obtain a single email communication from the Debtor, Pulser or Iconical II, and did not investigate the validity of the potential preference actions totaling approximately $9.4 million ($7.9 million to non-insiders, and $1.5 million to insiders) that the Committee agreed to waive under the Plan. Moreover, the Committee is settling claims against Bay and Peters for breaching their fiduciary duty to the Debtor and its unsecured creditors for nothing despite the existence of an $8 million insurance policy. (*See* Dkt. No. 327 at 9–11.)

(approximately $2.3 million after payment of Committee professional fees and settlements to Universal and Warner) and part of which will be returned to Pulser and used to purchase the Third Party Releases. The Plan proposes to give Pulser, a conceded statutory insider, a $100 million deficiency claim, which, if allowed, would potentially allow Pulser to control the voting in Class 4.[4] Significantly, the inflated Pulser deficiency claim, if allowed, would also entitle Pulser to a distribution of approximately 70% of the cash it will have purportedly contributed to settle the Challenge Lawsuit, or approximately $5 million of the approximately $7.3 million potentially available to general unsecured creditors after paying committee professionals and making payments to Universal and Warner.

To make the settlement seem reasonable, Pulser proposes to use its Class 4 distribution to purchase the Third-Party Releases from general unsecured creditors willing to release their direct claims against Pulser, Iconical II, the Debtor Affiliates, and Pandora. The Plan Supporters argue that the settlement of the Challenge Lawsuit is worth $8 million, but the settling parties' own admissions prove that it cannot be valued at more than approximately $2.5 to $3 million. In their joint statement in support of the Debtor's Second Amended Plan, Pulser and Iconical II conceded that the Pulser Allocation Amount is not for the settlement of the Challenge Lawsuit; it is being used to settle individual direct claims. Pulser candidly acknowledges that it "has effectively proposed to settle claims of individual Class 4 creditors by offering them a portion of its own pro rata distribution in exchange for the [Third-Party] Releases." (Statement of Iconical II and Pulser in Support of Approval of Disclosure Statement [Dkt. No. 329] at 4; *see also id.* ("[Pulser] has agreed to share its own recovery with other Class 4 creditors . . . ."), *id.* at 5 ("Pulser has agreed to share its allocable portion of the Unsecured Creditors Fund"), *id.* (describing Pulser's "agreement to redistribute its own share of the fund").) The Debtor confirms this view of the settlement in the Disclosure Statement, stating that the Pulser Allocation Amount is available only to "[t]hose class 4 claim holders who affirmatively agree to provide these third party releases." (Plan at 15.)

---

[4] Sony and Orchard reserve the right to object to Pulser's claim and to seek designation of Pulser's vote pursuant to Section 1126(e) of the Bankruptcy Code.

By contrast, holders of Class 4 Claims "who do not affirmatively agree to provide these third party releases . . . will not receive the Pulser Allocation Amount."[5] (*Id.*)

Based on the projections in the Disclosure Statement, Pulser will receive a distribution of between $5 and $5.3 million of the $8 million Settlement Fund. The range of potential distributions is set forth below:

| Recipient | Low-Case Claims | Low-Case Distribution (5.27%) | High Case Claims | High-Case Distribution (4.96%) |
|---|---|---|---|---|
| Committee Professionals | N/A | $500,000 | N/A | $500,000 |
| Warner | N/A | $100,000 | N/A | $100,000 |
| Universal | N/A | $125,000 | N/A | $125,000 |
| Sony | $12,419,314 | $654,810 | $12,419,314 | $615,897 |
| Orchard | $4,583,097 | $241,644 | $4,583,097 | $227,285 |
| Other Unsecured | $20,967,086 | $1,106,035 | $29,694,937 | $1,472,628 |
| Pulser Allocation Amount | $100,000,000 | $5,272,511 | $100,000,000 | $4,959,190 |
| **Total** | **$137,969,497** | **$8,000,000** | **$146,697,348** | **$8,000,000** |

The redistribution of the Pulser Allocation Amount is calculated as follows:

$$\frac{\text{Allowed Amount of Participating Class 4 Claim}}{\text{Total Amount of Allowed Participating Class 4 Claims}} \quad X \quad \text{Pulser's Class 4 Distribution}$$

(Plan at 16; Disclosure Statement at 62–63.) Thus, if the total amount of Allowed Participating Class 4 Claims is approximately $21 million, each holder of an Allowed Participating Class 4 Claim would be entitled to an additional approximately 25% distribution. If the total amount of Allowed Participating Class 4 Claims is $10 million, the additional distribution could be more than 50%. It is conceivable that some Class 4 creditors could receive distributions approaching 100% of their claims, while distributions to Class 4 creditors who retain their rights against third-parties would be capped at approximately 5% of their claims. (Plan at 16; Disclosure Statement at 63–64.)

---

[5] *See also* 2nd Am. Disclosure Statement at 54; 2nd Am. Plan at 5 ("The additional significant distribution available is the result of Pulser agreeing to assign the distribution that Pulser would otherwise receive to Eligible Class 4 Claim Holders in exchange for a full and complete release by such creditor of any claim against (i) any of the "Debtor Affiliates" (defined below), (ii) the Lender Released Parties, and (iii) Pandora.").

As Sony and Orchard have pointed out numerous times, the Plan Supporters have repeatedly structured and then restructured the Plan to apply maximum pressure to Sony and Orchard in an attempt to force through a Plan that inures primarily to the benefit of Pulser, Iconical II, and the officers and directors they share with the Debtor. The latest version of the Plan only reinforces this conclusion.

In both the First and Second Amended Disclosure Statements, the Debtor stated unequivocally that the Committee's "challenge rights have not been bargained away, and in the event the Plan or another plan acceptable to the Committee is not confirmed, the challenge rights are preserved for the Committee or any successor chapter 7 trustee." (Dkt. No. 279 at 22–23; Dkt. No. 314 at 24.) That representation remained in the draft Disclosure Statement circulated to the parties on June 30, 2016. However, in response to Sony's and Orchard's comments to the current version of the Plan and Disclosure Statement, the Plan Supporters reversed their position, and now claim that the Challenge claims would not be available to a chapter 7 trustee. The Disclosure Statement provides:

> Sony believes that if a chapter 7 trustee is appointed, the chapter 7 trustee will be able to pursue the Challenge Claims with contingency counsel to achieve in Sony's view a higher return to creditors than what is proposed in the Plan. The Debtor, the Prepetition Secured Creditors, and the Committee believe that the right to pursue the Challenge Claims has expired with respect to all parties other than the Committee and that a chapter 7 trustee would not have the right to pursuant any Challenge Claims.

(Disclosure Statement at 46.) The only explanation for the Committee's agreement with this position is that it would rather attempt to put pressure on Sony and Orchard than protect the interests of all unsecured creditors.

## OBJECTIONS TO THE DISCLOSURE STATEMENT

## II.     THE COURT SHOULD REJECT THE DISCLOSURE STATEMENT BECAUSE THE PLAN IS UNCONFIRMABLE AS A MATTER OF LAW

A bankruptcy court should reject a disclosure statement if the proposed plan is patently unconfirmable. *See, e.g.*, *In re Beyond.com Corp.*, 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003) (MM); Order Establishing Procedures for Disclosure Statement Hearing and Confirmation

Hearing [Dkt. No. 31] at 5 ("The court will not approve a disclosure statement for a plan which, on its face, does not conform to the requirements of the Bankruptcy Code."). Here, the Plan cannot be confirmed for at least three reasons: (i) it unfairly discriminates against Sony and Orchard in violation of Section 1123(a)(4) of the Bankruptcy Code; (ii) it improperly classifies Universal's and Warner's claims to gerrymander classes of approving creditors in violation of Section 1122(a) of the Bankruptcy Code; and (iii) it improperly extends the automatic stay beyond confirmation without any justification for doing so. Accordingly, solicitation of acceptances of the Plan would be futile and the Court should reject the Disclosure Statement.

### A. The Plan Unfairly Discriminates Against Sony and Orchard in Violation of Sections 1129(a)(1) and 1123(a)(4) of the Bankruptcy Code Because It Requires Sony to Release Its Unique Claim Against the Debtor's Officers to Receive an Equal Percentage Distribution Under the Plan

A plan must "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment." 11 U.S.C. § 1123(a)(4). A plan violates Section 1123(a)(4) of the Bankruptcy Code if it (i) provides for different percentage distributions to co-class members, *In re AOV Indus., Inc.*, 792 F.2d 1140, 1152 (D.C. Cir. 1986) (The "most conspicuous inequality that § 1123(a)(4) prohibits is payment of different percentage settlements to co-class members."); (ii) requires a class member to tender more valuable consideration in exchange for the same distribution, *id.* ("It is disparate treatment when members of a common class are required to tender more valuable consideration — be it their claim against specific property of the debtor or some other cognizable chose in action — in exchange for the same percentage of recovery."); or (iii) fails to provide a class member with the same opportunity to receive the same treatment under the plan. *In re The Vaughan Co., Realtors*, 543 B.R. 325, 339 (Bankr. D.N.M. 2015).

To receive its pro rata share of the Pulser Allocation Amount, each unsecured Class 4 creditor must release its individual claims against the Third-Party Releasees. This provision results in unequal treatment to Sony because to share equally with the other Class 4 creditors,

Sony must tender more valuable consideration than any other creditor – a release of a unique, pending fraud action against the Debtor's officers.

In *In re AOV Industries*, the court rejected a two-tier distribution structure for unsecured creditors similar to the one proposed in the Plan, finding that it violated Section 1123(a)(4) of the Bankruptcy Code because it required one creditor to give up a unique claim that other creditors were not required to release. 792 F.2d at 1152. The plan provided general unsecured creditors a 4% recovery and would have paid an additional 13% to each unsecured creditor that released claims against two parties that contributed $3 million to fund the plan. *Id.* at 1150. One of the unsecured creditors objected because it had a unique guaranty claim against the funding parties. *Id.* The court found that "to the extent that the creditor was called upon to release a unique, direct claim in order to participate in the $3 million Fund," it was being subjected to unequal treatment in violation of Section 1123(a)(4) of the Bankruptcy Code. *Id.* at 1152.

Likewise, in *In re Union Meeting Partners*, the plan provided for an additional 15% distribution to creditors that granted releases to the debtor's general partners. 165 B.R. 553, 566 (Bankr. E.D. Pa. 1994). One creditor objected because it was required to relinquish additional claims to receive the same 15% distribution, claiming that the plan unfairly discriminated against him because it required him to release claims not being released by the other creditors. The bankruptcy court agreed and rejected the plan. *Id.* at 566–67, 577.

Here, like the objecting creditors in *In re AOV Industries* and *In re Union Meeting Partners*, Sony is receiving unequal treatment in violation of Section 1123(a)(4) of the Bankruptcy Code because it must release its unique fraud claim against the Debtor's officers to receive an equal percentage distribution. No other creditor has asserted a claim against the Third-Party Releasees, so no other creditor is giving up the same consideration as Sony. Indeed, the Debtor is candid that it does not believe that any other Class 4 creditor has a viable claim against any of the Third-Party Releasees. (*See* Disclosure Statement at 64 (urging unsecured creditors to grant the Third-Party Releases because "the Debtor believes that the Retained Claims have no value").) The only reason to tie two-thirds of the distribution to unsecured creditors to the release of non-existent claims against third-parties is to discriminate against Sony and Orchard.

The Plan Supporters' intentions are apparent when considering that the Original Plan did not require Class 4 creditors to provide the Third-Party Releases to share equally in the Settlement Fund. Under the Original Plan, a holder of a Class 4 Claim would have received an equal distribution even if it opted out of the Third-Party Releases. (*See* Original Plan [Dkt. No. 216] at 16; Original Disclosure Statement [Dkt. No. 221 at 40.) The Debtor claims that the Third-Party Releases are necessary (i) "to avoid claims that the Debtor Affiliates will likely assert against the Debtor and/or the Lender Released Parties if they are sued," and (ii) "to avoid the depletion of the Escrowed Funds, which are part of the funds that will be paid to Pulser on account of Pulser's class 2 allowed claim" (Disclosure Statement at 61),[6] but those concerns have always existed. The only change between the filing of the Original Plan on March 31, 2016, and the Amended Plan on May 9, 2016 (when this new structure was first proposed), were that Sony filed a lawsuit against Bay, Peters, and Rondinelli and made its intention to oppose the Plan known.

**B.    The Debtor Improperly Classifies Universal's Claim in Class 5 and Warner's Claim in Class 6 to Gerrymander an Accepting Class of Impaired Creditors**

Section 1122(a) of the Bankruptcy Code requires a plan proponent to place only similar claims in the same class. 11 U.S.C. § 1122(a). In evaluating whether a claim is similar, a bankruptcy court must look at "the nature of each claim, i.e., the kind, species, or character of each category of claims." *Steelcase, Inc.v. Johnston (In re Johnston)*, 21 F.3d 323, 327 (9th Cir. 1994). If claims are similar, they may not be classified separately, "absent a legitimate business or economic justification" for doing so. *Barakat v. The Life Ins. Co. of Va. (In re Barakat)*, 99 F.3d 1520, 1526 (9th Cir. 1996). The desire to obtain the affirmative vote of an impaired class of creditors is not a legitimate business justification; such gerrymandering is prohibited by the Bankruptcy Code. *Id.* (affirming denial of confirmation of plan where "[t]he sole purpose of Debtor's separate classification [of substantially similar unsecured claims] was to obtain acceptance of the Plan"); *Oxford Life Ins. Co. v. Tucson Self-Storage, Inc. (In re Tucson Self-Storage, Inc.)*, 166 B.R. 892, 898 (B.A.P. 9th Cir. 1994) (rejecting plan where classification of

---

[6] There does not appear to be any basis for creditors to have to release Iconical II and the Debtor has not provided one. Iconical II is not contributing anything under the Plan and is being paid in full.

claims was "made for the sole purpose of gerrymandering an affirmative vote of an impaired class."). But that is what the Debtor attempts to do here.

The Debtor has separately classified Universal (in Class 5) and Warner (in Class 6), while placing the claims of 375 other unsecured creditors – including Sony, Orchard, and the Debtor's other content providers – in Class 4. Universal's and Warner's claims are indistinguishable from the contract claims asserted by other unsecured creditors, including, for example, Isolation Network, A-Train Entertainment, CD Baby, DistroKid, Routenote, Sony, Super Cassettes Industries, Orchard, Merlin, Tunecore, and dozens of other content providers with claims in this bankruptcy. (*Compare* Notice of Debtor's Determination to Reject Executory Contracts and Unexpired Leases [Dkt. No. 132] (rejecting content agreements with more than 80 "labels") *with* Disclosure Statement Ex. 3 [Dkt. No. 357 at 113–120] (listing general unsecured claims). The Debtor knows that the claims are virtually identical (indeed, in the first three iterations of the Plan, Universal's and Warner's claims were classified with Sony's and Orchard's in Class 5 and would have been moved to Class 4 had they rejected the Debtor's "settlement" offer), but it needs these additional classes of claims because without one or both of Universal and Warner accepting the Plan, it would be impossible for the Debtor to satisfy Section 1129(a)(10) of the Bankruptcy Code.[7] If Universal's and Warner's claims are in Class 4, Pulser's statutory insider vote could not be counted, Sony and Orchard would control the class, and the Plan would necessarily fail. (*See* Statement of Iconical II and Pulser in Support of Approval of Disclosure Statement [Dkt. No. 329] at 7 (conceding that "Pulser is an insider of the Debtor".) The Debtor's separate classification of Universal's and Warner's claims should be recognized and rejected – for what it is – unabashed gerrymandering.

The Debtor attempts to justify separate classification of Universal's and Warner's claims on the alleged existence of "potentially valuable [antitrust] claims" against Universal and Warner that "would serve to reduce" the amount of Universal's and Warner's claims. (Disclosure

---

[7] Even the Debtor does not actually believe that its classification scheme passes muster. In its 2004 Motion, it conceded that Sony's and Orchard's votes will likely determine whether the Plan is accepted. (*See* Dkt. No. 341 at 18–19 (noting that Sony's and Orchard's claims may determine whether Class 4 has accepted the Plan).)

Statement at 67–68.)[8]  But the Debtor contends that it has those same claims against Sony and Orchard, both of which the Debtor acknowledges belong in Class 4.  Indeed, the Debtor's entire antitrust theory rests on the identity of those claims – it contends that Warner, Universal, Sony, Orchard, and Merlin colluded together.[9]

In this regard, it is also significant that the Debtor's license agreements with other content providers whose claims are in Class 4 also contain MFN clauses – the stated basis of the Debtor's alleged antitrust claims against Warner, Universal, Sony, and Orchard.  For example, the Debtor classifies the unsecured claim of Isolation Networks – one of the Debtor's top five largest creditors, with an unsecured claim of more than $1.9 million – in Class 4, despite the existence of a MFN clause in its contract with the Debtor.  (*See* Claim No. 48 at 8–9.)[10]  Sony and Orchard do not have access to the content licenses between the Debtor and the myriad of other unsecured creditors in Class 4, but the artificial, self-serving classifications made by the Debtor is evident even based on the limited information currently available.

But even if the Debtor's antitrust theory was not foreclosed by the law and the facts, the mere possibility of antitrust counterclaims or defenses to Warner's and Universal's claims cannot possibly provide a justification for separate classification of the Universal and Warner claims.  It would be a rare bankruptcy whose class of unsecured creditors contained only allowed claims.  In virtually every case, the unsecured class contains both allowed and disputed claims, and the disputed claims are resolved through a well-established claims resolution process.  If the mere possibility of a defense or counterclaim to a claim by itself were a sufficient reason for separate classification under Section 1122(a), there would be no limits on the Debtor's ability to

---

[8] Pulser and Iconical II offered the same justification in its statement in support of the Second Amended Disclosure Statement.  (*See* Dkt. No. 329 at 6 ("[T]here is an obvious business justification for the separate classification of the Label and non-Label claims – namely, that the Debtor asserts substantial antitrust claims against the Labels that are simply inapplicable to other general unsecured creditors.").)

[9] Moreover, potential antitrust claims are not a valid defense to a contract claim.  *See, e.g.*, *El Salto, S. A. v. PSG Co.*, 444 F.2d 477, 482 (9th Cir. 1971) ("The Supreme Court has ruled that a Sherman Act violation is not an affirmative defense to a contract suit, even where the violation is inherent in the contract sued upon, so long as judicial enforcement of the contract would not be enforcing the precise conduct made unlawful by the Act.")  The Debtor's claims, even if proven, "would not affect the enforceability of the amount owed" on Warner's or Universal's contract.  *In re J.B. Lovell Corp.*, 88 B.R. 459, 462 (Bankr. N.D. Ga. 1988).

[10] Of course, the fact that the Debtor has not accused Isolation Networks of anticompetitive conduct evidences the complete lack of merit of those claims and that the sole reason for asserting such claims is to create leverage to get Sony and Orchard to drop their objections to the discriminatory Plan and for Sony to drop its fraud claim against Bay, Peters, and Rondinelli.

gerrymander an affirmative vote, which it could accomplish by simply asserting a defense or counterclaim, no matter how far-fetched the theory.[11]

The Debtor next argues that the "unique manner" in which the Universal and Warner claims are treated justifies their separate classification under the Plan. (Disclosure Statement at 67–68.) But that justification confuses classification based on the "nature" of a claim under Section 1122(a) of the Bankruptcy Code, with a claimant's treatment after the claim has first been properly classified. The proposed treatment of a claim under a plan is irrelevant with respect to whether the claim is classified properly in the first instance. Were it the other way around, a Debtor could justify separate classification of claims based solely on its desire, and ability, to treat creditors differently.[12] In any event, the supposed unique treatment is really a problem of the Debtor's own making and could easily be remedied. Rather than a fixed distribution, the parties could have agreed to allow Universal's and Warner's claims at an agreed upon amount that would arrive at the desired distribution as part of Class 4.

This separate classification of 375 unsecured claims in Class 4 (which includes dozens of content licensors like Warner and Universal) and just one each in Classes 5 and 6 cannot be justified based on what the Debtor concedes is the mere possibility of uninvestigated antitrust claims — especially given that those same antitrust claims would be equally applicable to multiple other creditors whose claims are classified in Class 4. The Debtor's proposed classification must be rejected because it was made solely to obtain the affirmative vote of an impaired class. *See Boston Post Rd. Ltd. P'ship v. FDIC (In re Boston Post Rd. Ltd. P'ship)*, 21 F.3d 477, 483 (2d Cir. 1994) (noting that "approving a plan that aims to disenfranchise the overwhelmingly largest creditor through artificial classification is simply inconsistent with the principles underlying the Bankruptcy Code").

---

[11] The Ninth Circuit's holding in *In re Johnston*, 21 F.3d at 328, does not require a different result. In *Johnston*, the presence of ongoing litigation was just one of several "special circumstances" the court considered in approving separate classification of the creditor's unsecured claim. *See In re Barakat*, 99 F.3d at 1525 (differentiating its prior holding in *Johnston* because in *Barakat*, unlike in *Johnston*, no "special circumstances" were present). Of course, here, there is no ongoing litigation, the Debtor's purported counterclaims are applicable to multiple other creditors, all of which are classified in Class 4, and none of the other special circumstances identified in *Johnston* is present here.
[12] Nor does Section 1123(a)(4) of the Bankruptcy Code stand in the way of classifying Universal's and Warner's claims in Class 4. So long as there is consent, creditors in the same class may be treated differently and may settle their claims on different terms.

### C. There is No Basis to Continue the Automatic Stay Beyond Confirmation of the Plan

The "automatic stay . . . prohibits action against the bankruptcy estate only until the bankruptcy court confirms a plan reorganizing the debtor's property." *Atalanta Corp. v. Allen (In re Allen)*, 300 F.3d 1055, 1059 (9th Cir. 2002). Accordingly, upon confirmation of the Plan the automatic stay should cease to operate. Nonetheless, the Plan provides that "all injunctions or stays provided for in this chapter 11 case pursuant to section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the date the Plan Confirmation Order is entered, shall remain in full force and effect until a final decree and order closing the chapter 11 case is entered by the Court." (Plan at 41.) The Debtor is liquidating, and there is no basis to extend the stay beyond confirmation of the Plan.

### III. THE DISCLOSURE STATEMENT SHOULD BE REJECTED BECAUSE IT DOES NOT CONTAIN ADEQUATE INFORMATION

If the Court does not reject the Disclosure Statement because of the deficiencies in the Plan, the Court should still reject the Disclosure Statement as currently drafted. Section 1125(b) of the Bankruptcy Code conditions a debtor's solicitation of votes on a proposed chapter 11 plan on a bankruptcy court's determination that the disclosure statement contains "adequate information." According to the Bankruptcy Code, adequate information is:

> information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information . . .

11 U.S.C. § 1125(a)(1).

A disclosure statement should not contain misleading statements, opinions or conclusory assertions, or omit critical facts. *See, e.g.*, *In re Pac. Shores Dev., Inc.*, No. 10-11351MM-11,

2011 Bankr. LEXIS 785, at *16 (Bankr. S.D. Cal. Feb. 25, 2011) (rejecting disclosure statement that contained "inaccurate and misleading statements"); *In re Nat'l Health & Safety Corp.*, No. 99-18339DWS, 2000 Bankr. LEXIS 745, at *4 n.3 (Bankr. E.D. Pa. July 5, 2000) (noting that a disclosure statement is inadequate when it contains statements that are "misleading and/or slanted", fails to contain a "full and accurate picture" and "omit[s] material information and misrepresent[s] other information in a heavy-handed sales job").

Although the Debtor fixed certain deficiencies previously identified by Sony, Orchard and the Court, the Disclosure Statement still remains inadequate because it contains (i) incorrect, unsupported, and misleading statements regarding the alleged claims against Sony and Orchard, and (ii) inadequate and misleading statements regarding the settlement of the Committee's Challenge Lawsuit. Sony provided language to insert into the Disclosure Statement – as the Court suggested – and offered to meet and confer, but rather than meet and confer with Sony and Orchard, the Debtor cherry-picked a few comments and left the rest out. If the Court does not reject the Disclosure Statement based upon the unconfirmability of the Plan, the Court should direct the Debtor to address the deficiencies described more fully below by including Sony's and Orchard's position regarding the antitrust claims and the description of the Challenge Lawsuit as set forth in Exhibits A and B attached hereto.

**A.     All False Allegations Against Sony and Orchard Should Be Removed from the Disclosure Statement**

The Debtor has no basis to allege that Sony and Orchard colluded with Universal, Warner, and Merlin to fix prices to audio subscription streaming services by using contracts containing MFN clauses. And even if the Debtor could allege such a claim, the Debtor has no basis to contend that its claim is "valuable." The Debtor has included these baseless allegations in an attempt to force through a settlement that is beneficial to Pulser, Iconical II, and the officers and directors they share with the Debtor. Accordingly, the Debtor's statements falsely inflating the value of its alleged claims either must be removed from the Disclosure Statement or, at a minimum, Sony's position showing the falsity of the Debtor's statements must be adequately disclosed as provided in Exhibit A.

### 1. The Debtor Has No Factual Basis to Allege An Antitrust Conspiracy

The Debtor readily admits that its allegations are based not on fact, but on the Debtor's unsubstantiated "preliminary" belief that such claims might exist. (*See* Disclosure Statement at 75–76 (describing the Debtor's "preliminary antitrust theories" and stating that the Debtor "preliminarily believes that it has very valuable causes of action against the Sony Parties under a collusion theory.").) But the Debtor's separate license agreements with Sony and Orchard put the lie to its accusation that Sony and Orchard conspired with Universal, Warner and Merlin to fix prices. These agreements show that Sony and Orchard agreed to materially different prices, not a supposed "fixed" price. Further demonstrating the incoherence of the Debtor's MFN theory, the Orchard agreement did not even have an MFN clause until August 2015, and the MFN clause it did eventually include is nothing like the MFN clause in Sony's agreement with the Debtor. (*See* Sony's Opposition to the Debtor's Rule 2004 Motion [Dkt. No. 350] at 12.)

### 2. The Debtor Has No Legal Basis to Allege an Antitrust Conspiracy

The Debtor has also not been forthcoming on the law, which recognizes that MFNs are widely used in many industries, including the entertainment industry, and typically are entirely proper. *See, e.g.*, *Blue Cross & Blue Shield of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1415 (7th Cir. 1995) (Posner, J.) (describing most favored nations clauses as "standard devices," "the sort of conduct that the antitrust laws seek to encourage," and "not price-fixing"). The MFN clause in the Sony /Rdio agreement requires the Debtor (the buyer) to give Sony (the seller) an overall deal that is at least as good as it offers anyone else. This type of MFN clause cannot prevent any record company from providing the Debtor or any other audio subscription streaming service a lower price.

For the first time – in the Debtor's fourth attempt at filing a confirmable plan and adequate disclosure statement – the Debtor cites to *Starr v. Sony BMG Music Entertainment*, falsely claiming that the Second Circuit "ruled in favor of a Section 1 Sherman Act claim against Sony" and that the case involved "principally the use of MFNs in Sony's sale of music." (Disclosure Statement at 75.) Neither of these statements is true, and they should be removed from the disclosure statement or corrected.

*Starr* does not hold that the mere fact that a contract contains an MFN clause plausibly suggests a price-fixing conspiracy. Nor did *Starr* "rule[] in favor of a Section 1 Sherman Act claim," given that it was decided at the motion to dismiss stage based solely on the allegations in the plaintiffs' complaint. In *Starr*, the Second Circuit allowed an antitrust case to go past the pleadings stage where the plaintiffs' complaint contained "factual allegations" of parallel conduct. *Starr v. Sony Music BMG Music Entertainment*, 592 F.3d 314, 323 (2d Cir. 2010). These factual allegations included: (1) that the defendants had formed joint ventures to sell music downloads to consumers, which provided "a forum and means through which defendants could communicate about pricing;" *id.* at 318, 323; (2) that the defendants jointly boycotted a leading music retailer; *id.* at 323; and that (3) "all defendants raised wholesale prices from about $0.65 per song to $0.70 per song" at the same time. *Id.* Although the Second Circuit does discuss the MFNs in the defendants' contracts with the joint ventures, its conclusion that the case could go forward was based on the sum of these and other allegations of parallel pricing. *Id.* (noting that the allegations "taken together" raise a suggestion of parallel conduct). If the mere presence of MFNs were sufficient to suggest collusion, there would have been no need for the Second Circuit's detailed analysis.

Notably, when the Department of Justice actually analyzed the same joint ventures at issue in *Starr*, it concluded, with the benefit of an evidentiary record, that the record companies had *not* colluded on price. *See* Statement by Assistant Attorney General R. Hewitt Pate Regarding the Closing of the Digital Music Investigation (Dec. 23 2003), https://www.justice.gov/archive/atr /public/press_ releases/ 2003/ 201946.htm ("None of the several theories of competitive harm that the Division considered were ultimately supported by the facts. The Division found no impermissible coordination among the record labels as to the terms on which they would individually license their music to third-party services.").

### 3. The Debtor Knows That Its Antitrust Claim Is Worthless

The Debtor knows that it does not have valuable antitrust claims against Sony and Orchard. Elliott Peters – the Debtor's General Counsel – worked at Warner Music Group for approximately 10 years, including when the Debtor's license agreement with Warner was

negotiated and signed. At the time, Peters was a Senior Vice President and the Head of Digital Legal Affairs; it appears that he led the group at Warner with responsibility for negotiating Warner's streaming agreement with the Debtor in 2010. If there were an antitrust conspiracy to price fix among Warner, Universal, Sony, Orchard, and Merlin, Peters would have known about it. Yet the Debtor settled its purported antitrust claim with Warner for virtually nothing, showing that Peters, and thus the Debtor, knows this antitrust claim is worthless.

Specifically, the Debtor settled its supposedly valuable antitrust claim against Warner by agreeing to pay Warner $100,000—a 16.1% distribution on its claim—and to provide releases from the Debtor, Pulser, Iconical II, and Pandora. If Warner were to instead receive a pro rata distribution under the proposed Plan, it would receive between $96,000 (a 15.4% distribution) and $117,000 (an 18.8% distribution), meaning that the Debtor valued these antitrust claims at a few thousand dollars at best. At worst, Warner could actually receive more as a result of its settlement of the Debtor's antitrust allegations than other creditors against whom the Debtor did not make similar assertions.[13] In addition, unlike other creditors, Warner will receive broad general releases from the Debtor, Pulser, Iconical II and Pandora, and a promise by the Debtor not to pursue any discovery from or to disparage Warner.[14]

Given the lack of any basis for or value to these antitrust claims and the Debtor's agreement not to take discovery from Universal and Warner or to disparage them, it is clear that the Debtor is pursuing these frivolous claims against Sony and Orchard and is seeking overly broad and unduly burdensome discovery from Sony and Orchard to pressure Sony and Orchard into dropping their objections to the Plan. If the Court allows the Debtor to include these scurrilous allegations against Sony and Orchard, it should be directed to include the text on Exhibit A setting forth Sony's and Orchard's positions with respect to the Debtor's allegations.

---

[13] Indeed, as the Court noted at the June 16, 2016, hearing, Universal's and Warner's treatment under the Plan appears to be "more favorable" than the treatment being provided to holders of Class 4 Claims. If the Court approves the Debtor's artificial classification of Universal's and Warner's claims, Sony reserves the right to argue that the treatment of Warner and Universal unfairly discriminates against holders of Class 4 Claims.
[14] As discussed more fully in Sony's objection to the Debtor's Rule 2004 Motion, the value of agreeing to forego discovery could actually be worth millions of dollars to Warner. (*See* Dkt. No. 350 at 1, 3, 8, 13.)

## B.     The Disclosure Statement Should Provide an Accurate Description of the Settlement of the Challenge Lawsuit

Sony and Orchard pointed out in their objection to the Second Amended Disclosure Statement that the first paragraph of the Committee's description of the settlement of the Challenge Lawsuit contained three categorically false statements. (*See* Dkt. No. 327 at 22.) Rather than fix and clarify these statements, the Debtor merely added the words "except as set forth below" to the end of each of the false sentences. The Disclosure Statement now provides:

> The Plan provides for the release of the Debtor's claims against Pulser and Iconical II in exchange for, among other things, payment by Pulser to the estate in the amount of $8 million for the benefit of holders of allowed general unsecured claims, and Pulser's waiver of any right to share in any distribution of such funds on account of Pulser's Allowed Class 4 Claim (the "<u>Secured Creditor Settlement</u>"), **except as set forth below**. . . . Thus, if there is a recovery by the Estate from the Sony Parties Actions (defined below), the general unsecured creditors receive the benefit of that recovery because as part of the Secured Creditor Settlement, Pulser will not be entitled to share in any recovery obtained from the pursuit of any Sony Parties Actions **except as set forth below**.

(Disclosure Statement at 29–30 (emphasis added).)

Of course, the Debtor does not say where in the 161-page Disclosure Statement the "except as set forth below" limitations can be found. This was no doubt done intentionally so the Debtor could leave unsecured creditors with the deliberately misleading impression that the settlement of the Challenge Lawsuit is worth $8 million, that Pulser is waiving its claim to its Class 4 distribution, and that Pulser will not share in the recovery obtained from any lawsuit against Sony and Orchard. Although the Disclosure Statement might arguably now be technically true with the addition of "except as set forth below," it still must be clarified so that Class 4 creditors are not misled and can make an informed decision as to whether they want to vote in favor of the Plan.

<u>First</u>, the settlement of the Challenge Lawsuit accounts for only $3 million of the $8 million Settlement Fund. (*See, e.g*, Section I.B, above.) The other $5 million is available only to Class 4 creditors who provide the Third-Party Releases. If a Class 4 creditor opts out of the Third-Party Releases, it will still have released the claims that would have been asserted in the Challenge Lawsuit, yet only receive a 5% distribution on its claim. (*See* Disclosure Statement at 62.)

Second, Pulser has not "waived" its right to share in the distribution to holders of Class 4

Claims; Pulser is accepting an approximately $5 million distribution and using it to settle claims

outside the scope of the Challenge Lawsuit.  (*See, e.g.*, Statement of Iconical II and Pulser in

Support of Approval of Disclosure Statement [Dkt. No. 329] at 4 ("Pulser has effectively proposed

to settle claims of individual Class 4 creditors by offering them a portion of its own pro rata

distribution in exchange for the Releases."), *id.* ("[Pulser] has agreed to share its own recovery

with other Class 4 creditors . . . ."), *id.* at 5 ("Pulser has agreed to share its allocable portion of the

Unsecured Creditors Fund").)

        Finally, Pulser – not the unsecured creditors – will be the primary beneficiary of any action

pursued against Sony and Orchard because Pulser will be reimbursed for all Previously Advanced

Funds before anything will be distributed to unsecured creditors.  The Previously Advanced Funds

already exceed $4.2 million:

| Professional | Amounts Paid through May 31, 2016[15] |
|---|---|
| Iconical II Counsel<br>(Skadden, Arps, Slate Meagher & Flom LLP) | $330,000 |
| Pulser Counsel<br>(Stubbs Alderton Markiles, LLP) | $250,000 |
| Debtor Counsel<br>(Levene, Neale, Bender, Yoo & Brill L.L.P) | $861,411 |
| Moelis & Company LLP | $2,150,000 |
| Committee Counsel<br>(Pachulski Stang Ziehl & Jones LLP) | $269,169 |
| Committee Financial Advisor<br>(FTI Consulting) | $249,421 |
| Winston & Strawn LLP | $100,000 |
| **Total Professional Fees Paid Through May 31, 2016** | **$4,210,001** |

The total amount of professional fees will likely exceed $6 million, (*see* Disclosure Statement,

Ex. 6 (estimating additional payments to professionals employed by Pulser and Iconical II ($1

million), the Debtor ($1,000,000), and the Committee ($166,756), totaling approximately $2.2

million), and Winston & Strawn LLP will receive the first 30% of any recovery against Sony and

---

[15] *See* Dkt. Nos. 314 at 61–65; Dkt. No. 220; Dkt. No. 246 at 10.

-21-

Orchard, meaning that any recovery on account of claims against Sony and Orchard must exceed approximately $9 million before there can be any distribution to holders of allowed Class 4 Claims.

The terms of the settlement that will determine the size of any distribution to unsecured creditors is the most important piece of information to any unsecured creditor evaluating whether to vote in favor of the Plan. As the Court recognized at the June 16, 2016, hearing, creditors should not be forced to sift through a 161-page document for bits of information scattered about the Disclosure Statement to understand the terms of the settlement that forms the basis of the Plan. The Debtor must accurately describe the Plan and make clear (i) how much of the settlement is tied to the Challenge Lawsuit and how much is tied to the settlement of individual claims; (ii) that Pulser has not waived its distribution; and (iii) that Pulser will be the prime beneficiary of any action against Sony – not the unsecured creditors. Accordingly, if the Debtor is not going to accept the changes Sony and Orchard proposed to the Debtor and correct these obvious misstatements on its own, it should be directed to include the text on Exhibit B setting forth Sony's and Orchard's positions with respect to the Committee's description of the settlement.

## IV.    RESERVATION OF RIGHTS

This Objection is submitted without prejudice to, and with a full reservation of, Sony's and Orchard's rights to (i) supplement this Objection in advance of or in connection with any hearing to consider the Disclosure Statement or any amended disclosure statement filed by the Debtor or any other party, (ii) rely on arguments made in prior filings, (iii) take discovery of the Plan Supporters, (iv) object to claims filed by Pulser or any other creditor, (v) seek designation of Pulser's claim, (vi) seek conversion of this Chapter 11 case to a case under Chapter 7, and (vii) object to confirmation of the Plan or any other plan on any grounds whatsoever, regardless of whether those grounds are addressed herein.

## CONCLUSION

WHEREFORE, Sony and Orchard request that the Court deny approval of the Disclosure Statement and grant such other relief as the Court deems just and proper.

Dated: July 19, 2016

Respectfully submitted,

FELDERSTEIN FITZGERALD
WILLOUGHBY & PASCUZZI LLP

By:/s/ Paul J. Pascuzzi
PAUL J. PASCUZZI
DONALD W. FITZGERALD

-and-

LUSKIN, STERN & EISLER LLP
RICHARD STERN (Admitted *Pro Hac Vice*)
STEPHAN HORNUNG (Admitted *Pro Hac Vice*)

*Attorneys for Sony Music Entertainment*
*and Orchard Enterprises NY, Inc.*

**Exhibit A**

**[To Be Inserted at Page 78, Line 5]**

Sony and Orchard have advised the Debtor that they intend to oppose any such antitrust claim asserted against them. It is Sony's position that the Debtor has presented no evidence whatsoever to support its belief that it has an antitrust claim against Sony and Orchard. In addition Sony and Orchard believe that the Debtor's theory of MFN-based collusion is contradicted by the law, which recognizes that MFNs are standard devices used widely in business and are not inherently suspect, as well as facts and documents already in the Debtor's possession.

More importantly, Sony and Orchard believe that the Debtor knows that it does not have valuable antitrust claims against Sony and Orchard. Elliott Peters – the Debtor's General Counsel – worked at Warner Music Group for approximately 10 years, including when the Debtor's license agreement with Warner was negotiated and signed. At the time, Peters was a Senior Vice President and the Head of Digital Legal Affairs; it appears that he led the group at Warner with responsibility for negotiating Warner's streaming agreement with the Debtor in 2010. If there were an antitrust conspiracy to price fix among Warner, Universal, Sony, Orchard, and Merlin, Peters would have known about it. Yet the Debtor settled its purported antitrust claim with Warner for virtually nothing, showing that Peters, and thus the Debtor, knows this antitrust claim is worthless.

Specifically, the Debtor settled its supposedly valuable antitrust claim against Warner by agreeing to pay Warner $100,000—a 16.1% distribution on its claim—and to provide releases from the Debtor, Pulser, Iconical II, and Pandora. If Warner were to instead receive a pro rata distribution under the proposed Plan, it would receive between $96,000 (a 15.4% distribution) and $117,000 (an 18.8% distribution), meaning that the Debtor valued these antitrust claims at a few thousand dollars at best. At worst, Warner could actually receive more as a result of its settlement of the Debtor's antitrust allegations than other creditors against whom the Debtor did not make similar assertions. In addition, unlike other creditors, Warner will receive broad general releases from the Debtor, Pulser, Iconical II, and Pandora, and a promise by the Debtor not to pursue any discovery from Warner relating to the Debtor's antitrust claims or otherwise.

The Debtor settled its "valuable" antitrust claim against Universal by agreeing to pay Universal $125,000—a 9.6% distribution on its claim—in addition to the broad releases from the Debtor, Pulser, Iconical II, and Pandora, and a promise by the Debtor not to pursue any discovery from Universal relating to the Debtor's antitrust claims or otherwise. Were Universal to receive a pro rata distribution under the proposed Plan, it would have received between $200,000 and $245,000, meaning that the Debtor was able to obtain a settlement that could, at best, be valued at $120,000 (not including the value of the broad releases and the Debtor's promise to not conduct any discovery against Universal relating to the antitrust claims or otherwise).

Given the lack of any basis for or value to these antitrust claims, it appears to Sony and Orchard that the Debtor has manufactured these claims, and has attempted to pursue overly broad and unduly burdensome discovery from Sony and Orchard regarding these claims, in order to pressure Sony and Orchard into dropping their objections to the Plan.

Sony and Orchard do not agree with the Debtor's, Pulser's, Iconical II's and the Committee's characterization of the so-called Secured Creditor Settlement with the Debtor's majority shareholder, Pulser.  <u>First</u>, Sony and Orchard believe that the settlement of the Challenge Claims can be valued at no more than $3 million.  The other $5 million is available only to Class 4 creditors who provide the third-party releases to Pulser, Iconical II, the Debtor Affiliates and Pandora.  If a Class 4 creditor opts out of the Third-Party Releases, it will still have released the claims that would have been asserted in the Challenge Lawsuit.

<u>Second</u>, Pulser has not "waived" its right to share in the distribution to holders of Class 4 Claims; as Pulser candidly acknowledges, Pulser is accepting an approximately $5 million distribution and using it to buy individual releases of claims outside the scope of the Challenge Lawsuit for itself, Iconical II, the Debtor Affiliates, and Pandora.  (*See* Dkt. No. 329 at 4 ("Pulser has effectively proposed to settle claims of individual Class 4 creditors by offering them a portion of its own pro rata distribution in exchange for the Releases.").)

<u>Third</u>, Sony and Orchard believe that the Debtor's statements regarding any recovery from the actions against third parties are misleading and that creditors will never receive any recovery from the pursuit of third-party claims.  Neither the Debtor nor the Committee has identified causes of action that may be brought on behalf of the estate other than the frivolous claims they have asserted against Sony and Orchard.  Any affirmative net recoveries on account of claims pursued against Sony and Orchard after paying the costs and expenses of any such litigation will be distributed as follows:  (1) to Pulser for all advances made related to such causes of action (including any payments made to Winston Strawn LLP and to pay for third party expenses); and (2) to Pulser for reimbursement of Previously Advanced Funds.  The amount of Previously Advanced Funds already exceeds $4.2 million, and based upon the Debtor's projections in the Disclosure Statement, it will almost certainly exceed $6 million.  Winston & Strawn LLP will receive the first 30% of any recovery against Sony and Orchard, meaning that any recovery on

1  account of claims against Sony and Orchard must exceed approximately $9 million before there

2  can be any distribution to holders of allowed Class 4 Claims.

3          <u>Finally</u>, Sony and Orchard do not believe creditors should accept the settlement contained

4  in the Plan.  The question is whether the Debtor's majority and controlling shareholder and its

5  affiliate should be paid before the Debtor's other creditors.  After a limited investigation (both in

6  terms of time and budget), the Debtor, Pulser, Iconical II, and the Committee are presenting the

7  settlement embodied in the Plan as described above.  However, the Debtor's initial plan of

8  reorganization proposed to settle the Challenge Claims by unconditionally providing $5 million to

9  general unsecured creditors.  The current Plan proposes to settle the Challenge Claims by

10 unconditionally providing only $2.5 million to general unsecured creditors, while the Debtor's

11 majority and controlling shareholder Pulser that voluntarily took the risk of the Debtor's business

12 model receives approximately $46 million.