RON BENDER (SBN 143364)
PHILIP A. GASTEIER (SBN 130043)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
10250 Constellation Boulevard, Suite 1700
Los Angeles, California 90067
Telephone: (310) 229-1234
Facsimile: (310) 229-1244
Email: rb@lnbyb.com; pag@lnbyb.com; kjm@lnbyb.com
Attorneys for Chapter 11 Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re:<br><br>RDIO, INC.,<br><br><br><br><br>       Debtor. | Case No. 15-31430<br><br>Chapter 11<br><br>**DISCLOSURE STATEMENT DESCRIBING DEBTOR'S PLAN OF REORGANIZATION DATED AUGUST 10, 2016**<br><br>Disclosure Statement Hearing:<br>Date: August 11, 2016<br>Time: 11:00 a.m.<br>Place: U.S. Bankruptcy Court<br>      Courtroom 17<br>      450 Golden Gate Ave., 16th Floor<br>      San Francisco, CA 94102<br>Judge: The Hon. Dennis Montali<br><br>Plan Confirmation Hearing:<br>Date: [To Be Scheduled]<br>Time: [To Be Scheduled]<br>Place: [Same As Above] |

1

## TABLE OF CONTENTS

I.  INTRODUCTION.................................................................................2

    A.  DISCLAIMER.................................................................5

    B.  PURPOSE OF THIS DISCLOSURE STATEMENT.....................7

    C.  DEADLINES FOR VOTING AND OBJECTING; DATE OF PLAN CONFIRMATION HEARING..............................................8

        1.  Time and Place of the Plan Confirmation Hearing............8

        2.  Deadline For Voting For or Against the Plan...................8

        3.  Deadline for Objecting to the Confirmation of the Plan........9

    D.  IDENTITY OF PERSONS TO CONTACT FOR MORE INFORMATION REGARDING THE PLAN.......................................9

II.  BACKGROUND..............................................................................9

    A.  DESCRIPTION AND HISTORY OF THE DEBTOR'S BUSINESS AND THE DEBTOR'S SALE PROCESS WHICH LED TO THE FILING OF THE DEBTOR'S CHAPTER 11 CASE.................9

    B.  RELATIONSHIPS BETWEEN DEBTOR, PULSER MEDIA, ICONICAL II AND RELATED ENTITIES AND PARTIES...........17

    C.  SIGNIFICANT EVENTS WHICH HAVE OCCURRED DURING THE BANKRUPTCY CASE...........................................19

        1.  Formation of the Committee.....................................19

        2.  Operational Issues..............................................19

        3.  Administrative Matters.........................................22

        4.  Employment of Professionals...................................22

        5.  Sale Transaction...............................................22

        6.  Executory Contracts and Unexpired Leases.....................23

        7.  Plan Exclusivity...............................................23

        8.  The Committee's Challenge Deadline...........................24

        9.  The Recommendation of the Debtor and the Committee that All General Unsecured Creditors Vote to Accept the Plan..........25

    D.  STANDARD FOR APPROVAL OF COMPROMISE UNDER BANKRUPTCY RULE 9019................................................25

    E.  THE PROBABILITY OF SUCCESS FACTOR FAVORS A COMPROMISE.....26

    F.  THE DIFFICULTIES OF COLLECTION ARE ADDRESSED BY THE PLAN.....27

    G.  THE EXPENSE, INCONVENIENCE, AND DELAY OF FURTHER LITIGATION.....27

    H.  THE SETTLEMENT SERVES THE INTERESTS OF CREDITORS.....28

    I.  DISCUSSION OF COMMITTEE'S INVESTIGATION OF POTENTIAL CLAIMS AND DEFENSES AGAINST PULSER AND ICONICAL II.....28

i

III.   FACTS REGARDING THE SECURED CREDITOR SETTLEMENT ................30

    A.    THE PULSER NOTE ................................................................30

    B.    THE ICONICAL NOTE ..........................................................32

    C.    RDIO'S FINANCIAL CONDITION AND THE SALE PROCESS ..............34

    D.    THE RELATIONSHIP BETWEEN PULSER, ICONICAL II, AND THE DEBTOR ......35

IV.   EQUITABLE RECHARACTERIZATION ....................................36

V.    EQUITABLE SUBORDINATION ...........................................39

    A.    LIMITS ON THE SCOPE OF THE REMEDY ................................42

    B.    CLAIMS AGAINST THE DEBTOR'S OFFICERS AND DIRECTORS ..............42

    C.    PREFERENCES ...................................................................43

    D.    CONCLUSION ...................................................................43

VI.   CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS .......49

    A.    WHAT CREDITORS AND INTEREST HOLDERS WILL RECEIVE UNDER THE PLAN ....................................................................49

    B.    UNCLASSIFIED CLAIMS ......................................................49

       1.   Administrative Expenses ................................................49

       2.   Priority Tax Claims .....................................................53

    C.    CLASSIFIED CLAIMS AND INTERESTS ....................................55

       1.   Classes of Secured Claims .............................................55

       2.   Class of Priority Unsecured Claims ..................................57

       3.   Classes of General Unsecured Claims ................................58

       4.   Class of Interest Holders ...............................................64

    D.    MEANS OF EFFECTUATING THE PLAN AND IMPLEMENTATION OF THE PLAN ..64

       1.   Funding for the Plan ...................................................64

       2.   Post-Effective Date Management of the Reorganized Debtor and Employment of Professionals By the Reorganized Debtor ................................................65

       3.   Disbursing Agent .......................................................65

       4.   Dissolution of the Committee ..........................................66

       5.   Objections to Claims ...................................................66

       6.   Avoidance Actions and Recoveries ...................................67

       7.   Non-Avoidance Actions and Recoveries ..............................68

       8.   Release of Pulser, Pulser Affiliates, Iconical II and Iconical Affiliates .......69

       9.   Release by the Debtor Releasing Parties of Universal, Warner and the Sony Parties ................................................70

      10.   Applicability of Releases of Unknown Claims .......................72

      11.   Exclusions from Releases ..............................................72

      12.   Continuing Confidentiality Obligations ..............................73

      13.   Exemption from Transfer Taxes ......................................73

      14.   Establishment of the Reserve .........................................73

      15.   Formation of the Creditors Trust and Appointment of the Creditors Trustee ...74

Case: 15-31430   Doc# 388   Filed: 08/10/16   Entered: 08/10/16 14:58:13   Page 3 of 97

16. **Employment of Professionals By the Creditors Trustee and Payment of Professional Fees and Expenses By the Creditors Trustee Incurred after the Effective Date** ...................................................................................................74

17. **Distributions to be Made Pursuant to the Plan** ..............................................75

18. **Exculpations and Releases** .............................................................................75

19. **Injunctions** ....................................................................................................76

20. **Executory Contracts and Unexpired Leases** ...................................................77

21. **Changes in Rates Subject to Regulatory Commission Approval** .....................77

22. **Retention of Jurisdiction** ..............................................................................77

23. **Indemnity Claims Stipulation** ........................................................................79

**VII. TAX CONSEQUENCES OF THE PLAN** ...............................................................80

**VIII. CONFIRMATION REQUIREMENTS AND PROCEDURES** ..................................81

    A. WHO MAY VOTE OR OBJECT ..........................................................................81

    B. WHO MAY VOTE TO ACCEPT/REJECT THE PLAN ............................................81

    C. WHAT IS AN ALLOWED CLAIM/INTEREST .......................................................81

    D. WHAT IS AN IMPAIRED CLAIM/INTEREST .......................................................82

    E. WHO IS NOT ENTITLED TO VOTE ...................................................................83

    F. WHO CAN VOTE IN MORE THAN ONE CLASS ..................................................83

    G. VOTES NECESSARY TO CONFIRM THE PLAN ....................................................83

    H. VOTES NECESSARY FOR A CLASS TO ACCEPT THE PLAN ................................83

    I. TREATMENT OF NON-ACCEPTING CLASSES .....................................................84

    J. REQUEST FOR CONFIRMATION DESPITE NONACCEPTANCE BY IMPAIRED CLASS(ES) ......................................................................................................84

    K. LIQUIDATION ANALYSIS ................................................................................84

    L. FEASIBILITY ..................................................................................................88

**IX. RISK FACTORS REGARDING THE PLAN** ...........................................................88

**X. EFFECT OF CONFIRMATION OF THE PLAN** ......................................................89

    A. DISCHARGE ...................................................................................................89

    B. MODIFICATION OF THE PLAN .........................................................................89

    C. POST-CONFIRMATION STATUS REPORTS .........................................................89

    D. POST-CONFIRMATION CONVERSION/DISMISSAL ..............................................89

    E. FINAL DECREE ..............................................................................................90

Case: 15-31430    Doc# 388    Filed: 08/10/16    Entered: 08/10/16 14:58:13    Page 4 of 97

# I. <u>INTRODUCTION</u>

Rdio, Inc., chapter 11 debtor and debtor in possession in the above-referenced chapter 11 bankruptcy case (the "<u>Debtor</u>" or "<u>Rdio</u>"), is the Debtor in a pending chapter 11 bankruptcy case. The Debtor filed a voluntary petition under chapter 11 of 11 U.S.C. §§ 101 *et seq.* (the "<u>Bankruptcy Code</u>") on November 16, 2015.

This document is the Disclosure Statement which describes the Debtor's Plan of Reorganization Dated August 10, 2016 ("<u>Plan</u>") that is being proposed by the Debtor. The Plan includes a good faith compromise of certain claims and controversies pursuant to section 1123 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019.

Chapter 11 allows the Debtor, and, under some circumstances, creditors and other parties in interest, to propose a plan of reorganization. The Plan is a plan of reorganization which has been proposed by the Debtor and is supported by the Official Committee of Unsecured Creditors (the "<u>Committee</u>") and by the Debtor's two pre-petition secured creditors consisting of Pulser Media, Inc. ("<u>Pulser</u>") and Iconical Investments II LP ("<u>Iconical II</u>") (with Pulser and Iconical II collectively defined as the "<u>Prepetition Secured Creditors</u>"). A detailed description of the relationships between the Debtor, the Prepetition Secured Creditors and other related entities and parties is set forth in section IIB below. The Plan is an integrated global settlement that is the result of extensive negotiations between the Debtor, the Committee, the Prepetition Secured Creditors, and the Debtor's three largest music labels (each of whom was previously a member of the Committee), all of whom support the Plan and confirmation of the Plan. The effective date of the Plan (the "<u>Effective Date</u>") will be as set forth in the Plan. All capitalized terms used in this Disclosure Statement which are not defined in this Disclosure Statement but which are defined in the Plan shall be deemed to have the same definitions as

2

used in the Plan. The Debtor following the Effective Date will be referred to herein as the "Reorganized Debtor".

Settlement discussions among the Debtor, the Committee, the Prepetition Secured Creditors and separate settlement discussions with each of the three music labels have resulted in an agreement on the terms of a fully consensual plan of reorganization, the terms of which are contained in the Plan and are described in detail in this Disclosure Statement. In summary, the settlement results in (i) the Prepetition Secured Creditors, who hold a perfected lien against all of the Estate Funds, permitting $5,725,000 million of the Estate Funds (the "Unsecured Creditors Fund") to be used solely for the payment of the allowed claims of general unsecured creditors in the manner described in detail below and the payment of the allowed fees and expenses of the professionals retained by the Committee which are incurred on or after March 1, 2016 and the fees and expenses of the professionals employed by the Liquidating Trust (defined below) (collectively, "Committee Professional Fees"), (ii) the Prepetition Secured Creditors obtaining a full and complete release from this estate, (iii) holders of allowed general unsecured claims receiving the proceeds from certain causes of action  (other than Avoidance Actions) until their claims are paid in full at which time such proceeds are paid to the Prepetition Secured Creditors, (iv) the Committee waiving any right to file any lawsuit against the Prepetition Secured Creditors "challenging" the claims and liens of the Prepetition Secured Creditors (subject to the condition subsequent that the Plan be confirmed and become effective). The Debtor and the Committee both believe that this resolution is a very fortunate development for this case and is in the best interests of creditors and this estate, and (v) each of the music labels obtaining full and complete releases from the Debtor, the Debtor's estate, and any persons or entities claiming under or through them (as more fully described below), with reciprocal releases being provided by the music labels.

3

The Debtor believes that the Plan terms are fair under the circumstances of this case and that the Plan provides a fair economic result for all creditors. As explained in more detail below, the Debtor estimates that if the Committee Professional Fees do not exceed $500,000, general unsecured creditors (defined below as class 4 claim holders) will likely receive under the Plan a cash payment shortly after Plan confirmation equal to at least 17% of the amounts of their class 4 allowed claims depending upon the ultimate final amount of class 4 allowed claims in this case. In comparison, the Debtor believes that Pulser, whom the Debtor believes is owed (and therefore lost) several multiples more money than all of the other creditors combined and which is secured by a perfected lien against all or substantially all of the assets of this bankruptcy estate, will be receiving under the Plan a recovery on its secured claim which is likely not to be substantially higher than the recovery that will be received by general unsecured creditors. The Debtor projects that if all of the Escrowed Funds are ultimately returned to the Debtor and then paid to Pulser, there are no allowed administrative claims in this case other than the allowed fees and expenses of the employed professionals, there are no allowed Indemnity Claims (defined below), the expenses of special litigation counsel do not exceed $300,000, and the Plan Effective Date occurs by September 30, 2016, Pulser's ultimate recovery will be approximately 25%, recognizing that much of which will only be received by Pulser at the end of the escrow period at some point in 2017. It is also important to note that in order to maximize the recovery for general unsecured creditors, as part of the global settlement under the Plan, Pulser will be paying out of its collateral all of the allowed fees and expenses of the professionals employed by the Debtor, $166,756.46 of the allowed fees and expenses of the professionals employed by the Committee, all allowed priority tax claims and all allowed non-tax priority claims. If any Indemnity Claims are asserted against the Escrowed Funds by Pandora, there ends up being any allowed administrative claims in this case other than the

allowed fees and expenses of the employed professionals, the projected costs of bringing this case to conclusion exceeds the projected sum, or the fees and expenses of the Debtor's professionals exceed the projected figures, then the ultimate recovery for Pulser will be reduced by the same amount.

The Debtor is advised that claims traders have offered general unsecured creditors substantially less than class 4 claim holders will be receiving under the Plan, and understands that some creditors have already sold their claims to claims traders.

**ATTACHED AS EXHIBIT "7" TO THIS DISCLOSURE STATEMENT IS THE COMMITTEE'S LETTER IN SUPPORT OF CONFIRMATION OF THE PLAN.**

**A.    Disclaimer**

**THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE PLAN IS INCLUDED HEREIN AND THEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND DESCRIBING TREATMENT UNDER THE PLAN. THE INFORMATION CONTAINED HEREIN AND THEREIN MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN AND TO DESCRIBE TREATMENT UNDER AND TERMS OF THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT OR THE PLAN, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.**

**ALL CREDITORS AND PARTIES IN INTEREST ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN**

Case: 15-31430    Doc# 388    Filed: 08/10/16    Entered: 08/10/16 14:58:13    Page 8 of 97

SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT OR THE PLAN ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THIS DISCLOSURE STATEMENT AND THE EXHIBITS ANNEXED TO THIS DISCLOSURE STATEMENT, AND, IF THE TERMS OF THIS DISCLOSURE STATEMENT AND THE PLAN ARE INCONSISTENT, THE PLAN WILL CONTROL. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN SHALL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. ANY ESTIMATES OF CLAIMS AND INTERESTS SET FORTH IN THIS DISCLOSURE STATEMENT MAY VARY FROM THE AMOUNTS OF CLAIMS AND INTERESTS ULTIMATELY ALLOWED BY THE COURT.

THE FINANCIAL DATA RELIED UPON IN FORMULATING THE PLAN IS BASED ON THE DEBTOR'S BOOKS AND RECORDS WHICH, UNLESS OTHERWISE INDICATED, ARE UNAUDITED. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS PROVIDED BY THE DEBTOR. THE COURT HAS NOT YET DETERMINED WHETHER OR NOT THE PLAN IS CONFIRMABLE, AND THE COURT HAS NO RECOMMENDATION AS TO WHETHER OR NOT YOU SHOULD SUPPORT OR OPPOSE, OR ACCEPT OR REJECT, THE PLAN.

THE INFORMATION AND STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING, WITHOUT LIMITATION, INFORMATION ABOUT THE DEBTOR, ITS BUSINESS AND ITS BANKRUPTCY ESTATE AND ASSETS, HAVE BEEN PROVIDED SOLELY BY THE DEBTOR, AND

6

**SUCH INFORMATION HAS NOT BEEN INDEPENDENTLY VERIFIED BY ANY OTHER PARTY.**

**B.      Purpose of this Disclosure Statement**

This Disclosure Statement summarizes what is in the Plan and tells you certain information relating to the Plan and the process the Court follows in determining whether or not to confirm the Plan.

**READ THIS DISCLOSURE STATEMENT CAREFULLY IF YOU WANT TO KNOW ABOUT:**

**(1)      WHO CAN VOTE OR OBJECT**,

**(2)      WHAT THE TREATMENT OF YOUR CLAIM IS (i.e., what your claim will receive if the Plan is confirmed) AND HOW THIS TREATMENT COMPARES TO WHAT YOUR CLAIM WOULD RECEIVE IN A CHAPTER 7 LIQUIDATION OF THE DEBTOR**,

**(3)      THE HISTORY OF THE DEBTOR AND SIGNIFICANT EVENTS DURING ITS BANKRUPTCY CASE,**

**(4)      THINGS THE COURT WILL LOOK AT TO DECIDE WHETHER OR NOT TO CONFIRM THE PLAN,**

**(5)      THE EFFECT OF PLAN CONFIRMATION, AND**

**(6)      WHETHER THE PLAN IS FEASIBLE.**

This Disclosure Statement cannot tell you everything about your rights.  You should consider consulting your own lawyer to obtain more specific advice on how the Plan will affect you and what is the best course of action for you.

Be sure to read the Plan as well as this Disclosure Statement.  If there are any inconsistencies between the Plan and this Disclosure Statement, the Plan provisions will govern.

7

The Bankruptcy Code requires a Disclosure Statement to contain "adequate information" concerning the Plan. The Bankruptcy Court has approved this document as an adequate Disclosure Statement, containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan. Only after this Disclosure Statement has been approved by the Court may the Debtor solicit votes for the Plan.

**C.     Deadlines for Voting and Objecting; Date of Plan Confirmation Hearing**

THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON ALL CREDITORS AND INTEREST HOLDERS IN THIS CASE.

**1.     Time and Place of the Plan Confirmation Hearing**

The hearing where the Court will determine whether or not to confirm the Plan (the "Plan Confirmation Hearing") will take place on _____, 2016, at __:__ __.m., before the Honorable Dennis Montali, United States Bankruptcy Judge for the Northern District of California, San Francisco Division, in Courtroom 17 located at 450 Golden Gate Ave., 16th Floor, San Francisco, California 94102.

**2.     Deadline For Voting For or Against the Plan**

If you are entitled to vote, it is in your best interest to timely vote and make the election on the enclosed ballot and return the ballot in the enclosed addressed and stamped envelope (or timely return the stamped and addressed post card enclosed with the Plan package) to Ron Bender, Esq., Levene, Neale, Bender, Yoo & Brill L.L.P., 10250 Constellation Blvd., Suite 1700, Los Angeles, California 90067. You can also email your completed ballot (or a copy of

8

your completed and signed post card) to rb@lnbyb.com.  Your ballot must be received by 5:00 p.m., PST, on _____, 2016 or it will not be counted.

### 3. Deadline for Objecting to the Confirmation of the Plan

Objections to the confirmation of the Plan must, by _____, 2016, be filed with the Court and served by same day service upon counsel to the Debtor – Ron Bender, Esq., Levene, Neale, Bender, Yoo & Brill L.L.P., 10250 Constellation Blvd., Suite 1700, Los Angeles, California 90067, fax: (310) 229-1244, email: rb@lnbyb.com and upon counsel to the Committee – John D. Fiero, Esq. or Debra I. Grassgreen, Esq., Pachulski Stang Ziehl & Jones LLP, 150 California Street, 15th Floor, San Francisco, California 94111, fax (415) 263-7010, email: jfiero@pszjlaw.com; dgrassgreen@pszjlaw.com.

### D. Identity of Persons to Contact for More Information Regarding the Plan

Any interested party desiring further information about the Plan should contact counsel to the Debtor – Ron Bender, Esq., Levene, Neale, Bender, Yoo & Brill L.L.P., 10250 Constellation Blvd., Suite 1700, Los Angeles, California 90067, fax: (310) 229-1244, email: rb@lnbyb.com or counsel to the Committee - John D. Fiero, Esq. or Debra I. Grassgreen, Esq., Pachulski Stang Ziehl & Jones LLP, 150 California Street, 15th Floor, San Francisco, California 94111, fax (415) 263-7010, email: jfiero@pszjlaw.com; dgrassgreen@pszjlaw.com.

## II. <u>BACKGROUND</u>

### A. Description and History of the Debtor's Business and the Debtor's Sale Process which Led to the Filing of the Debtor's Chapter 11 Case

The Debtor commenced its bankruptcy case by filing a voluntary petition under Chapter 11 of the Bankruptcy Code on November 16, 2015 (the "<u>Petition Date</u>").  The Debtor continues to manage its financial affairs and bankruptcy estate as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

9

The Debtor was founded in 2008 as a digital music service. The Debtor's business operations were launched in 2010 after the Debtor secured requisite licenses from the applicable holders of music rights. Since that time, the Debtor grew into a worldwide music service, ultimately operating in 86 countries.

One of the primary services the Debtor provided was an unlimited, on demand music streaming service where, for $9.99 per month in the U.S., the user had access to an entire library of songs with access to them through a computer, mobile device, etc. In other words, the Debtor's primary business model was based upon a monthly recurring subscription for full access to its content rather than on an owned a la carte download model. The Debtor also made available other subscription tiers at lower costs per month with varying service offerings or functionality (e.g., a family tier, a student tier, and a select tier with alternative functionality) as well a "free to the user" advertising supported Internet radio service. Prior to the Debtor's bankruptcy filing, the Debtor was generating approximately $1.5 million of U.S. monthly revenue from its monthly subscription service. While the Debtor's monthly subscription service provided the Debtor with its historical primary revenue source, prior to the Debtor's bankruptcy filing, the Debtor was also generating approximately $100,000-$150,000 of monthly revenue from advertisers who advertised in the Debtor's advertising-based service offerings. The Debtor's primary assets consisted of the Debtor's (i) owned technology (e.g., website, mobile apps, content ingestion technology, reporting technology, software, databases, etc.), (ii) content license agreements, (iii) subscribers, (iv) employee talent pool, and (v) goodwill.

Under its pre-petition operating business model, the Debtor was incurring monthly operating expenses of approximately $3.5-$4.0 million, comprised primarily of payroll for the Debtor's approximately U.S. 140 employees (much of which represented costs of retaining high caliber Silicon Valley engineering talent), payment to the owners of music rights, costs of

10

maintaining the service, rent, marketing costs, business development costs, technology maintenance costs, and foreign administrative expenses. With average monthly total revenue of approximately $1.6-$1.65 million and average monthly operating expenses of $3.5-$4.0 million, the Debtor's pre-petition business operations under its pre-petition operating business model resulted in operating losses of approximately $1.85-$2.4 million per month, and the Debtor ultimately no longer had the economic means of continuing to fund its significant operating losses.

The Debtor has approximately $188,500,000 of secured debt (although, but for the global settlement embodied in the Plan, such debt remains subject to a potential challenge by the Committee). In addition, the Debtor scheduled (i) approximately $273,909 of pre-petition wage related priority claims; (ii) approximately $130,326 of pre-petition priority tax claims; and (iii) approximately $24,390,222 of non-priority general unsecured debt (recognizing that this figure does not take into account any disputed, unliquidated or contingent unsecured debt, any claims asserted in filed proofs of claim, or any debt which may arise as a result of the Debtor's rejection of unexpired leases or executory contracts or breaches or terminations of license agreements). The Debtor is continuing to review its books and records, its bankruptcy schedules and filed proofs of claim. The Debtor will file amended bankruptcy schedules and update this Disclosure Statement as appropriate.

Despite the investment of several hundred million dollars and years of efforts to build its subscriber base (and to attract meaningful advertising dollars), the Debtor was unable to achieve profitability – or even to reduce its operating losses to tolerable levels.

As a result, the Debtor's majority shareholder, Pulser, employed a highly qualified investment bank in Moelis & Company ("Moelis") in the fall of 2014, initially with the goal of attempting to raise new equity capital. Despite extensive efforts by Moelis, however, the

Case: 15-31430   Doc# 388   Filed: 08/10/16   Entered: 08/10/16 14:58:13   Page 14 of 97

prospects for raising new debt or equity capital were not promising at the time. At that point, Pulser extended the Moelis mandate to include seeking a buyer or merger partner because the Debtor was not going to be able to continue to fund such significant operating losses indefinitely.

By June 2015, Pandora Media, Inc. ("Pandora") was emerging as the most interested party and the party most likely to present the best offer and to close a sale. Pandora submitted a signed preliminary letter of intent (the "Initial LOI") on July 8, 2015, which was never counter-signed by the Debtor. Concurrent with the continuing negotiations with Pandora regarding the Initial LOI, Moelis continued its marketing efforts, and, over the subsequent three months, the Debtor's management and Moelis continued discussions with other interested parties that had been identified. The negotiations with Pandora were long and intensive. Pandora advised the Debtor that it had approximately 125 people working on this transaction. Negotiations broke down several times. After substantial negotiation of the Initial LOI and several subsequent versions, and additional due diligence by Pandora, the parties executed a non-binding LOI on September 29, 2015 (the "Executed Non-Binding LOI").

Following the execution of the Executed Non-Binding LOI, Pandora continued its due diligence and the parties commenced negotiations on the terms of a definitive transaction. Those negotiations were also very intense and extended. The Executed Non-Binding LOI provided that upon the election of Pandora, the Debtor's asset sale to Pandora would be conducted as part of a chapter 11 bankruptcy process and an asset purchase pursuant to a sale under 11 U.S.C. § 363. The Debtor contends that after the Executed Non-Binding LOI, the Debtor and Pandora held several discussions regarding potential alternatives to a chapter 11 bankruptcy process, and the Debtor pursued financing transactions with other parties. Negotiations between the Debtor and Pandora continued all the way until the definitive Asset Purchase Agreement between the

12

Debtor and Pandora was executed on November 16, 2015 (the "<u>APA</u>"). Pursuant to the APA, Pandora required that its asset purchase be consummated through a chapter 11 bankruptcy process by the Debtor and an asset sale under 11 U.S.C. § 363.

The Debtor contends that through the entire negotiation between the Debtor and Pandora until shortly before the parties executed the APA, the Debtor anticipated that Pandora would acquire the Debtor's assets in a manner that would allow Pandora to continue to operate the Debtor's business as a going concern. Until the Court approved the Debtor's asset sale to Pandora at the hearing on December 21, 2015, the Debtor continued to operate its business in the ordinary course and in accordance with the APA, so that the required overbid process could be pursued and other potential acquirers had an opportunity to acquire the Debtor's business and continue to operate the service. Several interested parties engaged in due diligence, one of which invested significant time and resources in due diligence prior to deciding not to bid.

Ultimately, Pandora decided that it would not purchase the Debtor's business as a going concern, but would acquire only certain assets, consisting primarily of the Debtor's core technology and related engineering and production/design staff. Pursuant to the APA, Pandora paid a base purchase price of $75.0 million, subject to adjustment as provided in the APA. Pandora also agreed to enter into a Master Services Agreement, which provided for a payment of $2.5 million to the Debtor and which was approved by the Court at a hearing held on November 23, 2015. The Debtor never understood the logic of Pandora's decision to close the Rdio service, and was never sure whether Pandora might not ultimately change its mind again before the sale closed. Rdio's service operated in 86 countries, its app was well received and favorably regarded when reviewed against the apps of Spotify, Apple and Google, included both a paid subscription service and a free internet radio service modeled after Pandora, enabled via direct licenses with rights holders globally and a licensed catalog of over 40 million tracks.

Case: 15-31430    Doc# 388    Filed: 08/10/16    Entered: 08/10/16 14:58:13    Page 16 of 97

The Debtor believes that duplicating this footprint would have ultimately in all likelihood cost Pandora hundreds of millions of dollars and have taken 24-36 months. All Pandora would have to do is seek and obtain certain rights holder consents for the transfer of certain of the Debtor's existing recorded music and music publishing licenses.

The APA provided for the Debtor's assumption and assignment to Pandora of certain executory contracts and unexpired leases, the rejection of others, and a post-closing sale period during which Pandora was permitted to supplement the list of executory contracts and unexpired leases to be assumed and assigned to Pandora.

The APA provided that 15% of the Aggregate Consideration (as defined in the APA) would be deposited into an escrow account to backstop the Debtor's indemnification obligations to Pandora. The APA also required secured creditor Iconical II to provide a guarantee of the Debtor's indemnification obligations under the APA, subject to various limitations and conditions. The APA provided for the possibility of certain downward price adjustments and walk away rights, fortunately none of which came to fruition due to effective efforts by the Debtor to ensure that over 80% of the Debtor's employees receiving offers from Pandora accepted, which included incentive bonuses paid for with the consent of the Prepetition Secured Creditors out of their collateral.

Pandora's obligations under the APA were subject to the Debtor meeting certain deadlines all of which were achieved. The Debtor's management worked diligently through the sale closing to ensure that all conditions of the APA were met, despite the fact that only one member of the Debtor's executive staff received an acceptable offer to join Pandora. The APA required the filing of a motion for an order approving bid and sale procedures (the "Bidding Procedures Order") within one day of the Petition Date. The Debtor was also required to use commercially reasonable efforts to obtain the Bankruptcy Court's entry of the Bidding

14

Procedures Order on or prior to December 1, 2015; and obtain the Bankruptcy Court's entry of the order approving the sale (the "Sale Order") on or prior to December 23, 2015. Pandora had the right to terminate the APA if any such deadlines were not met. Fortunately, all required deadlines were met.

The Debtor was also required to seek and obtain approval of a Master Services Agreement ("Services Agreement") pursuant to which the Debtor agreed to provide the services of its employees to Pandora in order to advance the sale process, and Pandora agreed to compensate the Debtor for such services, in the aggregate amount of $2.5 million, payable in installments. Pandora's agreement to make the payments under the Services Agreement allowed the Debtor to fund a substantial portion of its employee costs through the sale closing. The APA also required that the Debtor file a motion for approval of the Services Agreement within one day following the Petition Date. The Court approved the Services Agreement at a hearing held on November 23, 2015.

Pursuant to the APA, Pandora required that its purchase of the Debtor's assets be conducted through a chapter 11 bankruptcy process. However, Pandora agreed that the Debtor could and should market Pandora's offer for overbid to ensure that the highest and best price was paid for the Debtor's assets. The Debtor retained Moelis for the purpose of marketing the Debtor's assets for overbid and to assist the Debtor to conduct an auction process in the event of any successful overbids – recognizing that the Debtor had only a limited amount of time available to consummate a sale (and to conduct the auction sale process). Not only did the Debtor not have the financial means with which to continue to fund its operating losses on any long-term basis, as a result of the business uncertainty created by the Debtor's bankruptcy filing, particularly with regard to the potential loss of its very valuable employee talent, the

15

continuing desirability and value of the Debtor's assets and business were clearly jeopardized by delay. Pandora understandably required a prompt sale process.

In the APA, certain bidding procedures ("<u>Bidding Procedures</u>") were agreed to by the Debtor and Pandora, all of which the Debtor believed to be reasonable and appropriate under the circumstances of this case and in compliance with the law. At a continued hearing held on November 23, 2015, the Court granted the Debtor's motion filed on November 16, 2015, for approval of the Bidding Procedures. On November 24, 2015, the Court entered the Bidding Procedures Order. The Bidding Procedures Order explained to prospective overbidders how a prospective overbidder would become qualified to participate in the auction sale ("<u>Auction</u>").

The timing of the sale process was critical as Pandora conditioned its offer on the Debtor obtaining an entered Sale Order on or prior to December 23, 2015. The Court scheduled the sale hearing to be held on December 21, 2015, and the Auction was scheduled to be held (in the event that one or more qualified overbidders elected to participate in the Auction) on December 18, 2015. The Debtor was assured by Moelis that this was a sufficient amount of time for Moelis to conduct an overbid process, particularly given the breadth of Moelis' pre-bankruptcy marketing process and Moelis' in-depth knowledge of the Debtor's industry and marketplace and prospective overbidders, to insure that the highest and best price was obtained from the sale of the Debtor's assets.

Although the Debtor and Pandora had both been operating in the internet radio business for an extended period of time, the differences in their particular business models, and the way they had developed, made Pandora a particularly suitable buyer for the Debtor's assets. As compared to Pandora's music service, the Debtor's service involved more specific (personalized) customer choice and a tiered-priced subscription service. The Debtor's digital music service provided both internet radio and subscription on-demand listening experiences.

Case: 15-31430   Doc# 388   Filed: 08/10/16   Entered: 08/10/16 14:58:13   Page 19 of 97

The Debtor secured extensive IP licensing agreements with music labels and publishers, allowing it to offer a comprehensive library of over 35 million songs. While Pandora ultimately decided that it would not be continuing the Debtor's existing streaming music service, the Debtor's technology was of great benefit to Pandora in providing this type of service in the future. These aspects of the Debtor's business are complimentary and offered opportunities for Pandora to expand its business model which appeared attractive in the then-present marketplace.

With the assistance of Moelis, the Debtor had been engaged for over one year in an active marketing process involving contacts with over 110 financially significant potential investors or purchasers, which included substantial discussions with a number of different prospective buyers over many months prior to the Petition Date. The negotiations with Pandora alone continued for over three months from the time Pandora delivered its initial draft of the LOI. Moelis continued with its efforts to attempt to solicit overbids during the overbid process. While a number of prospective overbidders signed confidentiality agreements and spent significant time in the Debtor's data room conducting due diligence, ultimately no party submitted any overbid to Pandora's offer.

The Court approved the Debtor's asset sale to Pandora at a hearing held on December 21, 2015, and the Debtor's asset sale to Pandora closed two days later on December 23, 2015.

**B.      Relationships Between Debtor, Pulser Media, Iconical II And Related Entities and Parties**

Pulser is the majority equity holder of the Debtor. In turn, the majority stockholder of Pulser is Iconical Investments LP ("Iconical  LP"), a limited partnership that is associated with Janus Friis Degnbol ("Janus Friis"). Pulser and the Debtor have been primarily funded by companies associated with Janus Friis. Iconical II, which has made substantial loans to the

17

Debtor and Pulser, is also a limited partnership that is associated with Janus Friis.

Iconical II and Iconical LP and their respective affiliated entities (collectively, the "Iconical Entities") are funds engaged in making investments in innovative businesses and are primarily managed by the following directors: Mark Dyne, Janus Friis, and Murray Markiles. Prior to the Petition Date, the Debtor had four members on its Board of Directors - Mark Dyne, Janus Friis, Anthony Bay and Andrew Larner - however, on October 30, 2015, Mark Dyne and Janus Friis resigned from the Debtor's Board of Directors (and from the Board of Directors of Pulser).

The Debtor's Board of Directors sought to add and appoint an independent member to the Board. Accordingly, on or about November 2, 2015, Peter Kravitz was appointed to the Debtor's Board of Directors, joining the other two remaining members of the Board of Directors (Anthony Bay and Andrew Larner). Prior to joining the Debtor's Board of Directors, Peter Kravitz had no prior affiliation, relationship, connection, or business dealings with the Debtor, Pulser, or any of the Iconical Entities.

From approximately late 2009 until November 2013, Andrew Larner served as the Chief Executive Officer of the Debtor. From the middle of 2014 until early 2015, Andrew Larner was a partner and operating employee of an investment and incubation company, The Factory LP, which was financed by Iconical II. Europlay Capital Advisors, LLC ("ECA") provides advisory services and back-office services to Iconical LP and Iconical II. ECA, directly and acting on behalf of Iconical LP and Iconical II, has provided various support and business advisory services to the Debtor and Pulser. Joseph Miller, a member of ECA and an authorized bank signatory for Iconical LP and Iconical II, acting on behalf of Iconical LP and Iconical II and their respective interests, has been directly involved in all of the financing and strategic discussions involving Pulser and the Debtor, the Debtor's bankruptcy case and the proposed

18

asset sale to Pandora.

**C.  Significant Events Which Have Occurred During the Bankruptcy Case**

The following is a list of significant events which have occurred <u>during</u> the Debtor's chapter 11 case:

**1.  Formation of the Committee**

The United States Trustee (the "<u>UST</u>") formed the Committee at the very outset of this case to represent the interests of general unsecured creditors.  The Committee was originally composed of the following seven members: Roku, Inc.; Sony Music Entertainment; AXS Digital LLC; Shazam Media Services; Warner Music Group Corp.; UMG Recordings, Inc.; and Mosaic Networx LLC.  Sony Music Entertainment, UMG Recordings, Inc., Warner Music Group Corp. and Shazam Media Services have since resigned from the Committee.  The Committee is currently comprised of the remaining three members.  The Committee is represented by Pachulski Stang Ziehl & Jones LLP ("<u>PSZJ</u>").

**2.  Operational Issues**

**i.  Use of Cash Collateral and Post-Petition Borrowing**

In order for the Debtor to continue to operate its business and manage this bankruptcy estate through the closing of the pending sale to Pandora or an overbidder, the Debtor had to be able to use its cash and post-petition operating revenue, and the Debtor had to be able to borrow additional money to fund its projected post-petition cash flow shortfalls.  Fortunately, both of the Prepetition Secured Creditors agreed to consent to the Debtor's use of their cash collateral, and Iconical II agreed to lend the Debtor up to $3 million on a post-petition senior lien basis. The Debtor had negotiated a pre-petition cash collateral and post-petition financing stipulation with Pulser and Iconical II.  The Committee negotiated certain changes to that stipulation post-petition.  The Court held an initial emergency hearing on the motion on November 18, 2015,

19

and then the Court held a continued hearing on the motion on November 23, 2015. At the continued hearing, the Court granted the motion on an interim basis (subject to certain changes agreed to by the parties) pending a final hearing to be held on December 10, 2015. With the consent of the parties, the Court granted the motion and approved the agreed upon stipulation on a final basis at the hearing held on December 10, 2015. Iconical II agreed to lend the Debtor $1.8 million of the $3.0 million following interim Court approval, and Iconical II agreed to lend the Debtor the $1.2 million balance following the Court's final approval. The Debtor would not have been able to continue operating or to consummate its asset sale to Pandora if not for Iconical II's post-petition loan to the Debtor. The Debtor has been managing this bankruptcy estate in accordance with various budgets which have been approved by the Debtor, the Prepetition Secured Creditors and the Committee. The stipulation provided the Committee with the standing to challenge the validity, priority and allowability of the claims and liens of the Prepetition Secured Creditors. The deadline of the Committee to file any such action against the Prepetition Secured Creditors (the "Challenge Deadline") has been extended from time to time by agreement of the Prepetition Secured Creditors, recognizing that, with the consent of the Committee, certain releases of the Prepetition Secured Creditors and their principals were already provided and approved by the Court in the Court approved stipulation.

### ii. Emergency Motion to Pay the Debtor's Pre-Petition Priority Wages

At the commencement of this case, the Debtor filed an emergency motion for authority to pay the Debtor's pre-petition priority wages and related benefits in the ordinary course of business to avoid the disruption to the Debtor's business from failing to do so. The Court granted the Debtor's emergency wage motion at a hearing held on November 18, 2015.

### iii. Emergency Motion to Provide Adequate Assurance of Payment to the Debtor's Utilities

At the commencement of this case, the Debtor filed an emergency motion for an order authorizing the Debtor to provide adequate assurance of future payment to certain utility companies pursuant to Section 366(c) of the Bankruptcy Code. The Court granted the Debtor's emergency utilities motion at a hearing held on November 18, 2015.

### iv. Emergency Motion to Maintain Cash Management Systems.

At the commencement of this case, the Debtor filed an emergency motion for authority to maintain its cash management systems, which was imperative to avoid significant disruption to the Debtor's business operations. The Court granted the Debtor's emergency utilities motion at a hearing held on November 18, 2015.

### v. Motion to Honor Pre-Petition Employee Bonus Incentive Agreements

At the commencement of this case, the Debtor filed an emergency motion for authority to honor the Debtor's various employee bonus incentive agreements. This was critically important to the Debtor's ability to maintain its key employees pending the sale closing to Pandora or to a successful overbidder, both because the Debtor needed the services of those employees to enable the Debtor to consummate the sale and because Pandora had the ability to reduce its purchase price or even cancel the sale altogether if a requisite number of employees did not agree to go to work for Pandora. The Court granted the Debtor's emergency motion over the UST's objection at a hearing held on November 18, 2015. The UST subsequently filed a motion in which the UST requested the Court to reconsider its ruling, but the Court denied that motion.

### vi. Motion for Approval of Master Services Agreement with Pandora

At the commencement of this case, the Debtor filed an emergency motion for approval of the Services Agreement between the Debtor and Pandora. The Court granted the Debtor's emergency motion at a continued hearing held on November 23, 2015.

### 3. **Administrative Matters**

The Debtor was required to address the various administrative matters attendant to the commencement of this bankruptcy case, which required an extensive amount of work by the Debtor's employees and its bankruptcy counsel, Levene, Neale, Bender, Yoo & Brill L.L.P. ("LNBYB"). These matters included the preparation of the Debtor's Schedules of Assets and Liabilities and Statement of Financial Affairs, and the UST compliance package. The Debtor has made every effort to comply with its duties under 11 U.S.C. Sections 521, 1106 and 1107 and all applicable UST guidelines, including the filing of the Debtor's monthly operating reports. The Debtor also attended the organizational meeting of creditors conducted by the UST, which ultimately resulted in the appointment of the Committee by the UST, and the Debtor attended its initial interview with the UST and the meeting of creditors required under 11 U.S.C. § 341(a). The Court approved the Debtor's designation of Elliott Peters as the designated responsible individual for this case.

### 4. **Employment of Professionals**

The Debtor has employed three professionals: LNBYB as its bankruptcy counsel; Moelis as its financial advisor to assist the Debtor in the sale process; and Winston & Strawn LLP ("WS") as special litigation counsel. The Committee has employed two professionals: PSZJ as its bankruptcy counsel and FTI Consulting as its financial advisor.

### 5. **Sale Transaction**

The Court entered the sale order and related findings of fact and conclusions of law on December 22, 2015, and the Debtor's sale to Pandora closed on December 23, 2015. Pandora's base purchase price was $75.0 million. After taking into account the deposit of $11,250,000 which was paid into escrow (the "Escrowed Funds") as was required by Pandora to protect Pandora against any claims made against Pandora by creditors of the Debtor, the total net sum

Case: 15-31430   Doc# 388   Filed: 08/10/16   Entered: 08/10/16 14:58:13   Page 25 of 97

of $63,750,000 was delivered to the Debtor at the sale closing, which the Debtor deposited into its general operating account. After adding to this figure the Debtor's cash on hand as of the sale closing and deducting from this figure repayment of the post-petition loan to Iconical II and all of the Debtor's paid expenses pursuant to the approved budgets and other Court orders, as of August 2, 2016, the Debtor was holding a total of approximately $54.2 million (exclusive of the $11.25 million of Escrowed Funds) (the "Estate Funds"). The Debtor will continue to pay the estate's expenses (including the professional fees incurred by counsel to the Prepetition Secured Creditors) in accordance with approved budgets out of the Estate Funds. The remaining balance of Estate Funds together with all funds ultimately paid to the Debtor from the Escrowed Funds and any and all recoveries obtained by the Debtor from the pursuit of any causes of action will serve as the source of funding for all payments required to be made under the Plan.

### 6.   **Executory Contracts and Unexpired Leases**

In connection with the Debtor's asset sale to Pandora, Pandora was given the right to designate which executory contracts and unexpired leases Pandora desired to have assigned to it at the closing, and Pandora had the right to wait up to thirty days to designate any others that Pandora desired to have assigned to it after the sale closing. Pandora ultimately decided not to take an assignment of any additional executory contracts or unexpired leases other than the initial ones that were assumed by the Debtor and assigned to Pandora at the sale closing. The Debtor therefore took all of the required steps to reject nearly all of its remaining executory contracts and unexpired leases which were not assigned to Pandora, with such rejection effective as of the sale closing date of December 23, 2015.

### 7.   **Plan Exclusivity**

The Debtor filed a timely motion to extend its plan exclusivity periods. The Committee filed an objection to the Debtor's motion and requested the Court to terminate the Debtor's plan

Case: 15-31430    Doc# 388    Filed: 08/10/16    Entered: 08/10/16 14:58:13    Page 26 of 97

exclusivity. With the consent of the Debtor, the Committee, and the Prepetition Secured Creditors, the Debtor's exclusive periods to file and solicit acceptances of a chapter 11 plan were extended a number of times. The Debtor's plan exclusivity has since terminated. During the Debtor's extended plan exclusivity periods, the Prepetition Secured Creditors agreed that they would not initiate any contested matter or adversary proceeding seeking to recover any of the Pandora sale proceeds pending the Plan confirmation process (except as otherwise already authorized by the final financing order or the Sale Order).

### 8. The Committee's Challenge Deadline

As part of the final cash collateral and post-petition financing stipulation approved in this case, the Committee negotiated for the standing necessary to challenge the validity, priority and allowability of the pre-petition claims and liens of the Prepetition Secured Creditors and for a deadline for the Committee or another party in interest with standing and requisite authority, to commence a timely contested matter or adversary proceeding challenging any of the Debtor's stipulations regarding the validity, priority and allowability of the Prepetition Secured Creditors' claims and liens. No party brought such an action by the January 24, 2016 deadline (the "Challenge Deadline"). However, the Challenge Deadline has been extended with respect to the Committee only, on multiple occasions, to provide the Debtor, the Committee and the Prepetition Secured Creditors with the opportunity to attempt to negotiate the terms of a fully consensual plan of reorganization, recognizing that, with the consent of the Committee, certain releases of Iconical II, Pulser and their principals were already provided and approved by the Court in the Court approved cash collateral and post-petition financing stipulation. Such challenge rights have not been bargained away, and, in the event the Plan or another plan acceptable to the Committee is not confirmed, the challenge rights are preserved for the Committee.

Case: 15-31430    Doc# 388    Filed: 08/10/16    Entered: 08/10/16 14:58:13    Page 27 of 97

### 9. The Recommendation of the Debtor and the Committee that All General Unsecured Creditors Vote to Accept the Plan

The Committee advised the Debtor that had the Committee not been able to reach a settlement agreement with the Prepetition Secured Creditors, the Committee would have filed a "Challenge" lawsuit against the Prepetition Secured Creditors.

A detailed discussion of the Committee's investigation of claims against Pulser and Iconical II (the "Analysis"), which has been prepared by counsel to the Committee, is set forth below. For the reasons described and as set forth below, the Committee believes that the settlement embodied by the terms of the Plan is in the best interests of general unsecured creditors.

For the reasons detailed below, when taking into account the costs, risks and delays that would be associated with the Committee's pursuit of a "Challenge" lawsuit against the Prepetition Secured Creditors, the Debtor and the Committee believe that the best interests of general unsecured creditors are served by voting to accept the Plan. **The Debtor and the Committee therefore recommend that all creditors vote to accept the Plan**.

### D. Standard for Approval of Compromise Under Bankruptcy Rule 9019

Bankruptcy Rule 9019(a) provides in relevant part that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). In reviewing proposed settlements, the standard that courts applied under the former Bankruptcy Act also applies under the Bankruptcy Code. *See In re Carla Leather, Inc.*, 44 B.R. 457, 466 (Bankr. S.D.N.Y. 1984), *aff'd*, 50 B.R. 764 (S.D.N.Y. 1985). The U.S. Supreme Court stated in *Protective Committee v. Anderson*, 390 U.S. 414 (1968), that in order to approve a proposed settlement under the Bankruptcy Act, a court must have found that the settlement was "fair and equitable" based on an "educated estimate of the complexity, expense,

Case: 15-31430   Doc# 388   Filed: 08/10/16   Entered: 08/10/16 14:58:13   Page 28 of 97

and likely duration of . . . litigation, the possible difficulties of collecting on any judgment which might be obtained and all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *Carla Leather*, 44 B.R. at 466.

A court, however, should not substitute its own judgment for the judgment of a trustee or a debtor. *Id*. at 465. In reviewing a proposed settlement, a court is not "to decide the numerous questions of law and fact . . . but rather to canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." *In re W.T. Grant & Co.*, 699 F.2d 599, 608 (2d Cir. 1983). "When assessing a compromise, courts need not rule upon disputed facts and questions of law, but rather only canvass the issues. A mini trial on the merits is not required." *In re Schmitt*, 215 B.R. 417, 423 (B.A.P. 9th Cir. 1997) (citations omitted).

The Ninth Circuit has held that in considering a proposed compromise, the Court must evaluate the following factors: (i) the probability of success; (ii) the difficulties, if any, of collection; (iii) the complexity of litigation involved, and the expense, inconvenience and delay in necessarily attending to it; and (iv) the paramount interests of creditors. *In re Woodson*, 839 F.2d 610, 620 (9th Cir. 1988) (quoting *In re A & C Properties*, 784 F.2d 1377, 1381 (9th Cir. 1986), *cert. denied sub nom*). Those factors are discussed below.

**E.    The Probability of Success Factor Favors a Compromise**

The proposed settlement discussed above (the "Secured Creditor Settlement") is the result of the Committee's investigation of claims against Pulser and Iconical II. As discussed in the Analysis, the estate's claims against Pulser and Iconical II involve complex issues of fact, unsettled issues of law and somewhat vague legal standards that make the outcome of litigation with Pulser and Iconical II unpredictable. Although the Committee believes that $87 million of Pulser's total claim in excess of $180 million is more vulnerable to recharacterization than the

Case: 15-31430   Doc# 388   Filed: 08/10/16   Entered: 08/10/16 14:58:13   Page 29 of 97

remainder, there is significant risk that the Committee will not prevail on its recharacterization claim against Pulser and its other causes of action against Pulser and Iconical II. Moreover, even if the Committee successfully recharacterized the most vulnerable $87 million portion, Pulser would still have a secured claim of over $90 million, leaving general unsecured creditors entirely out of the money. In this case, the benefit of securing a prompt, meaningful recovery to unsecured creditors without incurring additional administrative expenses significantly outweighs the risk and costs of prosecuting highly speculative litigation involving unsettled law and uncertain legal standards. Accordingly, the Committee submits that the first element of the traditional test under *A & C Properties* supports approval of the compromise reflected in the Plan.

**F.** **The Difficulties of Collection are Addressed by the Plan**

The second element of the *A & C Properties* test is satisfied. If the Committee pursued its challenge lawsuit against the Prepetition Secured Creditors and did not prevail, the Debtor's estate would be saddled with significant administrative claims for professional fees and costs without the means of satisfying such claims. Moreover, if the Committee pursued litigation, the Debtor would likely spend several additional months, or longer, in bankruptcy developing a new plan of reorganization or possibly face conversion to chapter 7 in the event that the Prepetition Secured Creditors decided not to consent to the use of additional cash collateral. In contrast, the Plan guarantees a swift exit from bankruptcy and a prompt distribution to the Debtor's general unsecured creditors. In addition, the Plan provides certainty of payment of administrative and priority claims.

**G.** **The Expense, Inconvenience, and Delay of Further Litigation**

The third prong of the test under *A & C Properties* is the complexity of litigation involved, and the expense, inconvenience, and attendant delay. As discussed above regarding

27

the probability of success, the implementation of the Plan will avoid the expense of protracted litigation. The Committee has already incurred well over $100,000 of fees investigating the claims against the Prepetition Secured Creditors. The Committee believes that just the costs of litigating such claims would exceed $1 million. In addition, the contingency fee could amount to 33% to 40% of any recovery ultimately obtained through a subsequent settlement or judgment. Inevitable appeals would add further delay and uncertainty even if a favorable judgment was obtained.

**H.    The Settlement Serves the Interests of Creditors**

Finally, as explained above, the settlement embodied in the Plan serves the interests of creditors. For example, the settlement provides for the payment of administrative claims, provides a meaningful recovery to general unsecured creditors, and avoids highly speculative and protracted litigation that would otherwise delay a distribution (if any) to unsecured creditors by months and likely years. Accordingly, the settlement embodied in the Plan serves the best interests of creditors.

**I.    Discussion of Committee's Investigation of Potential Claims and Defenses Against Pulser and Iconical II**

The Plan provides for the release of the Debtor's claims against Pulser and Iconical II in exchange for, among other things, payment by Pulser to the estate in the amount of $5,725,000 million for the benefit of holders of allowed general unsecured claims other than Sony Music Entertainment ("Sony Music") and Orchard Enterprises NY, Inc. ("Orchard," and together, the "Sony Parties") and for Pulser to purchase the claims of the Sony Parties, and Pulser's waiver of any right to share in any distribution of such funds on account of Pulser's Allowed Class 4 Claim (the "Secured Creditor Settlement"), except as set forth below. In addition, as part of the Secured Creditor Settlement, any net recovery by the estate from the pursuit of any causes of

action other than avoidance causes of action (after payment of all related fees and expenses) shall be distributed to all holders of class 4 allowed claims on a pro rata basis, including Pulser on account of the Pulser Allowed Class 4 Claim. Further, a component of the settlement discussions between the Debtor, the Committee, and the Prepetition Secured Creditors, which resulted in an agreement on the terms of a fully consensual plan of reorganization, was the joint decision not to pursue any avoidance causes of action or any claims against the Sony Parties. On the Effective Date, all rights of the Debtor or its estate to pursue any avoidance causes of action shall be permanently waived.

*The Committee supports the Secured Creditor Settlement.* The Committee's counsel and its financial advisors evaluated the potential claims and defenses that might be asserted against Pulser and Iconical II in an effort to recharacterize as equity contributions or equitably subordinate the claims of Pulser and Iconical II to the claims of unsecured creditors. The Committee compared the risks, costs and benefits of pursuing such litigation to the Secured Creditor Settlement and concluded that the proposed Secured Creditor Settlement is in the best interests of the estate and its creditors.

The following analysis discusses the basis for the Secured Creditor Settlement. It is based upon information gained from a review by the Committee's counsel and financial advisors of the transactional documents underlying the claims of Pulser and Iconical II, the Debtor's books and records produced to the Committee and other information and documents provided by the Debtor, Pulser, and Iconical II. Although litigation has not been commenced and formal discovery has not been undertaken, the Committee has reviewed thousands of pages of documents requested from and provided voluntarily by the Debtor, Pulser, and Iconical II. The documents produced consist primarily of loan and security documents, various financial records, board minutes and materials reviewed by the boards of Pulser and the Debtor. The

Debtor, Pulser, and Iconical II have not produced any emails relating to the Committee's analysis, contending that that producing such emails is cost prohibitive. The Committee's investigation of the Challenge claims began in early December, 2015 and was largely concluded by mid-February, 2016. The Committee devoted more than 234 attorney hours and incurred $164,290 in legal fees conducting the investigation. During its investigation, the Committee interviewed (i) Elliott Peters, the general counsel of the Debtor, (ii) Anthony Bay, the Chief Executive Officer and a Director of the Debtor, and (iii) Maikao Grare, the Senior Vice President of Finance of the Debtor.

After reviewing the documents and information provided by the Debtor, Pulser, and Iconical II, the Committee's counsel and financial advisors are not aware of any basis to question the accuracy of the facts that are material to the analysis below and to the conclusion that the Secured Creditor Settlement is prudent and in the best interests of the general unsecured creditors.

### III. FACTS REGARDING THE SECURED CREDITOR SETTLEMENT

### A. The Pulser Note

Beginning in September 2012, Pulser advanced money to Rdio pursuant to a secured promissory note dated September 21, 2012 (the "Pulser Note") issued by Rdio, as borrower, in favor of Mdio, Inc. (n/k/a Pulser), as lender. The Pulser Note was signed by Andrew Larner as CEO for both Rdio as borrower and Pulser as lender. Pursuant to the Pulser Note, Pulser agreed to advance, at its sole discretion, up to $26.2 million at an interest rate of 6% per annum (the "Interest Rate"), with all principal and accrued interest due on September 21, 2015 (the "Maturity Date"). Under the Pulser Note and each amendment, discussed below, Pulser retained discretion, and was never required, to make any advances to Rdio. In addition, the Pulser Note does not contain any financial covenants that are typically required by a

30

commercial lender (e.g., maintaining a certain level of working capital or maintaining a specified debt to equity ratio). The Pulser Note, by its express terms, is governed and construed under California law.

The obligations under the Pulser Note were secured by a second priority blanket security interest in Rdio's assets, subordinate to a security interest held by Rdio Investment Holdings Limited, a company formed under the laws of the British Virgin Islands ("RIHL"), discussed below. The security interest was granted in the note itself rather than by a separate security agreement and this was the case with the subsequent amendments discussed below. Under the terms of the Pulser Note, any remedy taken with respect to the collateral required prior written consent by RIHL. Pulser perfected its security interest in Rdio's personal property by filing a financing statement on December 27, 2013, approximately fifteen months after the Pulser Note was executed.

The Pulser Note was amended over the next three years as follows:

On January 8, 2013, the Pulser Note was amended (the "First Amended Note") to permit advances up to a maximum of $48,750,010. The First Amended Note was signed by Andrew Larner on behalf of both Rdio as the borrower and Pulser as the lender. The Maturity Date and Interest Rate remained the same, and the liens securing the First Amended Note continued to be subordinate to the liens held by RIHL. Sometime in late April 2013, Pulser's advances under the First Amended Note exceeded the maximum stated amount of $48,750,010. Pulser continued to make advances of over $87 million before the First Amended Note was amended in December 2014 to authorize these additional amounts.

On December 17, 2014, the First Amended Note was amended (the "Second Amended Note") to permit advances up to a maximum of $178,000,000 and to capture the $87 million in advances that had been made over the maximum amount of the First Amended Note since April

31

2013. The Maturity Date remained the same under the Second Amended Note, but the Interest Rate was reduced to 0.95% per annum. The Second Amended Note states that Pulser holds a "continuing second priority security interest" in Rdio's assets, but there is no reference to RIHL or the need for prior written consent by Pulser to exercise any rights or remedies. The Second Amended Note was executed by Maikao Grare, as SVP of Finance for Rdio, and by Anthony Bay, as CEO of Pulser.

On July 10, 2015, the Second Amended Note was amended (the "Third Amended Note") to permit advances up to a maximum amount of $208,000,000. The Maturity Date was extended by more than three years to December 31, 2018. The Interest Rate remained at 0.95% per annum. The Third Amended Note states that Pulser holds a continuing first-priority security interest in Rdio's assets. Anthony Bay signed the Third Amended Note on behalf of both the borrower and lender. As of July 10, 2015, Pulser had advanced $176,196,410 to Rdio.

Pulser and Rdio did not appear to follow corporate formalities in connection with the loan documents or advances. They were unable to produce any board minutes or other documents evidencing that board approvals were obtained on either side of the transactions, despite requests to do so. The Committee understands based on information provided by the Debtor that the Pulser advances were used to fund operations.

**B.    The Iconical Note**

On October 19, 2015, Rdio issued a secured promissory note in favor of Iconical II, as a purchaser and collateral agent (the "Iconical Note") up to a maximum amount of $5 million. The Iconical Note was issued pursuant to, and concurrent with, a note purchase agreement ("Iconical Note Purchase Agreement") of the same date between Rdio and Iconical II, described below. The Iconical Note bears an interest rate of 12% per annum, and all interest and principal became due upon the earliest of: (i) any event of default; (ii) any merger, reorganization, or sale;

32

or (iii) November 25, 2015.  The Iconical Note Purchase Agreement is signed by Anthony Bay on behalf of Rdio, and by Murray Markiles on behalf of Iconical II.  Advances under the Iconical Note were subject to Iconical II's sole discretion.  In connection with the Iconical Note and Iconical Note Purchase Agreement, Rdio also entered into a security agreement, patent security agreement, and trademark security agreement.  Iconical II immediately filed a financing statement to perfect its security interests.

The Iconical Note Purchase Agreement recites that it was entered "solely to fund payroll obligations and general operating expenses" of Rdio.  The Iconical Note does not contain any financial covenants by Rdio.  Under the Note Purchase Agreement, Iconical II acted as collateral agent for itself and other potential lenders, who apparently never materialized.  On the same day that the Iconical Note was issued by Rdio, Iconical II delivered a letter to Pulser and Rdio, captioned, "Notice of Events of Default and Reservation of Rights."  Iconical II advised that, subject to its reservation of rights, it would, and did, continue to advance money under the Iconical Note.  Documents produced informally by the lenders indicate that, as of the Petition Date, Iconical II advanced $4,335,860.30 to Rdio under the Iconical Note.

On October 19, 2015, Pulser guaranteed Rdio's obligations under the Iconical Note in favor of Iconical II.  On the same day, Iconical II and Pulser entered an intercreditor agreement ("Intercreditor Agreement") pursuant to which Pulser's security interest in Rdio's assets  under the Third Amended Note were subordinated to Iconical II's security interest.

On October 19, 2015, Rdio, as borrower, and Pulser, as lender, agreed to Amendment No. 1 to Third Amended and Restated Secured Promissory Note ("Amendment No. 1 to Pulser Note"), which generally amended and restated the terms of default to include cross default provisions, and made the Intercreditor Agreement between Pulser and Iconical II controlling notwithstanding other terms of the Third Amended Note.

Case: 15-31430   Doc# 388   Filed: 08/10/16   Entered: 08/10/16 14:58:13   Page 36 of 97

Based on the post-petition maturity dates of the Third Amended Note and the Iconical Note, as well as available documents from Rdio, Pulser and Iconical II, the Committee believes that no principal or interest was paid to either Pulser or Iconical II.

**C.    Rdio's Financial Condition and the Sale Process**

Based on the Committee's investigation, it appears that the advances by Pulser and Iconical II made under the Pulser Note, as amended, and the Iconical Note (collectively, the "Notes") were the only form of financing available to the Debtor and that Rdio was unable to repay the Notes from its operating cash flow.

According to Elliott Peters' declaration in support of the first-day motions ("Peters' Decl."), in the fall of 2014, Pulser hired an investment bank (Moelis) to raise new equity capital. When it became clear that they could not raise new equity, Moelis was directed to find a substantial outside investor, buyer, or merger partner.  The Committee believes that the sale process commenced in earnest in March or April, 2015.  Moelis conducted a "broad marketing process" and identified Pandora as a potential purchaser. Rdio's assets were ultimately acquired by Pandora in an asset sale pursuant to section 363 of the Bankruptcy Code. The July 8, 2015 LOI from Pandora to Pulser shows that Pandora initially intended to acquire Rdio as a going concern, free of debt, through a stock acquisition at a price of $100 million in Pandora common stock.  Subsequent LOI's continued to provide for the same overall purchase price ($100 million) and the same overall structure until Pandora changed its proposal to an asset sale in the September 29, 2015 Executed Non-Binding LOI, which was signed by the parties. That Executed Non-Binding LOI permitted Pandora, upon its election, to conduct the asset sale under section 363 of the Bankruptcy Code but the Debtor contends the parties continued to explore other transaction structures outside of bankruptcy until a short time prior to the signing of their APA. Only shortly prior to signing the APA, the transaction price was reduced to $75 million in

Case: 15-31430   Doc# 388   Filed: 08/10/16   Entered: 08/10/16 14:58:13   Page 37 of 97

cash and was determined to be a purchase of only specified assets and liabilities under section 363 of the Bankruptcy Code. Between December 2012 and June 2015, the monthly accounts payable only exceeded $7 million twice, and were typically between $4-6 million. During the sale process, Rdio's monthly accounts payable spiked. They went from $8.4 million in July 2015 to $13.4 million in October 2015 and to $17.6 million in November.

**D.**     **The Relationship Between Pulser, Iconical II, and the Debtor**

Pulser owns seventy-nine percent of the equity of Rdio and is its controlling shareholder. According to the Peters' Decl., an affiliate of Iconical II -- Iconical Investments LP is the majority shareholder of Pulser although the documents show it as owning only 47.4% of Pulser's equity. We understand that Iconical II, Iconical Investments LP, and their affiliates (the "Iconical Entities") are investment funds associated with Janus Friis (the co-creator of Skype) and are primarily managed by the following directors: Mark Dyne, Janus Friis, and Murray Markiles. According to the Peters' Decl., Pulser and Rdio have been primarily funded by companies associated with Mr. Friis. Anthony Bay, Andrew Larner, Janus Friis, and Mark Dyne all were board members of Rdio and Pulser at the time the advances were made under the Notes. Janus Friis and Mark Dyne resigned from Rdio's board and Pulser's board shortly prior to the Petition Date.

Rdio and Pulser shared the same mailing address, which was the physical office space occupied by Rdio. Anthony Bay served as CEO and President of Pulser and Rdio from November 18, 2013 and currently serves in that capacity for Rdio. He resigned as CEO and President of Pulser on November 2, 2015. Maikao Grare is the current secretary of Rdio and served as the secretary of Pulser from May 10, 2013 through November 2, 2015. Andrew Larner served as CEO of Rdio until November 2013. He signed the Pulser Note and First Amended Note in his dual capacities as CEO of Rdio and Pulser. Peters served as general

Case: 15-31430    Doc# 388    Filed: 08/10/16    Entered: 08/10/16 14:58:13    Page 38 of 97

counsel for Rdio. The Committee understands that individuals who held dual positions at Rdio and Pulser used an Rdio email address.

## IV. EQUITABLE RECHARACTERIZATION

The recharacterization of debt to equity is a legal concept rooted primarily in tax law. *See, e.g., A.R. Lantz Co. v. United States,* 424 F.2d 1330, 1331 (9th Cir. 1970) ("This action deals with the oft-litigated tax issue of whether certain advances made to a corporation created debt, or constituted capital contributions."). No provision of the Bankruptcy Code expressly authorizes the recharacterization of debt to equity. Most circuits that have addressed this issue, however, have held that a bankruptcy court may properly order the recharacterization of debt to equity under the broad authority afforded by section 105(a) of the Bankruptcy Code.[1] These courts have held that recharacterization is well within the broad powers afforded a bankruptcy court by section 105(a). The Bankruptcy Code establishes a system in which contributions to capital receive a lower priority than loans because the essential nature of a capital interest is a fund contributed to meet the obligations of a business and which is to be repaid only after all other obligations have been satisfied. *Fairchild Dornier GMBH v. Official Comm. (In re Dornier Aviation, Inc.),* 453 F.3d 225 (4th Cir.2006) (citing *Cohen v. KB Mezzanine (In re SubMicron Sys. Corp.),* 432 F.3d 448 (3d Cir. 2006)); *see also Redmond v. Jenkins (In re Alternate Fuels, Inc.)*, 789 F.3d 1139, 1148 (10th Cir. 2015).

These courts apply a multi-factor test that is similar to the eleven-factor recharacterization test enunciated by the Sixth Circuit in *Bayer Corp. v. MascoTech Inc. (In re*

---

1 The [bankruptcy] court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte,* taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." 11 U.S.C. § 105(a).

36

*AutoStyle Plastics, Inc.),* 269 F.3d 726 (6th Cir.2001). Under *AutoStyle,* bankruptcy courts look to the following eleven factors to determine whether recharacterization is warranted:

1.  the names given to the instruments, if any, evidencing the indebtedness;

2.  the presence or absence of a fixed maturity date and schedule of payments;

3.  the presence or absence of a fixed rate of interest and interest payments;

4.  the source of repayments;

5.  the adequacy or inadequacy of capitalization;

6.  the identity of interest between the creditor and the stockholder;

7.  the security, if any, for the advances;

8.  the corporation's ability to obtain financing from outside lending institutions;

9.  the extent to which the advances were subordinated to the claims of outside creditors;

10. the extent to which the advances were used to acquire capital assets; and

11. the presence or absence of a sinking fund to provide repayments.

269 F.3d at 749-50.

The factors are slightly modified by some courts, which may also consider whether voting rights are granted with the transaction and whether corporate formalities such as board meetings and minutes support the approval of the loan agreements, as well as other relevant considerations. *See, e.g., Friedman's Liquidating Trust v. Goldman Sachs Credit Partners, L.P. (In re Friedman's Inc.)*, 452 B.R. 512, 520 (Bankr. D. Del. 2011); *Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.)*, 473 B.R. 525,581 (Bankr. D. Del. 2012). No one factor is controlling or decisive. The factors must be considered within the particular circumstances of each case. *AutoStyle,* 269 F.3d at 750.

Case: 15-31430    Doc# 388    Filed: 08/10/16    Entered: 08/10/16 14:58:13    Page 40 of 97

While the Ninth Circuit has held that a court has the authority to recharacterize claims in a bankruptcy proceeding, it has flatly rejected reliance on section 105(a) as a source of authority to do so.  Instead, it has held that a request to recharacterize a claim is construed as a request to disallow the claim under section 502(b)(1) of the Bankruptcy Code applying state law to "determine whether that obligation gives the holder of the obligation a 'right to payment' under state law." *Official Comm. v. Hancock Park Capital II (In re Fitness Holdings Int'l),* 714 F.3d 1141, 1148–49 (9th Cir.2013); *see also Grossman v. Lothian (In re Lothian Oil, Inc.),* 650 F.3d 539, 542–44 (5th Cir.2011).

Therefore, federal courts within the Ninth Circuit are not bound to apply the eleven-factor *AutoStyle* test.  Moreover, because California courts have not yet articulated a test under state law, it is not clear what the proper test is.[2]   Other state courts have imported a similar multi-factor test from federal tax law.  *Arch Petroleum, Inc. v. Sharp,* 958 S.W.2d 475, 477 n.3 (Tex. Ct. App. 1997) ("For an oft-cited discussion of the distinction between debt and equity, including a list of sixteen distinguishing factors, *see Fin Hay Realty Co. v. United States,* 398 F.2d 694, 696 (3d Cir.1968).").  The *AutoStyle* factors were derived from a tax case, *Roth Steel Tube Co. v. Comm'r of Internal Revenue,* 800 F.2d 625, 630 (6th Cir.1986).  *AutoStyle*, 269 F.3d at 748.  In the tax context, the Ninth Circuit has also identified an eleven-factor test very similar to the *AutoStyle* factors.  *Hardman v. United States*, 827 F.2d 1409, 1411 (9th Cir. 1987).[3]

---

[2]  Prior to the *Fitness Holdings* decision, the Central District of California applied the *AutoStyle* factors, using its purported authority under section 105(a) in declining to recharacterize. *Daewoo Motor Am. Inc. v. Daewoo Motor Co. (In re Daewoo Motor Am., Inc.)*, 471 B.R. 721, 733-34 (C.D. Cal. 2012), *aff'd*, 554 F. App'x 638 (9th Cir. 2014).

[3]  These factors are:  (1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a maturity date; (3) the source of the payments; (4) the right to enforce

38

The most recent Circuit level authority on recharacterization is *Redmond v. Jenkins (In re Alternate Fuels, Inc.),* 789 F.3d 1139 (10th Cir. 2015). It is notable as an example of how difficult it is for a plaintiff to succeed in recharacterization litigation even where the factors appear to justify it. The Bankruptcy Court and BAP had both found that the debt at issue should be recharacterized and the Tenth Circuit reversed. In a 2 to 1 split decision, the Tenth Circuit ultimately determined that neither equitable subordination, which it deemed "an extraordinary remedy to be employed by courts sparingly," nor recharacterization, after application of its own 13-factor test, were appropriate. As a policy consideration, the court refused to overemphasize the undercapitalization and financial condition of the debtor company because it would discourage lenders, including insider/ owners, to provide rescue financing in similar situations. The court also pointed out that the promissory notes in question were not found to be invalid or unenforceable under applicable state law and that sufficient consideration was exchanged under state law.

The Committee believes that the outcome of litigation to recharacterize the Pulser advances from debt to equity is extremely uncertain based on the foregoing.

## V. <u>EQUITABLE SUBORDINATION</u>

The Ninth Circuit has adopted the widely applied three-factor test for equitable subordination under section 510 (c) of the Bankruptcy Code:

    (i)      the subordinated creditor must have engaged in inequitable misconduct;

---

payment of principal and interest; (5) participation and management; (6) a status equal to or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) payment of interest only out of "dividend" money; (11) the ability of the corporation to obtain loans from outside lending institutions. *Hardman v. United States*, 827 F.2d 1409, 1411-12 (9th Cir. 1987).

39

(ii)     the inequitable conduct must have resulted in injury to other creditors or conferred an unfair advantage on the creditor to be subordinated; and

(iii)     equitable subordination of the claim must not be inconsistent with the other provisions of the bankruptcy laws.

*Henry v. Lehman Commercial Paper, Inc. (In re First Alliance Mortgage Co.)*, 471 F.3d 977, 1006 (9th Cir. 2006).

The objecting party has the initial burden of coming forward with material evidence to overcome the prima facie validity accorded to proofs of claim. The burden shifts to the claimant to demonstrate the fairness of its conduct. The burden on the claimant is not only to prove the good faith of the parties to the transaction, but also to show the inherent fairness from the point of view of the debtor corporation and those with interests therein. *United States v. State St. Bank & Trust Co.*, 520 B.R. at 80.

For non-insider claimants, egregious conduct must be established to justify equitable subordination. *See Friedman v. Sheila Plotsky Brokers, Inc. (In re Friedman),* 126 B.R. 63, 71 (BAP 9th Cir. 1991) (finding that for non-insider claimants, the objecting party must prove that the claimant is guilty of gross misconduct tantamount to fraud, overreaching, or spoliation to the detriment of others). However, the standard is lower for insiders. "'Courts have generally recognized three categories of misconduct that may constitute inequitable conduct for insiders: (1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's use of the debtor as a mere instrumentality or alter ego.'" *United States v. State St. Bank & Trust Co.*, 520 B.R. at 82 (quoting *In re Mid-American Waste Systems*, 284 B.R. 53, 70 (Bankr. D. Del (2002)). Undercapitalization of the debtor alone will not justify equitable subordination. *Wood v. Richmond (In re Branding Iron Steak House)*, 536 F.2d 299, 302 (9th Cir 1976)

("subordination requires some showing of suspicious, inequitable conduct beyond mere initial undercapitalization of the enterprise").

The Bankruptcy Code defines an "insider" of a corporate debtor as including (i) director of the debtor; (ii) officer of the debtor; (iii) person in control of the debtor; (iv) partnership in which the debtor is a general partner; (v) general partner of the debtor; or (vi) relative of a general partner, director, officer, or person in control of the debtor. 11 U.S.C. § 101(31)(B). Thus, Pulser is a statutory insider by virtue of its controlling equity interest and the fact that all four of Rdio board members also served on Pulser's board.

The making of a secured loan by a controlling shareholder clearly does not constitute inequitable conduct standing alone. *Sinclair v. Burr* (*In re Mid-Town Produce Terminal*), 599 F.2d 389, 392 (10th Cir. 1979) ("We are unwilling to find a dominant shareholder may not loan money to a corporation in which he is the principal owner and himself become a secured creditor. To hold the debt may be subordinated on that basis alone would discourage owners from trying to salvage a business, and require all contributions to be made in the form of equity capital. We do not think that is desirable as social policy, nor required by the cases."). However, where the lien is granted for the purpose of improperly gaining an advantage over other creditors, courts have held that may be inequitable, depending on the other facts and circumstances surrounding the extension of the secured debt. *Fabricators, Inc. v. Technical Fabricators, Inc. (In re Fabricators),* 926 F.2d 1458, 1467 (5th Cir.1991) (finding the insider claimant's secured loan was not an isolated act, but was one step interconnected with a series of actions to gain an advantage over the position of other creditors); s*ee In re EMB Assoc.,* 92 B.R. 9, 17 (Bankr. D.R.I. 1988) (finding insider committed egregious conduct by demanding liens on the debtor's property while allowing past and future creditors to continue investing money in

Case: 15-31430  Doc# 388  Filed: 08/10/16  Entered: 08/10/16 14:58:13  Page 44 of 97

the insolvent debtor); *State St. Bank & Trust Co.*, 520 B.R. at 84 (equitably subordinating insider claims where unsecured debt was subsequently converted to secured debt).

## A.    Limits on the Scope of the Remedy

Equitable subordination is remedial, not penal, and is applied only to the extent necessary to offset the specific harm caused by the inequitable conduct.  *Stoombus v Kilimnik*, 988 F.2d 949, 960 (9th Cir. 1993) (court should have looked at harm to each of the relevant creditors to determine whether insider's claim should be subordinated to their claims and, if so, to what extent).  Courts will subordinate a claim "only to the claims of creditors whom the inequitable conduct has disadvantaged." *Unsecured Cred. Comm v. Banque Paribas* (*In re Heartland Chems., Inc.*), 136 B.R. 503 (Bankr. C.D. Ill. 1992) (actual harm suffered by debtor's trade creditors could only be measured by amount of inventory actually shipped by trade creditors in reliance on secured creditor's purported misrepresentations); *Enron Corp. v. Avenue Special Sit. Fund (In re Enron Corp.)*, 333 B.R. 205 (Bankr. S.D. N.Y. 2005) (court may subordinate a claim only to the extent necessary to offset the harm suffered by the debtor and its creditors on account of that harmful conduct); *Cosoff v. Rodman (In re W.T. Grant Co.*, 699 F.2d 599 (2d Cir. 1983) (court must consider less drastic alternatives).

The Committee has not discovered facts showing that Iconical II engaged in inequitable conduct with respect to Rdio's creditors and does not believe it will prevail on a claim to equitably subordinate the debt owed to Iconical II.  The equitable subordination claims against Pulser are stronger but subject to much uncertainty with respect to the extent to which unsecured creditors were harmed by Pulser's conduct.

## B.    Claims against the Debtor's Officers and Directors

Any claims the Debtor may have against its officers and directors based on their roles in serving both Pulser and the Debtor would be based under breaches of their fiduciary duties of

42

care and loyalty under Delaware law. The Committee believes the claims are subject to the same uncertainties as the equitable subordination claims.

**C.**    **Preferences**

The fact that Pulser's advances under the First Amended Note exceeded the maximum face amount of the note, *may* have resulted in a preferential transfer that was not entirely offset by new value when those advances were incorporated into the Second Amended Note and additional security was granted. To a large extent, this analysis depends on collateral values in December 2014.

However, regardless of the collateral values in December 2014, the Secured Creditor Settlement is in the best interests of the general unsecured creditors for three reasons. First, the preference analysis is irrelevant if the debt is recharacterized; it only matters if Pulser prevails on the recharacterization claim. Second, any preference received by Pulser would be largely, if not entirely, offset by subsequent advances. Third, Pulser would share in any preference recovery and would likely receive most of it based on its very substantial deficiency claim.

**D.**    **Conclusion**

All of the foregoing claims as well as any other claims are released under the Secured Creditor Settlement and the terms of the Plan. Litigation of the foregoing claims is highly speculative and fact intensive. Moreover, the Committee expects Pulser and Iconical II to vigorously defend the litigation, ensuring that it will be protracted and expensive. While it is possible the Committee may ultimately – after years of litigation and appeals – succeed on certain of the foregoing claims, and although a fee agreement was not executed, the Committee had determined that a well-regarded law firm was willing to prosecute the Challenge Claim on a contingency fee basis and advance costs, there is significant risk that it will not result in a better recovery for unsecured creditors than the Secured Creditor Settlement because for this to occur

43

the Committee would need to be successful in recharacterizing or subordinating nearly $150 million of Pulser's secured claim to have any meaningful impact on recoveries to general unsecured creditors.

Accordingly, the Committee believes that the Secured Creditor Settlement embodied in the Plan will provide an immediate and substantial distribution to general unsecured creditors, resolve complex and potentially cost prohibitive litigation, and is ultimately in the best interests of general unsecured creditors.

The Debtor and the Prepetition Secured Creditors believe that the Committee would be unsuccessful in the pursuit of any "Challenge" lawsuit. The Debtor and the Prepetition Secured Creditors further believe that even if the Committee was able to prevail in any aspect of any "Challenge" lawsuit, general unsecured creditors would not receive any distribution from this estate until 2017 at the earliest. The Debtor and the Prepetition Secured Creditors further believe that the only way that general unsecured creditors would have any chance of obtaining a higher recovery as a result of the Committee pursuing a "Challenge" lawsuit is if the Committee wins the lawsuit and is successful in recharacterizing the entirety of Pulser's $184 million secured claim as equity or equitably subordinating the entirety of Pulser's $184 million secured claim – both of which the Debtor and the Prepetition Secured Creditors believe would constitute extremely difficult and highly speculative litigation. Given the sheer magnitude of Pulser's $184 million secured claim, the Debtor and the Prepetition Secured Creditors believe that if the Committee was only successful in avoiding Pulser's liens but not recharacterizing or equitably subordinating Pulser's claims, then Pulser would be entitled to share pro rata in the Estate Funds which are distributed to general unsecured creditors in which case Pulser would receive the vast majority of the Estate Funds and the economic result for general unsecured creditors would be worse than what is being offered under the Plan.

Case: 15-31430   Doc# 388   Filed: 08/10/16   Entered: 08/10/16 14:58:13   Page 47 of 97

## **Sony's and Orchard's Objection to the Plan, Sony's Lawsuit and Mediation**

The Sony Parties filed a motion to convert the Debtor's chapter 11 case to chapter 7, which will be considered by the Court in the event the Plan is not confirmed. Sony contends in its conversion motion that if a chapter 7 trustee is appointed, the chapter 7 trustee would be able to pursue the Challenge Claims with contingency counsel to achieve in Sony's view a potentially higher return to creditors than what was proposed by the Debtor in prior versions of the Plan. The Debtor, the Prepetition Secured Creditors, and the Committee believe that the right to pursue the Challenge Claims has expired with respect to all parties other than the Committee and that a chapter 7 trustee would not have the right to pursuant any Challenge Claims. Subject to the execution of a settlement agreement, immediately following the confirmation of the Plan, the Sony Parties will withdraw their conversion motion.

On April 4, 2016, Sony filed an action in the United States District Court for the Southern District of New York asserting fraudulent inducement and unjust enrichment claims against Anthony Bay, Elliott Peters, and Jim Rondinelli, the Debtor's current CEO, the Debtor's General Counsel and the Debtor's Senior Vice President and Head of Licensing and Catalog, respectively. *Sony Music Entertainment vs. Anthony Bay et al.*, Index No. 16 Civ. 02505 (RJS) (S.D.N.Y.) (the "New York Action"). The complaint alleges that each of the Debtor's executives induced Sony to extend its content agreement and defer substantial payments totaling more than $5.5 million, even though Sony contends that each of the executives knew that the Debtor had no intention of performing under the agreement, that the Debtor would be filing for bankruptcy protection and ceasing operations, and that the Debtor would be selling substantially all of its assets to Pandora. The Debtor believes that the Sony lawsuit has absolutely no merit. The Debtor believes that if the Sony lawsuit is not dismissed or settled and proceeds to trial, the Debtor's executives will prevail. The Debtor believes that Sony's lawsuit, and any other

45

lawsuit brought against any of the Debtor's officers and/or directors, could result in the allowance of indemnity claims brought against the Debtor ("Indemnity Claims"). As explained below, subject to the confirmation of the Plan, the holders of any such Indemnity Claims will not be permitted to receive any distributions from the Unsecured Creditors Fund on account of any such Indemnity Claims.

The Debtor, the Committee and the Sony Parties agreed to participate in a voluntary mediation in an effort to resolve the objection of the Sony Parties to the Debtor's prior plan of reorganization to attempt to reach an agreement on the terms of a fully consensual plan of reorganization and resolve the New York Action. The parties participated in a full-day of mediation on August 4, 2016 before retired bankruptcy judge Allan Gropper. The parties continued with their own settlement discussions following the conclusion of the mediation. As a result, and subject to written documentation, the parties were able to reach an agreement on the terms of a fully consensual plan of reorganization, the terms of which are contained in the Plan and are explained in this Disclosure Statement as well as resolve all other disputes between the parties, including the New York Action.

Pursuant to the settlement, Pulser will purchase all of the Sony Parties Claims on the Effective Date, the Sony Parties will dismiss the New York Action with prejudice, the Debtor Releasing Parties will provide the releases to the Sony Parties described in Section VI.D.9 below, and the fees and expenses incurred by Judge Gropper related to the mediation will be shared equally by the Debtor, the Prepetition Secured Creditors and the Sony Parties as agreed by the parties in the stipulation filed as Docket No. 376). The Sony Parties will also exchange mutual releases with Pulser and Iconical II and their affiliates and with the defendants in the New York Action. The settlement agreement will contain other terms and conditions, including confidentiality, non-disparagement and other similar clauses. If there is any inconsistency

between the Plan and the written settlement agreement, the written settlement agreement will control.

The claims being settled are described more fully in prior filings with the Court. (See, e.g., Docket Nos. 305, 310, 327, 329, 341, 342, 350, 352, 361.) The Debtor and the Committee believe that this settlement easily satisfies the applicable legal standard set forth in section II.D above and is in the best interest of the Debtor, the Debtor's estate, and all parties in interest.

**Claims**

a. **Secured Claims**

The Debtor believes that it has two pre-petition secured creditors consisting of $184,000,000 owing to Pulser and approximately $4,500,000 to Iconical II. The Debtor believes that both secured claims are secured by a lien against all or substantially all of the Debtor's assets, with Iconical II's lien having priority over Pulser's lien. The full amount of the Iconical II post-petition loan was paid in full at the time of the Pandora sale closing.

b. **Administrative Claims**

The Debtor does not believe that it has any outstanding post-petition debt other than the outstanding fees and expenses of the professionals employed by the Debtor and the professionals employed by the Committee and an allowed administrative claim in the amount of $14,033.82 in favor of SoundExchange on account of post-petition royalties for the digital performance and reproduction of recordings (see Docket Numbers 330 and 331). Roku, Inc. ("Roku") has asserted an administrative claim in the amount of $785,398 for alleged post-petition sales of its remote control associated with its hardware devices that feature an Rdio button. The Debtor and the Committee are attempting to obtain additional information from Roku to determine the extent and validity of Roku's asserted claim and to determine whether any portion of Roku's claim is entitled to administrative claim status. Universal has informed

the Debtor that there may be amounts owed for post-petition services provided by Universal to the Debtor. Universal's agreements with the Debtor terminated by their own terms on November 30, 2015, and, at the request of the Debtor, Universal extended its agreements until December 23, 2015. Universal has received certain payments for the post-petition period but has not received a reconciliation of amounts due. The Debtor has agreed to work with Universal to determine whether there are any additional amounts due for the post-petition period. Regardless of how these matters are resolved, the Debtor has sufficient funds on hand to satisfy these foregoing alleged administrative claims.

### c. Pre-Petition Priority Wage Claims

A detailed explanation of the Debtor's outstanding pre-petition priority wage claims is set forth in Section III(C)(2) below.

### d. Pre-Petition Priority Tax Claims

A detailed explanation of the Debtor's outstanding pre-petition priority wage claims is set forth in Section III(B)(2) below.

### e. General Unsecured Claims

The Debtor believes that it owed as of the Petition Date a total of approximately $25,599,617 of non-priority general unsecured debt. This figure does not take into account any disputed, unliquidated or contingent unsecured debt, any claims asserted in filed proofs of claim, or any debt which may arise as a result of the Debtor's rejection of unexpired leases or executory contracts or breaches or terminations of license agreements. There would be a total of approximately $49,209,344 of non-priority general unsecured claims if every claim asserted in a timely filed proof of claim is allowed in the amount asserted. The Debtor has classified all general unsecured claims into one class – class 4. A chart detailing all of the Debtor's scheduled non-priority general unsecured debt as well as all non-priority general unsecured debt

48

asserted in timely filed proofs of claim, excluding the Pulser Unsecured Claim and excluding any claims of Universal, Warner or the Sony Parties, is attached as Exhibit "3" to this Disclosure Statement (the "Class 4 Claims Chart"). The Debtor is continuing with its review of the scheduled and filed general unsecured claims. The Class 4 Claims Chart also indicates all additional general unsecured claims which were asserted in timely filed proofs of claim. The Class 4 Claims Chart does not include any claims which were filed after the claims bar date. The Debtor is investigating those claims and will update the Class 4 Claims Chart and/or file objections to the late filed claims as appropriate.

## VI. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### A. What Creditors and Interest Holders Will Receive Under the Plan

As required by the Bankruptcy Code, the Plan classifies claims and interests in various classes according to their right to priority. The Plan states whether each class of claims or interests is impaired or unimpaired. The Plan sets out the treatment each class will receive.

### B. Unclassified Claims

Certain types of claims are not placed into voting classes; instead they are unclassified. They are not considered impaired and they do not vote on the Plan because they are automatically entitled to specific treatment provided for them in the Bankruptcy Code. As such, the Debtor has not placed the following claims in a class.

#### 1. Administrative Expenses

Administrative expenses are claims for costs or expenses of administering the Debtor's chapter 11 case which are allowed under Bankruptcy Code Section 507(a)(2). The Bankruptcy Code requires that all administrative claims be paid in full on the Effective Date unless a particular claimant agrees to a different treatment.

49

The following chart lists <u>all</u> of the Debtor's § 507(a)(2) administrative claims and their treatment under the Plan.[4]

| **Name** | **Amount Owed** | **Treatment** |
|---|---|---|
| Clerk's Office Fees | $0 | Paid in full on the Effective Date out of the Estate Funds |
| Office of the U.S. Trustee Fees | $0 | Paid in full on the Effective Date out of the Estate Funds |
| Levene, Neale, Bender, Yoo & Brill L.L.P. ("<u>LNBYB</u>"), bankruptcy counsel to the Debtor | $1,000,000.00 (est.), which would be in addition to the post-petition fees and expenses paid to LNBYB by the Debtor | Paid in full (or in such other amount as agreed among LNBYB, the Debtor, and the Prepetition Secured Creditors) out of the Estate Funds within the later of (i) five days following the Effective Date and (ii) five days following the date of entry of an order of the Court allowing such fees and expenses |
| Winston & Strawn LLP, special litigation counsel to the Debtor | The Debtor has paid a $100,000 post-petition retainer to WS. The balance of any fees earned by WS will be paid in the manner described in the Debtor's amended application to employ to WS (filed as docket number 305). The Debtor currently estimates this additional balance will be approximately $250,000. | Treatment will be as described in the Debtor's amended application to employ WS (filed as docket number 305). |
| Moelis & Company ("<u>Moelis</u>"), financial advisor to the Debtor | $0 (est.) as Moelis has already been paid the full amount of its allowed fees and expenses | N/A |
| Pachulski Stang Ziehl & Jones LLP ("<u>PSZJ</u>"), bankruptcy counsel to the Committee | $500,000.00 (est.), which would be in addition to the post-petition fees and expenses already paid to PSZJ by the Debtor and | Paid in full within the later of (i) five days following the Effective Date and (ii) five days following the date of |

---

[4] The Debtor intends to pay the $14,033.82 allowed administrative claim of SoundExchange prior to the Plan confirmation hearing. In any event, the $14,033.82 allowed administrative claim of SoundExchange will be paid within five days following the Effective Date.

50

| | | |
|---|---|---|
| | those agreed to be paid from Estate Funds | entry of an order of the Court allowing such fees and expenses out of the Unsecured Creditor Funds and the Estate Funds as explained below |
| FTI Consulting ("FTI"), financial advisor to the Committee | $150,000.00 (est.), which would be in addition to the post-petition fees and expenses already paid to FTI by the Debtor | Paid in full within the later of (i) five days following the Effective Date and (ii) five days following the date of entry of an order of the Court allowing such fees and expenses out of the Unsecured Creditor Funds and the Estate Funds as explained below |
| Post-Petition Non-Professional Fee Administrative Claims | $0 (est.) as the Debtor expects that all such administrative claims will have been paid in full prior to Plan confirmation | Paid in full (or in such other amount as agreed among the administrative claimant, the Debtor, and the Prepetition Secured Creditors) out of the Estate Funds within the later of (i) five days following the Effective Date or (ii) if the Debtor and other parties disagree about the amount owed, five days following the date of entry of an order of the Court allowing such administrative claim |
| **TOTAL** | $1,900,000.00 est. | Paid in the manner described above |

Court Approval of Professional Fees and Expenses Required and Source of Funding

Payment:

The Court must approve all professional fees and expenses listed in this chart before they may be paid. For all professional fees and expenses except fees owing to the Clerk of the Bankruptcy Court and fees owing to the UST, the professional in question must file and serve a properly noticed fee application and the Court must rule on the application. Only the amount of fees and expenses allowed by the Court (or such other amount as agreed among the Debtor, the Prepetition Secured Creditors, and the professional) will be required to be paid under the Plan.

51

The administrative claim amounts set forth above simply represent the Debtor's best estimate as to the amounts of allowed administrative claims in this case for the Debtor's professionals and the Committee's best estimate as to the amounts of allowed administrative claims in this case for the Committee's professionals. The actual administrative claims through the Effective Date may be higher or lower than the figures set forth above. Much of whether the actual administrative claims for professionals exceed the estimates set forth above will be dependent upon whether the Debtor and its counsel are required to engage in any substantial litigation regarding the confirmation of the Plan, or objecting to claims or any other matter. To the extent the Debtor and its counsel are required to engage in any such substantial litigation, LNBYB and any other professionals who will be employed by the Debtor are likely to incur professional fees and expenses in excess (and possibly substantially in excess) of the estimated figures set forth above. By voting to accept the Plan, creditors are not acknowledging the validity of, or consenting to the amount of, any of these administrative claims, and creditors are not waiving any of their rights to object to the allowance of any of these administrative claims. Similarly, professionals who have been employed in this case are not being deemed to have agreed that the figures set forth above represent any ceiling on the amount of fees and expenses that they have incurred or are entitled to seek to be paid pursuant to Court order as such fees and expenses are just estimates provided at the time of the preparation of the Plan.

At a hearing held on April 1, 2016, the Court awarded (i) LNBYB fees and expenses of $907,034.56 through February 29, 2016; (ii) PSZJ fees and expenses of $422,714.74 through January 31, 2016[5]; and (iii) FTI fees of $262,631 through February 29, 2016. Of the

---

[5] The order of the Court entered as Docket No. 220 provides that the approved fees and expenses of PSZJ were through February 29, 2016, when they are actually through January 31, 2016.

Case: 15-31430   Doc# 388   Filed: 08/10/16   Entered: 08/10/16 14:58:13   Page 55 of 97

$1,380,000 which the Debtor had deposited into a segregated account for the benefit of these professionals pursuant to previously agreed upon Court orders and budgets (the "Professional Fee Account"), the Court authorized payment of (i) $861,410.72 to LNBYB – leaving an unpaid balance of $45,623.84 through February 29, 2016; (ii) $269,168.62 to PSZJ – leaving an unpaid balance of $153,546.12 through January 31, 2016; and (iii) $249,420.66 to FTI – leaving an unpaid balance of $13,210.34 through February 29, 2016. These unpaid balances total $212,380.30. With the agreement of the Debtor, the Prepetition Secured Creditors and the Committee, this total unpaid balance of $212,380.30, which has already been allowed by the Court, will be paid out of the Estate Funds (inclusive of any funds which have been deposited into the Professional Fee Account after April 1, 2016). The unpaid balance of $153,546.12 owing to PSZJ and the unpaid balance of $13,210.34 owing to FTI described above are collectively referred to herein as the "Committee Professionals Unpaid Balances". All fees and expenses incurred by PSZJ from February 1, 2016 and FTI from March 1, 2016 through the Plan Effective Date, which are allowed by the Court, will be paid out of the Unsecured Creditors Fund. All fees and expenses incurred by LNBYB through the Plan Effective Date, which are allowed by the Court, will be paid out of the Estate Funds. Fees and expenses incurred by professionals after the Plan Effective Date will be paid in the manner set forth below in the section of this Disclosure Statement entitled "Means of Effectuating the Plan and Implementation of the Plan". The $100,000 post-petition retainer the Debtor paid to WS was paid out of the Estate Funds, and the expenses incurred by WS will be paid out of the Estate Funds. All further fees to be paid to WS will be paid out of the Estate Funds or out of the Unsecured Creditors Fund, computed in the manner described in the Debtor's amended application to employ WS (filed as docket number 305).

**2. Priority Tax Claims**

Priority tax claims include certain unsecured income, employment and other taxes described by Section 507(a)(8) of the Bankruptcy Code. Section 1129(a)(9)(C) of the Bankruptcy Code requires that each holder of such a Section 507(a)(8) priority tax claim receive regular installment payments of a total value, as of the Effective Date, equal to the allowed amount of such allowed tax claims, over a period ending not later than five years after the Petition Date. As set forth in the Debtor's bankruptcy schedules, the Debtor believes that it owed as of the Petition Date a total of approximately $130,326 to taxing agencies, which amounts are entitled to priority under 11 U.S.C. § 507(a)(8). A chart setting forth the identities of each of these taxing agencies and the amounts of their priority tax claims is set forth in exhibit "2" to this Disclosure Statement (the "Priority Tax Claims Chart").[6] The Debtor is continuing with its review of the scheduled and filed priority tax claims. The Debtor will file objections to any filed tax claims which the Debtor believes are not valid. The Priority Tax Claims Chart also indicates all additional priority tax claims which were asserted in timely filed proofs of claim. The Priority Tax Claims Chart also indicates all additional priority tax claims which were asserted in timely filed proofs of claim. The Debtor has included such filed tax claims in the Priority Tax Claims Chart for information purposes only. The Debtor is not agreeing to the allowance of any such filed tax claims, and the Debtor reserves all rights to file and prosecute objections to any such filed tax claims. The Debtor will pay allowed priority tax

---

[6] The Debtor believes that the scheduled priority claims of the San Francisco Tax Collector (in the total amount of $106,890.44), and the filed proof of claim (Claim No. 22-1) of the San Francisco Tax Collector (filed as a secured claim) have been satisfied. The Debtor is in the process of contacting the San Francisco Tax Collector in order to obtain confirmation that these claims have been satisfied. The Debtor will either enter into a stipulation with the San Francisco Tax Collector indicating that these claims have been satisfied, or the Debtor will amend its Schedules of Assets and Liabilities to reflect that no amounts are due to the San Francisco Tax Collector and the Debtor will object to the proof of claim filed by the San Francisco Tax Collector.

54

claims in full out of the Estate Funds on the Effective Date unless there is a dispute with any such priority tax claim. If there is a dispute, the Debtor will pay any such disputed priority tax claim within ten days following the date of entry of an order of the Court allowing such disputed priority tax claim, inclusive of interest accrued following the Effective Date at the statutory rate.

## C.     Classified Claims and Interests

### 1.     Classes of Secured Claims

Secured claims are claims secured by liens on property of the Debtor's estate. The following is a description of the Plan's treatment of the classes containing the Debtor's known secured claims:

<u>Class 1</u> - Class 1 is comprised of the pre-petition secured claim of Iconical II, which shall be deemed allowed in the amount of $4,220,833, plus all accrued interest, fees, and other amounts due and payable thereunder (with the final class 1 allowed claim estimated to be approximately $4,500,000). The class 1 claim is secured by a first priority lien against all or substantially all of the assets of the Debtor's estate. The class 1 claim is not impaired under the Plan and is therefore not entitled to vote on the Plan. The class 1 allowed claim will be paid in full in cash from the Estate Funds on the Effective Date.

<u>Class 2</u> - Class 2 is comprised of the pre-petition secured claim of Pulser. Pursuant to the Secured Creditor Settlement, the total claim of Pulser shall be deemed allowed in the amount of $184,000,000, which is inclusive of all accrued interest, fees, and other amounts due and payable thereunder through the Petition Date. The class 2 secured claim of Pulser is secured by a second priority lien (junior only to the lien of Iconical II) against all or substantially all of the assets of the Debtor's estate. Pulser's class 2 allowed claim will be equal to all remaining Estate Funds on the Effective Date after all required Plan payments have

been made plus all future recoveries by the Debtor or its bankruptcy estate from the Escrowed Funds.

The class 2 secured claim of Pulser is estimated to be in the amount of approximately $47,229,009 if Pulser is ultimately paid the full amount of the Escrowed Funds and there are no future recoveries from any causes of action.[7] The balance of Pulser's allowed claim, estimated to be in the amount of approximately $136,770,991 (the "Pulser Unsecured Claim"), will be included in class 4 as a class 4 allowed claim but, as part of the global resolution reached, will not receive any distribution from this estate on account of the Pulser Unsecured Claim. The class 2 claim is impaired under the Plan and is therefore entitled to vote on the Plan. On account of its class 2 secured claim, Pulser will receive all of the Estate Funds remaining on the Effective Date after all required Plan payments have been made plus all future recoveries by the Debtor or its bankruptcy estate from the Escrowed Funds.

In addition, in consideration of the Prepetition Secured Creditors permitting the Debtor to use cash collateral during the chapter 11 case and to use the remaining Estate Funds, which constitutes Pulser's collateral, to fund all payment obligations under the Plan (including, but not limited to the establishment and funding of the Unsecured Creditors Fund), on the Effective Date (i) the Debtor and the Debtor's bankruptcy estate will be permanently deemed to have released the "Lender Released Parties" (as defined in Exhibit "8" of this Disclosure Statement), which includes Pulser and all Pulser Affiliates, from any and all claims or causes of action that the Debtor or the Debtor's bankruptcy estate (or any representative of the Debtor's bankruptcy estate, including the Committee and any subsequently appointed trustee) may have against any of the Lender Released Parties, including Pulser or any of the Pulser Affiliates; (ii) the class 2

---

[7] Attached as Exhibit "6" to this Disclosure Statement is a computation setting forth the estimated amount of the class 2 secured claim of Pulser.

56

secured claim of Pulser and the liens which secure Pulser's class 2 claim shall be deemed permanently valid and allowed; (iii) the Debtor and the Debtor's bankruptcy estate will be permanently deemed to have released Iconical II and all Iconical Affiliates from any and all claims or causes of action that the Debtor or the Debtor's bankruptcy estate (or any representative of the Debtor's bankruptcy estate, including the Committee and any subsequently appointed trustee) may have against Iconical II or any of the Iconical Affiliates; and (iv) the class 1 claim of Iconical II and the liens which secure Iconical II's class 1 claim shall be deemed permanently valid and allowed.

### 2. Class of Priority Unsecured Claims

Certain priority claims that are referred to in Bankruptcy Code Sections 507(a)(3), (4), (5), (6), and (7) are required to be placed in classes. These types of claims are entitled to priority treatment as follows: the Bankruptcy Code requires that each holder of such a claim receive cash on the Effective Date equal to the allowed amount of such claim. However, a class of unsecured priority claim holders may vote to accept deferred cash payments of a value, as of the Effective Date, equal to the allowed amount of such claim. The Debtor paid all of the priority wage related claims of those employees who were still employed by the Debtor as of the Petition Date. As set forth in the Debtor's bankruptcy schedules, the Debtor believes that it owes a total of approximately $273,909 to former employees which amounts are entitled to priority under 11 U.S.C. § 507(a)(4). A chart setting forth the identities of each of these individuals and the amounts of their claims that the Debtor believes are entitled to priority is set forth in exhibit "1" to this Disclosure Statement (the "Priority Wage Claims Chart"). The claims bar date in this case was March 21, 2016. The Debtor is continuing with its review of the scheduled and filed priority wage related claims. The Debtor will file objections to any filed priority wage related claims which the Debtor believes are not valid. The Priority Wage Claims

57

Chart also indicates all additional priority wage claims which were asserted in timely filed proofs of claim. All allowed non-tax priority claims will be treated as class 3 claims under the Plan. The Debtor will pay all allowed non-tax priority claims in full out of the Estate Funds on the Effective Date unless there is a dispute with any such non-tax priority claim. If there is a dispute, the Debtor will pay any such disputed non-tax priority claim within ten days following the date of entry of an order of the Court allowing such disputed non-tax priority claim.

### 3. Class of General Unsecured Claims

General unsecured claims are pre-petition unsecured claims which are not entitled to priority under Bankruptcy Code Section 507(a). The following identifies the Plan's treatment of the class containing <u>all</u> of the Debtor's non-priority general unsecured claims:

<u>Class 4</u> - Class 4 is comprised of all non-priority general unsecured claims. The Class 4 Claims Chart attached as Exhibit "3" to this Disclosure Statement contains the details of all of the Debtor's scheduled class 4 claims as well as all class 4 claims asserted in timely filed proofs of claim, excluding the Pulser Unsecured Claim.[8] As set forth in the Class 4 Claims Chart, exclusive of the Pulser Unsecured Claim, the Debtor estimates a preliminary low case estimate of approximately $25,599,617 of class 4 claims (if no filed proofs of claim are allowed in amounts which are higher than scheduled by the Debtor), and the Debtor estimates a preliminary high case estimate of approximately $49,209,344 of class 4 claims (if every timely filed proof of claim is allowed in the amount which is higher than scheduled by the Debtor).[9] The Debtor is continuing with its review of the scheduled and filed class 4 claims and will update the Class 4 Claims Chart as appropriate. Including a claim in the Class 4 Claims Chart is not an acknowledgement by the Debtor of the validity of any class 4 claim. Except with

[8] The Class 4 Claims Chart may not include certain unliquidated claims.
[9] The claims bar date in this case was March 21, 2016 and has therefore passed.

58

respect to class 4 claims allowed pursuant to an order of the Court, the Debtor reserves all rights to object to any class 4 claim at any time, and the rights of all other parties in interest to object to any class 4 claim (other than the Pulser Unsecured Claim, the Sony Parties Claims, and the claims of Warner and Universal which are being settled under the Plan) at any time are strictly preserved. Class 4 claims are impaired under the Plan and are therefore entitled to vote on the Plan.

**Treatment**:

As explained in more detail below, the Sony Parties have asserted total general unsecured claims of $17,002,410 (the "Sony Parties Claims"). Pulser and the Sony Parties have reached an agreement under which Pulser will purchase all of the Sony Parties Claims on the Effective Date. Under the Plan, each holder of a class 4 allowed claim other than Warner, Universal and the Sony Parties ("Non-Label Class 4 Allowed Claims") and other than Pulser will receive a payment from the Unsecured Creditors Fund equal to its pro rata share of the Unsecured Creditors Fund remaining after payment of the Committee Professional Fees and the liquidated settlement payments (discussed immediately below) are paid to Warner and to Universal.

The form of ballot for class 4 claim holders to use is attached as Exhibit "9" to this Disclosure Statement.

Universal Settlement. The Debtor scheduled UMG Recordings, Inc., Universal Music Canada, Inc., and Universal International Music B.V. (collectively, "Universal") as having a royalty claim in the amount of $219,267.65 and a contract claim of $590,724.06 for a total claim of $809,991.71. Universal filed three proofs of claim asserting a claim in the amount of $482,496.68 for Universal International Music B.V., a claim in the amount of $629,374.16 for UMG Recordings, Inc., and a claim in the amount of $189,305 for Universal Music Canada,

Inc. (for total claims of $1,301,175.84). The Debtor scheduled Universal Music Group Distribution as having a claim in the amount of $590,724.06. That specific Universal entity did not file any proof of claim, but the Debtor assumes that this claim is subsumed in the three claims filed by Universal. The Debtor and Universal have reached a settlement agreement, which is supported by the Committee, under which Universal will be paid $125,000.00 from the Unsecured Creditors Fund on the Effective Date in full settlement of Universal's general unsecured claims. There will be mutual releases, discovery waivers, and related provisions. The Debtor's settlement with Universal will be the subject of a written settlement agreement (the "Universal Settlement Agreement") that will be part of a separately filed settlement motion with the Court. The Debtor intends to have the Universal Settlement Agreement approved as soon as possible, and anticipates that a hearing to approve the Universal Settlement Agreement will be held in advance of the Plan confirmation hearing. In the event of any inconsistency between the terms of the Plan and the terms of the Universal Settlement Agreement which is approved by the Court, the terms of the Universal Settlement Agreement shall govern and control, and, if there is an inconsistency, nothing in the Plan shall modify or be deemed to modify the provisions of the Universal Settlement Agreement. The class 4 claims of Universal are impaired under the Plan and are therefore entitled to vote on the Plan. The Debtor believes that the treatment of the class 4 claims of Universal is less favorable than the treatment being afforded to holders of Non-Label Class 4 Allowed Claims. By receiving $125,000 in full settlement and satisfaction of its class 4 claims, Universal is (i) receiving a payment equal to approximately 9.6% of its asserted general unsecured claims and (ii) providing third party releases.

Warner Settlement. The Debtor scheduled Warner Music Inc., WEA International Inc., and Warner Music Brasil Ltda. (collectively, "Warner") as having a royalty claim in the amount

Case: 15-31430   Doc# 388   Filed: 08/10/16   Entered: 08/10/16 14:58:13   Page 63 of 97

of $137,500 and a contract claim of $432,909.22 for a total claim of $570,409.22. Warner has filed a proof of claim asserting a claim in the amount of $619,796.62. The Debtor and Warner have reached a settlement agreement, which is supported by the Committee, under which Warner will be paid $100,000.00 from the Unsecured Creditors Fund on the Effective Date in full settlement of Warner's general unsecured claims. There will be mutual releases, discovery waivers, and related provisions. The Debtor's settlement with Warner will be the subject of a written settlement agreement (the "Warner Settlement Agreement") that will be part of a separately filed settlement motion with the Court. The Debtor intends to have the Warner Settlement Agreement approved as soon as possible, and anticipates that a hearing to approve the Warner Settlement Agreement will be held in advance of the Plan confirmation hearing. In the event of any inconsistency between the terms of the Plan and the terms of the Warner Settlement Agreement which is approved by the Court, the terms of the Warner Settlement Agreement shall govern and control, and, if there is an inconsistency, nothing in the Plan shall modify or be deemed to modify the provisions of the Warner Settlement Agreement. The class 4 claims of Warner are impaired under the Plan and are therefore entitled to vote on the Plan. The Debtor believes that the treatment of the class 4 claims of Warner is less favorable than the treatment being afforded to holders of Non-Label Class 4 Allowed Claims. By receiving $100,000 in full settlement and satisfaction of its class 4 claims, Warner is (i) receiving a payment equal to approximately 16.1% of its asserted general unsecured claims and (ii) providing third party releases.

The Claims of the Sony Parties. The Debtor scheduled Sony Music as having a royalty claim in the amount of $147,403.76 and a contract claim of $2,599,232.82 for a total claim of $2,746,636.58. The Debtor scheduled Orchard as having a claim of $493,945.89. Sony filed a proof of claim asserting a general unsecured claim in the amount of $12,419,314.00, and

Case: 15-31430   Doc# 388   Filed: 08/10/16   Entered: 08/10/16 14:58:13   Page 64 of 97

Orchard filed a proof of claim asserting a general unsecured claim in the amount of $4,583,096.96, for a total combined general unsecured claim of $17,002,410. As explained above, subject to execution of a settlement agreement, Pulser and the Sony Parties have reached an agreement under which Pulser will purchase all of the Sony Parties Claims on the Effective Date. There will also be mutual releases, discovery waivers, and related provisions in the settlement agreement. In the event of any inconsistency between the terms of the Plan, this Disclosure Statement and the terms of the settlement agreement with the Sony Parties, the terms of the settlement agreement shall govern and control, and, if there is an inconsistency, nothing in the Plan or this Disclosure Statement shall modify or be deemed to modify the provisions of the settlement agreement. Pulser agrees not to be paid any money from the Unsecured Creditors Fund on account of the Sony Parties Claims that Pulser will have purchased.

Assuming the Committee Professional Fees total $500,000, and after payment of the various settlement amounts to Universal and Warner, a balance of $5,000,000 will remain in the Unsecured Creditors Fund for distribution to all holders of Non-Label Class 4 Allowed Claims. As reflected in the Class 4 Claims Chart, the Debtor currently estimates that there will be a total of approximately $20,943,643-$29,513,783 of Non-Label Class 4 Allowed Claims. If the final amount of Non-Label Class 4 Allowed Claims is the mid-point between the amounts scheduled by the Debtor and the amounts asserted by creditors in their filed proofs of claim, the final amount of Non-Label Class 4 Allowed Claims will be $25,228,713. If that occurs, then based upon the assumptions above, the Debtor estimates that the ultimate distribution to holders of Non-Label Class 4 Allowed Claims will be approximately 19.8% of the amounts of their Non-Label Class 4 Allowed Claims. If, on the other hand, the Non-Label Class 4 Claims are allowed as filed in the Court's claims register, then based upon the assumptions above, the Debtor

Case: 15-31430   Doc# 388   Filed: 08/10/16   Entered: 08/10/16 14:58:13   Page 65 of 97

estimates that the ultimate distribution to holders of Non-Label Class 4 Allowed Claims will be approximately 16.94%.

All of the foregoing percentage recoveries are simply estimates by the Debtor based upon the information known to the Debtor today and taking into account the various assumptions set forth above. These are not guaranteed percentage recoveries for holders of Non-Label Class 4 Allowed Claims. A change in any of the foregoing variables or assumptions would alter the final distribution percentage paid to holders of Non-Label Class 4 Allowed Claims.

**Additional Recovery from Causes of Action**

In addition to the recoveries described above, each holder of a non-label class 4 allowed claim will receive its pro rata distribution of any net recovery by the estate from the pursuit of any causes of action other than avoidance causes of action. The Debtor is not currently aware of the existence of any such causes of action.

The distribution to holders of Non-Label Class 4 Allowed Claims will be made within the later of (i) thirty days following the Effective Date; and (ii) thirty days after the final disputed class 4 claim is resolved by final order (or as soon as reasonably practicable thereafter). The Creditors Trustee reserves the right to seek an order of the Court, after notice and a hearing, authorizing the Creditors Trustee to make one or more interim distributions to holders of Non-Label Class 4 Allowed Claims. As part of any such request by the Creditors Trustee to make such an interim distribution, the Creditors Trustee will seek an order of the Court, after notice and a hearing, providing for the Creditors Trustee to maintain a sufficient reserve to enable the Creditors Trustee to make a pro rata payment to holders of then disputed class 4 claims in the event such disputed class 4 claims become Non-Label Class 4 Allowed Claims.

63

**THE DEBTOR URGES EACH CLASS 4 CLAIM HOLDER TO READ THE LETTER FROM THE COMMITTEE ATTACHED AS EXHIBIT "7" TO THIS DISCLOSURE STATEMENT. AN ADDITIONAL COPY OF THE COMMITTEE LETTER HAS BEEN PROVIDED TO YOU AS A STAND ALONE LETTER IN BLUE COLOR IN THE PLAN SOLICITATION PACKAGE THAT HAS BEEN SENT TO EACH CLASS 4 CLAIM HOLDER.**

**4.      Class of Interest Holders**

Interest holders are the parties who hold an ownership interest (i.e., equity interest) in the Debtor. The following identifies the Plan's treatment of the class of interest holders:

<u>Class 5</u> - Class 5 is comprised of all equity interests in the Debtor. While class 5 interests are impaired under the Plan, holders of class 5 interests are not entitled to vote on the Plan as they are deemed not to have accepted the Plan under 11 U.S.C. §1126(g). Class 5 interest holders will not receive any of the Estate Funds or any other distribution from this estate on account of their class 5 equity interests.

**D.      Means of Effectuating the Plan and Implementation of the Plan**

**1.      Funding for the Plan**

The Plan will be funded from the Estate Funds in the manner described herein and from any recoveries obtained by the Debtor's estate, including from any return of the Escrowed Funds, and from the pursuit of any other causes of action other than avoidance causes of action. Specifically, on the Effective Date, the Debtor shall transfer the sum of $5,500,000 (the "<u>Unsecured Creditors Fund</u>") to the "<u>Creditors Trust</u>" (defined below) for the purposes of funding the Committee Professional Fees and all distributions to be made to holders of Non-Label Class 4 Allowed Claims in accordance with the terms of the Plan  This is the sum remaining from the $5,725,000 being provided for the benefit of holders of Non-Label Class 4

64

Allowed Claims after deducting the settlement payments to be made to Universal and to Warner.

**2.      Post-Effective Date Management of the Reorganized Debtor and Employment of Professionals By the Reorganized Debtor**

The Debtor currently anticipates that the post-Effective Date management of the Reorganized Debtor will be comprised of all or a portion of the Debtor's current management. At least ten days prior to the Plan confirmation hearing, the Debtor will file a supplemental pleading with the Court identifying the names and compensation of the people who will serve as post-Effective Date management of the Reorganized Debtor.  The role of the post-Effective Date management of the Reorganized Debtor shall include taking any and all actions that such management determines to be appropriate, including overseeing and helping to effectuate or facilitate the wind down and/or dissolution of the Debtor's many foreign subsidiaries.  The post-Effective Date management of the Reorganized Debtor shall have the right to cause the Reorganized Debtor to employ any professionals they deem appropriate to represent the Reorganized Debtor and to pay the fees and expenses incurred by such professionals after the Effective Date out of the Reserve without any further order of the Court.  The Debtor currently anticipates that the Reorganized Debtor will retain LNBYB as its counsel to assist the Reorganized Debtor to perform all of its functions as the Reorganized Debtor.  The Debtor does not expect the total compensation to be paid to the management of the Reorganized Debtor and the professionals to be employed by the Reorganized Debtor to exceed the amount of the Reserve (i.e., $300,000).

**3.      Disbursing Agent**

The Reorganized Debtor shall serve as the disbursing agent for purposes of making all distributions required to be made under the Plan out of the Estate Funds and to make the

settlement payments to Universal and to Warner. The Reorganized Debtor will not charge any disbursing agent fee for making such Plan distributions. The Creditors Trustee shall serve as the disbursing agent for purposes of making all distributions required to be made under the Plan out of the Unsecured Creditors Fund.

### 4. Dissolution of the Committee

On the Effective Date, the Committee shall be deemed automatically dissolved, and the members of the Committee shall be discharged of any further duties involving this estate. The members of the Committee shall have the right, but not the obligation, to participate in any role in the Creditors Trust that the Committee and its members deem appropriate.

### 5. Objections to Claims

Following the Effective Date, the Trustee of the Creditors Trust (the "Creditors Trustee") will file objections (or continue with the prosecution of all pending objections) to any disputed class 4 claims which were not resolved to final order by the Effective Date unless the Creditors Trustee deems the amount in dispute to be insignificant and not warrant further objection. With respect to disputed class 4 claims which are not resolved prior to the Effective Date, the Creditors Trustee will have the authority, in his/her sole discretion and in the reasonable exercise of his/her business judgment, to settle or compromise any disputed class 4 claim without further Court approval provided notice of such settlement or compromise is filed with the Court. Following the Effective Date, the Reorganized Debtor will file objections (or continue with the prosecution of all pending objections) to all claims other than class 4 disputed claims which are disputed by Pulser (since Pulser is the only creditor which would be economically affected by the allowance of such claims) and which were not resolved by final order prior to the Effective Date unless Pulser deems the amount in dispute to be insignificant and not warrant further objection. With respect to non-class 4 disputed claims which are not

66

resolved prior to the Effective Date, the Reorganized Debtor will have the authority, in its sole discretion and in the reasonable exercise of its business judgment, to settle or compromise any disputed non-class 4 disputed claim without further Court approval provided Pulser consents to such settlement or compromise and provided notice of such settlement or compromise is filed with the Court. As provided by Section 502(c) of the Bankruptcy Code, the Court may estimate for purpose of allowance any contingent or unliquidated claim, the fixing or liquidation of which, as the case may be, would unduly the administration of this case. Both the Creditors Trustee and the Reorganized Debtor, as applicable, shall have the authority to file any objections to claims following the Effective Date, subject to the limitations described above, and the Court shall retain jurisdiction over the Reorganized Debtor and this case and estate to resolve or adjudicate such objections to claims following Plan confirmation regardless of whether such objections to claims were first commenced before or after Plan confirmation. Nothing contained in the Plan shall constitute a waiver or release by the Reorganized Debtor or the Creditors Trustee of any rights of setoff or recoupment, or of any defense, the Reorganized Debtor or the Creditors Trustee may have with respect to any claim. The deadline for any objections to be filed to any timely filed claim shall be the date which is thirty days after the Effective Date (the "Claims Objection Bar Date"). Any timely filed claim for which no objection was filed by the Claims Objection Bar Date shall be deemed to constitute an allowed claim.

### 6. Avoidance Actions and Recoveries

The Debtor has done a preliminary analysis of all payments made during the ninety-day preference period for non-insiders and the one-year period for insiders on account of antecedent debt which would or may be avoidable as preference payments. The Debtor preliminarily believes that most of such payments would likely be subject to some form of ordinary course,

contemporaneous exchange or new value defense. A schedule showing all such payments made by the Debtor during the ninety-day preference period for non-insiders and the one-year period for insiders is attached as Exhibit "5" to this Disclosure Statement. Also attached as Exhibit "5" to this Disclosure Statement is a summary of the Debtor's preliminary analysis of all such payments and potential preference exposure. The Committee played no role in the preparation of this preliminary analysis. The Debtor will continue to analyze these payments made and to determine whether any updates or changes should be made to this schedule. The Debtor is not aware of any fraudulent conveyances which have occurred and which need to be or should be avoided. A component of the settlement discussions between the Debtor, the Committee, and the Prepetition Secured Creditors, which resulted in an agreement on the terms of a fully consensual plan of reorganization, was the joint decision not to pursue any avoidance causes of action or to pursue any actions against the Sony Parties, Universal or Warner. As a result, on the Effective Date, all rights of the Debtor or its estate to pursue any avoidance causes of action shall be permanently waived.

### 7. Non-Avoidance Actions and Recoveries

The Debtor will continue to analyze whether there are any causes of action available to this estate other than avoidance actions– recognizing that at this time the Debtor is not aware of the existence of any such causes of action. On the Effective Date, the standing of this estate to commence any such causes of action (or to continue with the pursuit of any such pending causes of actions) shall be automatically deemed assigned and transferred to the Creditors Trust. All fees and expenses incurred by the Creditors Trust in connection with the filing and prosecution of any such causes of action shall be funded solely from the Unsecured Creditors Fund. The Court shall retain jurisdiction over the Reorganized Debtor, the Creditors Trust, the Creditors Trustee, this case and this estate to resolve or adjudicate any and all such causes of action which

Case: 15-31430   Doc# 388   Filed: 08/10/16   Entered: 08/10/16 14:58:13   Page 71 of 97

are filed regardless of whether such causes of action were first commenced by the Debtor before the Effective Date or first commenced by the Creditors Trustee after the Effective Date. Any net recovery by the estate from the pursuit of any such causes of action (after payment of all related fees and expenses) shall be distributed on a pro rata basis to all holders of Non-Label Class 4 Allowed Claims excluding Pulser.

### 8. Release of Pulser, Pulser Affiliates, Iconical II and Iconical Affiliates

The Estate Funds (and any ultimate recovery of the Escrowed Funds) are expected to be the primary source of funds to be used to fund and confirm the Plan. Since all of the Estate Funds constitute Pulser's collateral (in the absence of a successful challenge by the Committee), the Debtor would have no ability to confirm the Plan and to make the payments to non-Pulser creditors required to be made under the Plan out of the Estate Funds without Pulser's consent. Pulser has advised the Debtor that subject to all of the terms of the Plan, Pulser will vote to accept the Plan and consent to the Debtor's use of the Estate Funds to make all of the payments to non-Pulser creditors required to be made under the Plan and to fund the other Plan obligations.

#### (a) *Release by the Debtor of Lender Released Parties and Debtor Affiliates*

In consideration of the Prepetition Secured Creditors agreement to permit the use of cash collateral and to permit the Debtor to use the Estate Funds to make all of the payments to creditors required to be made under the Plan and to fund the other Plan obligations, on the Effective Date, the Debtor on behalf of itself and all of the "Debtor Releasing Parties" (as defined in Exhibit "8" to this Disclosure Statement) releases, discharges, and acquits the Prepetition Secured Creditors and each of the "Lender Released Parties" and each of the Debtor Affiliates (as defined in Exhibit "8" to this Disclosure Statement) from any and all "Released Claims" (as defined in Exhibit "8" to this Disclosure Statement) that any such releasing party

69

ever had or claimed to have, or has or claims to have presently or at any future date, against any of the Lender Released Parties or the Debtor Affiliates arising from or related in any way whatsoever to the Debtor.

**(b)** ***Incorporation of Final DIP Order***

The admissions, stipulations, and agreements of, and release by, the Debtor set forth in the Final DIP Order[10] are incorporated herein by reference and shall be irrevocable and binding on the Debtor and all parties in interest in the Debtor's chapter 11 case and shall not be subject to further "Challenge" (as defined in the Final DIP Order) by the Committee or any other party in interest. For the avoidance of doubt, the Retained Claims do not include any claim of any party in interest that has been released pursuant to the Final DIP Order or the right to prosecute any "Challenge" (as defined in the Final DIP Order).

**9. Release by the Debtor Releasing Parties of Universal, Warner and the Sony Parties**

On the Effective Date, the Debtor, on behalf of itself and all of the Debtor Releasing Parties (as defined in Exhibit "8" to this Disclosure Statement) hereby releases, discharges and acquits Universal, Warner and the Sony Parties and each of their respective present and former predecessors, successors, assigns, affiliates, members, partners, managers, current and former equity holders, officers, agents, employees, attorneys, affiliates, directors, direct and indirect parents, direct and indirect subsidiaries and sister companies (the "Label Released Parties") from the Released Claims (as defined in Exhibit "8" to this Disclosure Statement). With respect

---

10 As used herein, "Final DIP Order" means the Final Order: (I) Authorizing Debtor to Obtain Postpetition Financing Pursuant to 11 U.S.C. § 105, 362, 363, and 364; (II) Granting Liens and Superpriority Claims to Postpetition Lender Pursuant to 11 U.S.C. § 364 and 507; (III) Authorizing Use of Cash Collateral Pursuant to 11 U.S.C. § 363; and (IV) Providing Adequate Protection to Prepetition Security Parties Pursuant to 11

70

to the Label Released Parties, the Released Claims include, without limitation, any and all claims arising (i) under any antitrust or competition laws or rules, (ii) under any consumer protection or business trade laws, (iii) out of or relating in any way to "Most Favored Nations" clauses or provisions or practices with similar effect found in any agreement involving or with any of the Label Released Parties, or (iv) relating in any way to the contractual relationship between the Label Released Parties and the Debtor Releasing Parties. In addition:

(i) The Debtor Releasing Parties shall not sue any of the Label Released Parties with respect to any Released Claim or to assist any third party in commencing or maintaining any Proceeding ("Proceeding" shall include any lawsuit, litigation, claim, investigation, or any other action or activity in which or as a result of which legal or equitable remedies, sanctions, damages or penalties could be sought or imposed) against any of the Label Released Parties related in any way to any claim released by the Debtor Releasing Parties herein;

(ii) The Debtor Releasing Parties will not (a) disparage or denigrate in any way the Label Released Parties; (b) seek any discovery from the Label Released Parties, or (c) assist any third party in commencing or maintaining any Proceeding against the Label Released Parties (for the avoidance of doubt, this provision prohibits the Debtor Releasing Parties from making any allegations concerning the Label Released Parties in any Proceeding); and

(iii) The Debtor Releasing Parties will not file any motion(s) pursuant to Bankruptcy Rule 2004, or any similar discovery enabling rule or procedure, seeking any documents or information from any of the Label Released Parties or an examination of any of the Label Released Parties, nor will they join or participate in

71

any such motion(s), and the Debtor shall withdraw any such pending Bankruptcy Rule 2004 motions.

## 10. Applicability of Releases of Unknown Claims

On the Effective Date, all rights of the Debtor Releasing Parties to challenge any of the releases being provided herein, whether pursuant to Section 1542 of the California Civil Code or otherwise, shall be deemed permanently waived, regardless of whether the Debtor, this estate, the Debtor Releasing Parties, or any other party in interest, discovers or obtains any information in the future pertaining to matters being released herein which they did not know or have as of the Effective Date or any date prior thereto. The releases being provided herein are expressly intended to cover and include a release of any claims, demands or causes of action which arise out of, relate to, are connected with, or are incidental to any such information which may be discovered or obtained in the future. The Debtor Releasing Parties therefore expressly waive the provisions of Section 1542 of the Civil Code of the State of California which provides as follows:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.**

## 11. Exclusions from Releases

Notwithstanding anything to the contrary in the Plan, nothing herein shall be deemed as releasing the Debtor or the Debtor's estate, any Lender Released Parties, Pandora or any Debtor Affiliates from any claims of Universal arising from the breach by any of such persons of the Sale Order, the Transition Services Agreement (as defined in the Sale Order), any obligations to Universal under the Sale Order or the Transition Services Agreement, or any administrative

Case: 15-31430    Doc# 388    Filed: 08/10/16    Entered: 08/10/16 14:58:13    Page 75 of 97

claim of Universal or the Sony Parties (recognizing that any such administrative claim of the Sony Parties will be included in the claims of the Sony Parties being purchased by Pulser).

### 12. Continuing Confidentiality Obligations

The confidentiality obligations of the Debtor and the Debtor's estate to Universal and to the Sony Parties as set forth in the agreements between Universal or the Sony Parties and the Debtor or with any of the Debtor Affiliates survive the Effective Date and remain in full force and effect. The Creditors Trust shall return to Universal and to the Sony Parties (as applicable) all originals and copies of the Universal and Sony Parties agreements, and any other reports, information or other documents related to Universal or the Sony Parties, or destroy them at the option of the Creditors Trustee, within five days after the Effective Date or as otherwise provided in any settlement agreement with Universal or with the Sony Parties.

### 13. Exemption from Transfer Taxes

Pursuant to section 1146(c) of the Bankruptcy Code, the issuance, transfer or exchange of a security, or the making or delivery of an instrument of transfer under a plan confirmed under section 1129 of the Bankruptcy Code, may not be taxed under any law imposing a stamp tax or similar tax. Transfers under the Plan that are exempt from taxes under section 1146(c) of the Bankruptcy Code include all transfers by the Debtor after the commencement of its chapter 11 case in contemplation of the Plan but prior to the Effective Date, and all transfers to and by the Reorganized Debtor or the Creditors Trustee as contemplated by the Plan, including all payments made to claim holders in accordance with the terms of the Plan. The taxes from which such transfers are exempt include stamp taxes, recording taxes, sales and use taxes, transfer taxes, and other similar taxes.

### 14. Establishment of the Reserve

Case: 15-31430    Doc# 388    Filed: 08/10/16    Entered: 08/10/16 14:58:13    Page 76 of 97

Following the confirmation of the Plan and prior to the Effective Date, the Debtor shall deposit the total sum of $300,000.00 from the Estate Funds into a segregated account (the "Reserve"), with such funds to be used solely to pay for (i) the post-Effective Date fees and expenses of the professionals retained by the Reorganized Debtor, (ii) the post-Effective Date fees and costs owing to the Clerk of the Bankruptcy Court and the quarterly fees owing to the UST (which shall be paid by the Reorganized Debtor out of the Reserve), (iii) any post-Effective Date third-party expenses owing by the Reorganized Debtor, and (iv) the compensation to be paid to the management of the Reorganized Debtor. The funds shall remain in the Reserve until the entry of a final decree closing this bankruptcy case. If the funds in the Reserve ultimately prove to be insufficient to pay all of fees, costs and expenses, and compensation described above for which the Reserve is being established, Pulser shall have the right to supplement the Reserve with additional Estate Funds, as needed, but only with Pulser's consent in its sole discretion. If any funds remain in the Reserve upon the entry of a final decree closing this bankruptcy case, such excess funds shall be paid to Pulser.

### 15. Formation of the Creditors Trust and Appointment of the Creditors Trustee

On the Effective Date, a trust will be formed (the "Creditors Trust") solely for the benefit of all Non-Label Class 4 Allowed Claims. As explained above, on the Effective Date, the Reorganized Debtor shall transfer the sum of $5,500,000 (i.e., the "Unsecured Creditors Fund") to the Creditors Trust. The Committee will file the form of the Creditors Trust agreement with the Court, and the Committee will identify the person who will serve as the Creditors Trustee, at least ten days prior to the Plan confirmation hearing.

### 16. Employment of Professionals By the Creditors Trustee and Payment of Professional Fees and Expenses By the Creditors Trustee Incurred after the Effective Date

The Creditors Trustee shall have the authority to employ professionals as the Creditors

74

Trustee deems appropriate and to pay the fees and expenses incurred by such professionals after the Effective Date out of the Unsecured Creditors Fund without any further order of the Court. The Debtor expects that the Creditors Trustee will retain PSZJ as his/her counsel and FTI as his/her financial advisor to assist the Creditors Trustee to perform all of his/her functions as the Creditors Trustee. The Committee has advised the Debtor that the Committee does not expect the fees and expenses of the Creditors Trustee and the professionals employed by the Creditors Trustee to exceed $250,000.

### 17. Distributions to be Made Pursuant to the Plan

All payments to be made under the Plan to holders of Non-Label Class 4 Allowed Claims and all payments of Committee Professional Fees shall be made by the Creditors Trustee out of the Unsecured Creditors Fund. All other payments to be made under the Plan shall be made by the Reorganized Debtor out of the Estate Funds and the Reserve. Except as otherwise agreed to by the Reorganized Debtor or the Creditors Trustee (as applicable) and the respective creditor in writing, all distributions to be made to holders of allowed claims pursuant to the Plan shall be delivered by the Reorganized Debtor or the Creditors Trustee (as applicable) by regular mail, postage prepaid, to the address shown in the Debtor's bankruptcy schedules, as they may from time to time be amended in accordance with Bankruptcy Rule 1000, or, if a different address is stated in a proof of claim timely filed with the Bankruptcy Court, to such address. Checks issued to pay allowed claims shall be null and void (and may be voided by the Reorganized Debtor or the Creditors Trustee (as applicable)) if not negotiated by the recipient within sixty (60) days after the date of issuance thereof.

### 18. Exculpations and Releases

To the maximum extent permitted by law, neither the Debtor, the Committee or its members, the Prepetition Secured Creditors, the Reorganized Debtor nor the Creditors Trustee,

Case: 15-31430   Doc# 388   Filed: 08/10/16   Entered: 08/10/16 14:58:13   Page 78 of 97

nor any of their employees, officers, directors, shareholders, agents, members, representatives, or professionals employed or retained by any of them, shall have or incur liability to any person or entity for any act taken or omission made in good faith in connection with or related to this bankruptcy case or the formulation and implementation of the Plan, or a contract, instrument, release, or other agreement or document created in connection therewith, the solicitation of acceptances for or confirmation of the Plan, or the consummation and implementation of the Plan and the transactions contemplated therein, provided, however, that the foregoing provisions shall have no effect on the liability of any person or entity that would otherwise result from the failure to perform any obligation under the Plan or that would otherwise result from any act or omission to the extent that such act or omission is determined by a final order of the Court to have constituted negligence, gross negligence or willful misconduct (including fraud).

### 19. Injunctions

The Plan Confirmation Order shall enjoin the prosecution, whether directly, derivatively or otherwise, of any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, liability or interest released or terminated pursuant to the Plan. Except as provided in the Plan or the Plan Confirmation Order, as of the Effective Date, all entities that have held, currently hold or may hold a claim or other debt or liability that is released or terminated or an interest or other right of a creditor or equity security holder that is released, terminated or extinguished pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against the Debtor, the Committee (or its members), the Reorganized Debtor or the Creditors Trustee, or their property on account of any such released, terminated or extinguished claims, debts or liabilities or extinguished interests or rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing,

Case: 15-31430   Doc# 388   Filed: 08/10/16   Entered: 08/10/16 14:58:13   Page 79 of 97

attaching, collecting or recovering in any manner any judgment, award, decree or order; (iii) creating, perfecting or enforcing any lien or encumbrance; and (iv) commencing or continuing any action in any manner, in any place, that does not comply with or is inconsistent with the provisions of the Plan. By accepting a distribution made pursuant to the Plan, each holder of an allowed claim which receives a distribution pursuant to the Plan shall be deemed to have specifically consented to the injunctions set forth in this Section.

## 20. Executory Contracts and Unexpired Leases

All of the Debtor's remaining executory contracts and unexpired leases which have not previously been assumed or rejected by the Debtor, if any, shall be deemed to be rejected by the Debtor effective as of 11:59 PST on the Effective Date. The Debtor believes that there are at most only a very limited number of any such remaining executory contracts and unexpired leases. **THE BAR DATE FOR FILING A PROOF OF CLAIM BASED ON A CLAIM ARISING FROM THE REJECTION OF AN UNEXPIRED LEASE OR EXECUTORY CONTRACT WHICH IS REJECTED ON THE EFFECTIVE DATE WILL BE THIRTY DAYS AFTER THE EFFECTIVE DATE.** Any claim based on the rejection of an unexpired lease or executory contract will be barred if the proof of claim is not timely filed, unless the Court orders otherwise.

## 21. Changes in Rates Subject to Regulatory Commission Approval

The Debtor is not subject to governmental regulatory commission approval of its rates.

## 22. Retention of Jurisdiction

After confirmation of the Plan and occurrence of the Effective Date, in addition to jurisdiction which exists in any other court, the Court will retain such jurisdiction as is legally permissible including for the following purposes:

77

i.       To resolve any and all disputes regarding the operation and interpretation of the Plan and the Plan Confirmation Order;

ii.      To determine the allowability, classification, or priority of claims and interests upon objection by the Debtor, the Reorganized Debtor, the Creditors Trustee, or by other parties in interest with standing to bring such objection or proceeding and to consider any objection to claim or interest whether such objection is filed before or after the Effective Date;

iii.     To determine the extent, validity and priority of any lien asserted against property of the Debtor or property of its estate;

iv.      To construe and take any action to enforce the Plan, the Plan Confirmation Order, and any other order of the Court, issue such orders as may be necessary for the implementation, execution, performance, and consummation of the Plan, the Plan Confirmation Order and all matters referred to in the Plan and the Plan Confirmation Order, and to determine all matters that may be pending before the Court in this case on or before the Effective Date with respect to any person or entity related thereto;

v.       To determine (to the extent necessary) any and all applications for allowance of compensation and reimbursement of expenses of professionals for the period on or before the Effective Date;

vi.      To determine any request for payment of administrative expenses;

vii. To determine motions for the rejection, assumption, or assignment of executory contracts or unexpired leases filed before the Effective Date and the allowance of any claims resulting therefrom;

viii.    To determine all applications, motions, adversary proceedings, contested matters, and any other litigated matters instituted during the pendency of this case whether before, on, or after the Effective Date;

78

ix. To determine such other matters and for such other purposes as may be provided in the Plan Confirmation Order;

x. To modify the Plan under Section 1127 of the Bankruptcy Code in order to remedy any apparent defect or omission in the Plan or to reconcile any inconsistency in the Plan so as to carry out its intent and purpose;

xi. Except as otherwise provided in the Plan or the Plan Confirmation Order, to issue injunctions, to take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or the Plan Confirmation Order, or the execution or implementation by any person or entity of the Plan or the Plan Confirmation Order;

xii. To issue such orders in aid of consummation of the Plan and the Plan Confirmation Order, notwithstanding any otherwise applicable nonbankruptcy law, with respect to any person or entity, to the fullest extent authorized by the Bankruptcy Code or Bankruptcy Rules; and

xiii. To enter a final decree closing this chapter 11 case.

## 23. Indemnity Claims Stipulation

It shall be a condition precedent to the Effective Date that the Debtor, the Committee, and the Prepetition Secured Creditors shall have entered into a stipulation which has been approved by the Court to the effect that: (a) the Committee shall use good faith efforts to support the stay of claims under applicable nonbankruptcy law against holders of Indemnity Claims; (b) the automatic stay shall be lifted to the extent necessary to allow such holders to access available D&O insurance policies, and (c) subject to the confirmation of the Plan, upon the occurrence of the Effective Date, the holders of Indemnity Claims shall withdraw their

79

Indemnity Claims and waive any right to receive any distributions from the Unsecured Creditors Fund.

## VII. TAX CONSEQUENCES OF THE PLAN

CREDITORS AND INTEREST HOLDERS CONCERNED WITH HOW THE PLAN MAY AFFECT THEIR TAX LIABILITY SHOULD CONSULT WITH THEIR OWN ACCOUNTANTS, ATTORNEYS, AND/OR ADVISORS. The following disclosure of possible tax consequences is intended solely for the purpose of alerting readers about possible tax issues the Plan may present to this estate. The Debtor CANNOT and DOES NOT represent that the tax consequences contained below are the only tax consequences of the Plan because the Tax Code embodies many complicated rules which make it difficult to state completely and accurately all of the tax implications of any action.

The Debtor does not anticipate that confirmation of the Plan will have any significant or materially negative effect on any tax liability of this estate. However, the Debtor does believe that it is possible or even likely that the confirmation of the Plan may serve to reduce or eliminate all or a portion of the Debtor's current net operating loss (NOL). The Debtor has not performed any detailed analysis of the extent to which, if any, the confirmation of the Plan may have on the retention or loss of NOL or ability of any party to use any such NOL in the future. The Debtor does not have the financial wherewithal or funding available to it to employ a bankruptcy tax expert to assist the Debtor in this regard or to analyze the negative impact, if any, of the confirmation of the Plan on any such NOL. Any NOL which may be preserved through Plan confirmation shall be preserved under and by the Plan. The Debtor makes no representations regarding the potential tax consequences to creditors or interest holders from the confirmation of or implementation of the Plan.

80

The Debtor is not aware of any tax benefits that either Pulser or Iconical II will receive as a result of the confirmation of the Plan.

## VIII. CONFIRMATION REQUIREMENTS AND PROCEDURES

PERSONS OR ENTITIES CONCERNED WITH CONFIRMATION OF THE PLAN SHOULD CONSULT WITH THEIR OWN ATTORNEYS BECAUSE THE LAW ON CONFIRMING A PLAN OF REORGANIZATION IS VERY COMPLEX. The following discussion is intended solely for the purpose of alerting readers about basic confirmation issues, which they may wish to consider, as well as certain deadlines for filing claims. The Debtor CANNOT and DOES NOT represent that the discussion contained below is a complete summary of the law on this topic.

Many requirements must be met before the Court can confirm a plan. Some of the requirements include that the plan must be proposed in good faith, acceptance of the plan, whether the plan pays creditors at least as much as creditors would receive in a chapter 7 liquidation, and whether the plan is feasible. These requirements are not the only requirements for confirmation.

### A. Who May Vote or Object

Any party in interest may object to the confirmation of the Plan, but, as explained below, not everyone is entitled to vote to accept or reject the Plan.

### B. Who May Vote to Accept/Reject the Plan

A creditor or interest holder has a right to vote for or against the Plan if that creditor or interest holder has a claim or interest which is both (1) allowed or allowed for voting purposes and (2) classified in an impaired class.

### C. What Is an Allowed Claim/Interest

As noted above, a creditor or interest holder must first have an allowed claim or interest

81

to have the right to vote.  Generally, any proof of claim or interest will be allowed, unless a party in interest files an objection to the claim or interest.  When an objection to a claim or interest is filed, the creditor or interest holder holding the claim or interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or interest for voting purposes.

THE  BAR  DATE  FOR  FILING  A  PROOF  OF  CLAIM  IN  THIS  CASE  ON ACCOUNT  OF  NON-GOVERNMENTAL  PRE-PETITION  CLAIMS  WAS  MARCH  21, 2016.  A creditor or interest holder may have an allowed claim or interest even if a proof of claim or interest was not timely filed.  A claim is deemed allowed if (1) it is scheduled on the Debtor's schedules and such claim is not scheduled as disputed, contingent, or unliquidated, and (2) no party in interest has objected to the claim.  An interest is deemed allowed if it is scheduled and no party in interest has objected to the interest.

**D.    What Is an Impaired Claim/Interest**

As noted above, an allowed claim or interest has the right to vote only if it is in a class that is <u>impaired</u> under the Plan.  A class is impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.  For example, a class comprised of general unsecured claims is impaired if the Plan fails to pay the members of that class 100% of what they are owed.

The Debtor believes that classes 1 and 3 are not impaired and that classes 2, 4, and 5 are impaired.  Members of classes 2 and 4 are entitled to vote to accept or reject the Plan.  Members of class 5 are deemed to have rejected the Plan pursuant to the provisions of 11 U.S.C. §1126(g).  Parties who dispute the Debtor's characterization of their claim or interest as being impaired or unimpaired may file an objection to the Plan contending that the Debtor has incorrectly characterized the class.

## E. Who Is <u>Not</u> Entitled to Vote

The following four types of claims are <u>not</u> entitled to vote: (1) claims that have been disallowed; (2) claims in unimpaired classes; (3) claims entitled to priority pursuant to Bankruptcy Code Sections 507(a)(2), (a)(3), and (a)(8); and (4) claims in classes that do not receive or retain any value under the Plan. Claims in unimpaired classes are not entitled to vote because such classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Bankruptcy Code Sections 507(a)(2), (a)(3), and (a)(8) are not entitled to vote because such claims are not placed in classes and they are required to receive certain treatment specified by the Bankruptcy Code. Claims in classes that do not receive or retain any value under the Plan do not vote because such classes are deemed to have rejected the Plan. EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

## F. Who Can Vote in More Than One Class

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim is entitled to accept or reject the Plan in both capacities by casting one ballot for the secured part of the claim and another ballot for the unsecured claim.

## G. Votes Necessary to Confirm the Plan

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cramdown" on non-accepting classes, as discussed below.

## H. Votes Necessary for a Class to Accept the Plan

A class of claims is considered to have accepted the Plan when more than one-half (1/2) in number and at least two-thirds (2/3) in dollar amount of the claims which actually voted on

the plan, voted in favor of the plan. A class of interests is considered to have "accepted" a plan when at least two-thirds (2/3) in amount of the interest-holders of such class which actually voted on the plan, voted to accept the plan.

**I.  Treatment of Non-accepting Classes**

As noted above, even if <u>all</u> impaired classes do not accept the Plan, the Court may nonetheless confirm the Plan if the non-accepting classes are treated in the manner required by the Bankruptcy Code. The process by which non-accepting classes are forced to be bound by the terms of a plan is commonly referred to as "cramdown." The Bankruptcy Code allows the Plan to be "crammed down" on non-accepting classes of claims or interests if it meets all consensual requirements except the voting requirements of 1129(a)(8) and if the Plan does not "discriminate unfairly" and is "fair and equitable" toward each impaired class that has not voted to accept the Plan as referred to in 11 U.S.C. § 1129(b) and applicable case law.

**J.  Request for Confirmation Despite Nonacceptance by Impaired Class(es)**

The Debtor will ask <u>the Court</u> to confirm the Plan by cramdown on any and all impaired classes that do not vote to accept the Plan.

**K.  Liquidation Analysis**

Another confirmation requirement is the "Best Interest Test", which requires a liquidation analysis. Under the Best Interest Test, if a claimant or interest holder is in an impaired class and that claimant or interest holder does not vote to accept the Plan, then that claimant or interest holder must receive or retain under the Plan property of a value not less than the amount that such holder would receive or retain if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.

In a chapter 7 case, the Debtor's assets are usually liquidated by a chapter 7 trustee. Secured creditors are paid first from the sales proceeds of properties subject to their lien.

Administrative claims are paid next. Next, unsecured creditors are paid from any remaining sales proceeds, according to their rights to priority. Unsecured creditors with the same priority share in proportion to the amount of their allowed claim in relationship to the amount of total allowed unsecured claims. Finally, interest holders receive the balance that remains after all creditors are paid, if any.

For the Court to be able to confirm the Plan, the Court must find that all creditors and interest holders who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a chapter 7 liquidation of the Debtor. The Debtor maintains that this requirement is clearly met. Simply put, the Debtor believes that all of the Estate Funds and all other assets of this estate, other than avoidance actions, constitute the collateral of Iconical II and/or Pulser. As a result, the Debtor believes that in a chapter 7 liquidation of the Debtor, Iconical II and Pulser would simply foreclose on the Estate Funds and upon all other assets of this estate and that all claim holders in this estate other than Iconical II and Pulser would receive absolutely nothing, unless there were recoveries from the pursuit of avoidance actions where the amount of net recoveries exceeds the total amount of administrative and priority claims in this case and/or the chapter 7 trustee (as a successor to the Committee) successfully exercised his/her "challenge" rights to challenge the validity, priority and allowability of the claims and liens of Iconical II and Pulser. The Debtor believes that there is no merit to any such "challenge". The Committee's analysis with respect to any "challenge" rights is described in detail above. The Debtor believes that in a chapter 7 liquidation of the Debtor, a chapter 7 trustee would likely enter into a settlement with the Prepetition Secured Creditors in exchange for less (and likely much less) than the $5.5 million that is being used to fund the settlements with Universal and Warner and to make the required payment to the Creditors Trust under the Plan. Moreover, under the Plan, Pulser has agreed to a voluntary reduction of more than $35

85

million in the amount of the Pulser Unsecured Claim, which Pulser would have no reason to agree to in a chapter 7 liquidation. In addition, under the Plan, Pulser is permitting its collateral to be used to pay all of the allowed fees and expenses of the professionals employed by the Debtor, $166,756.46 of the allowed fees and expenses of the professionals employed by the Committee, all allowed priority tax claims and all allowed non-tax priority claims. As a result, the Debtor believes that it is clear that all claim holders other than Iconical II and Pulser will receive *more* (*and substantially more*) under the Plan than they would receive in any chapter 7 liquidation of the Debtor. Even if the chapter 7 trustee was able to enter into the same settlement agreement with the Prepetition Secured Creditors that the Committee was able to negotiate, the Plan avoids the costs of a chapter 7 trustee insuring that holders of Non-Label Class 4 Allowed Claims will receive at least as much (i.e., not less) under the Plan than they would receive in a chapter 7 liquidation of the Debtor. Moreover, the Debtor believes that it is clear that holders of Non-Label Class 4 Allowed Claims will receive their distribution from this estate much earlier than they would receive any distribution from a chapter 7 estate of the Debtor because of the time delay in administering a chapter 7 bankruptcy estate.

Below is a chart showing that every holder of a Non-Label Class 4 Allowed Claim will receive at least as much under the Plan than they would receive in a chapter 7 liquidation of the Debtor (recognizing that the Debtor believes that holders of Non-Label Class 4 Allowed Claims will receive *substantially more* under the Plan than they would receive in a chapter 7 liquidation of the Debtor). This chart assumes that a chapter 7 trustee would be able to negotiate the same $5.5 million settlement and claim reduction with Pulser.

**Plan Treatment:**

$5,725,000 settlement funds

[$225,000] settlement payments to Universal and Warner

86

[$500,000] fees and expenses of Creditors Trustee's professionals

$5,000,000 net settlement funds available for distribution to holders of Non-Label Class 4 Allowed Claims

$25,228,713 total Non-Label Class 4 Allowed Claim assuming the mid-point between the amount of the claims asserted in every timely filed class 4 claim and the amounts scheduled by the Debtor

**19.8%** estimated distribution to each holder of a Non-Label Class 4 Allowed Claim

**Chapter 7 Liquidation Treatment:**

$5,725,000 settlement funds

[$225,000] settlement payments to Universal and Warner

 [$500,000] fees and expenses of Chapter 7 Trustee's professionals

[$1,943,250] compensation of Chapter 7 Trustee pursuant to section 326 of the bankruptcy code[11]

[$500,000] estimated outstanding fees and expenses of the Committee's professionals

$2,556,750 net settlement funds available for distribution to holders of Non-Label Class 4 Allowed Claim

$25,228,713 total Non-Label Class 4 Allowed Claim assuming the mid-point between the amount of the claims asserted in every timely filed class 4 claim and the amounts scheduled by the Debtor

**10.1%** estimated distribution to each holder of a Non-Label Class 4 Allowed Claim

While class 5 interest holders are receiving no distribution under the Plan, they would also receive no distribution in a chapter 7 liquidation of the Debtor.  As a result, class 5 interest

---

[11] This assumes that a chapter 7 trustee distributes the total sum of $64 million.

Case: 15-31430   Doc# 388   Filed: 08/10/16   Entered: 08/10/16 14:58:13   Page 90 of 97

holders are also receiving *not less* than they would receive in any chapter 7 liquidation of the Debtor. Class 2 has indicated a willingness to vote to accept the Plan (and the Plan could not be confirmed over the dissent of class 2) so the Debtor does not need to satisfy the "best interest of creditors test" with respect to class 2. The Debtor has satisfied the "best interest of creditors test" with respect to members of class 4 who do not vote to accept the Plan and with respect to members of class 5. The Debtor submits that the Plan provides fair and equitable treatment of all classes of creditors and the greatest feasible recovery for all creditors.

**L.      Feasibility**

Another requirement for confirmation involves the feasibility of the Plan, which means that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor.

There are at least two important aspects of a feasibility analysis. The first aspect considers whether the Debtor will have enough cash on hand on the Effective Date to pay all the claims and expenses which are entitled to be paid on such date. Since the Debtor already has enough cash on hand (through the Estate Funds) to pay all the claims and expenses which are entitled to be paid on the Effective Date and the consent of Pulser to make all such payments out of the Estate Funds, and to fund the Unsecured Creditors Fund, this first aspect of Plan feasibility has clearly been satisfied. The second aspect considers whether the Debtor will have enough cash over the life of the Plan to make the required Plan payments. Since the Plan is a liquidating Plan, where all Estate Funds, the Unsecured Creditors Fund and any other recoveries by this estate will be distributed to holders of allowed claims, this second aspect of Plan feasibility has, by definition, been satisfied.

## IX. RISK FACTORS REGARDING THE PLAN

Case: 15-31430     Doc# 388     Filed: 08/10/16     Entered: 08/10/16 14:58:13     Page 91 of 97

Since the Plan is a liquidating Plan, where all Estate Funds, the Unsecured Creditors Fund and any other recoveries by this estate will be distributed to holders of allowed claims in accordance with the terms of the Plan, there is no traditional "risk" to the ability of the Debtor to perform under the Plan.

## X.  EFFECT OF CONFIRMATION OF THE PLAN

### A.  Discharge

The Debtor will not receive a discharge under the Plan because the requirements of Section 1141 of the Bankruptcy Code necessary for the Debtor to receive a discharge are not present.

### B.  Modification of the Plan

The Debtor reserves the right to modify the Plan at any time before confirmation and seek confirmation of such modified Plan consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  The Debtor may also seek to modify the Plan at any time after confirmation of the Plan but before the Effective Date so long as (1) the Plan has not been substantially consummated and (2) the Court authorizes the proposed modifications after notice and a hearing.  The Reorganized Debtor may seek to modify the Plan after the Effective Date.  Notwithstanding the foregoing, any modification of the Plan, whether before or after confirmation, shall require the prior consent of the Prepetition Secured Creditors.

### C.  Post-Confirmation Status Reports

Until a final decree closing the Debtor's chapter 11 case is entered, the Reorganized Debtor and/or the Creditors Trustee shall file quarterly status reports with the Court explaining what progress has been made toward consummation of the confirmed Plan, and the Reorganized Debtor shall pay the post-confirmation quarterly fees to the UST out of the Reserve.

### D.  Post-Confirmation Conversion/Dismissal

Case: 15-31430   Doc# 388   Filed: 08/10/16   Entered: 08/10/16 14:58:13   Page 92 of 97

A creditor or any other party in interest may bring a motion to convert or dismiss this case under Section 1112(b) of the Bankruptcy Code after the Plan is confirmed if there is a default in performing the Plan, with the Reorganized Debtor and the Creditors Trustee reserving all rights to oppose any such motion. If the Court orders this case converted to chapter 7 after the Plan is confirmed, then all property that had been property of this chapter 11 estate, and that has not been disbursed pursuant to the Plan, will revest in the chapter 7 estate, and the automatic stay will be reimposed upon the revested property, but only to the extent that relief from stay was not previously authorized by the Court during this case. The Plan Confirmation Order may also be revoked under very limited circumstances. The Court may revoke the Plan Confirmation Order if it was procured by fraud and if a party in interest brings an adversary proceeding to revoke confirmation within 180 days after the date of entry of the Plan Confirmation Order.

**E.      Final Decree**

Once this estate has been fully administered as referred to in Bankruptcy Rule 3022, the Reorganized Debtor shall file a motion with the Court to obtain a final decree to close this chapter 11 case. The Reorganized Debtor shall be responsible for the timely payment of all fees incurred pursuant to 28 U.S.C. Section 1930(a)(6) and shall pay all such fees out of the Reserve.

Dated: August 10, 2016

Presented By:

LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.

By:    _/s/ Ron Bender_____
        RON BENDER
        PHILIP A. GASTEIER
        KRIKOR J. MESHEFEJIAN
        Attorneys for Chapter 11
        Debtor and Plan Proponent

90

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document: **DISCLOSURE STATEMENT DESCRIBING DEBTOR'S PLAN OF REORGANIZATION DATED AUGUST 10, 2016** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **August 10, 2016**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ *Service information continued on attached page*

**2.  SERVED BY UNITED STATES MAIL**: On **August 10, 2016**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> <u>completed</u> no later than 24 hours after the document is filed.

☐ *Service information continued on attached page*

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **August 10, 2016**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ *Service information continued on attached page*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| August 10, 2016 | Jason Klassi | /s/ Jason Klassi |
| *Date* | *Type Name* | *Signature* |

91

**15-31430 Notice will be electronically mailed to:**

Ron Bender on behalf of Debtor Rdio, Inc.
rb@lnbyb.com

Ron Bender on behalf of Plaintiff Rdio, Inc.
rb@lnbyb.com

Kathryn M.S. Catherwood on behalf of Creditor Music Reports, Inc.
kcatherwood@foley.com, vgoldsmith@foley.com

Andrea Cheuk on behalf of Creditor Tesla Motors Netherlands B.V.
acheuk@teslamotors.com, scastro@teslamotors.com

Shawn M. Christianson on behalf of Creditor SoundExchange
schristianson@buchalter.com

David N. Crapo on behalf of Creditor Broadcast Music, Inc.
dcrapo@gibbonslaw.com

John D. Fiero on behalf of Creditor Committee Official Committee of Unsecured Creditors
jfiero@pszjlaw.com, ocarpio@pszjlaw.com

Stephen D. Finestone on behalf of Creditor WEA International, Inc.
sfinestone@pobox.com

Stephen D. Finestone on behalf of Creditor Warner Music Brazil, Ltd
sfinestone@pobox.com

Stephen D. Finestone on behalf of Creditor Warner Music, Inc.
sfinestone@pobox.com

Donald W. Fitzgerald on behalf of Creditor Orchard Enterprises NY, Inc.
dfitzgerald@ffwplaw.com, shoang@ffwplaw.com

Donald W. Fitzgerald on behalf of Creditor Sony Music Entertainment, Inc.
dfitzgerald@ffwplaw.com, shoang@ffwplaw.com

Donald W. Fitzgerald on behalf of Defendant Sony Music Entertainment
dfitzgerald@ffwplaw.com, shoang@ffwplaw.com

Philip A. Gasteier on behalf of Debtor Rdio, Inc.
pag@lnbrb.com

Philip A. Gasteier on behalf of Plaintiff Rdio, Inc.
pag@lnbrb.com

Julie M. Glosson on behalf of U.S. Trustee Office of the U.S. Trustee / SF
julie.m.glosson@usdoj.gov

Debra I. Grassgreen on behalf of Creditor Committee Official Committee of Unsecured Creditors
dgrassgreen@pszjlaw.com, hphan@pszjlaw.com

Irvin M. Gross on behalf of Debtor Rdio, Inc.
img@lnbyb.com

Irvin M. Gross on behalf of Plaintiff Rdio, Inc.

Case: 15-31430    Doc# 388    Filed: 08/10/16    Entered: 08/10/16 14:58:13    Page 95 of 97

img@lnbyb.com

Stephan Hornung on behalf of Creditor Orchard Enterprises NY, Inc.
hornung@lsellp.com

Stephan Hornung on behalf of Creditor Sony Music Entertainment, Inc.
hornung@lsellp.com

Lynette C. Kelly on behalf of U.S. Trustee Office of the U.S. Trustee / SF
lynette.c.kelly@usdoj.gov, ustpregion17.oa.ecf@usdoj.gov

Monica Y. Kim on behalf of Debtor Rdio, Inc.
myk@lnbyb.com

Andy S. Kong on behalf of Creditor AXS Digital, LLC
kong.andy@arentfox.com

Paul J. Laurin on behalf of Interested Party ROKU, INC.
plaurin@btlaw.com, slmoore@btlaw.com

Annie Li on behalf of Interested Party Iconical Investments II LP
annie.li@skadden.com, Brigitte.Travaglini@skadden.com

John William Lucas on behalf of Creditor Committee Official Committee of Unsecured Creditors
jlucas@pszjlaw.com, ocarpio@pszjlaw.com

Thor D. McLaughlin on behalf of Creditor Digital 720 2nd, LLC
tmclaughlin@allenmatkins.com

Krikor J. Meshefejian on behalf of Debtor Rdio, Inc.
kjm@lnbyb.com

Krikor J. Meshefejian on behalf of Plaintiff Rdio, Inc.
kjm@lnbyb.com

Office of the U.S. Trustee / SF
USTPRegion17.SF.ECF@usdoj.gov, ltroxas@hotmail.com

Paul J. Pascuzzi on behalf of Creditor Sony Music Entertainment, Inc.
ppascuzzi@ffwplaw.com, JNiemann@ffwplaw.com

Paul J. Pascuzzi on behalf of Defendant Sony Music Entertainment
ppascuzzi@ffwplaw.com, JNiemann@ffwplaw.com

Valerie Bantner Peo on behalf of Creditor SoundExchange
vbantnerpeo@buchalter.com

J. Alexandra Rhim on behalf of Creditor Bank of the West
arhim@hrhlaw.com

Richard A. Rogan on behalf of Creditor CMRRA-SODRAC Inc
rrogan@jmbm.com, jb8@jmbm.com

Jason Rosell on behalf of Creditor Committee Official Committee of Unsecured Creditors
jrosell@pszjlaw.com, sshoemaker@pszjlaw.com

Jane K. Springwater on behalf of Creditor UMG Recordings, Inc.

93

1   jspringwater@friedmanspring.com

2   Jane K. Springwater on behalf of Creditor Universal International Music, B.V.
jspringwater@friedmanspring.com

3

4   Jane K. Springwater on behalf of Creditor Universal Music Canada, Inc
jspringwater@friedmanspring.com

5   Michael St. James on behalf of Creditor DP 1550 Bryant, LLP
ecf@stjames-law.com

6

7   Sabrina L. Streusand on behalf of Creditor Dell Financial Services LLC
streusand@slollp.com, prentice@slollp.com

8   Donna S. Tamanaha on behalf of U.S. Trustee Office of the U.S. Trustee / SF
Donna.S.Tamanaha@usdoj.gov

9   Bennett G. Young on behalf of Creditor CMRRA-SODRAC Inc
byoung@jmbm.com, jb8@jmbm.com

10

Case: 15-31430    Doc# 388    Filed: 08/10/16    Entered: 08/10/16 14:58:13    Page 97 of
97